FILED

AR 23  10 46 AM '01

CLERK
U.S. DISTR OT COURT
HARTFORD CONN

## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | |
|---|---|
| THE CADLE COMPANY and D.A.N. JOINT VENTURE, A LIMITED PARTNERSHIP, | § |
| Plaintiffs, | § |
| vs. | § |
| | § |
| CHARLES A. FLANAGAN; LISA G. FLANAGAN; ANGELA CIMINO BURR; MJCC CORPORATION; MJCC REALTY, LIMITED PARTNERSHIP (a/k/a MJCC REALTY LIMITED PARTNERSHIP); SOCRATES T. BABACAS; LEONARD A. FASANO; FASANO & IPPOLITO (n/k/a FASANO, IPPOLITO & LEE, L.L.C.); TODD R. BAINER; TODD R. BAINER, L.L.C.; STANLEY F. PRYMAS; THOMPSON & PECK, INC.; and JOSEPH CAPORALE, | § |
| Defendants. | § |

No. 3:01CV531(RNC)

April 23, 2001

### RICO CASE STATEMENT

Pursuant to this Court's Standing Order in Civil RICO Cases, Plaintiffs submit the following RICO Case Statement.

### Summary Of The Suit

Plaintiffs are the owners and holders of over $2,400,000 in judgment and other debt claims against Charles A. Flanagan ("Flanagan"). This suit involves a fraudulent conspiracy among Flanagan, his wife, and numerous of Flanagan's friends, relatives and business associates to transfer, hide and otherwise shield the substantial assets of Flanagan from the claims of Plaintiffs.

## 1.  **Parties**

A.  Plaintiff The Cadle Company ("TCC") is an Ohio corporation with its principal place of business in Newton Falls, Ohio.  Plaintiff D.A.N. Joint Venture, A Limited Partnership ("DJV") is an Ohio limited partnership with its principal place of business in Newton Falls, Ohio.

B.  All of the Defendants listed below were active participants in and provided knowing and substantial assistance for the implementation and successful execution of the fraudulent scheme involved in this suit.

(1)  Defendant Charles A. Flanagan is a citizen of Connecticut who resides in North Haven, Connecticut.

(2)  Defendant Lisa G. Flanagan is a citizen of Connecticut who resides in North Haven, Connecticut.

(3)  Defendant Angela Cimino Burr is a citizen of Connecticut who resides in Branford, Connecticut.

(4)  Defendant MJCC Corporation is a Connecticut corporation with its principal place of business in North Haven, Connecticut.

(5)  Defendant MJCC Realty, Limited Partnership (a/k/a M.J.C.C. Realty Limited Partnership) is a Connecticut limited partnership with its principal place of business in North Haven, Connecticut.

(6) Defendant Socrates T. Babacus is a citizen of Massachusetts who resides in Springfield, Massachusetts.

(7) Defendant Leonard A. Fasano is a citizen of Connecticut who resides in New Haven, Connecticut.

(8) Defendant Fasano & Ippolito (n/k/a Fasano, Ippolito & Lee, L.L.C.) is a Connecticut law firm with its principal place of business in New Haven, Connecticut. At all relevant times, Defendant Leonard A. Fasano was acting as an agent of and within the course and scope of his duties as an attorney working for Defendant Fasano & Ippolito.

(9) Defendant Todd R. Bainer is a citizen of Connecticut who resides in Branford, Connecticut.

(10) Defendant Todd R. Bainer, L.L.C. is a Connecticut law firm with its principal place of business in Branford, Connecticut. At all relevant times, Defendant Todd R. Bainer acted as an agent of and within the course and scope of his duties as the sole attorney working for Defendant Todd R. Bainer, L.L.C. and its predecessor in interest, the Law Firm of Todd R. Bainer.

(11) Defendant Stanley F. Prymas is a citizen of Connecticut who resides in Deep River, Connecticut.

