of the stock during the time that Judge Covello's order was still in effect for Flanagan to turn over the stock to Plaintiff TCC. Flanagan, however, willfully disobeyed Judge Covello's order.

Bainer received the Insurance Agency stock from Flanagan, typed the restrictive legend on Flanagan's stock certificate, and returned the stock certificate to Flanagan at a time when Bainer knew of the property execution that had been served on the Insurance Agency, and knew, must have known, or should have known of the federal court turnover order and the injunction restricting Flanagan's ability to transfer or alienate his property. The primary purpose of signing the Shareholder Agreement and placing the restrictive legend on the stock was to delay, hinder or defraud Plaintiffs in their efforts to execute on Flanagan's stock.

Flanagan claims that he then drove to Bradley Airport and delivered his Insurance Agency stock to Babacas, who supposedly was waiting for Flanagan at the airport. According to Flanagan, Babacas then went back to Springfield, Massachusetts with Flanagan's stock. Although the federal court injunction and turnover orders were still in effect at the time that Flanagan purportedly transferred his Insurance Agency stock to Babacas, Flanagan claims that he did not comply with Judge Covello's orders and did not turn the stock over to Plaintiffs based on the advice of Fasano.

-21-

Then, when Flanagan faced the prospect of jail time for contempt, Flanagan met with Prymas and discussed Flanagan's plan to pay off the Federal Suit judgment and pledge his Insurance Agency stock to his father. Despite the restrictions in the prior Shareholder Agreement limiting Flanagan's ability to pledge his Insurance Agency stock, Prymas (according to Flanagan) consented to the November 19, 1998 pledge of Flanagan's stock to his father.

**L.  Bainer Vies For Control Of The Efforts
To Protect Flanagan's Assets**

On December 9,. 1998 Bainer and Fasano had a telephone conversation to discuss Plaintiffs' efforts to execute on Flanagan's Insurance Agency stock and Fasano's concern that Plaintiffs would obtain Flanagan's stock. Fasano said that he was concerned that the restrictive legend that Bainer had placed on Flanagan's stock might be invalid because it was placed on Flanagan's stock in violation of Judge Covello's injunction against Flanagan transferring or diminishing his assets. Fasano also informed Bainer that Flanagan would not be going bankrupt unless Flanagan had some sort of "side deal" with Prymas regarding the Insurance Agency stock.

Bainer, however, was not overly impressed with Fasano's handling of the Flanagan stock crisis, and was more than willing to let Flanagan and Prymas know that he could do a much better job in fending off the execution efforts of Plaintiffs. In a December 10, 1998 letter to Fasano, Bainer wrote:

As for your alleged "strategy", it doesn't seem to have served Charlie very well at all. From what I can tell, and in my opinion, there is no organized "strategy" at all. Which is one of the reasons the current serious difficulties exist. It was your obligation to protect Charlie from testifying in any fashion that would harm him, and arguably the Corporation. My understanding is that he has testified before the Federal Court as recently as November 1998, that no restriction has been placed upon his stock. It is my further understanding that a copy of his stock, without the restriction I personally typed onto it [in August 1998], was presented to the Federal Court in November 1998, as a copy of his current stock in its current form.

You knew a restriction had been placed on that stock and purportedly allowed Charlie to harm himself by testifying in that fashion. You should have protected Charlie, from himself and his lack of knowledge about the legal system, in this regard and did not do so.

(Px 18)

In that same letter, Bainer told Fasano:

Further, that you don't see the problem with such an arrangement, or your representing Charlie and Judge Flanagan, with regard to Charlie's pledging of his stock, in known violation of the buy/sell agreement, and in an obvious attempt to frustrate the creditors, is a strong testament to the reason Charlie finds himself in the serious difficulty he apparently, and unfortunately, does. Your representation of the pledgor and pledgee in this situation is strong evidence that there does exist an improper effort to defraud the creditors. Even the most inexperienced of counsels in this type of matter, usually knows enough to make sure each player has separate counsel in such a factual scenario. Your rationalization that you're saving Judge Flanagan from expending monies is just that - a rationalization. There are any number of

lawyers in the area which would be honored to protect his interests, if he has any, without charge to him.

