UNITE STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

THE CADLE COMPANY and            :
D.A.N. JOINT VENTURE,            :        Case No.: 3:01 cv 531 (AVC)
A LIMITED PARTNERSHIP            :
                                 :
                                 :
v.                               :
                                 :
CHARLES A. FLANAGAN, ET AL.      :        April 29, 2004

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

In support of his motion for summary judgment against the Plaintiffs The Cadle

Company ("Cadle") and D.A.N. Joint Venture, A Limited Partnership ("DAN", collectively, the

"Plaintiffs"), the defendant Charles A. Flanagan ("Charles Flanagan" or "Flanagan"), through

his undersigned counsel, submits the following:


## I.    INTRODUCTION

The Plaintiffs have commenced this action pursuant to the Racketeer Influenced and

Corrupt Organizations Act (18 U.S.C. § 1961, et seq.) ("RICO"), alleging that the defendants

conspired to prevent the Plaintiffs from collecting upon various claims and judgments which the

Plaintiffs allege to have against Charles Flanagan. While defendants in a RICO action are usually

joint and severally liable to the plaintiff, in this case the Plaintiffs have expressly confined their

damages claim against Flanagan to damages caused by Flanagan's alleged wrongful conduct

which occurred from and after Flanagan's bankruptcy filing on February 17, 1999. Second

Amended Complaint, ¶ 85. Regardless of whether the Plaintiffs can ultimately establish that they

have been damaged by the alleged conspiracy described in this lawsuit, discovery in this action

has revealed that the Plaintiffs are due <u>no</u> damages from Flanagan. Accordingly, Flanagan is

entitled to judgment as a matter of law. More specifically, summary judgment should enter in

favor of Charles Flanagan because the only alleged injury suffered by the Plaintiffs occurring

after February 17, 1999 was 1) freely and voluntarily incurred by the Plaintiffs; and, 2) was not

proximately caused by Flanagan's conduct.


## II.    STATEMENT OF FACTS

### A. Procedural History

On February 17, 1999, more than two years before the commencement of this action,

Flanagan filed a voluntary petition for relief with the United States Bankruptcy Court, District of

Connecticut (the "Bankruptcy Court") under Chapter 11 of Title 11 of the United States Code

(the "Bankruptcy Code"). While the case was subsequently converted to one under Chapter 7 of

the Bankruptcy Code, the bankruptcy case is still pending. Affidavit of Charles A. Flanagan,

submitted herewith ("Flanagan Affidavit") ¶ 2. As a bankruptcy debtor, Flanagan is protected by

the automatic stay contained in Section 362 of the Bankruptcy Code which, <u>inter alia</u>, requires a

party to seek and obtain relief from the automatic stay before commencing or continuing an

action against him alleging conduct which took place prior to the bankruptcy filing.

On or about April 4, 2001, the Plaintiffs filed the initial complaint (the "Initial

Complaint") in this action. Along with Flanagan, the Plaintiffs also named the following

individuals and entities as party defendants: Lisa G. Flanagan (Flanagan's wife), Angela Cimino

Burr (Flanagan's mother-in-law). MJCC Corp., MJCC Realty Limited Partnership, Socrates T.

Babacus, Leonard A. Fasano (Flanagan's attorney prior to the petition), Fasano & Ippolito, Todd

R. Bainer (counsel to Thompson & Peck, Inc.), Todd R. Bainer, LLC, Stanley F. Prymas

(Flanagan's former business partner at Thompson & Peck, Inc.), Thompson & Peck, Inc.

