UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| THE CADLE COMPANY and<br>D.A.N. JOINT VENTURE,<br>A LIMITED PARTNERSHIP, | §<br><br>§ | No. 3:01CV531(AVC) |
| Plaintiffs, | § | |
| vs. | § | |
| CHARLES A. FLANAGAN, et al. | § | May 11, 2004 |
| Defendants. | § | |

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF
PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56(a)(1), Plaintiffs set forth below the undisputed facts which support Plaintiffs' Motions for Summary Judgment.

A.  **Background**

1.  Flanagan was a very wealthy man.  In the early 1990s Flanagan had over $11,700,000 in assets, with a net worth of over $4,355,000. (Px 55)

2.  Flanagan's largest single asset was his 50% stock ownership in Thompson & Peck, Inc. ("T&P"), which was a large, independent insurance agency in Connecticut. (Px 176) Flanagan's 50% stock ownership in T&P was estimated to be worth $2,000,000. (Px 55)

3.  In addition, Flanagan received substantial rental income from numerous apartment buildings and other rental properties that he owned. (Px 177; Px C p. 49; Px H pp. 60-61; Px 55)

4.  Flanagan, however, was a "notorious slum lord" who drained income from his properties by taking money out of his apartment buildings, but not putting any money back in. (Px D p. 56)

5.  Not only was Flanagan a notorious slumlord, in the mid 1990s Flanagan submitted a false financial disclosure form to

the IRS in an effort to convince the IRS to reduce the amount of his taxes.  (Px A(1) pp. 30-31; 48-49 & 53)

6.    Flanagan intentionally omitted from the IRS disclosure form his access to a checking account in the name of "Crocker House Associates", which was a d/b/a of Flanagan, and Flanagan's ownership of various apartment buildings, which were held in the names of other entities that were secretly owned and controlled by Flanagan. (Px A(1) pp. 32; 48-51; Px 75 & 76)

7.    On December 14, 2002 Flanagan pled guilty to the felony of submitting false financial information to the IRS. (Px A(1) p. 7; Px 76 & 77)

8.    In 1996 Plaintiff TCC filed suit against Flanagan in Cadle v. Flanagan, United States District Court, District of Connecticut, No. 3:96-CV-02648 (AVC) (the "Federal Suit") in connection with Flanagan's default on a $75,000 loan which had previously been conveyed to TCC.  (Flanagan Answer ¶70)

9.    On March 20, 1997 a final judgment was entered in the Federal Suit against Flanagan in the amount of $93,519.38. (Px 175; Px 109)

10.   A debtor's examination of Flanagan was scheduled before Judge Covello on March 9, 1998.  (Judicial Notice)

11.   On February 25, 1998 Plaintiff TCC served a document subpoena on Flanagan requiring Flanagan to produce at the debtor's examination documents pertaining to Flanagan's assets, including Flanagan's stock ownership in T&P. (Px G(1) p. 62)

12.   At the March 9, 1998 debtor's examination, however, Flanagan refused to produce any documents pertaining to his assets, and refused to provide any testimony about his assets. (Px G(1) pp. 63, 69, 80, 81, 83; Px G(2) p. 187)    Rather, Flanagan's attorney represented to Judge Covello that Flanagan was invoking his Fifth Amendment right against self-incrimination and was refusing to provide any evidence about his assets because Flanagan was under criminal investigation by the IRS and the F.B.I. for income tax matters.  (Px 78; Px G(1) p. 83; Px G(2) p. 187)

13.   The purported Fifth Amendment IRS concerns, however, were simply a ruse concocted by Flanagan and his attorney to avoid or delay providing any information to Plaintiffs about the

location and transfer of Flanagan's assets. (Px 105; Px A(1) pp. 197-98)

14.  After hearing the excuses for Flanagan's refusal to produce documents or testify about his assets, on March 9, 1998 Judge Covello issued an order prohibiting Flanagan from transferring his assets, and requiring Flanagan to submit to the Court for in camera inspection the documents pertaining to Flanagan's assets which supposedly were subject to the Fifth Amendment privilege against self-incrimination:

> I'm entering an order that Mr. Flanagan, from this point forward, transfer nothing of a single asset until such time as this is unraveled, and that includes the family lawn mower, bicycle, whatever.
>
> * * *
>
> And, to the extent that the documents that [Plaintiff TCC] seeks are claimed [by Flanagan] to be the subject of a Fifth Amendment privilege, again, the Court would direct that those be submitted to the Court for in-camera inspection.

(Px 78 p. 7)

15.  Thereafter, on April 13, 1998 Judge Covello ordered Flanagan and T&P to turn over Flanagan's stock ownership in T&P or provide sufficient documentation to show Flanagan's disposition of the T&P stock.  (Px 127; Px 109 p. 51)

16.  By 1998, Plaintiffs held judgment and other debt claims against Flanagan which totaled in excess of $1,000,000. (Px G(1) pp. 44-45; Px 175; Px H pp. 60-61, 84, 86, 89, 90 & 93-95; Px 20)

17.  According to Attorney William Gallagher (the former president of the Connecticut State Bar Association) (Px D p. 53)), Flanagan "was probably the New Haven Judicial District's biggest debt beat.  He had enormous number of debts against him."  (Id. p. 28)

18. Further, Flanagan "had a history of trying to avoid paying his creditors." (Id. pp. 47-48)

19. In 1998 Flanagan was engaged in a multi-faceted conspiracy to defraud Plaintiffs out of the benefit of the judgment and other debt claims that they held against Flanagan. (Px B pp. 21-24; 115; 118-20; 228-29; Px 18 p. 2; Px 72 p. 2)

20. According to Attorney Gallagher (who is counsel for Defendants Prymas and T&P herein), there is no doubt in his mind that Flanagan set out not to pay Plaintiffs, one way or the other, "by hook or by crook". (Px D. pp. 60-61)

**B.    The Settlement Proceeds Scheme**

21. In 1996 Flanagan and Prymas had a dispute over management and control of T&P, which resulted in a suit filed by Flanagan against Prymas and T&P in state court in Connecticut. (Px 21 ¶11)

22. Pursuant to a June 17, 1998 settlement of that suit (Px 21) (the "Settlement Agreement"), Flanagan, Prymas and T&P agreed that (1) there would be an adjustment of the management compensation paid to Flanagan to cover the discrepancies for the additional sums that had been paid to Prymas (id. ¶2); (2) an additional $75,000 in settlement proceeds would be paid to Flanagan over three years payable in 78 equal bi-monthly installments of $961.10 (id. ¶12); and (3) Flanagan would not transfer his T&P stock to any other person or entity. (Id. ¶13)

23. It was the original intent of Prymas, T&P and Flanagan that the ¶12 Settlement Agreement payments would be 1099-miscellaneous income, and not wages. (Px B pp. 202; 204-07; 210-11; Px 70; Px D pp. 15-16; Pxs 179, 180, 181 & 182)

24. Indeed, when the stipulation of settlement was dictated into the record, it was the intention of Prymas, Flanagan and T&P to treat the $75,000 settlement payments as a damage settlement which would be 1099 income, and not wages. (Px D p. 19)

25. In addition, the accountant for T&P, James Rayner, was of the opinion that the ¶12 Settlement Agreement payments to Flanagan were "not W-2 compensation (wages), but a taxable damage settlement to be reported on 1099-MISC." (Px 22)

26. As noted by T&P's attorney, William Gallagher, at the time the Settlement Agreement was tendered to the state court for approval, it was the intention of Flanagan, Prymas and T&P that the $75,000 settlement payments would be damage payments -- 1099 income -- and not wages. (Px D p. 20)

27. Further, at a T&P corporate meeting on September 3, 1997, Flanagan, Prymas and T&P all agreed that the settlement payments to Flanagan under ¶12 were "1099 income not subject to garnishment or withholding." (Px 106 p. 3)

28. Indeed, after the date of the execution of the Settlement Agreement on June 17, 1997 until the very date that Plaintiff TCC served a property execution on T&P on January 5, 1998, the ¶12 settlement payments to Flanagan were treated by T&P, Prymas and Flanagan as 1099 income, and not wages. (Px B pp. 62-63; 218 & 223; Px F pp. 4 & 10; Px E p. 172) As noted by Flanagan when it was suggested that the $75,000 settlement payments might be subject to wage garnishment:

> [H]ow can the deal change or get modified to hurt/damage me after the fact? We all agree and sign off on one thing and after the fact there are changes? How is this right?

