UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| THE CADLE COMPANY and D.A.N. JOINT VENTURE, A LIMITED PARTNERSHIP, | § § § | No. 3:01CV531(AVC) |
| Plaintiffs, | § | |
| vs. | § | |
| CHARLES A. FLANAGAN, et al. | § | September 7, 2004 |
| Defendants. | § | |

PLAINTIFFS' CONSOLIDATED RESPONSE TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

This is the Consolidated Response of Plaintiffs The Cadle Company ("TCC") and D.A.N. Joint Venture, A Limited Partnership ("DJV") to the Motions for Summary Judgment submitted by (1) Defendants Todd R. Bainer and Todd R. Bainer, L.L.C. (collectively, "Bainer"); (2) Defendants Leonard A. Fasano and Fasano & Ippolito (n/k/a Fasano, Ippolito & Lee, L.L.C.) (collectively, "Fasano"); (3) Defendants Stanley F. Prymas ("Prymas") and Thompson & Peck, Inc. ("T&P"); and (4) Defendant Charles A. Flanagan ("Flanagan").

<u>Introduction</u>

Most defendants don't confess. Rather, when a fraudfeasor is implicated in a scheme to defraud, the excuses start flowing like warm caramel over a rotten apple. While cross examination at depositions can strip away some of the sweet veneer, the best way to find out whether or not the core is rotten is to look at what was said and what was done before the suit was filed.

Here the pre-suit documents outline a concerted effort by the Defendants to hide, transfer and otherwise shield the substantial assets of Charles A. Flanagan ("Flanagan") from the judgment claims of Plaintiffs. As shown by the following, Flanagan orchestrated a complex and complicated scheme to defraud the Plaintiffs out of the benefit of their judgments against him, and in the process enlisted the support of his friends, his family and his business associates -- who are the other Defendants named in this suit.

While most defendants won't confess their own wrongful conduct, sometimes -- as in this case -- one co-conspirator will turn on the other co-conspirator. Here Flanagan's co-conspirators have admitted that:

(1)    "[T]he evidence developed during discovery . . . shows that Flanagan was desperately attempting to conceal his assets and evade his creditors." (Prymas/T&P MSJ Mem. p. 9)

(2)    Flanagan's conduct in transferring and pledging his T&P stock to various individuals "delayed, hindered or defrauded [Plaintiffs'] execution on [Flanagan's T&P] stock." (Bainer MSJ Mem. p. 34)

(3)    "It was Flanagan who transferred the T&P stock to Babacus and others to avoid execution by the plaintiffs." (Prymas/T&P MSJ Mem. p. 28)

(4)    "As the . . . facts produced during discovery amply demonstrate, the . . . fraud that caused Plaintiffs' inability to collect [on the judgment debts owed by Flanagan] was [committed by] Flanagan himself." (Prymas/T&P MSJ Mem. p. 28)

 (5) It was "Flanagan's fraudulent efforts to evade his creditors" that caused "Plaintiffs' lack of collection success . . .." (Prymas/T&P MSJ Mem. p. 28)

 (6) "Flanagan, himself, was the source of the fraud upon which Plaintiffs suffered damages . . .." (Prymas/T&P MSJ Mem. p. 20)

Finally, as noted by Judge Buchmeyer in a very similar case,

> [u]nder RICO one co-schemer is liable for the other co-schemers' predicate acts. Indeed, upon joining a fraudulent conspiracy, each defendant becomes liable for the prior conduct of the earlier conspirators, and remains liable for the subsequent conduct of the other conspirators.

<u>Cadle Co. v. Schultz</u>, 779 F.Supp. 392, 400 (N.D.Tex. 1991).

## I. The Defendants Have Failed To Meet Their Summary Judgment Burden

Pursuant to Rule 56(c), Fed.R.Civ.P., summary judgment is only appropriate

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

In deciding whether a genuine issue of material fact has been raised as to an issue, this Court "must construe the facts in the light most favorable to the non-moving party [Plaintiffs] and must resolve all ambiguities and draw all reasonable

inferences against the movant [Defendants]." <u>Baisch v. Gallina</u>, 346 F.3d 366, 371-72 (2d Cir. 2003)

Further, numerous allegations in Plaintiffs' Second Amended Complaint ("2AC") went unchallenged by the Defendants. Accordingly, the allegations in Plaintiffs' Second Amended Complaint not refuted by competent summary judgment evidence remain unresolved fact questions to be resolved at trial. <u>See Landry v. Air Line Pilots Ass'n</u>, 901 F.2d 404, 426, 430 & 431 (5th Cir. 1990).

As shown by the following, the Defendants have failed in their summary judgment burden, and the Defendants' Motions for Summary Judgment should be denied.

## II.    <u>Summary Of Facts</u>

### A.    <u>Background</u>

Flanagan was a very wealthy man.  In the early 1990s Flanagan had over $11,700,000 in assets, with a net worth of over $4,355,000. (Px 55)

Flanagan's largest single asset was his 50% stock ownership in Thompson & Peck, Inc. ("T&P"), which was a large, independent insurance agency in Connecticut. (Px 176)  Flanagan's 50% stock ownership in T&P was estimated to be worth $2,000,000. (Px 55)

In addition, Flanagan received substantial rental income from numerous apartment buildings and other rental properties that he owned. (Px 177; Px C p. 49; Px H pp. 60-61; Px 55) Flanagan, however, was a notorious slumlord who drained income

from his properties by taking money out of his apartment buildings, but not putting any money back in. (Px D pp. 56-57)

Not only was Flanagan a notorious slumlord, in the mid 1990s Flanagan submitted a false financial disclosure form to the IRS in an effort to convince the IRS to reduce the amount of his taxes. (Px A(1) pp. 30-31; 48-49 & 53) Flanagan intentionally omitted from the IRS disclosure form his access to a checking account in the name of "Crocker House Associates", which was a d/b/a of Flanagan, and Flanagan's ownership of various apartment buildings, which were held in the names of other entities that were secretly owned and controlled by Flanagan. (Px A(1) pp. 32; 48-51; Pxs 75 & 76) On December 4, 2002 Flanagan pled guilty to the felony of submitting false financial information to the IRS. (Px A(1) p. 7; Pxs 76 & 77)

In 1996 Plaintiff TCC filed suit against Flanagan in Cadle v. Flanagan, United States District Court, District of Connecticut, No. 3:96-CV-02648 (AVC) (the "Federal Suit" or "Cadle I") in connection with Flanagan's default on a $75,000 loan which had previously been conveyed to TCC. (Flanagan Answer ¶70) On March 20, 1997 a final judgment was entered in the Federal Suit against Flanagan in the amount of $90,747.87. (Px 175; Px 109 p. 51)

A debtor's examination of Flanagan was scheduled before Judge Covello on March 9, 1998. On February 25, 1998 Plaintiff TCC served a document subpoena on Flanagan requiring Flanagan to

produce at the debtor's examination documents pertaining to Flanagan's assets, including Flanagan's stock ownership in T&P. (Px G(1) p. 62)

At the March 9, 1998 debtor's examination, however, Flanagan refused to produce any documents pertaining to his assets, and refused to provide any testimony about his assets. (Px G(1) pp. 63, 65, 80, 81, 83; Px G(2) p. 187) Rather, Flanagan's attorney represented to Judge Covello that Flanagan was invoking his Fifth Amendment right against self-incrimination and was refusing to provide any evidence about his assets because Flanagan was under criminal investigation by the IRS and the F.B.I. for income tax matters. (Px 78; Px G(1) p. 83; Px G(2) p. 187) The purported Fifth Amendment IRS concerns, however, were simply a ruse concocted by Flanagan and his attorney to avoid or delay providing any information to Plaintiffs about the location and transfer of Flanagan's assets. (Pxs 105 & 18; Px A(1) pp. 197-99)

After hearing the excuses for Flanagan's refusal to produce documents or testify about his assets, on March 9, 1998 Judge Covello issued an order prohibiting Flanagan from transferring his assets, and requiring Flanagan to submit to the Court for <u>in camera</u> inspection the documents pertaining to Flanagan's assets which supposedly were subject to the Fifth Amendment privilege against self-incrimination:

> I am entering an order that Mr. Flanagan, from this point forward, transfer nothing of a single asset until such time as this is unraveled, and that includes the family lawn mower, bicycle, whatever.
>
> * * *
>
> And, to the extent that the documents that [Plaintiff TCC] seeks are claimed [by Flanagan] to be the subject of a Fifth Amendment privilege, again, the Court would direct that those be submitted to the Court for in-camera inspection.

(Px 78 p. 7)   Thereafter, on April 13, 1998 Judge Covello ordered Flanagan and T&P to turn over Flanagan's stock ownership in T&P or provide sufficient documentation to show Flanagan's disposition of the T&P stock.  (Px 127; Px 109 p. 51)

By 1998, Plaintiffs held judgment and other debt claims against Flanagan which totaled in excess of $1,000,000. (Px G(1) pp. 44-45; Px 175; Px H pp. 60-61, 84, 86, 89, 90 & 93-95; Pxs 20 & 175)  According to Attorney William Gallagher (the former president of the Connecticut State Bar Association) (Px D p. 53)), Flanagan "was probably the New Haven Judicial District's biggest deadbeat.  He had enormous number of debts against him." (Id. p. 28)  Further, Flanagan had a history of trying to avoid paying his creditors. (Id. pp. 47-48)

In 1998 Flanagan was engaged in a multi-faceted conspiracy to defraud Plaintiffs out of the benefit of the judgment and other debt claims that they held against Flanagan. (Px B pp. 21-24; 115; 118-20; 228-29; Px 18 p. 2; Px 72 p. 2)  According to

-7-

Attorney Gallagher (who is counsel for Defendants Prymas and T&P herein), there is no doubt in his mind that Flanagan set out to not pay Plaintiffs, one way or the other, "by hook or by crook". (Px D pp. 60-61)

As shown below, Defendants Todd R. Bainer ("Bainer"), Leonard A. Fasano ("Fasano"), Stanley F. Prymas ("Prymas") and T&P provided knowing and substantial assistance to Flanagan in his continuing efforts to defraud Plaintiffs out of the benefit of the judgment claims that they held against Flanagan. The concerted conduct of the Defendants constitutes a RICO conspiracy to assist Flanagan in his continuing efforts to thwart Plaintiffs' collection efforts, and thereby maintain control over his financial empire.

### B.    The Settlement Proceeds Scheme

In 1996 Flanagan and Prymas had a dispute over management and control of T&P, which resulted in a suit filed by Flanagan against Prymas and T&P in state court in Connecticut ("Flanagan v. Prymas". (Px 21 ¶11) Pursuant to a June 17, 1998 settlement of that suit (Px 21) (the "Settlement Agreement"), Flanagan, Prymas and T&P agreed that (1) there would be an adjustment of the management compensation paid to Flanagan to cover the discrepancies for the additional sums that had been paid to Prymas (id. ¶2); (2) an additional $75,000 in settlement proceeds would be paid to Flanagan over three years payable in 78 equal bi-monthly installments of $961.10 (id. ¶12); and (3)

Flanagan would not transfer his T&P stock to any other person or entity. (Id. ¶13)

It was the original intent of Prymas, T&P and Flanagan that the ¶12 Settlement Agreement payments would be 1099-miscellaneous income, and not wages. (Px B pp. 202; 204-07; 210-11; Px 70; Px D pp. 15-16; Pxs 179, 180, 181 & 182)    Indeed, when the stipulation of settlement was dictated into the record, it was the intention of Prymas, Flanagan and T&P to treat the $75,000 settlement payments as a damage settlement which would be 1099 income, and not wages. (Px D p. 19)

In addition, the accountant for T&P, James Rayner, was of the opinion that the ¶12 Settlement Agreement payments to Flanagan were "not W-2 compensation (wages), but a taxable damage settlement to be reported on 1099-MISC." (Px 22)    As admitted by T&P's attorney, William Gallagher, at the time the Settlement Agreement was tendered to the state court for approval, it was the intention of Flanagan, Prymas and T&P that the $75,000 settlement payments would be damage payments -- 1099 income -- and not wages. (Px D p. 20)

Further, at a T&P corporate meeting on September 3, 1997, Flanagan, Prymas and T&P all agreed that the settlement payments to Flanagan under ¶12 were "1099 income not subject to garnishments or withholding." (Px 106 p. 3)    Indeed, after the date of the execution of the Settlement Agreement on June 17, 1997 until the very date that Plaintiff TCC served a property

execution on T&P on January 5, 1998, the ¶12 settlement payments to Flanagan were treated by T&P, Prymas and Flanagan as 1099 income, and not wages. (Px B pp. 62-63; 218 & 223; Px F pp. 4 & 10; Px E p. 172)  As noted by Flanagan when it was suggested that the $75,000 settlement payments might be subject to wage garnishment:

> [H]ow can the deal change or get modified to hurt/damage me after the fact?  We all agree and sign off on one thing and after the fact there are changes?  How is this right?

(Px 182)

On January 5, 1998 a federal court writ of execution -- approved by Judge Covello (Px 68A p. 3) -- was served on Prymas, as president of T&P, in connection with TCC's March 20, 1997 judgment against Flanagan. (Px 111)  At p. 2 of the writ, T&P was commanded to

> pay to the sheriff the amount of a debt owed by you [T&P] to the judgment debtor [Flanagan], provided, if the debt owed by you [T&P] is not yet payable, payment shall be made to the sheriff when the debt becomes due if it becomes due within four months after the date of issuance of this execution.

