UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **THE CADLE COMPANY** and | § | **No. 3:01CV531(AVC)** |
| **D.A.N. JOINT VENTURE,** | | |
| **A LIMITED PARTNERSHIP,** | § | |
| | | |
| Plaintiffs, | § | |
| | | |
| vs. | § | |
| | | |
| **CHARLES A. FLANAGAN, et al.** | § | **September 7, 2004** |
| | | |
| Defendants. | § | |

**PLAINTIFFS' LOCAL RULE 56(a)2 STATEMENTS IN**
**OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56(a)2, Plaintiffs The Cadle Company ("TCC") and D.A.N. Joint Venture, A Limited Partnership ("DJV") submit the following responses to the Local Rule 56(a)1 Statements submitted by (1) Defendants Todd R. Bainer and Todd R. Bainer, L.L.C. (collectively, "Bainer"); (2) Defendants Leonard A. Fasano and Fasano & Ippolito (n/k/a Fasano, Ippolito & Lee, L.L.C.) (collectively, "Fasano"); (3) Defendants Stanley F. Prymas ("Prymas") and Thompson & Peck, Inc. ("T&P"); and (4) Defendant Charles A. Flanagan ("Flanagan").

### I.   **Bainer**

(1)  It is admitted that TCC is an Ohio corporation with its principal place of business in Newton Falls, Ohio.

(2)  It is admitted that DJV is an Ohio limited partnership with its principal place of business in Newton Falls, Ohio.

(3)  It is admitted that Flanagan was, until recently, a 50% shareholder and co-owner of T&P, which is an insurance

agency with an office in New Haven, Connecticut. According to Prymas and T&P, however, "Flanagan is no longer associated with T&P, having been discharged from employment after his criminal conviction", and Prymas recently purchased Flanagan's T&P stock in the course of Flanagan's bankruptcy proceedings. (Prymas/T&P MSJ Mem. (5/14/04) p. 25)

(4) It is admitted that Prymas was, until recently, a 50% shareholder and co-owner of T&P. Prymas, however, recently acquired Flanagan's T&P stock out of bankruptcy, so he is now the 100% shareholder and sole owner of T&P. (<u>Id</u>.)

(5) It is admitted that Bainer is an attorney licensed to practice law in the State of Connecticut and was corporate counsel to T&P at all times relevant to this action. It should also be noted, however, that Bainer served as counsel for Flanagan in connection with the prosecution of Flanagan's grievance against Plaintiffs' prior counsel, Paul M. Gaide, Esq., which resulted in a finding of no wrongful conduct by Gaide. (<u>See</u> Px 189)

(6) It is admitted that in 1996 Plaintiff TCC filed suit against Flanagan in <u>Cadle v. Flanagan</u>, United States District Court, District of Connecticut, No. 3:96-CV-02648 (AVC) (the "Federal Suit" or "<u>Cadle I</u>") in connection with Flanagan's

default on a $75,000 loan owed to Great Country Bank in Ansonia, Connecticut.  (2AC ¶19[1])

(7)  It is admitted that TCC and DJV were represented by Gaide.

(8)  It is admitted that Flanagan was represented by Fasano and then represented jointly by Fasano and Robert Skelton, Esq.

(9)  It is admitted that on March 20, 1997 a final judgment was entered by Judge Covello against Flanagan and in favor of TCC in the amount of $90,747.87.

(10) It is admitted that on October 2, 1997 a Writ of Execution in the amount of $93,519.38 (Px 68A) was issued against Flanagan in Cadle I and served on Flanagan.  (2AC ¶44)

(11) It is admitted that on January 5, 1998 a property execution (Px 68A) was served on T&P and Prymas in connection with the final judgment in Cadle I.  (2AC ¶59)

(12) It is admitted that on January 13, 1998 Bainer wrote a letter to Fasano (Px 23), but it is denied that the representations in ¶12 fairly summarize what was stated in the letter.

(13) It is admitted that on January 20, 1998 Flanagan signed a Claim of Exemption on behalf of T&P (Px 25), which stated that "[t]he only property held by Thompson & Peck is wages and, therefore, not subject to a property execution."  An

---

[1]    References to "2AC ¶__" are to the Second Amended Complaint dated August 30, 2002.

unsigned draft of this claim of exemption was, however, forwarded by Fasano to Bainer, T&P's counsel, on January 19, 1998 for review by Bainer. (Px 25A) Accordingly, a reasonable inference can be drawn that the claim of exemption form that was signed by Flanagan on behalf of T&P (Px 25) was filled out by Fasano and reviewed and approved by T&P's counsel, Bainer, before it was signed by Flanagan on January 20, 1998.

(14) It is admitted that on January 20, 1998 Fasano, on behalf of Flanagan, filed an Objection to Property Execution (Px 24) in the Federal Suit. However, on January 19, 1998 Fasano fowarded to Bainer a draft of the Objection to Property Execution (Px 25A p. 4) which, apparently, was reviewed and modified by Bainer before the Objection to Property Execution (Px 24) was filed with the Court. (Px 25A pp. 1 & 4) Indeed, on January 20, 1998 the revised Objection to Property Execution (Px 25B) was forwarded by Fasano to Bainer for review and approval before Fasano filed the Objection with the Court.

(15) It is admitted that at the March 9, 1998 Debtor's Examination (Px 78), Flanagan asserted his Fifth Amendment right against self-incrimination and refused to provide any evidence about his assets by claiming that any testimony about his assets would somehow serve to incriminate Flanagan because of a pending I.R.S. investigation. (2AC ¶21)

(16) It is admitted that on April 13, 1998 Judge Covello granted TCC's Motion for Turnover Order.  (Px 127)

(17) It is admitted that on September 23, 1998 Judge Covello granted Flanagan's Motion for Reconsideration (Px 187), but denied the relief requested.  (2AC ¶27)

(18) It is admitted that Fasano, on behalf of Flanagan, filed a "Notice of Compliance" on October 21, 1998 (Px 1) representing to the Court and TCC that Flanagan's T&P stock supposedly was "in possession of a creditor, Sharon Demetropolous [sic], and the defendant, CHARLES A. FLANAGAN, does not have possession or control of said stock." (Px 1, emphasis added)

(19) It is admitted that on October 22, 1998, Fasano, on behalf of Flanagan, filed an "Amended Notice of Compliance" (Px 2) that represented to the Court and TCC that Flanagan's T&P stock

> is in possession of a creditor, Sharon Demetropolous [sic], . . . and the defendant, CHARLES A. FLANAGAN, does not have possession or control of said stock. Said stock has been held by Sharon Demetropolous prior to the Court's Order for Turnover on April 13, 1998, and prior to the Court's Order on March 19, 1998, prohibiting the defendant from transferring any of his assets.

