26.   T&P stock had traditionally had restrictive legend on its stock certificates.  The stock had restrictive legend when Prymas and Flanagan purchased the agency in 1988 (Prymas,144).

27.   T&P was never served with the Court's Turnover Order in Cadle I. The only parties served with the Court's Turnover Order were The Cadle Co. (through its attorney) and Flanagan (through his attorney, Leonard Fasano). (Judicial Notice of <u>Cadle I</u>)

28.   At the time the restrictive legends were placed on the stock, neither Prymas nor Bainer had any knowledge of the injunction or turnover orders issued in Cadle I (Ex. I, Prymas/T&P Answers to Plaintiffs' Interrogatories, nos. 3, 4).

29.   Leonard Fasano did not represent T&P in 1998, or at any time during Cadle I (Cadle I docket sheet).

30.   Prymas did not learn of the Cadle I Turnover Order until December, 1998, after the Cadle I judgment had been paid in full (Ex. I, Prymas/T&P Answers to Plaintiffs' Interrogatories, nos. 3, 4).

31.   In December, 1998, the plaintiffs served on Prymas and T&P post-judgment interrogatories, seeking to learn the whereabouts of Flanagan's assets (Complaint, ¶61; Complaint, Ex. 26).

32.   Prymas, on behalf of T&P, requested the Corporation's attorney, Bainer, to advise him how to respond. (Px 162)

33.   On Bainer's advice, Prymas responded to the interrogatories that neither he nor T&P knew of any non-exempt property belonging to Flanagan (Px 162, 118).

25

34.    As of May, 1998, T&P treated the monies payable to Flanagan in compliance with the stipulated judgment as W-2 income, subject to withholding and garnishment, on the advice of an accountant, Andrew D'Agostino, CPA on advice of the Corporation's attorney, Todd Bainer, and resumed payment to Flanagan as wages (Prymas, 46-49, 57; Ex. F).

35.    Prymas' response on behalf of himself and T&) that he did not know of any nonexempt property was truthful in light of the change in tax treatment of the judgment payments to Flanagan. (Ex. F; Prymas, 32-33, 46-49, 57).

36.    In February, 1999, Flanagan filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Laws.

RESPECTFULLY SUBMITTED,

THE DEFENDANTS
STANLEY F. PRYMAS AND
THOMPSON & PECK, INC.

By:    _____
BARBARA L. COX
Federal Bar #ct08523
WILLIAM F. GALLAGHER
Federal Bar #ct04147
The Gallagher Law Firm
1377 Boulevard
P.O. Box 1925
New Haven, CT  06509
Tel:  203-624-4165
Fax:  203-865-5598

26

## CERTIFICATION OF SERVICE

This is to certify that a copy of the foregoing was mailed on the date above written to all counsel and *pro se* parties of record, namely:

F. Dean Armstrong, Esq.
1324 Dartmouth Road
Flossmoor, Ill.  60422

Edward C. Taiman, Esq.
Michael G. Albano, Esq.
Sabia & Hartley, LLC
190 Trumbull Street, #202
Hartford, CT  06103-2205

Todd R. Bainer, Esq.
P.O. Box 1092
Branford, CT 06405

Mary Anne A. Charron, Esq.
Gerald R. Swirsky, Esq.
R. Bradley Wolfe, Esq.
Gordon, Muir & Foley
Hartford Square North
Ten Columbus Boulevard
Hartford, CT 06106

Douglas S. Skalka, Esq.
James A. Lenes, Esq.
Neubert, Pepe & Monteith
195 Church Street, 13th Floor
New Haven, CT 06510-2026

Bradley K. Cooney, Esq.
69 Island Avenue
Madison, CT 06443

David G. Hill
June Sullivan, Esq.
Halloran & Sage, LLP
One Goodwin Square
225 Asylum Street
Hartford, CT 06103

Lisa G. Flanagan, *pro se*
230 Millbrook Road
North Haven, CT 06473

Paul Morgan Gaide, Esq.
713 Lovely Street
Avon, CT 06001

Richard Roberts, Esq.
Karen T. Gerber, Esq.
Amber J. Branciforte, Esq.
Nuzzo & Roberts, LLC
One Town Center
P.O. Box 747
Cheshire, CT 06410

