01CV531

(1) Whether Defendant Fasano provided knowing and
    substantial assistance in the implementation
    and/or execution of Flanagan's fraudulent
    scheme to hide, transfer or otherwise shield
    Flanagan's assets from the judgment claims of
    TCC and/or DJV? (Ps' MSJ Resp. §II)

(2) Whether Defendant Bainer provided knowing and
    substantial assistance in the implementation
    and/or execution of Flanagan's fraudulent
    scheme to hide, transfer or otherwise shield
    Flanagan's assets from the judgment claims of
    TCC and/or DJV? (Ps' MSJ Resp. §II)

(3) Whether Defendant Prymas provided knowing and
    substantial assistance in the implementation
    and/or execution of Flanagan's fraudulent
    scheme to hide, transfer or otherwise shield
    Flanagan's assets from the judgment claims of
    TCC and/or DJV? (Ps' MSJ Resp. §II)

(4) Whether Defendant T&P provided knowing and
    substantial assistance in the implementation
    and/or execution of Flanagan's fraudulent
    scheme to hide, transfer or otherwise shield
    Flanagan's assets from the judgment claims of
    TCC and/or DJV? (Ps' MSJ Resp. §II)

(5) Whether Plaintiffs were of the reasonable
    belief that they had a duty or obligation to
    pay the legal fees for defending Attorney
    Paul Gaide in connection with the Flanagan v.
    Gaide grievance? (Px L ¶7)

(6) What are the amount of Plaintiffs' damages by
    reason of the Defendants' violations of RICO?

(7) What amount of attorneys' fees should be
    reimbursed to Plaintiffs for their
    prosecution of this RICO action?

44

Each of the above issues is supported by the evidence cited in

Plaintiffs' Response to Defendants' Motions for Summary.

Respectfully submitted,

ARMSTRONG LAW FIRM

DATED: September ___, 2004.                  By_____
                                               F. Dean Armstrong
                                               Ct. Fed. Bar #CT22417
                                             1324 Dartmouth Road
                                             Flossmoor, IL 60422
                                             (708) 798-1599
                                             Fax (708) 798-1597


                                             Edward C. Taiman, Esq.
                                             SABIA & HARTLEY, LLC
                                             190 Trumbull Street
                                             Suite 202
                                             Hartford, CT 06103-2205
                                             (860) 541-2077
                                             Fax (860) 713-8944

                                             Attorneys for Plaintiffs
                                             The Cadle Company and
                                             D.A.N. Joint Venture,
                                             A Limited Partnership


### Certificate of Service

        I certify that a correct copy of the foregoing instrument
was faxed and mailed on September __, 2004 to all defense
counsel as shown on the attached Service List.


                                    _____
                                    F. Dean Armstrong

# EXHIBIT C:  Redlined Version Prymas/T&P Local

# Rule 56(a)1 Statement

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

THE CADLE COMPANY, ET AL          :        CIVIL ACTION NO.
    Plaintiffs                    :        3:01CV531(AVC)
                                  :
VS.                                :
                                  :
CHARLES A. FLANAGAN, ET AL         :        MAY 14, 2004
    Defendants

### STANLEY F. PRYMAS AND
### THOMPSON & PECK, INC.'S
### LOCAL RULE 56(a)1 STATEMENT, REDLINED

1.      It is admitted that[5] Stanley Prymas and Charles Flanagan were each fifty
(50%) percent owners of Thompson & Peck, Inc. ("T&P"), ~~an insurance agency that had
operated since 1928 in New Haven, Connecticut~~[6] (Exhibit A) but the remaining portions
of ¶1 are not supported by the cited reference and, accordingly, should be struck[sic].

2.      It is admitted that On June 17, 1997, Flanagan and Prymas ~~settled a
lawsuit between them by entering~~ a settlement agreement (Px 21) ~~that was
subsequently entered as a judgment by the Connecticut Superior Court ("stipulated
judgment")~~ which, on July 17, 1997, served as the basis for the stipulated judgment in
the Flanagan v. Prymas suit. (Exhibits A, B). The remaining allegations in ¶2, however,
are not supported by the cited references and, accordingly, should be struck[sic].

