**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **THE CADLE COMPANY** and | § | **No. 3:01CV531(AVC)** |
| **D.A.N. JOINT VENTURE,** | | |
| **A LIMITED PARTNERSHIP,** | § | |
| | | |
| Plaintiffs, | § | |
| | | |
| vs. | § | |
| | | |
| **CHARLES A. FLANAGAN, et al.** | § | **April 18, 2005** |
| | | |
| Defendants. | § | |

**PLAINTIFFS' SECOND AMENDED RESPONSE TO
DEFENDANT FASANO'S MOTION FOR SUMMARY JUDGMENT**

This is the Response of Plaintiffs The Cadle Company ("TCC") and D.A.N. Joint Venture, A Limited Partnership ("DJV") to the Motion for Summary Judgment submitted by Defendants Leonard A. Fasano and Fasano & Ippolito (n/k/a Fasano, Ippolito & Lee, L.L.C.) (collectively, "Fasano").

I. **At The Summary Judgment Stage, Plaintiffs Need Only Prove The Elements Of Their RICO Claims That Were Specifically Challenged By Fasano And Then Appropriately Supported By Specific Summary Judgment Proof.**

At the summary judgment stage, a plaintiff need not prove what the defendant has not properly challenged in the defendant's summary judgment motion. Rather, at the summary judgment stage a plaintiff need only prove the elements of its claims that were specifically and properly challenged by the defendant. An element of a plaintiff's claim is properly challenged when a defendant specifically informs the Court of

the basis of its motion and then appropriately supports each challenged element by reference to specific summary judgment proof.

The Court in its March 28, 2005 Order intimated that, in response to Fasano's Motion for Summary Judgment, Plaintiffs had to provide summary judgment evidence as to each element of their RICO claims. At the summary judgment stage, however, Plaintiffs need only prove the elements of their RICO claims that were specifically challenged by Fasano and then appropriately supported by specific summary judgment proof.

The mere filing of a motion for summary judgment by a defendant does not shift the burden to the plaintiff to prove each and every element of its claims by competent summary judgment evidence. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 160-61 (1970); Amaker v. Foley, 274 F.3d 677, 681 (2d Cir. 2001); Reed v. Bennett, 312 F.3d 1190, 1194-95 (10th Cir. 2002). Rather, at the summary judgment stage a plaintiff is only required to come forward with controverting summary judgment evidence as to facts (1) specifically challenged by the defendant which are (2) appropriately supported by the defendant's specific reference to pleadings, depositions, answers to interrogatories, admissions or affidavits which prove the absence of a genuine issue of material fact as to each challenged fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 327

1986); <u>Adickes</u>, 399 U.S. at 160-61; <u>Amaker</u>, 274 F.3d at 681;

<u>Reed</u>, 312 F.3d at 1194-95.

Under Rule 56(c)[1], a defendant moving for summary judgment

> bears the initial responsibility of [1]
> informing the district court of the basis
> for its motion, and [2] identifying those
> portions of both "the pleadings,
> depositions, answers to interrogatories, and
> admissions on file, together with the
> affidavits, if any," which [the defendant]
> believes demonstrates the absence of a
> genuine issue of material fact.

<u>Celotex</u>, 477 U.S. at 323 (quoting Rule 56(c)).  <u>See</u>, <u>also</u>, <u>Reed</u>,

312 F.3d at 1194.  Moreover,

> [b]efore the burden shifts to the
> [plaintiff] to demonstrate a genuine issue,
> the moving [defendant] most meet its
> "initial responsibility" of demonstrating
> that no genuine issue of material fact
> exists and that it is entitled to summary
> judgment as a matter of law.

<u>Reed</u>, 312 F.3d at 1194.  As explained by the Supreme Court in

<u>Adickes</u>, the burden on the plaintiff to assert controverting

summary judgment evidence arises only if the defendant's summary

judgment motion is properly "supported" as required by Rule

56(c).  <u>See</u>, <u>Adickes</u>, 398 U.S. at 160-61.  <u>See</u>, <u>also</u>, <u>Amaker</u>,

274 F.3d at 681; <u>Reed</u>, 312 F.3d at 1194-95.

Accordingly, summary judgment is "appropriate" only when

the defendant has met its initial burden of production under

Rule 56(c).  <u>Reed</u>, 312 F.3d at 1194; <u>Amaker</u>, 274 F.3d at 681.

---

[1] References to "Rule __" are to the Federal Rules of Civil Procedure.

If the evidence produced by the defendant in support of its motion for summary judgment does not meet this burden, "summary judgment must be denied even if no opposing evidentiary matter is presented" (Adickes, 398 U.S. at 160) because "[n]o defense to an insufficient showing is required." Id. at 161. See, also, Reed, 312 F.3d at 1194-95; Amaker, 274 F.3d at 681.

In deciding whether a genuine issue of material fact has been raised as to an issue, this Court "must construe the facts in the light most favorable to the non-moving party [Plaintiffs] and must resolve all ambiguities and draw all reasonable inferences against the movant [Defendants]." Baisch v. Gallina, 346 F.3d 366, 371-72 (2d Cir. 2003). Moreover, even if the underlying facts are undisputed, but the reasonable inferences which can be drawn therefrom are in dispute, summary judgment is inappropriate. See Cali v. Eastern Airlines, Inc., 442 F.2d 65, 71 (2d Cir. 1971).

Finally, numerous allegations in Plaintiffs' Second Amended Complaint ("2AC") went unchallenged by Fasano in his summary judgment motion. Accordingly, the allegations in Plaintiffs' Second Amended Complaint not refuted by Fasano through competent summary judgment proof remain unresolved fact questions to be resolved at trial. See Landry v. Air Line Pilots Ass'n, 901 F.2d 404, 426, 430 & 431 (5th Cir. 1990). See, also, Amaker, 274 F.3d at 681; Reed, 312 F.3d at 1194-95. Indeed,

> [t]he fact that [the plaintiffs] have made
> allegations [in their complaint] which the
> RICO defendants refute in brief but not with
> facts, by way of affidavit, evidence or
> otherwise, shows that factual issues remain
> to be resolved.

Landry, 901 F.2d at 431.

As shown by the following, Fasano has failed in his summary judgment burden, and, accordingly, Fasano's Motion for Summary Judgment should be denied.

**II.    Because The Defendants Have Not Contested Plaintiffs' RICO Allegations Against Flanagan, Plaintiffs' Claims That Flanagan Engaged In Substantive Violations Of RICO Remain Unresolved Fact Questions To Be Resolved At Trial.**

So long as the other elements of a RICO claim are satisfied, schemes to hide, transfer or otherwise shield a judgment debtor's assets from the execution efforts of a creditor may be redressed under RICO. See Handeen v. Lemaire, 112 F.3d 1339 (8th Cir.1997); Stochastic Decisions, Inc. v. DiDomenico, 995 F.2d 1158 (2d Cir.1993); Bankers Trust Company v. Rhoades, 859 F.2d 1096 (2d Cir.1988); Gutierrez v. Givens, 989 F.Supp. 1033 (S.D.Cal.1997); Gutierrez v. Givens, 1 F.Supp.2d 1086 (S.D.Cal.1998); and Cadle Co. v. Schultz, 779 F.Supp. 392 (N.D.Tex.1991).

In their summary judgment pleadings, Flanagan's co-conspirators have admitted that:

(1) "[T]he evidence developed during discovery . . . shows that Flanagan was desperately attempting to conceal his assets and evade his creditors." (Prymas/T&P MSJ Mem. p. 9)

(2) Flanagan's conduct in transferring and pledging his T&P stock to various individuals "delayed, hindered or defrauded [Plaintiffs'] execution on [Flanagan's T&P] stock." (Bainer MSJ Mem. p. 34)

(3) "It was Flanagan who transferred the T&P stock to Babacus and others to avoid execution by the plaintiffs." (Prymas/T&P MSJ Mem. p. 28)

(4) "The only thing that delayed, hindered or defrauded execution on [Flanagan's] stock was Flanagan's personal transfer and pledge of the stock to various individuals." (Bainer MSJ Mem. p. 34)

(5) "As the . . . facts adduced during discovery amply demonstrate, the . . . fraud that caused Plaintiffs' inability to collect [on the judgment debts owed by Flanagan] was [committed by] Flanagan himself." (Prymas/T&P MSJ Mem. p. 28)

(6) It was "Flanagan's fraudulent efforts to evade his creditors" that caused "Plaintiffs' lack of collection success . . .." (Prymas/T&P MSJ Mem. p. 28)

(7) "Flanagan, himself, was the source of the fraud upon which Plaintiffs suffered damages . . .." (Prymas/T&P MSJ Mem. p. 20)

Indeed, Prymas has admitted that Flanagan has committed bankruptcy fraud. (Px O) Moreover, this Court has previously ruled that Plaintiffs have stated viable claims against Flanagan

-6-

for substantive violations of §1962(b) and §1962(c) of RICO. (7/3/03 Ruling on Flanagan's Motion to Dismiss)

Here the Defendants have not contested Plaintiffs' allegations that Flanagan engaged in substantive violations of §1962(b) and §1962(c) of RICO in connection with Flanagan's scheme to hide, transfer and otherwise shield his assets from the judgment claims of Plaintiffs. Indeed, in Fasano's summary judgment pleading it was "assume[d] that Flanagan's personal activities created liability under RICO . . .." (Fasano Mem. p. 17) At the summary judgment stage, a RICO plaintiff need not prove the elements of a RICO claim that were not properly challenged by the defendants in their summary judgment pleadings. See Adickes, 396 U.S. at 160-61; Amaker, 274 F.3d at 681; Reed, 312 F.3d at 1194-95; Landry, 901 F.2d at 426, 430 & 431. Accordingly, Plaintiffs' claims that Flanagan engaged in substantive violations of §1962(b) & (c) of RICO remain unresolved fact questions to be resolved upon the evidence introduced at trial. Id.

> **III. The Summary Judgment Evidence Shows That Fasano Provided Knowing And Substantial Assistance To Flanagan In The Execution Of Flanagan's RICO Scheme, And Thus Is Liable As A Co-Conspirator Under §1962(d) of RICO.**

Plaintiffs do not contend that Fasano personally committed each act necessary to constitute a substantive violation of §§1962(b) or (c) of RICO. Rather, Plaintiffs contend -- and the

-7-

Defendants do not contest -- that it was Flanagan who personally committed the acts necessary to constitute substantive violations of §1962(b) and §1962(c).

Further, the summary judgment evidence shows that Fasano provided knowing and substantial assistance to Flanagan in connection with the execution of Flanagan's RICO scheme to hide, transfer and otherwise shield Flanagan's assets from the judgment claims of Plaintiffs. Accordingly, the summary judgment evidence shows that there are disputed issues of material fact as to whether Fasano can be held liable as a co-conspirator pursuant to §1962(d) of RICO. See Baisch v. Gallina, 346 F.3d 366, 376-77 (2d Cir. 2003)

As alleged in Plaintiffs' Second Amended Complaint, and as shown by the summary judgment evidence, Flanagan's RICO scheme involved five separate but related schemes to hide, transfer and otherwise shield his assets from Plaintiffs: (1) the "settlement proceeds" scheme; (2) the "shifting stock" scheme; (3) the "secret checking account" scheme; (4) the "Caporale property transfer" scheme; and (5) the "bankruptcy fraud" scheme. The summary judgment evidence set forth below shows that there are disputed issues of fact as to the role of Fasano in the implementation and execution of Flanagan's fraudulent scheme to hide, transfer and otherwise shield Flanagan's assets from the judgment claims of Plaintiffs.

Conspiracies are, by their very, nature, secretive operations. <u>See</u> <u>Pangburn v. Culbertson</u>, 200 F.3d 65, 72 (2d Cir. 1999). Accordingly, a RICO plaintiff rarely has direct evidence of a conspiracy, but may, by necessity, show a RICO conspiracy through circumstantial evidence. <u>Id</u>. In order for circumstantial evidence to have meaning, however, the proper context of the overall conduct of all participants must be examined, with the realization that a co-conspirator rarely confesses to his role in the wrongful scheme that is the subject of the conspiracy.

The role of Fasano in Flanagan's RICO scheme to hide, transfer and otherwise shield his assets from the judgment claims of Plaintiffs is set forth below in the summary judgment citations that are highlighted in bold typeset (<u>e.g.</u>, **"Px 3"** and **"Px 105"**), as opposed to regular typeset (<u>e.g.</u>, "Px Q ¶7"), which shows the context within which Fasano's wrongful assistance in the execution of Flanagan's scheme took place.

