UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **THE CADLE COMPANY** and | § | No. 3:01CV531(AVC) |
| **D.A.N. JOINT VENTURE,** | | |
| **A LIMITED PARTNERSHIP,** | § | |
| | | |
| Plaintiffs, | § | |
| | | |
| vs. | § | |
| | | |
| **CHARLES A. FLANAGAN, et al.** | § | April 18, 2005 |
| | | |
| Defendants. | § | |

**PLAINTIFFS' SECOND AMENDED RESPONSE TO
DEFENDANT BAINER'S MOTION FOR SUMMARY JUDGMENT**

This is the Response of Plaintiffs The Cadle Company ("TCC") and D.A.N. Joint Venture, A Limited Partnership ("DJV") to the Motion for Summary Judgment submitted by Defendants Todd R. Bainer and Todd R. Bainer L.L.C. (collectively, "Bainer").

**I.   At The Summary Judgment Stage, Plaintiffs
Need Only Prove The Elements Of Their RICO
Claims That Were Specifically Challenged By
Bainer And Then Appropriately Supported By
Specific Summary Judgment Proof.**

At the summary judgment stage, a plaintiff need not prove what the defendant has not properly challenged in the defendant's summary judgment motion.  Rather, at the summary judgment stage a plaintiff need only prove the elements of its claims that were specifically and properly challenged by the defendant.  An element of a plaintiff's claim is properly challenged when a defendant specifically informs the Court of the basis of its motion and then appropriately supports each

challenged element by reference to specific summary judgment proof.

The Court in its March 28, 2005 Order intimated that, in response to Bainer's Motion for Summary Judgment, Plaintiffs had to provide summary judgment evidence as to each element of their RICO claims.  At the summary judgment stage, however, Plaintiffs need only prove the elements of their RICO claims that were specifically challenged by Bainer and then appropriately supported by specific summary judgment proof.

The mere filing of a motion for summary judgment by a defendant does not shift the burden to the plaintiff to prove each and every element of its claims by competent summary judgment evidence.  See Adickes v. S.H. Kress & Co., 398 U.S. 144, 160-61 (1970); Amaker v. Foley, 274 F.3d 677, 681 (2d Cir. 2001); Reed v. Bennett, 312 F.3d 1190, 1194-95 (10th Cir. 2002).  Rather, at the summary judgment stage a plaintiff is only required to come forward with controverting summary judgment evidence as to facts (1) specifically challenged by the defendant which are (2) appropriately supported by the defendant's specific reference to pleadings, depositions, answers to interrogatories, admissions or affidavits which prove the absence of a genuine issue of material fact as to each challenged fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 327

1986); <u>Adickes</u>, 399 U.S. at 160-61; <u>Amaker</u>, 274 F.3d at 681;

<u>Reed</u>, 312 F.3d at 1194-95.

Under Rule 56(c)[1], a defendant moving for summary judgment

> bears the initial responsibility of [1] informing the district court of the basis for its motion, and [2] identifying those portions of both "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which [the defendant] believes demonstrates the absence of a genuine issue of material fact.

<u>Celotex</u>, 477 U.S. at 323 (quoting Rule 56(c)). <u>See</u>, <u>also</u>, <u>Reed</u>,

312 F.3d at 1194. Moreover,

> [b]efore the burden shifts to the [plaintiff] to demonstrate a genuine issue, the moving [defendant] most meet its "initial responsibility" of demonstrating that no genuine issue of material fact exists and that it is entitled to summary judgment as a matter of law.

<u>Reed</u>, 312 F.3d at 1194. As explained by the Supreme Court in

<u>Adickes</u>, the burden on the plaintiff to assert controverting

summary judgment evidence arises only if the defendant's summary

judgment motion is properly "supported" as required by Rule

56(c). <u>See</u>, <u>Adickes</u>, 398 U.S. at 160-61. <u>See</u>, <u>also</u>, <u>Amaker</u>,

274 F.3d at 681; <u>Reed</u>, 312 F.3d at 1194-95.

Accordingly, summary judgment is "appropriate" only when

the defendant has met its initial burden of production under

Rule 56(c). <u>Reed</u>, 312 F.3d at 1194; <u>Amaker</u>, 274 F.3d at 681.

---

[1] References to "Rule __" are to the Federal Rules of Civil Procedure.

If the evidence produced by the defendant in support of its motion for summary judgment does not meet this burden, "summary judgment must be denied even if no opposing evidentiary matter is presented" (Adickes, 398 U.S. at 160) because "[n]o defense to an insufficient showing is required." Id. at 161. See, also, Reed, 312 F.3d at 1194-95; Amaker, 274 F.3d at 681.

In deciding whether a genuine issue of material fact has been raised as to an issue, this Court "must construe the facts in the light most favorable to the non-moving party [Plaintiffs] and must resolve all ambiguities and draw all reasonable inferences against the movant [Defendants]." Baisch v. Gallina, 346 F.3d 366, 371-72 (2d Cir. 2003). Moreover, even if the underlying facts are undisputed, but the reasonable inferences which can be drawn therefrom are in dispute, summary judgment is inappropriate. See Cali v. Eastern Airlines, Inc., 442 F.2d 65, 71 (2d Cir. 1971).

Finally, numerous allegations in Plaintiffs' Second Amended Complaint ("2AC") went unchallenged by Bainer in his summary judgment motion. Accordingly, the allegations in Plaintiffs' Second Amended Complaint not refuted by Bainer through competent summary judgment proof remain unresolved fact questions to be resolved at trial. See Landry v. Air Line Pilots Ass'n, 901 F.2d 404, 426, 430 & 431 (5th Cir. 1990). See, also, Amaker, 274 F.3d at 681; Reed, 312 F.3d at 1194-95. Indeed,

> [t]he fact that [the plaintiffs] have made
> allegations [in their complaint] which the
> RICO defendants refute in brief but not with
> facts, by way of affidavit, evidence or
> otherwise, shows that factual issues remain
> to be resolved.

Landry, 901 F.2d at 431.

As shown by the following, Bainer has failed in his summary judgment burden, and, accordingly, Bainer's Motion for Summary Judgment should be denied.

**II.  Because The Defendants Have Not Contested Plaintiffs' RICO Allegations Against Flanagan, Plaintiffs' Claims That Flanagan Engaged In Substantive Violations Of RICO Remain Unresolved Fact Questions To Be Resolved At Trial.**

So long as the other elements of a RICO claim are satisfied, schemes to hide, transfer or otherwise shield a judgment debtor's assets from the execution efforts of a creditor may be redressed under RICO. See Handeen v. Lemaire, 112 F.3d 1339 (8th Cir.1997); Stochastic Decisions, Inc. v. DiDomenico, 995 F.2d 1158 (2d Cir.1993); Bankers Trust Company v. Rhoades, 859 F.2d 1096 (2d Cir.1988); Gutierrez v. Givens, 989 F.Supp. 1033 (S.D.Cal.1997); Gutierrez v. Givens, 1 F.Supp.2d 1086 (S.D.Cal.1998); and Cadle Co. v. Schultz, 779 F.Supp. 392 (N.D.Tex.1991).

In their summary judgment pleadings, Flanagan's co-conspirators have admitted that:

(1)  "[T]he evidence developed during
     discovery . . . shows that Flanagan was

              desperately attempting to conceal his assets and evade his creditors." (Prymas/T&P MSJ Mem. p. 9)

(2)    Flanagan's conduct in transferring and pledging his T&P stock to various individuals "delayed, hindered or defrauded [Plaintiffs'] execution on [Flanagan's T&P] stock." (Bainer MSJ Mem. p. 34)

(3)    "It was Flanagan who transferred the T&P stock to Babacus and others to avoid execution by the plaintiffs." (Prymas/T&P MSJ Mem. p. 28)

(4)    "The only thing that delayed, hindered or defrauded execution on [Flanagan's] stock was Flanagan's personal transfer and pledge of the stock to various individuals." (Bainer MSJ Mem. p. 34)

(5)    "As the . . . facts adduced during discovery amply demonstrate, the . . . fraud that caused Plaintiffs' inability to collect [on the judgment debts owed by Flanagan] was [committed by] Flanagan himself." (Prymas/T&P MSJ Mem. p. 28)

(6)    It was "Flanagan's fraudulent efforts to evade his creditors" that caused "Plaintiffs' lack of collection success . . .." (Prymas/T&P MSJ Mem. p. 28)

(7)    "Flanagan, himself, was the source of the fraud upon which Plaintiffs suffered damages . . .." (Prymas/T&P MSJ Mem. p. 20)

Indeed, Prymas has admitted that Flanagan has committed bankruptcy fraud. (Px O) Moreover, this Court has previously ruled that Plaintiffs have stated viable claims against Flanagan for substantive violations of §1962(b) and §1962(c) of RICO. (7/3/03 Ruling on Flanagan's Motion to Dismiss)

Here the Defendants have not contested Plaintiffs' allegations that Flanagan engaged in substantive violations of §1962(b) and §1962(c) of RICO in connection with Flanagan's scheme to hide, transfer and otherwise shield his assets from the judgment claims of Plaintiffs.  Indeed, in Fasano's summary judgment pleading it was "assume[d] that Flanagan's personal activities created liability under RICO . . .." (Fasano Mem. p. 17)  At the summary judgment stage, a RICO plaintiff need not prove the elements of a RICO claim that were not properly challenged by the defendants in their summary judgment pleadings. See Adickes, 396 U.S. at 160-61; Amaker, 274 F.3d at 681; Reed, 312 F.3d at 1194-95; Landry, 901 F.2d at 426, 430 & 431.  Accordingly, Plaintiffs' claims that Flanagan engaged in substantive violations of §1962(b) & (c) of RICO remain unresolved fact questions to be resolved upon the evidence introduced at trial. Id.

### III. The Summary Judgment Evidence Shows That Bainer Provided Knowing And Substantial Assistance To Flanagan In The Execution Of Flanagan's RICO Scheme, And Thus Is Liable As A Co-Conspirator Under §1962(d) of RICO.

Plaintiffs do not contend that Fasano personally committed each act necessary to constitute a substantive violation of §§1962(b) or (c) of RICO.  Rather, Plaintiffs contend -- and the Defendants do not contest -- that it was Flanagan who personally

-7-

committed the acts necessary to constitute substantive violations of §1962(b) and §1962(c).

Further, the summary judgment evidence shows that Bainer provided knowing and substantial assistance to Flanagan in connection with the execution of Flanagan's RICO scheme to hide, transfer and otherwise shield Flanagan's assets from the judgment claims of Plaintiffs. Accordingly, the summary judgment evidence shows that there are disputed issues of material fact as to whether Bainer can be held liable as a co-conspirator pursuant to §1962(d) of RICO. See Baisch v. Gallina, 346 F.3d 366, 376-77 (2d Cir. 2003)

As alleged in Plaintiffs' Second Amended Complaint, and as shown by the summary judgment evidence, Flanagan's RICO scheme involved five separate but related schemes to hide, transfer and otherwise shield his assets from Plaintiffs: (1) the "settlement proceeds" scheme; (2) the "shifting stock" scheme; (3) the "secret checking account" scheme; (4) the "Caporale property transfer" scheme; and (5) the "bankruptcy fraud" scheme. The summary judgment evidence set forth below shows that there are disputed issues of fact as to the role of Bainer in the implementation and execution of Flanagan's fraudulent scheme to hide, transfer and otherwise shield Flanagan's assets from the judgment claims of Plaintiffs.

Conspiracies are, by their very, nature, secretive operations. See Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999). Accordingly, a RICO plaintiff rarely has direct evidence of a conspiracy, but may, by necessity, show a RICO conspiracy through circumstantial evidence. Id. In order for circumstantial evidence to have meaning, however, the proper context of the overall conduct of all participants must be examined, with the realization that a co-conspirator rarely confesses to his role in the wrongful scheme that is the subject of the conspiracy.

The role of Bainer in Flanagan's RICO scheme to hide, transfer and otherwise shield his assets from the judgment claims of Plaintiffs is set forth below in the summary judgment citations that are highlighted in bold typeset (e.g., **"Px Q ¶¶4-7"**), as opposed to regular typeset (e.g., "Px 3" and "Px 105"), which shows the context within which Bainer's wrongful assistance in the execution of Flanagan's scheme took place.

A.    <u>Background</u>.

Flanagan was a very wealthy man. In the early 1990s Flanagan had over $11,700,000 in assets, with a net worth of over $4,355,000. (Px 55)

Flanagan's largest single asset was his 50% stock ownership in Thompson & Peck, Inc. ("T&P"), which was a large, independent

insurance agency in Connecticut. (Px 176) Flanagan's 50% stock ownership in T&P was estimated to be worth $2,000,000. (Px 55)

In addition, Flanagan received substantial rental income from numerous apartment buildings and other rental properties that he owned. (Px 177; Px C p. 49; Px H pp. 60-61; Px 55) Flanagan, however, was a notorious slumlord who drained income from his properties by taking money out of his apartment buildings, but not putting any money back in. (Px D pp. 56-57)

Not only was Flanagan a notorious slumlord, in the mid 1990s Flanagan submitted a false financial disclosure form to the IRS in an effort to convince the IRS to reduce the amount of his taxes. (Px A(1) pp. 30-31; 48-49 & 53) Flanagan intentionally omitted from the IRS disclosure form his access to a checking account in the name of "Crocker House Associates", which was a d/b/a of Flanagan, and Flanagan's ownership of various apartment buildings, which were held in the names of other entities that were secretly owned and controlled by Flanagan. (Px A(1) pp. 32; 48-51; Pxs 75 & 76) On December 4, 2002 Flanagan pled guilty to the felony of submitting false financial information to the IRS. (Px A(1) p. 7; Pxs 76 & 77)

In 1996 Plaintiff TCC filed suit against Flanagan in Cadle v. Flanagan, United States District Court, District of Connecticut, No. 3:96-CV-02648 (AVC) (the "Federal Suit" or "Cadle I") in connection with Flanagan's default on a $75,000

loan which had previously been conveyed to TCC. (Flanagan Answer ¶70) On March 20, 1997 a final judgment was entered in the Federal Suit against Flanagan in the amount of $90,747.87. (Px 175; Px 109 p. 51)

A debtor's examination of Flanagan was scheduled before Judge Covello on March 9, 1998. On February 25, 1998 Plaintiff TCC served a document subpoena on Flanagan requiring Flanagan to produce at the debtor's examination documents pertaining to Flanagan's assets, including Flanagan's stock ownership in T&P. (Px G(1) p. 62)

At the March 9, 1998 debtor's examination, however, Flanagan refused to produce any documents pertaining to his assets, and refused to provide any testimony about his assets. (Px G(1) pp. 63, 65, 80, 81, 83; Px G(2) p. 187) Rather, Flanagan's attorney represented to Judge Covello that Flanagan was invoking his Fifth Amendment right against self-incrimination and was refusing to provide any evidence about his assets because Flanagan was under criminal investigation by the IRS and the F.B.I. for income tax matters. (Px 78; Px G(1) p. 83; Px G(2) p. 187) The purported Fifth Amendment IRS concerns, however, were simply a ruse concocted by Flanagan and his attorney, Fasano, to avoid or delay providing any information to Plaintiffs about the location and transfer of Flanagan's assets.

