UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| THE CADLE COMPANY, et al., | § | No. 3:01CV531(AVC) |
| Plaintiffs, | § | |
| vs. | § | |
| ~~CHARLES A. FLANAGAN, et al.,~~ | § | |
| Defendants. | § | |

### AFFIDAVIT OF CHARLES A. FLANAGAN

My name is Charles A. Flanagan. I am over the age of 21, fully competent to make this affidavit, and personally acquainted with the facts as set forth herein. I believe in the obligation of an oath. If called as a witness upon the trial of this case, I could and would testify as follows:

1. I have previously provided truthful testimony about the role of my prior attorney, Leonard A. Fasano ("Fasano"), as to (a) the characterization of the $75,000 settlement proceeds; (b) the placement and use of my rental proceeds income in checking accounts in the names of my minor children and in the name of MJCC Corp.; and (c) the transfer of my 50% stock interest in Thompson & Peck, Inc. ("T&P").

2. There is, however, additional information within my personal knowledge about the role of Todd R. Bainer ("Bainer") and Stanley F. Prymas ("Prymas") in the transfer of my T&P stock and the characterization of the $75,000 settlement proceeds.



3. In early 1998 Cadle, through its attorney, Paul Gaide ("Gaide"), was engaged in extensive efforts to execute on my T&P stock toward satisfaction of numerous judgments that Cadle held against me. On or about March 9, 1998 Judge Covello issued an injunction prohibiting me from transferring any of my assets, and on or about April 13, 1998 Judge Covello issued a turnover order against me and T&P. Bainer and Prymas were informed of both Judge Covello's injunction and Judge Covello's turnover order. In short, both Bainer and Prymas were aware of Cadle's efforts to execute on my T&P stock as well as any other assets I might acquire including my settlement proceeds in the amount of $75,000.

4. The issue of Cadle's execution efforts was discussed on numerous occasions at T&P's board (auxiliary committee) meetings. Bainer was present at most if not all of these board meetings. Bainer specifically instructed Prymas and me to not make any reference in the board meeting minutes to our discussions about Cadle's execution efforts.

5. I remember at several board meetings in approximately spring or mid-1998 where Bainer, Prymas and I discussed Cadle's execution efforts on my T&P stock. At those board meetings Bainer encouraged the execution of a shareholder agreement between Prymas and me and the placement of a restrictive legend on our T&P stock. Bainer said at at least one of those T&P

-2-

board meetings that if Cadle was successful in getting my T&P stock, Cadle would make things difficult for Prymas, and asked out loud whether Prymas would want Cadle as his partner for the ownership of T&P. Bainer said that we (Prymas and I) needed to place a restrictive legend on the T&P stock to protect T&P stock from the execution efforts of Cadle and others.

6.  At this or another T&P board meeting in approximately spring or mid-1998, Bainer mentioned that he was concerned about the aggressiveness of Cadle's attorney, Gaide. At that board meeting Bainer told Prymas and me that one way to get Gaide to back off Cadle's execution efforts on my T&P stock was to come up with some way to sue Gaide. It was at that time that I made reference in my notes (Px 7) to "Sue Gaide to get him out of the litigation." Shortly thereafter, upon Prymas' proposal, and in conjunction with Bainer's representation of me in the Grievance Proceeding that I commenced against Attorney Gaide, T&P executed an indemnification agreement providing that T&P would indemnify Bainer for any claims by Cadle or its attorney, Gaide, against Bainer.

7.  It was Bainer's idea to put a restrictive legend on the T&P stock to protect the stock from Cadle's or another party's execution efforts. At the time that my T&P stock was handed to Bainer in August of 1998, both he and Prymas knew about the April 13, 1998 turnover order. Bainer, however,

-3-

insisted that my T&P stock be delivered to him at that time so he could place the restrictive legend on the stock.

8. In addition, I have been informed by Bonnie C. Mangan, the Chapter 7 Trustee of my bankruptcy estate, that in 2003, Prymas had T&P execute a luxury buy-out/golden parachute/poison-pill arrangement whereby if Cadle or anyone else was successful in acquiring my stock, T&P would have to pay a lot of money to Prymas in the form of a mandatory buy-out.

I know the above facts from personal knowledge and they are true and correct.

_____
Charles A. Flanagan

SUBSCRIBED AND SWORN TO BEFORE ME on this 8th day of April, 2005.

_____
Commissioner of the
Superior Court

-4-