### 1UNITED STATES DISTRICT COURT

### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| THE CADLE COMPANY, ET AL | : | Case No. 3:01-CV 531 |
|     Plaintiffs | : |  (AVC) |
| | : | |
| VS. | : | |
| | : | |
| CHARLES A. FLANAGAN, ET AL | : | APRIL 28, 2005 |
|     Defendants | | |

## SUPPLEMENTAL REPLY IN SUPPORT OF PRYMAS AND THOMPSON & PECK'S MOTION FOR SUMMARY JUDGMENT

### I.    Statement of Procedure on Summary Judgment

Prymas and Thompson & Peck's motion for summary judgment was filed May

18, 2004.  Plaintiffs responded on or about September 9, 2004 (Docket #310, 311).

Defendants moved to strike plaintiffs' response for failing to comply with Local Rule

56. On February 7, 2005, the Court granted defendants' motions to strike in part:

> [T]he Court concludes that the plaintiffs have not properly
> answered each of the defendants' Rule 56(a) averments with
> either an admission or a denial . . . , have answered without
> citation to evidence or cited memoranda . . . , have failed to
> include a separate section entitled "disputed issues of material
> fact" containing a list of each issue of material fact as to which it
> is contended there is a genuine issue to be tried with citations to
> the record.

Ruling on Stanley F. Prymas and Thompson & Peck's Motion to Strike Plaintiffs'

Local Rule 56(a)(2) Statement and For Sanctions, dated February 7, 2005

(emphasis in original). The Court gave plaintiffs until the close of business on

February 15, 2005 to file amended opposition papers, in compliance with Local Rule 56(a)(2). Id.

Plaintiffs filed an amended response on February 15, and subsequently filed a corrected amended response on February 16. Plaintiffs' memorandum of law consisted of boilerplate statements of law followed by lengthy string cites of exhibits without any analysis of the facts or how the law applied to the facts of this case. On March 28, 2005, the Court granted defendants' motion for summary judgment:

> At summary judgment . . . the burden is on the plaintiffs to come forward with evidence to support their allegations and must demonstrate how that evidence constitutes the predicate criminal acts required for a finding of a pattern of racketeering activity. The court will not divine from the second amend[ed] complaint how the record supports one or more of the alleged crimes or the material elements of each offense. Because plaintiffs' brief is insufficient to raise a genuine issue of material fact and fails to comply with Local Rule 7(a) requiring specific references to the record, the defendants' motion and amended motion for summary judgment is GRANTED (document nos. 219 and 226). Judgment shall be without prejudice pending re-submission by April 18, 2005 of opposition memorandum in a form that complies with this order, and shall be with prejudice in the event no submission is received.

Ruling on Motion for Summary Judgment, March 28, 2005.

The plaintiffs filed a Second Amended Response to the Prymas/T&P summary judgment motion on April 18, 2005. However, plaintiffs' amended response fails to comply with either the Court's order, F.R. Civ. P. 56 or L. Civ. P. 56. The Court should enter summary judgment.

The plaintiffs have not complied with the Court's orders on the motions to strike. They  have not provided a list of the material issues of fact in compliance with Local Rule 56(a)2.  Rather, they have listed only one broad conclusory issue as to Prymas and Thompson & Peck that utterly fails to meet the rule's requirement of a

statement of facts that are in dispute. For this reason alone, the Court could properly enter summary judgment.  Local Rule 56(a)3.

## II.  *Legal Argument:*  **Prymas and T&P are entitled to summary judgment on plaintiffs' civil RICO conspiracy claim.**

Plaintiffs have expressly limited their claims against Prymas and T&P to a claim for RICO conspiracy under 18 U.S.C. §1962(d). Plaintiff's RICO conspiracy claim against Prymas and T&P must fail as a matter of law, because under the law of this Circuit a civil plaintiff cannot recover for injury allegedly arising solely out of a RICO conspiracy. Beck v. Prupis, 529 U.S. 494 (2000); First Capital Asset Management, Inc. v. Satinwood, Inc., 385 F.3d 159, 182 (2d Cir. 2004).

In Beck,  the Supreme Court concluded that an injury caused by an overt act that is not an act of racketeering or otherwise wrongful under RICO is not sufficient to give rise to a cause of action for a civil RICO conspiracy.  Id., 505.

> [W]e conclude that injury caused by an overt act that is not an act of racketeering or otherwise wrongful under RICO, . . . is not sufficient to give rise to a cause of action under §1964(c) for a violation of §1962 (d).  As at common law, a civil conspiracy plaintiff cannot bring suit under RICO based on injury that caused by *any* act in furtherance of a conspiracy that might have caused the plaintiff injury.  Rather, consistency with the common law requires that a RICO conspiracy plaintiff allege injury from an *act* that is analogous to an "ac[t] of a tortious character," . . .  *meaning an act that is independently wrongful under RICO.*

Id., 505-06 (citation omitted, last emphasis added).

The Supreme Court's decision in Beck reaffirms the rule in this Circuit that there can be no liability for a RICO conspiracy without a substantive RICO violation. First Capital Management, 385 F.3d 182; Discon, Inc. v. NYNEX Corp., 93 F.3d]

1055,1064 (2d Cir. 1996), vacated on other (antitrust) grounds, 525 U.S. 128]
(1978): Schmidt v. Fleet Bank, 16 F.Supp. 2d 340, 353-54 (S.D.N.Y. 1998),
abrogation on other grounds recognized by Feinberg v. Katz, No. 99 CIV. 45(CSH),
2002 WL 1751135 (S.D.N.Y., July 26, 2002); Katzman v. Victoria's Secret
Catalogues, 167 F.R.D. 649, 658 (S.D.N.Y. 1996); Hecht v. Commerce Clearing
House, Inc., 897 F. 2d 21, 25 (2d Cir. 1990)(cited with approval in Beck, 529 U.S.
500).