(12) Defendant Thompson & Peck, Inc. is a Connecticut corporation with its principal place of business in New Haven, Connecticut. At all relevant times, Defendant Stanley F. Prymas

was acting as an agent of and within the course and scope of his duties as an officer for Defendant Thompson & Peck, Inc.

(13)  Defendant Joseph Caporale is a citizen of Connecticut who resides in Branford, Connecticut.

### 2.  Alleged Wrongful Conduct

The alleged wrongful conduct in violation of 18 U.S.C. §1962 and the basis of liability of each Defendant is as follows:

### A.  Flanagan Had Wealth, Power And Influence

The Debtor, Charles A. Flanagan ("Flanagan"), was a very wealthy man.  In 1992 Flanagan submitted financial statements to Connecticut banks representing that he had a net worth of over $4,355,000, with an annual salary of over $300,000. In addition, Flanagan received substantial rental income from numerous apartment buildings and other rental properties that he owned.

Flanagan's largest single asset was his 50% ownership interest in Defendant Thompson & Peck, Inc. (the "Insurance Agency"), one of the largest independent insurance agencies in Connecticut.  Flanagan represented that his 50% ownership interest in the Insurance Agency was worth $2,500,000.

In addition to wealth, Flanagan had considerable power and influence in the Connecticut legal community.  His father, Judge John C. Flanagan, was a long standing Connecticut Superior Court Judge, and Flanagan was not loath in letting his friends, business associates and adversaries know about the influence he supposedly

could assert in Connecticut legal circles.  Indeed, even in a case where the opposing lawyer, William Gallagher, was the president of the Connecticut Bar Association, Flanagan boasted that he would win the suit because his father supposedly had "put the fix in".

**B.    Flanagan Transfers A Number Of His Assets**

Flanagan, however, was not satisfied with just being wealthy; he wanted to be very wealthy.  So he borrowed millions of dollars from Connecticut banks and other banks in the New England area to acquire millions of dollars in apartment buildings and other income producing real estate.

When the local real estate market took a downturn in 1993, Flanagan took precautionary measures to protect his substantial assets.  At a time when he was burdened with millions of dollars in bank debt, Flanagan transferred the title to an 18-unit apartment building at 17 Howe Street, New Haven, Connecticut (the "Howe St. Property") to Howe Street Associates, which was a d/b/a of Flanagan.  In addition, Flanagan placed a bogus $250,000 mortgage lien on the Howe St. Property in the name of Crocker House Associates, which was another d/b/a of Flanagan.  Further, Flanagan transferred the title to an office building at 2790 Whitney Avenue, Hamden, Connecticut (the "Whitney Ave. Property") to West Meadow Associates, another d/b/a of Flanagan, and transferred the title to an apartment building at 475-81 George Street, New Haven, Connecticut (the "George St. Property") to Howe

Street Associates, the other d/b/a of Flanagan. The above transfers and the bogus mortgage lien were implemented by Flanagan in an effort to delay, hinder or defraud his creditors and to shield his rental properties from the claims of his creditors.

On April 5, 1995 Prime Bank (a bank that was seeking repayment from Flanagan on a defaulted real estate loan) took the deposition of Flanagan. At that time Flanagan testified that he no longer owned the Insurance Agency stock, and that he had previously transferred the stock to a "family trust". Flanagan's representation was false.

On July 18, 1994 Flanagan formed Defendant MJCC Corporation ("MJCC Corp."), but put the stock of the corporation in the names of Sharon Rosen and "Angela Cimino". Sharon Rosen is Flanagan's sister and "Angela Cimino" is in actuality Defendant Angela Cimino Burr ("Burr"), Flanagan's mother-in-law. Flanagan used MJCC Corp. as a vehicle to collect the rental proceeds from his properties in an effort to hide and shield that income from the claims of his creditors. Despite the fact that Sharon Rosen and Burr were the sole shareholders and sole officers and directors of MJCC Corp., Flanagan dominated and controlled the corporate affairs of MJCC Corp. and otherwise utilized MJCC Corp. as a vehicle to delay, hinder or defraud his creditors.