(Px 18, emphasis added)

In a follow up letter to Fasano, Bainer stated:

> With regard to your various threats of suits, conflicts, etc., it is unfortunate that you practice this way.  The substantive conflicts are yours.  You and Charlie's interest is now at conflict because <u>you made a materially false and misleading representation to the Court</u> in your November 12, 1998, pleading of "Amended Compliance" <u>about the location and control of physical possession of Charlie's stock</u>.

> \* \* \*

> You are not going to hold Thompson & Peck, Inc. hostage by telling me what I can or can not do for my Client.  From what I can tell, your legal acumen is to fight with everyone whom doesn't agree with your view of things. It is your judgment of <u>allowing Charlie to move the stock around</u>, instead of dealing with the matter straight-up, which causes him to be in the current predicament in which he finds himself -- including a Federal Court Judge threatening to put him in Federal prison.

(Px 19, emphasis added)

Prymas was also concerned about the ability of Fasano to handle the Insurance Agency stock crisis.  As noted by Prymas, Plaintiffs' collection attorney, Paul Gaide, Esq., had made significant progress toward executing on Flanagan's Insurance Agency stock, "and it appears that desperation is setting in. Gaide has his sights on Charlie's stock and it looks like he will get it."  (Px 20)

-24-

A board of directors meeting of the Insurance Agency was held on December 11, 1998 where Bainer made his pitch to take over the efforts to thwart Plaintiffs' ability to execute on Flanagan's Insurance Agency stock.   At that meeting Flanagan, Prymas and Bainer agreed that they would work together in an effort to defeat the judgment claims of Plaintiffs.

### M.    The Settlement Proceeds Scheme

In 1996 Flanagan and Prymas had a dispute over control of the Insurance Agency, which resulted in a suit filed by Flanagan against Prymas in state court in Connecticut.  In mid-June of 1997 Flanagan and Prymas settled that suit.   Pursuant to a June 17, 1998 Settlement Agreement (Px 21), Flanagan, Prymas and the Insurance Agency agreed that (1) there would be an adjustment of the management compensation paid to Flanagan to cover the discrepancies for the additional sums that had been paid to Prymus (id. ¶2); (2) an additional $75,000 in settlement proceeds would be paid to Flanagan over three years payable in 78 equal bi-monthly installments of $961.10 (id. ¶12); and (3) Flanagan would not transfer his Insurance Agency stock to any other person or entity.   (Id. ¶13)   It was fully recognized by Flanagan, Fasano, Prymas and Bainer that the settlement proceeds due to Flanagan were not exempt wages.   As noted by the Insurance Agency's accountant, the payments to Flanagan under the Settlement Agreement were not wages, but "a taxable damage settlement to be

reported on 1099-MISC." (Px 22)   Indeed, in early December of 1997 Flanagan told Bainer that he (Flanagan) was going to have a "family trust" set up to receive the settlement proceeds in an effort to shield the settlement proceeds from the claims of Flanagan's creditors.

On January 5, 1998 a property execution was served on the Insurance Agency and Prymas in connection with the final judgment in the Federal Suit.   The settlement proceeds, as non-exempt funds owed by the Insurance Agency to Flanagan, should have been disclosed and turned over to Plaintiff TCC in connection with the property execution.   (Px 23)   Flanagan, however, with the cooperation of Fasano, Prymas and Bainer, agreed to recharacterize the settlement payments as "wages" in an effort to shield those settlement proceeds from Plaintiffs and to delay, hinder or defraud Plaintiffs in their efforts to execute on Flanagan's assets.

Accordingly, on January 20, 1998 Fasano, on behalf of Flanagan, submitted to the federal court an objection to property execution claiming that "other than wages, there is no property held by Thompson & Peck."   (Px 24)   Further, on that same date Flanagan signed, on behalf of the Insurance Agency, a claim exemption form representing that "there is no property held by Thompson & Peck, Inc. with the exception of wages."   (Px 25) Fasano's and Flanagan's representations were knowingly false.