(Flanagan's former business) and Joseph Caporale (collectively, the "Defendants"). Flanagan

Affidavit, ¶ 3. The first count of the Initial Complaint stated that from 1992 to the present, the

Defendants allegedly engaged in a pattern of wrongful conduct, involving bankruptcy fraud, mail

fraud and wire fraud, in violation of RICO to allegedly prevent the Plaintiffs from collecting

upon various judgments they claim to hold against Flanagan. The second count pleaded that the

same alleged conduct constituted tortious interference with the Plaintiffs' right to collect upon

the same judgments.[1]

On April 20, 2001, Flanagan filed a motion with the Bankruptcy Court titled "Motion to

Compel The Cadle Company and D.A.N. Joint Venture, L.P and For Sanctions for Violation of

Automatic Stay" wherein he requested an order of the Bankruptcy Court determining that by

commencing this action, the Plaintiffs willfully violated the automatic stay contained in Section

362 of the Bankruptcy Code. On May 16, 2001, Judge Albert S. Dabrowski of the Bankruptcy

Court ruled that the Plaintiffs willfully violated the automatic stay contained in Section 362 of

the Bankruptcy Code and ordered the Plaintiffs to file a notice of dismissal of this action as to

Flanagan only. Thereafter, on May 24, 2001, the Plaintiffs filed a Notice of Voluntary Dismissal

in the District Court Action as to Flanagan only. Flanagan Affidavit, ¶ 4.

By motion dated June 20, 2002, the Plaintiffs requested permission to amend their

complaint so that only post-bankruptcy petition claims would be alleged against Flanagan. By

---

[1] The second count was dismissed for failure to state a claim upon which relief may be granted

Order dated August 21, 2002, this Court granted that motion and Flanagan was reinstated as a party defendant. Thereafter, the Plaintiffs served the Second Amended Complaint and Jury Demand dated August 30, 2002 (the "Complaint") on Flanagan. In the Complaint, the Plaintiffs allege wrongful conduct from 1992 through 1999 and seek damages of $2,400,000.00 against the Defendants other than Flanagan.

The claims against Flanagan, however, are substantially narrower. In Paragraph 85 of the Complaint, the Plaintiffs state:

> **The damage claims against Flanagan, however, are limited to the damages caused by Flanagan's wrongful conduct which occurred from and after Flanagan's bankruptcy filing on February 17, 1999. Plaintiffs only seek damages from Flanagan for his post-petition wrongful conduct, and not for any pre-petition conduct on Flanagan's part, and hereby expressly limit their damages claims against Flanagan to the damages caused by Flanagan's wrongful conduct which occurred from and after Flanagan's bankruptcy filing on February 17, 1999.**

In other words, the Plaintiffs' damage claim against Flanagan consists solely of the damages resulting from Flanagan's alleged post-February 17, 1999 or post-petition conduct.

## B. The Grievances

As will be explained more fully below, the Plaintiffs have admitted that their only damages resulting from Flanagan's post-petition conduct consist of legal fees paid to defend attorney Paul M. Gaide, Esq. ("Gaide") in connection with three ethics complaints filed by Flanagan with the Connecticut Statewide Grievance Committee. Gaide represented the Plaintiffs in most, if not all, of the Plaintiffs' collection litigation against Flanagan until Flanagan filed his

by Order of this Court dated March 27, 2002.

bankruptcy petition on February 19, 1999. (At that point, all such litigation was automatically stayed pursuant to Section 362 of the Bankruptcy Code.) Additionally, Gaide represented the Plaintiffs in Flanagan's bankruptcy case from February 26, 1999 until June 28, 1999, at which point he moved to withdraw his appearance on behalf of the Plaintiffs and entered an appearance on behalf of the Official Committee of Unsecured Creditors ("Creditors' Committee"). His motion to withdraw was granted on July 21, 1999. On June 18, 1999, Edward C. Taiman, Esq. entered his appearance on behalf of the Plaintiffs in the bankruptcy case. On October 25, 2000, Gaide withdrew his appearance on behalf of the Creditors' Committee. Attached as <u>Exhibit A</u> to Affidavit of James A. Lenes ("Lenes Affidavit"), filed herewith, are the relevant pages of the Docket Report of Flanagan's bankruptcy case, providing the appearance information summarized above.