(Px 182)

29. On January 5, 1998 a federal court writ of execution -- signed by Judge Covello (Px 68-A p. 3) -- was served on Prymas, as president of T&P, in connection with TCC's March 20, 1997 judgment against Flanagan. (Px 111)

30. At p. 2 of the writ, T&P was commanded to

> pay to the sheriff the amount of a debt owed by you [T&P] to the judgment debtor [Flanagan], provided, if the debt owed by you [T&P] is not yet payable, payment shall be made to the sheriff when the debt becomes due if it becomes due within four months after the date of issuance of this execution.

(Px 68-A)

31. Prymas was unsure how to deal with the property execution, and suggested to Flanagan that they seek the guidance of T&P's attorney, Bainer. (Px 68)

32. With the consent of Flanagan, on January 5, 1998 Prymas forwarded the property execution to Bainer for his legal opinion (Px 111), which was reviewed by Bainer on January 5, 1998. (Px 65)

33. Flanagan understood that as of January 5, 1998 T&P was to turn over to the sheriff all non-wage items that T&P held for Flanagan's benefit. (Px A(1) p. 58)

34. On January 5, 1998 Flanagan forwarded the property execution to his personal attorney, Fasano, expressing his concern that the ¶12 Settlement Agreement payments might be subject to the property execution:

> Please see enclosed which was served to Stanley Prymas this morning. I have not received anything yet, however I should be served shortly. My concern here is with the money I am currently receiving from [T&P] as a result of the settlement between Mr. Prymas and I. Is this subject to being taken?

(Px 144)

35. On the next day -- January 6th -- Flanagan asked Fasano whether it would make sense for Fasano to contact T&P's attorney, Bainer, to discuss how to handle the property execution which had been served on T&P. (Px 3)

36. After the property execution was served on T&P, Flanagan wanted the ¶12 Settlement Agreement payments recharacterized from 1099 income (which was subject to the property execution) to wages, and thus avoid losing the ¶12 Settlement Agreement payments to his creditor, TCC. (Px B pp. 213 & 223; Px E p. 93; Px D pp. 47-48)

37. Flanagan, however, was in a predicament: all parties had previously agreed that the ¶12 settlement payments were 1099 miscellaneous income, and T&P had previously treated the prior settlement payments to Flanagan as 1099 miscellaneous income. (Px B pp. 217-218 & 223; Px 72)

38.  Flanagan's personal attorney, Fasano, understood that the ¶12 Settlement Agreement payments, as they had been paid to Flanagan in the past, were subject to the writ of execution. (Px C p. 170)

39.  In an effort to skirt the writ, however, Fasano told T&P's attorney, Bainer, that he (Fasano) wanted the characterization of the ¶12 Settlement Agreement payments changed from 1099 miscellaneous income to wages. (Px C pp. 60 & 63)

40.  On January 9, 1998 Flanagan, Prymas and T&P agreed to send the property execution issue to Flanagan's attorney, Fasano, and to T&P's attorney, Bainer, for their thoughts on how to handle that issue. (Px 112)

41.  Bainer, however, full-well knew that Flanagan waned to recharacterize the ¶12 Settlement Agreement payments from 1099 miscellaneous income to wages in an effort to avoid the federal court property execution that TCC had served on T&P. (Px B p. 223)

42.  On January 12, 1998 Flanagan and Prymas agreed that T&P would "temporarily hold" the ¶12 Settlement Agreement payments to Flanagan, with the checks issued, but placed in a file at T&P, until the matter was resolved. (Px 140)

43.  It was Prymas who informed the bookkeeper, Andrea Steele, to process Flanagan's settlement checks for January, February, March and April of 1998, but to hold on to those checks and not distribute them to Flanagan. (Px F pp. 17-18; Px C p. 172; Px E pp. 87 & 160)

44.  Although Fasano had previously informed Bainer that he (Fasano) wanted the ¶12 settlement payments to be recharacterized as wages (and thus not subject to the federal property execution), on January 13, 1998 Bainer instructed Fasano that unless Fasano took "some affirmative legal action in federal court to stay or otherwise obviate the property execution", T&P would be left with no choice but to turn the ¶12 settlement funds over to the executing creditor, TCC. (Px 23; Px B pp. 191-93; Px E pp. 116-17; & 119-20)

45.  Rather than take any affirmative legal action in federal court to stay the writ of execution, on January 20, 1998 Flanagan and Fasano simply filed a claim exemption form (Px 25)

and an Objection to Property Execution (Px 24) which represented to TCC and Judge Covello that "other than wages, there was no other property belonging to Flanagan which was held by T&P." (Px 24; Px B p. 197)

46. Although Bainer and Prymas knew that Flanagan's and Fasano's representations to TCC and Judge Covello were false (Px 69), they took no steps to honor the federal court property execution and have the ¶12 Settlement Agreemet proceeds paid over to the sheriff.

47. Indeed, on January 25, 1998 -- some 5 days <u>after</u> Flanagan's and Fasano's representations to TCC and the Court -- Prymas informed Flanagan that "we are <u>not</u> treating [the ¶12 settlement payments] as salary, but rather 1099 income." (Px 113 (emphasis added))

48. And then on February 4, 1998 Prymas informed Bainer that any representation to Plaintiff TCC and Judge Covello that T&P "does not have any money assets due to Mr. Flanagan" was a misrepresentation because "T&P does have an obligation to [Flanagan]." (Px 69)

49. The "money assets" that T&P owed to Flanagan were the $75,000 in Settlement Agreement payments. (Px E pp. 128-30)

50. On February 4, 1998 Bainer wrote to Fasano reiterating that the ¶12 settlement payments were being treated by T&P as 1099 miscellaneous income, but suggested that Prymas and T&P would work with Flanagan "to see that Charlie and none of his creditors receives the funds at issue." (Px 70 p. 1)

51. Shortly thereafter, a meeting was scheduled in New Haven to discuss strategy on how to circumvent the federal court property execution. (Px 72)

52. On February 9, 1998 Flanagan and Fasano met with Prymas and Bainer to discuss the federal court property execution and the plan of Fasano and Flanagan to change the characterization of the Settlement Agreement payments to wages. (Px 65 p. 2; Px. B pp. 221-22; Px E pp. 136-39)

53. At that meeting Bainer warned the other Defendants that changing the characterization of the Settlement Agreement payments from 1099 miscellaneous income to wages in response to

the federal court property execution would leave them all open to a claim that there was a civil conspiracy to help Flanagan defraud his creditors. (Px 65 p. 2; Px B pp. 221-22; Px E pp. 136-39)

54. Bainer further warned that the conspiracy claim was a risk that they had to seriously consider. (Px 65 p. 2; Px B pp. 221-22; Px E pp. 136-39)

55. Fasano and Flanagan, as well as Bainer, Prymas and T&P, all agreed to accept that risk. (Id.)

56. Although no affirmative steps were taken in federal court to stay the writ of execution, not a single payment of the $75,000 settlement obligation was turned over to the sheriff, with the ¶12 settlement funds simply recharacterized as wages, and then paid directly to Flanagan. (Pxs 114; 115; 143 & 145); Px B pp. 207-08 & 217)