(Px 68A)

Prymas was unsure how to deal with the property execution, and suggested to Flanagan that they seek the guidance of T&P's attorney, Bainer. (Px 68)  With the consent of Flanagan, on January 5, 1998 Prymas forwarded the property execution to

Bainer for his legal opinion (Px 111), which was reviewed by Bainer on January 5, 1998. (Px 65)

Flanagan understood that as of January 5, 1998 T&P was to turn over to the sheriff all non-wage items that T&P held for Flanagan's benefit. (Px A(1) p. 55) On January 5, 1998 Flanagan forwarded the property execution to his personal attorney, Fasano, expressing his concern that the ¶12 Settlement Agreement payments might be subject to the property execution:

> Please see enclosed which was served to Stanley Prymas this morning. I have not received anything as yet, however I should be served shortly. My concern here is with the money I am currently receiving from [T&P] as a result of the Settlement between Mr. Prymas and I. Is this subject to being taken?

(Px 144) On the next day -- January 6th -- Flanagan asked Fasano whether it would make sense for Fasano to contact T&P's attorney, Bainer, to discuss how to handle the property execution which had been served on T&P. (Px 3)

After the property execution was served on T&P, Flanagan wanted the ¶12 Settlement Agreement payments recharacterized from 1099 income (which was subject to the property execution) to wages, and thus avoid losing the ¶12 Settlement Agreement payments to his creditor, TCC. (Px B pp. 213 & 223; Px E p. 93; Px D pp. 47-48) Flanagan, however, was in a predicament: all parties had previously agreed that the ¶12 settlement payments were 1099 miscellaneous income, and T&P had previously treated

the prior settlement payments to Flanagan as 1099 miscellaneous income. (Px B pp. 217-218 & 223; Px 72 p. 2)

Flanagan's personal attorney, Fasano, understood that the ¶12 Settlement Agreement payments, as they had been paid to Flanagan in the past, were subject to the writ of execution. (Px C p. 170) In an effort to skirt the writ, however, Fasano told T&P's attorney, Bainer, that he (Fasano) wanted the characterization of the ¶12 Settlement Agreement payments changed from 1099 miscellaneous income to wages. (Px B pp. 60 & 63)

On January 9, 1998 Flanagan, Prymas and T&P agreed to send the property execution issue to Flanagan's attorney, Fasano, and to T&P's attorney, Bainer, for their thoughts on how to handle that issue. (Px 112) Bainer, however, full-well knew that Flanagan wanted to recharacterize the ¶12 Settlement Agreement payments from 1099 miscellaneous income to wages in an effort to avoid the federal court property execution that TCC had served on T&P. (Px B pp. 223-24)

On January 12, 1998 Flanagan and Prymas agreed that T&P would "temporarily hold" the ¶12 Settlement Agreement payments to Flanagan, with the checks issued, but placed in a file at T&P, until the matter was resolved. (Px 140) It was Prymas who informed the bookkeeper, Andrea Steele, to process Flanagan's settlement checks for January, February, March and April of

1998, but to hold on to those checks and not distribute them to Flanagan. (Px F pp. 17-18; Px C p. 172; Px E pp. 87 & 159-160)

Although Fasano had previously informed Bainer that he (Fasano) wanted the ¶12 settlement payments to be recharacterized as wages (and thus not subject to the federal property execution) (Px B pp. 60 & 63), on January 13, 1998 Bainer instructed Fasano that unless Fasano took "some affirmative legal action in federal court to stay or otherwise obviate the property execution", T&P would be left with no choice but to turn the ¶12 settlement funds over to the executing creditor, TCC. (Px 23; Px B pp. 191-93; Px E pp. 116-17; & 119-20)

Rather than take any affirmative legal action in federal court to stay the writ of execution, on January 20, 1998 Flanagan and Fasano simply filed, on behalf of T&P, a claim exemption form (Px 25) and an Objection to Property Execution (Px 24) which represented to TCC and Judge Covello that "[o]ther than wages, there is no property [belonging to Flanagan] held by [T&P]." (Px 24; Px B p. 197)  Fasano had previously sent a draft of the Objection and the claim exemption form to Bainer for his review and approval. (Pxs 25A & 25B)  Although Bainer and Prymas knew that Flanagan's and Fasano's representations to TCC and Judge Covello were false (Px 69), they took no steps to honor the federal court property execution and have the ¶12 Settlement

Agreement proceeds paid over to the sheriff. (Judicial Notice of file in <u>Cadle I</u>)

Indeed, on January 25, 1998 -- some 5 days <u>after</u> Flanagan's and Fasano's representations to TCC and the Court -- Prymas informed Flanagan that "we are <u>not</u> treating [the ¶12 settlement payments] as salary, but rather 1099 income." (Px 113 (emphasis added))  And then on February 4, 1998 Prymas informed Bainer that any representation to Plaintiff TCC and Judge Covello that T&P "does not have any money assets due to Mr. Flanagan" was a misrepresentation because "T&P <u>does</u> have an obligation to [Flanagan]." (Px 69 (emphasis added)  The "money assets" that T&P owed to Flanagan were the $75,000 in Settlement Agreement payments. (Px E pp. 128-30)

On February 4, 1998 Bainer wrote to Fasano reiterating that the ¶12 settlement payments were being treated by T&P as 1099 miscellaneous income, but suggested that Prymas and T&P would work with Flanagan "to see that Charlie and none of his creditors receives the funds at issue." (Px 70 p. 1)  Shortly thereafter, a meeting was scheduled in New Haven to discuss strategy on how to circumvent the federal court property execution.  (Px 72 p. 2; Px 65 (2/9/98 entry))

On February 9, 1998 Flanagan and Fasano met with Prymas and Bainer to discuss the federal court property execution and the plan of Fasano and Flanagan to change the characterization of the Settlement Agreement payments to wages. (Px 65 p. 2; Px B

pp. 221-23; Px E pp. 136-39; Px 72 p. 2)  At that meeting Bainer
warned the other Defendants that changing the characterization
of the Settlement Agreement payments from 1099 miscellaneous
income to wages in response to the federal court property
execution would leave them all open to a claim that there was a
civil conspiracy to help Flanagan defraud his creditors.  Bainer
further warned that the conspiracy claim was a risk that they
had to seriously consider. (Px 65 p. 2; Px B pp. 221-23; Px E
pp. 136-39; Px 72 p. 2)

Fasano and Flanagan, as well as Bainer, Prymas and T&P, all
agreed to accept that risk. (Pxs 114 & 142) Although no
affirmative steps were taken in federal court to stay the writ
of execution, not a single payment of the $75,000 settlement
obligation was turned over to the sheriff, with the ¶12
settlement funds simply recharacterized as wages, and then paid
directly to Flanagan. (Pxs 114; 115; 142; 143 & 145; Px B pp.
207-08 & 217)  It was admitted by the T&P bookkeeper, Andrea
Steele, that she was instructed by Prymas to recharacterize the
settlement proceeds from 1099 miscellaneous income to wages. (Px
F p. 25)

The federal court property execution was issued on January
5, 1998 and expired on May 8, 1998. (Px 68A; Px E p. 91; Pxs 114
& 142)  The period during which the Settlement Agreement
payments were suspended was the same four month period. (Px E p.
91)  Prymas told the T&P bookkeeper, Andrea Steele, to process

the checks for those four months, but to hold on to them and not distribute them to Flanagan. (Px F pp. 17-18)  The four checks that were issued reflected money that was due by T&P to Flanagan under ¶12 of the Settlement Agreement, and at the time that those four checks were issued, the payments were considered 1099 income. (Px F pp. 29; 51-52; & 56)

To avoid the federal court property execution, the four issued-but-not-cashed settlement checks were moved to the end of the Settlement Agreement payout (after the writ of execution had expired), and then recharacterized as wages. (Px F pp. 29-33 & 37-38)  According to Prymas, it was Bainer who told him to hold the four issued-but-not-cashed Settlement Agreement checks until the writ of execution expired, and then add those payments to the end of the settlement pay-out. (Px E p. 57)

Having successfully conspired to defeat the January 5, 1998 federal court property execution, the next few TCC collection efforts were much easier to circumvent.  On November 12, 1998 Prymas and T&P were served with TCC's federal court Post Judgment Remedies Interrogatories, which inquired whether T&P held any non-exempt property (such as Settlement Agreement payments) that belonged to Flanagan. (Pxs 116 & 117)

Although Prymas knew that the ¶12 Settlement Agreement payments had been recharacterized from 1099 income to wages to avoid the earlier writ of execution, he sought comfort from co-conspirator Bainer on how to respond to the federal court PJR

-16-

Interrogatories. (Px 116)   Bainer affirmed the earlier conspiracy by concurring with Prymas that Flanagan was only paid wages by T&P (Px 118), and thus it was appropriate to respond to TCC that T&P was not in possession of any non-exempt property that belonged to Flanagan. (Px 119)   On November 30, 1998 Flanagan agreed to the continuation of the recharacterization plan. (Id.)

In connection with a $128,217 judgment against Flanagan that had been assigned to TCC, on December 18, 1998 TCC served an additional set of PJR Interrogatories on Prymas and T&P. (Px 26)   Prymas forwarded the PJR Interrogatories to Bainer with the request that Bainer review the documents "and let us know how to respond." (Id.)

Despite the fact that both Prymas and Bainer knew that T&P owed the settlement proceeds to Flanagan pursuant to the earlier Settlement Agreement, Bainer advised Prymas to respond that no money was due by T&P to Flanagan. (Pxs 118 & 119) Pursuant to the plan worked out among Flanagan, Fasano, Prymas and Bainer, on January 19, 1999 Prymas mailed to Plaintiffs' counsel responses to the PJR Interrogatories which falsely represented that Prymas knew of no funds that were owed to Flanagan. (Px 110)

Thus, in addition to the federal court writ of execution signed by Judge Covello, two more asset discovery "storms" had

been weathered by implementation of the Defendants' settlement proceeds scheme.  (Px 122)

### C.  The Shifting Stock Scheme

The Defendants knew that the primary target of TCC's collection efforts was Flanagan's 50% stock ownership in T&P. (Px B pp. 23, 24 & 29; Pxs 20 & 130 p. 1)  On January 5, 1998 a federal court property execution was served on T&P by serving its president, Prymas. (Pxs 68; 68A & 111)  Flanagan was aware of the service of the property execution on T&P, and expected a similar property execution to be served on him at any time. (Px 144)  Further, on January 5, 1998 T&P's attorney, Bainer, reviewed the TCC property execution issue for at least an hour. (Px 65)

Flanagan was concerned that the federal court property execution might lead to the seizure of his T&P stock. (Px D p. 23; Px 3)  Indeed, there was a prior episode where an executing creditor was able to obtain physical possession of Flanagan's stock, which required Flanagan to pay off that creditor to avoid the sale of his stock at a sheriff's sale. (Px D p. 23; Px G(1) pp. 93-94)  Flanagan and Prymas' lawyer knew that if a creditor could get hold of Flanagan's stock through execution, Flanagan would be forced to pay off the creditor. (Px D pp. 22-23; Px 3)

After service of the property execution on January 5, 1998, Flanagan wrote to his personal attorney, Fasano, on January 6th,

seeking advice on how to shield Flanagan's T&P stock from TCC's execution efforts:

> I wanted to make you aware that S. Prymas faxed to Atty. Bainer who represents T&P Inc. a copy of the Execution from Gaide that I faxed to you on Tues. . . .
>
>         \* \* \*
>
> Does it make sense for you to contact Atty. Bainer on my behalf and find out now what the issues are with T&P Inc. over this. Why would Gaide have S. Prymas served over my matter? I also <u>do</u> <u>not</u> <u>want</u> <u>it</u> <u>disclosed</u> <u>where</u> <u>my</u> <u>Stock</u> <u>is</u> <u>presently</u> <u>kept</u>. There may be an attempt to grab this stock. If there is a concern here, <u>please</u> <u>let</u> <u>me</u> <u>know</u> <u>if</u> <u>I</u> <u>should</u> <u>be</u> <u>doing</u> <u>anything</u> <u>different</u> <u>than</u> <u>what</u> <u>is</u> <u>presently</u> <u>being</u> <u>done</u>.