(Px 2 (emphasis added))

(20) It is admitted that on October 26, 1998 (<u>not</u> October 6th), a show cause order was entered by Judge Covello, <u>sua sponte</u>, ordering Flanagan to show cause on November 16, 1998

> why a finding of contempt should not enter against the defendant <u>and</u>/<u>or</u> <u>his</u> <u>counsel</u> [Fasano], for failing to comply with this court's April 13, 1998 turnover order (document no. 23).
>
> At that time, the defendant is further ordered to show cause, if any there be, why the court should not issue sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure and/or pursuant to 28 U.S.C. §1927.

(Px 190 (emphasis added))

(21) It is admitted that on November 12, 1998 Fasano, on behalf of Flanagan, filed a "Second Amended Notice of Compliance" (Px 6) that represented to the Court and TCC that, contrary to the representations in the "Notice of Compliance" (Px 1) and the "Amended Notice of Compliance" (Px 2), Flanagan's T&P stock supposedly "is in the hands of Socrates Babacus", who supposedly "loaned Mr. Flanagan $120,000.00 on or about June 19, 1997, and has held said stock as security for the judgment [sic] since the above date [June 19, 1997] until present . . .." (Px 6)

(22) It is admitted that on or about November 12, 1998 a second execution was served on T&P. (Px 162)

(23) It is admitted that at the November 16, 1998 show cause hearing, Judge Covello threatened to send Flanagan to federal prison unless Flanagan complied with the Turnover Order, ruling:

> [I]t has been established here [that Flanagan] has willfully and intentionally not complied with the [turnover] order as previously entered by the Court, and orders [Flanagan] committed to the Bureau of Prisons until such time as he purges himself of the contempt by complying fully with the [turnover] order.

(2AC ¶32; Px 109 pp. 51-52)   Further, it is admitted that Gaide gave Fasano the pay-out number for the judgment against Flanagan in the Federal Suit.

(24) It is admitted that Px 60 reflects a November 19, 1998 loan to Flanagan from his father in the amount of $110,000, and that Flanagan, (a) in violation of the March 9, 1998 injunction (Px 78 p. 7); (b) in violation of the April 13, 1998 Turnover Order (Px 127); and (c) in violation of the June 1, 1997 Settlement Agreement between Prymas and Flanagan (Px 21 ¶13), purported to pledge his T&P stock to his father.

(25) It is admitted that on November 19, 1998 Flanagan tendered $99,540.87 into the registry of the district court as the payoff for the judgment against him in the Federal Suit. (2AC ¶36)

(26) It is admitted that on November 20, 1998 Flanagan and Fasano filed a Motion to Vacate the Court's Order prohibiting Flanagan from transferring his assets, and on December 3, 1998 Judge Covello entered an order lifting the injunction. (2AC ¶37)

(27) It is admitted that in 1996 Flanagan and Prymas had a dispute over control of T&P, which resulted in a suit filed by Flanagan against Prymas in state court in Connecticut ("Flanagan v. Prymas"). (2AC ¶58) There is not, however, any summary judgment evidence to support the claim by Bainer in ¶27 that Flanagan's suit against Prymas was limited to "compensation, control and administrative-making issues at T&P". Accordingly, that allegation in ¶27 should be struck. Further, it is believed by the undersigned that Defendants Fasano, Flanagan, Bainer, Prymas and T&P all have a copy of the complaint that was filed by Flanagan against Prymas in 1996, which complaint should be disclosed to the Court and Plaintiffs to determine the scope of the claims by Flanagan against Prymas, and the nature of the relief sought by Flanagan.

(28) It is admitted that Flanagan was represented in the Flanagan v. Prymas suit by David Reilly, Esq.

(29) It is admitted that Prymas was represented in the Flanagan v. Prymas suit by William J. Gallagher, Esq.

(30) It is admitted that a settlement agreement was entered in the Flanagan v. Prymas suit on June 17, 1997 (Px 21), with that suit later resolved on July 17, 1997 by a stipulated judgment in accordance with the terms of the Settlement Agreement.

(31) It is admitted that pursuant to ¶12 of the Settlement Agreement, Flanagan was to receive, "[i]n addition to compensation provided in paragraph 2", $75,000 to be paid by T&P over three years in 78 bi-monthly equal installments.  (Px 21 ¶12 (emphasis added))

(32) It is admitted that pursuant to the terms of the Settlement Agreement, an Auxiliary Committee ("A.C.") was created adding a third member to the T&P board of directors. (Px 21 ¶1)

(33) It is admitted that by the terms of the Settlement Agreement, the A.C. was supposed to approve and ratify, within the first year term of the A.C., "a stockholders agreement between Prymas and Flanagan which provides for a mechanism for the workout of any stalemate which may come into existence between the said Prymas and Flanagan with the object of equally protecting the rights of both."  (Px 21 ¶10 (emphasis added)) It should be noted, however, that the Settlement Agreement (Px 21) did not provide for the execution of either a buy-sell agreement or the placement of a restrictive legend on the T&P stock certificates.

(34) It is admitted that Bainer, with the assistance of Fasano, prepared a Shareholders Agreement, which included a "buy-sell" agreement. (Pxs 57, 195, 56 & 193) The remainder of the allegations in ¶34 are not supported by the cited summary judgment evidence and, accordingly, those allegations should be struck.