_____
BARBARA L. COX

# EXHIBIT B:  Local Rule 56(a)2 Statement
## (excerpted)

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| THE CADLE COMPANY and | § | No. 3:01CV531(AVC) |
| D.A.N. JOINT VENTURE, | | |
| A LIMITED PARTNERSHIP, | § | |
| Plaintiffs, | § | |
| vs. | § | |
| CHARLES A. FLANAGAN, et al. | § | September 3, 2004 |
| Defendants. | § | |

PLAINTIFFS' LOCAL RULE 56(a)2 STATEMENTS IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56(a)2, Plaintiffs The Cadle Company ("TCC") and D.A.N. Joint Venture, A Limited Partnership ("DJV") submit the following responses to the Local Rule 56(a)1 Statements submitted by (1) Defendants Todd R. Bainer and Todd R. Bainer, L.L.C. (collectively, "Bainer"); (2) Defendants Leonard A. Fasano and Fasano & Ippolito (n/k/a Fasano, Ippolito & Lee, L.L.C.) (collectively, "Fasano"); (3) Defendants Stanley F. Prymas ("Prymas") and Thompson & Peck, Inc. ("T&P"); and (4) Defendant Charles A. Flanagan ("Flanagan").

### III. Prymas And Thompson & Peck

(1)  It is admitted that Prymas and Flanagan were each 50% shareholders of T&P, but the remaining portions of ¶1 are not

30

supported by the cited reference and, accordingly, should be struck.

(2) It is admitted that on June 17, 1997 Flanagan and Prymas entered into a settlement agreement (Px 21) which, on July 17, 1997, served as the basis for the stipulated judgment in the Flanagan v. Prymas suit. (T&P Ex. B pp. 6-7) The remaining allegations in ¶2, however, are not supported by the cited references and, accordingly, should be struck.

(3) It is admitted that the Settlement Agreement at ¶12 provides for an additional $75,000 to be paid by T&P to Flanagan over three years in bi-monthly equal installments of $961.10, which was "[i]n addition to compensation provided in paragraph 2 . . .." (Px 21 ¶12 (emphasis added)) The remainder of the allegations in ¶3, however, are not supported by the cited reference and, accordingly, should be struck.

(4) It is admitted that Prymas testified at his deposition that, in essence, T&P's accountant verbally told Prymas that the Settlement Agreement payments to Flanagan could be treated either as W-2 or 1099-Miscellaneous income for tax purposes. The testimony by Prymas, however, constitutes hearsay and, accordingly, should be struck.

31

(5) It is denied that the ¶12 Settlement Agreement payments were initially classified as 1099-Miscellaneous income to avoid running afoul of a loan covenant in connection with a loan by Sun Trust Bank to T&P. Indeed, as shown by the summary judgment evidence, Prymas agreed to the characterization of the $75,000 Settlement Agreement payments to Flanagan as 1099 income, as opposed to wages, in an effort to avoid paying any portion of the $75,000 Settlement Agreement payments to the creditors of Flanagan that had garnished Flanagan's wages. (See Pxs 70, 72 p. 2 & 135)

(6) It is admitted that the ¶12 Settlement Agreement payments were made by T&P to Flanagan as 1099-Miscellaneous income from August through December, 1997.

(7) While it is admitted that Prymas testified that, in essence, by 1998 he and Flanagan had a very rough relationship; that they had a history of litigation; and that they disliked each other intensely, the summary judgment evidence shows that Prymas agreed to work with Flanagan in Flanagan's efforts to avoid TCC's attempts to execute on Flanagan's assets. (See Pxs 70, 72 p.2 & 135)

32

(8)  It is denied that it was in late December of 1997 that Flanagan began demanding that the ¶12 Settlement Agreement payments be reclassified as wages.  Rather, the summary judgment evidence shows that it was only after January 5, 1998 -- the date that TCC's property execution was served on T&P -- that Flanagan began demanding that the ¶12 Settlement Agreement payments be changed from 1099-Miscellaneous income (and thus subject to TCC's property execution) to wages.  (See Px 72 p. 2) Indeed, as admitted by Bainer, the ¶12 Settlement Agreement payments to Flanagan were recharacterized as wages as a result of the service of TCC's property execution on T&P on January 5, 1998.  (Id.)