---

[5] Indicates language added by Plaintiffs
[2] ~~Language deleted by Plaintiffs.~~

3.      It is admitted that ~~The stipulated judgment required Prymas/T&P to pay Flanagan a total~~ the Settlement Agreement at ¶12 provides for an additional ~~of~~ $75,000.00 to be paid ty T&P to Flanagan over three years in bimonthly equal installments of $961.10, which was "[in addition to compensation provided in paragraph 2. . . ."(Px 21 ¶12(emphasis added). (Exhibit A, ¶12). The remainder of the allegations in ¶3, however, are not supported by the cited reference and, accordingly, should be struck[sic].

4.      It is admitted that ~~At the time of the Flanagan/Prymas settlement, T&P's accountant verbally told Prymas that the payments to Flanagan could be treated either as W-2 or 1099-Miscellaneous income for tax purposes (Prymas Dep. 21).~~ Prymas testified at his deposition that, in essdence, T&P's accountant verbally told Prymas that the Settlement Agreement payments to Flanagan could be treated either as W-2 or 1099-Miscellaneous income for tax purposes.  The testimony by Prymas, however, constitutes hearsay and, accordingly should be struck[sic].

5.      It is denied that the ¶12 Settlement Agreement payments were initially classified as~~Because Prymas was concerned that classifying the stipulated judgment payments might exceed limits on employees' salaries imposed by a loan covenant, he and Flanagan agreed to treat the payments~~ as 1099-Miscellaneous income to avoid running afoul of ~~the~~ a loan covenant in connection with a loan by Sun Trust Bank to T&P(Prymas 21-22).Indeed, as shown by the summary judgment evidence, Prymas agreed to the characterization of the $75,000 Settlement Agreement payments to

49

Flanagan as 1099 income, as opposed to wages, in an effort to avoid paying any
portion of the $75,000 Settlement Agreement payments to the creditors of Flanagan that
had garnished Flanagan's wages.(See Pxs 70, 72 p. 2 & 135)

6.     It is admitted that the ¶ 12 Settlement Agreement Payments were made by
T&P to Flanagan as 1099-Miscellaneous from August through December, 1997.

7.     By 1998, Prymas and Flanagan had a very rough relationship; they had a
history of litigation and they disliked each other intensely (Prymas, 25-27).While it is
admitted that Prymas testified that, in essence, by 1998 he and Flanagan had a very
rough relationship; that they had a history of litigation; and that they disliked each other
intensely, the summary judgment evidence shows that Prymas agreed to work with
Flanagen in Flanagan's efforts to avoid TCC's attempts to execute on Flanagan's
assets. (See Pxs 70, 72 p. 2 &135)

8.     It is denied that it was In late December, 1997 or early the following
January, Flanagan began demanding that T&P reclassify the judgment ¶12 Settlement
Agreement payments as W-2 income and subsequently threatened litigation if
Prymas/T&P would not comply (Prymas 23-24, 34, 91-92, 127-28; Exhibit E).Rather, the
summary judgment evidence shows that is was only after January 5, 1009 – the date
that TCC's property execution was served on T&P – that Flanagan began demanding
that the ¶ 12 Settlenent Agreement payments be changed from 1099-Miscellanious
income (and thus subject to TCC's property execution) to wages.  (See Pxs 72 p. 2)
Indeed, as admitted by Bainer, the ¶12 Settlement Agreement payments to Flanagan

50

were recharacterized as wages as a result of the service of TCC's property execution

on T&P on January 5, 1998.(Id.)

9.     It is admitted that In January of 1998 and before, Prymas knew that

Flanagan's wages from T&P were subject to active garnishment from Flanagan's

creditors (Prymas, 34-40).