A. <u>Background</u>.

Flanagan was a very wealthy man. In the early 1990s Flanagan had over $11,700,000 in assets, with a net worth of over $4,355,000. (Px 55)

Flanagan's largest single asset was his 50% stock ownership in Thompson & Peck, Inc. ("T&P"), which was a large, independent

insurance agency in Connecticut. (Px 176) Flanagan's 50% stock ownership in T&P was estimated to be worth $2,000,000. (Px 55)

In addition, Flanagan received substantial rental income from numerous apartment buildings and other rental properties that he owned. (Px 177; Px C p. 49; Px H pp. 60-61; Px 55) Flanagan, however, was a notorious slumlord who drained income from his properties by taking money out of his apartment buildings, but not putting any money back in. (Px D pp. 56-57)

Not only was Flanagan a notorious slumlord, in the mid 1990s Flanagan submitted a false financial disclosure form to the IRS in an effort to convince the IRS to reduce the amount of his taxes. (Px A(1) pp. 30-31; 48-49 & 53) Flanagan intentionally omitted from the IRS disclosure form his access to a checking account in the name of "Crocker House Associates", which was a d/b/a of Flanagan, and Flanagan's ownership of various apartment buildings, which were held in the names of other entities that were secretly owned and controlled by Flanagan. (Px A(1) pp. 32; 48-51; Pxs 75 & 76) On December 4, 2002 Flanagan pled guilty to the felony of submitting false financial information to the IRS. (Px A(1) p. 7; Pxs 76 & 77)

In 1996 Plaintiff TCC filed suit against Flanagan in <u>Cadle v. Flanagan</u>, United States District Court, District of Connecticut, No. 3:96-CV-02648 (AVC) (the "Federal Suit" or "<u>Cadle I</u>") in connection with Flanagan's default on a $75,000

loan which had previously been conveyed to TCC. (Flanagan Answer ¶70) On March 20, 1997 a final judgment was entered in the Federal Suit against Flanagan in the amount of $90,747.87. (Px 175; Px 109 p. 51)

A debtor's examination of Flanagan was scheduled before Judge Covello on March 9, 1998. On February 25, 1998 Plaintiff TCC served a document subpoena on Flanagan requiring Flanagan to produce at the debtor's examination documents pertaining to Flanagan's assets, including Flanagan's stock ownership in T&P. (Px G(1) p. 62)

At the March 9, 1998 debtor's examination, however, Flanagan refused to produce any documents pertaining to his assets, and refused to provide any testimony about his assets. (Px G(1) pp. 63, 65, 80, 81, 83; Px G(2) p. 187) Rather, Flanagan's attorney represented to Judge Covello that Flanagan was invoking his Fifth Amendment right against self-incrimination and was refusing to provide any evidence about his assets because Flanagan was under criminal investigation by the IRS and the F.B.I. for income tax matters. (Px 78; Px G(1) p. 83; Px G(2) p. 187) The purported Fifth Amendment IRS concerns, however, were simply a ruse concocted by Flanagan and his attorney, Fasano, to avoid or delay providing any information to Plaintiffs about the location and transfer of Flanagan's assets.

**(Pxs 105 & 18; Pxs 188 p. 3 #9 & 186 p. 2 ¶¶5 & 10; Px A(1) pp. 197-99)**

After hearing the excuses for Flanagan's refusal to produce documents or testify about his assets, on March 9, 1998 Judge Covello issued an order prohibiting Flanagan from transferring his assets, and requiring Flanagan to submit to the Court for <u>in camera</u> inspection the documents pertaining to Flanagan's assets which supposedly were subject to the Fifth Amendment privilege against self-incrimination:

> I am entering an order that Mr. Flanagan, from this point forward, transfer nothing of a single asset until such time as this is unraveled, and that includes the family lawn mower, bicycle, whatever.
>
> * * *
>
> And, to the extent that the documents that [Plaintiff TCC] seeks are claimed [by Flanagan] to be the subject of a Fifth Amendment privilege, again, the Court would direct that those be submitted to the Court for in-camera inspection.

(Px 78 p. 7) Thereafter, on April 13, 1998 Judge Covello ordered Flanagan and T&P to turn over Flanagan's stock ownership in T&P or provide sufficient documentation to show Flanagan's disposition of the T&P stock. (Px 127; Px 109 p. 51)

By 1998, Plaintiffs held judgment and other debt claims against Flanagan which totaled in excess of $1,000,000. (Px G(1) pp. 44-45; Px 175; Px H pp. 60-61, 84, 86, 89, 90 & 93-95; Pxs

20 & 175)  According to Attorney William Gallagher (the former president of the Connecticut State Bar Association) (Px D p. 53)), Flanagan "was probably the New Haven Judicial District's biggest deadbeat.  He had enormous number of debts against him." (Id. p. 28)  Further, Flanagan had a history of trying to avoid paying his creditors. (Id. pp. 47-48)

In 1998 Flanagan was engaged in a multi-faceted conspiracy to defraud Plaintiffs out of the benefit of the judgment and other debt claims that they held against Flanagan. (Px B pp. 21-24; 115; 118-20; 228-29; Px 18 p. 2; Px 72 p. 2)  As the Defendants have admitted, and as the facts adduced during discovery amply demonstrate, (1) "Flanagan was desperately attempting to conceal his assets and evade his creditors" (Prymas/T&P MSJ Mem. p. 9); (2) "the . . . fraud that caused Plaintiffs' inability to collect [on the judgment debts owed by Flanagan] was [committed by] Flanagan himself." (id. p. 28); (3) "[i]t was Flanagan who transferred the T&P stock to Babacus and others to avoid execution by the plaintiffs" (id.); (4) it was "Flanagan's fraudulent efforts to evade his creditors") that caused "Plaintiffs' lack of collection success" (id.); and (5) Flanagan's conduct in transferring and pledging his T&P stock to various individuals "delayed, hindered or defrauded [Plaintiffs'] execution on [Flanagan's T&P] stock." (Bainer MSJ Mem. p. 34)  According to Attorney Gallagher (who is counsel for

Defendants Prymas and T&P herein), there is no doubt in his mind that Flanagan set out to not pay Plaintiffs, one way or the other, "by hook or by crook". (Px D pp. 60-61)

As shown below, Fasano provided knowing and substantial assistance to Flanagan in his continuing efforts to defraud Plaintiffs out of the benefit of the judgment claims that they held against Flanagan. <u>See</u> <u>Baisch</u>, 346 F.3d at 376-77. The concerted conduct by the Defendants, including Fasano, constitutes a RICO conspiracy under §1962(d) to assist Flanagan in his continuing efforts to thwart Plaintiffs' collection efforts, and thereby maintain control over Flanagan's financial empire.

   **B.  The Summary Judgment Evidence Shows That Fasano Provided Knowing And Substantial Assistance To Flanagan In Connection With The Settlement <u>Proceeds Scheme</u>.**

In 1996 Flanagan and Prymas had a dispute over management and control of T&P, which resulted in a suit filed by Flanagan against Prymas and T&P in state court in Connecticut ("<u>Flanagan v. Prymas</u>". (Px 21 ¶11) Pursuant to a June 17, 1998 settlement of that suit (Px 21) (the "Settlement Agreement"), Flanagan, Prymas and T&P agreed that (1) there would be an adjustment of the management compensation paid to Flanagan to cover the discrepancies for the additional sums that had been paid to Prymas (<u>id</u>. ¶2); (2) an <u>additional</u> $75,000 in settlement

proceeds would be paid to Flanagan over three years payable in 78 equal bi-monthly installments of $961.10 (id. ¶12); and (3) Flanagan would not transfer his T&P stock to any other person or entity. (Id. ¶13)

It was the original intent of Prymas, T&P and Flanagan that the ¶12 Settlement Agreement payments would be 1099-miscellaneous income, and not wages. (Px B pp. 202; 204-07; 210-11; Px 70; Px D pp. 15-16; Pxs 179, 180, 181 & 182)  Indeed, when the stipulation of settlement was dictated into the record, it was the intention of Prymas, Flanagan and T&P to treat the $75,000 settlement payments as a damage settlement which would be 1099 income, and not wages. (Px D p. 19)

In addition, the accountant for T&P, James Rayner, was of the opinion that the ¶12 Settlement Agreement payments to Flanagan were "not W-2 compensation (wages), but a taxable damage settlement to be reported on 1099-MISC." (Px 22)  As admitted by T&P's attorney, William Gallagher, at the time the Settlement Agreement was tendered to the state court for approval, it was the intention of Flanagan, Prymas and T&P that the $75,000 settlement payments would be damage payments -- 1099 income -- and not wages. (Px D p. 20)

Further, at a T&P corporate meeting on September 3, 1997, Flanagan, Prymas and T&P all agreed that the settlement payments to Flanagan under ¶12 were "1099 income not subject to

garnishments or withholding." (Px 106 p. 3)  Indeed, after the date of the execution of the Settlement Agreement on June 17, 1997 until the very date that Plaintiff TCC served a property execution on T&P on January 5, 1998, the ¶12 settlement payments to Flanagan were treated by T&P, Prymas and Flanagan as 1099 income, and not wages. (Px B pp. 62-63; 218 & 223; Px F pp. 4 & 10; Px E p. 172)  As noted by Flanagan when it was suggested that the $75,000 settlement payments might be subject to wage garnishment:

> [H]ow can the deal change or get modified to hurt/damage me after the fact?  We all agree and sign off on one thing and after the fact there are changes?  How is this right?

(Px 182)

On January 5, 1998 a federal court writ of execution -- approved by Judge Covello (Px 68A p. 3) -- was served on Prymas, as president of T&P, in connection with TCC's March 20, 1997 judgment against Flanagan. (Px 111)  At p. 2 of the writ, T&P was commanded to

> pay to the sheriff the amount of a debt owed by you [T&P] to the judgment debtor [Flanagan], provided, if the debt owed by you [T&P] is not yet payable, payment shall be made to the sheriff when the debt becomes due if it becomes due within four months after the date of issuance of this execution.

(Px 68A)

Prymas was unsure how to deal with the property execution, and suggested to Flanagan that they seek the guidance of T&P's attorney, Bainer. (Px 68)  With the consent of Flanagan, on January 5, 1998 Prymas forwarded the property execution to Bainer for his legal opinion (Px 111), which was reviewed by Bainer on January 5, 1998. (Px 65)

Flanagan understood that as of January 5, 1998 T&P was to turn over to the sheriff all non-wage items that T&P held for Flanagan's benefit. (Px A(1) p. 55)  On January 5, 1998 Flanagan forwarded the property execution to his personal attorney, Fasano, expressing his concern that the ¶12 Settlement Agreement payments might be subject to the property execution:

> Please see enclosed which was served to Stanley Prymas this morning.  I have not received anything as yet, however I should be served shortly.  My concern here is with the money I am currently receiving from [T&P] as a result of the Settlement between Mr. Prymas and I.  Is this subject to being taken?