(Pxs 105 & 18; Pxs 188 p. 3 #9 & 186 p. 2 ¶¶5 & 10; Px A(1) pp. 197-99)

After hearing the excuses for Flanagan's refusal to produce documents or testify about his assets, on March 9, 1998 Judge Covello issued an order prohibiting Flanagan from transferring his assets, and requiring Flanagan to submit to the Court for <u>in camera</u> inspection the documents pertaining to Flanagan's assets which supposedly were subject to the Fifth Amendment privilege against self-incrimination:

> I am entering an order that Mr. Flanagan, from this point forward, transfer nothing of a single asset until such time as this is unraveled, and that includes the family lawn mower, bicycle, whatever.
>
> * * *
>
> And, to the extent that the documents that [Plaintiff TCC] seeks are claimed [by Flanagan] to be the subject of a Fifth Amendment privilege, again, the Court would direct that those be submitted to the Court for in-camera inspection.

(Px 78 p. 7)   Thereafter, on April 13, 1998 Judge Covello ordered Flanagan and T&P to turn over Flanagan's stock ownership in T&P or provide sufficient documentation to show Flanagan's disposition of the T&P stock.   (Px 127; Px 109 p. 51)

By 1998, Plaintiffs held judgment and other debt claims against Flanagan which totaled in excess of $1,000,000. (Px G(1) pp. 44-45; Px 175; Px H pp. 60-61, 84, 86, 89, 90 & 93-95; Pxs 20 & 175)   According to Attorney William Gallagher (the former

president of the Connecticut State Bar Association) (Px D p. 53)), Flanagan "was probably the New Haven Judicial District's biggest deadbeat.  He had enormous number of debts against him." (Id. p. 28)  Further, Flanagan had a history of trying to avoid paying his creditors. (Id. pp. 47-48)

In 1998 Flanagan was engaged in a multi-faceted conspiracy to defraud Plaintiffs out of the benefit of the judgment and other debt claims that they held against Flanagan. (Px B pp. 21-24; 115; 118-20; 228-29; Px 18 p. 2; Px 72 p. 2)  As the Defendants have admitted, and as the facts adduced during discovery amply demonstrate, (1) "Flanagan was desperately attempting to conceal his assets and evade his creditors" (Prymas/T&P MSJ Mem. p. 9); (2) "the . . . fraud that caused Plaintiffs' inability to collect [on the judgment debts owed by Flanagan] was [committed by] Flanagan himself." (id. p. 28); (3) "[i]t was Flanagan who transferred the T&P stock to Babacus and others to avoid execution by the plaintiffs" (id.); (4) it was "Flanagan's fraudulent efforts to evade his creditors") that caused "Plaintiffs' lack of collection success" (id.); and (5) Flanagan's conduct in transferring and pledging his T&P stock to various individuals "delayed, hindered or defrauded [Plaintiffs'] execution on [Flanagan's T&P] stock." (Bainer MSJ Mem. p. 34)  According to Attorney Gallagher (who is counsel for Defendants Prymas and T&P herein), there is no doubt in his mind

-13-

that Flanagan set out to not pay Plaintiffs, one way or the other, "by hook or by crook". (Px D pp. 60-61)

As shown below, Bainer provided knowing and substantial assistance to Flanagan in his continuing efforts to defraud Plaintiffs out of the benefit of the judgment claims that they held against Flanagan.  <u>See</u> <u>Baisch</u>, 346 F.3d at 376-77.  The concerted conduct by the Defendants, including Bainer, constitutes a RICO conspiracy under §1962(d) to assist Flanagan in his continuing efforts to thwart Plaintiffs' collection efforts, and thereby maintain control over Flanagan's financial empire.

**B.    The Summary Judgment Evidence Shows That Bainer Provided Knowing And Substantial Assistance To Flanagan In Connection With The Settlement Proceeds Scheme.**

In 1996 Flanagan and Prymas had a dispute over management and control of T&P, which resulted in a suit filed by Flanagan against Prymas and T&P in state court in Connecticut ("<u>Flanagan v. Prymas</u>". (Px 21 ¶11) Pursuant to a June 17, 1998 settlement of that suit (Px 21) (the "Settlement Agreement"), Flanagan, Prymas and T&P agreed that (1) there would be an adjustment of the management compensation paid to Flanagan to cover the discrepancies for the additional sums that had been paid to Prymas (<u>id</u>. ¶2); (2) an <u>additional</u> $75,000 in settlement proceeds would be paid to Flanagan over three years payable in 78 equal bi-monthly installments of $961.10 (<u>id</u>. ¶12); and (3)

-14-

Flanagan would not transfer his T&P stock to any other person or entity. (<u>Id</u>. ¶13)

It was the original intent of Prymas, T&P and Flanagan that the ¶12 Settlement Agreement payments would be 1099-miscellaneous income, and not wages. (Px B pp. 202; 204-07; 210-11; Px 70; Px D pp. 15-16; Pxs 179, 180, 181 & 182) Indeed, when the stipulation of settlement was dictated into the record, it was the intention of Prymas, Flanagan and T&P to treat the $75,000 settlement payments as a damage settlement which would be 1099 income, and not wages. (Px D p. 19)

In addition, the accountant for T&P, James Rayner, was of the opinion that the ¶12 Settlement Agreement payments to Flanagan were "not W-2 compensation (wages), but a taxable damage settlement to be reported on 1099-MISC." (Px 22) As admitted by T&P's attorney, William Gallagher, at the time the Settlement Agreement was tendered to the state court for approval, it was the intention of Flanagan, Prymas and T&P that the $75,000 settlement payments would be damage payments -- 1099 income -- and not wages. (Px D p. 20)

Further, at a T&P corporate meeting on September 3, 1997, Flanagan, Prymas and T&P all agreed that the settlement payments to Flanagan under ¶12 were "1099 income not subject to garnishments or withholding." (Px 106 p. 3) Indeed, after the date of the execution of the Settlement Agreement on June 17,

-15-

1997 until the very date that Plaintiff TCC served a property execution on T&P on January 5, 1998, the ¶12 settlement payments to Flanagan were treated by T&P, Prymas and Flanagan as 1099 income, and not wages. (Px B pp. 62-63; 218 & 223; Px F pp. 4 & 10; Px E p. 172)  As noted by Flanagan when it was suggested that the $75,000 settlement payments might be subject to wage garnishment:

> [H]ow can the deal change or get modified to hurt/damage me after the fact?  We all agree and sign off on one thing and after the fact there are changes?  How is this right?

(Px 182)

On January 5, 1998 a federal court writ of execution -- approved by Judge Covello (Px 68A p. 3) -- was served on Prymas, as president of T&P, in connection with TCC's March 20, 1997 judgment against Flanagan. (Px 111)  At p. 2 of the writ, T&P was commanded to

> pay to the sheriff the amount of a debt owed by you [T&P] to the judgment debtor [Flanagan], provided, if the debt owed by you [T&P] is not yet payable, payment shall be made to the sheriff when the debt becomes due if it becomes due within four months after the date of issuance of this execution.

(Px 68A)

Prymas was unsure how to deal with the property execution, and suggested to Flanagan that they seek the guidance of T&P's attorney, Bainer. (Px 68)  With the consent of Flanagan, on

-16-

January 5, 1998 Prymas forwarded the property execution to Bainer for his legal opinion (Px 111), which was reviewed by Bainer on January 5, 1998. (Px 65)

Flanagan understood that as of January 5, 1998 T&P was to turn over to the sheriff all non-wage items that T&P held for Flanagan's benefit. (Px A(1) p. 55) On January 5, 1998 Flanagan forwarded the property execution to his personal attorney, Fasano, expressing his concern that the ¶12 Settlement Agreement payments might be subject to the property execution:

> Please see enclosed which was served to Stanley Prymas this morning. I have not received anything as yet, however I should be served shortly. My concern here is with the money I am currently receiving from [T&P] as a result of the Settlement between Mr. Prymas and I. Is this subject to being taken?

(Px 144) On the next day -- January 6th -- Flanagan asked Fasano whether it would make sense for Fasano to contact T&P's attorney, Bainer, to discuss how to handle the property execution which had been served on T&P. (Px 3)

After the property execution was served on T&P, Flanagan wanted the ¶12 Settlement Agreement payments recharacterized from 1099 income (which was subject to the property execution) to wages, and thus avoid losing the ¶12 Settlement Agreement payments to his creditor, TCC. (Px B pp. 213 & 223; Px E p. 93; Px D pp. 47-48) Flanagan, however, was in a predicament: all parties had previously agreed that the ¶12 settlement payments

-17-

were 1099 miscellaneous income, and T&P had previously treated the prior settlement payments to Flanagan as 1099 miscellaneous income.  (Px B pp. 217-218 & 223; Px 72 p. 2)

Flanagan's personal attorney, Fasano, understood that the ¶12 Settlement Agreement payments, as they had been paid to Flanagan in the past, were subject to the writ of execution. (Px C p. 170)  In an effort to skirt the writ, however, Fasano told T&P's attorney, Bainer, that he (Fasano) wanted the characterization of the ¶12 Settlement Agreement payments changed from 1099 miscellaneous income to wages. (**Px B pp. 60 & 63**)

On January 9, 1998 Flanagan, Prymas and T&P agreed to send the property execution issue to Flanagan's attorney, Fasano, and to T&P's attorney, Bainer, for their thoughts on how to handle that issue. (Px 112)  Bainer, however, full-well knew that Flanagan wanted to recharacterize the ¶12 Settlement Agreement payments from 1099 miscellaneous income to wages in an effort to avoid the federal court property execution that TCC had served on T&P. (Px B pp. 223-24)

On January 12, 1998 Flanagan and Prymas agreed that T&P would "temporarily hold" the ¶12 Settlement Agreement payments to Flanagan, with the checks issued, but placed in a file at T&P, until the matter was resolved. (Px 140)  It was Prymas who informed the bookkeeper, Andrea Steele, to process Flanagan's

settlement checks for January, February, March and April of 1998, but to hold on to those checks and not distribute them to Flanagan. (Px F pp. 17-18)

Although Fasano had previously informed Bainer that he (Fasano) wanted the ¶12 settlement payments to be recharacterized as wages (and thus not subject to the federal property execution) (Px B pp. 60 & 63), on January 13, 1998 Bainer instructed Fasano that unless Fasano took "some affirmative legal action in federal court to stay or otherwise obviate the property execution", T&P would be left with no choice but to turn the ¶12 settlement funds over to the executing creditor, TCC. (Px 23; Px B pp. 191-93; Px E pp. 116-17; & 119-20)

Rather than take any affirmative legal action in federal court to stay the writ of execution, on January 20, 1998 Flanagan and Fasano simply filed, on behalf of T&P, a claim exemption form (Px 25) and an Objection to Property Execution (Px 24) which represented to TCC and Judge Covello that "[o]ther than wages, there is no property [belonging to Flanagan] held by [T&P]." (Px 24; Px B p. 197)  Fasano had previously sent a draft of the Objection and the claim exemption form to Bainer for his review and approval. (**Pxs 25A & 25B**)  Although Bainer and Prymas knew that Flanagan's and Fasano's representations to TCC and Judge Covello were false (Px 69), they took no steps to honor

-19-

the federal court property execution and have the ¶12 Settlement Agreement proceeds paid over to the sheriff. (Judicial Notice of file in <u>Cadle I</u>)

Indeed, on January 25, 1998 -- some 5 days <u>after</u> Flanagan's and Fasano's representations to TCC and the Court -- Prymas informed Flanagan that "we are <u>not</u> treating [the ¶12 settlement payments] as salary, but rather 1099 income." (Px 113 (emphasis added))  And then on February 4, 1998 Prymas informed Bainer that any representation to Plaintiff TCC and Judge Covello that T&P "does not have any money assets due to Mr. Flanagan" was a misrepresentation because "T&P <u>does</u> have an obligation to [Flanagan]." (Px 69 (emphasis added))  The "money assets" that T&P owed to Flanagan were the $75,000 in Settlement Agreement payments. (Px E pp. 128-30)

On February 4, 1998 Bainer wrote to Fasano reiterating that the ¶12 settlement payments were being treated by T&P as 1099 miscellaneous income, but suggested that Prymas and T&P would work with Flanagan "to see that Charlie and none of his creditors receives the funds at issue." **(Px 70 p. 1)**  Shortly thereafter, a meeting was scheduled in New Haven to discuss strategy on how to circumvent the federal court property execution.  (**Px 72 p. 2; Px 65 (2/9/98 entry)**)

On February 9, 1998 Flanagan and Fasano met with Prymas and Bainer to discuss the federal court property execution and the

plan of Fasano and Flanagan to change the characterization of the Settlement Agreement payments to wages. (**Px 65 p. 2; Px B pp. 221-23; Px E pp. 136-39; Px 72 p. 2**)  At that meeting Bainer warned the other Defendants that changing the characterization of the Settlement Agreement payments from 1099 miscellaneous income to wages in response to the federal court property execution would leave them all open to a claim that there was a civil conspiracy to help Flanagan defraud his creditors.  Bainer further warned that the conspiracy claim was a risk that they had to seriously consider. (**Px 65 p. 2; Px B pp. 221-23; Px E pp. 136-39; Px 72 p. 2**)

Fasano and Flanagan, as well as Bainer, Prymas and T&P, all agreed to accept that risk. (**Pxs 114 & 142**) Although no affirmative steps were taken in federal court to stay the writ of execution, not a single payment of the $75,000 settlement obligation was turned over to the sheriff, with the ¶12 settlement funds simply recharacterized as wages, and then paid directly to Flanagan. (Pxs **114; 115; 142**; 143 & 145; **Px B pp. 207-08 & 217**)  It was admitted by the T&P bookkeeper, Andrea Steele, that she was instructed by Prymas to recharacterize the settlement proceeds from 1099 miscellaneous income to wages. (Px F p. 25)

The federal court property execution was issued on January 5, 1998 and expired on May 5, 1998. (Px 68A; Px E p. 91; Pxs 114

& 142)   The period during which the Settlement Agreement payments were suspended was the same four month period. (Px E p. 91)   Prymas told the T&P bookkeeper, Andrea Steele, to process the checks for those four months, but to hold on to them and not distribute them to Flanagan. (Px F pp. 17-18)   The four checks that were issued reflected money that was due by T&P to Flanagan under ¶12 of the Settlement Agreement, and at the time that those four checks were issued, the payments were considered 1099 income. (Px F pp. 29; 51-52; & 56)

To avoid the federal court property execution, the four issued-but-not-cashed settlement checks were moved to the end of the Settlement Agreement payout (after the writ of execution had expired), and then recharacterized as wages. (Px F pp. 29-33 & 37-38)   According to Prymas, it was Bainer who told him to hold the four issued-but-not-cashed Settlement Agreement checks until the writ of execution expired, and then add those payments to the end of the settlement pay-out. (**Px E p. 57**)

Having successfully conspired to defeat the January 5, 1998 federal court property execution, the next few TCC collection efforts were much easier to circumvent.   On November 12, 1998 Prymas and T&P were served with TCC's federal court Post Judgment Remedies Interrogatories, which inquired whether T&P held any non-exempt property (such as Settlement Agreement payments) that belonged to Flanagan. (Pxs 116 & 117)

Although Prymas knew that the ¶12 Settlement Agreement payments had been recharacterized from 1099 income to wages to avoid the earlier writ of execution, he sought comfort from co-conspirator Bainer on how to respond to the federal court PJR Interrogatories. (Px 116)    Bainer affirmed the earlier conspiracy by concurring with Prymas that Flanagan was only paid wages by T&P (**Px 118**), and thus it was appropriate to respond to TCC that T&P was not in possession of any non-exempt property that belonged to Flanagan. (Px 119)    On November 30, 1998 Flanagan agreed to the continuation of the recharacterization plan. (<u>Id</u>.)