The evidence does not support plaintiffs' civil RICO claims.  They have not
shown that the injury they claim are the result of crimes under RICO.  They have not
demonstrated that any of Flanagan's conduct constituted RICO predicate acts.  The
evidence demonstrates that the change in tax classification of the stipulated
judgment monies and the placement of a restrictive stock legend were for legitimate
purposes and were not acts of racketeering within the purview of RICO.  There is no
evidence supporting plaintiffs' claims that Prymas or T&P knew about and agreed to
facilitate Flanagan's "schemes" to evade his creditors.  Consequently, no civil liability
under RICO may be imposed on either Prymas or T&P for their involvement in those
acts.  They are entitled to summary judgment.

**A.    Plaintiffs have provided no analysis of how Flanagan's conduct with
respect to the so-called "stock fraud scheme" or the "settlement
proceeds scheme" constitutes RICO predicate acts.**

Contrary to plaintiffs' contentions, defendants have not agreed that
Flanagan's conduct constituted RICO predicate acts. Plaintiffs' contention that
"Prymas has admitted that Flanagan committed bankruptcy fraud," citing Px. O,
does not establish that Flanagan has committed bankruptcy fraud. (See Plaintiffs'
Memorandum, pp. 6, 54)  Plaintiffs' Exhibit O contains no such "admission." In fact,

Exhibit O does not contain "facts as would be admissible in evidence," in this case, nor does it "show affirmatively that the affiant is competent to testify on the matters stated therein." F. R. Civ. P. 56(e).[1]

It is plaintiffs' burden in this case to prove its claims against the defendants. On summary judgment, the plaintiffs must come forth with sufficient evidence demonstrating that there is sufficient evidence to warrant a trial on their claims. In essence, plaintiffs claims against Prymas and T&P are that they conspired to commit crimes under RICO and that they were injured by RICO predicate acts committed as part of the conspiracy.   As this Court noted, "the law is clear that in order to prevail on a civil RICO cause of action, the plaintiffs must demonstrate that the defendant committed one or more of the crimes enumerated in 18 § U.S.C. 1961 (1) and prove each prong of the predicate criminal offense(s). Central Distrib. of Beer, Inc. v. Conn., 5 F.3d 181, 183-84 (6th Cir. 1993)("the conduct used to support a civil RICO action must be indictable"). Ruling, March 28, 2005. Thus, as the Court concluded, "the burden is on the plaintiffs to come forward with evidence to support their allegations and must demonstrate how that evidence constitutes the predicate criminal acts required for a finding of a pattern of racketeering activity." Id.

If it is plaintiffs' claim that only Flanagan committed the predicate criminal acts required for a finding of a pattern of racketeering activity, it is still the plaintiffs' burden to demonstrate how his conduct constitutes such a pattern of crimes under RICO.  Plaintiffs must show Flanagan's conduct alleged in the complaint constituted

---

[1]  At several points in plaintiffs' memorandum of law, plaintiffs refer to "undisputed" allegations in their complaint. Eg., Plaintiffs' Second Amended Response, p. 56. Plaintiffs do not identify which of the complaints' allegations they contend are "undisputed." To the extent that plaintiffs construe Prymas/T&P's answer of insufficient knowledge to a number of the complaints' allegations, those responses are deemed to be denials under F.R. Civ. P. 8(b), which provides: "If a party is without knowledge or information sufficient to form a belief as to the truth of an averment, the party shall so state and this has the effect of a denial."

crimes.    Plaintiffs have not identified the acts claimed to constitute a pattern of racketeering activity, nor have they provided any analysis of how Flanagan's conduct alleged in the complaint are indictable crimes. Plaintiffs' failure to offer any analysis of substantive criminal offenses allegedly forming the basis of their RICO claims requires affirming the Court's initial entry of summary judgment.

A conspirator "must intend to further an endeavor which, if completed, would satisfy all of the elements of a <u>substantive criminal offense</u>." <u>First Capital Asset Management</u>, 385 F.3d 178 (emphasis added). The plaintiffs have failed to articulate, much less provide evidence of conduct constituting substantive criminal offenses under RICO. Since demonstrating substantive criminal offenses is a necessary element of plaintiffs' conspiracy claim, the failure to provide the court with evidence demonstrating issues of material fact with respect to claimed RICO predicate offenses is fatal to the plaintiffs' claims on summary judgment.

Plaintiffs have cited no authority that makes the change from one alternative tax treatment to another a crime, where both treatments are permissible. Plaintiffs have also not provided any authority supporting a claim that any of Flanagan's representations to the Court in <u>Cadle I</u> are predicate acts under RICO. Similarly, plaintiffs have cited no authority that makes the failure to honor a court order a RICO predicate act.

The plaintiffs have also failed to show that any of Flanagan's conduct in the "shifting stock scheme" constituted a RICO predicate act. Plaintiffs present no argument that Flanagan's refusal to turn over his stock in response to the Court's order, his failure to provide information concerning the whereabouts of his stock to the plaintiffs or the Court or even the placement of a restrictive legend on

Flanagan's stock certificates constitute RICO predicate acts. Plaintiffs have submitted no evidence to support that the placement of the restrictive legend on Flanagan's stock caused any injury much less an injury for which civil RICO provides redress. There is no evidence that the legend impeded any of plaintiffs' efforts to locate or execute on the stock. There is no evidence that the stock legend insulated the stock from execution.

Plaintiffs' failure to make a sufficient showing that Flanagan's conduct constitutes RICO predicate acts, require the entry of summary judgment in favor of the defendants. If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Plaintiffs have failed to demonstrate that they were injured by racketeering crimes fathered by an alleged conspiracy involving Prymas or Thompson & Peck. The Supreme Court has ruled that injuries caused by overt acts that are not acts of racketeering or otherwise wrongful under RICO are an insufficient basis to give rise to a civil cause of action for RICO conspiracy. Rather, a RICO conspiracy plaintiff must demonstrate injury from an act that is a crime under RICO. Beck v. Prupis, 529 U.S. 494, 505-06 (2000).