Further, although Flanagan arranged for the funds to acquire the house at 230 Millbrook Road, North Haven, Connecticut (the

"North Haven House"), on June 23, 1995 the house was placed in the name of "Angela Cimono". On that same day, "Angela Cimono" deeded the North Haven House to M.J.C.C. Realty Limited Partnership, which is believed to be a d/b/a of Defendant MJCC Realty, Limited Partnership ("MJCC Ltd."). The general partner of MJCC Ltd. is MJCC Corp. and the limited partners are Sharon Rosen, Flanagan's sister, and Burr, Flanagan's mother-in-law. Despite the fact that Sharon Rosen and Burr were the sole limited partners of MJCC Ltd., Flanagan dominated and controlled the business affairs of MJCC Ltd. and otherwise utilized MJCC Ltd. as a vehicle to delay, hinder or defraud his creditors.

Shortly after the conveyance to MJCC Ltd., Flanagan and his wife, Defendant Lisa G. Flanagan, moved into the North Haven House. The transferor, "Angela Cimono", was in actuality Burr, Flanagan's mother-in-law. Flanagan handled the acquisition of and transfer of title to the North Haven House in this manner in an effort to delay, hinder or defraud his creditors.

**C.   Flanagan Refuses To Repay The Loans Owed To Plaintiffs And Refuses To Produce Documents Pertaining To His Assets**

By 1995 a number of the banks that had loaned money to Flanagan had failed and were taken over by the FDIC. Flanagan was able to settle many of his real estate bank debts by misrepresenting his true financial condition to the FDIC, and thereafter paying in settlement with the FDIC a substantially

discounted sum. Flanagan, however, refused to honor his word and repay the loan balances that were owed to the banks that are Plaintiffs' predecessors in interest.

In an effort to get Plaintiffs to substantially reduce the loan balances that were owed by Flanagan, on September 7, 1995 Flanagan represented to Plaintiffs that he had met with a "legal aid attorney" and had "completed [his] schedules for bankruptcy". Flanagan then warned Plaintiffs that if they did not accept a substantially discounted sum, Flanagan would file bankruptcy, and there would be nothing left for Plaintiffs.

On October 19, 1995 Flanagan had his wife, Lisa Flanagan, file for Chapter 7 (no asset) bankruptcy in the United States Bankruptcy Court, District of Connecticut, No. 95-32150. After filing, Flanagan arranged for Defendant Leonard Fasano ("Fasano") to become Lisa Flanagan's attorney in connection with her bankruptcy proceeding.

In the Lisa Flanagan bankruptcy proceeding, Plaintiff DJV sought the production of documents pertaining to the substantial assets that the Flanagans previously had represented that they owned in prior financial statements. Neither Flanagan nor Lisa Flanagan, however, produced the requested documents. Indeed, even in the face of an order by Bankruptcy Judge Dabrowski compelling the production of the documents relating to the Flanagans' assets, the subpoenaed documents were not produced. Accordingly, on

October 15, 1997 Lisa Flanagan was denied a discharge in bankruptcy for failure to produce the documents pertaining to the ownership and transfer of the Flanagans' assets.

### D. Flanagan Takes The Fifth Amendment And Judge Covello Enjoins Flanagan's Transfer Of Assets

In 1996 Plaintiff TCC filed suit against Flanagan in Cadle v. Flanagan, United States District Court, District of Connecticut, No. 3:96-CV-02648 (AVC) (the "Federal Suit") in connection with Flanagan's default on a $75,000 loan owed to Great Country Bank in Ansonia, Connecticut.. On March 20, 1997 a final judgment was entered by Judge Covello against Flanagan and in favor of TCC in the amount of $93,519.38.