In connection with a $128,217 judgment that had been entered in favor of People's Bank against Flanagan (and subsequently assigned to TCC), on December 18, 1998 TCC served Post Judgment Remedies Interrogatories on Prymas and the Insurance Agency. Prymas forwarded the PJR Interrogatories to Bainer with the request that Bainer review the documents "and let us know how to respond." (Px 26)

Despite the fact that both Prymas and Bainer knew that the Insurance Agency owed the settlement proceeds to Flanagan pursuant to the earlier Settlement Agreement, Bainer advised Prymas to respond that no money was due by the Insurance Agency to Flanagan. Pursuant to the plan worked out among Flanagan, Fasano, Prymas and Bainer, on January 19, 1999 Prymas mailed to Plaintiffs' counsel responses to the PJR Interrogatories which falsely represented that Prymas knew of no funds that were owed to Flanagan.

Further, in an effort to prevent Plaintiffs from further inquiry about the settlement funds owed by the Insurance Agency to Flanagan, on December 15, 1998, December 31, 1998, and February 19, 1999, Bainer threatened Plaintiffs' attorneys with grievance filings should they persist in doing what Bainer knew they had a perfect right to do. Bainer's letters threatening quasi-criminal action against Plaintiffs' attorneys (Pxs 27, 28 & 29) were mailed to Plaintiffs' attorneys on or about the dates indicated on the letters.

**N.    The Caporale Property Transfer Scheme**

In September of 1998 the George St. Property (which was owned by Flanagan but placed in the name of his d/b/a, Howe Street Associates) had a fair market value of $157,000. On September 18, 1998 -- while the federal court injunction and turnover order were still in effect -- Flanagan borrowed $94,200 against the George St. Property and placed a $94,200 mortgage on the property. In violation of Judge Covello's injunction and turnover orders, Flanagan not only placed a mortgage on one of his rental properties, but also dissipated or hid every penny of the $94,200 in mortgage proceeds.

In a further attempt to delay, hinder or defraud Plaintiffs in their efforts to collect on their judgments against Flanagan, in November of 1998 Flanagan and his wife, Lisa Flanagan, devised a scheme to transfer title to Flanagan's remaining rental properties, but still receive the benefit of the rental income from those properties. Pursuant to this plan, Flanagan would transfer title to his rental properties (the George St. Property; the Howe St. Property; and the Whitney Ave. Property) to a relative; Flanagan would then have the rental proceeds placed in a bank account in the name of the relative; and then Flanagan's wife would retrieve the rent checks from the P.O. box and sign the relative's name to the checks so that the Flanagans could cash the checks and maintain full use and benefit of the rental proceeds.

In November of 1998 Flanagan met with Defendant Joseph Caporale ("Caporale") to discuss Flanagan's property transfer scheme. Caporale's wife is the cousin of Flanagan's wife. At this meeting Flanagan said that he wanted to put some of his properties into Caporale's name if he (Caporale) was willing to go along with it. Caporale agreed.

Although Caporale never saw any of the rental properties, on December 4, 1998 Flanagan had his controlled business entities execute deeds to convey the George St. Property, the Howe Property and the Whitney Ave. Property to Caporale. Flanagan and Caporale then set up a United States Post Office box in Hamden, Connecticut (near Flanagan's office) for the receipt of the monthly rent checks, and opened up a joint checking account at First Union Bank in Branford, Connecticut for the deposit of the rent checks.

From early 1999 until approximately October of 2000, the monthly rent checks from Flanagan's rental properties were made out, at Flanagan's direction, to Caporale and mailed by the various tenants on the various properties to the P.O. box in Hamden, Connecticut. For one tenant alone, the monthly rent checks made out to Caporale were $1,100 per month.

Although these monthly rent checks were made out to Caporale and mailed to the Caporale P.O. box, Caporale never went to the P.O. box; never saw a rent check; never endorsed a rent check for deposit; never saw a monthly bank statement; and never saw or

received a penny from the rents.  Rather, either Flanagan or Lisa Flanagan would forge Caporale's name on the back of each rent check, and then cash or deposit the funds for Flanagan's own use and benefit.

O.   **Flanagan Commits Bankruptcy Fraud**

Although Flanagan had transferred, hidden or shielded his assets from the claims of Plaintiffs, Flanagan still wanted to recoup the $99,542.87 that he was forced to pay to TCC to avoid going to jail for contempt.  So on February 17, 1999 Flanagan, with Fasano as his attorney, filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Connecticut in New Haven.  Thereafter Flanagan filed a bankruptcy adversary proceeding against TCC (<u>Flanagan v. Cadle</u>, Adversary No. 99-3053) alleging that the $99,542.87 that was paid to TCC was a voidable preference, and thus subject to recoupment by Flanagan through §547(b) of the Bankruptcy Code.