On February 18, 1999, March 3, 1999 and March 4, 1999, Flanagan filed the ethics complaints at issue (the "Grievances"). The Grievances, in summary, alleged the following violations: Gaide, who was representing Cadle at the time, harassed Flanagan's minor children by having a Connecticut deputy sheriff serve post judgment interrogatories upon them. Also, he directly contacted Flanagan's then business partner, Stanley F. Prymas (also a defendant herein), even though Prymas was represented by counsel at the time. Although Prymas' counsel authorized Gaide to speak to Prymas on certain topics, his interrogation of Prymas went well beyond the scope of his authority. Gaide's conduct was initially found by the Local Panel of the Statewide Grievance Committee to have violated the Rules of Professional Conduct. Afterwards, the Reviewing Committee of the Statewide Grievance Committee held 13 days of hearings to review the finding of the Local Panel, from October 14, 1999 through October 25, 2001, and

determined that there was not clear and convincing evidence that Gaide's conduct violated

Connecticut's ethics rules. Flanagan Affidavit, ¶ 8 and <u>Exhibits A and B</u> thereto. During the

litigation of this case, the Plaintiffs revealed that they voluntarily paid over $50,000.00 to fund

Gaide's defense of the Grievances.


## C.  Evidence Obtained Through Discovery

During the discovery period in this case, the Plaintiffs revealed that the only money

damages that they claim is due from Flanagan in this action is approximately $50,000.00, which

is attributable to amounts spent by Cadle in providing Paul Gaide with legal counsel for his

defense of the Grievances.  On or about June 23, 2003, Flanagan propounded Interrogatories and

Requests for Production on the Plaintiffs. On or about November 21, 2003, the Plaintiffs

provided responses. Interrogatory Numbers 4 and 5, along with the Plaintiff's answers, are as

follows:

> 4.      Given the limitations stated in Paragraph 85 of the Second Amended
> Complaint as to the damages sought from Flanagan,
>    a.     State the amount of money damages that you claim are due to the
> Plaintiffs from Flanagan under Count One.
>
> ANSWER: Given the limitations stated in ¶85 of the Second Amended Complaint
> as to the damages sought from Flanagan, the amount of compensatory damages
> Plaintiffs claim are due from Flanagan under Count One of Second Amended
> Complaint (RICO) exceeds approximately $50,000.
>
>                                  …
>
>    c.      Describe how you calculated the amount of such money damages.
>
> ANSWER: The amount of money damages was calculated based on the amount
> of attorney fees and expenses incurred by Cadle in opposing the baseless
> grievance filed by Flanagan against Cadle's attorney, Paul Gaide, as part of
> Flanagan's plan to "sue Gaide to get him out of the litigation", which was in

furtherance of Flanagan's effort to get Plaintiffs to back off their efforts to collect on the debts owed by Flanagan to Plaintiffs.

     5.    State all ways in which you claim the Plaintiffs were injured by the defendants' alleged conduct that occurred from and after Flanagan's bankruptcy filing on February 17, 1999.

     <u>ANSWER</u>: See No. 4 above.

A complete copy of the Plaintiffs' Responses to Interrogatories is attached as <u>Exhibit B</u> to the of

Lenes Affidavit.

     On February 13, 2004, the Defendants took the deposition of Alan C. Adams, who was

the Plaintiffs' Account Officer with primary responsibility for the collection of the amounts

which Flanagan is alleged to have owed the Plaintiffs. At the deposition, Adams was specifically

asked about Cadle's decision to pay for Paul Gaide's representation in the grievance proceeding

referred to in the Plaintiffs' responses highlighted above. The following is Adams' testimony on

this subject:

     Q:  Okay. Mr. Adams, I'm switching gears again
now. I wanted to ask you about the grievance that was
filed against Attorney Gaide.

     A:  Yes.

     Q:  You were involved in that?

     A:  Yes.

     Q:  You attended all the hearings; didn't you?

     A:  Correct.

     Q:  Okay.

     A:  Not all, many.

Q:    And you were employed by Cadle Company at
that time?

A:    Yes.

Q:    And is it correct to say that the grievance
arose out of Attorney Gaide's collection efforts in
the Flanagan matter?