57. It was admitted by the T&P bookkeeper, Andrea Steele, that she was instructed by Prymas to recharacterize the settlement proceeds from 1099 miscellaneous income to wages. (Px F p. 25)

58. The federal court property execution was issued on January 5, 1998 and expired on May 8, 1998. (Px 68-A; Px E p. 91)

59. The period during which the Settlement Agreement payments were suspended was the same four month period. (Px E p. 91)

60. Prymas told the T&P bookkeeper, Andrea Steele, to process the checks for those four months, but to hold on to them and not distribute them to Flanagan. (Px F pp. 17-18)

61. The four checks that were issued reflected money that was due by T&P to Flanagan under ¶12 of the Settlement Agreement, and at the time that those four checks were issued, the payments were considered 1099 income. (Px F pp. 29; 51-52; & 56)

62. To avoid the federal court property execution, the four issued-but-not-cashed settlement checks were moved to the end of the Settlement Agreement payout (after the writ of execution had expired), and then recharacterized as wages. (Px F pp. 29-33 & 37-38)

63.  According to Prymas, it was Bainer who told him to hold the four issued but not cashed Settlement Agreement checks until the writ of execution expired, and then add those payments to the end of the settlement pay-out. (Px E p. 57)

64.  On November 12, 1998 Prymas and T&P were served with TCC's federal court Post Judgment Remedies Interrogatories, which inquired whether T&P held any non-exempt property (such as Settlement Agreement payments) that belonged to Flanagan. (Pxs 116 & 117)

65.  Although Prymas knew that the ¶12 Settlement Agreement payments had been recharacterized from 1099 income to wages to avoid the earlier writ of execution, he sought comfort from co-conspirator Bainer on how to respond to the federal court PJR Interrogatories. (Px 116)

66.  Bainer affirmed the earlier conspiracy by concurring with Prymas that Flanagan was only paid wages by T&P (Px 118), and thus it was appropriate to respond to TCC that T&P was not in possession of any non-exempt property that belonged to Flanagan. (Px 119)

67.  On November 30, 1998 Flanagan agreed to the continuation of the recharacterization plan. (Id.)

68.  In connection with a $128,217 judgment against Flanagan that had been assigned to TCC, on December 18, 1998 TCC served an additional set of PJR Interrogatories on Prymas and T&P. (Px 26)

69.  Prymas forwarded the PJR Interrogatories to Bainer with the request that Bainer review the documents "and let us know how to respond." (Id.)

70.  Despite the fact that both Prymas and Bainer knew that T&P owed the settlement proceeds to Flanagan pursuant to the earlier Settlement Agreement, Bainer advised Prymas to respond that no money was due by T&P to Flanagan.

71.  Pursuant to the plan worked out among Flanagan, Fasano, Prymas and Bainer, on January 19, 1999 Prymas mailed to Plaintiffs' counsel responses to the PJR Interrogatories which falsely represented that Prymas knew of no funds that were owed to Flanagan.  (Px 24)

### C.  <u>The Shifting Stock Scheme</u>

72.  The Defendants knew that the primary target of TCC's collection efforts was Flanagan's 50% stock ownership in T&P. (Px B pp. 24 & 29)

73.  On January 5, 1998 a federal court property execution was served on T&P by serving its president, Prymas. (Pxs 68; 68A; 111)

74.  Flanagan was aware of the service of the property execution on T&P, and expected a similar property execution to be served on him at any time. (Px 144)

75.  Further, on January 5, 1998 T&P's attorney, Bainer, reviewed the property execution for at least an hour. (Px 65)

76.  Flanagan was concerned that the federal court property execution might lead to the seizure of his T&P stock. (Px D p. 23; Px 3)

77.  Indeed, there was a prior episode where an executing creditor was able to obtain physical possession of Flanagan's stock, which required Flanagan to pay off that creditor to avoid the sale of his stock at a sheriff's sale. (<u>Id</u>.; Px G(1) pp. 93-94)

78.  Flanagan and Prymas' lawyer knew that if a creditor could get hold of Flanagan's stock through execution, Flanagan would be forced to pay off the creditor. (<u>Id</u>.; Px D p. 23; Px 3)

79.  After service of the property execution on January 5, 1998, Flanagan wrote to his personal attorney, Fasano, on January 6th, seeking advice on how to shield Flanagan's T&P stock from TCC's execution efforts:

I wanted to make you aware that S. Prymas faxed to Atty. Bainer who represents T&P Inc. a copy of the Execution from Gaide that I faxed to you on Tues. . . .

* * *

Does it make sense for you to contact Atty. Bainer on my behalf and find out now what the issues are with T&P Inc. over this.  Why would Gaide have S. Prymas served over my matter?  I also <u>do</u> <u>not</u> <u>want</u> <u>it</u> <u>disclosed</u> <u>where</u> <u>my</u> <u>Stock</u> <u>is</u> <u>presently</u> <u>kept</u>.  There may be an attempt to grab this stock.  If there is a concern here, <u>please</u> <u>let</u> <u>me</u> <u>know</u> <u>if</u> <u>I</u> <u>should</u> <u>be</u> <u>doing</u> <u>anything</u> <u>different</u> <u>than</u> <u>what</u> <u>is</u> <u>presently</u> <u>being</u> <u>done</u>.

(Px 3 (emphasis added))

80.  In his January 6th letter, Flanagan was asking Fasano if he (Flanagan) should be doing anything different other than what Flanagan had already done by placing the stock with Socrates Babacas. (Px A(1) pp. 111-12)

81.  Indeed, in order for Fasano to advise Flanagan on whether Flanagan should be doing anything different than "what is presently being done", Fasano would need to know what Flanagan was doing at that time to hide his T&P stock.  (Px C p. 94)

82.  In addition to the property execution which was served on January 5, 1998, on February 4, 1998 TCC filed a motion for turnover of Flanagan's T&P stock, which was received by T&P and Bainer on that same date. (Px 69A)

83.  Accordingly, as of February 4, 1998 Bainer -- as the attorney for T&P -- was on notice that TCC was seeking a turnover order against Flanagan and T&P for the turn over of Flanagan's T&P stock. (Px B pp. 200-01; 66-67; 163-64)

84.  Further, on March 9, 1998 Judge Covello issued an injunction prohibiting Flanagan from transferring any of his assets. (Px 78 p. 7)

85.  At the March 9th hearing, Flanagan pled the Fifth Amendment "based upon outside issues" (<u>i.e</u>., an IRS investigation) to avoid testifying as to the whereabouts of his T&P stock. (Px 105; Px A(1) pp. 197-98)

86.  As admitted by Flanagan, the location of his T&P stock had nothing to do with the IRS investigation. (Px A(1) p. 199)

87.  Flanagan and his attorney, Fasano, understood that Judge Covello's injunction was intended to freeze all of Flanagan's assets.  (Px C p. 45; Px 62)

88.  According to Fasano, Judge Covello was clear that Flanagan was not to transfer or move any of his assets. (Px C p. 45)

89.  Then on April 13, 1998 Judge Covello entered a turnover order (Px 127) requiring Flanagan and T&P to (1) turn over Flanagan's stock in T&P; and (2) provide TCC with a full and complete accounting as to any purported transfer or other disposition of the stock if a claim was asserted that Flanagan had "sold, hypothecated, pledged, gifted or otherwise divested himself or disposed of any interest in [T&P]." (Px 109 p. 51)

90.  On April 22, 1998 it was represented to Judge Covello that Fasano and Flanagan had "gathered together thousands of documents to be produced for in-camera inspection", and estimated that the documents would be produced to the Court within the next week. (Px 73)  The relevant subpoenaed documents, however, were never produced to the Court or to Plaintiffs.  (Px G(1) pp. 62-66, 67, 73-78 & 80-81; Px G(2) pp. 140, 180 & 182)