(Px 3 (emphasis added); Px C pp. 94-95)

In his January 6th letter, Flanagan was asking Fasano if he (Flanagan) should be doing anything different other than what Flanagan had already done by placing the stock with Socrates Babacas. (Px A(1) pp. 111-12)  Indeed, in order for Fasano to advise Flanagan on whether Flanagan should be doing anything different than "what is presently being done", Fasano would need to know what Flanagan was doing at that time to hide his T&P stock. (Px C p. 94)

In addition to the property execution which was served on January 5, 1998, on February 2, 1998 TCC filed a motion for turnover of Flanagan's assets (Px 197), which was received by T&P and Bainer on February 4, 1998. (Pxs 69 & 69A; Px B pp. 200-201; 66-67; & 163-64)  Accordingly, as of February 4, 1998

Bainer -- as the attorney for T&P -- was on notice that TCC was seeking a turnover order against Flanagan and T&P for the turn over of Flanagan's T&P stock. (Px B pp. 200-01; 66-67; 163-64)

Further, on March 9, 1998 Judge Covello issued an injunction prohibiting Flanagan from transferring any of his assets. (Px 78 p. 7)  At the March 9th hearing, Flanagan pled the Fifth Amendment "based upon outside issues" (i.e., an IRS investigation) to avoid testifying as to the whereabouts of his T&P stock. (Px 78 pp. 3-4; Px 105; Px A(1) pp. 197-98; Px 186 p. 2 ¶¶5 & 10; Px 188)  As admitted by Flanagan, the location of his T&P stock had nothing to do with the IRS investigation. (Px A(1) p. 199)

Flanagan and his attorney, Fasano, understood that Judge Covello's injunction was intended to freeze all of Flanagan's assets.  (Px C p. 45; Px 62)  According to Fasano, Judge Covello was clear that Flanagan was not to transfer or move any of his assets.  (Px C p. 45)

In response to TCC's second Motion for Turnover Order (Px 196) (which was served on T&P (id. p. 7), on April 13, 1998 Judge Covello entered a turnover order (Px 127) requiring Flanagan and T&P to (1) turn over Flanagan's stock in T&P; and (2) provide TCC with a full and complete accounting as to any purported transfer or other disposition of the stock if a claim was asserted that Flanagan had "sold, hypothecated, pledged,

gifted or otherwise divested himself or disposed of any interest in [T&P]."  (Px 109 p. 51)

On April 22, 1998 it was represented to Judge Covello that Fasano and Flanagan had "gathered together thousands of documents to be produced for in-camera inspection", and estimated that the documents would be produced to the Court within the next week. (Px 186 p. 2 ¶6)  The relevant subpoenaed documents, however, were never produced to the Court or to Plaintiffs.  (Px G(1) pp. 62-66, 67, 73-78 & 80-81; Px G(2) pp. 140, 180 & 182)

Even with the federal court writ of execution (Px 68A); the injunction freezing Flanagan's assets (Px 78 p. 7); and the Turnover Order for  Flanagan's T&P stock (Px 127), Bainer, Prymas and T&P were still willing to do all that they could to avoid TCC's collection efforts, and thereby prevent TCC from seizing Flanagan's T&P stock. (Px 67 p. 2; Px B pp. 217-18; Px 72)  One of the avenues discussed in mid 1998 was the execution of a buy-sell agreement and placement of a restrictive legend on Flanagan's T&P stock, which would make Flanagan's T&P stock less attractive to his creditors. (Pxs 126; 128; 66 p. 1; 135 p. 1; Px 194)

Despite Judge Covello's injunction against the transfer of Flanagan's assets and the turnover order requiring the turn over of Flanagan's T&P stock, the Defendants proceeded with their

plan to place a restrictive legend on Flanagan's stock. (Px 129)

On July 27, 1998 Flanagan informed Bainer that:

> I received your fax regarding the delivery
> of the T&P Stock Certificates from Stanley
> and I.  I left you a message yesterday that
> I can deliver the T&P Inc. stock that
> pertains to me, have the restrictive wording
> put on my stock and take my stock back with
> me.   Before this is done, it is my
> understanding that you were going to review
> with Atty. Ippolito [Fasano's law partner]
> on Tues. 7-28-98 the Buy Sell Agreement for
> Atty. Ippolito's input.   Shouldn't this
> discussion and a draft of your and his
> discussion take place, have this draft
> discussed, modified if need be, voted on by
> Stanley and I and than finish with the Stock
> restrictions.
>
> Please advise.

(Px 56 (emphasis added))  Accordingly, Fasano knew that Flanagan had possession or control of his T&P stock and that a restrictive legend was to be placed on Flanagan's stock.  (Px B p. 105; Pxs 56 & 195)

On August 21, 1998 Flanagan, Prymas and Bainer met at T&P's office in New Haven to carry out the terms of their plan. (Pxs 56 & 195) At this meeting, Flanagan handed his T&P stock certificate to Bainer, who then typed the restrictive legend on the stock and returned it to Flanagan. (Px B pp. 68 & 92-93)

Although Judge Covello had issued an injunction prohibiting Flanagan's transfer of assets, and had issued a turnover order requiring Flanagan and T&P to turn over Flanagan's T&P stock, Flanagan, Bainer and Prymas refused to obey Judge Covello's

orders and turn over the stock. Bainer, as T&P's agent, was also subject to the turnover order and should have turned Flanagan's T&P stock over to TCC. (Px 133; Px AA dep. pp. 63-64) Flanagan, however, did not feel as though he was obligated to honor Judge Covello's orders because his attorney, Fasano, had told him he did not have to turn over his T&P stock. (Px A(8) pp. 4 & 96; Px A(1) pp. 120-21)

On September 23, 1998 Judge Covello again ordered Flanagan to turn over the T&P stock and the documentation showing any transfer of that stock. (Px 187) After two motions to stay the enforcement of the turnover order were overruled by Judge Covello, on October 21, 1998 Flanagan and Fasano submitted to the Court a "Notice of Compliance" (Px 1), representing that Flanagan's stock was in the hands of a purported creditor, "Sharon Demetropolis" (actually, "Demetropoulous"), and that Flanagan did not have possession or control of the stock. (Id.; Px C pp. 66-67)

On the very next day Flanagan and Fasano submitted an "Amended Notice of Compliance" (Px 2), again representing that Flanagan's stock was in the hands of Ms. Demetropoulous and that Flanagan did not have possession or control of the stock. Flanagan and Fasano also represented that

> [s]aid stock has been held by Sharon Demetropolis [sic] prior to the Court's Order for Turnover on April 13, 1998, and prior to the Court's Order on March 9, 1998

> prohibiting [Flanagan] from transferring any
> of his assets.

(<u>Id</u>.)

In an affidavit submitted by Fasano to Judge Covello, Flanagan represented that he had "borrowed money from Sharon Demetropolous [sic] and gave her the stock as security for the money." (Px 58; Px C pp. 66-7)  But Ms. Demetropoulous (who was one of Fasano's clients (Px C p. 39)) knew nothing about Flanagan's stock, and did not in fact have possession of Flanagan's stock.  (Px J pp. 153-56; Px C pp. 67-70)

Fasano knew, must have known, or should have known that Flanagan's representations to the Court were false. (Pxs 3, 62, 18 & 19) Indeed, in a letter by Flanagan to Fasano dated January 6, 1998 (Px 3), Flanagan instructed Fasano that "I . . . do not want it disclosed where my Stock is presently kept.  There may be an attempt to grab this stock."  Fasano admitted that Flanagan's statement is pregnant with the implication that Fasano knew where Flanagan was hiding his stock.  (Px C p. 94) Moreover, Flanagan testified that he did not read the erroneous "Demetropolous affidavit" (Px 58) before he signed it, and that the erroneous information about the location of his T&P stock was put in his affidavit by Fasano. (Px A(1) pp. 123-27)

### (1)  <u>Plan B: The Bogus Babacas Debt Scheme</u>

On October 26, 1998 Judge Covello issued a Show Cause Order scheduling a contempt hearing on November 16, 1998 for

-24-

Flanagan's failure to turn over his stock and failure to provide an accounting as to any disposition of the stock as required by the turnover order.  (Px 190)   Now Flanagan and Fasano were caught in a bind.  The purported secured debt of Flanagan to Ms. Demetropoulous was bogus, and Fasano's client did not in fact have possession of Flanagan's stock.  (Px C pp. 39 & 69-70) Flanagan and Fasano then came up with Plan B: a friend and business associate of Flanagan by the name of Socrates T. Babacas ("Babacas") would claim to have loaned substantial sums of money to Flanagan and also claim to have possession of the stock as collateral for the bogus loan. (Px 3)

Pursuant to this plan, on November 11, 1998 Flanagan prepared and had Babacas fax from his office in Springfield, Massachusetts to Fasano's office in New Haven, Connecticut a bogus stock pledge agreement (Px 4) and a bogus assignment of rents. (Px 5)   Then on November 12, 1998 Flanagan and Fasano submitted a Second Amended Notice of Compliance (Px 6) now representing that the stock of T&P was not really in the hands of Ms. Demetropoulous as previously represented, but rather was in the possession of Babacas.  Flanagan and Fasano also represented that Babacas supposedly had loaned Flanagan "$120,000.00 on or about June 19, 1997, and has held said stock as security for the judgment [sic] since the above date [June 19, 1997] until present . . .." (Id.)  Fasano knew, must have

known, or should have known that the Babacas debt/stock collateral representations were false. (Px 3; Px E pp. 152-53)

Indeed, Fasano knew that Flanagan had signed a Settlement Agreement on June 17, 1997 (Px 21) which, in ¶13, contained a commitment by Flanagan to not transfer his stock to any other person or entity. Moreover, Fasano knew that on July 7, 1997 Flanagan had signed a sworn certificate representing that he owned his T&P stock "unencumbered from any source" and that he "will not transfer the stock to any other person or entity." (Px 61) As admitted by Flanagan, one of the purposes of placing the stock with Babacas was to keep it out of the hands of Flanagan's creditors. (Px A(8) p. 28)

Moreover, Fasano knew that the purported Babacas loan of $120,000 to Flanagan was a sham. Flanagan did not want to turn the T&P stock over to Plaintiffs, and Judge Covello refused to allow Flanagan to get away with not producing all of the documents pertaining to the purported loan and the purported stock pledge to Babacas. Flanagan and Fasano were left with no alternative but to pay off the judgment, place the stock in the hands of Flanagan's father as collateral for the loan, and then file bankruptcy for the return of the funds paid to satisfy the judgment.

     **(2)  Flanagan Loans Money To Babacas, But Claims
The Loans Were Really Repayment Of The Bogus
Babacus Debt**

     On October 27, 1998 Fasano represented to the Court that
"Mr. Flanagan did not make any transfers after Judge Covello's
[March 9, 1998] order freezing the assets of Mr. Flanagan."  (Px
62)  Then again on November 16, 1998 Fasano "assure[d]" the
Court that "from the day that order has been received [March 9,
1998], Mr. Flanagan has not transferred any assets."  (Px 109 p.
4)  Fasano's representations were false.

     Although Flanagan represented to Judge Covello and TCC (a)
that he had not transferred any assets after March 9, 1998; and
(b) that Babacas had loaned Flanagan $120,000:

    (a)  On May 24, 1998, while the federal court
injunction was in effect, Flanagan <u>loaned</u>
$500 to Babacas.  (Px 9)

    (b)  On June 19, 1998, while the federal court
injunction was in effect, Flanagan <u>loaned</u>
$1,000 to Babacas.  Indeed, the $1,000 check
was marked "<u>loan</u> - 2 wk pay off."  (Px 10)
Further, in his June 19, 1998 transmittal
letter to Babacas (Px 11), Flanagan wrote:
"Enclosed is the amount I can <u>loan</u> you. . .
. I hope you can repay this <u>loan</u> amount as
you told me - w/in 2 wks as I have bills I
will have to pay w/ the money I have <u>loaned</u>
to you."

    (c)  On August 24, 1998, while the federal court
injunction was in effect, Flanagan <u>loaned</u>
$500 to Babacas.  (Px 12)

    (d)  On October 21, 1998, while the federal court
injunction was in effect, Flanagan <u>loaned</u>
$500 to Babacas.  (Px 13)  In a transmittal
letter to Babacas (Px 14), Flanagan wrote:
"Enclosed is $500 check for the <u>loan</u> we

> spoke about.  Per our discussion this <u>loan</u>
> will be paid back w/in 2 wks."

In  addition,  on  March  25,  1999  Flanagan  <u>loaned</u>  an
additional $300 to Babacas, the very same person that supposedly
had loaned $120,000 in cash to Flanagan.  In his March 25, 1999
transmittal letter to Babacas, Flanagan wrote: "Enclosed please
find the $300 <u>loan</u> amount we spoke about today. . . . I am
running real low on funds."  (Px 15 (emphasis added))

On that same date Flanagan wrote another letter to Babacas
stating:

> I have sent via express mail today the $300.
> You will have it delivered to you by noon
> tomorrow.
>
> I really hope this matter goes this next
> week.  I do not have the ability to <u>loan</u> any
> more money.  As it is I am taking my
> daughters savings and I do not like doing
> this.

(Px 16 (emphasis added))  Then on the next day (March 26th)
Flanagan faxed yet another letter to Babacas (Px 17) again
confirming the <u>loan</u> by Flanagan to Babacas, and not any
repayment of a loan: "The $300 <u>loan</u> will arrive by noon today. .
. . I also must tell you that I do not have the ability to <u>loan</u>
any more money."