(35) It is admitted that the Buy-Sell Agreement (Px 57) provided that a restrictive legend was to be placed on the T&P stock certificates of Flanagan and Prymas. (Px 57 ¶10)

(36) It is admitted that Flanagan and Prymas executed the Shareholders Agreement on August 21, 1998 in the presence of each other and Bainer. (Px 57)

(37) It is admitted that on August 21, 1998 Bainer had physical possession of Flanagan's T&P stock and personally typed the restrictive legends on the respective stock certificates of Flanagan and Prymas and then handed each of them back their stock certificates. (2AC ¶48)

(38) It is admitted that Prymas testified at his deposition that T&P's accountant, James A. Rayner, told Prymas, on some unspecified date, that payment of the $75,000 settlement payments to Flanagan by T&P could be classified as either salary or 1099 income. The testimony by Prymas, however, constitutes hearsay and, accordingly, the representations in ¶38 should be struck.

(39) It is admitted that Prymas testified at his deposition that pursuant to a "general covenant" in a bank loan, that T&P could not pay out more than 65% of its revenue in salary expenses. The representations in ¶39, however, are not consistent with the cited summary judgment evidence and, accordingly, should be struck.

(40) It is denied that the sole concern of Prymas and Flanagan in characterizing the $75,000 in ¶12 Settlement Agreement payments as 1099 income in 1997 was because of their concern about the cap on salaries set forth in the Sun Trust loan agreement. Indeed, as admitted by Bainer in his February 4, 1998 letter (Px 70), Prymas agreed to the characterization of the $75,000 Settlement Agreement payments as 1099 income, as opposed to wages, in an effort to avoid paying any portion of the $75,000 Settlement Agreement payments to any creditors of Flanagan that had garnished Flanagan's wages.

(41) It is admitted that on or about January 5, 1998 a property execution was served on T&P and Prymas (Px 68A) in connection with the final judgment in the Federal Suit. (2AC ¶59)

(42) It is admitted that in response to the January 5, 1998 Property Execution, Bainer wrote to Flanagan's counsel, Fasano, by letter dated January 13, 1998. (Px 23) However, it is denied that Bainer has fairly summarized what was stated in the January

13, 1998 letter and, accordingly, the remaining statements in ¶42 should be struck.

(43) It is admitted that from early January of 1998 until early in May of 1998, Flanagan did not <u>receive</u> the bi-monthly Settlement Agreement <u>checks</u> from T&P.  It should be noted, however, that during that period the Settlement Agreement checks to Flanagan <u>were</u> <u>issued</u> <u>by</u> <u>T&P</u>, but were <u>placed</u> <u>in</u> <u>a</u> <u>file</u> until an agreement could be reached on what to do with the Settlement Agreement payments to Flanagan in light of the Property Execution which TCC had served on T&P.  (Px 140; Px F pp. 17-18)

(44) It is admitted that Flanagan <u>signed</u> the Claim of Exemption form on January 20, 1998 (Px 25), but a prior unsigned version of this form was forwarded by Fasano to Bainer on January 19, 1998 for Bainer's review and approval.  (Px 25A) Accordingly, it is reasonable to infer that Fasano prepared the Claim of Exemption form on January 19, 1998, which was reviewed and approved by Bainer on that date.  (<u>Id</u>.)

(45) It is admitted that Fasano, on behalf of Flanagan, filed the Objection to Property Execution (Px 24) on January 20, 1998.  However, it should be noted that an earlier and different version of the Objection to Property Execution was forwarded by Fasano to Bainer on January 19, 1998 (Px 25A), which apparently was reviewed and modified by Bainer on that date.  (Px 65)

(46) It is admitted that, after TCC's property execution expired on May 5, 1998, the ¶12 Settlement Agreement payments were resumed to Flanagan as W-2 wages, which could be subject to <u>percentage</u> garnishment pursuant to wage garnishments obtained by some of Flanagan's creditors.

(47) It is admitted that on or about September 1, 1995 DJV brought suit against Flanagan in New Haven Superior Court, CV-95-0378422S, to collect on a $550,000 note upon which Flanagan had defaulted.

(48) It is admitted that on or about January 15, 1999, DJV obtained an $800,000 Prejudgment Remedy against Flanagan, and that DJV requested that Flanagan's stock be kept by the Connecticut Superior Court as security for the Prejudgment Remedy, which relief was denied.

(49) It is admitted that on or about September 18, 1995, DJV brought suit against Flanagan in Litchfield Superior Court, CV-95-0069365S, to collect on a $60,000 promissory note and a $200,000 promissory note on which notes Flanagan had defaulted.

(50) It is admitted that on or about April 15, 1998 DJV obtained a $321,546.27 judgment against Flanagan.

(51) It is admitted that on or about July 15, 1997, Peoples Bank assigned its judgment in the amount of $128,217.04 against Flanagan to TCC in CV-96-0333436-S.  (Px 175)

(52) It is admitted that on or about December 18, 1998, DJV served post-judgment interrogatories on T&P employees in connection with the Litchfield action (Px 163), and that TCC served post-judgment interrogatories on T&P employees in connection with the Peoples Bank action.  (Px 164)

(53) It is admitted that on or about December 30, 1998 DJV served a notice for the deposition of T&P.  (Px 28)

(54) It is admitted that on or about December 31, 1998 Bainer mailed, by first class mail, a letter to TCC's attorney. (Px 28)  The remaining statements in ¶54, however, do not fairly summarize what was stated in that letter.

(55) It is admitted that on or about January 7, 1999, Bainer filed a motion for protective order regarding the December 30, 1998 deposition notices.

(56) It is admitted that on or about January 19, 1999, T&P employees all responded to the post-judgment interrogatories.

(57) It is admitted that on February 17, 1999, Flanagan filed a Chapter 11 bankruptcy petition.  (2AC ¶70)

(58) It is admitted that on November 19, 1999 Bainer wrote a letter to TCC's attorney.  (Px 29)  The remaining statements in ¶58, however, do not fairly summarize what was stated in the letter.