(9)  It is admitted that in January of 1988 and before, Prymas knew that Flanagan's wages from T&P were subject to active garnishment from Flanagan's creditors.

(10) It is admitted that on January 5, 1998 TCC served T&P with a property execution in Cadle I. (Px 68A) It is denied, however, that the ¶12 Settlement Agreement payments to Flanagan were suspended based on the advice of Bainer pending a legal opinion from Flanagan's attorney, Fasano, as to the proper tax classification of the payments.  Rather, the summary judgment

33

evidence shows that the ¶12 Settlement Agreement payments to Flanagan were suspended as part of a conspiracy by Fasano, Prymas, T&P and Bainer to assist Flanagan with his scheme to hide, transfer and otherwise shield his ¶12 Settlement Agreement payments from the judgment claims of Plaintiff.    (See Pxs 72 p. 2, 24, 25A & 25B)

(11) It is denied that in 1998, Prymas was not interested in doing anything to help Flanagan.    Indeed, the summary judgment evidence shows to the contrary.    (Pxs 70, 72 p. 2, 135 p. 2 & 194)

(12) While it is admitted that Prymas testified that, in essence, he was concerned about the potential disruption to the business created by Flanagan's threats of more legal action against T&P, the summary judgment evidence shows that Prymas and T&P weighed the risk of a conspiracy claim against them should they agree to assist Flanagan with his plan to recharacterize the ¶12 Settlement Agreement proceeds, and opted to take that risk by affirmatively assisting Flanagan in the implementation and execution of his plan.    (See Pxs 72 p. 2, 114 & 142)

(13) It is denied that Prymas did not care if Flanagan's creditors received the settlement money, but rather, the summary

34

judgment shows to the contrary. (Pxs 70, 72 p. 2, 135 p. 2 & 194)

(14) It is admitted that on or about January 20, 1998, Flanagan signed, on behalf of T&P, a form claim of exemption (Px 25), representing that T&P had no Flanagan assets other than wages, and filed the claim with the Court in Cadle I. (But see Px 25A)

(15) It is denied that the June 17, 1997 Settlement Agreement (Px 21) required Flanagan and Prymas to both sign checks and other important documents on behalf of T&P. (See Px 21 ¶5)

(16) It is admitted that neither Prymas nor T&P were parties to the underlying action in Cadle I, but T&P was a party to the ancillary post-judgment collection proceedings and was served with a motion for turnover order (Px 196 p.7) and was a party bound by the order granting the turnover order. (Px 127)

(17) It is denied that Prymas and Flanagan construed ¶¶5 and 6 of the Settlement Agreement (Px 21) to require both of them to sign any important documents on behalf of T&P, and it is denied that the cited references for the statements in ¶17

35

support that statement.  Accordingly, the representations in ¶17 should be struck.

(18) It is denied that Flanagan was not authorized to sign the claim exemption to the property execution (Px 25) unilaterally on behalf of T&P.  Further, it is denied that the cited references for the statements in the ¶12 support that proposition and, accordingly, the representations in ¶18 should be struck.  Moreover, the summary judgment evidence shows that a draft form of the exemption was sent to T&P's attorney, Bainer, for review and approval before the form was signed by Flanagan and filed with the Court.  (See Px 25A)  Moreover, there is no evidence to show that T&P ever objected to the actions that were taken by Flanagan on behalf of T&P.