10.     It is admitted that On January 5, 1998, the Cadle Company TCC served

T&P with a property execution in Cadle Company v. Flanagan, Civ. Action No. 3:98-CV-

02648 (AVC) (D.Conn.) ("Cadle I") (Cadle I, Execution).    Faced with competing

demands from the execution and Flanagan, T&P, on advice of the corporation's

counsel, Todd Bainer, suspended the stipulated judgment Settlement Agreement

payments to Flanagan, pending a legal opinion from Flanagan's attorney, Leonard

Fasano, Esq., as to the proper tax classification of the payments (Prymas, 24-30, 34,

42, 47, 91-92).Rather, the summary judgment evidence shows that the ¶12 Settlement

Agreement payments to Flanagan were suspended as part of a conspiracy by Fasano,

Prymas, T&P and Bainer to assist Flanagan with his scheme to hide, transfer and

otherwise shield his ¶12 Settlement Agreement payments from the judgment claims of

Plaintiff. (See Pxs 72 p. 2, 24, 25A & 25B)

11.     It is denied that In 1998, Prymas was not interested in doing anything to

help Flanagan (Prymas, 25-26, 27).  Indeed the summary judgment evidence shows to

the contrary.

51

12. ~~Prymas was very concerned about the potential disruption to the business created by Flanagan's threats of more legal action against the corporation~~ (Prymas, 39, 41). While it is admitted that Prymas testified that, in essdence, he was concerned about the potential disruption to the business created by Flanagan's threats of more legal action against T&P, the summary judgment evidence shows that Prymas and T&P weighed the risk of a conspiracy claim against them should they agree to assist Flanagan with his plan to recharacterize the ¶12 Settlement Agreement proceeds, and opted to take that risk by affirmatively assisting Flanagan in the implementation and execution of his plan. (See Pxs 72 p. 2, 114 & 142)

13. It is denied that Prymas did not care if Flanagan's creditors received the settlement money, ~~and, in fact, hoped that the money would go to a creditor through garnishment, because he did not like Flanagan~~ (Prymas, 34-40) but rather, the summary judgment evidence shows to the contrary. (Pxs 70, 72 p. 2, 135 p. 2 & 194).

14. It is admitted that On or about January 20, 1998, Flanagan signed on behalf of T&P a form claim of exemption, stating that T&P had no Flanagan assets other than wages, and filed the claim with the court in Cadle I (Complaint Ex. 25). (But see Px 25A)

15. It is denied that The June 17, 1997 ~~stipulated judgment~~ Settlement Agreement required Flanagan and Prymas to both sign checks and other important documents on behalf of T&P (Ex. A, ¶¶5, 6). (See Px 21 ¶5)

16.    It is admitted that Neither Prymas nor T&P were parties to the underlying action in Cadle I but T&P was a party to the ancillary post-judgment collection proceedings and was served with a motion for turnover order (Px196 p. 7) and was a party bound by the order granting the turnover order. (Judicial Notice, Cadle I)(Px 127).

17.    It is denied that Prymas and Flanagan construed paragraphs 5 and 6 of the stipulated judgment to require both of them to sign any important documents on behalf of T&P (Ex. A, ¶¶5, 6; Ex. H). and it is denied that the cited references for the statements in ¶17 support that statement.    Accordingly, the representations in ¶17 should be struck [sic].

18.    It is denied that Flanagan was not authorized to sign the exemption unilaterally on behalf of T&P (Id.). Further, it is denied that the cited references for the statements in the ¶12 support that proposition and, accordingly, the representations in ¶18 should be struck.    Moreover the summary judgment evidence shows that a draft form of the exemption was sent to T&P's attorney, Bainer, for review and approval before the form was signed by Flanagan and filed with the Court.    (See Px 25A) Moreover, there is no evidence to show that T&P ever objected to the actions that were taken by Flanagan on behalf of T&P.

19.    On February 10, 1998, Andrew D'Agostino, CPA, issued a professional opinion letter stating that the judgment payments to Flanagan should be classified as wages in order to avoid tax code violations that could subject T&P to various taxes, penalties and interest (Ex. F; Prymas, 32-33). Plaintiffs deny the allegations in ¶19 and

deny that the cited references support the representations as stated in ¶19. Rather summary judgment evidence shows that the *February 10, 1998* letter by Andrew D'Agostino was used as an after-the-fact excuse to justify the prior recharacterization of the ¶12 Settlement Agreement payments on January 20, 1998 (Px 24 as part of the overall conspiracy to hide, transfer and otherwise shield Flanagan's ¶12 Settlement Agreement payments from the judgment claims of Plaintiff. See Ps' MSJ Resp. §II. Indeed, the ¶12 Sjettlement Agreement payments to Flanagan were only resumed after the expiration of the property execution on May 15, 1998. (Pxs 142 & 114)