(Px 144)  On the next day -- January 6th -- Flanagan asked Fasano whether it would make sense for Fasano to contact T&P's attorney, Bainer, to discuss how to handle the property execution which had been served on T&P. (Px 3)

After the property execution was served on T&P, Flanagan wanted the ¶12 Settlement Agreement payments recharacterized from 1099 income (which was subject to the property execution)

to wages, and thus avoid losing the ¶12 Settlement Agreement payments to his creditor, TCC. (Px B pp. 213 & 223; Px E p. 93; Px D pp. 47-48) Flanagan, however, was in a predicament: all parties had previously agreed that the ¶12 settlement payments were 1099 miscellaneous income, and T&P had previously treated the prior settlement payments to Flanagan as 1099 miscellaneous income. (Px B pp. 217-218 & 223; Px 72 p. 2)

Flanagan's personal attorney, Fasano, understood that the ¶12 Settlement Agreement payments, as they had been paid to Flanagan in the past, were subject to the writ of execution. (**Px C p. 170**) In an effort to skirt the writ, however, Fasano told T&P's attorney, Bainer, that he (Fasano) wanted the characterization of the ¶12 Settlement Agreement payments changed from 1099 miscellaneous income to wages. (**Px B pp. 60 & 63**)

On January 9, 1998 Flanagan, Prymas and T&P agreed to send the property execution issue to Flanagan's attorney, Fasano, and to T&P's attorney, Bainer, for their thoughts on how to handle that issue. (Px 112) Bainer, however, full-well knew that Flanagan wanted to recharacterize the ¶12 Settlement Agreement payments from 1099 miscellaneous income to wages in an effort to avoid the federal court property execution that TCC had served on T&P. (Px B pp. 223-24)

On January 12, 1998 Flanagan and Prymas agreed that T&P would "temporarily hold" the ¶12 Settlement Agreement payments to Flanagan, with the checks issued, but placed in a file at T&P, until the matter was resolved. (Px 140)  It was Prymas who informed the bookkeeper, Andrea Steele, to process Flanagan's settlement checks for January, February, March and April of 1998, but to hold on to those checks and not distribute them to Flanagan. (Px F pp. 17-18)

Although Fasano had previously informed Bainer that he (Fasano) wanted the ¶12 settlement payments to be recharacterized as wages (and thus not subject to the federal property execution) (Px B pp. 60 & 63), on January 13, 1998 Bainer instructed Fasano that unless Fasano took "some affirmative legal action in federal court to stay or otherwise obviate the property execution", T&P would be left with no choice but to turn the ¶12 settlement funds over to the executing creditor, TCC. (Px 23; Px B pp. 191-93; Px E pp. 116-17; & 119-20)

Rather than take any affirmative legal action in federal court to stay the writ of execution, on January 20, 1998 Flanagan and Fasano simply filed, on behalf of T&P, a claim exemption form (**Px 25**) and an Objection to Property Execution (**Px 24**) which represented to TCC and Judge Covello that "[o]ther than wages, there is no property [belonging to Flanagan] held by

[T&P]." (Px 24; Px B p. 197)  Fasano had previously sent a draft of the Objection and the claim exemption form to Bainer for his review and approval. (**Pxs 25A & 25B**)  Although Bainer and Prymas knew that Flanagan's and Fasano's representations to TCC and Judge Covello were false (**Px 69**), they took no steps to honor the federal court property execution and have the ¶12 Settlement Agreement proceeds paid over to the sheriff. (Judicial Notice of file in <u>Cadle I</u>)

Indeed, on January 25, 1998 -- some 5 days <u>after</u> Flanagan's and Fasano's representations to TCC and the Court -- Prymas informed Flanagan that "we are <u>not</u> treating [the ¶12 settlement payments] as salary, but rather 1099 income." (Px 113 (emphasis added))  And then on February 4, 1998 Prymas informed Bainer that any representation to Plaintiff TCC and Judge Covello that T&P "does not have any money assets due to Mr. Flanagan" was a misrepresentation because "T&P <u>does</u> have an obligation to [Flanagan]." (Px 69 (emphasis added))  The "money assets" that T&P owed to Flanagan were the $75,000 in Settlement Agreement payments. (Px E pp. 128-30)

On February 4, 1998 Bainer wrote to Fasano reiterating that the ¶12 settlement payments were being treated by T&P as 1099 miscellaneous income, but suggested that Prymas and T&P would work with Flanagan "to see that Charlie and none of his creditors receives the funds at issue." (Px 70 p. 1)  Shortly

thereafter, a meeting was scheduled in New Haven to discuss strategy on how to circumvent the federal court property execution. (**Px 72 p. 2; Px 65 (2/9/98 entry)**))

On February 9, 1998 Flanagan and Fasano met with Prymas and Bainer to discuss the federal court property execution and the plan of Fasano and Flanagan to change the characterization of the Settlement Agreement payments to wages. (**Px 65 p. 2; Px B pp. 221-23; Px E pp. 136-39; Px 72 p. 2**) At that meeting Bainer warned the other Defendants that changing the characterization of the Settlement Agreement payments from 1099 miscellaneous income to wages in response to the federal court property execution would leave them all open to a claim that there was a civil conspiracy to help Flanagan defraud his creditors. Bainer further warned that the conspiracy claim was a risk that they had to seriously consider. (**Px 65 p. 2; Px B pp. 221-23; Px E pp. 136-39; Px 72 p. 2**)

Fasano and Flanagan, as well as Bainer, Prymas and T&P, all agreed to accept that risk. (**Pxs 114 & 142**) Although no affirmative steps were taken in federal court to stay the writ of execution, not a single payment of the $75,000 settlement obligation was turned over to the sheriff, with the ¶12 settlement funds simply recharacterized as wages, and then paid directly to Flanagan. (Pxs 114; **115**; 142; 143 & 145; Px B pp. 207-08 & 217) It was admitted by the T&P bookkeeper, Andrea

Steele, that she was instructed by Prymas to recharacterize the settlement proceeds from 1099 miscellaneous income to wages. (Px F p. 25)

The federal court property execution was issued on January 5, 1998 and expired on May 5, 1998. (Px 68A; Px E p. 91; Pxs 114 & 142)   The period during which the Settlement Agreement payments were suspended was the same four month period. (Px E p. 91)   Prymas told the T&P bookkeeper, Andrea Steele, to process the checks for those four months, but to hold on to them and not distribute them to Flanagan. (Px F pp. 17-18)   The four checks that were issued reflected money that was due by T&P to Flanagan under ¶12 of the Settlement Agreement, and at the time that those four checks were issued, the payments were considered 1099 income. (Px F pp. 29; 51-52; & 56)

To avoid the federal court property execution, the four issued-but-not-cashed settlement checks were moved to the end of the Settlement Agreement payout (after the writ of execution had expired), and then recharacterized as wages. (Px F pp. 29-33 & 37-38)   According to Prymas, it was Bainer who told him to hold the four issued-but-not-cashed Settlement Agreement checks until the writ of execution expired, and then add those payments to the end of the settlement pay-out. (Px E p. 57)

Having successfully conspired to defeat the January 5, 1998 federal court property execution, the next few TCC collection

efforts were much easier to circumvent.  On November 12, 1998 Prymas and T&P were served with TCC's federal court Post Judgment Remedies Interrogatories, which inquired whether T&P held any non-exempt property (such as Settlement Agreement payments) that belonged to Flanagan. (Pxs 116 & 117)

Although Prymas knew that the ¶12 Settlement Agreement payments had been recharacterized from 1099 income to wages to avoid the earlier writ of execution, he sought comfort from co-conspirator Bainer on how to respond to the federal court PJR Interrogatories. (Px 116)  Bainer affirmed the earlier conspiracy by concurring with Prymas that Flanagan was only paid wages by T&P (Px 118), and thus it was appropriate to respond to TCC that T&P was not in possession of any non-exempt property that belonged to Flanagan. (Px 119)  On November 30, 1998 Flanagan agreed to the continuation of the recharacterization plan. (Id.)

In connection with a $128,217 judgment against Flanagan that had been assigned to TCC, on December 18, 1998 TCC served an additional set of PJR Interrogatories on Prymas and T&P. (Px 26)  Prymas forwarded the PJR Interrogatories to Bainer with the request that Bainer review the documents "and let us know how to respond." (Id.)

Despite the fact that both Prymas and Bainer knew that T&P owed the settlement proceeds to Flanagan pursuant to the earlier

Settlement Agreement, Bainer advised Prymas to respond that no money was due by T&P to Flanagan. (Pxs 118 & 119) Pursuant to the plan worked out among Flanagan, Fasano, Prymas and Bainer, on January 19, 1999 Prymas mailed to Plaintiffs' counsel responses to the PJR Interrogatories which falsely represented that Prymas knew of no funds that were owed to Flanagan. (Px 110)

Thus, in addition to the federal court writ of execution approved by Judge Covello, two more asset discovery "storms" had been weathered by implementation of the Defendants' settlement proceeds scheme. (Px 122)

   **C.   The Summary Judgment Evidence Shows That Fasano Provided Knowing And Substantial Assistance To Flanagan In Connection With The Shifting Stock Scheme.**

The Defendants knew that the primary target of TCC's collection efforts was Flanagan's 50% stock ownership in T&P. (Px B pp. 23, 24 & 29; Pxs 20 & 130 p. 1)  On January 5, 1998 a federal court property execution was served on T&P by serving its president, Prymas. (Pxs 68; 68A & 111)  Flanagan was aware of the service of the property execution on T&P, and expected a similar property execution to be served on him at any time. (Px 144)  Further, on January 5, 1998 T&P's attorney, Bainer, reviewed the TCC property execution issue for at least an hour. (Px 65)

Flanagan was concerned that the federal court property execution might lead to the seizure of his T&P stock. (Px D p. 23; Px 3)  Indeed, there was a prior episode where an executing creditor was able to obtain physical possession of Flanagan's stock, which required Flanagan to pay off that creditor to avoid the sale of his stock at a sheriff's sale. (Px D p. 23; Px G(1) pp. 93-94)  Flanagan and Prymas' lawyer knew that if a creditor could get hold of Flanagan's stock through execution, Flanagan would be forced to pay off the creditor. (Px D pp. 22-23; Px 3)

After service of the property execution on January 5, 1998, Flanagan wrote to his personal attorney, Fasano, on January 6th, seeking advice on how to shield Flanagan's T&P stock from TCC's execution efforts:

> I wanted to make you aware that S. Prymas faxed to Atty. Bainer who represents T&P Inc. a copy of the Execution from Gaide that I faxed to you on Tues. . . .
>
> * * *
>
> Does it make sense for you to contact Atty. Bainer on my behalf and find out now what the issues are with T&P Inc. over this.  Why would Gaide have S. Prymas served over my matter?  I also <u>do</u> <u>not</u> <u>want</u> <u>it</u> <u>disclosed</u> <u>where</u> <u>my</u> <u>Stock</u> <u>is</u> <u>presently</u> <u>kept</u>.  There may be an attempt to grab this stock.  If there is a concern here, <u>please</u> <u>let</u> <u>me</u> <u>know</u> <u>if</u> <u>I</u> <u>should</u> <u>be</u> <u>doing</u> <u>anything</u> <u>different</u> <u>than</u> <u>what</u> <u>is</u> <u>presently</u> <u>being</u> <u>done</u>.

(**Px 3** (emphasis added)); **Px C pp. 94-95**)

In his January 6th letter, Flanagan was asking Fasano if he (Flanagan) should be doing anything different other than what Flanagan had already done by placing the stock with Socrates Babacas. (**Px A(1) pp. 111-12**)  Indeed, in order for Fasano to advise Flanagan on whether Flanagan should be doing anything different than "what is presently being done", Fasano would need to know what Flanagan was doing at that time to hide his T&P stock.  (**Px C p. 94**)

In addition to the property execution which was served on January 5, 1998, on February 2, 1998 TCC filed a motion for turnover of Flanagan's assets (Px 197), which was received by T&P and Bainer on February 4, 1998. (Pxs 69 & 69A; Px B pp. 200-201; 66-67; & 163-64)  Accordingly, as of February 4, 1998 Bainer -- as the attorney for T&P -- was on notice that TCC was seeking a turnover order against Flanagan and T&P for the turn over of Flanagan's T&P stock. (Px B pp. 200-01; 66-67; 163-64)

Further, on March 9, 1998 Judge Covello issued an injunction prohibiting Flanagan from transferring any of his assets. (Px 78 p. 7)  At the March 9th hearing, Flanagan pled the Fifth Amendment "based upon outside issues" (<u>i.e.</u>, an IRS investigation) to avoid testifying as to the whereabouts of his T&P stock. (Px 78 pp. 3-4; **Px 105; Px A(1) pp. 197-98; Px 186 p. 2 ¶¶5 & 10; Px 188 p. 3 #9**)  As finally admitted by Flanagan,

the location of his T&P stock had nothing to do with the IRS investigation. (**Px A(1) pp. 197-199**)

Flanagan and his attorney, Fasano, understood that Judge Covello's injunction was intended to freeze all of Flanagan's assets. (**Px C p. 45; Px 62**) According to Fasano, Judge Covello was clear that Flanagan was not to transfer or move any of his assets. (**Px C p. 45**)

In response to TCC's second Motion for Turnover Order (Px 196) (which was served on T&P (id. p. 7)), on April 13, 1998 Judge Covello entered a turnover order (Px 127) requiring Flanagan and T&P to (1) turn over Flanagan's stock in T&P; and (2) provide TCC with a full and complete accounting as to any purported transfer or other disposition of the stock if a claim was asserted that Flanagan had "sold, hypothecated, pledged, gifted or otherwise divested himself or disposed of any interest in [T&P]." (Px 109 p. 51)

On April 22, 1998 it was represented to Judge Covello that Fasano and Flanagan had "gathered together thousands of documents to be produced for in-camera inspection", and estimated that the documents would be produced to the Court within the next week. (**Px 186 p. 2 ¶6**) The relevant subpoenaed documents, however, were never produced to the Court or to Plaintiffs. (**Px G(1) pp. 62-66, 67, 73-78 & 80-81; Px G(2) pp. 140, 180 & 182**)

Both Bainer and Prymas were informed of both Judge Covello's March 9, 1998 Injunction and Judge Covello's April 13, 1998 Turnover Order. (Px Q ¶3)  Even with the federal court writ of execution (Px 68A); the injunction freezing Flanagan's assets (Px 78 p. 7); and the Turnover Order for Flanagan's T&P stock (Px 127), Bainer, Prymas and T&P were still willing to do all that they could to avoid TCC's collection efforts, and thereby prevent TCC from seizing Flanagan's T&P stock. (**Px 67 p. 2**; Px B pp. 217-18; Px 72)  One of the avenues discussed in mid 1998 was the execution of a buy-sell agreement and placement of a restrictive legend on Flanagan's T&P stock, which would make Flanagan's T&P stock less attractive to his creditors. (Pxs 126; 128; 66 p. 1; 135 p. 1; Px 194)

The issue of Cadle's execution efforts was discussed on numerous occasions at T&P's board (auxiliary committe) meetings. (Px Q ¶4)  Bainer specifically instructed Prymas and Flanagan to not make any reference in the board meeting minutes to the discussions among Flanagan, Prymas and Bainer about Cadle's execution efforts. (Id.)