In connection with a $128,217 judgment against Flanagan that had been assigned to TCC, on December 18, 1998 TCC served an additional set of PJR Interrogatories on Prymas and T&P. (Px 26)    Prymas forwarded the PJR Interrogatories to Bainer with the request that Bainer review the documents "and let us know how to respond." (<u>Id</u>.)

Despite the fact that both Prymas and Bainer knew that T&P owed the settlement proceeds to Flanagan pursuant to the earlier Settlement Agreement, Bainer advised Prymas to respond that no money was due by T&P to Flanagan. (Pxs **118** & 119) Pursuant to the plan worked out among Flanagan, Fasano, Prymas and Bainer, on January 19, 1999 Prymas mailed to Plaintiffs' counsel responses to the PJR Interrogatories which falsely represented

that Prymas knew of no funds that were owed to Flanagan. (Px 110)

Thus, in addition to the federal court writ of execution approved by Judge Covello, two more asset discovery "storms" had been weathered by implementation of the Defendants' settlement proceeds scheme. (**Px 122**)

### C. The Summary Judgment Evidence Shows That Bainer Provided Knowing And Substantial Assistance To Flanagan In Connection With The Shifting Stock Scheme.

The Defendants knew that the primary target of TCC's collection efforts was Flanagan's 50% stock ownership in T&P. (Px B pp. 23, 24 & 29; Pxs 20 & 130 p. 1)  On January 5, 1998 a federal court property execution was served on T&P by serving its president, Prymas. (Pxs 68; 68A & 111)  Flanagan was aware of the service of the property execution on T&P, and expected a similar property execution to be served on him at any time. (Px 144)  Further, on January 5, 1998 T&P's attorney, Bainer, reviewed the TCC property execution issue for at least an hour. (Px 65)

Flanagan was concerned that the federal court property execution might lead to the seizure of his T&P stock. (Px D p. 23; Px 3)  Indeed, there was a prior episode where an executing creditor was able to obtain physical possession of Flanagan's stock, which required Flanagan to pay off that creditor to avoid the sale of his stock at a sheriff's sale. (Px D p. 23; Px G(1)

pp. 93-94)  Flanagan and Prymas' lawyer knew that if a creditor
could get hold of Flanagan's stock through execution, Flanagan
would be forced to pay off the creditor. (Px D pp. 22-23; Px 3)

    After service of the property execution on January 5, 1998,
Flanagan wrote to his personal attorney, Fasano, on January 6th,
seeking advice on how to shield Flanagan's T&P stock from TCC's
execution efforts:

> I wanted to make you aware that S. Prymas
> faxed to Atty. Bainer who represents T&P
> Inc. a copy of the Execution from Gaide that
> I faxed to you on Tues. . . .
>
> * * *
>
> Does it make sense for you to contact Atty.
> Bainer on my behalf and find out now what
> the issues are with T&P Inc. over this.  Why
> would Gaide have S. Prymas served over my
> matter?   I also do not want it disclosed
> where my Stock is presently kept.    There
> may be an attempt to grab this stock.   If
> there is a concern here, please let me know
> if I should be doing anything different than
> what is presently being done.

(Px 3 (emphasis added)); Px C pp. 94-95)

    In his January 6th letter, Flanagan was asking Fasano if he
(Flanagan) should be doing anything different other than what
Flanagan had already done by placing the stock with Socrates
Babacas. (Px A(1) pp. 111-12)  Indeed, in order for Fasano to
advise Flanagan on whether Flanagan should be doing anything
different than "what is presently being done", Fasano would need

to know what Flanagan was doing at that time to hide his T&P stock. (Px C p. 94)

In addition to the property execution which was served on January 5, 1998, on February 2, 1998 TCC filed a motion for turnover of Flanagan's assets (Px 197), which was received by T&P and Bainer on February 4, 1998. (Pxs 69 & 69A; Px B pp. 200-201; 66-67; & 163-64) Accordingly, as of February 4, 1998 Bainer -- as the attorney for T&P -- was on notice that TCC was seeking a turnover order against Flanagan and T&P for the turn over of Flanagan's T&P stock. (**Px B pp. 200-01; 66-67; 163-64**)

Further, on March 9, 1998 Judge Covello issued an injunction prohibiting Flanagan from transferring any of his assets. (Px 78 p. 7) At the March 9th hearing, Flanagan pled the Fifth Amendment "based upon outside issues" (i.e., an IRS investigation) to avoid testifying as to the whereabouts of his T&P stock. (Px 78 pp. 3-4; Px 105; Px A(1) pp. 197-98; Px 186 p. 2 ¶¶5 & 10; Px 188 p. 3 #9) As finally admitted by Flanagan, the location of his T&P stock had nothing to do with the IRS investigation. (Px A(1) pp. 197-199)

Flanagan and his attorney, Fasano, understood that Judge Covello's injunction was intended to freeze all of Flanagan's assets. (Px C p. 45; Px 62) According to Fasano, Judge Covello was clear that Flanagan was not to transfer or move any of his assets. (Px C p. 45)

In response to TCC's second Motion for Turnover Order (Px 196) (which was served on T&P (id. p. 7)), on April 13, 1998 Judge Covello entered a turnover order (Px 127) requiring Flanagan and T&P to (1) turn over Flanagan's stock in T&P; and (2) provide TCC with a full and complete accounting as to any purported transfer or other disposition of the stock if a claim was asserted that Flanagan had "sold, hypothecated, pledged, gifted or otherwise divested himself or disposed of any interest in [T&P]." (Px 109 p. 51)

On April 22, 1998 it was represented to Judge Covello that Fasano and Flanagan had "gathered together thousands of documents to be produced for in-camera inspection", and estimated that the documents would be produced to the Court within the next week. (Px 186 p. 2 ¶6)  The relevant subpoenaed documents, however, were never produced to the Court or to Plaintiffs.  (Px G(1) pp. 62-66, 67, 73-78 & 80-81; Px G(2) pp. 140, 180 & 182)

Both Bainer and Prymas were informed of both Judge Covello's March 9, 1998 Injunction and Judge Covello's April 13, 1998 Turnover Order. (**Px Q ¶3**)  Even with the federal court writ of execution (Px 68A); the injunction freezing Flanagan's assets (Px 78 p. 7); and the Turnover Order for Flanagan's T&P stock (Px 127), Bainer, Prymas and T&P were still willing to do all that they could to avoid TCC's collection efforts, and thereby

prevent TCC from seizing Flanagan's T&P stock. (**Px 67 p. 2; Px B pp. 217-18; Px 72**)  One of the avenues discussed in mid 1998 was the execution of a buy-sell agreement and placement of a restrictive legend on Flanagan's T&P stock, which would make Flanagan's T&P stock less attractive to his creditors. (Pxs 126; 128; 66 p. 1; 135 p. 1; Px 194)

The issue of Cadle's execution efforts was discussed on numerous occasions at T&P's board (auxiliary committe) meetings. (**Px Q ¶4**)  Bainer specifically instructed Prymas and Flanagan to not make any reference in the board meeting minutes to the discussions among Flanagan, Prymas and Bainer about Cadle's execution efforts.  (**Id.**)

At several board meetings in approximately spring or mid-1998, Flanagan, Prymas and Bainer discussed Cadle's execution efforts on Flanagan's T&P stock. (**Px Q ¶5**)  At those board meetings, Bainer encouraged the execution of a shareholder agreement between Prymas and Flanagan and the placement of a restrictive legend on Flanagan's T&P stock. (**Id.**)  Bainer stated to Prymas that if Cadle was successful in getting Flanagan's T&P stock, Cadle would make things difficult for Prymas, and then Bainer asked out loud whether Prymas would want Cadle as his partner for the ownership of T&P. (**Id.**)  Bainer then said that Prymas and Flanagan needed to place a restrictive legend on the T&P stock to protect that stock from the execution efforts of

Cadle. (<u>Id.</u>)  Indeed, it was <u>Bainer's</u> <u>idea</u> to put a restrictive legend on the T&P stock to protect that stock from Cadle's execution efforts. (**Px Q ¶7**)

Despite Judge Covello's injunction against the transfer of Flanagan's assets and the turnover order requiring the turn over of Flanagan's T&P stock, the Defendants proceeded with their plan to place a restrictive legend on Flanagan's stock. (**Px 129**) On July 27, 1998 Flanagan informed Bainer that:

> I received your fax regarding the delivery of the T&P Stock Certificates from Stanley and I.  I left you a message yesterday that <u>I</u> <u>can</u> <u>deliver</u> <u>the</u> <u>T&P</u> <u>Inc.</u> <u>stock</u> <u>that</u> <u>pertains</u> <u>to</u> <u>me</u>, have the restrictive wording put on my stock and take my stock back with me.  Before this is done, it is my understanding that you were going to <u>review</u> <u>with</u> <u>Atty.</u> <u>Ippolito</u> [<u>Fasano's</u> <u>law</u> <u>partner</u>] on Tues. 7-28-98 <u>the</u> <u>Buy</u> <u>Sell</u> <u>Agreement</u> for Atty. Ippolito's input.  Shouldn't this discussion and a draft of your and his discussion take place, have this draft discussed, modified if need be, voted on by Stanley and I and than finish with the Stock restrictions.
>
> Please advise.

(**Px 56** (emphasis added))  Accordingly, Fasano knew that Flanagan had possession or control of his T&P stock and that a restrictive legend was to be placed on Flanagan's stock.  (Px B p. 105; Pxs 18, 56 & 195)

On August 21, 1998 Flanagan, Prymas and Bainer met at T&P's office in New Haven to carry out the terms of their plan. (Pxs 56 & 195) At this meeting, Flanagan handed his T&P stock

certificate to Bainer, who then typed the restrictive legend on the stock and returned it to Flanagan. (**Px B pp. 68 & 92-93**)

At the time Flanagan's T&P stock was handed to Bainer in August of 1998, both Bainer and Prymas knew about the Aprli 13, 1998 Turnover Order. (**Px Q ¶7**) Bainer, however, insisted that Flanagan's T&P stock be delivered to him at that time, so he could place a restrictive legend on Flanagan's stock. (**Id.**)

Although Judge Covello had issued an injunction prohibiting Flanagan's transfer of assets, and had issued a turnover order requiring Flanagan <u>and</u> <u>T&P</u> to turn over Flanagan's T&P stock, Flanagan, Bainer and Prymas refused to obey Judge Covello's orders and turn over the stock.  Bainer, as T&P's agent, was also subject to the turnover order and should have turned Flanagan's T&P stock over to TCC. (**Px 133; Px AA pp. 63-64**) Flanagan, however, did not feel as though he was obligated to honor Judge Covello's orders because his attorney, Fasano, had told him he did not have to turn over his T&P stock. (Px A(8) pp. 95-96; Px A(1) pp. 120-21)

On September 23, 1998 Judge Covello again ordered Flanagan to turn over the T&P stock and the documentation showing any transfer of that stock.  (Px 187)  After two motions to stay the enforcement of the turnover order were overruled by Judge Covello, on October 21, 1998 Flanagan and Fasano submitted to the Court a "Notice of Compliance" (Px 1), representing that

Flanagan's stock was in the hands of a purported creditor, "Sharon Demetropolis" (actually, "Demetropoulous"), and that Flanagan did not have possession <u>or</u> <u>control</u> of the stock. (<u>Id</u>.; Px C pp. 66-67)

On the very next day Flanagan and Fasano submitted an "Amended Notice of Compliance" (Px 2), again representing that Flanagan's stock was in the hands of Ms. Demetropoulous and that Flanagan did not have possession <u>or</u> <u>control</u> of the stock. Flanagan and Fasano also represented that

> [s]aid stock has been held by Sharon Demetropolis [sic] prior to the Court's Order for Turnover on April 13, 1998, and prior to the Court's Order on March 9, 1998 prohibiting [Flanagan] from transferring any of his assets.

(<u>Id</u>.)