In continued defiance of this Court order, the plaintiffs continue to provide mere string cites of exhibits they claim as evidence of the RICO crimes of wire fraud, mail fraud, or bankruptcy fraud they contend caused their injury. However, plaintiffs provide no analysis to the Court of their claims of predicate acts, and continue to ask the Court to divine the basis of their RICO claims for which they bear the burden

of proof.  Plaintiffs' Exhibit P is the very type of string cite the Court criticized in its ruling granting summary judgment.  Exhibit P is not evidence, within the purview of Local Rule 56(a)(3), that may be considered by the Court on a motion for summary judgment. Exhibit P is neither an affidavit of a competent witness, nor evidence that would be admissible at trial. Rather, it is a unsworn, self-serving, conclusory and unsupported laundry list of exhibits. Exhibit P is not evidence upon which the Court may rely in deciding the motion for summary judgment, and is not permitted by either the Federal Rules of Civil Procedure or this Court's local rules. It should be stricken.  They have failed to provide any legal analysis of predicate indictable crimes to support their claimed RICO injury.

**B.**    **No Civil RICO liability may be imposed on either Prymas or T&P for the change in tax classification of the judgment monies payable to Flanagan.**

The evidence shows that Prymas and T&P role in the change in tax treatment of the payments due to Flanagan under the terms of the stipulated judgment was solely for legitimate purposes, based on the advice of an accountant and the corporate attorney.  The change in tax classification from 1099 income to wages was not racketeering activity for which civil liability under RICO may be imposed.

Plaintiffs have no standing to challenge the change in tax classification of the judgment payments to Flanagan. The purpose of a tax classification is to establish taxpayer's (and employer's) liability for payment of  federal income tax.  The tax classification is not made for the benefit of third parties, such as creditors.   Although plaintiffs assume that they had some vested right in the tax treatment of the

judgment monies, and that once one classification was selected, the classification could not be changed, they have cited no legal authority for either assumption.

Plaintiffs had no protected interest or right in the tax treatment of the stipulated judgment monies. Plaintiffs cannot seriously claim that T&P or Prymas had any superior duty to plaintiffs, or any of Flanagan's creditors, with respect to the tax treatment of the stipulated judgment monies.  T&P's obligation was to apply the most correct tax classification to the monies.  That obligation extended only to the United States government and to Flanagan.

Prymas's primary duty was to act in the best interests of T&P.  See Arrigoni v. Adorno, 129 Conn. 673, 681 (1943). His agreement to change the tax classification to a more correct one, based on accounting advice, fulfilled his superior duty to the corporation, which superceded any conflicting duty he may have had to Flanagan's creditors.  The mere fact that the change in tax treatment may have had *some* effect on Cadle's ability to execute[2] on the judgment monies does not transform a legitimate change in tax classification, based on accounting advice, into an illegal act, much less a RICO predicate act. No Civil RICO liability may be imposed on either Prymas or T&P for the change in the tax classification of the judgment monies payable to Flanagan.

There is ample authority that the payments pursuant to the stipulated judgment were properly classified as wages in 1988.  Flanagan had sued Prymas to recover *inter alia* compensation from T&P.  Prymas/T&P Reply in Support of Motion for Summary Judgment, Ex. B.  The sums payable to Flanagan were to equalize his

---

[2]  It should be noted that the change in tax treatment did not place the monies beyond plaintiffs' reach. Once classified as wages, Cadle could have, but did not seek to garnish Flanagan's wages.

compensation from T&P with Prymas.  PX 21, ¶2, 12. The payments to Flanagan of past due compensation under the stipulated judgment were properly considered wages for federal income tax purposes.   E.g., United States v. Cleveland Indians Baseball Company, 532 U.S. 200, 121 S.Ct. 1433, (2001)(settlement payments representing back wages subject to FICA and FUTA taxes according to year in which the wages were in fact paid); Hemelt v. United States, 122 F.3d 204, 210 (4th Cir. 1997)(settlement payments representing wage-based relief should be treated as wages).

Plaintiffs strenuously avoid the implication of Accountant D'Agostino's February 10, 1998 opinion letter stating that the judgment monies were more properly classified as W-2 wages. Prymas and T&P were entitled to rely on the advice of professionals in choosing one of the alternative tax treatments available for the judgment payments to Flanagan. See Streber v. Commissioner of Internal Revenue, 138 F.3d 216, 222-23 (5th Cir. 1998)(no penalty could be assessed for selection of one of alternative tax treatments based on professional advice).  No civil RICO liability may be imposed on them for the application of an appropriate tax treatment of the judgment monies, based on the advice of an accountant and counsel.

## C.    A silent concealment of assets is not a predicate act under RICO.

Plaintiffs' claims are remarkably similar to those advanced in First Capital Asset Management, Inc. v. Satinwood, Inc., 385 F.3d 159 (2d Cir. 2004) affirming First Capital Asset Management, Inc. v.Brickelbrush, 219 F. Supp. 2d 576 (S.D.N.Y. 2002). In that case, the Second Circuit affirmed the District Court's dismissal of conspiracy claims against family members who allegedly received fraudulent

conveyances from a debtor who was trying to avoid his creditors.   As the Court explained,

> At bottom, Plaintiffs have alleged that Sohrab engaged in a single scheme to defraud two creditors by quickly moving his assets to his relatives and then concealing the existence of those assets during his bankruptcy proceedings. But however egregious, Sohrab's fraud on Plaintiffs may have been, they have failed to allege that he was engaged in a pattern of racketeering activity. Accordingly, Count Five was properly dismissed as alleged against him.

> Finally, because Plaintiffs did not adequately allege a substantive violation of RICO in Count Five on the part of either Sohrab or Afsar, the District Court properly dismissed Count Six, which alleged a RICO conspiracy in violation of 18 U.S.C. § 1962(d).

Id., 182.