A debtor's examination of Flanagan was scheduled before Judge Covello on March 9, 1998. On February 25, 1998 Plaintiff TCC served a document subpoena on Flanagan requiring Flanagan to produce at the debtor's examination documents pertaining to Flanagan's assets, including Flanagan's stock ownership in the Insurance Agency and Flanagan/Prymas Insurance Group, Inc. (the "Insurance Group").

At the March 9, 1998 debtor's examination, however, Flanagan refused to produce any documents pertaining to his assets, and refused to provide any testimony about his assets. Rather, Flanagan's attorney represented to Judge Covello that Flanagan was invoking his Fifth Amendment right against self-incrimination and was refusing to provide any evidence about his assets because

Flanagan was under criminal investigation by the I.R.S. and the F.B.I. for income tax matters. Flanagan contended that any documents or testimony about his assets would tend to incriminate him as to the I.R.S. matters. The purported Fifth Amendment I.R.S. concerns, however, were simply a ruse concocted by Flanagan and Fasano to avoid or delay providing any information to Plaintiffs about the location and transfer of Flanagan's assets.

After hearing the purported excuses for Flanagan's refusal to produce documents or testify about his assets, Judge Covello issued an order (1) prohibiting Flanagan from transferring his assets; and (2) requiring Flanagan to submit to the Court for in camera inspection the documents pertaining to Flanagan's assets which supposedly were subject to the Fifth Amendment's privilege against self-incrimination:

> I'm entering an order that Mr. Flanagan, from this point forward, transfer nothing of a single asset until such time as this is unraveled, and that includes the family lawn mower, bicycle, whatever.

> * * *

> And, to the extent that the documents that [Plaintiff TCC] seeks are claimed [by Flanagan] to be the subject of a Fifth Amendment privilege, again, the Court would direct that those be submitted to the Court for in-camera inspection.

### E.    The Children's Checking Account Scheme

In a deliberate and bad faith effort to avoid Judge Covello's injunction, and a further effort to defraud Plaintiffs, in March

of 1998 Flanagan -- upon the advice of Fasano -- set up separate checking accounts in the name of Flanagan's minor children, and then had the rental income from Flanagan's rental properties deposited into those accounts. Flanagan would then write checks on his children's checking accounts to transfer assets (cash) in violation of Judge Covello's injunction and to further hide his income from the claims of Plaintiffs.

The children's checking account scheme continued from March of 1998 until at least November of 1998. This scheme was implemented through the use of the U.S. mails in that monthly bank statements were mailed to Flanagan (but addressed to his minor children) for each month from March of 1998 until at least November of 1998.

**F.   Judge Covello Orders Flanagan To Turn Over
The Insurance Agency Stock And To Account For
Any Disposition Or Transfer Of The Stock**

Then on April 13, 1998 Judge Covello entered a turnover order requiring Flanagan and the Insurance Agency to (1) turn over to TCC Flanagan's stock in the Insurance Agency; and (2) provide TCC with a full and complete accounting as to any purported transfer or other disposition of the stock if a claim was asserted that Flanagan had "sold, hypothecated, pledged, gifted or otherwise divested himself or disposed of any interest in the [Insurance Agency]."

On April 22, 1998 Fasano, on behalf of Flanagan, represented to Judge Covello that they had "gathered together thousands of documents to be produced for in-camera inspection", and estimated that the documents would be produced to the Court within the next week. The relevant subpoenaed documents, however, were never produced to the Court or to Plaintiffs.