In his bankruptcy schedules, Flanagan and Fasano listed the false debt owed to Babacas, but did not list the alleged debt owed to Ms. Demetropoulous.  Further, Flanagan did not list in his bankruptcy schedules the ownership interests that he had in the three rental properties, and falsely testified at the §341 Meeting of Creditors that he did not own any real estate.

Equally as disturbing, Flanagan did not list in his bankruptcy schedules the substantial rental income that he had

received and was continuing to receive from the George St. Property, the Howe St. Property and the Whitney Ave. Property. Then, however, on January 25, 2000 Flanagan was arrested by the New Haven police for failing to provide heat and water for the tenants at the Howe St. Property.   (Px 30)   This prompted an investigation by Plaintiffs which eventually unearthed Flanagan's ownership interest in the three rental properties that Flanagan had not disclosed in connection with his bankruptcy filing.

**P.   The Defendants Are Jointly And Severally Liable For The Conduct Of Flanagan And The Other Co-Conspirators**

The Defendants made or knowingly participated in the fraudulent transfers referred to above with actual intent to hinder, delay or defraud Plaintiffs in their efforts to enforce the judgments and other debt claims that they hold against Flanagan.   The Defendants were and are part of a conspiracy to wrongfully and fraudulently transfer, hide and otherwise shield the assets of Flanagan from the judgment and other debt claims of Plaintiffs.   The acts of each Defendant as described herein played an integral role in the execution of the fraudulent scheme, and at all relevant times all Defendants acted with awareness that their role was part of an overall improper activity.

All of the Defendants are jointly and severally liable for the full amount of damages caused to Plaintiffs because they each engaged in the affirmative conduct described herein in furtherance

of the goals of the conspiracy. Upon joining the conspiracy, each Defendant became liable for the prior conduct of Flanagan and the earlier conspirators, and remains liable for the subsequent conduct of the other conspirators until such time as there is a clear and unequivocal renouncement of any further participation in the conspiracy. To date, none of the co-conspirators named as Defendants herein have renounced their further participation in the fraudulent conspiracy.

In connection with the fraudulent transfers described herein, the Defendants used the United States mails and interstate telephone lines as an integral part of the conspiracies to wrongfully and fraudulently transfer, hide and otherwise shield Flanagan's assets from the judgment and other debt claims of Plaintiffs.

**Q.    Plaintiffs Have Standing As Assignees Of The Judgment And Other Debt Claims Against Flanagan**

Plaintiffs TCC and DJV, as assignees, are the owners and holders of the judgments and other debt claims against Flanagan, with the full power and right to enforce any claims pertaining thereto against the Defendants as named herein.

### 3.    Other Wrongdoers

The other wrongdoers, other than the Defendants named herein, are the other persons and entities who assisted Flanagan and the other Defendants in the implementation and execution of the fraudulent transfer schemes set forth above.

### 4.  Victims/Injury

Plaintiffs have suffered direct, proximate and consequential damages as a result of the acts described above in an amount not less than $2,400,000, which includes the amount that Plaintiffs would have been able to collect under Plaintiffs' judgment and other debt claims against Flanagan, as well as the attorneys' fees incurred by Plaintiffs in connection with their unsuccessful efforts to execute on the assets of Flanagan.  The damage claims against Flanagan, however, are limited to the damages caused by Flanagan's wrongful conduct which occurred from and after Flanagan's bankruptcy filing on February 17, 1999.

Although the fraudulent conspiracy described herein was directed primarily at Plaintiffs, the victims of the Defendants' fraudulent scheme are Plaintiffs as well as the other judgment creditors of Flanagan, including Fleet Bank in New Haven, Connecticut; Heritage Bank & Trust in Holyoke, Massachusetts; First Federal Savings and Loan Association of Rochester in Rochester, New York; and Milford Savings Bank in Milford, Connecticut.  Plaintiffs have been injured in their business or property by reason of a violation of 18 U.S.C. §1962.  Pursuant to 18 U.S.C. §1964(c), Plaintiffs are entitled to recover from the Defendants treble their actual damages, costs of suit, and reasonable attorneys' fees.