A:    Yes.

Q:    And is it also accurate to say that Cadle
Company provided representation for Attorney Gaide's
defense in that matter?

A:    Yes, I think so.

Q:    Were you involved with any of the discussions
at Cadle Company about whether or not they should take
on that obligation?

A:    Yes.

Q:    Okay.  And tell us, how was that
determination made?

A:    I discussed it with Tim Dugic and Bill
Shaulis, I believe at some point Vic Buente came into
the discussions, and ultimately Dan Cadle.

Deposition Transcript of Alan C. Adams, p. 153-54. Adams also testified as follows:

Q:    First, getting right back to the topic that
Attorney Cooney was just speaking to you about, the
Cadle's decision to provide Attorney Gaide with
representation in the grievance hearing --

A:    Yes.

Q:    -- to your knowledge, was Cadle again under
any obligation to provide that counsel?

- 8 -

A:   No.

Q:   Was there any contractual relationship between Mr. Gaide and Cadle or Dan over anything that might encompass a grievance hearing that you're aware of?

A:   Not that I'm aware of.

Q:   <u>So it's your understanding that it was purely voluntary on Cadle's part to pay for Mr. Gaide's representation in a grievance?</u>

A:   <u>I believe so.</u>

Deposition Transcript of Alan C. Adams, p. 158 (Emphasis added). A copy of the relevant pages of the transcript of the Alan C. Adams deposition is attached as Exhibit C to the Lenes Affidavit.

## III.   LAW AND ARGUMENT

### A. Summary Judgment Standards

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. <u>American International Group, Inc. v. London American International Corp.</u>, 664 F. 2d 348, 351 (2d Cir. 1981). When the moving party meets this burden, the adverse party must then affirmatively set forth specific facts which demonstrate that a genuine issue for trial exists. <u>Anderson v. Liberty Lobby Inc.</u>, 477 U.S. 242, 250 (1986). If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate. <u>Celotex Corp.</u>, 477 U.S. at 323. If the nonmoving party

submits evidence which is "merely colorable," legally sufficient opposition to the motion for
summary judgment is not met. <u>Anderson</u>, 477 U.S. at 249.

**B.      The Plaintiffs Have Suffered No Cognizable RICO Damages**

       1.      The Plaintiffs suffered no injury they had no duty to pay Gaide's legal

      fees.

The Plaintiffs have stated in unequivocal terms that the amount of damages which they
claim is due from Flanagan is attributable to monies spent in paying Paul Gaide's legal fees in
connection with the Grievances. See Plaintiffs' Interrogatory responses quoted above. According
to Alan C. Adams, the Plaintiffs' Account Officer during the relevant periods with responsibility
for collection amounts claimed due from Flanagan, the Plaintiffs had no obligation whatsoever to
pay Gaide's legal fees. Deposition of Alan C. Adams, p. 158. The payment was voluntary. The
Plaintiffs cannot willingly elect to take on Gaide's financial burden and then claim that they were
damaged thereby. Given that the payment was voluntary, it cannot be deemed an injury entitling
the Plaintiffs to compensation.

In <u>Zito v. Leasecomm Corp.</u>, 2003 U.S. Dist. LEXIS 17236 (S.D.N.Y. 2003), the
plaintiffs (lessees) sued the defendants (dealers and lessor) under RICO, alleging, in part, that the
dealers engaged in deceptive marketing practices to persuade lessees to lease their allegedly
ineffective products through the lessor and that the lessor used extortionate enforcement tactics
against defaulting lessees. In their motion to dismiss, the defendants claimed that the plaintiffs'
alleged damages resulted from their voluntary decision to enter into business transactions which
they regret and were not procured by fraudulent misrepresentations or other improper means.

Essentially, the defendants claimed that because the claimed injury resulted from informed voluntary conduct, the plaintiffs failed to plead a causation link between the defendants conduct and the damages. While the court rejected this argument, pointing to portions of the complaint providing sufficient causation allegations, the court acknowledged that without the causation link, the plaintiffs could not prevail in their RICO claim. Id. at *57-59.