91.  The relevant subpoenaed documents, however, were never produced to the Court or to Plaintiffs. (Px G(1) pp. 62-66, 67, 73-78 & 80-81; Px G(2) pp. 140, 180 & 182)

92.  Even with the federal writ of execution; the injunction freezing Flanagan's assets; and the Turnover Order for Flanagan's T&P stock, Bainer, Prymas and T&P were still willing to do all that they could to avoid TCC's collection efforts, and thereby prevent TCC from seizing Flanagan's T&P stock. (Px 67 p. 2; Px B p. 217; Px 72))

93.  One of the avenues discussed in mid 1998 was the execution of a buy-sell agreement and placement of a restrictive legend on Flanagan's T&P stock, which would make Flanagan's T&P stock less attractive to his creditors. (Pxs 126; 128; 66 p. 1; 135 p. 1)

94.  Despite Judge Covello's injunction against the transfer of Flanagan's assets and the turnover order requiring the turn over of Flanagan's T&P stock, the Defendants proceeded with their plan to place a restrictive legend on Flanagan's stock. (Px 129)

95.  On July 27, 1998 Flanagan informed Bainer that:

I received your fax regarding the delivery of the T&P
Stock Certificates from Stanley and I.  I left you a
message yesterday that I can deliver the T&P Inc.
stock that pertains to me, have the restrictive
wording put on my stock and take my stock back with
me.  Before this is done, it is my understanding that
you were going to review with Atty. Ippolito [Fasano's
law partner] on Tues. 7-28-98 the Buy Sell Agreement
for Atty. Ippolito's input.  Shouldn't this discussion
and a draft of your and his discussion take place,
have this draft discussed, modified if need be, voted
on by Stanley and I and than finish with the Stock
restrictions.

Please advise.

(Px 56 (emphasis added))

96.  Accordingly, Fasano knew that Flanagan had possession
or control of his T&P stock and that a restrictive legend was to
be placed on Flanagan's stock.  (Px B p. 105)

97.  On August 21, 1998 Flanagan, Prymas and Bainer met at
T&P's office in New Haven to carry out the terms of their plan.
At this meeting, Flanagan handed his T&P stock certificate to
Bainer, who then typed the restrictive legend on the stock and
returned it to Flanagan. (Px B pp. 68 & 92-93)

98.  Although Judge Covello had issued an injunction
prohibiting Flanagan's transfer of assets, and had issued a
turnover order requiring Flanagan and T&P to turn over
Flanagan's T&P stock, Flanagan, Bainer and Prymas refused to
obey Judge Covello's orders and turn over the stock.

99.  Bainer, as T&P's agent, was also subject to the
turnover order and should have turned Flanagan's T&P stock over
to TCC. (Px 133)

100. Flanagan, however, did not feel as though he was
obligated to honor Judge Covello's orders because his attorney,
Fasano, had told him he did not have to turn over his T&P stock.
(Px B pp. 120-21)

101. On September 23, 1998 Judge Covello again ordered Flanagan to turn over to Plaintiff TCC the T&P stock and the documentation showing transfer of that stock. (Px 74)

102. After two motions to stay the enforcement of the turnover order were overruled by Judge Covello, on October 21, 1998 Flanagan and Fasano submitted to the Court a "Notice of Compliance" (Px 1), representing that Flanagan's stock was in the hands of a purported creditor, "Sharon Demetropolis" (actually, "Demetropoulous"), and that Flanagan did not have possession or control of the stock. (Id.; Px C pp. 66-67)

103. On the very next day Flanagan and Fasano submitted an "Amended Notice of Compliance" (Px 2), again representing that Flanagan's stock was in the hands of Ms. Demetropoulous and that Flanagan did not have possession or control of the stock. Flanagan and Fasano also represented that

[s]aid stock has been held by Sharon Demetropolis [sic] prior to the Court's order for turnover on April 13, 1998, and prior to the Court's order on March 9, 1998 prohibiting [Flanagan] from transferring any of his assets.

(Id.)

104. In an affidavit submitted by Fasano to Judge Covello, Flanagan represented that he had "borrowed money from Sharon Demetropolis [sic] and gave her the stock as security for the money." (Px 58; Px C pp. 66-7)

105. But Ms. Demetropoulous (who was one of Fasano's clients) (Px C p. 39) knew nothing about Flanagan's stock, and did not in fact have possession of Flanagan's stock. (Px J p. 23; Px C pp. 67-69)

106. Fasano knew, must have known, or should have known that Flanagan's representations to the Court were false. (Px 62)

107. Indeed, in a letter by Flanagan to Fasano dated January 6, 1998 (Px 3), Flanagan instructed Fasano that "I . . . do not want it disclosed where my Stock is presently kept. There may be an attempt to grab this stock."

108. Fasano admitted that Flanagan's statement is pregnant with the implication that Fasano knew where Flanagan was hiding his stock.  (Px C p. 94)

### (1)  Plan B: The Bogus Babacas Debt Scheme

109. On October 26, 1998 Judge Covello issued a Show Cause Order scheduling a contempt hearing on November 16, 1998 for Flanagan's failure to turn over his stock and failure to provide an accounting as to any disposition of the stock as required by the turnover order.  (Px 77)

110. Now Flanagan and Fasano were caught in a bind.  The purported secured debt of Flanagan to Ms. Demetropoulous was bogus, and Fasano's client did not in fact have possession of Flanagan's stock.

111. Flanagan and Fasano then came up with Plan B: a friend and business associate of Flanagan by the name of Socrates T. Babacas ("Babacas") would claim to have loaned substantial sums of money to Flanagan and also claim to have possession of the stock as collateral for the bogus loan.

112. Pursuant to this plan, on November 11, 1998 Flanagan prepared and had Babacas fax from his office in Springfield, Massachusetts to Fasano's office in New Haven, Connecticut a bogus stock pledge agreement (Px 4) and a bogus assignment of rents. (Px 5)

113. Then on November 12, 1998 Flanagan and Fasano submitted a Second Amended Notice of Compliance (Px 6) now representing that the stock of T&P was not really in the hands of Ms. Demetropoulous as previously represented, but rather was in the possession of Babacas.

114. Flanagan and Fasano also represented that Babacas supposedly had loaned Flanagan "$120,000.00 on or about June 19, 1997, and has held said stock as security for the judgment [sic] since the above date until present . . .." (Id.)

115. Fasano knew, must have known, or should have known that the Babacas debt/stock collateral representations were false.

116. Indeed, Fasano knew that Flanagan had signed a Settlement Agreement on June 17, 1997 (Px 21) which, in ¶13, contained a commitment by Flanagan to not transfer his stock to any other person or entity.

117. Moreover, Fasano knew that on July 7, 1997 Flanagan had signed a sworn certificate representing that he owned his T&P stock "unencumbered from any source" and that he "will not transfer the stock to any other person or entity." (Px 61)

118. As admitted by Flanagan, one of the purposes of placing the stock with Babacus was to keep it out of the hands of Flanagan's creditors. (Px A p. 28)

> **(2)  Flanagan Loans Money To Babacus, But Claims The Loans Were Really Repayment Of The Bogus Babacus Debt**

119. On October 27, 1998 Fasano represented to the Court that "Mr. Flanagan did not make any transfers after Judge Covello's [March 9, 1998] order freezing the assets of Mr. Flanagan." (Px 62)

120. Then again on November 16, 1998 Fasano "assure[d]" the Court that "from the day that order has been received [March 9, 1998], Mr. Flanagan has not transferred any assets." (Px 109 p. 4)

121. Fasano's representations were false.

122. Although Flanagan represented to Judge Covello and TCC (a) that he had not transferred any assets after March 9, 1998; and (b) that Babacus had loaned Flanagan $125,000:

(a)  On May 24, 1998, while the federal court injunction was in effect, Flanagan <u>loaned</u> $500 to Babacus. (Px 9)

(b)  On June 19, 1998, while the federal court injunction was in effect, Flanagan <u>loaned</u> $1,000 to Babacus. Indeed, the $1,000 check was marked "<u>loan</u> - 2 week pay off." (Px 10) Further, in his June 19, 1998 transmittal letter to Babacus (Px 11), Flanagan wrote: "Enclosed is the amount I can <u>loan</u> you. . . . I hope you can repay this <u>loan</u> amount as you told me - w/in 2 wks as I have bills I will have to pay with the money I have <u>loaned</u> to you."