Further, Flanagan admitted to Prymas that it was Flanagan
who had loaned money to Babacas. (Px E pp. 152-53)  Finally,
Babacas supposedly held the T&P stock as collateral for a
purported $120,000 loan, but when Flanagan asked for the return

-28-

of the stock, Babacas released the purported collateral (the T&P stock) to Flanagan, for no consideration, so Flanagan could then pledge the stock to his father as security for another loan. (Px A(1) pp. 146-47)

Indeed, the representations by Fasano to Judge Covello and Plaintiffs about the whereabouts and availability of Flanagan's T&P stock were materially false. (Px 67 p. 2; Px B pp. 32-33) Further, Fasano's representations that Flanagan's T&P stock was out of Flanagan's possession and control since June of 1997 was knowingly both false and misleading. (Px 67 p. 2; Px B pp. 146-147) According to T&P's attorney, Fasano knew that his representations to Judge Covello and Plaintiffs about the location of Flanagan's stock "was substantively untrue." (Px 67 p. 3) As admitted by T&P's attorney, Fasano made materially false and misleading statements to Judge Covello and the Plaintiffs as to the location and control of physical possession of Flanagan's T&P stock. (Px 19 p. 2; Px B p. 146-48)

In the fall of 1998 Flanagan and Fasano were playing a "shell game" on the location of Flanagan's T&P stock. (Px B p. 29) According to the attorney for T&P, Fasano's misrepresentations about the location of Flanagan's stock and the movement of the stock from one person to another was evidence of a conspiracy to defraud Flanagan's creditors. (Px B pp. 22-24 & 211) And, as admitted by T&P's attorney, it was Fasano who was allowing Flanagan to shift his stock all around

in defiance of Judge Covello's orders, and in derogation of Plaintiffs' rights to obtain execution upon that stock in satisfaction of their judgments against Flanagan. (Px B p. 105; Px 19 p. 2)

### (3) Judge Covello Holds Flanagan In Contempt, But Gives Flanagan The Opportunity To Purge The Contempt By Producing The Subpoenaed Documents

After hearing Flanagan's excuses for not complying with the Court's turnover order, on November 16, 1998 Judge Covello proceeded to hold Flanagan in contempt:

> [i]t has been established here [that Flanagan] has willfully and intentionally not complied with the order as previously entered by the Court, and orders [Flanagan] committed to the Bureau of Prisons until such time as he purges himself of the contempt by complying further with the order.

(Px 109 pp. 51-2)

In an effort to keep Flanagan from going to jail that very day, Fasano represented to Judge Covello that Flanagan would immediately produce all relevant documents about the purported Babacas debt and the purported stock transfers. (Px 109 pp. 53-59) Based on the representations of Fasano, Judge Covello temporarily stayed the execution of his contempt order:

> [W]e're going to continue the [contempt] matter to a very short date here . . . and we'll see what has been produced here, and what problems exist. But we're going to keep after this on a day by day basis until it's resolved. . . . [t]he execution of the [contempt] order is stayed, and the matter

    is continued to [November 24, 1998] at 10:00
    a.m.

(Id. p. 59-60)

     For Flanagan to stay out of jail, Flanagan and Fasano were
supposed to produce to Judge Covello the documents which would
show the bona fides of the purported $120,000 loan by Babacas to
Flanagan, and the documents which would show the bona fides of
the purported stock pledge by Flanagan to Babacas. (Px C p. 157)
Although Fasano represented to Judge Covello that Fasano would
supply copies of the money orders for the $120,000 supposedly
borrowed by Flanagan from Babacas (Px 109 p. 53), Fasano never
saw proof of those money orders, and never produced them to the
Court. (Px C p. 152-54)

     Second, although Fasano represented to Judge Covello that
Fasano would demand from Babacas the receipts for the roughly
$1,600 per month that Flanagan supposedly paid to Babacas for
the months of October, November and December of 1997 and January
and February of 1998, Fasano never saw those receipts, and never
produced them to the Court. (Px C pp. 153-54)

     In addition, although Fasano represented to Judge Covello
that he would check Flanagan's calendar and copy the pages for
the days that Flanagan had supposedly met with Babacas, Fasano
never produced that calendar to the Court. (Px C p. 156)

     And finally, although Fasano represented to Judge Covello
that he would provide copies of his law firm's trust account

records to show where Flanagan had supposedly placed the borrowed funds in Fasano's trust account for the payment of Flanagan's bills, Fasano, again, never produced those records to the Court. (Px C p. 156)

Accordingly, since neither Flanagan nor Fasano could produce the documentation to show the bona fides of the purported Babacas loan and stock pledge, Flanagan needed to pay-off the federal court judgment as his "get-out-of-jail card." (Px C pp. 144 & 152-57) Any pledge of Flanagan's stock to his father, however, would be in violation of the T&P buy-sell agreement (Px B p. 24), and would constitute an obvious attempt to frustrate Flanagan's creditors. (Px B p. 115; Px 18 p. 2)

Further, with TCC pursuing Flanagan's T&P stock, and with Fasano acting as the lawyer for both the pledgor-debtor (Flanagan) and the pledgee (Flanagan's father), this was "strong evidence" of an effort by Flanagan and Fasano to <u>defraud Flanagan's creditors</u>. (Px B pp. 118-19; 115-16; Px 18) According to T&P's attorney, Fasano was saying and doing whatever Flanagan wanted in an effort to get Flanagan out of the jam he was in. (Px 67 p. 3)

Bainer and Fasano then talked about the possibility that Flanagan would file bankruptcy. (Px 130 p. 2; Px 18 p. 2) Upon filing bankruptcy, Flanagan could claim that the pay-off of the federal court judgment (which had enabled Flanagan to get out of jail) was a voidable preference, which would then have to be

paid back to Flanagan's bankruptcy estate. (Px C p. 144)
Fasano, however, informed Bainer that Flanagan was not going to
file bankruptcy unless he had some sort of side deal with Prymas
regarding Flanagan's T&P stock. (Px 18 p. 2; Px B pp. 107-08; Px
130 pp. 2-3)

Although Flanagan avoided going to jail by paying off the
federal court judgment, TCC still had "close to $1,000,000 more
in judgments" against Flanagan (Px 20), and it appeared to
Prymas that "desperation is setting in." (<u>Id</u>.)  Further, Prymas
was concerned that TCC's collection attorney, Paul Gaide, "has
his sights on Charlie's stock and it now looks like he will get
it." (<u>Id</u>.)

In addition, Fasano informed Bainer that he (Fasano) was
concerned that TCC still might obtain Flanagan's T&P stock. (Px
130 p. 1)  According to Bainer, Fasano was concerned that the
prior restrictive legend that was placed on Flanagan's T&P stock
might not be valid because it was placed on Flanagan's stock in
violation of the prior orders of Judge Covello:

> Then Fasano went on to explain concern that
> Gaide will obtain Charlie's [T&P] stock.
> Told him that I didn't think Gaide
> creditor's would find the stock attractive
> with restriction/legend on it.
>
> He replied "What if the restriction is
> invalid?"  He then related that the Federal
> Court [Judge Covello] had issued an order in
> March 1998 prohibiting Charlie from
> transferring or diminishing his assets
> including the stock.  Lenny seemed to think
> that this affected the viability of the

restriction placed on the stock in the
summer of 1998.

(Px 130 p. 1)

### (4)  Bainer Vies For Control Of The Efforts To Protect Flanagan's Assets

Bainer was not overly impressed with Fasano's handling of
the Flanagan stock crisis, and was more than willing to let
Flanagan and Prymas know that he could do a much better job in
fending off the execution efforts of Plaintiffs.  According to
Bainer, Fasano was "in way over [his] head in this matter."  (Px
66 p. 2; see, also, Pxs 20, 105 & 192)  Prymas and T&P, however,
were still willing to do all that they could to try to prevent
Flanagan's T&P stock from falling into the hands of TCC.  (Px
135 p. 2)

In a December 10, 1998 letter to Fasano, Bainer wrote:

> As for your alleged "strategy", it doesn't
> seem to have served Charlie very well at
> all.  From what I can tell, and in my
> opinion, there is no organized "strategy" at
> all, which is one of the reasons the current
> serious difficulties exist.  It was your
> obligation to protect Charlie from
> testifying in any fashion that would harm
> him, and arguably the Corporation.  My
> understanding is that he has testified
> before the Federal Court as recently as
> November 1998, that no restriction has been
> placed upon his stock.  It is my further
> understanding that a copy of his stock,
> without the restriction I personally typed
> onto it [in August 1998], was presented to
> the Federal Court in November 1998, as a
> copy of his current stock in its current
> form.

-34-

> <u>You</u> knew a restriction had been placed on that stock and purportedly allowed Charlie to harm himself by testifying in that fashion. <u>You</u> should have protected Charlie, from himself and his lack of knowledge about the legal system, in this regard and did not do so.

(Px 18 p. 1, emphasis added))

In that same letter, Bainer told Fasano:

> Further, that you don't see the problem with such an arrangement, or your representing Charlie and Judge Flanagan, with regard to Charlie's pledging of his stock, in known violation of the buy/sell agreement, and <u>in an obvious attempt to frustrate the creditors</u>, is a strong testament to the reason Charlie finds himself in the serious difficulty he apparently, and unfortunately, does. Your representation of the pledgor and pledgee in this situation is <u>strong evidence</u> that there does exist an <u>improper effort to defraud the creditors</u>.

(Px 18 p. 2, emphasis added))

In a follow-up letter to Fasano, Bainer stated:

> With regard to your various threats of suits, conflicts, etc., it is unfortunate that you practice this way. The substantive conflicts are yours. You and Charlie's interest is now at conflict because <u>you made a materially false and misleading representation to the Court</u> in your November 12, 1998, pleading of "Amended Compliance" <u>about the location and control of physical possession of Charlie's stock</u>.

> * * *

> You are not going to hold Thompson & Peck, Inc. hostage by telling me what I can or can not do for my Client. From what I can tell, your legal acumen is to fight with everyone whom doesn't agree with your view of things. It is your judgment of <u>allowing Charlie to</u>

> <u>move</u> <u>the</u> <u>stock</u> <u>around</u>, instead of dealing
> with the matter straight-up, which causes
> him to be in the current predicament in
> which he finds himself -- including a
> Federal Court Judge threatening to put him
> in Federal prison.

(Px 19 pp. 2-3, emphasis added)

A board of directors meeting of T&P was held on December 11, 1998 where Bainer made his pitch to take over the efforts to thwart Plaintiffs' ability to execute on Flanagan's Insurance Agency stock. (Pxs 185 & 122) At that meeting Flanagan, Prymas and Bainer agreed that they would work together in an effort to defeat the judgment claims of Plaintiffs. (Px 185) Flanagan agreed that Bainer would now be in charge of the efforts to shield Flanagan's assets from the judgment claims of Plaintiffs. (Px 122)

### D.   **The Secret Checking Account Scheme**

In 1998 Flanagan owned three rental properties in Connecticut. In order to conceal his ownership of these properties, Flanagan had placed the title to these three properties in the names of two entities that he owned and controlled. (Px A(1) pp. 58 & 93-94)

Flanagan owned an 18-unit apartment building at 17 Howe Street, New Haven, Connecticut (the "Howe St. Property") which Flanagan held in the name of Howe Street Associates. In addition, Flanagan owned an office building at 2790 Whitney Avenue, Hamden, Connecticut (the "Whitney Ave. Property"), which

was owned by Flanagan in the name of West Meadow Associates. Further, Flanagan owned an apartment building at 475-81 George Street, New Haven, Connecticut (the "George St. Property"), which was also held by Flanagan in the name of Howe Street Associates. (Id.; Px 177; Px H pp. 60-61)

On March 9, 1998 Judge Covello issued an injunction which prohibited Flanagan from transferring any of his assets. (Px 78 p. 7) It was Fasano's understanding that Judge Covello's injunction was intended to freeze all of Flanagan's assets. (Px C p. 45) Indeed, Fasano was of the belief that Judge Covello was clear that Flanagan was not to move or transfer any of his assets. (Id.) Flanagan also understood that, under Judge Covello's injunction, he was to transfer nothing, not even the family lawn mower. (Px A(1) pp. 55-56)

Obviously, Flanagan's rental income and equity from his three rental properties were covered by Judge Covello's injunction. (Px C p. 49) As admitted by Fasano, if Flanagan had taken proceeds from a rental property and used the proceeds to either put in his own pocket or to pay third parties, that would have been a violation of Judge Covello's injunction. (Px C pp. 50-51)

On November 16, 1998 Flanagan's attorney, Fasano, represented to the Court that Flanagan had not, in fact, transferred any of his assets in violation of Judge Covello's March 9, 1998 injunction. As represented by Fasano:

-37-

> After [the March 9, 1998] hearing, Your
> Honor, what you did was froze all of the
> assets of Mr. Flanagan, indicating that he's
> not to transfer any assets whatsoever, and
> let me assure the Court from the day that
> order has been received, Mr. Flanagan has
> not transferred any assets.

(Px 109 pp. 3-4 (emphasis added))  Fasano's representation to the Court was false.