## II.  <u>Fasano</u>

(1)  It is admitted that Fasano, at all relevant times, was one of the attorneys representing Flanagan.

(2)  It is admitted that Fasano, at all relevant times, worked for Defendant Fasano & Ippolito (n/k/a Fasano, Ippolito & Lee, L.L.C.).  The cited summary judgment evidence, however, does not support the statement that, at all relevant times, Fasano acted as an agent of and within the course and scope of his duties as an attorney working for Defendant Fasano & Ippolito & Lee, L.L.C.

(3)  It is denied that Fasano relied on information provided to him by Flanagan when making various representations to the Court.  Indeed, Flanagan testified that the false Flanagan affidavit that was submitted by Fasano to the Court (and copied to TCC) (Px 58) was signed by Flanagan without reading the affidavit, with Fasano, <u>on</u> <u>his</u> <u>own</u>, filling in the false information about the purported stock pledge to Sharon Demetropoulous that was contained within the affidavit.  (Px A(1) pp. 123-27)

(4)  It is denied that Fasano had no other relationship with Flanagan other than an attorney/client relationship.  Indeed, the summary judgment evidence shows that Fasano did not simply provide legal advice to his client, but rather provided illegal advice to Flanagan on how Flanagan could further his

scheme to hide, transfer and otherwise shield his substantial assets from the judgment claims of Plaintiffs. (<u>See</u> Plaintiffs' Response to Defendants' Motions for Summary Judgment ("Ps' MSJ Resp." §II)

(5) It is denied that Fasano corrected the erroneous information with the Court within a reasonable amount of time. Rather, the summary judgment evidence shows that once one false representation about the location of Flanagan's T&P stock was unearthed (Pxs 1 & 2), another false representation (Px 6) was provided to the Court and TCC. (<u>See</u> Pxs 3 & 193) Further, at no time did Fasano correct the erroneous information that was provided to the Court on January 20, 1998 (Px 24) that T&P, in response to TCC's property execution, did not hold any assets (Settlement Agreement payments) that were due to Flanagan, and at no time did Fasano correct the erroneous repreesntations to the Court that Flanagan did not have <u>control</u> over his T&P stock. (Pxs 1 & 2)

(6) Plaintiffs deny that Fasano had never heard of Socrates Babacas prior to the filing of the Second Amended Notice of Compliance (Px 6), and object to the erroneous characterization of Fasano's deposition testimony as set forth in ¶6. Rather, Fasano testified that he first heard of Socrates Babacas "on or before the date that I amended the document dated October 21st, 1998 [Px 1]." (Px C pp. 16-17)

(7)  Plaintiffs deny that the November 20, 1998 pledge of Flanagan's T&P stock to his father "didn't frustrate the creditors [but] paid the creditor, [TCC]", and deny that "[b]ut for the pledge of the stock to Judge Flanagan, [TCC] wouldn't have been paid in full."  First, the representations in ¶7 are not supported by the cited summary judgment evidence and, accordingly, should be struck.  And second, the summary judgment evidence shows (a) that after Flanagan paid off the Federal Court judgment to TCC to avoid going to jail, Flanagan filed for bankruptcy and instituted a preference action against TCC for the return of the $99,542.87; (b) that Plaintiffs had over $1,000,000 in judgment and other debt claims against Flanagan at that time (Pxs 20 & 175); and (c) that the pledging of Flanagan's T&P stock to his father -- in violation of the Court's March 9, 1998 injunction (Px 78 p. 7); in violation of the Court's April 13, 1998 Turnover Order (Px 127); and in violation of ¶13 of the Settlement Agreement -- frustrated Plaintiffs' collection efforts in those other actions, and as a result, Plaintiffs were not paid in full.  (Px L ¶2; Px H; Px 175)

(8)  While it is correct that Flanagan testified at his deposition that no one ever told him that he would assert his Fifth Amendment right regarding the location of his T&P stock as a pretext so that he would not have to disclose the whereabouts of his stock, the summary judgment evidence shows that Flanagan

and Fasano had developed a "strategy" to have Flanagan invoke
the Fifth Amendment "based upon outside issues" (i.e., the
pending I.R.S. investigation) so as to avoid disclosing the
whereabouts of Flanagan's stock.  (See Px 105; Px 188 p. 3 #9;
Px 186 p. 2 ¶¶5 & 10)  As finally admitted by Flanagan, however,
the I.R.S. investigation had nothing to do with the location of
his T&P stock.  (Px A(1) p. 199)

　　　(9)  While it is admitted that Flanagan testified that
"nobody said anything" about whether the turnover order did not
apply if Flanagan had the T&P stock in his hands to deliver it
to Bainer, the cited reference does not support the statement in
¶9 and, accordingly, the representations in ¶9 should be struck.
Moreover, Flanagan previously testified that even though he had
physical possession of his T&P stock on August 21, 1998 and
hand-delivered his T&P stock certificate to Bainer, he was
advised by Fasano that he did not have to comply with the
Federal Court order and turn the stock over.  (Px A (8)pp. 4 &
96; Px A(1) pp. 120-21)

　　　(10) While it is admitted that Fasano testified at his
deposition that, in essence, he had no knowledge that Flanagan
had possession of the T&P stock, the summary judgment evidence
is to the contrary.  (See Px 3; Px A(8) pp. 4 & 96; Px A(1) pp.
120-21; Pxs 18, 195, 56 & 193)

(11) While it is admitted that Fasano testified that he did not know that a restrictive legend was placed on Flanagan's T&P stock, the summary judgment evidence is to the contrary. (See Pxs 18, 3, 56 & 195)

(12) While it is admitted that at times some of the Defendants were at odds with other of the Defendants, and some of the Defendants occasionally disagreed with the other Defendants, the summary judgment evidence references do not support the representations in ¶12 and, accordingly, ¶12 should be struck.