(19) Plaintiffs deny the allegations in ¶19 and deny that the cited references support the representations as stated in ¶19.  Rather, the summary judgment evidence shows that the February 10, 1998 letter by Andrew D'Agostino was used as an after-the-fact excuse to justify the prior recharacterization of the ¶12 Settlement Agreement payments on January 20, 1998 (Px 24) as part of the overall conspiracy to hide, transfer and otherwise shield Flanagan's ¶12 Settlement Agreement payments

from the judgment claims of Plaintiff. See Ps' MSJ Resp. §II. Indeed, the ¶12 Settlement Agreement payments to Flanagan were only resumed after the expiration of the property execution on May 15, 1998. (Pxs 142 & 114)

(20) It is denied that based on the accountant's February 10, 1998 opinion, T&P reclassified the ¶12 Settlement Agreement payments to Flanagan as W-2 wages and it is denied that, based on the advice of T&P's attorney, Bainer, T&P resumed settlement payments in May, 1998. While it is admitted that the ¶12 Settlement Agreement payments resumed to Flanagan after May 8, 1998, the decision had already been made in January of 1998 to recharacterize the ¶12 Settlement Agreement payments as W-2 wages in order to avoid TCC's property execution (Pxs 24, 25, 25A & 25B), and the change in characterization of the ¶12 Settlement Agreement payments was made as a result of the property execution served by TCC, not as a result of a subsequent letter from Flanagan's personal accountant. (See Px 72 p. 2) Moreover, the §12 Settlement Agreement payments to Flanagan did not resume as of February 11, 1998, but rather only resumed after May 8, 1998, which was after the property execution had expired. (See Pxs 114, 128 & 142)

37

(21) It is admitted that the <u>Cadle I</u> property execution served on T&P expired on or about May 5, 1998.

(22) It is admitted that TCC did not subsequently obtain another property execution in <u>Cadle I</u> to serve on T&P or file any motion or objection contesting the claim of exemption filed by Flanagan in January, 1998.

(23) It is admitted that on or about November 19, 1998 Flanagan paid the <u>Cadle I</u> judgment, but he did not pay TCC's post-judgment attorneys' fees incurred in TCC's unsuccessful collection efforts. (Px L ¶4)

(24) It is admitted that the Settlement Agreement provided that Flanagan and Prymas were to execute a shareholders agreement within the one-year term of the Auxiliary Committee and required each of them to continue ownership of their T&P stock, which included a provision prohibiting Flanagan from transferring his T&P stock to "any other person or entity". (Px 21 ¶¶10 & 13)

(25) It is denied that in August of 1998, as part of their compliance with the Settlement Agreement, Prymas and Flanagan had T&P's corporate attorney, Bainer, place restrictive legends on each of their stock certificates. First, the summary

judgment evidence shows that the Settlement Agreement (Px 21) did not require a buy-sell agreement or the placement of restrictive legends on the stock. And second, the summary judgment evidence shows that the restrictive legend was placed on Flanagan's T&P stock as part of the overall plan to delay, hinder or defraud Plaintiffs in their efforts to execute on Flanagan's T&P stock. (See Pxs 114, 128, 142 & 194)

(26) It is denied that T&P's stock had traditionally had a restrictive legend on its stock certificates and that the stock had restrictive legends when Prymas and Flanagan purchased the agency in 1988. Further, there is no summary judgment evidence cited to support these propositions and, accordingly, the allegations in ¶26 should be struck.

(27) It is denied that T&P was never served with the Court's turnover order in Cadle I and that the only parties served with the Court's turnover order were TCC and Flanagan. First, there is no summary judgment evidence cited to support these allegations and, accordingly, the allegations in ¶27 should be struck. Further, the summary judgment evidence shows that T&P was a party to the court-ordered obligations under the turnover order (Px 127) and was, in fact, served through service

of the turnover order on Flanagan, who was a director and 50% shareholder of T&P at the time. Further, the summary judgment evidence shows that T&P received notice of the turnover order. (See Pxs 196 p. 7 & 192)

(28) It is denied that at the time the restrictive legends were placed on Flanagan's T&P stock, neither Prymas nor Bainer had any knowledge of the injunction or turnover orders issued in Cadle I. Indeed, the summary judgment evidence shows that both Prymas and Bainer had actual and constructive notice of the March 9, 1998 injunction prohibiting Flanagan from transferring any assets and the April 13, 1998 Turnover Order ordering Flanagan to turnover the T&P stock certificates and any documents showing Flanagan's disposition of the T&P stock. (See Pxs 196 p. 7 & 192)