20.     It is denied that Based on the accountant's opinion, T&P reclassified the ~~judgment~~ ¶12 Settlement Agreement payments to Flanagan as W-2 wages and, on advice, of T&P's attorney, Bainer, resumed settlement payments in May, 1998 (Prymas, 46-49, 57). While it is admitted that the ¶12 Settlement Agreement payments resumed to Flanagan after May 8, 1998, the decision had already been made in January of 1998 to recharacterize the ¶12 Settlement Agreement payments as W-2 wages in order to avoid TCC's property execution served by TCC, not as a result of a subsequent letter from Flanagan's personal accountant. (See Px72 p. 2). Moreover, the §12 Settlement Agreement payments to Flanagandid not resume as of February 11, 1998, but rather only resumed after May 8, 1998, which was after the property execution had expired. (See Pxs 114, 128 & 142)

21.     It is admitted that The Cadle I property execution served on T&P expired on May 5, 1998 (Execution).

22.    The Cadle Company did not subsequently obtain another property execution to serve on T&P in Cadle I or file any motion or objection contesting the claim of exemption filed by Flanagan in January, 1998 (Cadle I docket sheet).

23.    It is admitted that On November 19, 1998, Flanagan paid the Cadle I judgment, together with interest and attorney's fees, in full (Ex. G).but he did not pay TCCs'post-judgment attorneys' fees incurred in TCC's unsuccessful collection efforts. (Px L ¶4)

24.    It is admitted that The stipulated judgment Settlement Agreement required provided that Flanagan and Prymas were to execute a shareholders' agreement within the one-year term of the Auxiliary Committee and, directed required each of them to continue ownership of the corporate their T&P stock, which included a provision and prohibited prohibiting Flanagan from transfer transferring his T&P of the stock to "any other person or entity" (Ex. A, ¶¶10, 13). (Px 21 ¶¶10 & 13)

25.    It is denied that In August, 1998, as part of their compliance with the stipulated judgment, Prymas and Flanagan had T&P's corporate attorney, Bainer, place restrictive legends on each of their stock certificates (Prymas, 144).First the summary judgment evidence shows that the Settlement Agreement (Px 21) did not require a buy-sell agreement or the placement of restrictive legends on the stock.  And second, the summary judgment evidence shows that the restrictive legend was placed on Flanagan's T&P stock as part of the overall plan to delay, hinder or defraud Plaintiffs in their efforts to execute on Flanagan's T&P stock. (See Pxs 114, 128, & 194)

26.    It is denied that T&P stock had traditionally had restrictive legend on its stock certificates.  The stock had restrictive legend when Prymas and Flanagan purchased the agency in 1988 (Prymas, 144). Further, there is no summary judgment evidence cited to support these propositions and, accordingly, the allegations in ¶26 should be struck.

27.    It is denied that T&P was never served with the Court's Turnover Order in Cadle I.  The only parties served with the Court's Turnover Order were The Cadle Co. (through its attorney) and Flanagan (through his attorney, Leonard Fasano). First, there is no summary judgment evidence cited to support these allegations and, accordingly, the allegations in ¶27 should be struck.  Further, the summary judgment evidence shows that T&P was a party to the court-ordered obligations under the turnover order (Px 127) and was, in fact, served through service of the turnover order on Flanagan, who was a director and 50% shareholder of T&P at the time.  Further, the summary judgment evidence shows that T&P received notice of the turnover order. (See Pxs 196 p. 7 & 192)

28.    It is denied that At the time the restrictive legends were placed on the Flanagan's T&P stock, neither Prymas nor Bainer had any knowledge of the injunction or turnover orders issued in Cadle I (Ex. I, Prymas/T&P Answers to Plaintiffs' Interrogatories, nos. 3, 4).Indeed, the summary judgment evidence shows that both Prymas and Bainer had actual and constructive notice of the March 9, 1998 unjunction prohibiting Flanagan from transferring any assets and the April 13, 1998 Turnover Order

ordering Flanagan to turnover the T&P stock certificates and any documents showing Flanagan's disposition of the T&P stock. (See Pxs 196 p. 7 & 192)