At several board meetings in approximately spring or mid-1998, Flanagan, Prymas and Bainer discussed Cadle's execution efforts on Flanagan's T&P stock. (Px Q ¶5)  At those board meetings, Bainer encouraged the execution of a shareholder agreement between Prymas and Flanagan and the placement of a

restrictive legend on Flanagan's T&P stock. (<u>Id</u>.)  Bainer stated
to Prymas that if Cadle was successful in getting Flanagan's T&P
stock, Cadle would make things difficult for Prymas, and then
Bainer asked out loud whether Prymas would want Cadle as his
partner for the ownership of T&P. (<u>Id</u>.)  Bainer then said that
Prymas and Flanagan needed to place a restrictive legend on the
T&P stock to protect that stock from the execution efforts of
Cadle. (<u>Id</u>.)  Indeed, it was <u>Bainer's</u> <u>idea</u> to put a restrictive
legend on the T&P stock to protect that stock from Cadle's
execution efforts. (Px Q ¶7)

Despite Judge Covello's injunction against the transfer of
Flanagan's assets and the turnover order requiring the turn over
of Flanagan's T&P stock, the Defendants proceeded with their
plan to place a restrictive legend on Flanagan's stock. (Px 129)
On July 27, 1998 Flanagan informed Bainer that:

> I received your fax regarding the delivery
> of the T&P Stock Certificates from Stanley
> and I.  I left you a message yesterday that
> <u>I</u> <u>can</u> <u>deliver</u> <u>the</u> <u>T&P</u> <u>Inc.</u> <u>stock</u> <u>that</u>
> <u>pertains</u> <u>to</u> <u>me</u>, have the restrictive wording
> put on my stock and take my stock back with
> me.  Before this is done, it is my
> understanding that you were going to <u>review</u>
> <u>with</u> <u>Atty.</u> <u>Ippolito</u> [<u>Fasano's</u> <u>law</u> <u>partner</u>]
> on Tues. 7-28-98 <u>the</u> <u>Buy</u> <u>Sell</u> <u>Agreement</u> for
> Atty. Ippolito's input.  Shouldn't this
> discussion and a draft of your and his
> discussion take place, have this draft
> discussed, modified if need be, voted on by
> Stanley and I and than finish with the Stock
> restrictions.

Please advise.

(**Px 56** (emphasis added))  Accordingly, Fasano knew that Flanagan had possession or control of his T&P stock and that a restrictive legend was to be placed on Flanagan's stock.  (**Px B p. 105; Pxs 18, 56 & 195**)

On August 21, 1998 Flanagan, Prymas and Bainer met at T&P's office in New Haven to carry out the terms of their plan. (**Pxs 56 & 195**) At this meeting, Flanagan handed his T&P stock certificate to Bainer, who then typed the restrictive legend on the stock and returned it to Flanagan. (Px B pp. 68 & 92-93)

At the time Flanagan's T&P stock was handed to Bainer in August of 1998, both Bainer and Prymas knew about the Aprli 13, 1998 Turnover Order. (Px Q ¶7)  Bainer, however, insisted that Flanagan's T&P stock be delivered to him at that time, so he could place a restrictive legend on Flanagan's stock. (Id.)

Although Judge Covello had issued an injunction prohibiting Flanagan's transfer of assets, and had issued a turnover order requiring Flanagan <u>and</u> <u>T&P</u> to turn over Flanagan's T&P stock, Flanagan, Bainer and Prymas refused to obey Judge Covello's orders and turn over the stock.  Bainer, as T&P's agent, was also subject to the turnover order and should have turned Flanagan's T&P stock over to TCC. (Px 133; Px AA pp. 63-64) Flanagan, however, did not feel as though he was obligated to honor Judge Covello's orders because his attorney, Fasano, had

told him he did not have to turn over his T&P stock. (**Px A(8) pp. 95-96; Px A(1) pp. 120-21**)

On September 23, 1998 Judge Covello again ordered Flanagan to turn over the T&P stock and the documentation showing any transfer of that stock. (Px 187) After two motions to stay the enforcement of the turnover order were overruled by Judge Covello, on October 21, 1998 Flanagan and Fasano submitted to the Court a "Notice of Compliance" (**Px 1**), representing that Flanagan's stock was in the hands of a purported creditor, "Sharon Demetropolis" (actually, "Demetropoulous"), and that Flanagan did not have possession <u>or</u> <u>control</u> of the stock. (<u>Id</u>.; **Px C pp. 66-67**)

On the very next day Flanagan and Fasano submitted an "Amended Notice of Compliance" (**Px 2**), again representing that Flanagan's stock was in the hands of Ms. Demetropoulous and that Flanagan did not have possession <u>or</u> <u>control</u> of the stock. Flanagan and Fasano also represented that

> [s]aid stock has been held by Sharon Demetropolis [sic] prior to the Court's Order for Turnover on April 13, 1998, and prior to the Court's Order on March 9, 1998 prohibiting [Flanagan] from transferring any of his assets.

(<u>Id</u>.)

In an affidavit submitted by Fasano to Judge Covello, Flanagan represented that he had "borrowed money from Sharon

-31-

Demetropolous [sic] and gave her the stock as security for the money." (**Px 58; Px C pp. 66-7**)  But Ms. Demetropoulous (who was one of Fasano's clients (Px C p. 39)) knew nothing about Flanagan's stock, and did not in fact have possession of Flanagan's stock.  (Px J pp. 153-56; Px C pp. 67-70)

Fasano knew, must have known, or should have known that Flanagan's representations to the Court were false. (**Pxs 3, 62, 18 & 19**)  Indeed, in a letter by Flanagan to Fasano dated January 6, 1998 (**Px 3**), Flanagan instructed Fasano that "I . . . do not want it disclosed where my Stock is presently kept.  There may be an attempt to grab this stock."  Fasano admitted that Flanagan's statement is pregnant with the implication that Fasano knew where Flanagan was hiding his stock.  (**Px C p. 94**)  Moreover, Flanagan testified that he did not read the erroneous "Demetropolous affidavit" (Px 58) before he signed it, and that the erroneous information about the location of his T&P stock was put in his affidavit by Fasano. (**Px A(1) pp. 123-27**)

(1)  <u>Plan B: The Bogus Babacas Debt Scheme</u>

On October 26, 1998 Judge Covello issued, <u>sua</u> <u>sponte</u>, a Show Cause Order scheduling a contempt hearing on November 16, 1998 for Flanagan's failure to turn over his stock and failure to provide an accounting as to any disposition of the stock as required by the turnover order.  (Px 190)  Now Flanagan and Fasano were caught in a bind.  The purported secured debt of

Flanagan to Ms. Demetropoulous was bogus, and Fasano's client did not in fact have possession of Flanagan's stock. (Px C pp. 39 & 69-70) Flanagan and Fasano then came up with Plan B: a friend and business associate of Flanagan by the name of Socrates T. Babacas ("Babacas") would claim to have loaned substantial sums of money to Flanagan and also claim to have possession of the stock as collateral for the bogus loan. (**Px 3**)

Pursuant to this plan, on November 11, 1998 Flanagan prepared and had Babacas fax from his office in Springfield, Massachusetts to Fasano's office in New Haven, Connecticut a bogus stock pledge agreement (Px 4) and a bogus assignment of rents. (Px 5) Then on November 12, 1998 Flanagan and Fasano submitted a Second Amended Notice of Compliance (**Px 6**) now representing that the stock of T&P was not really in the hands of Ms. Demetropoulous as previously represented, but rather was in the possession of Babacas. Flanagan and Fasano also represented that <u>Babacas supposedly had loaned Flanagan</u> "$120,000.00 on or about June 19, 1997, and has held said stock as security for the judgment [sic] since the above date [June 19, 1997] until present . . .." (<u>Id</u>.) Fasano knew, must have known, or should have known that the Babacas debt/stock collateral representations were false. (**Px 3**; Px E pp. 152-53)

Indeed, Fasano knew that Flanagan had signed a Settlement Agreement on June 17, 1997 (Px 21) which, in ¶13, contained a

commitment by Flanagan to not transfer his stock to any other person or entity.  (Px 3)  Moreover, Fasano knew that on July 7, 1997 Flanagan had signed a sworn certificate representing that he owned his T&P stock "unencumbered from any source" and that he "will not transfer the stock to any other person or entity." (Px 61)  As admitted by Flanagan, one of the purposes of placing the stock with Babacas was to keep it out of the hands of Flanagan's creditors. (Px A(8) p. 28)

Moreover, Fasano knew that the purported Babacas loan of $120,000 to Flanagan was a sham.  Flanagan did not want to turn the T&P stock over to Plaintiffs, and Judge Covello refused to allow Flanagan to get away with not producing all of the documents pertaining to the purported loan and the purported stock pledge to Babacas.  Flanagan and Fasano were left with no alternative but to pay off the judgment, place the stock in the hands of Flanagan's father as collateral for the loan, and then file bankruptcy for the return of the funds paid to satisfy the judgment.

### (2)  Flanagan Loans Money To Babacas, But Claims The Loans Were Really Repayment Of The Bogus Babacus Debt

On October 27, 1998 Fasano represented to the Court that "Mr. Flanagan did not make any transfers after Judge Covello's [March 9, 1998] order freezing the assets of Mr. Flanagan."  (Px 62)  Then again on November 16, 1998 Fasano "assure[d]" the

Court that "from the day that order has been received [March 9, 1998], Mr. Flanagan has not transferred any assets." (Px 109 p. 4) Fasano's representations were false.

Although Flanagan represented to Judge Covello and TCC (a) that he had not transferred any assets after March 9, 1998; and (b) that Babacas had loaned Flanagan $120,000:

> (a) On May 24, 1998, while the federal court injunction was in effect, Flanagan <u>loaned</u> $500 to Babacas. (Px 9)
>
> (b) On June 19, 1998, while the federal court injunction was in effect, Flanagan <u>loaned</u> $1,000 to Babacas. Indeed, the $1,000 check was marked "<u>loan</u> - 2 wk pay off." (Px 10) Further, in his June 19, 1998 transmittal letter to Babacas (Px 11), Flanagan wrote: "Enclosed is the amount I can <u>loan</u> you. . . . I hope you can repay this <u>loan</u> amount as you told me - w/in 2 wks as I have bills I will have to pay w/ the money I have <u>loaned</u> to you."
>
> (c) On August 24, 1998, while the federal court injunction was in effect, Flanagan <u>loaned</u> $500 to Babacas. (Px 12)
>
> (d) On October 21, 1998, while the federal court injunction was in effect, Flanagan <u>loaned</u> $500 to Babacas. (Px 13) In a transmittal letter to Babacas (Px 14), Flanagan wrote: "Enclosed is $500 check for the <u>loan</u> we spoke about. Per our discussion this <u>loan</u> will be paid back w/in 2 wks."

In addition, on March 25, 1999 Flanagan <u>loaned</u> an additional $300 to Babacas, the very same person that supposedly had loaned $120,000 in cash to Flanagan. In his March 25, 1999 transmittal letter to Babacas, Flanagan wrote: "Enclosed please

-35-

find the $300 <u>loan</u> amount we spoke about today. . . . I am running real low on funds." (Px 15 (emphasis added))

On that same date Flanagan wrote another letter to Babacas stating:

> I have sent via express mail today the $300. You will have it delivered to you by noon tomorrow.
>
> I really hope this matter goes this next week. I do not have the ability to <u>loan</u> any more money. As it is I am taking my daughters savings and I do not like doing this.