In an affidavit submitted by Fasano to Judge Covello, Flanagan represented that he had "borrowed money from Sharon Demetropolous [sic] and gave her the stock as security for the money." (Px 58; Px C pp. 66-7) But Ms. Demetropoulous (who was one of Fasano's clients (Px C p. 39)) knew nothing about Flanagan's stock, and did not in fact have possession of Flanagan's stock. (Px J pp. 153-56; Px C pp. 67-70)

Fasano knew, must have known, or should have known that Flanagan's representations to the Court were false. (Pxs 3, 62, 18 & 19) Indeed, in a letter by Flanagan to Fasano dated January 6, 1998 (Px 3), Flanagan instructed Fasano that "I . . . do not

want it disclosed where my Stock is presently kept.  There may
be an attempt to grab this stock."  Fasano admitted that
Flanagan's statement is pregnant with the implication that
Fasano knew where Flanagan was hiding his stock.  (Px C p. 94)
Moreover, Flanagan testified that he did not read the erroneous
"Demetropolous affidavit" (Px 58) before he signed it, and that
the erroneous information about the location of his T&P stock
was put in his affidavit by Fasano. (Px A(1) pp. 123-27)

      **(1)**   **Plan B: The Bogus Babacas Debt Scheme**

On October 26, 1998 Judge Covello issued, <u>sua</u> <u>sponte</u>, a
Show Cause Order scheduling a contempt hearing on November 16,
1998 for Flanagan's failure to turn over his stock and failure
to provide an accounting as to any disposition of the stock as
required by the turnover order.  (Px 190)  Now Flanagan and
Fasano were caught in a bind.  The purported secured debt of
Flanagan to Ms. Demetropoulous was bogus, and Fasano's client
did not in fact have possession of Flanagan's stock.  (Px C pp.
39 & 69-70) Flanagan and Fasano then came up with Plan B: a
friend and business associate of Flanagan by the name of
Socrates T. Babacas ("Babacas") would claim to have loaned
substantial sums of money to Flanagan and also claim to have
possession of the stock as collateral for the bogus loan. (Px 3)

Pursuant to this plan, on November 11, 1998 Flanagan
prepared and had Babacas fax from his office in Springfield,

Massachusetts to Fasano's office in New Haven, Connecticut a bogus stock pledge agreement (Px 4) and a bogus assignment of rents. (Px 5)   Then on November 12, 1998 Flanagan and Fasano submitted a Second Amended Notice of Compliance (Px 6) now representing that the stock of T&P was not really in the hands of Ms. Demetropoulous as previously represented, but rather was in the possession of Babacas.   Flanagan and Fasano also represented that <u>Babacas supposedly had loaned Flanagan</u> "$120,000.00 on or about June 19, 1997, and has held said stock as security for the judgment [sic] since the above date [June 19, 1997] until present . . .." (<u>Id</u>.)   Fasano knew, must have known, or should have known that the Babacas debt/stock collateral representations were false. (Px 3; Px E pp. 152-53)

Indeed, Fasano knew that Flanagan had signed a Settlement Agreement on June 17, 1997 (Px 21) which, in ¶13, contained a commitment by Flanagan to not transfer his stock to any other person or entity.   (Px 3)   Moreover, Fasano knew that on July 7, 1997 Flanagan had signed a sworn certificate representing that he owned his T&P stock "unencumbered from any source" and that he "will not transfer the stock to any other person or entity." (Px 61)   As admitted by Flanagan, one of the purposes of placing the stock with Babacas was to keep it out of the hands of Flanagan's creditors. (Px A(8) p. 28)

Moreover, Fasano knew that the purported Babacas loan of $120,000 to Flanagan was a sham. Flanagan did not want to turn the T&P stock over to Plaintiffs, and Judge Covello refused to allow Flanagan to get away with not producing all of the documents pertaining to the purported loan and the purported stock pledge to Babacas. Flanagan and Fasano were left with no alternative but to pay off the judgment, place the stock in the hands of Flanagan's father as collateral for the loan, and then file bankruptcy for the return of the funds paid to satisfy the judgment.

(2)  **Flanagan Loans Money To Babacas, But Claims The Loans Were Really Repayment Of The Bogus Babacus Debt**

On October 27, 1998 Fasano represented to the Court that "Mr. Flanagan did not make any transfers after Judge Covello's [March 9, 1998] order freezing the assets of Mr. Flanagan." (Px 62) Then again on November 16, 1998 Fasano "assure[d]" the Court that "from the day that order has been received [March 9, 1998], Mr. Flanagan has not transferred any assets." (Px 109 p. 4) Fasano's representations were false.

Although Flanagan represented to Judge Covello and TCC (a) that he had not transferred any assets after March 9, 1998; and (b) that Babacas had loaned Flanagan $120,000:

(a)  On May 24, 1998, while the federal court injunction was in effect, Flanagan <u>loaned</u> $500 to Babacas. (Px 9)

-34-

    (b)   On June 19, 1998, while the federal court injunction was in effect, Flanagan <u>loaned</u> $1,000 to Babacas.  Indeed, the $1,000 check was marked "<u>loan</u> - 2 wk pay off."  (Px 10) Further, in his June 19, 1998 transmittal letter to Babacas (Px 11), Flanagan wrote: "Enclosed is the amount I can <u>loan</u> you. . . . I hope you can repay this <u>loan</u> amount as you told me - w/in 2 wks as I have bills I will have to pay w/ the money I have <u>loaned</u> to you."

    (c)   On August 24, 1998, while the federal court injunction was in effect, Flanagan <u>loaned</u> $500 to Babacas.  (Px 12)

    (d)   On October 21, 1998, while the federal court injunction was in effect, Flanagan <u>loaned</u> $500 to Babacas.  (Px 13)  In a transmittal letter to Babacas (Px 14), Flanagan wrote: "Enclosed is $500 check for the <u>loan</u> we spoke about.  Per our discussion this <u>loan</u> will be paid back w/in 2 wks."

In addition, on March 25, 1999 Flanagan <u>loaned</u> an additional $300 to Babacas, the very same person that supposedly had loaned $120,000 in cash to Flanagan.  In his March 25, 1999 transmittal letter to Babacas, Flanagan wrote: "Enclosed please find the $300 <u>loan</u> amount we spoke about today. . . . I am running real low on funds."  (Px 15 (emphasis added))

On that same date Flanagan wrote another letter to Babacas stating:

        I have sent via express mail today the $300. You will have it delivered to you by noon tomorrow.

        I really hope this matter goes this next week.  I do not have the ability to <u>loan</u> any more money.  As it is I am taking my

> daughters savings and I do not like doing
> this.

(Px 16 (emphasis added))  Then on the next day (March 26th)
Flanagan faxed yet another letter to Babacas (Px 17) again
confirming the <u>loan</u> by Flanagan to Babacas, and not any
repayment of a loan: "The $300 <u>loan</u> will arrive by noon today. .
. . I also must tell you that I do not have the ability to <u>loan</u>
any more money."

Further, Flanagan admitted to Prymas that it was Flanagan
who had loaned money to Babacas. (Px E pp. 152-53)  Finally,
Babacas supposedly held the T&P stock as collateral for a
purported $120,000 loan, but when Flanagan asked for the return
of the stock, Babacas released the purported collateral (the T&P
stock) to Flanagan, <u>for no consideration</u>, so Flanagan could then
pledge the stock to his father as security for another loan. (Px
A(1) pp. 146-47)

Indeed, the representations by Fasano to Judge Covello and
Plaintiffs about the whereabouts and availability of Flanagan's
T&P stock were materially false. (Px 67 p. 2; Px B pp. 32-33)
Further, Fasano's representations that Flanagan's T&P stock was
out of Flanagan's possession and control since June of 1997 was
knowingly both false and misleading. (Px 67 p. 2; Px B pp. 146-
147)  According to T&P's attorney, Fasano knew that his
representations to Judge Covello and Plaintiffs about the
location of Flanagan's stock "was substantively untrue." (Px 67

p. 3)   As admitted by T&P's attorney, Fasano made materially false and misleading statements to Judge Covello and the Plaintiffs as to the location and control of physical possession of Flanagan's T&P stock. (Px 19 p. 2; Px B p. 146-48)

In the fall of 1998 Flanagan and Fasano were playing a "shell game" on the location of Flanagan's T&P stock. (Px B p. 29)   According to the attorney for T&P, Fasano's misrepresentations about the location of Flanagan's stock and the movement of the stock from one person to another was evidence of a conspiracy to defraud Flanagan's creditors. (Px B pp. 22-24 & 211)   And, as admitted by T&P's attorney, it was Fasano who was allowing Flanagan to shift his stock all around in defiance of Judge Covello's orders, and in derogation of Plaintiffs' rights to obtain execution upon that stock in satisfaction of their judgments against Flanagan. (Px B p. 105; Px 19 p. 2)

### (3)   Judge Covello Holds Flanagan In Contempt, But Gives Flanagan The Opportunity To Purge The Contempt By Producing The Subpoenaed Documents

After hearing Flanagan's excuses for not complying with the Court's turnover order, on November 16, 1998 Judge Covello proceeded to hold Flanagan in contempt:

> [i]t has been established here [that Flanagan] has willfully and intentionally not complied with the order as previously entered by the Court, and orders [Flanagan] committed to the Bureau of Prisons until such time as he purges himself of the

> contempt by complying further with the
> order.

(Px 109 pp. 51-2)

In an effort to keep Flanagan from going to jail that very day, Fasano represented to Judge Covello that Flanagan would immediately produce all relevant documents about the purported Babacas debt and the purported stock transfers. (Px 109 pp. 53-59)  Based on the representations of Fasano, Judge Covello temporarily stayed the execution of his contempt order:

> [W]e're going to continue the [contempt]
> matter to a very short date here . . . and
> we'll see what has been produced here, and
> what problems exist.  But we're going to
> keep after this on a day by day basis until
> it's resolved. . . . [t]he execution of the
> [contempt] order is stayed, and the matter
> is continued to [November 24, 1998] at 10:00
> a.m.

(Id. p. 59-60)

For Flanagan to stay out of jail, Flanagan and Fasano were supposed to produce to Judge Covello the documents which would show the bona fides of the purported $120,000 loan by Babacas to Flanagan, and the documents which would show the bona fides of the purported stock pledge by Flanagan to Babacas. (Px C p. 157) Although Fasano represented to Judge Covello that Fasano would supply copies of the money orders for the $120,000 supposedly borrowed by Flanagan from Babacas (Px 109 p. 53), Fasano never saw proof of those money orders, and never produced them to the Court. (Px C p. 152-54)

Second, although Fasano represented to Judge Covello that Fasano would demand from Babacas the receipts for the roughly $1,600 per month that Flanagan supposedly paid to Babacas for the months of October, November and December of 1997 and January and February of 1998, Fasano never saw those receipts, and never produced them to the Court. (Px C pp. 153-54)

In addition, although Fasano represented to Judge Covello that he would check Flanagan's calendar and copy the pages for the days that Flanagan had supposedly met with Babacas, Fasano never produced that calendar to the Court. (Px C p. 156)

And finally, although Fasano represented to Judge Covello that he would provide copies of his law firm's trust account records to show where Flanagan had supposedly placed the borrowed funds in Fasano's trust account for the payment of Flanagan's bills, Fasano, again, never produced those records to the Court. (Px C p. 156)

Accordingly, since neither Flanagan nor Fasano could produce the documentation to show the bona fides of the purported Babacas loan and stock pledge, Flanagan needed to pay-off the federal court judgment as his "get-out-of-jail card." (Px C pp. 144 & 152-57) Any pledge of Flanagan's stock to his father, however, would be in violation of the T&P buy-sell agreement (Px B p. 24); would be a violation of he March 9, 1998 injunction (Px 78 p. 7); would be a violation of the April 13,

1998 Turnover Order (Px 127); and would constitute an obvious attempt to frustrate Flanagan's creditors. (Px B p. 115; Px 18 p. 2)

Further, with TCC pursuing Flanagan's T&P stock, and with Fasano acting as the lawyer for both the pledgor-debtor (Flanagan) and the pledgee (Flanagan's father), this was "strong evidence" of an effort by Flanagan and Fasano to <u>defraud Flanagan's creditors</u>. (Px B pp. 118-19; 115-16; Px 18) According to T&P's attorney, Fasano was saying and doing whatever Flanagan wanted in an effort to get Flanagan out of the jam he was in. (Px 67 p. 3)

Bainer and Fasano then talked about the possibility that Flanagan would file bankruptcy. (Px 130 p. 2; Px 18 p. 2)  Upon filing bankruptcy, Flanagan could claim that the pay-off of the federal court judgment (which had enabled Flanagan to get out of jail) was a voidable preference, which would then have to be paid back to Flanagan's bankruptcy estate. (Px C p. 144) Fasano, however, informed Bainer that Flanagan was not going to file bankruptcy unless he had some sort of side deal with Prymas regarding Flanagan's T&P stock. (Px 18 p. 2; Px B pp. 107-08; Px 130 pp. 2-3)

Although Flanagan avoided going to jail by paying off the federal court judgment, TCC still had "close to $1,000,000 more in judgments" against Flanagan (Px 20), and it appeared to

Prymas that "desperation is setting in." (<u>Id</u>.)  Further, Prymas was concerned that TCC's collection attorney, Paul Gaide, "has his sights on Charlie's stock and it now looks like he will get it." (<u>Id</u>.)

In addition, Fasano informed Bainer that he (Fasano) was concerned that TCC still might obtain Flanagan's T&P stock. (Px 130 p. 1)  According to Bainer, Fasano was concerned that the prior restrictive legend that was placed on Flanagan's T&P stock might not be valid because it was placed on Flanagan's stock in violation of the prior orders of Judge Covello:

> Then Fasano went on to explain concern that Gaide will obtain Charlie's [T&P] stock. Told him that I didn't think Gaide creditor's would find the stock attractive with restriction/legend on it.
>
> He replied "What if the restriction is invalid?"  He then related that the Federal Court [Judge Covello] had issued an order in March 1998 prohibiting Charlie from transferring or diminishing his assets including the stock.  Lenny seemed to think that this affected the viability of the restriction placed on the stock in the summer of 1998.

(Px 130 p. 1)

### (4)  Bainer Vies For Control Of The Efforts
### To Protect Flanagan's Assets

Bainer was not overly impressed with Fasano's handling of the Flanagan stock crisis, and was more than willing to let Flanagan and Prymas know that he could do a much better job in fending off the execution efforts of Plaintiffs.  According to Bainer, Fasano was "in way over [his] head in this matter."  (Px 66 p. 2; <u>see</u>, <u>also</u>, Pxs 20, 105 & 192)  Prymas and T&P, however, were still willing to do all that they could to try to prevent Flanagan's T&P stock from falling into the hands of TCC.  (Px 135 p. 2)

In a December 10, 1998 letter to Fasano, Bainer wrote:

> As for your alleged "strategy", it doesn't seem to have served Charlie very well at all.  From what I can tell, and in my opinion, there is no organized "strategy" <u>at all</u>, which is one of the reasons the current serious difficulties exist.  It was your obligation to protect Charlie from testifying in any fashion that would harm him, and arguably the Corporation.  My understanding is that he has testified before the Federal Court as recently as November 1998, that no restriction has been placed upon his stock.  It is my further understanding that a copy of his stock, without the restriction I personally typed onto it [in August 1998], was presented to the Federal Court in November 1998, as a copy of his current stock in its current form.
>
> <u>You</u> knew a restriction had been placed on that stock and purportedly allowed Charlie to harm himself by testifying in that fashion.  <u>You</u> should have protected Charlie, from himself and his lack of knowledge about

the legal system, in this regard and did not
do so.

(Px 18 p. 1, emphasis added))

In that same letter, Bainer told Fasano:

Further, that you don't see the problem with
such an arrangement, or your representing
Charlie and Judge Flanagan, with regard to
Charlie's pledging of his stock, in known
violation of the buy/sell agreement, and <u>in
an obvious attempt to frustrate the
creditors</u>, is a strong testament to the
reason Charlie finds himself in the serious
difficulty he apparently, and unfortunately,
does. Your representation of the pledgor
and pledgee in this situation is <u>strong
evidence</u> that there does exist an <u>improper
effort to defraud the creditors</u>.