As in First Capital, plaintiffs at bar have failed to raise an issue of material fact with respect to RICO's continuity requirement. The nature of Flanagan's alleged scheme to defraud his creditors does not "'imply a threat of continued criminal activity,'" . . . "unlike, for example organized crime, . . . the alleged bankruptcy fraud was 'inherently terminable' once [the defendant] had fraudulently conveyed his assets, which he allegedly accomplished . . . *when he filed for bankruptcy,* the scheme essentially came to its conclusion." First Capital Asset Management, 385 F.3d 180-81 (emphasis added).

Plaintiffs' reliance on Baisch v. Gallina, 346 F.3d 366 (2d Cir. 2003) is misplaced.   In that case, there was evidence that the defendant knew of the co-defendant's fraudulent activity, including a statement by Gallina, preserved on videotape that the co-defendant, Rubino, was submitting fraudulent vouchers to the County, and was bribing individuals to sign off on fraudulent timesheets, as well as

his activities in providing insurance certificates to the County when he knew that the corporate defendant did not have insurance. 346 F.3d 370-71. In contrast, there is no evidence that Prymas or T&P knew of Flanagan's intent and efforts to "further and endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense" or that they adopted "the goal of furthering or facilitating the criminal endeavor." Id., 376-77. To the contrary, the documentary evidence clearly demonstrates that Prymas/T&P were willing to help Flanagan only to the extent that there activities were legal and proper, in reliance on professional advice.

Plaintiffs conveniently ignore the essential holding of Baisch that their injury must have been "'proximately caused by a pattern of racketeering activity, violating [18 U.S.C. §1962] or by individual RICO predicate acts.'" 346 F.3d 373, quoting Lerner v. Fleet Bank, N.A., 318 F.3d 113, 122-23 (2d Cir. 2003). Unlike the plaintiff in Baisch, the plaintiffs at bar have failed to point to any crime committed by Flanagan that is a predicate act under RICO. Rather, plaintiffs offer only vague, conclusory claims of mail fraud, wire fraud, and bankruptcy fraud, committed by Flanagan without any analysis or specific evidence.

Plaintiffs have failed to show that any of Flanagan's conduct in his efforts to evade creditors constitute crimes under RICO. They allege that Flanagan violated court orders, sought recharacterization of the tax treatment of the judgment proceeds as wages, subject to creditors' garnishments, transferred his T&P stock in the fall of 1997 to Socrates Babacus, transferred his T&P stock to his father, Judge John Flanagan, in the fall of 1998 as security for a loan to pay the judgment in Cadle I, subsequently declared a bankruptcy, utilized MJCC to shield certain assets from

creditors. Plaintiffs have failed to demonstrate how any of the foregoing activities are crimes or constitute a pattern of racketeering, as defined by RICO.

Although the violation of court orders, such as the Court's turnover order or injunction constitute contempt of court, contempt of court is not a RICO predicate act. The statutory list of predicate acts that can constitute "racketeering activity" under RICO, found at 18 U.S.C. §1961(1), is exclusive. Daddona v. Gaudio, 156 F.Supp.2d 153, 160 (D. Conn. 2000). To the extent the plaintiffs claim that Flanagan's filing of false documents or affidavits constituted predicate acts, it is now well established that filing false documents and affidavits in litigation does not constitute mail fraud for the purpose of supporting a RICO claim. Id., 156 F.Supp.2d 162.

The Second Circuit's decision in First Capital Asset Management, requires the entry of summary judgment in this case. There is no basis upon which to distinguish the claims asserted in that case from plaintiffs' claims at bar. Plaintiffs have simply chosen to ignore First Capital Asset Management, and have offered the Court no basis upon which to distinguish this controlling decision.

**D.    There is no evidence that Prymas or T&P agreed to further Flanagan's scheme to evade his creditors.**

There is no evidence to demonstrate that Prymas/T&P agreed to and acted to further the asserted goal of the alleged conspiracy -- to defraud Flanagan's creditors, an element that is essential to plaintiffs' conspiracy claim. It is well settled that a civil RICO plaintiff must demonstrate that the defendant "'knew about and agreed to facilitate the scheme'" to defraud Flanagan's creditors, specifically the

plaintiffs.  Baisch v. Galina, 346 F.3d 366, 377 (2d  Cir. 2003)(quoting Salinas v. United States, 522 U.S. 52, 65 (1997)).

There is no evidence that Prymas or T&P either knew about Flanagan's schemes or agreed to defraud his creditors.  None of the evidence plaintiffs cite support their claims that Prymas or T&P had any purpose to help Flanagan evade his creditors.  In fact, Bainer informed Fasano, in no uncertain terms, that T&P would not agree to do anything improper in regard to Flanagan's creditors and *expressly disavowed* any plan to defraud creditors.[3] PX 18, 23.  By December of 1998, it is clear that neither Flanagan or Fasano had informed Bainer, Prymas or Thompson & Peck about developments in the creditors' collection actions against Flanagan.[4]  PX 18.

There is no evidence to support plaintiffs' claims that Prymas/T&P had any specific knowledge of Flanagan's efforts to avoid Cadle's collection efforts.  Plaintiffs' claims are conclusory and the evidence they cite is inadmissible to show

---

[3]  "While I am Corporate Counsel, no officer of the Corporation, except over my strong and vocal objection, is going to participate in anything which even smells like a conspiracy to defraud Charlie's creditors." PX 18.  "I will counsel Thompson & Peck, Inc. to do anything *legally proper* that will assist Charlie with his current financial difficulties …. but the main purpose of my letter is to make sure you understand that if we don't have a chance to speak, you guys need to be affirmatively taking action to protect Charlie from the execution *if there is a legitimate reason for doing so.  Otherwise I have no option but to tell Thompson & Peck, Inc. that they will have to pay over the funds due Charlie, to the creditor* – which we would prefer not to do if there is a *legally proper, legitimate and appropriate basis* for such refusal." PX 23 (emphasis added).