On September 23, 1998 Judge Covello again ordered Flanagan to turn over the Insurance Agency stock to Plaintiff TCC. After two motions to stay the enforcement of the turnover order were overruled by Judge Covello, on October 21, 1998 Flanagan and Fasano submitted to the Court a "Notice of Compliance" (Px 1)[1], representing that Flanagan's stock was in the hands of a purported creditor, "Sharon Demetropolis" (actually, "Demetropoulous"), and that Flanagan did not have possession or control of the stock. On the very next day Flanagan and Fasano submitted an "Amended Notice of Compliance" (Px 2), again representing that Flanagan's stock was in the hands of Ms. Demetropoulous and that Flanagan did not have possession or control of the stock. Flanagan and Fasano also represented that

> [s]aid stock has been held by Sharon Demetropolis [sic] prior to the Court's order for turnover on April 13, 1998, and prior to the Court's order on March 9, 1998 prohibiting [Flanagan] from transferring any of his assets.

---

[1]    References to "Px ___" are to the number of the Plaintiffs' Exhibits attached to Plaintiffs' First Amended Complaint and Jury Demand.

In an affidavit submitted by Fasano to Judge Covello, Flanagan represented that he had "borrowed money from Sharon Demetropolis [sic] and gave her the stock as security for the money." But Ms. Demetropoulous (who was one of Fasano's clients) knew nothing about Flanagan's stock and did not in fact have possession of Flanagan's stock. Fasano knew, must have known, or should have known that Flanagan's representations to the Court were false. Indeed, in a letter by Flanagan to Fasano dated January 6, 1998 (Px 3), Flanagan instructed Fasano that "I . . . do not want it disclosed where my Stock is presently kept. There may be an attempt to grab this stock."

**G.   Plan B: The Bogus Babacas Debt Scheme**

On October 26, 1998 Judge Covello issued a Show Cause Order scheduling a contempt hearing on November 16, 1998 for Flanagan's failure to turn over his stock and failure to provide an accounting as to any disposition of the stock as required by the turnover order. Now Flanagan and Fasano were caught in a bind. The purported secured debt of Flanagan to Ms. Demetropoulous was bogus, and Fasano's client did not in fact have possession of Flanagan's stock. Flanagan and Fasano then came up with Plan B: a friend and business associate of Flanagan by the name of Socrates T. Babacas ("Babacas") would claim to have loaned substantial sums of money to Flanagan and also claim to have possession of the stock as collateral for the bogus loan.

Pursuant to this plan, on November 11, 1998 Flanagan prepared and had Babacas fax from his office in Springfield, Massachusetts to Fasano's office in New Haven, Connecticut a bogus stock pledge agreement (Px 4) and a bogus assignment of rents. (Px 5)   Then on November 12, 1998 Flanagan and Fasano submitted a Second Amended Notice of Compliance (Px 6) now representing that the stock of the Insurance Agency was not really in the hands of Ms. Demetropoulous as previously represented, but rather was in the possession of Babacas.   Flanagan and Fasano also represented that Babacas supposedly had loaned Flanagan "$120,000.00 on or about June 19, 1997, and has held said stock as security for the judgment [sic] since the above date until present . . . ."   Fasano knew, must have known, or should have known that the Babacas debt/stock collateral representations were false.

At the November 16, 1998 contempt hearing Flanagan testified that on two occasions Ms. Demetropoulous had loaned him $10,000 in cash, and "we have an understanding that when the Babacas liability is satisfied, she would take over his position."   As far as the alleged Babacas debt and stock pledge, Flanagan testified that Babacas had loaned him (Flanagan) $125,000 on September 16, 1997; that Flanagan had pledged the Insurance Agency stock to Babacas as security for the loan; that Flanagan and Babacas had signed the pledge agreement on September 16, 1997; and that Flanagan gave the Insurance Agency stock to Babacas on September

16, 1997, the same date that Flanagan supposedly signed the pledge agreement. Flanagan further testified that he had paid the $1,600 per month in rent from the Whitney Ave. Property to Babacas in cash from September 20, 1997 until February of 1998. Flanagan's testimony was false.