### 5.   Pattern Of Racketeering Activity

The course of conduct described above constitutes violations by Defendants of §§1962(b), (c) and (d) of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§1961 _et seq._) ("RICO"). The Defendants engaged in a pattern of wrongful conduct involving bankruptcy fraud, mail fraud and wire fraud to acquire an interest in and to maintain control over the affairs of Flanagan's financial empire. Further, the Defendants combined together to engage in a pattern of wrongful conduct involving bankruptcy fraud, mail fraud and wire fraud to fraudulently transfer and otherwise maintain custodianship over Flanagan's assets. See Handeen v. Lemaire, 112 F.3d 1339 (8th Cir. 1997); Stochastic Decisions, Inc. v. DiDomenico, 995 F.2d 1158 (2d Cir. 1993); Gutierrez v. Givens, 989 F.Supp. 1033 (S.D.Cal. 1997); Gutierrez v. Givens, 1 F.Supp.2d (S.D.Cal. 1998); and Cadle Co. v. Schultz, 779 F.Supp. 392 (N.D.Tex. 1991).

A.   The alleged predicate acts are:

(i)   **Bankruptcy Fraud.** The conduct of the Defendants described herein constitutes bankruptcy fraud in violation of 18 U.S.C. §152, 18 U.S.C. §157 and 11 U.S.C. §548 in that the Defendants provided knowing and substantial assistance to Flanagan in connection with the fraudulent transfer of Flanagan's assets as set forth above; Flanagan's assertion of the bogus Babacus debt;

and the filing of fraudulent bankruptcy schedules and statements of financial affairs.

    **(ii)** **Mail Fraud**.   The conduct of the Defendants described herein constitutes mail fraud in violation of 18 U.S.C. §1341 in that:

    (a)   the Defendants participated in a scheme or artifice to defraud or attempt to defraud Plaintiffs;

    (b)   the Defendants, or someone associated with the scheme, used the mails or caused the mails to be used, by placing or causing to be placed in an authorized depository for mail a letter intended to be sent or delivered by the United States Postal Service; and

    (c)   the use of the mails was for the purpose of executing the scheme.

In that regard, the United States mails were used in connection with:

    (1)   the implementation and execution of transfers of title to the Howe St. Property; the George St. Property; and the Whitney Ave. Property in 1995, and the placement of the bogus $250,000 mortgage lien on the Howe St. Property;

    (2)   the formation of MJCC Corp. and MJCC Ltd.;

    (3)   the acquisition of the North Haven House in the name of "Angelo Cimono" and transfer of that property to MJCC Ltd. in June of 1995;

    (4)   the children's checking account scheme;

    (5)   the bogus Babacas debt scheme;

    (6)   the pay-off of the federal judgment and the pledge of Flanagan's Insurance Agency stock to Flanagan's father;

(7)  the loaning of funds by Flanagan to Babacas;

(8)  the settlement proceeds scheme; and

(9)  the Caporale property transfer scheme, including the mailing of the monthly rent checks from Flanagan's tenants to the P.O. box in Hamden, Connecticut.

**(iii)  Wire Fraud.**  The conduct of the Defendants described herein constitutes wire fraud in violation of 18 U.S.C. §1343 in that:

(a)  the Defendants devised a scheme or artifice to defraud or attempt to defraud Plaintiffs;

(b)  the Defendants transmitted communications by means of a telephone or fax machine connected to interstate wires for the purpose of executing such scheme or artifice; and

(c)  the Defendants used a telephone or a fax machine connected to interstate wires willfully and with the specific intent to carry out some essential step in attempting to carry out the scheme or artifice to defraud or attempt to defraud Plaintiffs.

In that regard, the interstate telephone wires were used in connection with:

(1)  the bogus Babacas debt scheme;

(2)  the pay off of the federal judgment and the pledge of Flanagan's Insurance Agency stock to Flanagan's father; and

(3)  the loaning of funds by Flanagan to Babacas.