Analogous conclusions, that a RICO plaintiff cannot establish causation where the plaintiff voluntarily and knowingly engages in the very activity from which it later claims injury, were reached in In re Mastercard, 313 F.3d 257 (5th Cir. 2002) (no proximate causation for group of internet gamblers against credit card company that provided them credit to gamble online) and Doug Grant, Inc. v. Greate Bay Casino Corp., 232 F.3d 173, 187-88 (3rd Cir. 2000) (voluntary participation in illegal but non-fraudulent gambling not compensable as plaintiff "can avoid any injury simply by walking away."). While these cases obviously go one step further than the instant case, since it is not claimed that the Plaintiffs participated in the alleged conspiracy, the point is the same: A party cannot knowingly and freely choose to incur an alleged injury and then sue to recover under RICO for that same alleged injury.

The Plaintiffs' informed and un-coerced decision to fund Gaide's defense should not create a liability for Flanagan. Summary judgment should enter in favor of Charles Flanagan because the Plaintiffs' alleged injury was willingly incurred.

2.    The Plaintiffs' claimed injury was not proximately caused by Flanagan's conduct.

The civil cause of action under RICO is established in 18 U.S.C. § 1964(c), which

provides:

> Any person injured in his business or property <u>by reason of</u> a violation of section 1962 of
> this chapter may sue therefor in any appropriate United States district court and shall
> recover threefold the damages he sustains and the cost of the suit, including a reasonable
> attorney's fee . . . .

(Emphasis added). The Supreme Court has construed this section's "by reason of" language to

require a showing that the defendant's violation was the "but for" cause <u>and</u> the proximate cause

of the plaintiff's injury. <u>Chera v. Chera</u>, 2000 U.S. Dist. LEXIS 13749, *12 (E.D.N.Y.

2000)(citing <u>Holmes v. Securities Investor Protection Corp.</u>, 503 U.S. 258, 268 (1992)). The

Supreme Court stated that under RICO, proximate cause demands "some direct relation between

the injury asserted and the injurious conduct alleged." <u>Holmes</u> at 268. Under this standard, "a

plaintiff who complain[s] of harm flowing merely from the misfortunes visited upon a third

person by the defendant's acts [is] generally said to stand at too remote a distance to recover." <u>Id.</u>

at 268-69. "[T]he critical question posed by the direct injury test is whether the damages a

plaintiff sustains are derivative of an injury to a third party. If so, then the injury is indirect; if

not, it is direct." <u>Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.</u>, 191 F.3d 229,

238-39 (2d Cir. 1999). Put another way, "[t]he general tendency of the law, in regard to damages

at least, is not to go beyond the first step." <u>Associated General Contractors of Cal., Inc. v. State</u>

<u>Council of Carpenters</u>, 459 U.S. 519, 534 (1983).

In <u>Chera</u>, the court summarized the policy rationales in support of the direct injury

requirement as identified by the Supreme Court in <u>Holmes</u>:

> First, "the less direct an injury is, the more difficult it becomes to ascertain the
> amount of a plaintiff's damages attributable to the violation, as distinct from other,
> independent, factors." <u>Holmes</u>, 503 U.S. at 269. Second, providing a remedy for

those indirectly injured "would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries." Id. Lastly, "the general interest in deterring injurious conduct" does not justify tolerating these complex causation problems "since directly injured victims can generally be counted on to vindicate the law as private attorneys general." Id. at 269-70.

Chera v. Chera, 2000 U.S. Dist. LEXIS 13749, 14-15 (E.D.N.Y. 2000).