(c)  On August 24, 1998, while the federal court injunction
     was in effect, Flanagan loaned $500 to Babacas.  (Px
     12)

(d)  On October 21, 1998, while the federal court
     injunction was in effect, Flanagan loaned $500 to
     Babacas.  (Px 13)  In a transmittal letter to Babacas
     (Px 14), Flanagan wrote: "Enclosed is $500 check for
     the loan we spoke about.  Per our discussion this loan
     will be paid back w/in 2 wks."

     123. In addition, on March 25, 1999 Flanagan loaned an
additional $300 to Babacas, the very same person that supposedly
had loaned $125,000 in cash to Flanagan.  In his March 25, 1999
transmittal letter to Babacas, Flanagan wrote: "Enclosed please
find the $300 loan amount we spoke about today. . . . I am
running real low on funds."  (Px 15)

     124. On that same date Flanagan wrote another letter to
Babacas stating:

     I have sent via express mail today the $300.  You will
     have it delivered to you by noon tomorrow.

     I really hope this matter goes this next week.  I do
     not have the ability to loan any more money.  As it is
     I am taking my daughters savings and I do not like
     doing this.

(Px 16)

     125. Then on the next day (March 26th) Flanagan faxed yet
another letter to Babacas (Px 17) again confirming the loan by
Flanagan to Babacas, and not any repayment of a loan: "The $300
loan will arrive by noon today. . . . I also must tell you that
I do not have the ability to loan any more money."

     126. Further, Flanagan admitted to Prymas that it was
Flanagan who had loaned money to Babacas. (Px  E pp. 152-53)

     127. Finally, Babacas supposedly held the T&P stock as
collateral for a purported $120,000 loan, but when Flanagan
asked for the return of the stock, Babacas released the
purported collateral (the T&P stock) to Flanagan, for no
consideration, so Flanagan could then pledge the stock to his
father as security for another loan. (Px A(1) pp. 146-47)

128. Indeed, the representations by Fasano to Judge Covello and Plaintiffs about the whereabouts and availability of Flanagan's T&P stock were materially false. (Px 67 p. 2; Px B p. 33)

129. Further, Fasano's representations that Flanagan's T&P stock was out of Flanagan's possession and control since June of 1997 was knowingly both false and misleading. (Px 67 p. 2; Px B p. 146)

130. According to T&P's attorney, Fasano knew that his representations to Judge Covello and Plaintiffs about the location of Flanagan's stock "was substantively untrue." (Px 67 p. 3)

131. As admitted by T&P's attorney, Fasano made materially false and misleading statements to Judge Covello and the Plaintiffs as to the location and control of physical possession of Flanagan's T&P stock. (Px 19 p. 2; Px B p. 147-48)

132. In the fall of 1998 Flanagan and Fasano were playing a "shell game" on the location of Flanagan's T&P stock. (Px B p. 29)

133. According to the attorney for T&P, Fasano's misrepresentations about the location of Flanagan's stock and the movement of the stock from one person to another was evidence of a <u>conspiracy</u> <u>to</u> <u>defraud</u> <u>Flanagan's</u> <u>creditors</u>. (Px B pp. 22-24 & 211)

134. And, as admitted by T&P's attorney, it was <u>Fasano</u> who was allowing Flanagan to shift his stock all around in defiance of Judge Covello's orders, and in derogation of Plaintiffs' rights to obtain execution upon that stock in satisfaction of their judgments against Flanagan. (Px B p. 106; Px 167; Px 19 p. 2)

**(3)    Judge Covello Holds Flanagan In Contempt, But Gives Flanagan The Opportunity To Purge The <u>Contempt By Producing The Subpoenaed Documents</u>**

135. After hearing Flanagan's excuses for not complying with the Court's turnover order, on November 16, 1998 Judge Covello proceeded to hold Flanagan in contempt. As noted by Judge Covello:

> It has been established here [that Flanagan] had willfully and intentionally not complied with the order as previously entered by the Court, and orders [Flanagan] committed to the Bureau of Prisons until such time as he purges himself of the contempt by complying further with the order.

(Px 109 pp. 51-2)

136. In an effort to keep Flanagan from going to jail that very day, Fasano represented to Judge Covello that Flanagan would immediately produce all relevant documents about the purported Babacas debt and the purported stock transfers. (Px 109 p. 53-59)

137. Based on the representations of Fasano, Judge Covello temporarily stayed the execution of his contempt order:

> We're going to continue the [contempt] matter to a very short date here . . . and we'll see what has been produced here, and what problems exist. But we're going to keep after this on a day to day basis until it's resolved. . . . The execution of the [contempt] order is stayed, and the matter is continued to [November 24, 1998] at 10:00 a.m.

(Id. p. 59)

138. For Flanagan to stay out of jail, Flanagan and Fasano were supposed to produce to Judge Covello the documents which would show the bona fides of the purported $120,000 loan by Babacas to Flanagan, and the documents which would show the bona fides of the purported stock pledge by Flanagan to Babacas. (Px C p. 157)

139. Although Fasano represented to Judge Covello that Fasano would supply copies of the money orders for the $125,000 supposedly borrowed by Flanagan from Babacas (Px 109 p. 53), Fasano never saw proof of those money orders, and never produced them to the Court. (Px C p. 152-54)

140. Second, although Fasano represented to Judge Covello that Fasano would demand from Babacas the receipts for the roughly $1,600 per month that Flanagan supposedly paid to

Babacas for the months of October, November and December of 1997 and January and February of 1998, Fasano never saw those receipts, and never produced them to the Court. (Px C pp. 153-54)

141. In addition, although Fasano represented to Judge Covello that he would check Flanagan's calendar and copy the pages for the days that Flanagan had supposedly met with Babacas, Fasano never produced that calendar to the Court. (Px C p. 156)

142. And finally, although Fasano represented to Judge Covello that he would provide copies of his law firm's trust account records to show where Flanagan had supposedly placed the borrowed funds in Fasano's trust account for the payment of Flanagan's bills, Fasano, again, never produced those records to the Court. (Px C p. 156)

143. Accordingly, since neither Flanagan nor Fasano could produce the documentation to show the bona fides of the purported Babacas loan and stock pledge, Flanagan needed to pay-off the federal court judgment as his "get-out-of-jail card." (Px C p. 144)

144. Any pledge of Flanagan's stock to his father, however, would be in violation of the T&P buy-sell agreement (Px B p. 24), and would constitute an obvious attempt to frustrate Flanagan's creditors. (Px B p. 115; Px 18 p. 2)

145. Further, with TCC pursuing Flanagan's T&P stock, and with Fasano acting as the lawyer for both the pledgor-debtor (Flanagan) and the pledgee (Flanagan's father), this was "strong evidence" of an effort by Flanagan and Fasano to defraud Flanagan's creditors. (Px B pp. 118-19; 115-16; Px 18)

146. According to T&P's attorney, Fasano was saying and doing whatever Flanagan wanted in an effort to get Flanagan out of the jam he was in. (Px 67 p. 3)

147. Bainer and Fasano then talked about the possibility that Flanagan would file bankruptcy. (Px 130 p. 2; Px 18 p. 2)

148. Upon filing bankruptcy, Flanagan could claim that the pay-off of the federal court judgment (which had enabled Flanagan to get out of jail) was a voidable preference, which would then have to be paid back to Flanagan's bankruptcy estate. (Px C p. 144)

149. Fasano, however, informed Bainer that Flanagan was not going to file bankruptcy unless he had some sort of side deal with Prymas regarding Flanagan's T&P stock. (Px 18 p. 2; Px B pp. 107-08; Px 130 pp. 2-3)

150. Although Flanagan got out of jail by paying off the federal court judgment, TCC still had "close to $1,000,000 more in judgments" against Flanagan (Px 20), and it appeared to Prymas that "desperation is setting in." (Id.)