In October of 1998 -- while the federal court injunction was still in effect -- Flanagan borrowed $94,200 against the George St. Property and placed a $94,200 mortgage on that property (Px A(1) pp. 133-34; Px 178)  In violation of Judge Covello's injunction, Flanagan not only placed a mortgage on one of his properties, but also transferred every penny of the $94,200 in mortgage proceeds. (Px A(1) pp. 160-66)  As admitted by Flanagan's attorney, Fasano, this was a violation of Judge Covello's injunction. (Px C p. 52)

Further, based on Fasano's advice, Flanagan secretly ran the income from his rental properties through three checking accounts in the names of third parties: one in the name of MJCC Corp., which was an entity controlled by Flanagan; the second in the name of Matthew Flanagan, which was one of Flanagan's sons; and the third in the name of Jeremy Flanagan, which was another of Flanagan's sons. (Px A(1) pp. 22-23; 63-64; 99; 128-30 & 219-220; Px A(4) p. 184)  Flanagan had signatory authority on all three accounts. (Px A(1) pp. 77-78 & 219-20)

-38-

In March of 1998 Flanagan did not put his rental property income in an account in his own name because he was trying to hide that income from his creditors. (Px A(1) pp. 22-23 & 73-74) Moreover, Flanagan put the rental property income in the name of his children's checking accounts on the advice of his attorney, Fasano. (Px A(5) p. 28; Px A(1) pp. 15 & 26)

Further, on March 9, 1998 Flanagan and Fasano were ordered to prepare a computation of all income and all necessary living expenses for Flanagan, which was filed with the Court on March 17, 1998. (Px 90) This computation was supposed to include all income that Flanagan received from any source, including any rental income. (Px C pp. 187-89) The computation that Flanagan and Fasano filed with the Court, however, did not include any income from Flanagan's rental properties. (Px A(1) pp. 62-63)

The rental income hidden by Flanagan and Fasano was substantial. (Px 177; Px 55) During a two-day period in August of 1998 -- while the federal court injunction was still in effect -- Flanagan took $11,600 out of the Jeremy Flanagan account and cashed the checks. (Px A(1) pp. 153) Further, over a four-day period in August of 1998 -- again, while the March 9, 1998 injunction was still in effect -- Flanagan wrote four checks totaling $19,759, all payable to cash, with no documentation to show what Flanagan did with the money. (Px A(1) pp. 160-61)

The chart printed on the next page shows Flanagan's activity in writing over $43,700 worth of checks to cash, to himself, to his wife, and to Socrates Babacas during the very time that this Court had enjoined Flanagan from transferring any of his assets. Fasano's November 16, 1998 assurance to the Court that Flanagan had "not transferred any assets" (Px 109 p. 4) was false.

### Checks Written By Flanagan In Violation Of Injunction

| Date | Account | # | Amount | Signor | Payee | Px |
|------|---------|-----|----------|--------|---------------|-----|
| 3-11-98 | MJCC Corp. | 453 | 1,575.00 | CAF | CASH | 79 |
| 3-30-98 | MJCC Corp. | 475 | 656.00 | CAF | Ch. Flanagan | 80 |
| 4-8-98 | MJCC Corp. | 485 | 90.00 | CAF | CASH | 38 |
| 4-9-98 | MJCC Corp. | 488 | 900.00 | CAF | CASH | 38 |
| 4-13-98 | MJCC Corp. | 491 | 175.50 | CAF | CASH | 38 |
| 4-14-98 | MJCC Corp. | 492 | 108.00 | CAF | CASH | 38 |
| 4-15-98 | MJCC Corp. | 505 | 90.00 | CAF | CASH | 38 |
| 4-15-98 | MJCC Corp. | 515 | 771.00 | CAF | Ch. Flanagan | 81 |
| 4-16-98 | MJCC Corp. | 507 | 233.42 | CAF | CASH | 38 |
| 4-17-98 | MJCC Corp. | 510 | 147.00 | CAF | CASH | 38 |
| 4-22-98 | MJCC Corp. | 513 | 104.00 | CAF | CASH | 38 |
| 4-30-98 | MJCC Corp. | 517 | 108.00 | CAF | CASH | 38 |
| 5-6-98 | MJCC Corp. | 526 | 1,300.00 | CAF | Lisa Flanagan | 82 |
| 5-8-98 | MJCC Corp. | 480 | 156.00 | CAF | CASH | 38 |
| 5-8-98 | MJCC Corp. | 530 | 600.00 | CAF | CASH | 83 |
| 5-8-98 | MJCC Corp. | 532 | 740.00 | CAF | Ch. Flanagan | 85 |
| 5-9-98 | MJCC Corp. | 533 | 117.00 | CAF | CASH | 86 |
| 5-11-98 | MJCC Corp. | 528 | 2,000.00 | CAF | Ch. Flanagan | 87 |
| 5-11-98 | MJCC Corp. | 534 | 200.00 | CAF | Lisa Flanagan | 88 |
| 5-13-98 | MJCC Corp. | 541 | 500.00 | CAF | Ch. Flanagan | 89 |
| 5-24-98 | Jeremy F. | 106 | 500.00 | CAF | Soc. Babacus | 9 |
| 5-27-98 | MJCC Corp. | 546 | 1,200.00 | CAF | CASH | 91 |
| 6-8-98 | MJCC Corp. | 560 | 3,000.00 | CAF | Ch. Flanagan | 38 |
| 6-19-98 | MJCC Corp. | 571 | 1,000.00 | CAF | Soc. Babacus | 10 |
| 7-27-98 | MJCC Corp. | 600 | 75.00 | CAF | CASH | 38 |
| 8-10-98 | Jeremy F. | 109 | 200.00 | CAF | Lisa Flanagan | 97 |
| 8-21-98 | Jeremy F. | 101 | 1,600.00 | CAF | Lisa Flanagan | 137 |
| 8-23-98 | Jeremy F. | 126 | 125.00 | CAF | Lisa Flanagan | 92 |
| 8-25-98 | Jeremy F. | 104 | 5,600.00 | CAF | CASH | 94 |
| 8-25-98 | Jeremy F. | 105 | 850.00 | CAF | CASH | 95 |

| 8-26-98 | Jeremy F. | 107 | 5,000.00 | CAF | CASH | 96 |
| 8-27-98 | Jeremy F. | 108 | 6,159.00 | CAF | CASH | 99 |
| 8-28-98 | Jeremy F. | 110 | 3,000.00 | CAF | CASH | 100 |
| 8-28-98 | Jeremy F. | 127 | 100.00 | CAF | Lisa Flanagan | 101 |
| 9-2-98 | Jeremy F. | 128 | 110.00 | CAF | Lisa Flanagan | 102 |
| 9-9-98 | MJCC Corp. | 629 | 3,000.00 | CAF | CASH | 38 |
| 10-8-98 | MJCC Corp. | 648 | 1,200.00 | CAF | CASH | 38 |
| 10-12-98 | Matthew F. | 94 | <u>500.00</u> | CAF | Soc. Babacus | 13 |

$43,789.92

And even worse, it was Fasano who advised Flanagan that it was perfectly acceptable to transfer the funds out of Flanagan's nominee checking accounts even in the face of the Court's March 9, 1998 injunction. (Px A(1) pp. 15; 59-60; 64; 95 & 100-01) Fasano now admits, however, that any such conduct on the part of Flanagan would, in fact, be a violation of this Court's March 9, 1998 injunction. (Px C p. 50)

On December 14, 2002 Flanagan pled guilty to the felony of submitting a false financial form to the IRS (Pxs 76 & 77; Px A(1) p. 7) The rental properties -- and the income therefrom -- hidden from the IRS are the same rental properties previously hidden from this Court and the Plaintiffs in the prior suit. (Px A(1) pp. 50-51)

### E.   The Caporale Property Transfer Scheme

In a further attempt to delay, hinder or defraud Plaintiffs in their efforts to collect on their judgments against Flanagan, in November of 1998 Flanagan and his wife, Lisa Flanagan, devised a scheme to transfer title to Flanagan's remaining rental properties, but still receive the benefit of the rental

income from those properties.  Pursuant to this plan, Flanagan
would transfer title to his rental properties (the George St.
Property; the Howe St. Property; and the Whitney Ave. Property)
to a relative; Flanagan would then have the rental proceeds
placed in a bank account in the name of the relative; and then
Flanagan's wife would retrieve the rent checks from the P.O. box
and sign the relative's name to the checks so that the Flanagans
could cash the checks and maintain full use and benefit of the
rental proceeds.  (Pxs K(1) & K(2); Px 184)

In November of 1998 Flanagan met with Joseph Caporale
("Caporale") to discuss Flanagan's property transfer scheme.
Caporale's wife is the cousin of Flanagan's wife.  At this
meeting Flanagan said that he wanted to put some of his
properties into Caporale's name if he (Caporale) was willing to
go along with it.  Caporale agreed.  (Id.)

Although Caporale never saw any of the rental properties,
on December 4, 1998 Flanagan had his controlled business
entities execute deeds to convey the George St. Property, the
Howe St. Property and the Whitney Ave. Property to Caporale.
Flanagan then set up a United States Post Office box in Hamden,
Connecticut (near Flanagan's office) for the receipt of the
monthly rent checks, and opened a joint checking account at
First Union Bank in Branford, Connecticut for the deposit of the
rent checks.  (Id.)

From early 1999 until approximately October of 2000, the monthly rent checks from Flanagan's rental properties were made out, at Flanagan's direction, to Caporale and mailed by the various tenants on the various properties to the P.O. box in Hamden, Connecticut.  For one tenant alone, the monthly rent checks made out to Caporale were $1,100 per month.  (Id.)

Although these monthly rent checks were made out to Caporale and mailed to the Caporale P.O. box, Caporale never went to the P.O. box; never saw a rent check; never endorsed a rent check for deposit; never saw a monthly bank statement; and never saw or received a penny from the rents.  Rather, either Flanagan or Lisa Flanagan would forge Caporale's name on the back of each rent check, and then cash or deposit the checks into this account for Flanagan's own use and benefit.  (Id.)

### F.  Flanagan Commits Bankruptcy Fraud

Although Flanagan had transferred, hidden or shielded his assets from the claims of Plaintiffs, Flanagan still wanted to recoup the $99,542.87 that he was forced to pay to TCC to avoid going to jail for contempt.  So on February 17, 1999 Flanagan filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Connecticut in New Haven.  Thereafter Flanagan filed a bankruptcy adversary proceeding against TCC (Flanagan v. Cadle, Adversary No. 99-3053) alleging that the $99,542.87 that was paid to TCC was a voidable

-43-

preference, and thus subject to recoupment by Flanagan through §547(b) of the Bankruptcy Code. (Flanagan Answer ¶70)

In his bankruptcy schedules, Flanagan listed the false debt owed to Babacas, but did not list the alleged debt owed to Ms. Demetropoulous. Further, Flanagan did not list in his bankruptcy schedules the ownership interests that he had in the three rental properties, and falsely testified at the §341 Meeting of Creditors that he did not own any real estate. (Px 173 pp. 8 & 53) In addition, Flanagan did not list in his bankruptcy schedules the substantial rental income that he had received and was continuing to receive from the George St. Property, the Howe St. Property and the Whitney Ave. Property. (Px I ¶2)

In connection with the filing and prosecution of his bankruptcy proceeding, Flanagan knowingly, intentionally and fraudulently made the following false oaths:

    (a)  In Schedule I - Current Income and at #1 and
         #2 of the Statement of Financial Affairs (Px
         174), Flanagan failed to disclose the rental
         income that he was receiving and had
         received for the two years prior to his
         bankruptcy filing from the George St.
         Property, the Whitney Ave. Property and the
         Howe St. Property, the three rental
         properties that were equitably owned by
         Flanagan.

    (b)  In Schedule I - Current Income (Px 174),
         Flanagan failed to disclose as additional
         sources of income the rental proceeds that
         he received from his three rental
         properties.

(c)  At the April 5, 1999 §341 Meeting of Creditors (Px 173), Flanagan provided false testimony that he had no other source of income other than as an employee of Thompson & Peck, Inc. and Flanagan/Prymas Insurance Group. (Id. p. 29) Contrary to Flanagan's representations, at the time of his bankruptcy filing he was receiving additional income from his three rental properties.

(d)  At #2 of Schedule B - Personal Property (Px 174), Flanagan made the false representation that he had no money in any checking accounts.  Contrary to Flanagan's representations, at the time of his bankruptcy filing, Flanagan had many thousands of dollars in three separate checking accounts in the names of Matthew Flanagan, Jeremy Flanagan and MJCC Corporation, which Flanagan had set up for his personal benefit and over which Flanagan had control and check writing authority.

(e)  At #11 of the Statement of Financial Affairs (Px 174), Flanagan made the false representation that there were no financial accounts for his benefit which were closed or otherwise transferred within one year immediately preceding his bankruptcy filing. Contrary to Flanagan's representations, there were three separate checking accounts in the names of Matthew Flanagan, Jeremy Flanagan and MJCC Corporation for the benefit of Flanagan which were closed or otherwise transferred within the one year immediately preceding his bankruptcy filing.

(f)  At #12 of the Statement of Financial Affairs (Px 174), Flanagan made the false representation that he did not have any depository in which he had cash within one year immediately preceding his bankruptcy filing.  Contrary to Flanagan's representations, Flanagan had deposited many thousands of dollars of his rental income into three separate checking accounts in the names of Matthew Flanagan, Jeremy Flanagan and MJCC Corporation as depositories within

the one year immediately preceding his bankruptcy filing.

(g) At the April 5, 1999 §341 Meeting of Creditors (Px 173), Flanagan provided false testimony that he had never contributed any property or assets to MJCC Corporation. (Id. p. 57) Contrary to Flanagan's representations, Flanagan had deposited many thousands of dollars of rental income from his three rental properties into a checking account in the name of MJCC Corporation.

(h) At the April 5, 1999 §341 Meeting of Creditors (Px 173), Flanagan provided false testimony that MJCC Corporation did not have any business and had not been active for the prior five years. (Id. p. 6) Contrary to Flanagan's representations, MJCC Corporation was in fact an active corporation as the general partner of MJCC Realty Limited Partnership, and MJCC Corporation had received many thousands of dollars of rental income from Flanagan's three rental properties over the prior five-year period of time.