(13) While it is admitted that Fasano and Bainer testified that the T&P settlement proceeds were reclassified as wages at the advice of professional accountants, the summary judgment evidence is to the contrary. Indeed, there was confirmation of the reclassification provided to this Court on January 20, 1998 (Pxs 24, 25A & 25B), with the purported "advice" from the accountant not provided until February 10, 1998.

(14) It is denied that Plaintiffs offer no evidence to support any criminal activity by Fasano, and it is denied that the cited summary judgment evidence supports that proposition. Accordingly, the representations in ¶14 should be struck. See §II.

(15) While it is admitted that Flanagan paid TCC the full amount of the Federal Court judgment, he did so to avoid going to jail for contempt, and after paying TCC he filed for bankruptcy and initiated a preference action against TCC for return of the $99,540.87. (Px L ¶3)

(16) It is denied that Fasano, as legal counsel for Flanagan, engaged in activities that are typical to an attorney, and that Fasano only provided legal services to Flanagan. Indeed, the summary judgment evidence shows that rather than the provision of legal services to a client, Fasano provided illegal services to Flanagan in an effort to assist Flanagan in his scheme to hide, transfer and otherwise shield his assets from the judgment claims of Plaintiffs. See Ps' MSJ Resp. §II.

(17) It is denied that Plaintiffs have no evidence further to present at trial, other than the allegations in the Complaint, that Fasano violated RICO. Further, the cited reference for this allegation, Plaintiffs' Response to Defendant Fasano's Motion to Compel dated March 8, 2004, does not support the representation in ¶17 and, accordingly, ¶17 should be struck. See Ps' MSJ Resp. §II.

(18) Plaintiffs deny that there was no "strategy" to stop Flanagan from testifying about where his T&P stock was located. Indeed, the summary judgment evidence shows that Flanagan and

<u>Fasano</u> implemented and successfully executed a strategy to have Flanagan invoke the Fifth Amendment to stop Flanagan from testifying back in March of 1998 about his stock by pleading the Fifth Amendment "based upon outside issues." (Pxs 105, 186 & 188)

(19) It is admitted that Fasano testified, in essence, that when there was a court order not to transfer assets, Fasano <u>generally</u> makes sure that his client understands the order and its ramifications.

(20) Plaintiffs admit that Fasano testified, in essence, that if there is an indication of a violation of a court order, Fasano generally <u>meets</u> <u>with</u> <u>the</u> <u>client</u> again and expresses his concern to find out if there is a problem. However, <u>Sharon Demetropoulous</u> <u>was</u> <u>a</u> <u>client</u> <u>of</u> <u>Fasano</u>, but Fasano never checked with Ms. Demetropoulous about whether or not she did in fact hold Flanagan's T&P stock. (Px C pp. 39 & 67-70) Further, in spite of what Flanagan had stated to Fasano in his January 6, 1998 letter (Px 3), Fasano represented to the Court that Ms. Demetropoulous had physical possession of Flanagan's T&P stock, with Flanagan not having any control over that stock. (Pxs 1 & 2) Flanagan knew, must have known, or should have known that his representations to the Court were false. (Px 3; Px C pp. 94-95 & 111-12)

(21) It is denied that Fasano never advised any client to circumvent the spirit or the words of an injunction. Indeed, the summary judgment evidence is to the contrary. (See Px A(8) pp. 4 & 96; Px A(1) pp. 22-23; 63-64; 99; 128-30 & 219; Px A(4) p. 184; Pxs 3 & 193) Indeed, Fasano prepared the pledge agreement for the transfer of Flanagan's T&P stock to his father, which was in direct violation of both the March 9, 1998 injunction (Px 78 p. 7) and the April 13, 1998 Turnover Order (Px 127). (Px 18)

### III. <u>Prymas And Thompson & Peck</u>

(1) It is admitted that Prymas and Flanagan were each 50% shareholders of T&P, but the remaining portions of ¶1 are not supported by the cited reference and, accordingly, should be struck.

(2) It is admitted that on June 17, 1997 Flanagan and Prymas entered into a settlement agreement (Px 21) which, on July 17, 1997, served as the basis for the stipulated judgment in the <u>Flanagan v. Prymas</u> suit. (T&P Ex. B pp. 6-7) The remaining allegations in ¶2, however, are not supported by the cited references and, accordingly, should be struck.

(3) It is admitted that the Settlement Agreement at ¶12 provides for an additional $75,000 to be paid by T&P to Flanagan

over three years in bi-monthly equal installments of $961.10, which was "[i]n addition to compensation provided in paragraph 2 . . .." (Px 21 ¶12 (emphasis added))  The remainder of the allegations in ¶3, however, are not supported by the cited reference and, accordingly, should be struck.

(4)  It is admitted that Prymas testified at his deposition that, in essence, T&P's accountant verbally told Prymas that the Settlement Agreement payments to Flanagan could be treated either as W-2 or 1099-Miscellaneous income for tax purposes. The testimony by Prymas, however, constitutes hearsay and, accordingly, should be struck.

(5)  It is denied that the ¶12 Settlement Agreement payments were initially classified as 1099-Miscellaneous income to avoid running afoul of a loan covenant in connection with a loan by Sun Trust Bank to T&P.  Indeed, as shown by the summary judgment evidence, Prymas agreed to the characterization of the $75,000 Settlement Agreement payments to Flanagan as 1099 income, as opposed to wages, in an effort to avoid paying any portion of the $75,000 Settlement Agreement payments to the creditors of Flanagan that had garnished Flanagan's wages. (See Pxs 70, 72 p. 2 & 135)

(6)  It is admitted that the ¶12 Settlement Agreement payments were made by T&P to Flanagan as 1099-Miscellaneous income from August through December, 1997.