(29) It is admitted that Fasano did not formally represent T&P in 1998, or at any time during Cadle I. Fasano did, however, prepare T&P's Claim of Exemption form (Px 25) on behalf of T&P, and forwarded a copy of the Claim of Exemption form to T&P's attorney, Bainer, for review. (Pxs 25A & 25B)

(30) It is denied that Prymas did not learn of the Cadle I turnover order until December, 1998. Rather, the summary

40

judgment evidence shows that Prymas had actual and constructive notice of the turnover order as of April 25, 1998. (Pxs 196 p. 7 & 192)

(31) It is admitted that in December, 1998, Plaintiffs served on Prymas and T&P post-judgment interrogatories seeking to learn the whereabouts of Flanagan's assets.

(32) It is admitted that Prymas, on behalf of T&P, wrote a letter to T&P's attorney, Bainer, requesting confirmation from Bainer on how to respond. The allegations in ¶32, however, are not supported by any summary judgment evidence and, accordingly, should be struck. Moreover, the summary judgment evidence shows that Flanagan, Fasano, Prymas, T&P and Bainer had already worked out a plan on the recharacterization of the ¶12 Settlement Agreement payments. (See Px 72 p. 2; Pxs 24, 25, 25A & 25B)

(33) It is denied that on Bainer's advice, Prymas responded to the interrogatories that neither he nor T&P knew of any non-exempt property belonging to Flanagan. While it is admitted that Prymas responded to the interrogatories that neither he nor T&P knew of any non-exempt property belonging to Flanagan, there is no summary judgment evidence cited for the representations in ¶33 and, accordingly, the allegations in ¶33 should be struck.

41

Moreover, the summary judgment evidence shows that Flanagan, Fasano, Prymas, T&P and Bainer had already worked out a plan to recharacterize the ¶12 Settlement Agreement payments to Flanagan. (See Px 72 p. 2; Pxs 24, 25, 25A & 25B)

(34) It is denied that as of May, 1998, T&P treated the monies payable to Flanagan under ¶12 of the Settlement Agreement as W-2 income, subject to withholding and garnishment, on the advice of Flanagan's accountant, Andrew D'Agostino, and, on the advice of T&P's attorney, Bainer, resumed payment to Flanagan as wages.    First, the cited summary judgment evidence does not support the representations in ¶34 and, accordingly, those representations should be struck.  Further, the summary judgment evidence shows that, pursuant to a prior plan agreed to by Flanagan, Fasano, Prymas, T&P and Bainer, there was already an agreement to recharacterize the ¶12 Settlement Agreement payments as W-2 wages in order to avoid TCC's previously served property execution.    (See Pxs 24, 25, 25A, 25B & 72 p. 2) Further, the summary judgment evidence shows that the recharacterization of the ¶12 Settlement Agreement payments was pursuant to the plan to assist Flanagan in his efforts to delay,

hinder or defraud Plaintiffs in their efforts to execute on Flanagan's assets. <u>See</u> Ps' MSJ Resp. §II.

(35) It is denied that Prymas' response on behalf of himself and T&P that he did not know of any non-exempt property of Flanagan was truthful in light of the change in tax treatment of the judgment payments to Flanagan. First, the allegations in ¶35 are not supported by any summary judgment evidence and, accordingly, should be struck. Further, the summary judgment evidence shows that the recharacterization of the ¶12 Settlement Agreement payments was pursuant to the plan to assist Flanagan in his efforts to delay, hinder or defraud Plaintiffs in their efforts to execute on Flanagan's assets. <u>See</u> Ps' MSJ Resp. §II.

(36) It is admitted that on February 17, 1999, Flanagan filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy laws.

* * * * * * * * * * * * * * * * * *

V.    <u>**Disputed Issues Of Material Fact**</u>

While Plaintiffs believe the summary judgment evidence is strongly in Plaintiffs' favor, with the Defendants' denials an argument could be made that the following are issues of material fact as to which there is a genuine issue to be tried:

43