29.    It is admitted that Leonard Fasano did not formally represent T&P in 1998, or at any time during Cadle I (Cadle I docket sheet).Fasano did, however, prepare T&P's Claim of Exemption form (Px 25) on behalf of T&P, and forwarded a copy of the Claim of Exemption form to T&P's attorney, Bainer, for review. (Pxs 25A & 25B)

30.    It is denied that Prymas did not learn of the Cadle I Turnover Order until December, 1998, after the Cadle I judgment had been paid in full (Ex. I, Prymas/T&P Answers to Plaintiffs' Interrogatories, nos. 3, 4). Rather, the summary judgment evidence shows that Prymas had actual and constructive notice of the turnover order as of April 25, 1998. (Pxs 196 p.7 & 192)

31.    It is admitted that In December, 1998, the plaintiffs served on Prymas and T&P post-judgment interrogatories, seeking to learn the whereabouts of Flanagan's assets (Complaint, ¶61; Complaint, Ex. 26).

32.    It is admitted that Prymas, on behalf of T&P, requested the Corporation's wrote a letter to T&P's attorney, Bainer, to advise him requesting confirmation from Bainer on how to respond. (Px 162) The allegations in ¶32, however, are not supported by any summary judgment evidence and, accordingly, should be struck. Moreover the summary judgment evidence shows that Flanagan, Fasano, Prymas, T&P and Bainer had already worked out a plan on the recharacterization of the ¶12 Settlement Agreement payments. (See Px 72 p. 2; Pxs 24, 25, 25A & 25B)

33.    It is denied that On Bainer's advice, Prymas responded to the interrogatories that neither he nor T&P knew of any non-exempt property belonging to Flanagan (Ex. Px 162, 118). While it is admitted that Prymas responded to the interrogatories that neither he nor T&P knew of any non-exempt property belonging to Flanagan, there is no summary judgment evidence cited for the representations in ¶33 and, accordingly, the allegations in ¶33 should be struck.   Moreover, the summary judgment evidence shows that Flanagan, Fasano, Prymas, T&P and Bainer had already worked out a plan on the recharacterization of the ¶12 Settlement Agreement payments. (See Px 72 p. 2; Pxs 24, 25, 25A & 25B)

34.    It is denied that As of May, 1998, T&P treated the monies payable to Flanagan in compliance with the stipulated judgment under ¶12 of the Settlement Agreement as W-2 income, subject to withholding and garnishment, on the advice of an accountant, Andrew D'Agostino, CPA on advice of the Corporation's T&P's attorney, Todd Bainer, and resumed payment to Flanagan as wages (Prymas, 46-49, 57; Ex. F). First the cited summary judgment evidence does not support the representations in ¶34 and, accordingly, those representations should be struck [sic]. Further, the evidence shows that, pursuant to a prior plan agreed to by Flanagan, Fasano, Prymas, T&P and Bainer, there was already an agreement to recharacterize the ¶12 Settlement Agreement payments as W-2 wages in order to avoide TCC's previously served property execution. (See Pxs 24, 25, 25A, 25B & 72) Further, the summary judgment evidence shows that the recharacertization of the ¶12 Settlement Agreement payments

58

was pursuant to the plan to assist Flanagan in his efforts to delay, hinder or defraud Plaintiffs in their efforts to execute on Flanagan's assets. See Ps' MSJ Resp. §11.

35.    It is denied that Prymas' response on behalf of himself and T&) that he did not know of any nonexempt property was truthful in light of the change in tax treatment of the judgment payments to Flanagan.    Further, the summary judgment evidence shows that the recharacertization of the ¶12 Settlement Agreement payments was pursuant to the plan to assist Flanagan in his efforts to delay, hinder or defraud Plaintiffs in their efforts to execute on Flanagan's assets. See Ps' MSJ Resp. §11.

36.    In February, 1999, Flanagan filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Laws.

RESPECTFULLY SUBMITTED,


THE DEFENDANTS
STANLEY F. PRYMAS AND
THOMPSON & PECK, INC.


By:    _____

BARBARA L. COX
 Federal Bar #ct08523
The Gallagher Law Firm
1377 Boulevard
P.O. Box 1925
New Haven, CT  06509
Tel:  203-624-4165
Fax:  203-865-5598


59