(Px 16 (emphasis added)) Then on the next day (March 26th) Flanagan faxed yet another letter to Babacas (Px 17) again confirming the <u>loan</u> by Flanagan to Babacas, and not any repayment of a loan: "The $300 <u>loan</u> will arrive by noon today. . . . I also must tell you that I do not have the ability to <u>loan</u> any more money."

Further, Flanagan admitted to Prymas that it was Flanagan who had loaned money to Babacas. (Px E pp. 152-53) Finally, Babacas supposedly held the T&P stock as collateral for a purported $120,000 loan, but when Flanagan asked for the return of the stock, Babacas released the purported collateral (the T&P stock) to Flanagan, <u>for</u> <u>no</u> <u>consideration</u>, so Flanagan could then pledge the stock to his father as security for another loan. (Px A(1) pp. 146-47)

Indeed, the representations by Fasano to Judge Covello and Plaintiffs about the whereabouts and availability of Flanagan's T&P stock were materially false. (**Px 67 p. 2; Px B pp. 32-33**) Further, Fasano's representations that Flanagan's T&P stock was out of Flanagan's possession and control since June of 1997 was knowingly both false and misleading. (**Px 67 p. 2; Px B pp. 146-147**) According to T&P's attorney, Fasano knew that his representations to Judge Covello and Plaintiffs about the location of Flanagan's stock "was substantively untrue." (**Px 67 p. 3**) As admitted by T&P's attorney, Fasano made materially false and misleading statements to Judge Covello and the Plaintiffs as to the location and control of physical possession of Flanagan's T&P stock. (**Px 19 p. 2; Px B p. 146-48**)

In the fall of 1998 Flanagan and Fasano were playing a "shell game" on the location of Flanagan's T&P stock. (**Px B p. 29**) According to the attorney for T&P, Fasano's misrepresentations about the location of Flanagan's stock and the movement of the stock from one person to another was evidence of a <u>conspiracy</u> <u>to</u> <u>defraud</u> <u>Flanagan's</u> <u>creditors</u>. (**Px B pp. 22-24 & 211**) And, as admitted by T&P's attorney, it was <u>Fasano</u> who was allowing Flanagan to shift his stock all around in defiance of Judge Covello's orders, and in derogation of Plaintiffs' rights to obtain execution upon that stock in

satisfaction of their judgments against Flanagan. (**Px B p. 105; Px 19 p. 2**)

> ### (3)  Judge Covello Holds Flanagan In Contempt, But Gives Flanagan The Opportunity To Purge The Contempt By Producing The Subpoenaed Documents

After hearing Flanagan's excuses for not complying with the Court's turnover order, on November 16, 1998 Judge Covello proceeded to hold Flanagan in contempt:

> [i]t has been established here [that Flanagan] has willfully and intentionally not complied with the order as previously entered by the Court, and orders [Flanagan] committed to the Bureau of Prisons until such time as he purges himself of the contempt by complying further with the order.

(Px 109 pp. 51-2)

In an effort to keep Flanagan from going to jail that very day, Fasano represented to Judge Covello that Flanagan would immediately produce all relevant documents about the purported Babacas debt and the purported stock transfers. (Px 109 pp. 53-59)  Based on the representations of Fasano, Judge Covello temporarily stayed the execution of his contempt order:

> [W]e're going to continue the [contempt] matter to a very short date here . . . and we'll see what has been produced here, and what problems exist.  But we're going to keep after this on a day by day basis until it's resolved. . . . [t]he execution of the [contempt] order is stayed, and the matter is continued to [November 24, 1998] at 10:00 a.m.

(<u>Id</u>. p. 59-60)

For Flanagan to stay out of jail, Flanagan and Fasano were supposed to produce to Judge Covello the documents which would show the bona fides of the purported $120,000 loan by Babacas to Flanagan, and the documents which would show the bona fides of the purported stock pledge by Flanagan to Babacas. (Px C p. 157) Although Fasano represented to Judge Covello that Fasano would supply copies of the money orders for the $120,000 supposedly borrowed by Flanagan from Babacas (Px 109 p. 53), Fasano never saw proof of those money orders, and never produced them to the Court. (Px C p. 152-54)

Second, although Fasano represented to Judge Covello that Fasano would demand from Babacas the receipts for the roughly $1,600 per month that Flanagan supposedly paid to Babacas for the months of October, November and December of 1997 and January and February of 1998, Fasano never saw those receipts, and never produced them to the Court. (Px C pp. 153-54)

In addition, although Fasano represented to Judge Covello that he would check Flanagan's calendar and copy the pages for the days that Flanagan had supposedly met with Babacas, Fasano never produced that calendar to the Court. (Px C p. 156)

And finally, although Fasano represented to Judge Covello that he would provide copies of his law firm's trust account records to show where Flanagan had supposedly placed the

-39-

borrowed funds in Fasano's trust account for the payment of Flanagan's bills, Fasano, again, never produced those records to the Court. (Px C p. 156)

Accordingly, since neither Flanagan nor Fasano could produce the documentation to show the bona fides of the purported Babacas loan and stock pledge, Flanagan needed to pay-off the federal court judgment as his "get-out-of-jail card." (Px C pp. 144 & 152-57) Any pledge of Flanagan's stock to his father, however, would be in violation of the T&P buy-sell agreement (Px B p. 24); would be a violation of he March 9, 1998 injunction (Px 78 p. 7); would be a violation of the April 13, 1998 Turnover Order (Px 127); and would constitute an obvious attempt to frustrate Flanagan's creditors. (**Px B p. 115; Px 18 p. 2**)

Further, with TCC pursuing Flanagan's T&P stock, and with Fasano acting as the lawyer for both the pledgor-debtor (Flanagan) and the pledgee (Flanagan's father), this was "strong evidence" of an effort by Flanagan and Fasano to defraud Flanagan's creditors. (**Px B pp. 118-19; 115-16; Px 18**) According to T&P's attorney, Fasano was saying and doing whatever Flanagan wanted in an effort to get Flanagan out of the jam he was in. (**Px 67 p. 3**)

Bainer and Fasano then talked about the possibility that Flanagan would file bankruptcy. (**Px 130 p. 2; Px 18 p. 2**) Upon

filing bankruptcy, Flanagan could claim that the pay-off of the federal court judgment (which had enabled Flanagan to get out of jail) was a voidable preference, which would then have to be paid back to Flanagan's bankruptcy estate. (Px C p. 144) Fasano, however, informed Bainer that Flanagan was not going to file bankruptcy unless he had some sort of side deal with Prymas regarding Flanagan's T&P stock. (**Px 18 p. 2; Px B pp. 107-08; Px 130 pp. 2-3**)

Although Flanagan avoided going to jail by paying off the federal court judgment, TCC still had "close to $1,000,000 more in judgments" against Flanagan (Px 20), and it appeared to Prymas that "desperation is setting in." (Id.) Further, Prymas was concerned that TCC's collection attorney, Paul Gaide, "has his sights on Charlie's stock and it now looks like he will get it." (Id.)

In addition, Fasano informed Bainer that he (Fasano) was concerned that TCC still might obtain Flanagan's T&P stock. (**Px 130 p. 1**) According to Bainer, Fasano was concerned that the prior restrictive legend that was placed on Flanagan's T&P stock might not be valid because it was placed on Flanagan's stock in violation of the prior orders of Judge Covello:

> Then Fasano went on to explain concern that Gaide will obtain Charlie's [T&P] stock. Told him that I didn't think Gaide creditor's would find the stock attractive with restriction/legend on it.

He replied "What if the restriction is invalid?" He then related that the Federal Court [Judge Covello] had issued an order in March 1998 prohibiting Charlie from transferring or diminishing his assets including the stock. Lenny seemed to think that this affected the viability of the restriction placed on the stock in the summer of 1998.

(**Px 130 p. 1**)

### (4)  Bainer Vies For Control Of The Efforts To Protect Flanagan's Assets

Bainer was not overly impressed with Fasano's handling of the Flanagan stock crisis, and was more than willing to let Flanagan and Prymas know that he could do a much better job in fending off the execution efforts of Plaintiffs. According to Bainer, Fasano was "in way over [his] head in this matter." (Px 66 p. 2; <u>see</u>, <u>also</u>, Pxs 20, 105 & 192) Prymas and T&P, however, were still willing to do all that they could to try to prevent Flanagan's T&P stock from falling into the hands of TCC. (Px 135 p. 2)

In a December 10, 1998 letter to Fasano, Bainer wrote:

As for your alleged "strategy", it doesn't seem to have served Charlie very well at all. From what I can tell, and in my opinion, there is no organized "strategy" <u>at all</u>, which is one of the reasons the current serious difficulties exist. It was your obligation to protect Charlie from testifying in any fashion that would harm him, and arguably the Corporation. My understanding is that he has testified before the Federal Court as recently as

November 1998, that no restriction has been
placed upon his stock.   It is my further
understanding  that  a  copy  of  his  stock,
without  the  restriction  I  personally  typed
onto  it  [in  August  1998],  was  presented  to
the  Federal  Court  in  November  1998,  as  a
copy  of  his  current  stock  in  its  current
form.

<u>You</u> knew  a  restriction  had  been  placed  on
that  stock  and  purportedly  allowed  Charlie
to  harm  himself  by  testifying  in  that
fashion.   <u>You</u> should  have  protected  Charlie,
from  himself  and  his  lack  of  knowledge  about
the  legal  system,  in  this  regard  and  did  not
do  so.

(**Px 18 p. 1**, emphasis added))

In that same letter, Bainer told Fasano:

Further,  that  you  don't  see  the  problem  with
such  an  arrangement,  or  your  representing
Charlie  and  Judge  Flanagan,  with  regard  to
Charlie's  pledging  of  his  stock,  in  known
violation  of  the  buy/sell  agreement,  and  <u>in</u>
<u>an</u>  <u>obvious</u>  <u>attempt</u>  <u>to</u>  <u>frustrate</u>  <u>the</u>
<u>creditors</u>,  is  a  strong  testament  to  the
reason  Charlie  finds  himself  in  the  serious
difficulty  he  apparently,  and  unfortunately,
does.   Your  representation  of  the  pledgor
and  pledgee  in  this  situation  is  <u>strong</u>
<u>evidence</u> that  there  does  exist  an  <u>improper</u>
<u>effort</u>  <u>to</u>  <u>defraud</u>  <u>the</u>  <u>creditors</u>.

(**Px 18 p. 2**, emphasis added))

In a follow-up letter to Fasano, Bainer stated:

With  regard  to  your  various  threats  of
suits,  conflicts,  etc.,  it  is  unfortunate
that  you  practice  this  way.   The  substantive
conflicts  are  yours.   You  and  Charlie's
interest  is  now  at  conflict  because  <u>you</u>  <u>made</u>
<u>a</u>  <u>materially</u>  <u>false</u>  <u>and</u>  <u>misleading</u>

<u>representation</u> <u>to</u> <u>the</u> <u>Court</u> in your November 12, 1998, pleading of "Amended Compliance" <u>about</u> <u>the</u> <u>location</u> <u>and</u> <u>control</u> <u>of</u> <u>physical</u> <u>possession</u> <u>of</u> <u>Charlie's</u> <u>stock</u>.

* * *

You are not going to hold Thompson & Peck, Inc. hostage by telling me what I can or can not do for my Client. From what I can tell, your legal acumen is to fight with everyone whom doesn't agree with your view of things. It is your judgment of <u>allowing</u> <u>Charlie</u> <u>to</u> <u>move</u> <u>the</u> <u>stock</u> <u>around</u>, instead of dealing with the matter straight-up, which causes him to be in the current predicament in which he finds himself -- including a Federal Court Judge threatening to put him in Federal prison.

(**Px 19 pp. 2-3**, emphasis added)

A board of directors meeting of T&P was held on December 11, 1998 where Bainer made his pitch to take over the efforts to thwart Plaintiffs' ability to execute on Flanagan's Insurance Agency stock. (Pxs 185 & 122) At that meeting Flanagan, Prymas and Bainer agreed that they would work together in an effort to defeat the judgment claims of Plaintiffs. (Px 185) Flanagan agreed that Bainer would now be in charge of the efforts to shield Flanagan's assets from the judgment claims of Plaintiffs. (Px 122)

Indeed, Bainer mentioned to Flanagan and Prymas at a T&P board meeting that Bainer was concerned about the aggressiveness of Cadle's attorney, Gaide. (Px Q ¶6) At that board meeting, Bainer told Prymas and Flanagan that one way to get Gaide to

-44-

back off Cadle's execution efforts on Flanagan's T&P stock was to come up with some way to sue Gaide.  (Id.)  It was at that time that Flanagan made reference in his notes (Px 7) to "Sue Gaide to get him out of the litigation." (Px Q ¶6)  Shortly thereafter, upon Prymas' proposal, and in the conjunction with Bainer's representation of Flanagan in the grievance proceeding that Flanagan had commenced against Attorney Gaide, T&P executed an indemnification agreement providing that T&P would indemnify Bainer for any claims by Cadle or its attorney, Gaide, against Bainer. (Id.)