(Px 18 p. 2, emphasis added))

In a follow-up letter to Fasano, Bainer stated:

With regard to your various threats of
suits, conflicts, etc., it is unfortunate
that you practice this way. The substantive
conflicts are yours. You and Charlie's
interest is now at conflict because <u>you made
a materially false and misleading
representation to the Court</u> in your November
12, 1998, pleading of "Amended Compliance"
<u>about the location and control of physical
possession of Charlie's stock</u>.

* * *

You are not going to hold Thompson & Peck,
Inc. hostage by telling me what I can or can
not do for my Client. From what I can tell,
your legal acumen is to fight with everyone
whom doesn't agree with your view of things.
It is your judgment of <u>allowing Charlie to
move the stock around</u>, instead of dealing
with the matter straight-up, which causes
him to be in the current predicament in
which he finds himself -- including a

> Federal Court Judge threatening to put him
> in Federal prison.

(Px 19 pp. 2-3, emphasis added)

A board of directors meeting of T&P was held on December 11, 1998 where Bainer made his pitch to take over the efforts to thwart Plaintiffs' ability to execute on Flanagan's Insurance Agency stock. (Pxs 185 & 122) At that meeting Flanagan, Prymas and Bainer agreed that they would work together in an effort to defeat the judgment claims of Plaintiffs. (**Px 185**) Flanagan agreed that Bainer would now be in charge of the efforts to shield Flanagan's assets from the judgment claims of Plaintiffs. (**Px 122**)

Indeed, Bainer mentioned to Flanagan and Prymas at a T&P board meeting that Bainer was concerned about the aggressiveness of Cadle's attorney, Gaide. (**Px Q ¶6**) At that board meeting, Bainer told Prymas and Flanagan that one way to get Gaide to back off Cadle's execution efforts on Flanagan's T&P stock was to come up with some way to sue Gaide. (**Id.**) It was at that time that Flanagan made reference in his notes (Px 7) to "Sue Gaide to get him out of the litigation." (**Px Q ¶6**) Shortly thereafter, upon Prymas' proposal, and in the conjunction with Bainer's representation of Flanagan in the grievance proceeding that Flanagan had commenced against Attorney Gaide, T&P executed an indemnification agreement providing that T&P would indemnify

-44-

Bainer for any claims by Cadle or its attorney, Gaide, against Bainer. (**Id**.)

    **D.**    **The Summary Judgment Evidence Shows That Fasano Provided Knowing And Substantial Assistance To Flanagan In Connection With The Secret Checking Account Scheme.**

In 1998 Flanagan owned three rental properties in Connecticut. In order to conceal his ownership of these properties, Flanagan had placed the title to these three properties in the names of two entities that he owned and controlled. (Px A(1) pp. 58 & 93-94)

Flanagan owned an 18-unit apartment building at 17 Howe Street, New Haven, Connecticut (the "Howe St. Property") which Flanagan held in the name of Howe Street Associates. In addition, Flanagan owned an office building at 2790 Whitney Avenue, Hamden, Connecticut (the "Whitney Ave. Property"), which was owned by Flanagan in the name of West Meadow Associates. Further, Flanagan owned an apartment building at 475-81 George Street, New Haven, Connecticut (the "George St. Property"), which was also held by Flanagan in the name of Howe Street Associates. (Id.; Px 177; Px H pp. 60-61)

On March 9, 1998 Judge Covello issued an injunction which prohibited Flanagan from transferring any of his assets. (Px 78 p. 7) It was Fasano's understanding that Judge Covello's injunction was intended to freeze all of Flanagan's assets. (Px C p. 45) Indeed, Fasano was of the belief that Judge Covello

was clear that Flanagan was not to move or transfer any of his assets. (Id.)  Flanagan also understood that, under Judge Covello's injunction, he was to transfer nothing, not even the family lawn mower. (Px A(1) pp. 55-56)

Obviously, Flanagan's rental income and equity from his three rental properties were covered by Judge Covello's injunction. (Px C p. 49)  As admitted by Fasano, if Flanagan had taken proceeds from a rental property and used the proceeds to either put in his own pocket or to pay third parties, that would have been a violation of Judge Covello's injunction. (Px C pp. 50-51)

On November 16, 1998 Flanagan's attorney, Fasano, represented to the Court that Flanagan had not, in fact, transferred any of his assets in violation of Judge Covello's March 9, 1998 injunction.  As represented by Fasano:

> After [the March 9, 1998] hearing, Your Honor, what you did was froze all of the assets of Mr. Flanagan, indicating that he's not to transfer any assets whatsoever, and let me assure the Court from the day that order has been received, Mr. Flanagan has not transferred any assets.

(Px 109 pp. 3-4 (emphasis added))  Fasano's representation to the Court was false.

In October of 1998 -- while the federal court injunction was still in effect -- Flanagan borrowed $94,200 against the George St. Property and placed a $94,200 mortgage on that

property (Px A(1) pp. 133-34; Px 178)  In violation of Judge Covello's injunction, Flanagan not only placed a mortgage on one of his properties, but also transferred every penny of the $94,200 in mortgage proceeds. (Px A(1) pp. 160-66)  As admitted by Flanagan's attorney, Fasano, this was a violation of Judge Covello's injunction. (Px C p. 52)

Further, based on Fasano's advice, Flanagan secretly ran the income from his rental properties through three checking accounts in the names of third parties: one in the name of MJCC Corp., which was an entity controlled by Flanagan; the second in the name of Matthew Flanagan, which was one of Flanagan's sons; and the third in the name of Jeremy Flanagan, which was another of Flanagan's sons. (Px A(1) pp. 26; 59; 60; 63-64; & 100-101; Px A(4) p. 184)  Flanagan had signatory authority on all three accounts. (Px A(1) pp. 77-78 & 219-20)

In March of 1998 Flanagan did not put his rental property income in an account in his own name because he was trying to hide that income from his creditors. (Px A(1) pp. 22-23 & 73-74) Moreover, Flanagan put the rental property income in the name of his children's checking accounts on the advice of his attorney, Fasano. (Px A(5) p. 28; Px A(1) pp. 15 & 26)

Further, on March 9, 1998 Flanagan and Fasano were ordered to prepare a computation of all income and all necessary living expenses for Flanagan, which was filed with the Court on March

17, 1998. (Px 90) This computation was supposed to include all income that Flanagan received from any source, including any rental income. (Px C pp. 187-89) The computation that Flanagan and Fasano filed with the Court, however, did not include any income from Flanagan's rental properties. (Px A(1) pp. 62-63)

The rental income hidden by Flanagan and Fasano was substantial. (Px 177; Px 55) During a two-day period in August of 1998 -- while the federal court injunction was still in effect -- Flanagan took $11,600 out of the Jeremy Flanagan account and cashed the checks. (Px A(1) pp. 153) Further, over a four-day period in August of 1998 -- again, while the March 9, 1998 injunction was still in effect -- Flanagan wrote four checks totaling $19,759, all payable to cash, with no documentation to show what Flanagan did with the money. (Px A(1) pp. 160-61)

The chart printed below shows Flanagan's activity in writing over $43,700 worth of checks to cash, to himself, to his wife, and to Socrates Babacas during the very time that this Court had enjoined Flanagan from transferring any of his assets. Fasano's November 16, 1998 assurance to the Court that Flanagan had "not transferred any assets" (Px 109 p. 4) was false.

**Checks Written By Flanagan In Violation Of Injunction**

| Date | Account | # | Amount | Signor | Payee | Px |
|---|---|---|---|---|---|---|
| 3-11-98 | MJCC Corp. | 453 | 1,575.00 | CAF | CASH | 79 |
| 3-30-98 | MJCC Corp. | 475 | 656.00 | CAF | Ch. Flanagan | 80 |
| 4-8-98 | MJCC Corp. | 485 | 90.00 | CAF | CASH | 38 |
| 4-9-98 | MJCC Corp. | 488 | 900.00 | CAF | CASH | 38 |
| 4-13-98 | MJCC Corp. | 491 | 175.50 | CAF | CASH | 38 |
| 4-14-98 | MJCC Corp. | 492 | 108.00 | CAF | CASH | 38 |
| 4-15-98 | MJCC Corp. | 505 | 90.00 | CAF | CASH | 38 |
| 4-15-98 | MJCC Corp. | 515 | 771.00 | CAF | Ch. Flanagan | 81 |
| 4-16-98 | MJCC Corp. | 507 | 233.42 | CAF | CASH | 38 |
| 4-17-98 | MJCC Corp. | 510 | 147.00 | CAF | CASH | 38 |
| 4-22-98 | MJCC Corp. | 513 | 104.00 | CAF | CASH | 38 |
| 4-30-98 | MJCC Corp. | 517 | 108.00 | CAF | CASH | 38 |
| 5-6-98 | MJCC Corp. | 526 | 1,300.00 | CAF | Lisa Flanagan | 82 |
| 5-8-98 | MJCC Corp. | 480 | 156.00 | CAF | CASH | 38 |
| 5-8-98 | MJCC Corp. | 530 | 600.00 | CAF | CASH | 83 |
| 5-8-98 | MJCC Corp. | 532 | 740.00 | CAF | Ch. Flanagan | 85 |
| 5-9-98 | MJCC Corp. | 533 | 117.00 | CAF | CASH | 86 |
| 5-11-98 | MJCC Corp. | 528 | 2,000.00 | CAF | Ch. Flanagan | 87 |
| 5-11-98 | MJCC Corp. | 534 | 200.00 | CAF | Lisa Flanagan | 88 |
| 5-13-98 | MJCC Corp. | 541 | 500.00 | CAF | Ch. Flanagan | 89 |
| 5-24-98 | Jeremy F. | 106 | 500.00 | CAF | Soc. Babacus | 9 |
| 5-27-98 | MJCC Corp. | 546 | 1,200.00 | CAF | CASH | 91 |
| 6-8-98 | MJCC Corp. | 560 | 3,000.00 | CAF | Ch. Flanagan | 38 |
| 6-19-98 | MJCC Corp. | 571 | 1,000.00 | CAF | Soc. Babacus | 10 |
| 7-27-98 | MJCC Corp. | 600 | 75.00 | CAF | CASH | 38 |
| 8-10-98 | Jeremy F. | 109 | 200.00 | CAF | Lisa Flanagan | 97 |
| 8-21-98 | Jeremy F. | 101 | 1,600.00 | CAF | Lisa Flanagan | 137 |
| 8-23-98 | Jeremy F. | 126 | 125.00 | CAF | Lisa Flanagan | 92 |
| 8-25-98 | Jeremy F. | 104 | 5,600.00 | CAF | CASH | 94 |
| 8-25-98 | Jeremy F. | 105 | 850.00 | CAF | CASH | 95 |
| 8-26-98 | Jeremy F. | 107 | 5,000.00 | CAF | CASH | 96 |
| 8-27-98 | Jeremy F. | 108 | 6,159.00 | CAF | CASH | 99 |
| 8-28-98 | Jeremy F. | 110 | 3,000.00 | CAF | CASH | 100 |
| 8-28-98 | Jeremy F. | 127 | 100.00 | CAF | Lisa Flanagan | 101 |
| 9-2-98 | Jeremy F. | 128 | 110.00 | CAF | Lisa Flanagan | 102 |
| 9-9-98 | MJCC Corp. | 629 | 3,000.00 | CAF | CASH | 38 |
| 10-8-98 | MJCC Corp. | 648 | 1,200.00 | CAF | CASH | 38 |
| 10-12-98 | Matthew F. | 94 | 500.00 | CAF | Soc. Babacus | 13 |

$43,789.92

And even worse, it was Fasano who advised Flanagan that it was perfectly acceptable to transfer the funds out of Flanagan's

nominee checking accounts even in the face of the Court's March
9, 1998 injunction.  (Px A(1) pp. 15; 26; 59-60; 64; & 100-01)
Fasano now admits, however, that any such conduct on the part of
Flanagan would, in fact, be a violation of this Court's March 9,
1998 injunction.  (Px C p. 50)

On December 14, 2002 Flanagan pled guilty to the felony of
submitting a false financial form to the IRS  (Pxs 76 & 77; Px
A(1) p. 7)  The rental properties -- and the income therefrom --
hidden from the IRS are the same rental properties previously
hidden from this Court and the Plaintiffs in the prior suit.
(Px A(1) pp. 50-51)

**E.   The Caporale Property Transfer Scheme.**

In a further attempt to delay, hinder or defraud Plaintiffs
in their efforts to collect on their judgments against Flanagan,
in November of 1998 Flanagan and his wife, Lisa Flanagan,
devised a scheme to transfer title to Flanagan's remaining
rental properties, but still receive the benefit of the rental
income from those properties.  Pursuant to this plan, Flanagan
would transfer title to his rental properties (the George St.
Property; the Howe St. Property; and the Whitney Ave. Property)
to a relative; Flanagan would then have the rental proceeds
placed in a bank account in the name of the relative; and then
Flanagan's wife would retrieve the rent checks from the P.O. box
and sign the relative's name to the checks so that the Flanagans

could cash the checks and maintain full use and benefit of the rental proceeds.  (Pxs K(1) & K(2); Px 184)

     In November of 1998 Flanagan met with Joseph Caporale ("Caporale") to discuss Flanagan's property transfer scheme. Caporale's wife is the cousin of Flanagan's wife.  At this meeting Flanagan said that he wanted to put some of his properties into Caporale's name if he (Caporale) was willing to go along with it.  Caporale agreed.  (Id.)

     Although Caporale never saw any of the rental properties, on December 4, 1998 Flanagan had his controlled business entities execute deeds to convey the George St. Property, the Howe St. Property and the Whitney Ave. Property to Caporale. Flanagan then set up a United States Post Office box in Hamden, Connecticut (near Flanagan's office) for the receipt of the monthly rent checks, and opened a joint checking account at First Union Bank in Branford, Connecticut for the deposit of the rent checks.  (Id.)

     From early 1999 until approximately October of 2000, the monthly rent checks from Flanagan's rental properties were made out, at Flanagan's direction, to Caporale and mailed by the various tenants on the various properties to the P.O. box in Hamden, Connecticut.  For one tenant alone, the monthly rent checks made out to Caporale were $1,100 per month.  (Id.)

Although these monthly rent checks were made out to Caporale and mailed to the Caporale P.O. box, Caporale never went to the P.O. box; never saw a rent check; never endorsed a rent check for deposit; never saw a monthly bank statement; and never saw or received a penny from the rents. Rather, either Flanagan or Lisa Flanagan would forge Caporale's name on the back of each rent check, and then cash or deposit the checks into this account for Flanagan's own use and benefit. (Id.)