[4]  "I'm very concerned for the Corporation about what has been going on that you and/or Charlie decided to omit from disclosure to me or the other Board of Directors.  This is a legitimate concern for the Corporation, whether you agree with it or not.  … That you and Charlie are unwilling to voluntarily provide information to the Corporation, so that it can understand what is going on and so that I can make sure the other officers – Mr. Prymas and Mr. Buckmir – do not violate *any court orders that may be out there … [T]hey don't know* what's going on behind the scenes and what representations have been made to third parties, and *what court orders have entered* [regarding Charlie's 50% interest] which arguably affect the Corporation and the officers – ultimately."  PX 18, emphasis added.

that Prymas/T&P had knowledge of any of the procedural events in <u>Cadle I</u>, including the turnover order.

In a last ditch desperate effort to avoid summary judgment, the plaintiffs have produced an affidavit of Charles Flanagan, appended to their summary judgment papers as Plaintiffs' Exhibit Q. This affidavit is entitled to no weight for many reasons.

It is evident that Flanagan has given this affidavit to the plaintiffs in exchange for a dismissal of plaintiffs' objection to his bankruptcy discharge and to the discharge of Flanagan's wife, Lisa Flanagan. <u>See</u>, Joint Motion to Dismiss Objection to Discharge Action, dated April 8, 2005, ¶10, Exhibit A, ¶2. It is plain from the font and the format of the Flanagan affidavit, that it was prepared by plaintiffs' attorney, F. Dean Armstrong. Thus, Flanagan has signed an affidavit, prepared by the plaintiffs in exchange for plaintiffs' withdrawal of their claims against both him and his wife. There plainly has been collusion and improper consideration for plaintiffs' agreement to withdraw their objection to discharge action, in contravention of Local Bankruptcy Rule 7041-1(b).[5]

Plaintiffs' Exhibit Q is also procedurally defective.  A number of statements in Flanagan's affidavit fail to satisfy the affirmative showing of competence required of affidavit statements by F.R. Civ. P. 56(c), which requires affidavits to "be made on personal knowledge, . . . set forth such facts as would be admissible in evidence, . . . and show *affirmatively* that the affiant is competent to testify to the matters stated therein (emphasis added)." "A court may . . .strike portions of

_____
[5] Conspicuously absent from Plaintiffs and Flanagan stipulated motion is the debtor's affidavit and his attorney's statement that "*no* consideration has been promised or given, directly or indirectly, for any such dismissal."  L. Br. 7041-1(b) (emphasis added).

affidavits which are not made from the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements." Hollander v. American Cyanimid Co., 999 F.Supp. 252, 255 (D. Conn. 1998)(citing cases).

Several averments in Flanagan's affidavit are so vague and conclusory that they would not be admissible in evidence. Moreover, the statements fail to show affirmatively Flanagan is competent to testify about them. For example, in Paragraphs 3 and 7 of the affidavit, Flanagan states that Todd Bainer and Stanley Prymas "were informed" of both the injunction and turnover orders in Cadle I, and that they "knew" of the turnover order in August, 1998. There are no facts to support these vague and conclusory assertions. Generalized and conclusory statements are insufficient to withstand summary judgment. Weeks v. ARA Services, 869 F. Supp. 194, 196 (S.D.N.Y. 1994). There is no "affirmative showing" that Flanagan is competent to offer evidence about what Bainer or Prymas "were informed" of or "knew" and the wording suggests that the statement may be based on hearsay.  The Court should disregard these statements.  Hollander, 999 F.Supp. 256.

Even more troubling, however, is that Paragraphs 3 and 7 directly contradict Flanagan's own earlier sworn testimony that he did not know when Bainer or Prymas became aware of the federal court orders. In his deposition given on August 24, 2000, Flanagan gave the following testimony:

> Q.    When did Attorney Bainer, to your knowledge, become aware of the Federal Court's injunction?
>
> A.    I don't know.
>
> Q.    When did Mr. Prymas become aware of the Federal Court injunction, to your knowledge?

> A.     I don't know.
>
> Q.     Are you aware that he is aware of the Federal
>
> Court injunction?
>
> A.     I don't know.

Flanagan deposition, August 24, 2000, p. 84 (attached hereto as Exhibit N).

The documentary evidence in the summary judgment record clearly demonstrates that Prymas and Bainer did not become aware of the orders in Cadle I until December 1998. Bainer's file memo of December 9, 1998, made after his telephone conversation with Attorney Leonard Fasano, reflects that he learned for the first time of the Federal Court orders in that telephone conversation. (Px. 130) On that same day Bainer wrote to Fasano stating that he had learned "today for the first time that there have been some rather serious court orders entered in the past – as far back as March of 1998." (12/9/98 Bainer letter, attached hereto as Def. Ex. P. Fasano confirmed that he was unwilling to give Bainer information about the developments in Cadle I. Def. Ex. P, Px. 131 ("I am not going to give you any information whatsoever.") Bainer complained bitterly about Flanagan and Fasano's failure to disclose information that might affect T&P.   Def. Ex. P, Px. 18.   Because Flanagan and Fasano refused to give Bainer any information about court orders that might affect T&P, Bainer resorted to telephoning plaintiffs' then-counsel, Paul Gaide. Def. Ex. P, Px. 66 (spoke to Gaide only after Fasano and Flanagan refused to share court documents). Subsequently, Bainer wrote to Gaide informing him that T&P were "in the dark" about court orders and requested copies of any applicable orders. Def. Ex. P, Px. 27 Bainer placed the restrictive legend on the stock without knowing about the Federal Court orders. Px. 135 The contemporaneous documents

clearly demonstrate that Flanagan's unsupported assertion that Bainer and Prymas "were informed" of the court's orders at any time before December, 1998 is false.