### H. Judge Covello Holds Flanagan In Contempt, But Gives Flanagan The Opportunity To Purge The Contempt By Producing The Subpoenaed Documents

After hearing Flanagan's excuses for not complying with the Court's turnover order, on November 16, 1998 Judge Covello proceeded to hold Flanagan in contempt:

> It has been established here [that Flanagan] had willfully and intentionally not complied with the order as previously entered by the Court, and orders [Flanagan] committed to the Bureau of Prisons until such time as he purges himself of the contempt by complying further with the order.

In an effort to keep Flanagan from going to jail that very day, Fasano represented to Judge Covello that Flanagan and Fasano would immediately produce all relevant documents about the purported Babacas debt and the purported stock transfers.

Based on the representations of Fasano, Judge Covello temporarily stayed the execution of his contempt order:

> We're going to continue the [contempt] matter to a very short date here . . . and we'll see what has been produced here, and what problems exist. But we're going to keep after this on a day to day basis until it's resolved. . . . The execution of the [contempt] order is stayed, and the matter is continued to [November 24, 1998] at 10:00 a.m.

I.    **Plan C: Pay Off The Federal Judgment And Pledge The Stock To Flanagan's Father**

But now Flanagan, Fasano and Babacas had painted themselves into a corner. Since there was a bogus loan from Babacas and a bogus stock pledge, either they would have to engage in wholesale fabrication of checks, receipts and numerous other documents, or they would have to pay off the full amount of the judgment, and thereby obviate the need to comply with Judge Covello's outstanding orders. So Flanagan and Fasano came up with Plan C: "borrow" money from Flanagan's father, and represent to the Court that Flanagan had pledged the stock to Judge Flanagan as security for the loan. (Px 7)

On November 19, 1998 Flanagan tendered $99,542.87 into the registry of the district court as the payoff for the judgment against him in the Federal Suit. Fasano then prepared a pledge and security agreement between Flanagan and his father whereby the effective date of the stock pledge was the date that Judge Covello vacated the injunction order prohibiting Flanagan from transferring his assets. In an effort to give Plan C an aura of legitimacy, Flanagan and Fasano had Babacas sign, for no consideration and with no apparent benefit to Babacas, a purported "release" (Px 8) authorizing the release of the Insurance Agency stock to Flanagan's father and the subordination of Babacas' purported lien position.

On November 20, 1998 Flanagan and Fasano filed a motion to vacate the court's order prohibiting Flanagan from transferring his assets, and on December 3, 1998 Judge Covello entered an order lifting the injunction.   Accordingly, the purported pledge agreement from Flanagan to his father did not become effective until December 3, 1998.

### J.   Flanagan Loans Money To Babacas, But Claims The Loans Were Really Repayment Of The Bogus Babacus Debt

The purported Babacas loan of $125,000 to Flanagan was a sham.   Flanagan did not want to turn the Insurance Agency stock over to Plaintiffs, and Judge Covello refused to allow Flanagan to get away with not producing all of the documents pertaining to the purported loan and the purported stock pledge to Babacas. Flanagan and Fasano were left with no alternative but to pay off the judgment, and then place the stock in the hands of Flanagan's father as collateral for the loan.

On October 27, 1998 Fasano represented to the Court that "Mr. Flanagan did not make any transfers after Judge Cavello's [March 9, 1998] order freezing the assets of Mr. Flanagan."   Then again on November 16, 1998 Fasano represented to Judge Covello that "from the day that order has been received [March 9, 1998], Mr. Flanagan has not transferred any assets."   Fasano knew, must have known, or should have known that his representations were false.

-17-

Although Flanagan represented to Judge Covello (a) that he had not transferred any assets after March 9, 1998; and (b) that Babacas had loaned Flanagan $125,000:

    (a)   On May 24, 1998, while the federal court injunction was in effect, Flanagan <u>loaned</u> $500 to Babacas. (Px 9)

    (b)   On June 19, 1998, while the federal court injunction was in effect, Flanagan <u>loaned</u> $1,000 to Babacas. Indeed, the $1,000 check was marked "<u>loan</u> - 2 week pay off." (Px 10) Further, in his June 19, 1998 transmittal letter to Babacas (Px 11), Flanagan wrote: "Enclosed is the amount I can <u>loan</u> you. . . . I hope you can repay this <u>loan</u> amount as you told me - w/in 2 wks as I have bills I will have to pay with the money I have <u>loaned</u> to you."