B.  The dates of the predicate acts, the participants in the predicate acts, and a description of the facts surrounding the predicate acts are set forth in detail and discussed in §2 above.

C.    The circumstances constituting mail fraud and wire fraud are set forth in detail and discussed in §2 above.

D.    To date, there has not been a criminal conviction for the predicate acts.

E.    Although final judgments have been entered against Flanagan in connection with his failure to repay loans, it is not believed that any of the predicate acts have been the basis of a judgment in civil litigation.

F.    As described herein, the Defendants engaged in numerous acts of racketeering activity within ten years of each other.  The predicate acts and other wrongful conduct of the Defendants described herein were related in the sense that they involved the same or similar purposes, results, participants, victims and methods of commission, and did not involve isolated or sporadic events.  Further, there was continuity of conduct in that the predicate acts and other wrongful activities of the Defendants described herein extended over a considerable period of time and involved conduct with the threat of continuing wrongful activities.

G.    As discussed in §5(F), the predicate acts relate to each other as part of a common plan and scheme by the Defendants to hide, transfer and otherwise shield Flanagan's assets from the claims of Plaintiffs.

### 6.   **Enterprise.**

A.   Pursuant to 18 U.S.C. §1962(b), the Defendants have engaged in the pattern of racketeering activity described herein to acquire an interest in or maintain control of Flanagan's financial empire, an "enterprise" affecting interstate commerce within the meaning of 18 U.S.C. §1961(4).

Further, pursuant to 18 U.S.C. §1962(c), Flanagan, the Defendants and other persons not named as Defendants herein have participated in an associational enterprise-in-fact affecting interstate commerce. The associational enterprise was devoted to the wrongful and fraudulent transfer and continuing custodianship of Flanagan's assets, and was formed for the purpose of carrying out the activities alleged in this Complaint. The enterprise has an on-going organization and functions as a continuing unit. The purpose of the enterprise is to accomplish the fraudulent transfer and continuing custodianship of Flanagan's assets to shield those assets from the claims of Plaintiffs. Flanagan, the Defendants and other persons not named as Defendants herein have conducted the affairs of this enterprise through the pattern of racketeering activity described herein.

Further, the Defendants participated in varying capacities in the fraudulent scheme to transfer Flanagan's assets for the purpose of defeating the claims of Plaintiffs. The Defendants willfully associated themselves with the scheme to defraud

Plaintiffs and willfully participated in such scheme. As set forth above, Flanagan committed numerous fraudulent and wrongful acts which constitute mail fraud, wire fraud and bankruptcy fraud. The Defendants named herein knew about and agreed to facilitate Flanagan's wrongful and fraudulent scheme, and provided knowing and substantial assistance toward the accomplishment of Flanagan's wrongful and fraudulent goal. In addition, the Defendants aided or abetted the mail fraud, wire fraud and bankruptcy fraud described herein. Accordingly, pursuant to 18 U.S.C. §1962(d) and 18 U.S.C. §2, the Defendants are liable as principals and co-conspirators.

B. For Plaintiffs' §1962(b) claims, the structure of the Insurance Agency is that of a Connecticut corporation, while the other assets within Flanagan's financial empire are unincorporated entities; the purpose of the Insurance Agency was to write insurance policies and process the claims of the insureds, as well as provide for the financial well-being of Flanagan and Prymas; and the function and course of conduct of the Insurance Agency and other assets controlled by Flanagan was to conduct business and generate income for the benefit of Flanagan and the other members of Flanagan's family.

For Plaintiffs' §1962(c) claims, the structure of the enterprise was associational-in-fact; the purpose of the enterprise was to hide, transfer, shield and otherwise maintain

control over Flanagan's financial empire; and the function and course of conduct of the enterprise was to engage in the wrongful transfers and fraudulent conduct described in §2 above.

C.    Defendants Flanagan and Prymas are employees, officers and directors of the Insurance Agency.    Defendants Flanagan and Burr are officers and/or directors of MJCC Corp.

D.    All of the Defendants, and other wrongdoers not named as defendants herein, are associated with the §1962(c) associational enterprise-in-fact.