The facts of Holmes v. Securities Investor Protection Corp. provide a useful analogy to the case at bar. In Holmes, the Securities Investor Protection Corporation ("SIPC") provided financial protection to the customers of failed member broker-dealers. The Supreme Court applied the above-quoted factors to determine whether SIPC could sustain a RICO claim against Holmes, whose stock-fraud scheme had rendered two broker-dealers insolvent, triggering SIPC's duty to reimburse their customers. Holmes at 260-64. The Supreme Court reasoned that it was primarily the broker-dealers' inability to pay customer's claims that caused the customers' injury and that the stock-fraud scheme was secondary. As such, the Supreme Court held that the injury to SIPC (whether seen as the duty to pay the claims or the claims themselves via subrogation) was too remote to sustain a RICO claim. Id. at 271. If the customers were to have a RICO claim, the Court reasoned, then a district court would have to determine whether the stock fraud, "as opposed to, say, the broker-dealers' poor business practices or their failures to anticipate developments in the financial markets" caused the customers' injuries, and "then find some way to apportion the possible respective recoveries." Id. at 272-73. Moreover, since the broker-dealers themselves had in fact already sued Holmes, the Supreme Court concluded there was no reason to extend RICO's treble damages action to such an indirect party as SIPC. Id. at 273-74.

In Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc., 191 F.3d 229 (2d Cir. 1999), the plaintiff insurers sued several major tobacco companies, alleging that the

companies had conspired to deceive the public and the plaintiffs concerning the health risks of

smoking. Plaintiffs sought to recover the money they had spent treating their insureds' smoking-

related illnesses. 191 F.3d at 232, 233. Relying on <u>Holmes</u>, the Second Circuit examined the

issue of proximate cause, which requires proof of (1) direct injury, and (2) foreseeability. <u>Id.</u> at

235-36. As to the first element, the court concluded there was no direct injury because the

plaintiff insurers' injuries arose only from the injuries sustained by its insureds. The court stated:

> Without injury to the individual smokers, the [plaintiffs] would not have incurred
> any increased costs in the form of the payment of benefits, nor would they have
> experienced the difficulties of cost prediction and control that constituted the crux
> of their infrastructure harms. Being purely contingent on harm to third parties,
> these injuries are indirect. Consequently, because defendants' alleged misconduct
> did not proximately cause the injuries alleged, plaintiffs lack standing to bring
> RICO claims against defendants.

<u>Id.</u> at 239.

Turning to the case at bar, the Plaintiffs were not legally obligated to pay Gaide's legal

fees. Nevertheless, even if the Plaintiffs' voluntary payment of those fees could be deemed an

"injury," the "injury" only arose from the alleged injury to Gaide. Implicit in the Plaintiffs'

damages claim against Flanagan is that the Grievances lacked merit. Even if this were true, any

resulting injury to the Plaintiffs would be secondary and not proximately caused by Flanagan's

conduct. The proximate cause of the Plaintiffs' alleged injury was Cadle's unilateral and

voluntary decision to assume this cost.

This analysis is buttressed by review of the <u>Holmes</u> factors supporting the rationale for

the direct injury requirement. First, it would be quite difficult to ascertain the amount of the

Plaintiffs' alleged damages attributable to Flanagan's conduct, as distinct from other independent

factors such as Gaide's conduct or the Plaintiffs' underlying reasons for paying the fees.[2]

Second, any attempt to deem the Grievances as a predicate act of the alleged RICO conspiracy

against the Plaintiffs would require that the Court determine whether the grievance complaints

were filed for reasons stated therein  (i.e., to raise alleged ethics violations by Attorney Gaide) or

whether they were filed in furtherance of the alleged conspiracy to prevent Cadle form collecting

its debt. Third, to the extent the Grievances constituted an injury (which is expressly denied), the

allegedly directly injured party, Gaide, has already sought to vindicate his rights. Gaide actually

filed his own RICO action against many of the Defendants in this action, wherein he claimed,

inter alia, that the filing of the grievance was part of a conspiracy to cause Gaide personal

injuries and economic losses.[3] Under the Holmes factors, therefore, the Grievances do not

provide a basis for the Plaintiffs to claim damages under RICO.