151. Further, Prymas was concerned that TCC's collection attorney, Paul Gaide, "has his sights on Charlie's stock and it now looks like he will get it." (Id.)

152. In addition, Fasano informed Bainer that he (Fasano) was concerned that TCC still might obtain Flanagan's T&P stock. (Px 130 p. 1)

153. According to Bainer, Fasano was concerned that the prior restrictive legend that was placed on Flanagan's T&P stock might not be valid because it was placed on Flanagan's stock in violation of the prior orders of Judge Covello:

> Then Fasano went on to explain concern that Gaide will obtain Charlie's [T&P] stock.  Told him that I didn't think Gaide creditors would find the stock attractive with restriction/legend on it.
>
> He replied "what if the restriction is invalid?"  He then related that the Federal Court [Covello] had issued an order in March 1998 prohibiting Charlie from transferring or diminishing his assets including the stock.  Lenny seemed to think that this affected the viability of the restriction placed on the stock in the summer of 1998.

(Px 130 p. 1)

### (4)  Bainer Vies For Control Of The Efforts To Protect Flanagan's Assets

154. Bainer was not overly impressed with Fasano's handling of the Flanagan stock crisis, and was more than willing to let Flanagan and Prymas know that he could do a much better job in fending off the execution efforts of Plaintiffs.  According to Bainer, Fasano was "in way over [his] head in this matter." (Px 66 p. 2)

-22-

155. Prymas and T&P, however, were still willing to do all that they could to try to prevent Flanagan's T&P stock from falling into the hands of TCC. (Px 135 p. 2)

156. In a December 10, 1998 letter to Fasano, Bainer wrote:

As for your alleged "strategy", it doesn't seem to have served Charlie very well at all. From what I can tell, and in my opinion, there is no organized "strategy" at all. Which is one of the reasons the current serious difficulties exist. It was your obligation to protect Charlie from testifying in any fashion that would harm him, and arguably the Corporation. My understanding is that he has testified before the Federal Court as recently as November 1998, that no restriction has been placed upon his stock. It is my further understanding that a copy of his stock, without the restriction I personally typed onto it [in August 1998], was presented to the Federal Court in November 1998, as a copy of his current stock in its current form.

You knew a restriction had been placed on that stock and purportedly allowed Charlie to harm himself by testifying in that fashion. You should have protected Charlie, from himself and his lack of knowledge about the legal system, in this regard and did not do so.

(Px 18)

157. In that same letter, Bainer told Fasano:

Further, that you don't see the problem with such an arrangement, or your representing Charlie and Judge Flanagan, with regard to Charlie's pledging of his stock, in known violation of the buy/sell agreement, and in an obvious attempt to frustrate the creditors, is a strong testament to the reason Charlie finds himself in the serious difficulty he apparently, and unfortunately, does. Your representation of the pledgor and pledgee in this situation is strong evidence that there does exist an improper effort to defraud the creditors.

(Px 18, emphasis added)

158. In a follow-up letter to Fasano, Bainer stated: With regard to your various threats of suits, conflicts, etc., it is unfortunate that you practice this way. The substantive conflicts are yours. You and Charlie's interest is now at conflict because <u>you made a materially false and misleading representation to the Court</u> in your November 12, 1998, pleading of "Amended Compliance" <u>about the location and control of physical possession of Charlie's stock</u>.

* * *

You are not going to hold Thompson & Peck, Inc. hostage by telling me what I can or can not do for my Client. From what I can tell, your legal acumen is to fight with everyone whom doesn't agree with your view of things. It is your judgment of <u>allowing Charlie to move the stock around</u>, instead of dealing with the matter straight-up, which causes him to be in the current predicament in which he finds himself -- including a Federal Court Judge threatening to put him in Federal prison.

(Px 19, emphasis added)

159. A board of directors meeting of T&P was held on December 11, 1998 where Bainer made his pitch to take over the efforts to thwart Plaintiffs' ability to execute on Flanagan's Insurance Agency stock.

160. At that meeting Flanagan, Prymas and Bainer agreed that they would work together in an effort to defeat the judgment claims of Plaintiffs. (Px 185)

161. Flanagan agreed that Bainer would now be in charge of the efforts to shield Flanagan's assets from the judgment claims of Plaintiffs. (Px 122)

D.  **The Secret Checking Account Scheme**

162. In 1998 Flanagan owned three rental properties in Connecticut.

163. In order to conceal his ownership of these properties, Flanagan had placed the title to these three properties in the names of two entities that he owned and controlled. (Px A(1) pp. 58 & 93-94)

164. Flanagan owned an 18-unit apartment building at 17 Howe Street, New Haven, Connecticut (the "Howe St. Property") which Flanagan held in the name of Howe Street Associates. (Id.)

165. In addition, Flanagan owned an office building at 2790 Whitney Avenue, Hamden, Connecticut (the "Whitney Ave. Property"), which was owned by Flanagan in the name of West Meadow Associates. (Id.)

166. Further, Flanagan owned an apartment building at 475-81 George Street, New Haven, Connecticut (the "George St. Property"), which was also held by Flanagan in the name of Howe Street Associates. (Id.)

167. On March 9, 1998 Judge Covello issued an injunction which prohibited Flanagan from transferring any of his assets. (Px 78 p. 7)

168. It was Fasano's understanding that Judge Covello's injunction was intended to freeze all of Flanagan's assets. (Px C p. 45)

169. Indeed, Fasano was of the belief that Judge Covello was clear that Flanagan was not to move or transfer any of his assets. (Id.)

170. Flanagan also understood that, under Judge Covello's injunction, he was to transfer nothing, not even the family lawn mower. (Px A(1) pp. 55-56)

171. Obviously, Flanagan's rental income and equity from his three rental properties were covered by Judge Covello's injunction. (Px C p. 49)

172. As admitted by Fasano, if Flanagan had taken proceeds from a rental property and used the proceeds to either put in his own pocket or to pay third parties, that would have been a violation of Judge Covello's injunction. (Px C p. 50)

173. On November 16, 1998 Flanagan's attorney, Fasano, represented to the Court that Flanagan had not, in fact, transferred any of his assets in violation of Judge Covello's March 9, 1998 injunction. As represented by Fasano:

> After [the March 9, 1998] hearing, Your Honor, what you did was froze all of the assets of Mr. Flanagan, indicating that he's not to transfer any assets whatsoever, and <u>let</u> <u>me</u> <u>assure</u> <u>the</u> <u>Court</u> from the day that order has been received, <u>Mr.</u> <u>Flanagan</u> <u>has</u> <u>not</u> <u>transferred</u> <u>any</u> <u>assets</u>.