(i) At #3 of the Statement of Financial Affairs (Px 174), Flanagan failed to disclose the numerous creditors that he had paid within 90 days of his bankruptcy filing through the three separate checking accounts in the names of Matthew Flanagan, Jeremy Flanagan and MJCC Corporation.

(j) At the April 5, 1999 §341 Meeting of Creditors (Px 173), Flanagan provided false testimony that after Flanagan transferred his three rental properties to Caporale in December of 1998, all of the rental income from the properties had been received by Caporale. (Id. p. 69) Contrary to Flanagan's representations, after the transfer of the three rental properties to Caporale in December of 1998, the rental income from the three properties did not go to Caporale, but rather went to Flanagan and his wife, Lisa Flanagan. (Pxs K(1) & K(2))

(k) At the April 5, 1999 §341 Meeting of Creditors (Px 173), Flanagan provided false testimony that when he transferred his three rental properties to Caporale in December of 1998, there was no equity in any of the properties. (<u>Id</u>. p. 66) Contrary to Flanagan's representations, there was substantial equity in the three properties at the time that they were transferred to Caporale. (Pxs 177; Px 184, 39(A), 39(B) & 39(C))

(l) At #13 of Schedule B - Personal Property (Px 174), Flanagan made the false representation that there were no accounts receivable that were owed to Flanagan. Contrary to Flanagan's representations, at the time of Flanagan's bankruptcy filing, Flanagan was owed many thousands of dollars for loans to Socrates Babacas.

(m) In Schedule B - Personal Property (Px 174), Flanagan falsely listed Socrates Babacas as a secured creditor in the amount of $85,000 with a purported security interest in Flanagans' stock in Thompson & Peck, Inc. and Flanagan/Prymas Insurance Group. Contrary to Flanagan's representations, no money was owed by Flanagan to Babacas, and Babacas did not in fact have a legitimate security interest in Flanagan's stock in either Thompson & Peck, Inc. or Flanagan/Prymas Insurance Group.

(n) At the 2004 examination conducted on September 13, 2002, Flanagan provided false testimony that he had produced copies of all of his financial statements to counsel for Plaintiffs. (Px A(3) pp. 340-41)Contrary to Flanagan's representations, Flanagan had failed to produce a copy of a July 12, 1994 financial statement that Flanagan had provided to the IRS.

(Px I ¶3)

Further, in the three years prior to Flanagan's bankruptcy filing, Flanagan received over $300,000 in rental income from

the George St. Property, the Whitney Ave. Property and the Howe St. Property, the three rental properties that Flanagan equitably owned. In addition, in the fall of 1998 Flanagan received $94,200 in cash through a mortgage loan on the George St. Property. (Px 178) Flanagan has failed to explain satisfactorily his loss of assets or deficiency of assets to meet his liabilities. (Px I ¶3)

### III. Plaintiffs Have Stated A Valid Claim Against The Defendants For Violation Of §1962(b), §1962(c) And §1962(d) Of RICO

#### A. Introduction

Fraudulent transfers are wrong. Whether dressed-up in estate planning clothes, or deceitfully designed to circumvent a court order against transfers of assets, fraudulent transfers frustrate the collection of legitimate debts that a court has ordered to be paid. Not only do fraudulent transfers harm creditors, they breed disrespect for the judicial process as well.

Here we have a wealthy debtor, Flanagan, who conspired with numerous family members, business associates and controlled entities to fraudulently transfer his substantial assets in an effort to defeat the judgment claims of Plaintiffs. As shown by the detailed allegations in Plaintiffs' Second Amended Complaint, and as proven by the evidence gathered through discovery, the Defendants have gotten caught in a complicated

and sophisticated scheme designed to shield Flanagan's assets from the judgment claims of Plaintiffs.  The Defendants should be held accountable for all of the harm that they have caused.

In order to discourage the proliferation of fraudulent transfers, there must be some deterrent effect to the law.  If the only remedy for a fraudulent transfer is to simply unwind a transaction that was fraudulently implemented in the first instance, fraudulent transfers will not only continue, they will proliferate and grow in number.  Every debtor on the run and his or her co-conspirators will smugly transfer asset after asset because (a) they might not get caught; and (b) even if they did, they would only have to unwind a transaction that they shouldn't have done in the first place.  And that's a gamble that every crook would take, and that's no deterrence at all.

Not surprisingly, the essence of this case is a conspiracy -- a conspiracy among Flanagan and the other Defendants to hide, transfer and otherwise shield the substantial assets of Flanagan from the judgment claims of Plaintiffs.  Because (1) the Defendants engaged in the underlying wrongful conduct of mail fraud, wire fraud and bankruptcy fraud (referred to as "predicate acts") in connection with their fraudulent transfer scheme, and (2) their related wrongful conduct both (a) constitutes continuous wrongful conduct and (b) poses a threat of continuing wrongful activities (referred to as "continuity"), Plaintiffs have brought suit under the civil damage provisions

of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§1961-1968), the dreaded "RICO" statute.

We realize and appreciate that many district court judges have (to put it mildly) a very strong aversion to civil RICO suits. After all, the statute's too complicated; it federalizes state causes of action; and the label "racketeer" just doesn't seem to fit for a civil business dispute.[1]

But the statute is on the books; the Supreme Court has repeatedly struck down artificial barriers to the prosecution of a civil RICO action[2]; and there are certain patterns of wrongful conduct which can and should be prosecuted under RICO. See Handeen v. Lemaire, 112 F.3d 1339 (8th Cir.1997); Stochastic Decisions, Inc. v. DiDomenico, 995 F.2d 1158 (2d Cir.1993); Bankers Trust Company v. Rhoades, 859 F.2d 1096 (2d Cir.1988);

---

[1]     The term "racketeer" and the Act's acronym, "RICO", have caused many a district court judge to wince. However, a "racketeer" is one who engages in a "racket". A "racket" is a "business that obtains money or property through fraud ---; an illegal or dishonest practice." The American Heritage Dictionary of the English Language (Morris Ed. 1970). Regardless, perhaps there would have been less judicial resistance to a remedial act geared toward patterns of fraudulent conduct had the Act been given a more innocuous name.

[2]     See Sedima S.P.R.L. v. Imrex Co., 473 U.S. 479, 497-98 (1985) ("RICO is to be read broadly. This is the lesson not only of Congress' self-consciously expansive language and overall approach, . . . but also of its express admonition that RICO is to 'be liberally construed to effectuate its remedial purposes.'"); H.J., Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 248-49 (1989) ("Congress drafted RICO broadly enough to encompass a wide range of criminal activity, taking many different forms and likely to attract a broad array of perpetrators operating in many different ways."); National Organization of Women, Inc. v. Scheidler, 510 U.S. 249 (1994)  As stated by the Fifth Circuit in R.A.G.S. Couture, Inc. v. Hyatt, 774 F.2d 1350, 1353 (5th Cir.1985), "[t]he Supreme Court's Sedima decision cautions us not to place barriers before RICO plaintiffs that are not found in the text of the statute." See, also, Sun Savings & Loan Association v. Dierdorff, 825 F.2d 187, 194 (9th Cir.1987) ("Although RICO cases might be pesky, courts should not erect artificial barriers -- metaphysical or otherwise -- as a means of keeping RICO cases off the federal dockets."); Sutliff, Inc. v. Donovan Companies, Inc., 727 F.2d 648, 654 (7th Cir.1984).

Gutierrez v. Givens, 989 F.Supp. 1033 (S.D.Cal.1997); Gutierrez v. Givens, 1 F.Supp.2d (S.D.Cal.1998); and Cadle Co. v. Schultz, 779 F.Supp. 392 (N.D.Tex.1991).  This is just such a case.

### B.    Plaintiffs Need Not Show That Each Defendant Personally Used The Mails Or Wires To Transmit A Misrepresentation

Defendants Bainer, Fasano, Prymas & T&P contend that Plaintiffs failed to show in detail the use, by each and every Defendant, of the United States mail or interstate telephone lines for the transmission of a misrepresentation.  A RICO plaintiff need not, however, plead or prove any such allegations.

First, for a mail fraud or a wire fraud allegation[3], a Plaintiff need not plead or prove that the mailing or interstate wire communications, in and of themselves, contained any misrepresentations.  See Carpenter v. United States, 484 U.S. 19, 27 (1987); Baisch, 346 F.3d at 374; Cadle Co., 779 F.Supp. at 400 (citing cases at n. 50). Rather, all that is necessary is that the mail or interstate telephone lines be a part of the execution of the overall fraudulent scheme.  See Schmuck v. United States, 489 U.S. 705, 710-12 (1989); see, also, United States v. Finney, 714 F.2d 420, 423 (5th Cir.1983); United States v. Green, 494 F.2d 820, 823-24 (5th Cir.1974); Sun

---

[3]    The elements necessary to establish violations of the mail fraud and wire fraud statutes are essentially identical; hence, courts apply identical analyses to both statutes.  See Ideal Steel Supply Corp. v. Anza, 373 F.3d 251, 257 (2d Cir.2004); Cadle Co., 779 F.Supp. at 399 n. 37.

Savings, 825 F.2d at 196.    Accordingly, even "'innocent'
mailings -- ones that contain no false information -- may supply
the mailing element."    Schmuck, 489 U.S. at 715.    Further,
whether the Defendants' use of the mail and interstate wires was
part of an overall fraudulent scheme "is a question of fact
inappropriate for resolution before trial."   R.A.G.S. Couture,
774 F.2d at 1354-55.   See, also, United States v. Lane, 474 U.S.
438, 452-53 (1986);   United States v. Tony, 598 F.2d 1349, 1353-
54 (5th Cir.1979).

    And second, a plaintiff in a RICO case need not show that
each defendant personally utilized the mails or long distance
wire communications in connection with the execution of the
overall fraudulent scheme.   See United States v. Zichettello,
208 F.3d 72, 105-06 (2d Cir.2000);  Cadle Co., 779 F.Supp. at
339; Constellation Bank, N.A. v. C.L.A. Management Co., 1995 WL
42285 at *4 (S.D.N.Y. Feb 1, 1995);  Morrow v. Black, 742 F.Supp.
1199, 1203-04 (E.D.N.Y.1990);  Center Cadillac, 808 F.Supp. at
228; 131 Main Street Associates v. Manko, et al., 897 F.Supp.
1507, 1530 (S.D.N.Y.1995).    The exhibits submitted with
Plaintiffs' Response to Defendants' Motions for Summary Judgment
show numerous instances whereby the Defendants utilized the
United States mails in furtherance of their scheme to hide,
transfer or otherwise shield the substantial assets of Flanagan
from the judgment and other debt claims of the Plaintiffs.

For a mail fraud or wire fraud claim, a RICO plaintiff need only allege the connection of the defendant to the overall fraudulent scheme which, during some part thereof, involves the use of the mail or long distance wire communications.   Id. Indeed, so long as one participant in a fraudulent scheme "causes" the use of the mail or interstate telephone wires in the execution of the fraudulent scheme, all other knowing participants in the scheme are legally liable for the use of the mail or the interstate wires.   Id.   A defendant "causes" a use of the mail or wires when that defendant does an act knowing that the use of the mail or wires will follow in the ordinary course of business, or if the defendant reasonably could foresee that the use of the mail or wires would follow, even if the defendant did not actually intend for the use of the mail or wires to follow.   Id.   See, also, United States v. Amrep Corp., 560 F.2d 539, 545 (2d Cir.1977); United States v. Jones, 648 F.Supp. 225, 235 & n. 8 (S.D.N.Y.1996).

In addition, Plaintiffs have adequately alleged RICO conspiracy claims against Bainer, Fasano and the other Defendants under §1962(d).   As recently noted by the Second Circuit, §1962(d) does not require proof that each co-conspirator agreed to commit two predicate acts.   Zichettello, 208 F.3d at 99 n. 13.   Indeed, the Supreme Court has ruled that:

> Even if [the conspirator] did not commit [two or more acts of racketeering activity], there was ample evidence that he conspired

> to violate [§1962](c). The evidence showed
> that [the primary wrongdoer] committed at
> least two acts of racketeering activity . .
> . and that [the conspirator] knew about and
> agreed to facilitate the scheme. This is
> sufficient to support a conviction under
> §1962(d).

United States v. Salinas, 522 U.S. 52, 118 S.Ct. 469, 478 (1997).

Further, a RICO conspiracy claim can be proved if the defendant embraced the objective of the alleged conspiracy, and agreed to commit predicate acts in furtherance thereof. Zichettello, 208, F.3d at 99. To prove a RICO conspiracy it need only be shown that the defendants know the general nature of the conspiracy and that the conspiracy extends beyond their individual roles. Id. In applying this analysis, a court need inquire only whether an alleged conspirator knew what the other conspirators "were up to" or whether the situation would logically lead an alleged conspirator "to suspect he was part of a larger enterprise." Id.

In addition, there is no rule requiring that a plaintiff prove that a RICO conspirator knew of all predicate acts by insiders in furtherance of the conspiracy. Id. at 100. To be held liable as a RICO conspirator, a defendant need only be shown to have possessed knowledge of only the general contours of the conspiracy. Id. Simply, a plaintiff need not prove that a RICO conspirator-defendant agreed with every other

conspirator, or knew all of the other conspirators, or had full knowledge of all the details of the conspiracy.  <u>Id</u>.