(7)  While it is admitted that Prymas testified that, in essence, by 1998 he and Flanagan had a very rough relationship; that they had a history of litigation; and that they disliked each other intensely, the summary judgment evidence shows that Prymas agreed to work with Flanagan in Flanagan's efforts to avoid TCC's attempts to execute on Flanagan's assets.  (See Pxs 70, 72 p.2 & 135)

(8)  It is denied that it was in late December of 1997 that Flanagan began demanding that the ¶12 Settlement Agreement payments be reclassified as wages.  Rather, the summary judgment evidence shows that it was only after January 5, 1998 -- the date that TCC's property execution was served on T&P -- that Flanagan began demanding that the ¶12 Settlement Agreement payments be changed from 1099-Miscellaneous income (and thus subject to TCC's property execution) to wages.  (See Px 72 p. 2) Indeed, as admitted by Bainer, the ¶12 Settlement Agreement payments to Flanagan were recharacterized as wages as a result of the service of TCC's property execution on T&P on January 5, 1998.  (Id.)

(9)  It is admitted that in January of 1988 and before, Prymas knew that Flanagan's wages from T&P were subject to active garnishment from Flanagan's creditors.

(10) It is admitted that on January 5, 1998 TCC served T&P with a property execution in Cadle I. (Px 68A) It is denied, however, that the ¶12 Settlement Agreement payments to Flanagan

were suspended based on the advice of Bainer pending a legal opinion from Flanagan's attorney, Fasano, as to the proper tax classification of the payments.  Rather, the summary judgment evidence shows that the ¶12 Settlement Agreement payments to Flanagan were suspended as part of a conspiracy by Fasano, Prymas, T&P and Bainer to assist Flanagan with his scheme to hide, transfer and otherwise shield his ¶12 Settlement Agreement payments from the judgment claims of Plaintiff.  (<u>See</u> Pxs 72 p. 2, 24, 25A & 25B)

(11) It is denied that in 1998, Prymas was not interested in doing anything to help Flanagan.  Indeed, the summary judgment evidence shows to the contrary.  (Pxs 70, 72 p. 2, 135 p. 2 & 194)

(12) While it is admitted that Prymas testified that, in essence, he was concerned about the potential disruption to the business created by Flanagan's threats of more legal action against T&P, the summary judgment evidence shows that Prymas and T&P weighed the risk of a conspiracy claim against them should they agree to assist Flanagan with his plan to recharacterize the ¶12 Settlement Agreement proceeds, and opted to take that risk by affirmatively assisting Flanagan in the implementation and execution of his plan.  (<u>See</u> Pxs 72 p. 2, 114 & 142)

(13) It is denied that Prymas did not care if Flanagan's creditors received the settlement money, but rather, the summary judgment shows to the contrary. (Pxs 70, 72 p. 2, 135 p. 2 & 194)

(14) It is admitted that on or about January 20, 1998, Flanagan signed, on behalf of T&P, a form claim of exemption (Px 25), representing that T&P had no Flanagan assets other than wages, and filed the claim with the Court in Cadle I. (But see Px 25A)

(15) It is denied that the June 17, 1997 Settlement Agreement (Px 21) required Flanagan and Prymas to both sign checks and other important documents on behalf of T&P. (See Px 21 ¶5)

(16) It is admitted that neither Prymas nor T&P were parties to the underlying action in Cadle I, but T&P was a party to the ancillary post-judgment collection proceedings and was served with a motion for turnover order (Px 196 p.7) and was a party bound by the order granting the turnover order. (Px 127)

(17) It is denied that Prymas and Flanagan construed ¶¶5 and 6 of the Settlement Agreement (Px 21) to require both of them to sign any important documents on behalf of T&P, and it is denied that the cited references for the statements in ¶17 support that statement. Accordingly, the representations in ¶17 should be struck.

(18) It is denied that Flanagan was not authorized to sign the claim exemption to the property execution (Px 25) unilaterally on behalf of T&P.  Further, it is denied that the cited references for the statements in the ¶12 support that proposition and, accordingly, the representations in ¶18 should be struck.  Moreover, the summary judgment evidence shows that a draft form of the exemption was sent to T&P's attorney, Bainer, for review and approval before the form was signed by Flanagan and filed with the Court.  (See Px 25A)  Moreover, there is no evidence to show that T&P ever objected to the actions that were taken by Flanagan on behalf of T&P.

(19) Plaintiffs deny the allegations in ¶19 and deny that the cited references support the representations as stated in ¶19.  Rather, the summary judgment evidence shows that the February 10, 1998 letter by Andrew D'Agostino was used as an after-the-fact excuse to justify the prior recharacterization of the ¶12 Settlement Agreement payments on January 20, 1998 (Px 24) as part of the overall conspiracy to hide, transfer and otherwise shield Flanagan's ¶12 Settlement Agreement payments from the judgment claims of Plaintiff.  See Ps' MSJ Resp. §II. Indeed, the ¶12 Settlement Agreement payments to Flanagan were only resumed after the expiration of the property execution on May 15, 1998. (Pxs 142 & 114)

(20) It is denied that based on the accountant's February 10, 1998 opinion, T&P reclassified the ¶12 Settlement Agreement payments to Flanagan as W-2 wages and it is denied that, based on the advice of T&P's attorney, Bainer, T&P resumed settlement payments in May, 1998.  While it is admitted that the ¶12 Settlement Agreement payments resumed to Flanagan after May 8, 1998, the decision had already been made in January of 1998 to recharacterize the ¶12 Settlement Agreement payments as W-2 wages in order to avoid TCC's property execution (Pxs 24, 25, 25A & 25B), and the change in characterization of the ¶12 Settlement Agreement payments was made as a result of the property execution served by TCC, not as a result of a subsequent letter from Flanagan's personal accountant.  (See Px 72 p. 2)  Moreover, the §12 Settlement Agreement payments to Flanagan did not resume as of February 11, 1998, but rather only resumed after May 8, 1998, which was after the property execution had expired.  (See Pxs 114, 128 & 142)

(21) It is admitted that the Cadle I property execution served on T&P expired on or about May 5, 1998.

(22) It is admitted that TCC did not subsequently obtain another property execution in Cadle I to serve on T&P or file any motion or objection contesting the claim of exemption filed by Flanagan in January, 1998.