> **D.    The Summary Judgment Evidence Shows That Fasano Provided Knowing And Substantial Assistance To Flanagan In Connection With The Secret Checking Account Scheme.**

In 1998 Flanagan owned three rental properties in Connecticut.  In order to conceal his ownership of these properties, Flanagan had placed the title to these three properties in the names of two entities that he owned and controlled.  (Px A(1) pp. 58 & 93-94)

Flanagan owned an 18-unit apartment building at 17 Howe Street, New Haven, Connecticut (the "Howe St. Property") which Flanagan held in the name of Howe Street Associates.  In addition, Flanagan owned an office building at 2790 Whitney Avenue, Hamden, Connecticut (the "Whitney Ave. Property"), which was owned by Flanagan in the name of West Meadow Associates.

Further, Flanagan owned an apartment building at 475-81 George Street, New Haven, Connecticut (the "George St. Property"), which was also held by Flanagan in the name of Howe Street Associates. (Id.; Px 177; Px H pp. 60-61)

On March 9, 1998 Judge Covello issued an injunction which prohibited Flanagan from transferring any of his assets. (Px 78 p. 7) It was Fasano's understanding that Judge Covello's injunction was intended to freeze all of Flanagan's assets. (**Px C p. 45**) Indeed, Fasano was of the belief that Judge Covello was clear that Flanagan was not to move or transfer any of his assets. (**Id**.) Flanagan also understood that, under Judge Covello's injunction, he was to transfer nothing, not even the family lawn mower. (Px A(1) pp. 55-56)

Obviously, Flanagan's rental income and equity from his three rental properties were covered by Judge Covello's injunction. (Px C p. 49) As admitted by Fasano, if Flanagan had taken proceeds from a rental property and used the proceeds to either put in his own pocket or to pay third parties, that would have been a violation of Judge Covello's injunction. (**Px C pp. 50-51**)

On November 16, 1998 Flanagan's attorney, Fasano, represented to the Court that Flanagan had not, in fact, transferred any of his assets in violation of Judge Covello's March 9, 1998 injunction. As represented by Fasano:

> After [the March 9, 1998] hearing, Your
> Honor, what you did was froze all of the
> assets of Mr. Flanagan, indicating that he's
> not to transfer any assets whatsoever, and
> <u>let me assure the Court</u> from the day that
> order has been received, <u>Mr. Flanagan has
> not transferred any assets</u>.

(**Px 109 pp. 3-4** (emphasis added))  Fasano's representation to

the Court was false.

In October of 1998 -- while the federal court injunction

was still in effect -- Flanagan borrowed $94,200 against the

George St. Property and placed a $94,200 mortgage on that

property (Px A(1) pp. 133-34; Px 178)  In violation of Judge

Covello's injunction, Flanagan not only placed a mortgage on one

of his properties, but also transferred every penny of the

$94,200 in mortgage proceeds. (Px A(1) pp. 160-66)  As admitted

by Flanagan's attorney, Fasano, this was a violation of Judge

Covello's injunction. (Px C p. 52)

Further, <u>based on Fasano's advice</u>, Flanagan secretly ran

the income from his rental properties through three checking

accounts in the names of third parties: one in the name of MJCC

Corp., which was an entity controlled by Flanagan; the second in

the name of Matthew Flanagan, which was one of Flanagan's sons;

and the third in the name of Jeremy Flanagan, which was another

of Flanagan's sons. (**Px A(1) pp. 26; 59; 60; 63-64; & 100-101;

Px A(4) p. 184**)  Flanagan had signatory authority on all three

accounts. (Px A(1) pp. 77-78 & 219-20)

In March of 1998 Flanagan did not put his rental property income in an account in his own name because he was trying to hide that income from his creditors. (Px A(1) pp. 22-23 & 73-74) Moreover, Flanagan put the rental property income in the name of his children's checking accounts on the advice of his attorney, Fasano. (**Px A(5) p. 28; Px A(1) pp. 15 & 26**)

Further, on March 9, 1998 Flanagan and Fasano were ordered to prepare a computation of all income and all necessary living expenses for Flanagan, which was filed with the Court on March 17, 1998. (**Px 90**) This computation was supposed to include all income that Flanagan received from any source, including any rental income. (**Px C pp. 187-89**) The computation that Flanagan and Fasano filed with the Court, however, did not include any income from Flanagan's rental properties. (**Px A(1) pp. 62-63**)

The rental income hidden by Flanagan and Fasano was substantial. (Px 177; Px 55) During a two-day period in August of 1998 -- while the federal court injunction was still in effect -- Flanagan took $11,600 out of the Jeremy Flanagan account and cashed the checks. (Px A(1) pp. 153) Further, over a four-day period in August of 1998 -- again, while the March 9, 1998 injunction was still in effect -- Flanagan wrote four checks totaling $19,759, all payable to cash, with no documentation to show what Flanagan did with the money. (Px A(1) pp. 160-61)

The chart printed below shows Flanagan's activity in writing over $43,700 worth of checks to cash, to himself, to his wife, and to Socrates Babacas during the very time that this Court had enjoined Flanagan from transferring any of his assets. Fasano's November 16, 1998 assurance to the Court that Flanagan had "not transferred any assets" (**Px 109 p. 4**) was false.

### Checks Written By Flanagan In Violation Of Injunction

| Date | Account | # | Amount | Signor | Payee | Px |
|------|---------|-----|--------|--------|---------------|-----|
| 3-11-98 | MJCC Corp. | 453 | 1,575.00 | CAF | CASH | 79 |
| 3-30-98 | MJCC Corp. | 475 | 656.00 | CAF | Ch. Flanagan | 80 |
| 4-8-98 | MJCC Corp. | 485 | 90.00 | CAF | CASH | 38 |
| 4-9-98 | MJCC Corp. | 488 | 900.00 | CAF | CASH | 38 |
| 4-13-98 | MJCC Corp. | 491 | 175.50 | CAF | CASH | 38 |
| 4-14-98 | MJCC Corp. | 492 | 108.00 | CAF | CASH | 38 |
| 4-15-98 | MJCC Corp. | 505 | 90.00 | CAF | CASH | 38 |
| 4-15-98 | MJCC Corp. | 515 | 771.00 | CAF | Ch. Flanagan | 81 |
| 4-16-98 | MJCC Corp. | 507 | 233.42 | CAF | CASH | 38 |
| 4-17-98 | MJCC Corp. | 510 | 147.00 | CAF | CASH | 38 |
| 4-22-98 | MJCC Corp. | 513 | 104.00 | CAF | CASH | 38 |
| 4-30-98 | MJCC Corp. | 517 | 108.00 | CAF | CASH | 38 |
| 5-6-98 | MJCC Corp. | 526 | 1,300.00 | CAF | Lisa Flanagan | 82 |
| 5-8-98 | MJCC Corp. | 480 | 156.00 | CAF | CASH | 38 |
| 5-8-98 | MJCC Corp. | 530 | 600.00 | CAF | CASH | 83 |
| 5-8-98 | MJCC Corp. | 532 | 740.00 | CAF | Ch. Flanagan | 85 |
| 5-9-98 | MJCC Corp. | 533 | 117.00 | CAF | CASH | 86 |
| 5-11-98 | MJCC Corp. | 528 | 2,000.00 | CAF | Ch. Flanagan | 87 |
| 5-11-98 | MJCC Corp. | 534 | 200.00 | CAF | Lisa Flanagan | 88 |
| 5-13-98 | MJCC Corp. | 541 | 500.00 | CAF | Ch. Flanagan | 89 |
| 5-24-98 | Jeremy F. | 106 | 500.00 | CAF | Soc. Babacus | 9 |
| 5-27-98 | MJCC Corp. | 546 | 1,200.00 | CAF | CASH | 91 |
| 6-8-98 | MJCC Corp. | 560 | 3,000.00 | CAF | Ch. Flanagan | 38 |
| 6-19-98 | MJCC Corp. | 571 | 1,000.00 | CAF | Soc. Babacus | 10 |
| 7-27-98 | MJCC Corp. | 600 | 75.00 | CAF | CASH | 38 |
| 8-10-98 | Jeremy F. | 109 | 200.00 | CAF | Lisa Flanagan | 97 |
| 8-21-98 | Jeremy F. | 101 | 1,600.00 | CAF | Lisa Flanagan | 137 |
| 8-23-98 | Jeremy F. | 126 | 125.00 | CAF | Lisa Flanagan | 92 |
| 8-25-98 | Jeremy F. | 104 | 5,600.00 | CAF | CASH | 94 |
| 8-25-98 | Jeremy F. | 105 | 850.00 | CAF | CASH | 95 |

| 8-26-98 | Jeremy F. | 107 | 5,000.00 | CAF | CASH | 96 |
| 8-27-98 | Jeremy F. | 108 | 6,159.00 | CAF | CASH | 99 |
| 8-28-98 | Jeremy F. | 110 | 3,000.00 | CAF | CASH | 100 |
| 8-28-98 | Jeremy F. | 127 | 100.00 | CAF | Lisa Flanagan | 101 |
| 9-2-98 | Jeremy F. | 128 | 110.00 | CAF | Lisa Flanagan | 102 |
| 9-9-98 | MJCC Corp. | 629 | 3,000.00 | CAF | CASH | 38 |
| 10-8-98 | MJCC Corp. | 648 | 1,200.00 | CAF | CASH | 38 |
| 10-12-98 | Matthew F. | 94 | 500.00 | CAF | Soc. Babacus | 13 |

$43,789.92

And even worse, it was Fasano who advised Flanagan that it was perfectly acceptable to transfer the funds out of Flanagan's nominee checking accounts even in the face of the Court's March 9, 1998 injunction.  (**Px A(1) pp. 15; 26; 59-60; 64; & 100-01**) Fasano now admits, however, that any such conduct on the part of Flanagan would, in fact, be a violation of this Court's March 9, 1998 injunction.  (Px C p. 50)

On December 14, 2002 Flanagan pled guilty to the felony of submitting a false financial form to the IRS  (Pxs 76 & 77; Px A(1) p. 7)  The rental properties -- and the income therefrom -- hidden from the IRS are the same rental properties previously hidden from this Court and the Plaintiffs in the prior suit. (Px A(1) pp. 50-51)

### E.  **The Caporale Property Transfer Scheme**.

In a further attempt to delay, hinder or defraud Plaintiffs in their efforts to collect on their judgments against Flanagan, in November of 1998 Flanagan and his wife, Lisa Flanagan,

devised a scheme to transfer title to Flanagan's remaining rental properties, but still receive the benefit of the rental income from those properties. Pursuant to this plan, Flanagan would transfer title to his rental properties (the George St. Property; the Howe St. Property; and the Whitney Ave. Property) to a relative; Flanagan would then have the rental proceeds placed in a bank account in the name of the relative; and then Flanagan's wife would retrieve the rent checks from the P.O. box and sign the relative's name to the checks so that the Flanagans could cash the checks and maintain full use and benefit of the rental proceeds. (Pxs K(1) & K(2); Px 184)

In November of 1998 Flanagan met with Joseph Caporale ("Caporale") to discuss Flanagan's property transfer scheme. Caporale's wife is the cousin of Flanagan's wife. At this meeting Flanagan said that he wanted to put some of his properties into Caporale's name if he (Caporale) was willing to go along with it. Caporale agreed. (Id.)

Although Caporale never saw any of the rental properties, on December 4, 1998 Flanagan had his controlled business entities execute deeds to convey the George St. Property, the Howe St. Property and the Whitney Ave. Property to Caporale. Flanagan then set up a United States Post Office box in Hamden, Connecticut (near Flanagan's office) for the receipt of the monthly rent checks, and opened a joint checking account at

First Union Bank in Branford, Connecticut for the deposit of the rent checks. (<u>Id</u>.)