**F.    The Summary Judgment Evidence Shows That Bainer Provided Knowing And Substantial Assistance To Flanagan In Connection With Flanagan's Bankruptcy Fraud Scheme.**

Although Flanagan had transferred, hidden or shielded his assets from the claims of Plaintiffs, Flanagan still wanted to recoup the $99,542.87 that he was forced to pay to TCC to avoid going to jail for contempt. So on February 17, 1999 Flanagan filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Connecticut in New Haven. Fasano was Flanagan's attorney in connection with Flanagan's initial bankruptcy filing (judicial notice). On December 9, 1998 Fasano told Bainer that Flanagan was not going to file bankruptcy unless Flanagan had arranged some side deal with Prymas regarding Flanagan's T&P stock. (Pxs 130 & 18 p. 2)

After his initial bankruptcy filing, Flanagan filed a bankruptcy adversary proceeding against TCC (Flanagan v. Cadle, Adversary No. 99-3053) alleging that the $99,542.87 that was

paid to TCC was a voidable preference, and thus subject to recoupment by Flanagan through §547(b) of the Bankruptcy Code. (Flanagan Answer ¶70)

In his bankruptcy schedules, Flanagan listed the false debt owed to Babacas, but did not list the alleged debt owed to Ms. Demetropoulous. Further, Flanagan did not list in his bankruptcy schedules the ownership interests that he had in the three rental properties, and falsely testified at the §341 Meeting of Creditors that he did not own any real estate. (Px 173 pp. 8 & 53) In addition, Flanagan did not list in his bankruptcy schedules the substantial rental income that he had received and was continuing to receive from the George St. Property, the Howe St. Property and the Whitney Ave. Property. (Px I ¶2) Indeed, Prymas has admitted that Flanagan has committed bankruptcy fraud. (Px O)

## IV. Plaintiffs Have Stated A Valid Conspiracy Claim Against Bainer For Violations Of §1962(d) Of RICO

### A. Plaintiffs Need Not Show That Bainer Personally Used The Mails Or Wires To Transmit A Misrepresentation

Bainer contends that Plaintiffs do not have standing to assert their RICO claims against Bainer because Bainer, himself, did not personally commit bankruptcy fraud, mail fraud or wire fraud. (Bainer Mem. pp. 3-24) What Bainer has overlooked, however, is that Plaintiffs have sued Bainer under the RICO

conspiracy statute -- 18 U.S.C. §1962(d) -- for providing knowing and substantial assistance to Flanagan in the implementation and execution of Flanagan's fraudulent plan to hide, transfer and otherwise shield Flanagan's assets from the judgment claims of Plaintiffs.

Accordingly, so long as Flanagan has engaged in a RICO substantive violation under either §1962(b) or §1962(c) -- which has not been challenged by Bainer in his summary judgment motion -- Plaintiffs have standing to sue Bainer as a RICO co-conspirator even if Bainer did not himself, personally, engage in all of the elements of bankruptcy fraud, mail fraud or wire fraud. As recently noted by the Second Circuit:

> We also note that the requirements for RICO's conspiracy charges under §1962(d) are less demanding. A "conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." Salinas v. United States, 522 U.S. 52, 65 (1997). In the civil context, a plaintiff must allege that the defendant "knew about and agreed to facilitate the scheme." Id. at 66. Baisch [the RICO plaintiff] has presented a genuine question as to [the alleged RICO co-conspirator's] knowledge of the racketeering enterprise and his willingness to promote it.

Baisch v. Gallina, 346 F.3d 366, 376-77 (2d Cir. 2003).

"The crime of mail fraud is committed when the mails are used as part of a scheme or artifice to defraud." Landry, 901

-54-

F.2d at 428, citing United States v. Margiotta, 688 F.2d 108, 121 (2d Cir. 1982). A plaintiff in a RICO case need not show that each defendant personally utilized the mails or long distance wire communications in connection with the execution of the overall fraudulent scheme. See United States v. Zichettello, 208 F.3d 72, 105-06 (2d Cir. 2000); Cadle Co. v. Schultz, 779 F.Supp. 392, 399 (N.D.Tex. 1991); Constellation Bank, N.A. v. C.L.A. Management Co., 1995 WL 42285 at *4 (S.D.N.Y. Feb 1, 1995); Morrow v. Black, 742 F.Supp. 1199, 1203-04 (E.D.N.Y.1990); Center Cadillac v. Bank Leumi Trust Company of New York, 808 F.Supp. 213, 228 (S.D.N.Y. 1992); 131 Main Street Associates v. Manko, et al., 897 F.Supp. 1507, 1530 (S.D.N.Y.1995). The exhibits submitted with Plaintiffs' Response to Defendants' Motions for Summary Judgment (see Px P(a) and, in particular, Pxs 18, 19, 23, 27, 28, 32, 56, 66, 67, 70, 72, 118, 129, 135 & 167), and the undisputed allegations in the Second Amended Complaint, show numerous instances whereby Bainer utilized the United States mails and interstate wires in furtherance of Flanagan's scheme to hide, transfer or otherwise shield the substantial assets of Flanagan from the judgment and other debt claims of the Plaintiffs.

For a mail fraud or wire fraud claim, a RICO plaintiff need only allege the connection of the defendant to the overall fraudulent scheme which, during some part thereof, involves the

use of the mail or long distance wire communications. Zichettello, 208 F.3d at 105-06. Indeed, so long as one participant in a fraudulent scheme "causes" the use of the mail or interstate telephone wires in the execution of the fraudulent scheme, all other knowing participants in the scheme are legally liable for the use of the mail or the interstate wires. Id. A defendant "causes" a use of the mail or wires when that defendant does an act knowing that the use of the mail or wires will follow in the ordinary course of business, or if the defendant reasonably could foresee that the use of the mail or wires would follow, even if the defendant did not actually intend for the use of the mail or wires to follow. Id. See, also, United States v. Amrep Corp., 560 F.2d 539, 545 (2d Cir.1977); United States v. Jones, 648 F.Supp. 225, 235 & n. 8 (S.D.N.Y.1996).

In addition, Plaintiffs have adequately alleged RICO conspiracy claims against Bainer under §1962(d). As recently noted by the Second Circuit, §1962(d) does not require proof that each co-conspirator agreed to commit two predicate acts. Zichettello, 208 F.3d at 99 n. 13. Indeed, the Supreme Court has ruled that:

> Even if [the conspirator] did not commit [two or more acts of racketeering activity], there was ample evidence that he conspired to violate [§1962](c). The evidence showed that [the primary wrongdoer] committed at least two acts of racketeering activity . . .

> . and that [the conspirator] knew about and
> agreed to facilitate the scheme.  This is
> sufficient to support a conviction under
> §1962(d).

United States v. Salinas, 522 U.S. 52, 118 S.Ct. 469, 478 (1997).  See, also, Baisch, 346 F.3d at 366-77 (citing Salinas as controlling in a civil conspiracy case under RICO).

Further, a RICO conspiracy claim can be proved if the defendant embraced the objective of the alleged conspiracy, and agreed to commit predicate acts in furtherance thereof. Zichettello, 208 F.3d at 99.  To prove a RICO conspiracy it need only be shown that the defendants know the general nature of the conspiracy and that the conspiracy extends beyond their individual roles.  Id.  In applying this analysis, a court need inquire only whether an alleged conspirator knew what the other conspirators "were up to" or whether the situation would logically lead an alleged conspirator "to suspect he was part of a larger enterprise."  Id.

In addition, there is no rule requiring that a plaintiff prove that a RICO conspirator knew of all predicate acts by insiders in furtherance of the conspiracy.  Id. at 100.  To be held liable as a RICO conspirator, a defendant need only be shown to have possessed knowledge of only the general contours of the conspiracy.  Id.  Simply, a plaintiff need not prove that a RICO conspirator-defendant agreed with every other

conspirator, or knew all of the other conspirators, or had full knowledge of all the details of the conspiracy. Id.

Further, Bainer claims that bankruptcy fraud cannot serve as a predicate act under RICO because it was Flanagan who committed the bankruptcy fraud, and not Bainer. Bainer is wrong.

The Second Amended Complaint adequately alleges the predicate act of bankruptcy fraud under RICO. See 7/3/03 Ruling on Flanagan's Motion to Dismiss p. 9. See, also, First Capital Asset Management v. Satinwood, 385 F.3d 159, 179 (2d Cir. 2004); Bankers Trust Co. v. Feldesman, 648 F.Supp. 17, 23-4 (S.D.N.Y.1986), on reargument, 676 F.Supp. 496, rev'd on other grounds, 859 F.2d 1096 (2d Cir.1988); Px 130 & Px O. While it is correct that Bainer did not, himself, personally commit each of the elements of bankruptcy fraud, it is alleged that the bankruptcy fraud by Flanagan was part of the overall fraudulent transfer scheme. Accordingly, any of the Defendants that joined the conspiracy and helped Flanagan accomplish the goals of the conspiracy would be liable for the harm caused by the predicate acts committed by the other conspirators.

As noted by Judge Buchmeyer in a very similar case:

> Under RICO, one co-schemer is liable for the other co-schemers' predicate acts. Indeed, upon joining a fraudulent conspiracy, each defendant becomes liable for the prior conduct of the earlier conspirators, and

> remains liable for the subsequent conduct of
> the other conspirators.

Cadle Co., 779 F.Supp. at 400.  Further, the Supreme Court has recently ruled:

> Under our interpretation, a plaintiff could,
> through a [RICO] §1964(c) [civil damage]
> suit for a violation of §1962(d), sue co-
> conspirators who might not themselves have
> violated one of the substantive provisions
> of §1962.

Beck v. Prupis, 529 U.S. 494, 506-07 (2000).

Next Bainer contends that Plaintiffs have not proved their mail fraud allegations because there was "no evidence that what was represented by Bainer in his letters was false."  (Bainer Mem. p. 18)  Plaintiffs need not, however, show that a mailing in furtherance of an overall fraudulent scheme itself contained a misrepresentation.

For a mail fraud or a wire fraud allegation[2], a Plaintiff need not plead or prove that the mailing or interstate wire communications, in and of themselves, contained any misrepresentations.  See Carpenter v. United States, 484 U.S. 19, 27 (1987); Baisch, 346 F.3d at 374; Cadle Co., 779 F.Supp. at 400 (citing cases at n. 50). Rather, all that is necessary is that the mail or interstate telephone lines be a part of the

---

[2]     The elements necessary to establish violations of the mail fraud and wire fraud statutes are essentially identical; hence, courts apply identical analyses to both statutes.  See Ideal Steel Supply Corp. v. Anza, 373 F.3d 251, 257 (2d Cir.2004); Cadle Co., 779 F.Supp. at 399 n. 37.

execution of the overall fraudulent scheme. <u>See Schmuck v. United States</u>, 489 U.S. 705, 710-12 (1989); <u>see</u>, <u>also</u>, <u>United States v. Finney</u>, 714 F.2d 420, 423 (5th Cir.1983); <u>United States v. Green</u>, 494 F.2d 820, 823-24 (5th Cir.1974); <u>Sun Savings</u>, 825 F.2d at 196. Accordingly, even "'innocent' mailings -- ones that contain no false information -- may supply the mailing element." <u>Schmuck</u>, 489 U.S. at 715. Further, whether the Defendant's use of the mail and interstate wires was part of an overall fraudulent scheme "<u>is a question of fact inappropriate for resolution before trial</u>." <u>R.A.G.S. Couture</u>, 774 F.2d at 1354-55. <u>See</u>, <u>also</u>, <u>United States v. Lane</u>, 474 U.S. 438, 452-53 (1986); <u>United States v. Tony</u>, 598 F.2d 1349, 1353-54 (5th Cir.1979).

Finally, a plaintiff does not have to prove full knowledge of all of the details of the conspiracy, but only that each defendant was aware of the general nature of the conspiracy and that the conspiracy extended beyond the defendant's individual role. <u>Zichettello</u>, 208 F.3d at 99. <u>See</u>, <u>also</u>, <u>Baisch</u>, 346 F.3d at 376-77. The summary judgment evidence shows that there was a conspiracy orchestrated by Flanagan to hide, transfer and otherwise shield his assets from the judgment claims of Plaintiffs (<u>see</u> §III above), and that it was foreseeable for the United States mails and interstate wire communications to be used in connection with that scheme. As in <u>Baisch</u>, Plaintiffs

have presented a genuine question as to Bainer's knowledge of
the racketeering enterprise and his willingness to promote it.
See Baisch, 346 F.3d at 374. Accordingly, Bainer's motion for
summary judgment should be denied.

Taking all of Plaintiffs' evidence as true, a jury could
find that Bainer knowingly took part with Flanagan in Flanagan's
RICO scheme to hide, transfer or otherwise shield his assets
from the judgment claims of Plaintiffs. See Ricciuti v. N.Y.C.
Transit Authority, 124 F.3d 123, 131 (2d Cir. 1997). A jury
which so found might rationally infer that Flanagan and Bainer
were jointly involved in a common scheme -- a conspiracy to
hide, transfer or otherwise shield Flanagan's assets from the
judgment claims of Plaintiffs. Id. If so, a jury could assign
responsibility to Bainer for acts taken by Flanagan in
furtherance of the conspiracy. Id.

Bainer also contends that Plaintiffs have "failed to plead
bankruptcy fraud with the particularity as required under
Fed.R.Civ.P. 9(b). (Bainer Mem. p. 15) Bainer, once again, is
wrong. As noted by the Court in its July 3, 2003 ruling on
Flanagan's motion to dismiss:

> The allegations in this case are that
> Flanagan fraudulently transferred a portion
> of his assets to others prior to filing
> bankruptcy and that he did so in order to
> keep those assets out of the bankruptcy
> estate and away from his creditors. The
> second amended complaint further alleges
> that Flanagan filed false bankruptcy

> accounts in connection with his Title 11
> proceeding. Taken as true, these
> allegations are sufficient to establish that
> Flanagan engaged in racketeering activity
> for purposes of RICO.

(7/3/03 Ruling on Flanagan's Motion to Dismiss p. 9)  Plaintiffs have plead their bankruptcy fraud claims with sufficient particularity to put the Defendants on fair notice of the nature of Plaintiffs' claims.  See Quaknine v. MacFarlane, 897 F.2d 75, 79 (2d Cir.1990); Update Traffic Systems v. Gould, et al., 857 F.Supp. 274, 281 (E.D.N.Y.1994); Center Cadillac v. Bank Leumi Trust Company of New York, 808 F.Supp. 213, 228 (S.D.N.Y.1992); Corwin v. Marney, Orton Investments, 788 F.2d 1063, 1068 n. 4 (5th Cir.1986); Cadle Co., 779 F.Supp. at 396.