There is likewise no evidence to support Flanagan's vague and conclusory averment that Bainer and Prymas were "aware of" Cadle's efforts to execute on Flanagan's T&P stock. (Px. Q ¶3) Moreover, in earlier sworn deposition testimony, Flanagan stated under oath that *at no time did he have an arrangement with Prymas to have Prymas participate in Flanagan's desire to put his stock beyond the reach of creditors*. (Flanagan depo, August 24, 2000, p. 39, Def. Ex. N)

The T&P agenda and minutes flatly contradict Flanagan's assertion in Paragraph 4 of his affidavit that Bainer instructed Prymas and Flanagan not to make reference to the Cadle execution in board meeting minutes. To the contrary, the T&P Auxiliary Committee minutes following the service of the execution on the corporation repeatedly refer to the execution, as do the meeting agendas. Def. Ex. Q.

There is no support for Flanagan's assertion in Paragraph 5 of his affidavit that Bainer expressed concern that Cadle would make things difficult for Prymas if it got the stock. Rather, Bainer's internal file memo of December 9, 1998 Def. Ex. P, Px. 130. attributes this sentiment to Fasano: "Much concentration on Prymas's need to strike some deal with Charlie in order to avoid Gaide coming in and getting the stock and *allegedly* making Prymas's life miserable." Id. (emphasis added).

Flanagan's previous testimony also contradicts his assertions in Paragraph 6 of his affidavit. For example, at his deposition in the instant case on March 13, 2003,

Flanagan testified that the note containing the "sue Gaide" notation referred to discussions between Flanagan, his father and Attorney Fasano. (Flanagan deposition 3/13/03, pp. 182, 183, 185, attached as Def. Ex. O)  Flanagan also testified that he did not consider filing a grievance against an attorney, a suit against that attorney, and that his grievance against Gaide had nothing to do with trying to get Cadle Company to back off its execution efforts. (Flanagan deposition 3/13/03, pp. 237-38, Def. Ex. O) Although Flanagan states in his affidavit that it was Bainer's idea to grieve Attorney Gaide, the idea more likely came from his wife, Lisa Flanagan's 1996 grievance against Attorney Gaide during her bankruptcy case. In fact, grievances against Attorney Gaide appear to be a Flanagan family tradition since 1996. (Lisa Flanagan grievance attached as Def. Ex. S.

Flanagan's statement in Paragraph 6 that T&P executed an indemnification agreement for Bainer is also contradicted by his earlier sworn testimony. On March 13, 2003, Flanagan testified that he did not know anything about an agreement to indemnify Prymas and Bainer: "If there is something out there, I do not know about it." (Flanagan depo, 3/13/03, p. 239, attached as Def. Ex. O.

Flanagan's statement in Paragraph 7 that it was Bainer's idea to put a restrictive legend on the T&P stock is contradicted by the contemporaneous memoranda. On April 7, 1998, Flanagan wrote to Prymas, "I spoke to Atty. Fasano yesterday and he recommends putting restrictive language on each of our T&P and Flanagan & Prymas stock. Atty. Fasano would like to see a draft from Todd Bainer of the language." (Def. Ex. R)  Prymas replied on the same day, "As I mentioned to you yesterday, I also think it is a good idea to have restrictive wording on our stock. However, the restrictive wording usually states that the stock cannot be transferred

or sold in accordance with a dated stockholders' agreement. Since we do not have a stockholder's agreement yet, we need to develop one." Id. The contemporaneous documents clearly show that the idea for a restrictive wording originated with Prymas, Fasano and Flanagan. Finally, Flanagan's vague assertion that Bainer and Prymas knew about the Court's April 13, 1998 turnover order in August of 1998 is contradicted by his earlier sworn testimony and by the December 1998 Bainer file memorandum and correspondence between Bainer, Fasano and Gaide during that month.

Plaintiffs' Exhibit Q is not the first time Flanagan has prevaricated in an affidavit. On September 6, 2002, Flanagan swore that he explained to Socrates Babacus that he needed to put a restrictive legend on the back of the stock shares in accordance with a shareholders' buy-sell agreement. (Flanagan affidavit, attached hereto as Def. Ex. T, ¶ 4). Two years earlier, Flanagan testified under oath that he did not tell Babacus that he was putting a restrictive legend on the stock and gave Babacus no explanation other than they were finalizing a stockholders' agreement. (Flanagan depo 8/24/00, Def. Ex. N, p. 80)

Flanagan's affidavit is entitled to no weight. Flanagan was convicted of the felony of lying to the IRS. His testimony is riddled with contradiction from previous sworn testimony, and it is clear he has signed the statements in Exhibit Q, a document prepared by plaintiffs' attorneys, in an effort to obtain a discharge in his bankruptcy action and a release for his wife, whose bankruptcy discharge was earlier denied. The court should disregard Px. Q. The statements in Exhibit Q fail to satisfy the requirements of F.R. Civ. P. 56(e) and provides an instance of an

affidavit made in bad faith, under F.R. Civ. P. 56(g), for which sanctions should be imposed.

The fact that plaintiffs have admitted (as they must) that Judge Covello granted Flanagan's motion to reconsider the turnover order in <u>Cadle I</u> is significant. Plaintiffs' Local Rule 56a(2) Statement in Opposition to Bainer Motion for Summary Judgment, ¶17. The granting of the motion for reconsideration necessarily means that the turnover order was not in effect until September 23, 1998, the date the judge denied the substantive relief requested in the motion. <u>See</u> <u>National Union Fire Insurance Co. v. Employee Staffing of America, Inc.</u>, Docket No. CIV. 3:93 CV 2504 EBB, Civ. 590 CV 246 EBB, 2001 WL 107 8807 (D. Conn. July 9, 2001)*2 (effect of granting motion for reconsideration was to reopen the recommended ruling); <u>see also</u> <u>Community Party of Indiana v. Whitcomb</u>, 414 U.S. 441, 445 (1974) (motion for reconsideration suspends finality of order for which reconsideration is sought; denial of motion restores the order). The restrictive legend had been placed on the stock in August, 1998, *before* the turnover order became effective. As a factual matter, the legend was not placed on the stock in violation of the Court's turnover order, because it was placed while the turnover order was suspended by persons who were not aware of the order.