    (c)   On August 24, 1998, while the federal court injunction was in effect, Flanagan <u>loaned</u> $500 to Babacas. (Px 12)

    (d)   On October 21, 1998, while the federal court injunction was in effect, Flanagan <u>loaned</u> $500 to Babacas. (Px 13) In a transmittal letter to Babacas (Px 14), Flanagan wrote: "Enclosed is $500 check for the <u>loan</u> we spoke about. Per our discussion this <u>loan</u> will be paid back w/in 2 wks."

In addition, on March 25, 1999 Flanagan loaned an additional $300 to Babacas, the very same person that supposedly loaned $125,000 in cash to Flanagan. In his March 25, 1999 transmittal letter to Babacas, Flanagan wrote: "Enclosed please find the $300 <u>loan</u> amount we spoke about today. . . . I am running real low on funds." (Px 15)

On that same date Flanagan wrote another letter to Babacas stating:

> I have sent via express mail today the $300. You will have it delivered to you by noon tomorrow.
>
> I really hope this matter goes this next week. I do not have the ability to <u>loan</u> any more money.  As it is I am taking my daughters savings and I do not like doing this.

(Px 16)  Then on the next day (March 26th) Flanagan faxed yet another letter to Babacas (Px 17) again confirming the loan by Flanagan to Babacas, and not any repayment of a loan: "The $300 <u>loan</u> will arrive by noon today. . . . I also must tell you that I do not have the ability to <u>loan</u> any more money."

### K.    The Shifting Stock Scheme

While Flanagan owned 50% of the Insurance Agency, the other 50% owner was Defendant Stanley F. Prymas ("Prymas").  In 1997 and continuing to the present, the attorney for the Insurance Agency was Defendant Todd R. Bainer ("Bainer").

On October 2, 1997 a writ of execution was issued against Flanagan in the Federal Suit.  Then on January 5, 1998, at a time when Bainer represented the Insurance Agency, a property execution in the Federal Suit was served on the Insurance Agency by service on its president, Prymas.

Prymas knew of and was concerned about Flanagan's creditors, and was primarily concerned about the collection efforts of Plaintiffs TCC and DJV.  During the summer of 1998 Flanagan and

Prymas had some discussions about the security of Flanagan's stock in the Insurance Agency and how to prevent the stock from falling into the hands of Flanagan's creditors. Prymas was in favor of Flanagan's desire to keep the stock out of the hands of Plaintiffs.

So during the summer of 1998 Flanagan, Prymas and the Insurance Agency attorney, Bainer, came up with a plan to shield Flanagan's Insurance Agency stock from Plaintiffs: (1) Flanagan and Prymas would enter into a shareholder agreement restricting the ability of either shareholder to transfer or otherwise encumber their Insurance Agency stock; and (2) a restrictive legend would be placed on the stock purporting to limit the transferability of the stock. It was Bainer's idea to have a restrictive legend placed on the Insurance Agency stock.

Bainer then prepared a "Shareholders' [Buy-Sell] Agreement" whereby both Prymas and Flanagan would agree that they would not "sell, assign, pledge, mortgage, transfer or in any way encumber" their stock in the Insurance Agency. On August 21, 1998 Flanagan, Prymas and Bainer met at the Insurance Agency's office in New Haven to carry out the terms of their plan.

After signing the Shareholder Agreement, Flanagan handed his Insurance Agency stock to Bainer, who then typed the restrictive legend on Flanagan's stock certificate. Bainer then returned the stock certificate to Flanagan, who had actual physical possession