E.    For the Plaintiffs' §1962(b) claim, the Defendants have engaged in the pattern of racketeering activity described in §2 to acquire an interest in or maintain control of the Insurance Agency and Flanagan's financial empire, an "enterprise" affecting interstate commerce within the meaning of 18 U.S.C. §1961(4).    For Plaintiffs' §1962(c) claims, the Defendants are individuals and entities who are some, but not all, of the members of the associational enterprise-in-fact.

F.    For the Plaintiffs' §1962(b) claims, the Insurance Agency is both a perpetrator and victim of the pattern of racketeering activity.    For Plaintiffs' §1962(c) claims, the Defendants and the other wrongdoers not named as defendants herein are perpetrators of the pattern of racketeering activity.

7.    As discussed above, the pattern of racketeering activity and the enterprise are separate.

8.    For Plaintiffs' §1962(b) claims, the Defendants engaged in the pattern of racketeering activities to acquire an interest in or maintain control of the Insurance Agency and Flanagan's financial empire -- the enterprises involved in those claims.    For Plaintiffs' §1962(c) claims, the Defendants conducted the affairs of the enterprise through the pattern of racketeering activity described above.

9.    For Plaintiffs' §1962(b) claims, the enterprises have not benefited from the pattern of racketeering activity.    For Plaintiffs' §1962(c) claims, the enterprise has benefited in that Flanagan's assets have remained beyond the reach of Plaintiffs.

10.    The Defendants' commission of and conspiracy to commit the predicate acts described above constitute a sufficient nexus with interstate commerce under the RICO statute.    <u>See</u> <u>Cadle v. Schultz</u>, 779 F.Supp. at 397-98.    In addition, the affairs of the Insurance Agency affect interstate commerce.

11.    N/A

12.    As described in §2 above, the Defendants engaged in a pattern of racketeering activity to acquire an interest in or maintain control of the Insurance Agency and Flanagan's financial empire.

13.    The Defendants, and the other wrongdoers not named as defendants herein, are associated with the enterprise.    The liable "person" and the "enterprise" are not one and the same entity.

14.  As described in §2 above, the Defendants engaged in a conspiracy to hide, transfer and otherwise shield Flanagan's assets from the claims of Plaintiffs, and such conduct constitutes a conspiracy to violate §1962(b) and §1962(c).

15.  Plaintiffs have been injured in their business or property by reason of the RICO violations described above in that the Defendants have defrauded Plaintiffs out of the benefit of their judgment and other claims against Flanagan and have otherwise caused Plaintiffs to incur additional and unnecessary legal fees in their prior unsuccessful efforts to execute on Flanagan's assets.

16.  But for the Defendants' violations of the RICO statute, Flanagan would not have been able to shield his assets from the claims of Plaintiffs, and Plaintiffs could have and would have been able to execute on Flanagan's assets towards satisfaction of the judgment and other claims that Plaintiffs hold against Flanagan.

17.  Plaintiffs have suffered direct, proximate and consequential damages as a result of the acts described above in an amount not less than $2,400,000, which includes the amount that Plaintiffs would have been able to collect under Plaintiffs' judgment and other debt claims against Flanagan, as well as the attorneys' fees incurred by Plaintiffs in connection with their unsuccessful efforts to execute on the assets of Flanagan.  The

damage claims against Flanagan, however, are limited to the damages caused by Flanagan's wrongful conduct which occurred from and after Flanagan's bankruptcy filing on February 17, 1999.

18. All of the Defendants are jointly and severally liable for the full amount of damages caused to Plaintiffs because the Defendants each engaged in affirmative conduct in furtherance of the goals of the conspiracy. See Chemetron Corporation v. Business Funds, Inc., 682 F.2d 1149, 1180 (5th Cir. 1982).

19. No other federal causes of action are alleged in the Complaint.

20. Because of complete diversity of citizenship, this Court also has diversity jurisdiction under 28 U.S.C. §1332 over Plaintiffs' state law claim for the Defendants' tortious interference and conspiracy to tortiously interfere with Plaintiffs' right to enforce, and realize the benefits from, Plaintiffs' judgments and other claims against Flanagan. See Cadle Co. v. Schultz, 779 F.Supp. 392 (N.D.Tex. 1991). Under this Court's federal question jurisdiction, the Court has supplemental jurisdiction over this state law claim.