Other factors further demonstrate that commencing the Grievances did not cause a direct

injury to the Plaintiffs. The Grievances were filed after Flanagan filed his bankruptcy petition,

meaning that throughout the duration of the Grievances the Plaintiffs were stayed, pursuant to

Section 362(a) of the Bankruptcy Code, from pursuing any collection efforts against Flanagan.

Paying Gaide's fees, therefore, was unconnected to any perceived need to ensure Gaide's

---

[2] The Plaintiffs may have chosen to pay Gaide's legal fees for any number of reasons. For example, their reasons may have been strategic as to Flanagan (i.e., to attempt to show Flanagan that they will not back down when faced with any perceived threat), to encourage Gaide and the Plaintiffs' other lawyers to be aggressive, loyalty, etc.

[3] The action, titled Paul M. Gaide v. Todd R. Bainer, Todd R. Bainer, Attorney at Law, Todd R. Bainer, LLC, Leonard A. Fasano, Robert G. Skelton, Skelton & Skelton, LLC, Law Office of Robert G. Skelton, Lisa G. Flanagan, Stanley F. Prymas, Thompson & Peck, Inc., Flanagan/Prymas Insurance Group, Inc., William F. Gallagher, Gallagher & Callistro, Barbara H. Katz, and Law Office of Barbara H. Katz, was filed in the United States District Court for the District of Connecticut and bore Civil Action Number 3:02-cv-00392-SRU. Gaide's action was dismissed for failure to state a claim on April 28, 2003.

continued representation in the collection litigation since such litigation was stayed. Moreover, during the 13 days of hearings that began on October 14, 1999, obviously the most costly portion of Gaide's defense, Gaide did not even represent the Plaintiffs in Flanagan's bankruptcy case. The Plaintiffs' decision to pay Gaide's legal fees was, at best, loosely connected to the Plaintiffs' collection efforts against Flanagan.

Accordingly, under the model established by the Supreme Court in Holmes, there is no direct relation between Flanagan filing the Grievances and the Plaintiffs' voluntary payment of Gaide's legal fees. The Plaintiffs complain of harm "flowing merely from the misfortunes visited upon a third person" and they "stand at too remote a distance to recover." See Holmes at 268-69. Summary judgment should enter against the Plaintiffs and in favor of Flanagan because the Plaintiffs' claimed damages were not proximately caused by Flanagan's conduct.

CONCLUSION

For all of these reasons, the defendant Charles A. Flanagan respectfully requests that the

Court enter summary judgment against the Plaintiffs The Cadle Company and D.A.N. Joint

Venture, A Limited Partnership.

THE DEFENDANT
CHARLES ATWOOD FLANAGAN

By: _____
James A. Lenes (CT 10408)
Neubert, Pepe & Monteith, P.C.
195 Church Street, 13th Floor
New Haven, CT  06510
Telephone No. (203) 821-2000

## CERTIFICATION

This is to certify that a copy of the foregoing was sent, via U.S. Mail, postage prepaid, on

April 29, 2004 to:

Edward C. Taiman, Jr.
Sabia & Hartley, LLC
190 Trumbull Street, Suite 202
Hartford, CT 06103-2205

F. Dean Armstrong
639 Perth Ave.
Flossmoor, IL 60422

David G. Hill
Halloran & Sage
One Goodwin Sq.
225 Asylum St.
Hartford, CT 06103

Peter C. Schwartz, Mary Anne Charron
R. Bradley Wolfe, Gerald R. Swirsky
Gordon, Muir & Foley
Hartford Square North
10 Columbus Blvd.
Hartford, CT 06106-5123

Barbara L. Cox
William F. Gallagher
Gallagher & Calistro
1377 Boulevard, Po Box 1925
New Haven, CT 06509-1925

Todd R. Bainer
Cooney & Bainer, P.C.
71 Cedar St.
Branford, CT 06405

Bradley K. Cooney
69 Island Ave.
Madison, CT 06443

By: _____
James A. Lenes (CT 10408)
Neubert, Pepe & Monteith, P.C.
195 Church Street, 13th Floor
New Haven, CT 06510
Telephone No. (203) 821-2000