(Px 109 pp. 2-3 (emphasis added))

174. Fasano's representation to the Court was false.

175. In September/October of 1998 -- while the federal court injunction was still in effect -- Flanagan borrowed $94,200 against the George St. Property and placed a $94,200 mortgage on that property (Px A(1) pp. 133-34)

176. In violation of Judge Covello's injunction, Flanagan not only placed a mortgage on one of his properties, but also transferred every penny of the $94,200 in mortgage proceeds. (Px A(1) pp. 160-66)

177. As admitted by Flanagan's attorney, Fasano, this was a violation of Judge Covello's injunction. (Px C p. 52)

178. Further, <u>based</u> <u>on</u> <u>Fasano's</u> <u>advice</u>, Flanagan secretly ran the income from his rental properties through three checking accounts in the names of third parties: one in the name of MJCC Corp., which was an entity controlled by Flanagan; the second in the name of Matthew Flanagan, which was one of Flanagan's sons; and the third in the name of Jeremy Flanagan, which was another of Flanagan's sons. (Px A(1) pp. 22-23; 63-64; 99; 128-30 & 219-220; Px A(4) p. 184)

179. Flanagan had signatory authority on all three accounts. (Px A(1) pp. 77-78 & 219-20)

180. In March of 1998 Flanagan did not put his rental property income in an account in his own name because he was trying to hide that income from his creditors. (Px A(1) pp. 22-23 & 73-74)

181. Moreover, Flanagan put the rental property income in the name of his children's checking accounts on the advice of his attorney, Fasano. (Px A(5) p. 28; Px A(1) pp. 15 & 26)

182. Further, on March 9, 1998 Flanagan and Fasano were ordered to prepare a computation of all income and all necessary living expenses for Flanagan, which was filed with the Court on March 17, 1998. (Px 90)

183. This computation was supposed to include all income that Flanagan received from any source, including any rental income. (Px C pp. 187-89)

184. The computation that Flanagan and Fasano filed with the Court, however, did not include any income from Flanagan's rental properties. (Px A(1) pp. 62-63)

185. During a two-day period in August of 1998 -- while the federal court injunction was still in effect -- Flanagan took $11,600 out of the Jeremy Flanagan account and cashed the checks. (Px A(1) pp. 153)

186. Further, over a four-day period in August of 1998 -- again, while the March 9, 1998 injunction was still in effect -- Flanagan wrote four checks totaling $19,759, all payable to cash, with no documentation to show what Flanagan did with the money. (Px A(1) pp. 160-61)

187. The chart printed in the Motion for Summary Judgment Brief shows Flanagan's activity in writing over $43,700 worth of checks to cash; to himself; to his wife; and to Socrates Babacas during the very time that this Court had enjoined Flanagan from transferring any of his assets.

188. Fasano's November 16, 1998 assurance to the Court that Flanagan had "not transferred any assets" (Px 109 p. 4) was false.

189. It was Fasano who advised Flanagan that it was perfectly acceptable to transfer the funds out of Flanagan's nominee checking accounts even in the face of the Court's March 9, 1998 injunction. (Px A(1) pp. 15; 59-60; 64; 95 & 100-01)

190. Fasano now admits, however, that any such conduct on the part of Flanagan would, in fact, be a violation of this Court's March 9, 1998 injunction.  (Px C p. 50)

191. On December 14, 2002 Flanagan plead guilty to the felony of submitting a false financial form to the IRS  (Pxs 76 & 77; Px A(1) p. 7)

192. The rental properties -- and the income therefrom -- hidden from the IRS are the same rental properties previously hidden from the Court and the Plaintiffs in the prior suit.  (Px A(1) pp. 50-51)

**E.   The Caporale Property Transfer Scheme**

193. In November of 1998 Flanagan met with Joseph Caporale ("Caporale") to discuss Flanagan's property transfer scheme. (Pxs K(1) & K(2))

194. Caporale's wife is the cousin of Flanagan's wife.

195. At this meeting Flanagan said that he wanted to put some of his properties into Caporale's name if he (Caporale) was willing to go along with it.  Caporale agreed.  (Id.)

196. Although Caporale never saw any of the rental properties, on December 4, 1998 Flanagan had his controlled business entities execute deeds to convey the George St. Property, the Howe St. Property and the Whitney Ave. Property to Caporale.

197. Flanagan then set up a United States Post Office box in Hamden, Connecticut (near Flanagan's office) for the receipt of the monthly rent checks, and opened a joint checking account at First Union Bank in Branford, Connecticut for the deposit of the rent checks.  (Id.)

198. From early 1999 until approximately October of 2000, the monthly rent checks from Flanagan's rental properties were made out, at Flanagan's direction, to Caporale and mailed by the various tenants on the various properties to the P.O. box in Hamden, Connecticut.

199. For one tenant alone, the monthly rent checks made out to Caporale were $1,100 per month.  (Id.; Px 184)

200. Although these monthly rent checks were made out to Caporale and mailed to the Caporale P.O. box, Caporale never went to the P.O. box; never saw a rent check; never endorsed a rent check for deposit; never saw a monthly bank statement; and never saw or received a penny from the rents.

201. Rather, either Flanagan or Lisa Flanagan would forge Caporale's name on the back of each rent check, and then cash or deposit the checks into this account for Flanagan's own use and benefit. (<u>Id</u>.)

### F.    <u>Flanagan Commits Bankruptcy Fraud</u>

202. Although Flanagan had transferred, hidden or shielded his assets from the claims of Plaintiffs, Flanagan still wanted to recoup the $99,542.87 that he was forced to pay to TCC to avoid going to jail for contempt.

203. So on February 17, 1999 Flanagan filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Connecticut in New Haven.  Thereafter Flanagan filed a bankruptcy adversary proceeding against TCC (<u>Flanagan v. Cadle</u>, Adversary No. 99-3053) alleging that the $99,542.87 that was paid to TCC was a voidable preference, and thus subject to recoupment by Flanagan through §547(b) of the Bankruptcy Code. (Flanagan Answer ¶70)

204. In his bankruptcy schedules, Flanagan listed the false debt owed to Babacas, but did not list the alleged debt owed to Ms. Demetropoulous.  (Px 174)

205. Further, Flanagan did not list in his bankruptcy schedules the ownership interests that he had in the three rental properties, and falsely testified at the §341 Meeting of Creditors that he did not own any real estate.  (Px 173 pp. 8 & 53)

206. Flanagan did not list in his bankruptcy schedules the substantial rental income that he had received and was continuing to receive from the George St. Property, the Howe St. Property and the Whitney Ave. Property.

207. In connection with the filing and prosecution of his bankruptcy proceeding, Flanagan knowingly, intentionally and fraudulently made the following false oaths:

(a)    In Schedule I - Current Income and at #1 and #2 of the Statement of Financial Affairs, Flanagan failed to disclose the rental income that he was receiving and had received for the two years prior to his bankruptcy filing from the George St. Property, the Whitney Ave. Property and the Howe St. Property, the three rental properties that were equitably owned by Flanagan.

(b)    In Schedule I - Current Income, Flanagan failed to disclose as additional sources of income the rental proceeds that he received from his three rental properties.

(c)    At the April 5, 1999 §341 Meeting of Creditors (Px 173), Flanagan provided false testimony that he had no other source of income other than as an employee of Thompson & Peck, Inc. and Flanagan/Prymas Insurance Group. (Id. p. 29) Contrary to Flanagan's representations, at the time of his bankruptcy filing he was receiving additional income from his three rental properties.

(d)    At #2 of Schedule B - Personal Property (Px 174), Flanagan made the false representation that he had no money in any checking accounts. Contrary to Flanagan's representations, at the time of his bankruptcy filing, Flanagan had many thousands of dollars in three separate checking accounts in the names of Matthew Flanagan, Jeremy Flanagan and MJCC Corporation, which Flanagan had set up for his personal benefit and over which Flanagan had control and check writing authority.

(e)    At #11 of the Statement of Financial Affairs (Px 174), Flanagan made the false representation that there were no financial accounts for his benefit which were closed or otherwise transferred within one year immediately preceding his bankruptcy filing. Contrary to Flanagan's representations, there were three separate checking accounts in the names of Matthew Flanagan, Jeremy Flanagan and MJCC Corporation for the benefit of Flanagan which were closed or otherwise transferred within the one year immediately preceding his bankruptcy filing.