In addition, Prymas and T&P contend that T&P can't be held by liable for Flanagan's wrongful conduct because Flanagan acted without proper corporate authority.  The Supreme Court, however, has ruled that to establish a RICO enterprise, the liability of the corporate defendant can be established by the agent's wrongful conduct, whether or not the agent conducts those affairs within the scope, or beyond the scope, of corporate authority.  <u>See</u> <u>Cedric Kushner Promotions, Ltd. v. King</u>, 533 U.S. 158 (2001).

Further, Defendants Prymas, Fasano, Prymas and T&P claim that bankruptcy fraud cannot serve as a predicate act under RICO because it was Flanagan who committed the bankruptcy fraud, and not the Defendants.  The Defendants are, once again, wrong.

The Second Amended Complaint adequately alleges the predicate act of bankruptcy fraud under RICO.  <u>See</u> 7/3/03 Ruling on Flanagan's Motion to Dismiss p. 9.  <u>See</u>, <u>also</u>, <u>Bankers Trust Co. v. Feldesman</u>, 648 F.Supp. 17, 23-4 (S.D.N.Y.1986), <u>on reargument</u>, 676 F.Supp. 496, <u>rev'd</u> <u>on</u> <u>other</u> <u>grounds</u>, 859 F.2d 1096 (2d Cir.1988).  While it is correct that each Defendant did not commit each of the elements of bankruptcy fraud, it is alleged that the bankruptcy fraud by Flanagan was part of the overall fraudulent transfer scheme.  Accordingly, any of the Defendants that joined the conspiracy and helped Flanagan

accomplish the goals of the conspiracy would be liable for the harm caused by the predicate acts committed by the other conspirators. As noted by Judge Buchmeyer:

> Under RICO, one co-schemer is liable for the other co-schemers' predicate acts. Indeed, upon joining a fraudulent conspiracy, each defendant becomes liable for the prior conduct of the earlier conspirators, and remains liable for the subsequent conduct of the other conspirators.

Cadle Co., 779 F.Supp. at 400.

Finally, a plaintiff does not have to prove full knowledge of all of the details of the conspiracy, but only that each defendant was aware of the general nature of the conspiracy and that the conspiracy extended beyond the defendant's individual role. Id. The summary judgment evidence shows that there was a conspiracy orchestrated by Flanagan to hide, transfer and otherwise shield his assets from the judgment claims of Plaintiffs, and that it was foreseeable for the United States mails and interstate wire communications to be used in connection with that scheme. Accordingly, the Defendants' motions for summary judgment should be denied. See Baisch, 346 F.3d at 374.

### C. Summary Judgment Is Not Appropriate On The Question Of Interstate Wire Communications

Defendants Prymas and T&P contend that Plaintiffs' wire fraud allegations are inadequate because Plaintiffs failed to allege that the wire communications between Fasano and Bainer

crossed state lines.  The unchallenged allegations in the Second Amended Complaint, however, show interstate wire communications (2AC ¶80.3), and the Defendants have failed in their burden to show that the wire communications did not, in fact, cross state lines.  See Ideal Steel, 373 F.3d at 265.  Accordingly, summary judgment is not appropriate on the question of interstate wire communications.

### D.    Plaintiffs Need Not Show That A Co-conspirator Defendant Benefited From The Wrongful Conduct

Defendants Bainer and Fasano argue that Plaintiffs cannot state a RICO claim against them because they, supposedly, did not benefit from Flanagan's fraudulent scheme to hide, transfer or otherwise shield Flanagan's assets from the claims of Plaintiffs.  The Supreme Court, however, has ruled that RICO liability can be imposed against a co-conspirator even if the co-conspirator did not personally benefit from the wrongful conduct.  See National Organization for Women, Inc. v. Scheidler, 510 U.S. 249 (1994).

### E.    Plaintiffs Have Adequately Alleged And Proved The Requisite Pattern Of Racketeering Activity

Defendants Bainer, Fasano, Prymas and T&P contend that Plaintiffs have not shown the requisite pattern of racketeering activity because the racketeering predicates supposedly are not related, and they supposedly do not amount to or pose a threat of continued criminal activity.  The Defendants are wrong.

On the issue of relatedness, the summary judgment evidence shows that the predicate acts/wrongful conduct of the Defendants were related in the sense that they involved the same or similar purposes, results, participants, victims and methods of commission, and did not involve isolated or sporadic events. Accordingly, Plaintiffs have shown that the racketeering predicates are sufficiently related to the RICO claim. See H.J., 492 U.S. at 240; Handeen, 112 F.3d at 1353; Cadle Co., 779 F.Supp. at 398 nn. 32-33; Landry, 901 F.2d at 433; George v. Blue Diamond Petroleum, Inc., 718 F.Supp. 539, 551 (W.D.La.1999).

Further, Plaintiffs have adequately alleged both open-ended continuity (short term related wrongful conduct with a threat of continuing into the future) and closed-ended continuity (long-term related wrongful conduct over a fixed and closed period of time). The continuity requirement for a RICO pattern was thoroughly discussed by this Court in its July 3, 2003 ruling on Flanagan's motion to dismiss, pp. 14-18.

In addition to proving that the RICO defendants engaged in interrelated wrongful conduct, "[t]o establish a RICO pattern it must be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, continuing racketeering activity." H.J., 492 U.S. at 240 (emphasis added). The continuity requirement for a RICO claim can be met by introducing evidence to show (a) long term related wrongful

conduct; or (b) short term related wrongful conduct which poses a threat of continuing wrongful activities. <u>Id</u>. For short term wrongful conduct, a threat of continuing wrongful activities can be shown either through (i) the nature of certain kinds of wrongful acts; or (ii) the nature of certain kinds of business enterprises. <u>Id</u>. at 242-43. <u>See</u>, <u>also</u>, <u>Akin v. Q-L Investments, Inc.</u>, 959 F.2d 521, 533 (5th Cir.1992); <u>United States v. Busacca</u>, 936 F.2d 232, 237-38 (6th Cir.1991).

For short term wrongful activities (<u>i.e.</u>, covering only "a few weeks or months", <u>H.J.</u>, 492 U.S. at 242), a RICO plaintiff must show, in addition to the related wrongful conduct, the threat of continuing wrongful activities. <u>Id</u>. This threat of continuing wrongful activities can be shown either through the nature of the wrongful acts themselves, or through the nature of the business enterprise. <u>Id</u>. at 242-43.

As made clear by the Supreme Court in <u>H.J.</u>, the nature of certain predicate acts themselves may pose the threat of continuing wrongful activities:

> A RICO pattern may surely be established if the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit. . . . Though the number of related predicates involved may be small and they may occur close together in time, the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future, and thus supply the requisite threat of continuity.

492 U.S.at 242.

In addition, the very nature of Flanagan's past wrongful conduct poses a distinct threat of continuing wrongful conduct. See Busacca, 936 F.2d at 237-38.  Further, here the allegations of mail fraud, wire fraud and bankruptcy fraud in connection with the fraudulent transfers and "continuing custodianship" of Flanagan's assets (2AC ¶82.2) involve a distinct threat of repetition continuing indefinitely into the future, and thus supply the requisite threat of continuity.  H.J., 492 U.S. at 242.  Although the wrongful acts of the Defendants constitute long-term related wrongful conduct, the nature of the wrongful acts themselves also pose a threat of long-term wrongful conduct.  Thus under the pleadings and the summary judgment evidence, Plaintiffs will be able to prove facts sufficient to meet the continuity requirement of a RICO pattern.  See H.J., 492 U.S. at 250; Landry, 901 F.2d at 426.

Even if the nature of the wrongful acts themselves do not pose a threat of long term wrongful activities, the threat of continuity may be established by showing the relationship of the predicate acts to the nature of the defendant's business enterprise.  In addition to showing the nexus between the predicate acts and the more traditional criminal enterprise,

> [t]he continuity requirement is likewise satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes), or of

> conducting or participating in an ongoing
> and legitimate RICO "enterprise".

<u>H.J</u>., 492 U.S. at 243.

Under the pleadings and the summary judgment evidence, a threat of continuing wrongful activities could be established at trial by showing that the predicate acts committed by Flanagan and the other Defendants were a regular way of conducting their ongoing businesses, or a regular way of conducting or participating in the conduct of the RICO enterprise, the association-in-fact enterprise dedicated to the purpose of hiding and shielding and continuing the custodianship over Flanagan's assets. <u>See</u> <u>H.J</u>., 492 U.S. at 250. Simply, under the pleadings, the summary judgment evidence, and the teachings of the Supreme Court in <u>H.J</u>., Plaintiffs will be able to prove the existence of a threat of continuing wrongful activities by Flanagan and the other Defendants. <u>See</u> <u>id</u>.; <u>Akin</u>, 959 F.2d at 533; <u>Ticor Title Ins. Co. v. Florida</u>, 937 F.2d 447, 450-51 (9th Cir.1991); <u>Ikuno v. Yip</u>, 912 F.2d 306, 309-19 (9th Cir.1990).

Further, continuity is a prospective determination, made at the time of the wrongful conduct, not in hindsight after the Defendants have gotten caught. <u>Busacca</u>, 936 F.2d at 238; <u>Morrow v. Black</u>, 742 F.Supp. 1199, 1207 (E.D.N.Y.1990). As stated by the court in <u>Busacca</u>:

> An analysis of the threat of continuity
> cannot be made solely from hindsight. All
> racketeering activity must necessarily come
> to an end sometime. The lack of a threat of

> continuity of racketeering activity cannot
> be asserted merely by showing a fortuitous
> interruption of that activity such as by an
> arrest, indictment or guilty verdict.
>
> Rather, in the context of an open-ended
> period of racketeering activity, the threat
> of continuity must be viewed at the time the
> racketeering activity occurred.

936 F.2d at 238. See, also, DeFalco v. Bernas, 244 F.3d 286, 323 (2d Cir.2001); Azrielli v. Cohen Law Offices, 21 F.3d 512, 521-22 (2d Cir.1994); First International Advisors, 956 F.Supp. at 486; Welch Foods, Inc. v. Moran, 1996 WL 107130 at *6 (W.D.N.Y. Mar. 6, 1996); Morrow v. Black, 742 F.Supp. 1199, 1207 (E.D.N.Y. 1990).

Moreover, at the time the Defendants were assisting Flanagan with his fraudulent transfer scheme and aiding with the "continuing custodianship" over Flanagan's assets (2AC ¶82.2), Flanagan had no intention of stopping even if he had met some intermediate goal. See DeFalco, 244 F.3d at 323-24. Indeed, the Bainer letters threatening a grievance against Plaintiffs' attorneys (2AC ¶63; Pxs 27, 28 & 29) -- which were part of an attempt to intimidate Plaintiffs' attorneys from investigating Flanagan's fraudulent transfers -- continued not only to February of 1999, but continued even after the filing of this suit. (See Pxs 31 & 32) See Tabas v. Tabas, 47 F.3d 1280, 1296 (3d Cir.1995).

Further, Flanagan's bankruptcy filing was a further step in the plot. (2AC ¶¶70-72) In addition, the hiding of Flanagan's

rental property income continued to at least until October of 2000. (2AC ¶68) Also, with the multiple schemes, multiple predicate acts, multiple participants and multiple victims as alleged in the Second Amended Complaint, closed-ended continuity can be shown even if the predicate acts were only committed over a relatively short period of time. See Azrielli, 21 F.3d at 521; Metromedia Company v. Fugazy, 983 F.2d 350, 369 (2d Cir.1992); Barsam v. Pure Tech Int., Inc., 864 F.Supp. 1440, 1450 (S.D.N.Y.1994).

Finally, while Flanagan's bankruptcy filing may, at this time, prohibit Plaintiffs from claiming damages from Flanagan's pre-petition wrongful conduct, his bankruptcy filing does not serve to erase the evidentiary impact of Flanagan's prior fraudulent conduct in order to show that Flanagan engaged in the requisite "pattern" of wrongful activities. Simply, the existence of a RICO pattern is an evidentiary issue which can be proved by showing that Flanagan and the other Defendants engaged in interrelated wrongful conduct of a sufficiently continuous nature, even is some of the predicate acts did not necessarily cause injury or harm to the plaintiff. Marshall & Isley Trust Co. v. Pate, 819 F.2d 806, 809-10 (7th Cir. 1987). See, also, Bankers Trust, 859 F.2d at 1103; Turkish v. Kasenetz, 27 F.3d 23, 27-28 (2d Cir. 1994); Jones v. Childers, 18 F.3d 899, 913-14 (11th Cir. 1994); Ticor Title Ins. Co. v. Florida, 937 F.2d 447, 450-451 (9th Cir. 1991).

The RICO statute authorizes a civil suit for damages by "[a]ny person injured in his business or property by reason of a violation of [§1962]." 18 U.S.C. §1964(c). In order to prevail, a RICO plaintiff must prove (1) that there was a pattern of wrongful conduct in violation of §1962 and (2) that the plaintiff was injured by reason of a violation of §1962. Marshall & Isley Trust, 819 F.2d at 809-10. By its statutory terms, under RICO there is a difference between proof of a pattern of wrongful conduct by the defendant over a 10-year period of time (as permitted under 18 U.S.C. §1961(5)), and proof that some of the defendant's wrongful conduct proximately caused plaintiff's damages. Marshall & Isley Trust, 819 F.2d at 809-10. Therefore, in establishing that the defendant's wrongful acts are "related" and sufficiently "continuous" to constitute a RICO "pattern", a plaintiff is not limited in his proof to predicate acts that caused injury or harm to the plaintiff. Id. See, also, Zervas v. Faulkner, 861 F.2d 823, 833 (5th Cir. 1988).