(23) It is admitted that on or about November 19, 1998 Flanagan paid the Cadle I judgment, but he did not pay TCC's post-judgment attorneys' fees incurred in TCC's unsuccessful collection efforts. (Px L ¶4)

(24) It is admitted that the Settlement Agreement provided that Flanagan and Prymas were to execute a shareholders agreement within the one-year term of the Auxiliary Committee and required each of them to continue ownership of their T&P stock, which included a provision prohibiting Flanagan from transferring his T&P stock to "any other person or entity". (Px 21 ¶¶10 & 13)

(25) It is denied that in August of 1998, as part of their compliance with the Settlement Agreement, Prymas and Flanagan had T&P's corporate attorney, Bainer, place restrictive legends on each of their stock certificates. First, the summary judgment evidence shows that the Settlement Agreement (Px 21) did not require a buy-sell agreement or the placement of restrictive legends on the stock. And second, the summary judgment evidence shows that the restrictive legend was placed on Flanagan's T&P stock as part of the overall plan to delay, hinder or defraud Plaintiffs in their efforts to execute on Flanagan's T&P stock. (See Pxs 114, 128, 142 & 194)

(26) It is denied that T&P's stock had traditionally had a restrictive legend on its stock certificates and that the stock had restrictive legends when Prymas and Flanagan purchased the

agency in 1988.  Further, there is no summary judgment evidence cited to support these propositions and, accordingly, the allegations in ¶26 should be struck.

(27) It is denied that T&P was never served with the Court's turnover order in <u>Cadle I</u> and that the only parties served with the Court's turnover order were TCC and Flanagan. First, there is no summary judgment evidence cited to support these allegations and, accordingly, the allegations in ¶27 should be struck.  Further, the summary judgment evidence shows that T&P was a party to the court-ordered obligations under the turnover order (Px 127) and was, in fact, served through service of the turnover order on Flanagan, who was a director and 50% shareholder of T&P at the time.  Further, the summary judgment evidence shows that T&P received notice of the turnover order. (<u>See</u> Pxs 196 p. 7 & 192)

(28) It is denied that at the time the restrictive legends were placed on Flanagan's T&P stock, neither Prymas nor Bainer had any knowledge of the injunction or turnover orders issued in <u>Cadle I</u>.  Indeed, the summary judgment evidence shows that both Prymas and Bainer had actual and constructive notice of the March 9, 1998 injunction prohibiting Flanagan from transferring any assets and the April 13, 1998 Turnover Order ordering Flanagan to turnover the T&P stock certificates and any documents showing Flanagan's disposition of the T&P stock.  (<u>See</u> Pxs 196 p. 7 & 192)

(29) It is admitted that Fasano did not formally represent T&P in 1998, or at any time during <u>Cadle I</u>. Fasano did, however, prepare T&P's Claim of Exemption form (Px 25) on behalf of T&P, and forwarded a copy of the Claim of Exemption form to T&P's attorney, Bainer, for review. (Pxs 25A & 25B)

(30) It is denied that Prymas did not learn of the <u>Cadle I</u> turnover order until December, 1998. Rather, the summary judgment evidence shows that Prymas had actual and constructive notice of the turnover order as of April 25, 1998. (Pxs 196 p. 7 & 192)

(31) It is admitted that in December, 1998, Plaintiffs served on Prymas and T&P post-judgment interrogatories seeking to learn the whereabouts of Flanagan's assets.

(32) It is admitted that Prymas, on behalf of T&P, wrote a letter to T&P's attorney, Bainer, requesting confirmation from Bainer on how to respond. The allegations in ¶32, however, are not supported by any summary judgment evidence and, accordingly, should be struck. Moreover, the summary judgment evidence shows that Flanagan, Fasano, Prymas, T&P and Bainer had already worked out a plan on the recharacterization of the ¶12 Settlement Agreement payments. (<u>See</u> Px 72 p. 2; Pxs 24, 25, 25A & 25B)

(33) It is denied that on Bainer's advice, Prymas responded to the interrogatories that neither he nor T&P knew of any non-exempt property belonging to Flanagan. While it is admitted that Prymas responded to the interrogatories that neither he nor

T&P knew of any non-exempt property belonging to Flanagan, there is no summary judgment evidence cited for the representations in ¶33 and, accordingly, the allegations in ¶33 should be struck. Moreover, the summary judgment evidence shows that Flanagan, Fasano, Prymas, T&P and Bainer had already worked out a plan to recharacterize the ¶12 Settlement Agreement payments to Flanagan. (<u>See</u> Px 72 p. 2; Pxs 24, 25, 25A & 25B)

(34) It is denied that as of May, 1998, T&P treated the monies payable to Flanagan under ¶12 of the Settlement Agreement as W-2 income, subject to withholding and garnishment, on the advice of Flanagan's accountant, Andrew D'Agostino, and, on the advice of T&P's attorney, Bainer, resumed payment to Flanagan as wages. First, the cited summary judgment evidence does not support the representations in ¶34 and, accordingly, those representations should be struck. Further, the summary judgment evidence shows that, pursuant to a prior plan agreed to by Flanagan, Fasano, Prymas, T&P and Bainer, there was already an agreement to recharacterize the ¶12 Settlement Agreement payments as W-2 wages in order to avoid TCC's previously served property execution. (<u>See</u> Pxs 24, 25, 25A, 25B & 72 p. 2) Further, the summary judgment evidence shows that the recharacterization of the ¶12 Settlement Agreement payments was pursuant to the plan to assist Flanagan in his efforts to delay, hinder or defraud Plaintiffs in their efforts to execute on Flanagan's assets. <u>See</u> Ps' MSJ Resp. §II.

(35) It is denied that Prymas' response on behalf of himself and T&P that he did not know of any non-exempt property of Flanagan was truthful in light of the change in tax treatment of the judgment payments to Flanagan. First, the allegations in ¶35 are not supported by any summary judgment evidence and, accordingly, should be struck. Further, the summary judgment evidence shows that the recharacterization of the ¶12 Settlement Agreement payments was pursuant to the plan to assist Flanagan in his efforts to delay, hinder or defraud Plaintiffs in their efforts to execute on Flanagan's assets. <u>See</u> Ps' MSJ Resp. §II.