From early 1999 until approximately October of 2000, the monthly rent checks from Flanagan's rental properties were made out, at Flanagan's direction, to Caporale and mailed by the various tenants on the various properties to the P.O. box in Hamden, Connecticut. For one tenant alone, the monthly rent checks made out to Caporale were $1,100 per month. (<u>Id</u>.)

Although these monthly rent checks were made out to Caporale and mailed to the Caporale P.O. box, Caporale never went to the P.O. box; never saw a rent check; never endorsed a rent check for deposit; never saw a monthly bank statement; and never saw or received a penny from the rents. Rather, either Flanagan or Lisa Flanagan would forge Caporale's name on the back of each rent check, and then cash or deposit the checks into this account for Flanagan's own use and benefit. (<u>Id</u>.)

> **F. The Summary Judgment Evidence Shows That Fasano Provided Knowing And Substantial Assistance To Flanagan In Connection With <u>Flanagan's Bankruptcy Fraud Scheme</u>.**

Although Flanagan had transferred, hidden or shielded his assets from the claims of Plaintiffs, Flanagan still wanted to recoup the $99,542.87 that he was forced to pay to TCC to avoid going to jail for contempt. So on February 17, 1999 Flanagan filed a Chapter 11 bankruptcy petition in the United States

Bankruptcy Court for the District of Connecticut in New Haven. Fasano was Flanagan's attorney in connection with Flanagan's initial bankruptcy filing (judicial notice).  On December 9, 1998 Fasano told Bainer that Flanagan was not going to file bankruptcy unless Flanagan had arranged some side deal with Prymas regarding Flanagan's T&P stock. (**Pxs 130 & 18 p. 2**)

After his initial bankruptcy filing, Flanagan filed a bankruptcy adversary proceeding against TCC (<u>Flanagan v. Cadle</u>, Adversary No. 99-3053) alleging that the $99,542.87 that was paid to TCC was a voidable preference, and thus subject to recoupment by Flanagan through §547(b) of the Bankruptcy Code. (Flanagan Answer ¶70)

In his bankruptcy schedules, Flanagan listed the false debt owed to Babacas, but did not list the alleged debt owed to Ms. Demetropoulous.  Further, Flanagan did not list in his bankruptcy schedules the ownership interests that he had in the three rental properties, and falsely testified at the §341 Meeting of Creditors that he did not own any real estate.  (Px 173 pp. 8 & 53)  In addition, Flanagan did not list in his bankruptcy schedules the substantial rental income that he had received and was continuing to receive from the George St. Property, the Howe St. Property and the Whitney Ave. Property. (Px I ¶2)  Indeed, Prymas has admitted that Flanagan has committed bankruptcy fraud. (Px O)

### IV. Plaintiffs Have Proved A Valid Conspiracy Claim Against Fasano For Violations Of §1962(d) Of RICO.

### A. Plaintiffs Need Not Show That Fasano Personally Used The Mails Or Wires To Transmit A Misrepresentation.

Fasano contends that Plaintiffs have not stated a valid RICO claim against Fasano because Fasano, himself, did not personally commit bankruptcy fraud, mail fraud or wire fraud. What Fasano has overlooked, however, is that Plaintiffs have sued Fasano under the RICO conspiracy statute -- 18 U.S.C. §1962(d) -- for providing knowing and substantial assistance to Flanagan in the implementation and execution of Flanagan's fraudulent plan to hide, transfer and otherwise shield Flanagan's assets from the judgment claims of Plaintiffs.

Accordingly, so long as Flanagan has engaged in a RICO substantive violation under either §1962(b) or §1962(c) -- which has not been challenged by Fasano in his summary judgment motion -- Plaintiffs have standing to sue Fasano as a RICO co-conspirator even if Fasano did not himself, personally, engage in all of the elements of bankruptcy fraud, mail fraud or wire fraud. As recently noted by the Second Circuit:

> We also note that the requirements for RICO's conspiracy charges under §1962(d) are less demanding. A "conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of

> furthering or facilitating the criminal
> endeavor." <u>Salinas v. United States</u>, 522
> U.S. 52, 65 (1997). In the civil context, a
> plaintiff must allege that the defendant
> "knew about and agreed to facilitate the
> scheme." <u>Id</u>. at 66. Baisch [the RICO
> plaintiff] has presented a genuine question
> as to [the alleged RICO co-conspirator's]
> knowledge of the racketeering enterprise and
> his willingness to promote it.

<u>Baisch v. Gallina</u>, 346 F.3d 366, 376-77 (2d Cir. 2003).

"The crime of mail fraud is committed when the mails are used as part of a scheme or artifice to defraud." <u>Landry</u>, 901 F.2d at 428, <u>citing</u> <u>United States v. Margiotta</u>, 688 F.2d 108, 121 (2d Cir. 1982). A plaintiff in a RICO case need not show that each defendant personally utilized the mails or long distance wire communications in connection with the execution of the overall fraudulent scheme. <u>See</u> <u>United States v. Zichettello</u>, 208 F.3d 72, 105-06 (2d Cir. 2000); <u>Cadle Co. v. Schultz</u>, 779 F.Supp. 392, 399 (N.D.Tex. 1991); <u>Constellation Bank, N.A. v. C.L.A. Management Co</u>., 1995 WL 42285 at *4 (S.D.N.Y. Feb 1, 1995); <u>Morrow v. Black</u>, 742 F.Supp. 1199, 1203-04 (E.D.N.Y.1990); <u>Center Cadillac v. Bank Leumi Trust Company of New York</u>, 808 F.Supp. 213, 228 (S.D.N.Y. 1992); <u>131 Main Street Associates v. Manko, et al</u>., 897 F.Supp. 1507, 1530 (S.D.N.Y.1995). The exhibits submitted with Plaintiffs' Response to Defendants' Motions for Summary Judgment (<u>see</u> Px P(a) and, in particular, Pxs 1, 2, 3, 6, 24, 25, 25A, 25B, 62,

90, 130, 131, 133, 141, 156, 188 & 195), and the undisputed allegations in the Second Amended Complaint, show numerous instances whereby Fasano utilized the United States mails and interstate wires in furtherance of Flanagan's scheme to hide, transfer or otherwise shield the substantial assets of Flanagan from the judgment and other debt claims of the Plaintiffs.

For a mail fraud or wire fraud claim, a RICO plaintiff need only allege the connection of the defendant to the overall fraudulent scheme which, during some part thereof, involves the use of the mail or long distance wire communications. Zichettello, 208 F.3d at 105-06. Indeed, so long as one participant in a fraudulent scheme "causes" the use of the mail or interstate telephone wires in the execution of the fraudulent scheme, all other knowing participants in the scheme are legally liable for the use of the mail or the interstate wires. Id. A defendant "causes" a use of the mail or wires when that defendant does an act knowing that the use of the mail or wires will follow in the ordinary course of business, or if the defendant reasonably could foresee that the use of the mail or wires would follow, even if the defendant did not actually intend for the use of the mail or wires to follow. Id. See, also, United States v. Amrep Corp., 560 F.2d 539, 545 (2d Cir.1977); United States v. Jones, 648 F.Supp. 225, 235 & n. 8 (S.D.N.Y.1996).

In addition, Plaintiffs have adequately alleged RICO conspiracy claims against Fasano under §1962(d). As recently noted by the Second Circuit, §1962(d) does not require proof that each co-conspirator agreed to commit two predicate acts. Zichettello, 208 F.3d at 99 n. 13. Indeed, the Supreme Court has ruled that:

> Even if [the conspirator] did not commit [two or more acts of racketeering activity], there was ample evidence that he conspired to violate [§1962](c). The evidence showed that [the primary wrongdoer] committed at least two acts of racketeering activity . . . and that [the conspirator] knew about and agreed to facilitate the scheme. This is sufficient to support a conviction under §1962(d).

United States v. Salinas, 522 U.S. 52, 118 S.Ct. 469, 478 (1997). See, also, Baisch, 346 F.3d at 366-77 (citing Salinas as controlling in a civil conspiracy case under RICO).

Further, a RICO conspiracy claim can be proved if the defendant embraced the objective of the alleged conspiracy, and agreed to commit predicate acts in furtherance thereof. Zichettello, 208 F.3d at 99. To prove a RICO conspiracy it need only be shown that the defendants know the general nature of the conspiracy and that the conspiracy extends beyond their individual roles. Id. In applying this analysis, a court need inquire only whether an alleged conspirator knew what the other conspirators "were up to" or whether the situation would

logically lead an alleged conspirator "to suspect he was part of a larger enterprise." Id.

In addition, there is no rule requiring that a plaintiff prove that a RICO conspirator knew of all predicate acts by insiders in furtherance of the conspiracy. Id. at 100. To be held liable as a RICO conspirator, a defendant need only be shown to have possessed knowledge of only the general contours of the conspiracy. Id. Simply, a plaintiff need not prove that a RICO conspirator-defendant agreed with every other conspirator, or knew all of the other conspirators, or had full knowledge of all the details of the conspiracy. Id.

As noted by Judge Buchmeyer in a very similar case:

> Under RICO, one co-schemer is liable for the other co-schemers' predicate acts. Indeed, upon joining a fraudulent conspiracy, each defendant becomes liable for the prior conduct of the earlier conspirators, and remains liable for the subsequent conduct of the other conspirators.

Cadle Co., 779 F.Supp. at 400. Further, the Supreme Court has recently ruled:

> Under our interpretation, a plaintiff could, through a [RICO] §1964(c) [civil damage] suit for a violation of §1962(d), sue co-conspirators who might not themselves have violated one of the substantive provisions of §1962.

Beck v. Prupis, 529 U.S. 494, 506-07 (2000).

Fasano also contends that Plaintiffs have not proved their mail fraud allegations because there was no evidence that what Fasano stated in any of his letters was false.  Plaintiffs need not, however, show that a mailing in furtherance of an overall fraudulent scheme itself contained a misrepresentation.  For a mail fraud or a wire  fraud allegation[2], a Plaintiff need not plead or prove that the mailing or interstate  wire communications, in and of themselves, contained any misrepresentations.  See Carpenter v. United States, 484 U.S. 19, 27 (1987); Baisch, 346 F.3d at 374; Cadle Co., 779 F.Supp. at 400 (citing cases at n. 50).  Rather, all that is necessary is that the mail or interstate telephone lines be a part of the execution of the overall fraudulent scheme.  See Schmuck v. United States, 489 U.S. 705, 710-12 (1989); see, also, United States v. Finney, 714 F.2d 420, 423 (5th Cir.1983); United States v. Green, 494 F.2d 820, 823-24 (5th Cir.1974); Sun Savings, 825 F.2d at 196.  Accordingly, even "'innocent' mailings -- ones that contain no false information -- may supply the mailing element." Schmuck, 489 U.S. at 715.  Further, whether the Defendant's use of the mail and interstate wires was part of an overall fraudulent scheme "is a question of fact

---

[2]     The elements necessary to establish violations of the mail fraud and wire fraud statutes are essentially identical; hence, courts apply identical analyses to both statutes.  See Ideal Steel Supply Corp. v. Anza, 373 F.3d 251, 257 (2d Cir.2004); Cadle Co., 779 F.Supp. at 399 n. 37.

inappropriate for resolution before trial." R.A.G.S. Couture, 774 F.2d at 1354-55.  See, also, United States v. Lane, 474 U.S. 438, 452-53 (1986); United States v. Tony, 598 F.2d 1349, 1353-54 (5th Cir.1979).

Finally, a plaintiff does not have to prove that the RICO defendant had full knowledge of all of the details of the conspiracy, but only that each defendant was aware of the general nature of the conspiracy and that the conspiracy extended beyond the defendant's individual role.  Zichettello, 208 F.3d at 99.  See, also, Baisch, 346 F.3d at 376-77.  The summary judgment evidence shows that there was a conspiracy orchestrated by Flanagan to hide, transfer and otherwise shield his assets from the judgment claims of Plaintiffs, and that it was foreseeable for the United States mails and interstate wire communications to be used in connection with that scheme.  (See §III above)  As in Baisch, Plaintiffs have presented a genuine question as to Fasano's knowledge of the racketeering enterprise and his willingness to promote it.  See Baisch, 346 F.3d at 374.  Accordingly, Fasano's motion for summary judgment should be denied.

### B.  For A RICO Conspiracy Claim, Plaintiffs Need Not Show That Fasano, Personally, Acquired An Interest In A RICO Enterprise

Fasano contends that Plaintiffs have failed to establish that Fasano, himself, acquired an interest in or control over

the RICO enterprise -- Flanagan's financial empire. (Fasano Mem. pp. 11 & 13)  Plaintiffs need not, however, show that Fasano, personally, acquired control over Flanagan's financial empire to state a RICO conspiracy claim against Fasano under §1962(d). See Beck v. Prupis, 529 U.S. 494, 506-07 (2000); United States v. Presisco, 832 F.2d 705, 714 (2d Cir. 1987); DeFalco v. Bernas, 244 F.3d 286, 306 (2d Cir. 2001).