**B.  For A RICO Fraudulent Transfer Case, Plaintiffs Need Not Allege Detrimental Reliance On Any Alleged Misrepresentations**

Bainer also contends that Plaintiffs cannot prove their mail fraud and wire fraud allegations against him because Plaintiffs cannot show that they relied to their detriment on any misleading mail or wire communications that were provided by Bainer to Plaintiffs.  (Bainer Mem. pp. 18-24)  Bainer, however, has overlooked the recent Second Circuit decision in Ideal Steel which held that if the RICO plaintiff was the intended target of the defendant's racketeering activity, the RICO plaintiff need not show that it detrimentally relied on any misleading mailings or interstate wire communications by the

defendants.   373 F.3d at 254 & 256.   As noted by the Second
Circuit:

> [T]he principle governing the present case
> is that where a complaint contains
> allegations of facts to show that the
> defendant engaged in a pattern of fraudulent
> conduct that is within the RICO definition
> of racketeering activity and that was
> intended to and did [cause harm to the
> plaintiff], the complaint adequately pleads
> proximate cause, and the plaintiff has
> standing to pursue a civil RICO claim.

Id. at 263.

 In Summit Properties Inc. v. Hoechst Celanese Corp., 214
F.3d 556 (5th Cir.2000) the Fifth Circuit stated the general
rule (cited by the Defendants) that

> when civil RICO damages are sought for
> injuries resulting from fraud, a general
> requirement of reliance by the plaintiff is
> a commonsense liability limitation.

Id. at 562.

 The Fifth Circuit in Summit Properties also recognized the
exception to the general rule (as exists here) where a plaintiff
need not allege or prove detrimental reliance on any alleged
misrepresentation:

> [I]n Holmes [v. Securities Investor
> Protection Corp., 503 U.S. 258, 112 S.Ct.
> 1311, 117 L.Ed. 2d 532 (1992)], the Court
> left open the possibility that the customers
> of an insolvent brokerage might recover
> under RICO for losses stemming from a series
> of fraudulent brokerage transactions despite
> the fact that those customers did not in any
> sense "rely" on a misrepresentation.   See
> 503 U.S. at 272 n. 19, 112 S.Ct. 1311.

> In that situation, the fraudulent brokerage transactions imposed immediate risks on the brokerage's customers by increasing the likelihood of the brokerage's insolvency, even if the conspirators did not intend such risks to fall on those customers through their sham transactions.

Summit Properties, 214 F.3d at 561 n. 22.  The Fifth Circuit then went on to note:

> Nevertheless, when an action poses a high and foreseeable risk on a third party, we may view the resulting injury as deliberate for the purpose of liability. . . . In that sense, the brokerage customers [in Holmes] may be seen as direct and contemporaneous victims of the fraudulent scheme and within the scope of the already noted exception.

Id.

This RICO-fraudulent transfer case is the type of case that falls squarely within the exception noted in Holmes and confirmed by the Fifth Circuit in Summit Properties.  Here the risk of injury to Plaintiffs did arise as a direct and contemporaneous result of the Defendants' fraudulent conduct.  Indeed, Plaintiffs were the intended target and intended victims of the Defendants' fraudulent transfer scheme.  See Baisch, 346 F.3d at 374-75.

Accordingly, for this RICO fraudulent transfer case, Plaintiffs need not allege or prove detrimental reliance on any alleged misrepresentations made by Bainer in his various mailings.  Therefore, Bainer's Motion for Summary Judgment should be denied.

C.  **Plaintiffs Need Not Show That Bainer Personally Benefited From His Wrongful Conduct**

In addition, Bainer argues that Plaintiffs cannot state a RICO claim against him because Bainer, supposedly, did not benefit from Flanagan's fraudulent scheme to hide, transfer or otherwise shield Flanagan's assets from the claims of Plaintiffs.  (Bainer Mem. pp. 22-23)  The Supreme Court, however, has ruled that RICO liability can be imposed against a co-conspirator even if the co-conspirator did not personally benefit from the wrongful conduct.  See National Organization for Women, Inc. v. Scheidler, 510 U.S. 249 (1994).

D.  **Summary Judgment Is Not Appropriate On The Question Of Interstate Wire Communications**

Further, Bainer contends that Plaintiffs' wire fraud allegations are inadequate because Plaintiffs failed to allege that the wire communications between Fasano and Bainer crossed state lines.  (Bainer Mem. p. 25)  The unchallenged allegations in the Second Amended Complaint, however, show interstate wire communications (2AC ¶80.3), and Bainer has failed in his burden to show that the wire communications did not, in fact, cross state lines.  See Ideal Steel, 373 F.3d at 265.  Accordingly, summary judgment is not appropriate on the question of interstate wire communications.  (Id.)

E.  **Plaintiffs Have Standing Under §1962(b)**

Next Bainer alleges that Plaintiffs do not have standing under §1962(b) because Plaintiffs supposedly have not established an "acquisitional" injury to themselves from Bainer's wrongful conduct. (Bainer Mem. pp. 25-27) Bainer is wrong.

First, for Plaintiffs' RICO conspiracy claims against Bainer under §1962(d), Plaintiffs need not show that Bainer, himself, personally engaged in conduct in violation of §1962(b). See Beck, 529 U.S. at 506-07. See, also, United States v. Persico, 832 F.2d 705, 714 (2d Cir. 1987); DeFalco, 244 F.3d at 306. And second, Plaintiffs have in fact shown an injury stemming from the acquisition or maintenance of control over Flanagan's financial empire -- the §1962(b) enterprise -- and not simply injuries resulting from the commission of the underlying predicate acts. (Px L ¶8; Px 175; Px H)

F.    **Plaintiffs Have Standing Under §1962(c)**

Bainer contends that he cannot be held liable for RICO violations because he simply acted as an attorney providing legal advice to his client, T&P. (Bainer Mem. pp. 28-30) Bainer is wrong.

Bainer does not cite any summary judgment evidence to support his argument. Indeed, the summary judgment evidence, shows that Bainer acted as a co-conspirator and provided illegal advice to the fellow members of that conspiracy. See Gutierrez

-66-

<u>v. Givens</u>, 989 F.Supp. 1033, 1047-48 (S.D. Cal. 1997)  As noted

by this Court in connection with Bainer's Motion for

Reconsideration:

> While the court agrees with the defendant
> that an attorney violates no rule of law by
> simply providing legal advice and services
> to his clients, the amended complaint
> alleges conduct going far beyond that of
> simply furnishing legal services. In
> particular, the amended complaint alleges
> that Bainer was a member of an <u>association-
> in-fact</u> constituting the RICO enterprise
> (amended complaint at ¶82.2) and in this
> capacity: (1) <u>willfully</u> <u>disobeyed</u> the
> court's property turn-over order and
> organized to keep certain stock certificates
> beyond the reach of the court; (2) <u>knowingly</u>
> <u>misrepresented</u> to the court that certain
> settlement proceeds belonging to Flanagan
> were wages and hence beyond the reach of
> creditors; and (3) participated in a
> <u>fraudulent</u> <u>scheme</u> to transfer Flanagan's
> assets for the purpose of defeating the
> claims of creditors. In the court's view,
> the alleged conduct crosses the line from
> providing legal services to conducting,
> operating and conspiring with an alleged
> RICO enterprise. . . .  Further, the court
> is of the opinion that the amended complaint
> sufficiently alleges that Bainer
> participated in a pattern of racketeering
> activity involving mail fraud and wire
> fraud.

(May 16, 2002 Order)

The summary judgment evidence outlined in §III above, and

the reasonable inferences therefrom, prove Plaintiffs' RICO

conspiracy allegations against Bainer that Bainer did, indeed

(1) willfully disobey the Court's property turn-over order and

organize to keep certain stock certificates beyond the reach of

the Court. (Px Q ¶¶4-7; Px 72 p. 2 & Pxs 18, 19, 23, 27, 28, 32, 56, 66, 67, 70, 118, 129, 135 & 167) (2) knowingly misrepresented to the Court that certain settlement proceeds belong to Flanagan were wages and hence beyond the reach of creditors (Px 75 p. 2; Px 72 p. 2 & Pxs 18, 19, 23, 27, 28, 32, 56, 66, 67, 70, 118, 129, 135 & 167) and (3) participate in a fraudulent scheme to transfer Flanagan's assets for the purpose of defeating the claims of creditors. (Px 72 p. 2 & Pxs 18, 19, 23, 27, 28, 32, 56, 66, 67, 70, 118, 129, 135 & 167) Accordingly, Plaintiffs have presented sufficient facts to show a genuine question as to Bainer's knowledge of the racketeering enterprise and his willingness to promote it. <u>See</u> <u>Baisch</u>, 346 F.3d at 376-77. Therefore, Bainer's Motion for Summary Judgment should be denied.

### G.   <u>Plaintiffs Have Standing Under §1962(d)</u>

In addition, Bainer claims that since Plaintiffs do not have a §1962(b) or §1962(c) claim against Bainer, Plaintiffs cannot assert a RICO conspiracy claim against Bainer under §1962(d). Bainer, again, is wrong.

Plaintiffs have asserted -- and Bainer has not contested -- valid claims against Flanagan for violations of §1962(b) and §1962(c). As noted by this Court

> The second amended complaint alleges that Flanagan and others willfully and knowingly committed various acts over a period of time in order the defraud Flanagan's creditors.

> As addressed previously, it also adequately
> alleges that Flanagan's acts constituted a
> pattern of racketeering activity.  Finally,
> the second amended complaint alleges that
> Flanagan was the lead conspirator in the
> entire scheme and that he and the other
> defendants agreed to shield his assets.
> Examining the second amended complaint in
> its entirety and viewing the facts in a
> light most favorable to the plaintiffs, the
> second amended complaint adequately alleges
> a civil RICO conspiracy under §1962(d).

(7/3/03 Ruling pp. 23-24)  Further, the Supreme Court has ruled

that:

> a [RICO] plaintiff could, through a [RICO]
> §1964(c) [civil damage] suit for a violation
> of §1962(d), sue co-conspirators who might
> not themselves have violated one of the
> substantive provisions of §1962.

Beck, 529 U.S. at 506-07.  Accordingly, Bainer's Motion for

Summary Judgment should be denied.

### H.    Plaintiffs Have Adequately Alleged And Proved The Requisite Pattern Of Racketeering Activity

The pattern requirement under RICO was thoroughly discussed

by this Court in its 7/3/03 Ruling on Flanagan's Motion to

Dismiss. (Id. pp. 14-18)  In that Ruling, the Court concluded

that:

> The second amended complaint alleges that
> several persons, including friends, family
> members and various legal entities allegedly
> created by Flanagan, schemed together to
> defraud various financial institutions.  The
> predicate acts supporting this scheme took
> place over several years, but within a ten-
> year period.  Viewing the second amended
> complaint in a light most favorable to the

          plaintiffs, it sufficiently alleges closed-ended continuity by setting forth a series of related predicate acts extending over a substantial period of time that was within the statutory time frame. The second amended complaint also alleges that the "continuing custodianship" of Flanagan's assets involves "a distinct threat of repetition continuing indefinitely into the future" since the enterprise is "dedicated to hiding and shielding and continuing the custodianship of Flanagan's assets." Taken as true and drawing all reasonable inferences therefrom, the second amended complaint sufficiently alleges open-ended continuity. Consequently, under either rationale, the second amended complaint adequately sets forth a pattern of racketeering activity as defined in §1961(5).

(7/3/03 Ruling pp. 18-19) None of the Defendants have challenged, by summary judgment motion, Plaintiffs' RICO allegations against Flanagan. Accordingly, Plaintiffs' RICO allegations against Flanagan remain disputed factual matters to be resolved upon the evidence introduced at trial. See Landry, 901 F.2d at 426, 430 & 431.

Bainer contends that Plaintiffs cannot demonstrate the existence of a RICO pattern of wrongful conduct because his individual actions, standing alone, are not sufficiently related, and his individual conduct does not constitute either closed-ended continuity or open-ended continuity. Bainer is wrong.

First, the focus for a RICO conspiracy claim against Bainer under §1962(d) is not limited to his individual conduct, but rather on the pattern of wrongful conduct practiced by the entire group of co-conspirators. See Beck, 529 U.S. at 506-07; United States v. Persico, 832 F.2d 705, 714 (2d Cir. 1987); DeFalco, 244 F.3d at 306.

Further, Bainer has not challenged the fact that Flanagan's conduct is sufficiently related and constitutes both closed-ended continuity and open-ended continuity, as found by this Court in its 7/3/03 Ruling. (Id. pp. 14-18) Accordingly, the relatedness of Flanagan's conduct and the continuity of that conduct remain disputed factual matters to be resolved upon the evidence introduced at trial. See Landry, 901 F.2d at 426, 430 & 431.

Finally, the summary judgment evidence shows the existence of not only related wrongful conduct, but also closed-ended continuity and open-ended continuity to meet the pattern requirement under RICO. (See Chronology of Predicate Acts attached hereto as Px P(a)) Accordingly, the jury would be justified in finding that the pattern requirement of RICO has been met.

(1)  **The Predicate Acts Are Sufficiently Related**

In Cosmos Forms Ltd. v. Guardian Life Insurance Co., 113 F.3d 308, 310 (2d Cir. 1997) the Second Circuit ruled:

-71-

> We reverse [summary judgment for the defendants] because the record presents disputed issues of material fact concerning the existence of a RICO pattern.
>
> * * *
>
> There is evidence in this case tending to show that the acts were not sporadic or isolated . . .. Evidence indicates that the purposes, results, participants, and methods of commission of the alleged acts are the same.

Here, the summary judgment evidence shows that the predicate acts/wrongful conduct of the Defendants were related in the sense that they involved the same or similar purposes, results, participants, victims and methods of commission, and did not involve isolated or sporadic events. (See Px P(a)) Moreover, the summary judgment evidence outlined in §III above shows that the relatedness element of a RICO pattern has been met in this case. First, all of the predicate acts were aimed at achieving a single goal -- to hide, transfer or otherwise shield Flanagan's assets from the judgment claims of Plaintiffs. Second, the participants were the same: Flanagan and his co-conspirators, Fasano, Bainer, Prymas and T&P. Third, the victims were the same: the Plaintiffs herein. Finally, the schemes and predicates were in no way isolated, but rather were related in the sense that they all occurred or commenced during or grew out of the process of Flanagan's efforts to hide, transfer or otherwise shield his assets from the judgment claims

of Plaintiffs.  See Landry, 901 F.2d at 433.  Accordingly, Plaintiffs have shown that the racketeering predicates are sufficiently related to support the RICO claims in this case. See H.J., 492 U.S. at 240; Handeen, 112 F.3d at 1353; Cadle Co., 779 F.Supp. at 398 nn. 32-33; Landry, 901 F.2d at 433; George v. Blue Diamond Petroleum, Inc., 718 F.Supp. 539, 551 (W.D.La.1999).