There is no indication on PX 25 that Flanagan signed the claim of exemption *on behalf of T&P* as the plaintiffs claim. Flanagan did not sign the exemption claim form as an officer or other representative of T&P. Rather, Flanagan signed as the "Judgment debtor," not as a representative of T&P. It was Flanagan's *individual* representation that T&P had none of Flanagan's property other than wages, and not a representation by T&P.

Prymas had no knowledge that Flanagan made such a representation at any time before it was filed with the court.  See Prymas' memo to Bainer, February 4, 1998, PX 69.  Moreover, because Prymas did not know about Flanagan's intended response to the exemption, he could not have authorized Bainer to either approve or modify Flanagan's unilateral claim of exemption.    In fact, Prymas expressed surprise to Bainer that the representation had been made. PX 69.  There is absolutely no evidence to support plaintiffs' speculative contention that Flanagan's objection was either approved or modified by Bainer.

Because there is no evidence that either Prymas or T&P agreed to or acted in furtherance of the goal of the alleged conspiracy, they are entitled to summary judgment on plaintiff's RICO conspiracy claim.


**E.    The evidence fails to demonstrate the existence of a RICO enterprise.**

Plaintiffs contend that the RICO enterprise in this case is a group of individuals associated in fact. See Second Amended Complaint ¶82. "[F]or an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." First Capital Asset Management, Inc. v. Satinwood, Inc., 385 F.3d 159, 174 (2d Cir. 2004)(quoting First Nationwide Bank v. Gelt Funding Corp., 820 F.Supp. 89, 98 (S.D.N.Y. 1993), aff'd. 27 F.3d 763 (2d Cir. 1994)emphasis added). The plaintiffs have provided no evidence that demonstrates that Prymas or T&P belonged to an association of individuals sharing a common purpose to engage in a particular fraudulent course of conduct, in this case, Flanagan's alleged efforts to avoid his creditors. There is no evidence that Prymas

or T&P shared or agreed to Flanagan's alleged purpose or agreed to work with the other defendants to achieve his asserted purpose or agreed to work with the other defendants to achieve Flanagan's purpose. Rather, the evidence shows that Flanagan manipulated family members, co-workers, attorneys and acquaintances in a series of sporadic acts that did not appear related to the individuals being manipulated.

In addition, the plaintiffs have failed to provide "evidence of an ongoing organization, formal or informal" or "evidence that the various associates function [ed] as a continuing unit." Cadle v. Flanagan, 271 F. Supp. 2d 379, 387 (D. Conn. 2003). There is no continuity between the sporadic and disparate acts of individuals responding the Flanagan's isolated demands.

**F.    Prymas and T&P are entitled to summary judgment on plaintiffs' aiding and abetting claims.**

Subsequent to the filing of the instant motion for summary judgment by defendants Prymas and T&P, this Court granted the defendants' motion to compel answers to their interrogatory numbers 6 and 7, requesting that the plaintiffs "[i] dentify each and every RICO predicate act you contend was committed" by defendants Prymas and T&P. Ruling on defendants' motion to compel, dated June 18, 2004. On September 7, 2004, the plaintiffs identified "each and every RICO predicate act" committed by defendants Prymas and T&P as follows:

> the provision of knowing and substantial assistance to Defendant Charles A. Flanagan ("Flanagan") in connection with (a) the settlement proceeds scheme - - the scheme to assist Flanagan in the recharacterization of the $75,000 in settlement proceeds so as to avoid Plaintiffs' execution efforts; and (b) the shifting stock scheme - - the scheme to assist Flanagan in the movement, restrictions on and

pledging of his T&P stock so as to avoid Plaintiffs' execution efforts. In connection with each of the above schemes, Defendant T&P [and Prymas] knew or could reasonably have anticipated that the United States mail and/or interstate wires would be used in connection with the execution of those schemes.

Plaintiffs' Supplemental Responses to the First Set of Interrogatories Submitted by Defendants Stanley F. Prymas and Thompson & Peck, dated September 7, 2004, attached hereto as Exhibit A.

The "predicate acts" plaintiffs have articulated describe only a claim that the defendants aided and abetted Flanagan's alleged RICO violations. See Lippe v. Bairnco Corp., 218 B.R. 294, 304 (S.D.N.Y. 1998). In Lippe, the court held that an allegation that the defendants "'knowingly, intentionally or recklessly' assisted in affecting the Transactions . . . " stated a non-cognizable civil claim for aiding and abetting a RICO violation, a claim. Id. 303-04. There is no claim that defendants Prymas or T&P had any part in *directing* the affairs of the alleged RICO enterprise, and, consequently, no basis for imposing civil RICO liability on them. Id., 304. The plaintiffs' characterization of the so-called "predicate acts" Prymas and T&P are alleged to have committed fails to describe conduct that may serve as a basis for the imposition of civil RICO liability as a matter of law. See also Prymas – T&P Memorandum of Law in Support of Motion for Summary Judgment, docket item 222, at 17-18. Consequently, summary judgment should be entered in favor of both Prymas and T&P.

**G.    Imposing civil RICO liability on defendants for Flanagan's fraudulent acts violates policies informing RICO's civil remedies.**

Plaintiffs ask this Court to ignore well-settled policies underlying RICO's civil remedies by turning every fraudulent transfer case into a civil RICO case, "in order to discourage the proliferation of fraudulent transfers," rather than following established state law remedies for those torts. Plaintiffs' Memorandum of Law at 5-6. Plaintiffs' arguments turn RICO's policies on their head and should be rejected.