21. While Plaintiffs realize and appreciate that many district court judges have a very real disdain for civil RICO actions, Plaintiffs have a valid RICO claim and would respectfully request the opportunity to prove their claims at trial. See Handeen v. Lemaire, 112 F.3d 1339 (8th Cir. 1997); Stochastic

Decisions, Inc. v. DiDomenico, 995 F.2d 1158 (2d Cir. 1993);
Gutierrez v. Givens, 989 F.Supp. 1033 (S.D.Cal. 1997); Gutierrez
v. Givens, 1 F.Supp.2d (S.D.Cal. 1998); and Cadle Co. v. Schultz,
779 F.Supp. 392 (N.D.Tex. 1991).

Respectfully submitted,

LAW OFFICES OF
F. DEAN ARMSTRONG, P.C.

DATED: April 23, 2001.                    By 
_____
F. Dean Armstrong
Ct. Fed. Bar #CT22417
639 Perth Avenue
Flossmoor, IL  60422
(708) 798-1599
Fax (708) 798-1599

Jill Hartley, Esq.
Edward C. Taiman, Jr., Esq.
SABIA & HARTLEY, LLC
190 Trumbull Street
Suite 202
Hartford, CT 06103-2205
(860) 541-2077
Fax (860) 713-8944

Attorneys for Plaintiffs
The Cadle Company and
D.A.N. Joint Venture,
A Limited Partnership

FILED
APR 23  10 48 AM '01

CLERK
U.S. DISTRICT COURT
HARTFORD CONN.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

IN RE:                                    :        CASE No. 3:01 CV 531(RNC)

THE CADLE COMPANY and D.A.N.             :
JOINT VENTURE, A LIMITED
PARTNERSHIP,                             :
     Plaintiffs

                          :

V.                                        :

                          :

CHARLES A . FLANAGAN; LISA G.
FLANAGAN; ANGELA CIMINO BURR;  :
MJCC CORPORATION; MJCC REALTY,
LIMITED PARTNERSHIP (a/k/a MJCC         :
REALTY LIMITED PARTNERSHIP);
SOCRATES T. BABACUS; LEONARD A. :
FASANO; FASANO & IPPOLITO (n/k/a
FASANO, IPPOLITO & LEE, L.L.C.);        :
TODD R. BAINER, L.L.C.; STANLEY F.
PRYMAS; THOMPSON & PECK, INC.;          :
and JOSEPH CAPORALE,
     Defendants.                         :        APRIL 23, 2001

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 23rd day of April, 2001, a copy of the RICO

Case Statement was served, via U.S. Mail, postage prepaid, upon the parties listed on the

attached service list.

By: _____
          Edward C. Taiman, Jr.

## Service List

CHARLES A. FLANAGAN
230 Millbrook Road
North Haven, CT 06473

LISA G. FLANAGAN
230 Millbrook Road
North Haven, CT 06473

MJCC CORPORATION          Mailing Address:    P.O. Box 5697
30 Village View Terrace                       Hamden, CT 06518
Meriden, CT 06451         **Agent:    Charles A. Flanagan**

MJCC REALTY, LIMITED PARTNERSHIP (a/k/a MJCCREALTY LIMITED
PARTNERSHIP)
81 West Meadow Road
Hamden, CT 06518          **Agent:    Charles A. Flanagan**

LEONARD A. FASANO
Fasano & Ippolito
388 Orange Street
New Haven, CT 06511

FASANO & IPPOLITO (n/k/aFASANO, IPPOLITO & LEE, L.L.C.)
388 Orange Street
New Haven, CT 06511

STANLEY F. PRYMAS
26 Hemlock Terrace Ext.
Deep River, CT 06417-1606

THOMPSON & PECK, INC.     Mailing Address:    P.O. Box 1793
321 Whitney Avenue                            New Haven, CT 06507
Hamden, CT 06511          **Agent:    Stanley F. Prymas**

ANGELA CIMINO BURR
167 Austin Ryer Lane
Branford, CT 06405

TODD R. BAINER, L.L.C.
71 Cedar Street
Branford, CT 06405

JOSEPH CAPORALE
36 Coachman Road
Branford, CT 06405

SOCRATES T. BABACUS
224 Birchland Avenue
Springfield, MA