(f)  At #12 of the Statement of Financial Affairs (Px 174), Flanagan made the false representation that he did not have any depository in which he had cash within one year immediately preceding his bankruptcy filing. Contrary to Flanagan's representations, Flanagan had deposited many thousands of dollars of his rental income into three separate checking accounts in the names of Matthew Flanagan, Jeremy Flanagan and MJCC Corporation as depositories within the one year immediately preceding his bankruptcy filing.

(g)  At the April 5, 1999 §341 Meeting of Creditors (Px 173), Flanagan provided false testimony that he had never contributed any property or assets to MJCC Corporation. (Id. p. 57) Contrary to Flanagan's representations, Flanagan had deposited many thousands of dollars of rental income from his three rental properties into a checking account in the name of MJCC Corporation.

(h)  At the April 5, 1999 §341 Meeting of Creditors (Px 173), Flanagan provided false testimony that MJCC Corporation did not have any business and had not been active for the prior five years. (Id. p. 6) Contrary to Flanagan's representations, MJCC Corporation was in fact an active corporation as the general partner of MJCC Realty Limited Partnership, and MJCC Corporation had received many thousands of dollars of rental income from Flanagan's three rental properties over the prior five-year period of time.

(i)  At #3 of the Statement of Financial Affairs (Px 174), Flanagan failed to disclose the numerous creditors that he had paid within 90 days of his bankruptcy filing through the three separate checking accounts in the names of Matthew Flanagan, Jeremy Flanagan and MJCC Corporation.

(j)  At the April 5, 1999 §341 Meeting of Creditors (Px 173), Flanagan provided false testimony that after Flanagan transferred his three rental properties to Caporale in December of 1998, all of the rental income from the properties had been received by Caporale. (Id. p. 69) Contrary to Flanagan's representations, after the transfer of the three rental properties to

Caporale in December of 1998, the rental income from the three properties did not go to Caporale, but rather went to Flanagan and his wife, Lisa Flanagan. (Pxs K(1) & K(2))

(k)   At the April 5, 1999 §341 Meeting of Creditors (Px 173), Flanagan provided false testimony that when he transferred his three rental properties to Caporale in December of 1998, there was no equity in any of the properties.  (Id. p. 66)  Contrary to Flanagan's representations, there was substantial equity in the three properties at the time that they were transferred to Caporale.  (Pxs 177; 184; 39(A), 39(B) & 39(C))

(l)   At #13 of Schedule B - Personal Property (Px 174), Flanagan made the false representation that there were no accounts receivable that were owed to Flanagan. Contrary to Flanagan's representations, at the time of Flanagan's bankruptcy filing, Flanagan was owed many thousands of dollars for loans to Socrates Babacas.

(m)   In Schedule B - Personal Property (Px 174), Flanagan falsely listed Socrated Babacas as a secured creditor in the amount of $85,000 with a purported security interest in Flanagans' stock in Thompson & Peck, Inc. and Flanagan/Prymas Insurance Group.  Contrary to Flanagan's representations, no money was owed by Flanagan to Babacas, and Babacas did not in fact have a legitimate security interest in Flanagan's stock in either Thompson & Peck, Inc. or Flanagan/Prymas Insurance Group.

(n)   At the 2004 examination conducted on September 13, 2002, Flanagan provided false testimony that he had produced copies of all of his financial statements to counsel for Plaintiffs. (Px A(3) pp. 340-41)  Contrary to Flanagan's representations, Flanagan had failed to produce a copy of a July 12, 1994 financial statement that Flanagan had provided to the IRS.

(Px I ¶3)

208. Further, in the three years prior to Flanagan's bankruptcy filing, Flanagan received over $300,000 in rental income from the George St. Property, the Whitney Ave. Property and the Howe St. Property, the three rental properties that Flanagan equitably owned.

209. In addition, in the fall of 1998 Flanagan received $94,200 in cash through a mortgage loan on the George St. Property. (Px 178)

210. Flanagan has failed to explain satisfactorily his loss of assets or deficiency of assets to meet his liabilities. (Px I ¶3)

## G. **Mail Fraud And Interstate Commerce**

211. As shown by the above summary judgment evidence, the United States Postal Service was used in connection with the Settlement Proceeds Scheme, the Shifting Stock Scheme, the Secret Checking Account Scheme and the Caporale Property Transfer Scheme.

212. Further, at all relevant times, Plaintiffs conducted business in numerous states and their business activities involve banks, financial institutions and customers in numerous states. (Px I ¶4)

## H. **Damages**

213. The Defendants' conduct as set forth in the summary judgment evidence not only caused Plaintiff to lose the ability to collect on Plaintiffs' judgments and other debt claims against Flanagan, but also caused Plaintiffs to incur substantial legal fees and other expenses in chasing and attempting to track down Flanagan's assets. (Px H pp. 60, 61, 84, 86, 89, 90 & 93-95; Px G(1) pp. 44-50; Px 175; Px G(2) p. 165)

## I. **There Is No Evidence To Support The Counterclaim Of T&P Or The Defendants' Affirmative Defenses**

214. There is no evidence to support T&P's Counterclaim for bad faith litigation.

215. The summary judgment evidence shows that there was, in fact, a good faith basis for Plaintiffs' claims; that the suit was filed with probable cause; and that there is, in fact, probable cause to support Plaintiffs' claims.

216. There is no basis for T&P's Counterclaim because no final judgment has been entered in T&P's favor as to Plaintiffs' claims against T&P as asserted in this suit.

217. Further, there is no evidence to support the affirmative defenses of payment/satisfaction as asserted by the Defendants.

218. While TCC received full payment on the final judgment rendered in the Federal Court Action, Plaintiffs did not receive full payment on the other judgment claims that Plaintiffs held against Flanagan. (Px H pp. 60, 61, 84, 86, 89, 90 & 93-95; Px G(1) pp. 44-50; Px 175; Px G(2) p. 165)

219. In addition, there is no evidence to support the affirmative defenses of waiver and estoppel as asserted by the Defendants.

220. Indeed, any alleged failure to serve notices of court orders would simply be a defense to a portion of Plaintiffs' claims, and not an affirmative defense to all of Plaintiffs' claims.

221. In addition, there is no evidence that the Defendants were without notice of the court orders at issue in this case.

222. Further, there is no evidence to support the affirmative defense of vexatious litigation as asserted by the Defendants.

223. Indeed, the summary judgment evidence shows that there was, in fact, a good faith basis for Plaintiffs' claims; that the suit was filed with probable cause; and that there is, in fact, probable cause to support Plaintiffs' claims.

224. There is no evidence to support the affirmative defenses of unclean hands, overreaching or unethical conduct as asserted by the Defendants.

225. There is no evidence that any alleged improper conduct on the part of Plaintiffs has any connection with the claims of Plaintiffs against the Defendants in this suit, and thus there is no basis for the affirmative defenses of unclean hands, overreaching and unethical conduct.

Respectfully submitted,
ARMSTRONG LAW FIRM


DATED: May __, 2004.          By_____
                              F. Dean Armstrong
                              Ct. Fed. Bar #CT22417
                              1324 Dartmouth Road
                              Flossmoor, IL 60422
                              (708) 798-1599
                              Fax (708) 798-1597


                              Edward C. Taiman, Esq.
                              SABIA & HARTLEY, LLC
                              190 Trumbull Street
                              Suite 202
                              Hartford, CT 06103-2205
                              (860) 541-2077
                              Fax (860) 713-8944

                              Attorneys for Plaintiffs
                              The Cadle Company and
                              D.A.N. Joint Venture,
                              A Limited Partnership

## **Certificate of Service**

    I certify that a correct copy of the foregoing instrument was faxed and mailed on May 11, 2004 to all defense counsel as shown on the attached Service List.

 

 

_____
F. Dean Armstrong