Accordingly, in proving that Flanagan engaged in a RICO pattern of wrongful conduct, Plaintiffs will be able to show that Flanagan engaged in numerous inter-related predicate acts over a 10-year period of time (18 U.S.C. §1961(5)), even if some of the prior wrongful conduct predated Flanagan's bankruptcy filing and did not necessarily cause the injury or harm that is at issue in this case. Cf. Kenworthy v. Conoco, Inc., 979 F.2d

1462, 1467-68 (10th Cir. 1992) (prior settlement did not bar the jury's consideration of pre-release conduct in determining the defendant's violations of the Federal Wage Act for the claim at issue).

Finally, the determination of a RICO "pattern" is a question of fact for resolution by the trier of fact. <u>See</u> <u>Handeen</u>, 112 F.3d at 1353; <u>Landry</u>, 902 F.2d at 426 & 433; <u>Brant v. Schal Associates, Inc</u>., 854 F.2d 948, 952 (7th Cir.1988); <u>George,</u> 718 F.Supp. at 551. Accordingly, the Defendants' motions for summary judgment should be denied.

### F.   Bainer And Fasano Cannot Escape Accountability For Their Wrongful Conduct <u>Because They Are Attorneys</u>

Defendants Fasano and Bainer claim that they should not be held liable for RICO violations because they acted as attorneys providing legal advice to their client. The summary judgment evidence, however, shows that Fasano and Bainer acted as co-conspirators and provided illegal advice to the fellow members of that conspiracy. As noted by this Court in connection with Bainer's Motion for Reconsideration:

> While the court agrees with the defendant that an attorney violates no rule of law by simply providing legal advice and services to his clients, the amended complaint alleges conduct going far beyond that of simply furnishing legal services. In particular, the amended complaint alleges that Bainer was a member of an <u>association-in-fact</u> constituting the RICO enterprise (amended complaint at ¶82.2) and in this capacity: (1) <u>willfully</u> <u>disobeyed</u> the

court's property turn-over order and
organized to keep certain stock certificates
beyond the reach of the court; (2) <u>knowingly
misrepresented</u> to the court that certain
settlement proceeds belonging to Flanagan
were wages and hence beyond the reach of
creditors; and (3) participated in a
<u>fraudulent</u> <u>scheme</u> to transfer Flanagan's
assets for the purpose of defeating the
claims of creditors. In the court's view,
the alleged conduct crosses the line from
providing legal services to conducting,
operating and conspiring with an alleged
RICO enterprise. . . . Further, the court
is of the opinion that the amended complaint
sufficiently alleges that Bainer
participated in a pattern of racketeering
activity involving mail fraud and wire
fraud.

(May 16, 2002 Order)

As far as Fasano's Motion for Reconsideration, the Court

ruled:

In the amended complaint it alleges that
Fasano was a member of an association-in-
fact (amended complaint at ¶82.2) and in
this capacity: (1) lied to this court for
Flanagan about an IRS investigation to
shield Flanagan from disclosing asset
information; (2) worked with Flanagan to
create a fraudulent scheme to hide
Flanagan's income from creditors; and (3)
fabricated a bogus stock pledge agreement to
shield Flanagan's stock from a turn-over
order from the court. In the court's view,
the allegations allege conduct "cross[ing]
the line between traditional rendition of
legal services [to] active participation and
directing the enterprise". . . .
Accordingly, the amended complaint
sufficiently states a RICO cause of action
against Fasano.

(May 7, 2002 Order) The facts as disclosed during discovery,

and as summarized in Plaintiffs' summary judgment response, will

-66-

fully support the allegations in Plaintiffs' Second Amended Complaint.

Finally, Plaintiffs have presented sufficient facts to show a genuine question as to Fasano's and Bainer's knowledge of the racketeering enterprise and their willingness to promote it. See Baisch, 346 F.3d at 376-77.   Therefore, the Defendants' Motions for Summary Judgment should be denied.

### G.   Prymas Has Not Asserted The Affirmative Defense Of Reliance Upon Advice Of Counsel.

Prymas contends that he can escape accountability under RICO because he supposedly relied upon the advice of T&P's attorney, Bainer, and an accountant.   Any such reliance on advice of counsel of defense, however, is an affirmative defense which must be pled and proved by the defendant.   See Rule 8(c), Fed.R.Civ.P.   Prymas has not, however, pled that affirmative defense in this case.

Moreover, the summary judgment evidence shows that Prymas was a knowing and willing participant in the furtherance of Flanagan's fraudulent transfer scheme.   Accordingly, the Motion for Summary Judgment by Prymas should be denied.   See Baisch, 346 F.3d at 376-77.

### H.   Plaintiffs Have Stated A Valid Conspiracy Claim Under §1962(d)

Defendants Bainer, Fasano, Prymas and T&P contend that Plaintiffs cannot assert a valid conspiracy claim under §1962(d) because Plaintiffs supposedly cannot prove their claims under

§1962(b) or §1962(c).  As noted by this Court in its July 3, 2003 Ruling On Defendant Flanagan's Motion to Dismiss, Plaintiffs have, in fact, stated valid claims against Flanagan under §1962(b) and §1962(c).  Accordingly, those unchallenged allegations remain disputed issues of fact to be resolved at trial.

Further, the summary judgment evidence shows the knowing and substantial assistance of Bainer, Fasano, Prymas and T&P furthering Flanagan's scheme to hide, transfer and otherwise shield his assets from the judgment claims of Plaintiffs. Accordingly, Plaintiffs have adequately stated conspiracy claims against all of the Defendants under §1962(d). See Baisch, 346 F.3d at 376-77.

### I. For A RICO Fraudulent Transfer Case, Plaintiffs Need Not Allege Detrimental Reliance On Any Alleged Misrepresentations

Defendants Bainer, Prymas and T&P contend that Plaintiffs cannot prove their mail fraud and wire fraud allegations against them because Plaintiffs cannot show that they relied to their detriment on any misleading mail or wire communications that were provided by that Defendant to Plaintiffs.  The Defendants, however, have overlooked the recent Second Circuit decision in Ideal Steel which held that if the RICO plaintiff was the intended target for the defendant's racketeering activity, the RICO plaintiff need not show that it detrimentally relied on any misleading mailings or interstate wire communications by the

defendants.   373 F.3d at 254 & 256.   As noted by the Second
Circuit:

> [T]he principle governing the present case
> is that where a complaint contains
> allegations of facts to show that the
> defendant engaged in a pattern of fraudulent
> conduct that is within the RICO definition
> of racketeering activity and that was
> intended to and did [cause harm to the
> plaintiff], the complaint adequately pleads
> proximate cause, and the plaintiff has
> standing to pursue a civil RICO claim.

Id. at 263.

     In Summit Properties Inc. v. Hoechst Celanese Corp., 214
F.3d 556 (5th Cir.2000) the Fifth Circuit stated the general
rule (cited by the Defendants) that

> when civil RICO damages are sought for
> injuries resulting from fraud, a general
> requirement of reliance by the plaintiff is
> a commonsense liability limitation.

Id. at 562.

     The Fifth Circuit in Summit Properties also recognized the
exception to the general rule (as exists here) where a plaintiff
need not allege or prove detrimental reliance on any alleged
misrepresentation:

> [I]n Holmes [v. Securities Investor
> Protection Corp., 503 U.S. 258, 112 S.Ct.
> 1311, 117 L.Ed. 2d 532 (1992)], the Court
> left open the possibility that the customers
> of an insolvent brokerage might recover
> under RICO for losses stemming from a series
> of fraudulent brokerage transactions despite
> the fact that those customers did not in any
> sense "rely" on a misrepresentation.   See
> 503 U.S. at 272 n. 19, 112 S.Ct. 1311.

> In that situation, the fraudulent brokerage
> transactions imposed immediate risks on the
> brokerage's customers by increasing the
> likelihood of the brokerage's insolvency,
> even if the conspirators did not intend such
> risks to fall on those customers through
> their sham transactions.

Summit Properties, 214 F.3d at 561 n. 22.  The Fifth Circuit

then went on to note:

> Nevertheless, when an action poses a high
> and foreseeable risk on a third party, we
> may view the resulting injury as deliberate
> for the purpose of liability. . . . In that
> sense, the brokerage customers [in Holmes]
> may be seen as direct and contemporaneous
> victims of the fraudulent scheme and within
> the scope of the already noted exception.

Id.

This RICO-fraudulent transfer case is the type of case that

falls squarely within the exception noted in Holmes and

confirmed by the Fifth Circuit in Summit Properties.  Here the

risk of injury to Plaintiffs did arise as a direct and

contemporaneous result of the Defendants' fraudulent conduct.

Indeed, Plaintiffs were the intended target and intended victims

of the Defendants' fraudulent transfer scheme.  Accordingly, for

this RICO fraudulent transfer case, Plaintiffs need not allege

detrimental reliance on any alleged misrepresentations.

### J.    Plaintiffs Have Shown That They Have Been Damaged By The Defendants' Wrongful Conduct.

Defendant Fasano contends that since Plaintiffs were paid

in full in connection with the federal court judgment, they

cannot show any damages.  The summary judgment evidence,

however, shows that although the face amount of the federal
court judgment was paid in full, the Plaintiffs were never
reimbursed their attorneys' fees for engaging in their efforts
to execute on Flanagan's assets while the Defendants were
foisting upon Plaintiffs the misrepresentations about the
location of Flanagan's assets. See Px L ¶8.

Further, Plaintiffs have over $1 million in judgment and
other debt claims against Flanagan, and have not recovered on
those claims because of the Defendants' conspiracy with Flanagan
to delay, hinder or defraud Plaintiffs in their efforts to
execute on Flanagan's assets. Id. Simply, had the Defendants
responded truthfully to Plaintiffs' discovery requests, and had
they not assisted Flanagan in the furtherance of his wrongful
scheme, Plaintiffs would have been able to execute on Flanagan's
assets towards satisfaction of the over $1 million in judgment
and debt claims that the Plaintiffs held against Flanagan. Id.

Finally, Flanagan claims that Plaintiffs are not entitled
to recover their attorneys' fees in defending TCC's attorney,
Gaide, in connection with the baseless grievance that Flanagan
filed against Gaide. The summary judgment evidence, however,
shows that because Flanagan's baseless grievance against Gaide
was the direct result of Gaide taking collection activities at
TCC's express request, Plaintiffs were of the belief that they
had a duty or obligation to defend Gaide in connection with that
grievance. (Px L ¶9) Accordingly, it is a disputed issue of

fact as to whether Plaintiffs are entitled to recover as RICO damages the attorneys fees that they expended in representing Gaide in connection with the baseless grievance that Flanagan filed against Gaide as part of Flanagan's plan to "Sue Gaide to get him out of the litigation". (Px 7)    See Stochastic Decisions, 995 F.2d at 1166-67.

## Conclusion

Flanagan and the other Defendants have gotten caught in a complicated and sophisticated fraudulent transfer scheme designed to shield Flanagan's assets from the judgment claims of Plaintiffs.    While this is not the first case to pursue fraudulent transfer co-conspirators under RICO[4], the vigorous prosecution of this case to a final judgment just might help slow down the proliferation of fraudulent transfers.

The RICO statute was enacted to provide new remedies for old problems that had, for whatever reason, slipped (or slithered) between the cracks in the law.    As noted by the Second Circuit, Congress enacted RICO

> to deal with a broadly based, deeply rooted problem by establishing new prohibitions, enhanced sanctions, and new remedies to deal with the activities of those engaged in illegal practices.

---

[4]    See Handeen v. Lemaire, 112 F.3d 1339 (8th Cir.1997); Stochastic Decisions, Inc. v. DiDomenico, 995 F.2d 1158 (2d Cir.1993); Bankers Trust Company v. Rhoades, 859 F.2d 1096 (2d Cir.1988); Gutierrez v. Givens, 989 F.Supp. 1033 (S.D.Cal.1997); and Cadle Co. v. Schultz, 779 F.Supp. 392 (N.D.Tex.1991).

Bankers Trust, 859 F.2d at 1103.    The facts surrounding Flanagan's fraudulent transfer scheme, as implemented by the Defendants and as detailed in the Second Amended Complaint and the facts as unearthed during discovery, are tailor-made for prosecution under RICO.

Based on the foregoing, Plaintiffs respectfully request that the Court overrule Defendants' Motions for Summary Judgment and permit this important case to proceed to trial.

Respectfully submitted,

ARMSTRONG LAW FIRM

DATED: September 7, 2004.          By_____

F. Dean Armstrong
Ct. Fed. Bar #CT22417
1324 Dartmouth Road
Flossmoor, IL 60422
(708) 798-1599
Fax (708) 798-1597

Edward C. Taiman, Esq.
SABIA & HARTLEY, LLC
190 Trumbull Street
Suite 202
Hartford, CT 06103-2205
(860) 541-2077
Fax (860) 713-8944

Attorneys for Plaintiffs
The Cadle Company and
D.A.N. Joint Venture,
A Limited Partnership

## Certificate of Service

    I certify that a correct copy of the foregoing instrument was faxed and mailed on September 3rd, 2004 to all defense counsel as shown on the attached Service List.


_____
F. Dean Armstrong