(36) It is admitted that on February 17, 1999, Flanagan filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy laws.

### IV.  <u>Flanagan</u>

(1) It is admitted that on February 17, 1999 Flanagan filed a voluntary petition for relief with the United States Bankruptcy Court, District of Connecticut, under Chapter 11 of Title 11 of the United States Code.

(2) It is admitted while Flanagan's bankruptcy case was subsequently converted to one under Chapter 7, Flanagan's bankruptcy case is still pending.

(3) There is no summary judgment evidence cited for the representations in ¶3 and, accordingly, those representations should be struck.

(4)  There is no summary judgment evidence cited for the representations in ¶4 and, accordingly, those representations should be struck.

(5)  It is admitted that Gaide represented the Plaintiffs in most of Plaintiffs' collection litigation against Flanagan until Flanagan filed his bankruptcy petition on February 17, 1999.

(6)  There is no summary judgment evidence cited for the representations in ¶6 and, accordingly, those representations should be struck.

(7)  There is no summary judgment evidence cited for the representations in ¶7 and, accordingly, those representations should be struck.

(8)  There is no summary judgment evidence cited for the representations in ¶8 and, accordingly, those representations should be struck.  In addition, it is specifically denied that there was any claim in any grievance by Flanagan against Gaide that Gaide's interview with Prymas went beyond the scope of his authority. (Px L ¶5)

(9)  There is no summary judgment evidence cited for the representations in ¶9 and, accordingly, those representations should be struck.  In addition, there was never a finding by any local panel or statewide panel that Gaide had violated any rules or professional conduct.  Rather, a determination of the existence of probable cause, without any hearing, is not a

finding that Gaide had violated any rules of professional conduct, which was plainly demonstrated during the trial of the <u>Flanagan v. Gaide</u> grievance.  (Px 189)

(10) There is no summary judgment evidence cited for the representations in ¶10 and, accordingly, those representations should be struck.  In addition, the reviewing committee of the statewide grievance committee examined Flanagan's motive for filing the grievance, including Flanagan's written confirmation that he wanted to "<u>Sue</u> Gaide to get him out of the <u>litigation</u>" (Px 7), and concluded that Gaide was not guilty of Flanagan's baseless allegations.  (Px 189)

(11) It is admitted that TCC paid over $50,000 to fund Gaide's defense of the grievances.

(12) There is no summary judgment evidence cited for the representations in ¶12 and, accordingly, those representations should be struck.  In addition, Plaintiffs were, in fact, under the belief that it was their duty and obligation to pay Gaide's legal fees to defend the grievance.  (Px L ¶6)

(13) There is no summary judgment evidence cited for the representations in ¶13 and, accordingly, those representations should be struck.

(14) There is no summary judgment evidence cited for the representations in ¶14 and, accordingly, those representations should be struck.

(15) There is no summary judgment evidence cited for the representations in ¶15 and, accordingly, those representations should be struck.

(16) There is no summary judgment evidence cited for the representations in ¶16 and, accordingly, those representations should be struck.

## V.    Disputed Issues Of Material Fact

While Plaintiffs believe the summary judgment evidence is strongly in Plaintiffs' favor, with the Defendants' denials an argument could be made that the following are issues of material fact as to which there is a genuine issue to be tried:

> (1) Whether Defendant Fasano provided knowing and substantial assistance in the implementation and/or execution of Flanagan's fraudulent scheme to hide, transfer or otherwise shield Flanagan's assets from the judgment claims of TCC and/or DJV? (Ps' MSJ Resp. §II)

> (2) Whether Defendant Bainer provided knowing and substantial assistance in the implementation and/or execution of Flanagan's fraudulent scheme to hide, transfer or otherwise shield Flanagan's assets from the judgment claims of TCC and/or DJV? (Ps' MSJ Resp. §II)

> (3) Whether Defendant Prymas provided knowing and substantial assistance in the implementation and/or execution of Flanagan's fraudulent scheme to hide, transfer or otherwise shield Flanagan's assets from the judgment claims of TCC and/or DJV? (Ps' MSJ Resp. §II)

(4)   Whether Defendant T&P provided knowing and
      substantial assistance in the implementation
      and/or execution of Flanagan's fraudulent
      scheme to hide, transfer or otherwise shield
      Flanagan's assets from the judgment claims
      of TCC and/or DJV? (Ps' MSJ Resp. §II)

(5)   Whether Plaintiffs were of the reasonable
      belief that they had a duty or obligation to
      pay the legal fees for defending Attorney
      Paul Gaide in connection with the Flanagan
      v. Gaide grievance? (Px L ¶7)

(6)   What are the amount of Plaintiffs' damages
      by reason of the Defendants' violations of
      RICO?

(7)   What amount of attorneys' fees should be
      reimbursed to Plaintiffs for their
      prosecution of this RICO action?

Each of the above issues is supported by the evidence cited in

Plaintiffs' Response to Defendants' Motions for Summary.

                              Respectfully submitted,

                              ARMSTRONG LAW FIRM


DATED: September 7, 2004.          By_____
                                      F. Dean Armstrong
                                      Ct. Fed. Bar #CT22417
                                      1324 Dartmouth Road
                                      Flossmoor, IL 60422
                                      (708) 798-1599
                                      Fax (708) 798-1597


                                      Edward C. Taiman, Esq.
                                      SABIA & HARTLEY, LLC
                                      190 Trumbull Street
                                      Suite 202
                                      Hartford, CT 06103-2205
                                      (860) 541-2077
                                      Fax (860) 713-8944

                                          Attorneys for Plaintiffs
                                          The Cadle Company and
                                          D.A.N. Joint Venture,
                                          A Limited Partnership


### Certificate of Service

    I certify that a correct copy of the foregoing instrument
was faxed and mailed on September 3, 2004 to all defense counsel
as shown on the attached Service List.


                              _____
                              F. Dean Armstrong