Rather, to state a RICO conspiracy claim against Fasano, Plaintiffs need only show that Fasano provided knowing and substantial assistance to Flanagan in the implementation or execution of Flanagan's fraudulent scheme to hide, transfer or otherwise shield his assets from the judgment claims of Plaintiffs. See Baisch, 346 F.3d at 376-77. As shown by the specific summary judgment citations set forth in §III above, Plaintiffs have made that showing.

Taking all of Plaintiffs' evidence as true, a jury could find that Fasano knowingly took part with Flanagan in Flanagan's RICO scheme to hide, transfer or otherwise shield his assets from the judgment claims of Plaintiffs. See Ricciuti v. N.Y.C. Transit Authority, 124 F.3d 123, 131 (2d Cir. 1997). A jury which so found might rationally infer that Flanagan and Fasano were jointly involved in a common scheme -- a conspiracy to hide, transfer or otherwise shield Flanagan's assets from the judgment claims of Plaintiffs. Id. If so, a jury could assign

responsibility to Fasano for acts taken by Flanagan in furtherance of the conspiracy.  <u>Id</u>.

### C. Plaintiffs Have Established That Fasano Participated In The Operation Or Management Of A RICO Enterprise

Next Fasano claims that Plaintiffs have failed to establish that Fasano participated in the operation or management of a RICO enterprise because he simply provided legal advice to his client.  (Fasano Mem. pp. 14-17)  The summary judgment evidence, however, shows that there are disputed issues of fact as to whether or not Fasano participated in the operation or management of the RICO enterprise at issue in this case -- control over Flanagan's financial empire.

Under Second Circuit precedent, the operation or management test is a relatively low hurdle for a RICO plaintiff to clear.  <u>Baisch</u>, 346 F.3d at 377.  Further,

> it is no great leap to find that one who assists in the fraud [Fasano] also conducts or participates in the conduct of the affairs of the enterprise.

<u>First Capital Asset Management v. Satinwood, Inc</u>., 385 F.3d 159, 178 (2d Cir. 2004)  Morover, the issue of whether a RICO defendant "operated or managed" the affairs of an enterprise is essentially a question of fact.  <u>See United Stated v. Allen</u>, 155 F.3d 35, 42-43 (2d Cir. 1998).

As demonstrated in §III above, the summary judgment evidence shows Fasano's knowing and active participation in the conspiracy to hide, transfer and otherwise shield Flanagan's assets from the judgment claims of Plaintiffs. (Px A(8) pp. 95-96; Px A(1) pp. 120-21; Px A(4) p. 184; Pxs 1, 2, 3, 6, 24, 25, 25A, 25B, 62, 90, 130, 188, 193 & 195; Pxs 18, 19, 56, 58, 67, 72, & 105; Px A(1) pp. 15, 22-23, 26, 58-60, 62-64, 100-01, 120-21, 123-27, Px A(5) p. 28; Px B pp. 22-24, 29, 32-33, 60, 63, 105, 107-08, 115-16, 118-19, 146-48 & 187-89)

As far as Fasano's claim that he did not develop the "strategy" to invoke the Fifth Amendment to prevent Flanagan from testifying about the location of his stock (Fasano MSJ Mem. p. 18), the summary judgment evidence shows that Fasano was, indeed, the architect of that strategy. (Pxs 105 & 18; Px A(1) pp. 197-99; Px 186 p. 2 ¶¶5 & 10; Px 188 p. 3 #9)

### D. Plaintiffs Have Asserted A Valid RICO Conspiracy Claim Against Fasano Under §1962(d)

Next Fasano contends that Plaintiffs have failed to establish a §1962(d) RICO conspiracy claim against him because he simply provided legal services to Flanagan in connection with Flanagan's efforts to hide, transfer or otherwise shield his assets from the judgment claims of Plaintiffs. As shown by the citations in §III above, the summary judgment evidence shows that there are disputed issues of fact on Fasano's knowing and

active participation in Flanagan's fraudulent conspiracy. (Px A(8) pp. 95-96; Px A(1) pp. 120-21; Px A(4) p. 184; Pxs 105; Px A(1) pp. 197-99; Px 186 p. 2 ¶¶5 & 10; Px 188 p. 3 #9; Pxs 1, 2, 3, 6, 24, 25, 25A, 25B, 62, 90, 130, 188, 193 & 195; Px A(1) pp. 15, 22-23, 26, 58-60, 62-64, 100-01, 120-21, 123-27; Px A(5) p. 28; Px C pp. 94; Px B pp. 22-24, 29, 32-33, 60, 63, 105, 107-08, 115-16, 118-19, 146-48, 152-57 & 187-89)

Here the summary judgment evidence shows that Fasano acted as a co-conspirator and provided improper and, indeed, illegal advice, to several members of Flanagan's fraudulent conspiracy. See Gutierrez v. Givens, 989 F.Supp. 1033, 1047-48 (S.D. Cal. 1997). As noted by this Court in connection with Fasano's Motion for Reconsideration:

> In the amended complaint it alleges that Fasano was a member of an association-in-fact (amended complaint at ¶82.2) and in this capacity: (1) lied to this court for Flanagan about an IRS investigation to shield Flanagan from disclosing asset information; (2) worked with Flanagan to create a fraudulent scheme to hide Flanagan's income from creditors; and (3) fabricated a bogus stock pledge agreement to shield Flanagan's stock from a turn-over order from the court. In the court's view, the allegations allege conduct "cross[ing] the line between traditional rendition of legal services [to] active participation and directing the enterprise". . . .. Accordingly, the amended complaint sufficiently alleges a RICO cause of action against Fasano.

(May 7, 2002 Order)

The summary judgment evidence, and the reasonable inferences therefrom, prove Plaintiffs' RICO conspiracy allegations against Fasano that Fasano did, indeed, (1) lie to the Court about an IRS investigation to shield Flanagan from disclosing asset information (Pxs 108 & 18; Px A(1) pp. 197-99; Px 186 p. 2 ¶¶5 & 10; & Px 188 p. 3 no. 9); (2) work with Flanagan to create a fraudulent scheme to hide Flanagan's income from creditors (Px A(1) pp. 15; 26; 59; 60; 63-64; 100-101; Px A(4) p. 184; Px A(5) p. 28; Pxs 3, 18, 19, 25A, 25B, 69, 72, 130, 186, 188, 193, 195, Px B pp. 60 & 63); and (3) work with Flanagan to fabricate a bogus stock pledge agreement to shield Flanagan's stock from a turnover order from the court. (Px 3; Px A pp. 95-96; Px A(1) pp. 120-21; Pxs 3, 18, 19, 1, 2, 6, 62, 66, 67, 72, 193 & 195; Px A pp. 111-12; 123-27; Px C p. 94; Px B pp. 22-24, 29, 32-33, 105, 115, 118-19, 146-48 & 211)

Accordingly, Plaintiffs have presented sufficient facts to show a genuine question as to Fasano's knowledge of the racketeering enterprise and his willingness to promote it.  <u>See</u> <u>Baisch</u>, 346 F.3d at 376-77.  Therefore, Fasano's Motion for Summary Judgment should be denied.

### E.   **Plaintiffs Have Shown That Fasano Engaged In RICO Predicate Acts**

Fasano claims that Plaintiffs have not presented any evidence that Fasano engaged in any RICO predicate acts.  As

detailed in §III above, the summary judgment evidence shows the knowing and active assistance of Fasano in Flanagan's scheme to hide, transfer and otherwise shield his assets from the judgment claims of Plaintiffs through (1) mailings in furtherance of the overall fraudulent scheme (Pxs 1, 2, 6, 24, 58, 62, 90, 131, 133, 156, 188 & 195) and (b) interstate wire communications in furtherance of the overall fraudulent scheme. (Pxs 3, 25A, 25B, 130, 133, 141, 156 & 195)  Not only were the United States Mail and interstate wires used directly by Fasano in connection with the execution of Flanagan's overall fraudulent scheme (see Schmuck, 489 U.S. at 1448), there is an unresolved question of fact as to whether Fasano could reasonably have anticipated the use of the mail or interstate wires by Flanagan (Zichettello, 208 F.3d at 105-06), which was not challenged by Fasano, and thus remains an unresolved fact question for resolution upon the evidence introduced at trial. See Amaker, 274 F.3d at 681; Reed, 312 F.3d at 194-95; Landry, 901 F.2d at 426, 430 & 431.

### F.   Plaintiffs Have Shown That They Have Been Damaged By The Defendants' Wrongful Conduct.

Fasano contends that since Plaintiffs were paid in full in connection with the federal court judgment in Cadle I, they cannot show any damages.  The summary judgment evidence, however, shows that although the face amount of the federal court judgment in Cadle I was paid in full, the Plaintiffs were

never reimbursed their attorneys' fees for engaging in their efforts to execute on Flanagan's assets while the Defendants were foisting upon Plaintiffs the misrepresentations about the location of Flanagan's assets. (Px L ¶8)

Further, Plaintiffs have over $1 million in judgment and other debt claims against Flanagan, and have not recovered on those claims because of the Defendants' conspiracy with Flanagan to delay, hinder or defraud Plaintiffs in their efforts to execute on Flanagan's assets. (Px L ¶8; Pxs 20 & 175; Px G(1) pp. 44-45; Px H pp. 60-61, 84, 86, 89, 90 & 93-95) Simply, had the Defendants responded truthfully to Plaintiffs' discovery requests, and had they not assisted Flanagan in the furtherance of his wrongful scheme, Plaintiffs would have been able to execute on Flanagan's assets towards satisfaction of the over $1 million in judgment and other debt claims that the Plaintiffs held against Flanagan. (Px L ¶8)

### Conclusion

Flanagan and the other Defendants have gotten caught in a complicated and sophisticated fraudulent transfer scheme designed to shield Flanagan's assets from the judgment claims of Plaintiffs. While this is not the first case to pursue fraudulent transfer co-conspirators under RICO[3], the vigorous

---

[3]     See Handeen v. Lemaire, 112 F.3d 1339 (8th Cir.1997); Stochastic Decisions, Inc. v. DiDomenico, 995 F.2d 1158 (2d Cir.1993); Bankers Trust

prosecution of this case to a final judgment just might help slow down the proliferation of fraudulent transfers.

The RICO statute was enacted to provide new remedies for old problems that had, for whatever reason, slipped (or slithered) between the cracks in the law. As noted by the Second Circuit, Congress enacted RICO

> to deal with a broadly based, deeply rooted
> problem by establishing new prohibitions,
> enhanced sanctions, and new remedies to deal
> with the activities of those engaged in
> illegal practices.

Bankers Trust, 859 F.2d at 1103. The facts surrounding Flanagan's fraudulent transfer scheme, as implemented by the Defendants and as detailed in the Second Amended Complaint and as unearthed during discovery, are tailor-made for prosecution under RICO.

Based on the foregoing, Plaintiffs respectfully request that the Court overrule Fasano's Motion for Summary Judgment and permit this important case to proceed to trial.

---

Company v. Rhoades, 859 F.2d 1096 (2d Cir.1988); Gutierrez v. Givens, 989 F.Supp. 1033 (S.D.Cal.1997); and Cadle Co. v. Schultz, 779 F.Supp. 392 (N.D.Tex.1991).

                                        Respectfully submitted,
                                        ARMSTRONG LAW FIRM


DATED: April 18, 2005.          By_____/s/_____
                                        F. Dean Armstrong
                                        Ct. Fed. Bar #CT22417
                                        1324 Dartmouth Road
                                        Flossmoor, IL 60422
                                        (708) 798-1599
                                        Fax (708) 798-1597


                                        Edward C. Taiman, Esq.
                                        SABIA & HARTLEY, LLC
                                        190 Trumbull Street
                                        Suite 202
                                        Hartford, CT 06103-2205
                                        (860) 541-2077
                                        Fax (860) 713-8944

                                        Attorneys for Plaintiffs
                                        The Cadle Company and
                                        D.A.N. Joint Venture,
                                        A Limited Partnership

### Certificate of Service

     I certify that a correct copy of the foregoing instrument
was faxed and mailed on April 18, 2005 to all defense counsel as
shown on the attached Service List.



                         _____/s/_____
                              F. Dean Armstrong