### (2)  Plaintiffs Have Adequately Shown Continuity

Further, Plaintiffs have adequately alleged both open-ended continuity (short term related wrongful conduct with a threat of continuing into the future) and closed-ended continuity (long-term related wrongful conduct over a fixed and closed period of time).  As noted by the Second Circuit in Cosmos in reversing summary judgment in favor of the RICO defendants:

> A relationship to show the existence of a
> pattern is indicated by temporal proximity
> of the acts, by common goal, methodology,
> and their repetition . . .. The requirement
> of continuity is met since the unlawful acts
> recurred with regularity over at least
> fifteen months, and the open-ended activity
> stopped only when [the plaintiffs started to
> investigate the defendants' conduct].

115 F.3d at 310.  Further, other factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes, are also relevant in determining whether closed-ended continuity exists.  See GICC Capital Corp. v. Technology Fin. Group, Inc., 67 F.3d 463, 467

(2d Cir. 1995).  Upon trial, the jury would be justified in finding both closed-ended and open-ended continuity. (See Px P(a))

In addition to proving that the RICO defendants engaged in interrelated wrongful conduct, "[t]o establish a RICO pattern it must be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, continuing racketeering activity." H.J., 492 U.S. at 240 (emphasis added).  The continuity requirement for a RICO claim can be met by introducing evidence to show (a) long term related wrongful conduct; or (b) short term related wrongful conduct which poses a threat of continuing wrongful activities.  Id.  For short term wrongful conduct, a threat of continuing wrongful activities can be shown either through (i) the nature of certain kinds of wrongful acts; or (ii) the nature of certain kinds of business enterprises.  Id. at 242-43.  See, also, Akin v. Q-L Investments, Inc., 959 F.2d 521, 533 (5th Cir.1992); United States v. Busacca, 936 F.2d 232, 237-38 (6th Cir.1991).

For short term wrongful activities (i.e., covering only "a few weeks or months", H.J., 492 U.S. at 242), a RICO plaintiff must show, in addition to the related wrongful conduct, the threat of continuing wrongful activities.  Id.  This threat of continuing wrongful activities can be shown either through the

nature of the wrongful acts themselves, or through the nature of the business enterprise.  <u>Id</u>. at 242-43.

As made clear by the Supreme Court in <u>H.J</u>., the nature of certain predicate acts themselves may pose the threat of continuing wrongful activities:

> A RICO pattern may surely be established if the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit. . . . Though the number of related predicates involved may be small and they may occur close together in time, the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future, and thus supply the requisite threat of continuity.

492 U.S. at 242.

In addition, the very nature of Flanagan's past wrongful conduct poses a distinct threat of continuing wrongful conduct. <u>See</u> <u>Busacca</u>, 936 F.2d at 237-38.  Further, here the allegations of mail fraud, wire fraud and bankruptcy fraud in connection with the fraudulent transfers and "<u>continuing custodianship</u>" of Flanagan's assets (2AC ¶82.2) involve a distinct threat of repetition continuing indefinitely into the future, and thus supply the requisite threat of continuity.  <u>H.J</u>., 492 U.S. at 242.  Although the wrongful acts of the Defendants constitute long-term related wrongful conduct, the nature of the wrongful acts themselves also pose a threat of long-term wrongful conduct.  Thus under the pleadings and the summary judgment

evidence, Plaintiffs will be able to prove facts sufficient to meet the continuity requirement of a RICO pattern.  See H.J., 492 U.S. at 250; Landry, 901 F.2d at 426.

Even if the nature of the wrongful acts themselves do not pose a threat of long term wrongful activities, the threat of continuity may be established by showing the relationship of the predicate acts to the nature of the defendant's business enterprise.  In addition to showing the nexus between the predicate acts and the more traditional criminal enterprise,

> [t]he continuity requirement is likewise satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes), or of conducting or participating in an ongoing and legitimate RICO "enterprise".

H.J., 492 U.S. at 243.

In DeFalco the RICO defendants contended that "the alleged scheme . . . was inherently finite and therefore did not pose a threat of repetition."  214 F.3d at 323.  The Second Circuit disagreed:

> [T]he record reveals sufficient evidence from which a reasonable jury could infer that the nature of the predicate acts committed by the . . . defendants implied a threat of continued criminal activity.
>
> * * *
>
> In assessing whether or not the plaintiff has shown open-ended continuity, the nature of the RICO enterprise and the predicate

> acts are relevant. . . . Where an
> inherently unlawful act is performed at the
> behest of an enterprise whose business is
> racketeering activity, there is a threat of
> continued criminal activity, and thus open-
> ended continuity.

DeFalco, 244 F.3d at 323.  As in DeFalco, the nature of the

enterprise in this case involves inherently unlawful activities.

Indeed, as noted by this Court:

> The second amended complaint also alleges
> that the "continuing custodianship" of
> Flanagan's assets involves "a distinct
> threat of repetition continuing indefinitely
> into the future" since the enterprise is
> "dedicated to hiding and shielding and
> continuing the custodianship over Flanagan's
> assets."  Taken as true and drawing all
> reasonable inferences therefrom, the second
> amended complaint sufficiently alleges open-
> ended continuity.

(Ruling pp. 17-18)

Under the pleadings and the summary judgment evidence (see

§III above), a threat of continuing wrongful activities could be

established at trial by showing that the predicate acts

committed by Flanagan and the other Defendants were a regular

way of conducting or participating in the conduct of the RICO

enterprise, the association-in-fact enterprise dedicated to the

purpose of hiding and shielding and continuing the custodianship

over Flanagan's assets.  See H.J., 492 U.S. at 250. Simply,

under the pleadings, the summary judgment evidence, and the

teachings of the Supreme Court in H.J., Plaintiffs will be able

to prove the existence of a threat of continuing wrongful

activities by Flanagan and the other Defendants. See id.; Akin, 959 F.2d at 533; Ticor Title Ins. Co. v. Florida, 937 F.2d 447, 450-51 (9th Cir.1991); Ikuno v. Yip, 912 F.2d 306, 309-19 (9th Cir.1990).

Further, continuity is a prospective determination, made at the time of the wrongful conduct, not in hindsight after the Defendants have gotten caught. Cosmos, 113 F.3d at 310; Busacca, 936 F.2d at 238; Morrow v. Black, 742 F.Supp. 1199, 1207 (E.D.N.Y.1990). As stated by the court in Busacca:

> An analysis of the threat of continuity cannot be made solely from hindsight. All racketeering activity must necessarily come to an end sometime. The lack of a threat of continuity of racketeering activity cannot be asserted merely by showing a fortuitous interruption of that activity such as by an arrest, indictment or guilty verdict.
>
> Rather, in the context of an open-ended period of racketeering activity, the threat of continuity must be viewed at the time the racketeering activity occurred.

936 F.2d at 238. See, also, DeFalco v. Bernas, 244 F.3d 286, 323 (2d Cir.2001); Azrielli v. Cohen Law Offices, 21 F.3d 512, 521-22 (2d Cir.1994); First International Advisors, 956 F.Supp. at 486; Welch Foods, Inc. v. Moran, 1996 WL 107130 at *6 (W.D.N.Y. Mar. 6, 1996); Morrow v. Black, 742 F.Supp. 1199, 1207 (E.D.N.Y. 1990).

Moreover, at the time the Defendants were assisting Flanagan with his fraudulent transfer scheme and aiding with the

"continuing custodianship" over Flanagan's assets (2AC ¶82.2), Flanagan had no intention of stopping even if he had met some intermediate goal.  See DeFalco, 244 F.3d at 323-24.  Indeed, the Bainer letters threatening a grievance against Plaintiffs' attorneys (2AC ¶63; Pxs 27, 28 & 29) -- which were part of an attempt to intimidate Plaintiffs' attorneys from investigating Flanagan's fraudulent transfers -- continued not only to February of 1999, but continued even after the filing of this suit.  (See Pxs 31 & 32 & Px Q ¶6))  See Tabas v. Tabas, 47 F.3d 1280, 1296 (3d Cir.1995).

Further, Flanagan's bankruptcy filing was a further step in the plot.  (2AC ¶¶70-72)  In addition, the hiding of Flanagan's rental property income continued to at least until October of 2000.  (2AC ¶68)  Also, with the multiple schemes, multiple predicate acts, multiple participants and multiple victims as alleged in the Second Amended Complaint, closed-ended continuity can be shown even if the predicate acts were only committed over a relatively short period of time.  See Azrielli, 21 F.3d at 521; Metromedia Company v. Fugazy, 983 F.2d 350, 369 (2d Cir.1992); Barsam v. Pure Tech Int., Inc., 864 F.Supp. 1440, 1450 (S.D.N.Y.1994).

Moreover, while Flanagan's bankruptcy filing may, at this time, prohibit Plaintiffs from claiming damages from Flanagan's pre-petition wrongful conduct, his bankruptcy filing does not

serve to erase the _evidentiary_ _impact_ of Flanagan's prior fraudulent conduct in order to show that Flanagan engaged in the requisite "pattern" of wrongful activities.    Simply, the existence of a RICO pattern is an evidentiary issue which can be proved by showing that Flanagan and the other Defendants engaged in interrelated wrongful conduct of a sufficiently continuous nature, even is some of the predicate acts did not necessarily cause injury or harm to the plaintiff.    Marshall & Isley Trust Co. v. Pate, 819 F.2d 806, 809-10 (7th Cir. 1987).    See, also, Bankers Trust, 859 F.2d at 1103; Turkish v. Kasenetz, 27 F.3d 23, 27-28 (2d Cir. 1994); Jones v. Childers, 18 F.3d 899, 913-14 (11th Cir. 1994); Ticor Title Ins. Co. v. Florida, 937 F.2d 447, 450-451 (9th Cir. 1991).

The RICO statute authorizes a civil suit for damages by "[a]ny person injured in his business or property by reason of a violation of [§1962]." 18 U.S.C. §1964(c).    In order to prevail, a RICO plaintiff must prove (1) that there was a pattern of wrongful conduct in violation of §1962 and (2) that the plaintiff was injured by reason of a violation of §1962. Marshall & Isley Trust, 819 F.2d at 809-10.    By its statutory terms, under RICO there is a difference between proof of a _pattern_ of wrongful conduct by the defendant over a 10-year period of time (as permitted under 18 U.S.C. §1961(5)), and proof that some of the defendant's wrongful conduct proximately

-80-

caused plaintiff's damages.  <u>Marshall & Isley Trust</u>, 819 F.2d at 809-10.   Therefore,  in  establishing  that  the  defendant's wrongful acts are "related" and sufficiently "continuous" to constitute a RICO "pattern", a plaintiff is not limited in his proof to predicate acts that caused injury or harm to the plaintiff.  <u>Id</u>. <u>See</u>, <u>also</u>, <u>Zervas v. Faulkner</u>, 861 F.2d 823, 833 (5th Cir. 1988).

Accordingly, in proving that Flanagan engaged in a RICO pattern of wrongful conduct, Plaintiffs will be able to show that Flanagan engaged in numerous inter-related predicate acts over a 10-year period of time (18 U.S.C. §1961(5)), even if some of the prior wrongful conduct predated Flanagan's bankruptcy filing and did not necessarily cause the injury or harm that is at issue in this case.  <u>Cf</u>. <u>Kenworthy v. Conoco, Inc.</u>, 979 F.2d 1462, 1467-68 (10th Cir. 1992) (prior settlement did not bar the jury's consideration of pre-release conduct in determining the defendant's violations of the Federal Wage Act for the claim at issue).

Finally, the determination of a RICO "pattern" is a question of fact for resolution by the trier of fact.  <u>See</u> <u>Handeen</u>, 112 F.3d at 1353; <u>Landry</u>, 902 F.2d at 426 & 433; <u>Brant v. Schal Associates, Inc</u>., 854 F.2d 948, 952 (7th Cir.1988); <u>George</u>, 718 F.Supp. at 551.  Here the jury would be justified in finding a RICO pattern.  (<u>See</u> the facts summarized in §III above

-81-

& Px P(a))   Accordingly, Bainer's Motion for Summary Judgment should be denied.

## Conclusion

Flanagan and the other Defendants have gotten caught in a complicated and sophisticated fraudulent transfer scheme designed to shield Flanagan's assets from the judgment claims of Plaintiffs.   While this is not the first case to pursue fraudulent transfer co-conspirators under RICO[3], the vigorous prosecution of this case to a final judgment just might help slow down the proliferation of fraudulent transfers.

The RICO statute was enacted to provide new remedies for old problems that had, for whatever reason, slipped (or slithered) between the cracks in the law.   As noted by the Second Circuit, Congress enacted RICO

> to deal with a broadly based, deeply rooted problem by establishing new prohibitions, enhanced sanctions, and new remedies to deal with the activities of those engaged in illegal practices.

Bankers Trust, 859 F.2d at 1103.   The facts surrounding Flanagan's fraudulent transfer scheme, as implemented by the Defendants and as detailed in the Second Amended Complaint and

---

[3]    See Handeen v. Lemaire, 112 F.3d 1339 (8th Cir.1997); Stochastic Decisions, Inc. v. DiDomenico, 995 F.2d 1158 (2d Cir.1993); Bankers Trust Company v. Rhoades, 859 F.2d 1096 (2d Cir.1988); Gutierrez v. Givens, 989 F.Supp. 1033 (S.D.Cal.1997); and Cadle Co. v. Schultz, 779 F.Supp. 392 (N.D.Tex.1991).

as unearthed during discovery, are tailor-made for prosecution under RICO.

Based on the foregoing, Plaintiffs respectfully request that the Court overrule Bainer's Motion for Summary Judgment and permit this important case to proceed to trial.

Respectfully submitted,
ARMSTRONG LAW FIRM

DATED: April 18, 2005.       By_____/s/_____
F. Dean Armstrong
Ct. Fed. Bar #CT22417
1324 Dartmouth Road
Flossmoor, IL 60422
(708) 798-1599
Fax (708) 798-1597

Edward C. Taiman, Esq.
SABIA & HARTLEY, LLC
190 Trumbull Street
Suite 202
Hartford, CT 06103-2205
(860) 541-2077
Fax (860) 713-8944

Attorneys for Plaintiffs
The Cadle Company and
D.A.N. Joint Venture,
A Limited Partnership

## Certificate of Service

I certify that a correct copy of the foregoing instrument was faxed and mailed on April 18, 2005 to all defense counsel as shown on the attached Service List.


F. Dean Armstrong