This Court has recognized that "Civil RICO is an unusually potent weapon— the litigation equivalent of a thermonuclear device". In re SmithKline Beecham Clinical Laboratories, Inc. Laboratory Test Billing Practices Litigation, 108 F.Supp.2d 84, 92 (D. Conn. 1999, Covello, J). In addressing a civil RICO claim, the "court's focus must be to ensure that RICO's severe penalties are limited to enterprises consisting of more than simple conspiracies to perpetrate acts of racketeering". Id at 92-93. "*Courts must always be on the lookout for the putative RICO case that is really nothing more than an ordinary fraud case clothed in the Emperor's trendy garb.*" Id at 93. "Further, in considering RICO claims, courts must attempt to achieve results consistent with Congress's goal of protecting legitimate businesses from infiltration *by organized crime*". Id at 93, n. 12. "[I]nvoking RICO's punitive, financially ruinous treble damage remedy could conceivably interfere with the very market force that RICO was designed to protect." Gruber v. Prudential-Bache Securities, Inc., 679 F. Supp. 165, 181 (D. Conn. 1987) (Cabranes, J.)(internal punctuation omitted). Even with all of the Plaintiffs' hybolic language, when it comes down to the facts, there is no evidence that supports any of the plaintiffs' RICO claims against Prymas or T&P, especially any claim based on a RICO conspiracy.

Plaintiffs' claims against Prymas and T&P in this matter demonstrate the danger of abuse of civil RICO remedies.  "The Second Circuit has warned that 'the potentially broad reach of RICO poses a danger of abuse [through] attempts to apply the statute to situations for which it was not primarily intended.'" Morin II, 835 F. Supp. 132.  The purposes of civil RICO liability is to deter *criminal* conduct. Mathon, 875 F. Supp. 995, 1001.  "The purposes of civil RICO liability do not include deterrents of unlawful acts, not rising to criminal liability, for which there are state and common law remedies."  Id., citing Hecht v. Commerce Clearing House, Inc. 897 F. 2d 21 (2d Cir. 1990).

> [A]lleged RICO violations must be viewed with appreciation of the extreme sanctions it provides, so that actions traditionally brought in state courts do not gain access to treble damages and attorneys fees in federal court simply because they are cast in terms of RICO violations.

Id.

This case presents an abuse of civil RICO.  The plaintiffs have cast their net too wide in seeking to hold defendants liable under RICO's draconian civil remedies for Flanagan's attempts to shield his assets.

**H.    Defendants adopt the arguments asserted by the Bainer and Fasano defendants in support of their motions for summary judgment.**

Prymas and T&P adopt all arguments made by defendants Bainer and Fasano in support of their motions for summary judgment, including arguments filed in reply to plaintiffs' opposing papers.

### III. CONCLUSION

Plaintiffs contend that Flanagan committed RICO predicate acts and assert that Prymas and T&P are liable for conspiring with Flanagan to commit those predicate acts. Plaintiffs' Memorandum 54. Plaintiffs concede that they do not claim that Prymas or T&P committed predicate acts under RICO. Id. p. 8. The essential flaw in plaintiffs' case is that they cannot prove they were injured by any pattern of racketeering crimes committed by Flanagan. Although they repeatedly contend that Flanagan committed mail fraud, wire fraud, and bankruptcy fraud, they have not analyzed his conduct to show that he committed crimes necessary to constitute a pattern of racketeering activity, as defined by RICO. It is plaintiffs' burden to prove as part of their conspiracy claim against defendants, that they were injured by RICO predicate acts. Beck v. Prupis, supra. Although they have been given four opportunities to oppose the pending motions for summary judgment, the plaintiffs have still not provided the analysis essential to their claims – that their injury is the result of a pattern of racketeering activity. Despite the Court's admonition, they have not demonstrated a single act of mail, wire, or bankruptcy fraud, much less a pattern of criminal activity.

The evidence demonstrates that Prymas and T&P's involvement in the change in tax classification of the stipulated judgment monies and in the restrictive stock legend were for legitimate purposes and were not acts of racketeering within the purview of RICO.  In addition, there is no evidence to show that they knew of, agreed to or acted in furtherance of Flanagan's goal of evading his creditors. No civil liability under RICO may be imposed on either Prymas or T&P consistent with RICO's purpose.  They are entitled to summary judgment on plaintiffs' claims.

*Respectfully Submitted,*

THE DEFENDANTS,
Stanley F. Prymas
and Thompson & Peck, Inc.

BY:  _____

BARBARA L. COX,
Federal Bar #ct08523
The Gallagher Law Firm
1377 Boulevard – P.O. Box 1925
New Haven, CT 06509
Tel:  (203) 624-4165
Fax: (203) 865-5598

*CERTIFICATION OF SERVICE*

This is to certify that a copy of the foregoing was mailed on the date above written to all counsel and *pro se* parties of record, namely:

F. Dean Armstrong, Esq.
1324 Dartmouth Road
Flossmoor, Ill.  60422

Edward C. Taiman, Esq.
Michael G. Albano, Esq.
Sabia & Hartley, LLC
190 Trumbull Street, #202
Hartford, CT  06103-2205

Todd R. Bainer, Esq.
P.O. Box 1092
Branford, CT 06405
747

Mary Anne A. Charron, Esq.
Gerald R. Swirsky, Esq.
R. Bradley Wolfe, Esq.
Gordon, Muir & Foley
Hartford Square North
Ten Columbus Boulevard
Hartford, CT 06106

Douglas S. Skalka, Esq.
James A. Lenes, Esq.
Neubert, Pepe & Monteith
195 Church Street, 13th Floor
New Haven, CT 06510-2026

Bradley K. Cooney, Esq.
69 Island Avenue
Madison, CT 06443

David G. Hill
June Sullivan, Esq.
Halloran & Sage, LLP
One Goodwin Square
225 Asylum Street
Hartford, CT 06103

Lisa G. Flanagan, *pro se*
12 Green Hill Rd.
North Haven, CT 06473

Paul Morgan Gaide, Esq.
713 Lovely Street
Avon, CT 06001

Richard Roberts, Esq.
Karen T. Gerber, Esq.
Amber J. Branciforte, Esq.
Nuzzo & Roberts, LLC
        One Town Center - P.O. Box

Cheshire, CT 06410

.

_____
BARBARA L. COX