UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
THE CADLE COMPANY and D.A.N.      :
JOINT VENTURE, LTD.               :
     Plaintiffs,                  :
                                  :
                                  :
VS.                               :     Civil No. 3:01CV531 (AVC)
                                  :
CHARLES A. FLANAGAN,              :
ET AL.,                           :
     Defendants.                  :
```

## RULING ON THE DEFENDANTS, LEONARD FASANO and FASANO, IPPOITO & LEE, LLC'S MOTION FOR SUMMARY JUDGMENT

This is an action for damages and equitable relief brought pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. The defendants, Leonard A. Fasano and his law firm, Fasano, IPPOITO & LEE, LLC now move for summary judgment pursuant to Fed. R. Civ. P. 56(a) arguing that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law.

The issues presented are whether Cadle has raised a genuine issue of material fact that: (1) Flanagan and Fasano engaged in predicate criminal activity to constitute the basis for a RICO action; (2) whether Fasano participated in the operation and management of a RICO enterprise; and (3) whether Fasano is entitled to judgment as matter of law on account of Cadle's failure to show RICO damages.

For the reasons hereinafter that follow, the court concludes that a genuine issue of material fact exists as to each issue articulated above. The motion is therefore DENIED.

**FACTS**

Examination of the second amended complaint, affidavits, pleadings, Rule 56(a) statements, exhibits and supplemental materials accompanying the motion for summary judgment, and the responses thereto, discloses the following undisputed, material facts.

I

Background

In 1996, the plaintiffs, Cadle Company and D.A.N. Joint Venture Ltd., (hereinafter "Cadle") filed suit against Flanagan in the United States District Court for the District of Connecticut in connection with his default on a $75,000 loan. The Cadle Company v. Charles Flanagan, Civ. No. 3:96cv2648(AVC) ("Cadle I"). On March 20, 1997, Cadle prevailed in the action and obtained a judgment against Flanagan in the amount of $90,747.87. On October 2, 1997, Cadle obtained a writ of execution against Flanagan but failed to realize any payment or property. On January 5, 1998, Cadle thereafter served a writ of execution against Thompson & Peck, Inc., a company that Flanagan jointly owned with the co-defendant, Stanley Prymas.

In response, Flanagan sent several letters to his attorney, Leonard A. Fasano of the law firm of Fason, Ippoito & Lee, LLC, in which he discussed his concern for the safe-keeping of funds that he was currently receiving from Thompson & Peck and his stock in Thompson & Peck. On January 20, 1998, Fasano filed an

2

objection to the writ of execution, stating that "Thompson & Peck, Inc., holds no property of Charles Flanagan. . . [o]ther than wages."

On February 4, 1998, Cadle filed a motion with the court seeking an examination of Flanagan as the judgment debtor.  On February 11, 1998, the court granted the motion and scheduled the hearing for March 9, 1998.  On February 25, 1998, Cadle served Flanagan with a subpoena requiring him to produce at the hearing documents pertaining to his assets, including his stock ownership in Thompson & Peck Inc., and the Flanagan/Prymas Insurance Group (hereinafter "Thompson & Peck").

On March 9, 1998, the court held an examination of judgment debtor hearing with Fasano appearing on behalf of Flanagan. During the hearing, Fasano represented to the court that Flanagan was under criminal investigation by the Federal Bureau of Investigation and the Internal Revenue Service, and that Flanagan would invoke his Fifth Amendment right against self-incrimination and, in this regard, would not furnish any documents or testimony pertaining to his assets.  At the close of the hearing, the court issued an order prohibiting Flanagan from transferring his assets and ordered him to submit to the court for in camera inspection documents pertaining to those assets.

On April 13, 1998, the court entered an order requiring Flanagan to turn over his stock in Thompson & Peck.  Further, the court ordered Flanagan to provide a full and complete accounting as to any purported transfer or other disposition of the stock.

3

Flanagan ignored the order.

On April 22, 1998, Fasano, on behalf of Flanagan, represented to the court that they had "gathered together thousands of documents to be produced for in camera inspection," and estimated that the documents would be produced to the court within the next week.  The documents were not forthcoming.

As set forth more fully infra, on November 16, 1998, the court held Flanagan in contempt for failure to turn over information relating to his assets, and ordered him committed to the Federal Bureau of Prisons until such time as he purged himself of that contempt.  After entering a stay of that order to give Flanagan an opportunity to comply, on November 19, 1998, the court vacated the order when Flanagan paid the judgment in full with interest, in the amount of $ 99,542.87.

On February 17, 1999, Flanagan filed a petition in the United States Bankruptcy Court for the District of Connecticut seeking relief under Chapter 11 of the United States Bankruptcy Code.  In his Chapter 11 filing, Flanagan stated that he owned no real estate and that his only asset of significance for purposes of his bankruptcy estate consisted of a 50% stock ownership in two business entities known as Thompson & Peck with an estimated fair market value of the stock at $1,000,000.  During discovery in connection with that filing, however, Cadle found evidence indicating that, contrary to Flanagan's representation in his bankruptcy petition, he owned three residential properties and had used various friends and family members as straw men to hide

4

his ownership and his receipt of rental income.  Flanagan also allegedly concealed from his creditors that he was owed $75,000 in settlement proceeds stemming from a lawsuit involving Thompson & Peck.

Cadle also discovered evidence indicating that, in and around November of 1998 and in connection with Cadle I, Flanagan and his lawyer, Leonard Fasano, had misrepresented the whereabouts of Flanagan's stock certificates, had orchestrated multiple asset transfers in contravention to this court's order enjoining the transfer of assets, and that Flanagan, in conjunction with his partner, Stanley Prymus, and their attorney, one Todd Bainer, had further violated an order of this court by placing a restrictive legend on the back of Flanagan's stock certificates.

In seeking redress, on April 4, 2001, Cadle filed the present action, alleging that Flanagan and his attorneys, among others, had engaged in a pattern of wrongful conduct involving bankruptcy fraud, mail fraud and wire fraud in order to prevent Cadle from collecting on various judgments.  In this action, they seek money damages pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq.("RICO")("Cadle II").

Viewing the evidence in a light most favorable to Cadle, the record supports a finding that Flanagan, his business partner, and his lawyers adopted fraud as a mechanism to defeat Cadle's lawful claims, and are set forth as follows.

5

II

The Schemes

A.   The Settlement Proceeds Scheme

Beginning in 1996, Flanagan and Prymas became embroiled in a Connecticut superior court lawsuit over control of Thompson & Peck.  On June 17, 1997, the parties settled the action with Flanagan, Prymas, and Thompson & Peck agreeing that: (1) there would be an adjustment of the management compensation paid to Flanagan to cover discrepancies for the additional sums that had been paid to Prymas; (2) an additional $75,000 in settlement proceeds would be paid to Flanagan over three years payable in 78 equal bi-monthly installments of $961.10; and (3) Flanagan would not transfer his stock to another person or entity.

The parties originally agreed to treat the payments to Flanagan as "1099 - miscellaneous income," and, in this regard, on June 17, 1997, a certified public accountant, one James Rayner, advised Prymas that

> it is our opinion that this type of payment
> to a stockholder in settlement of a corporate
> disagreement in not W-2 compensation [i.e.,
> wages], but a taxable damage settlement to
> be reported on 1099-MISC.

On January 5, 1998, after being served with the writ of execution, Flanagan was concerned that the payments might be subject to the property execution, and sent a note to Fasano stating:

> Please see enclosed which was served to
> Stanley Prymas this morning.  I have not
> received anything as yet, however I

6

should be served shortly.  My concern here
is with the money I am currently receiving
from Thompson & Peck Inc., as a result of the
settlement between Mr. Prymas and I.
Is this subject to being taken?

Cadle also served a writ of execution on Prymas, as president of

Thompson & Peck.  Prymas forwarded the writ to the legal counsel

for Thompson & Peck, co-defendant, Todd Bainer.  In order to

avoid the property execution, Fasano told Bainer that he wanted

the payments changed from 1099 miscellaneous income to wage

income.  On January 13, 1998, however, Bainer instructed Fasano

that unless Fasano took "some affirmative legal action in federal

court to stay or otherwise obviate the property execution,"

Thompson & Peck would be left with no choice but to turn the

settlement funds over to Cadle pursuant to the writ.

On January 19, 1998, Fasano, intending to block the property

execution, contacted Bainer and sent him a draft objection for

review and, on January 20, 1998, Fasano filed a claim exemption

form and an objection to property execution on behalf of Thompson

& Peck which represented to the court that "other than wages,

there is no property [belonging to Flanagan] held by Thompson &

Peck."

On January 25, 1998, Prymas informed Flanagan that "we are

not treating [the settlement proceeds] as salary, but rather 1099

income."  Further, on February 4, 1998, Prymas informed Bainer

that any representation to Cadle or the court that Thompson &

Peck "does not have any money assets due to Mr. Flanagan" was a

misrepresentation because "[Thompson & Peck] does have an

7

obligation to [Flanagan]." On February 4, 1998, Brainer wrote to Fasano reiterating that the settlement proceeds were being treated as 1099 miscellaneous income.

On February 9, 1998, Flanagan and Fasano met with Prymas and Bainer to discuss the property execution and Fasano's plan to change the characterization of the settlement agreement payments to wages. At the meeting, Bainer warned that changing the characterization of the payments from 1099 miscellaneous income to wages would leave them all open to a claim that there was a civil conspiracy to help Flanagan defraud his creditors, and further warned that the conspiracy claim was a risk that they had to seriously consider.

Fasano and Flanagan, as well as Bainer, Prymas and Thompson & Peck apparently agreed to accept that risk. The Thompson & Peck bookeeper, one Andrea Steele, testified that Prymas instructed her to re-characterize the settlement proceeds from 1099-miscellaneous income to wages. No one attempted to stay the writ of execution, and not a single payment of the $75,000 settlement obligation was turned over to the sheriff.

On November 12, 1998, Cadle served Prymas and Thompson & Peck with post judgment remedy interrogatories. The interrogatories inquired whether Thompson & Peck held any non-exempt property (such as settlement agreement payments) that belonged to Flanagan. Although Prymas knew that the settlement agreement payments had been re-characterized from 1099 income to wages to avoid the earlier writ of execution, he confirmed with

8

Bainer the understanding that this re-characterization was still in effect.

B.   The Checking Account Scheme

Flanagan owned three rental properties, i.e., the George Street property, the Howe Street property, and the Whitney Avenue property.  Flanagan placed the title to these properties in the names of two entities that he owned and controlled, i.e., Howe Street Associates and West Meadow Associates.  On March 9, 1998, the court issued an injunction freezing all of Flanagan's assets.  Shortly thereafter, Fasano advised Flanagan to set up checking accounts in the names of his minor children for purposes of collecting rental income on his rental properties and hiding those funds from his creditors.  During the period that the injunction was in effect, on advice from Fasano, Flanagan used these accounts to hide and to transfer approximately $43,000.

In October of 1998, while the injunction was still in effect, Flanagan borrowed $94,200 against the George St. Property and placed a $94,200 mortgage on that property.  Flanagan testified that he thereafter used those funds to pay bills, taxes, and utilities, among other things.

C.  The Shifting Stock Scheme

After being served with the property execution, on January 6, 1998, Flanagan sent Fasano a letter stating in relevant part:

> I [] do not want it disclosed where my stock
> is presently kept.  There may be an attempt
> to grab this stock.  If there is a concern here,
> please let me know if I should be doing
> anything different than what is presently

9

being done.

As Fasano knew, Flanagan had placed his stock with one Socrates Babacas for safekeeping, and over the next several months Flanagan refused to honor demands for that stock as set forth in a subpoena, a turn over order, and an order requiring an accounting.

Flanagan, Prymas and Bainer discussed Cadle's execution efforts at several meetings in the spring of 1998. At those meetings, Bainer encouraged Prymas and Flanagan to execute a shareholder agreement and place a restrictive legend on Flanagan's stock. Bainer stated to Prymas that if Cadle was successful in getting Flanagan's stock, Cadle would make things difficult for Prymas. Bainer then said that Prymas and Flanagan needed to place a restrictive legend on the stock to protect that stock from Cadle's execution efforts.

Despite an injunction forbidding Flanagan from transferring his assets and an order requiring Flanagan to turn over his assets, in July of 1998, Flanagan, Prymas, Bainer, proceeded with their plan to execute a shareholder agreement and place a restrictive legend on Flanagan' stock, with Fasano suggesting to Bainer that Fasano's law partner, Al Ippolito, review the proposed shareholder agreement.

In August 1998, Flanagan entered into a Shareholder Agreement [buy-sell agreement] with Prymas. The agreement provided that, among other things, they would not sell, assign, pledge, mortgage, transfer or in any way encumber their stock.

10

On August 21, 1998, Flanagan, Prymas and Bainer met at Thompson & Peck's office in New Haven.  There, Flanagan – in violation of the court's turnover order – gave his stock to Bainer.  Bainer, who was also subject to the court's turn over order as Thompson & Peck's agent, thereafter typed a restrictive legend on the stock certificates in order to limit their transferability, and, in violation of the turn over order, returned the certificates to Flanagan.

On September 23, 1998, the court once again ordered Flanagan to turn over his stock.  After the court denied two motions to stay the enforcement of that order, on October 21, 1998, Fasano filed a "Notice of Compliance" with the court representing that Flanagan's stock was in the hands of a purported creditor, one Sharon Demetropolis, and that Flanagan did not have possession or control of the stock.  On October 22, 1998, Fasano filed an amended notice, informing the court that Flanagan gave the stock to Demetropolous prior to the court's turnover order, and prior to the court's order of March 9, 1998, prohibiting Flanagan from transferring his assets.  In an affidavit submitted by Fasano, Flanagan represented that he had "borrowed money from Sharon Demetropolous [sic] and gave her the stock as security for the money."  Ms. Demetropoulous, however, knew nothing of the stock, and did not have possession of it.  Flanagan thereafter testified that he didn't read the affidavit before he signed it and that Fasano "made a mistake" in drafting it.

On October 26, 1998, the court ordered Flanagan to show

11

cause why he should not be found in contempt for failure to turn over his stock and failure to provide an accounting as to any disposition of the stock, and set the matter down for hearing on November 16, 1998.  On October 27, 1998, Fasano represented to the court that "Mr. Flanagan did not make any transfers after Judge Covello's [March 9, 1998] order freezing the assets of Mr. Flanagan."

On November 12, 1998, Fasano filed a Second Amended Notice of Compliance.  With this notice, Fasano represented to the court that as of June 19, 1997, the stock of Thompson & Peck was actually in the hands of one Socrates Babacus as collateral for a $120,000 loan from Babacus.  The notice also recited that Flanagan had agreed to secure with the stock two loans of $10,000 that Demetropolous had made to him.

On November 16, 1998, the court held the contempt hearing. Fasano represented to the court that, pursuant to the court's order of March 9, 1998, Flanagan had not transferred any assets. Flanagan, however, loaned Babacas $500 on May 24, 1998, $1,000 on June 19, 1998, $500 on August 24, 1998, $500 on October 21, 1998, and an additional $300 on March 25, 1999.

With respect to the Babacas debt and stock pledge, Flanagan testified that on September 16, 1997, Babacas loaned him $125,000 and that Flanagan pledged the stock to Babacas as security for the loan.  Further, Flanagan testified that he and Babacas had signed the pledge agreement on September 16, 1997, and that Flanagan gave the stock to Babacas on September 16, 1997, the

12

same date that Flanagan had allegedly signed the pledge
agreement.  Flanagan further testified that on two occasions,
Demetropoulous had loaned him $10,000 and that he had an
understanding with her that when the Babacas liability was
satisfied, she would take over his position.

At the close of hearing, the court held Flanagan in
contempt, stating:

> It has been established here [that
> Flanagan] had willfully and intentionally
> not complied with the order as previously
> entered by the court, and orders [Flanagan]
> committed to the Bureau of Prisons until
> such time as he purges himself of the
> contempt by complying further with the
> order.

In an effort to keep Flanagan from going to prison, Fasano
represented to the court that Flanagan would immediately produce
all relevant documents concerning the Babacas debt and the
purported stock transfers.  The court therefore temporarily
stayed execution of the contempt order, stating:

> We're going to continue the matter to a very
> short date here. . . and we'll see what has
> been produced here, and what problems
> exist.  But we're going to keep after this
> on a day to day basis until it's resolved. . .
> The execution of the order is stayed, and the
> matter is continued to [November 24, 1998] at
> 10:00 a.m.

On November 19, 1998, Flanagan presented the clerk of the court
with a check for $99,542.87 as payoff for the judgment.
Flanagan's father, John C. Flanagan, had loaned the money to him
pursuant to a pledge and security agreement.  Fasano prepared the
agreement with the effective date of the stock pledge being the

13

date the court vacated the order prohibiting Flanagan from

transferring his assets.  Fasano then had Babacas sign a release

authorizing the release of the stock to Flanagan's father and the

subordination of Babacas' purported lien position.  Specifically,

the release states:

> Please be advised that I hereby agree to
> subordinate to John C. Flanagan's pledge
> on the stock of Charles Flanagan from
> Thompason & Peck, Inc., and Flanagan &
> Prymas Insurance Group up to the
> balance I'm owed from the several loans
> I have given to Charles Flanagan.  My
> pledge amount will be secondary to
> Mr. John C. Flanagan.

The release does not recite any consideration given to Babacas

for surrendering his position.

On November 20, 1998, Fasano filed a motion to vacate the

court's order prohibiting Flanagan from transferring his assets

and, on December 3, 1998, the court entered an order granting

that relief.

On December 9, 1998, Bainer telephoned Fasano at the request

of Flanagan.  Bainer's notes regarding that conversation indicate

that the call was made out of concern that Cadle would obtain

Flanagan's stock.  Bainer told Fasano that he "didn't think

[Cadle] would find the stock attractive with restriction/legend

on it."  According to Bainer, Fasano then responded "what if the

restriction is invalid" as Judge Covello "had issued an order in

March 1998 prohibiting [Flanagan] from transferring or

diminishing his assets including the stock" and this may

"affect[] the validity of the restriction placed on the stock in

14

the summer of 1998." The notes also indicate that Bainer and
Fasano discussed bankruptcy for Flanagan, with Fasano concerned
about a bankruptcy filing because, among other things,
"[Flanagan] would have to litigate a number of fraud claims
against him then."

On December 10, 1998, Fasano sent a letter to Bainer,
stating in part:

> [M]y interest is to preserve [Flanagan's assets]
> i.e. the stock, and to keep my client out of
> contempt orders. . . it may be your practice,
> but it certainly is not my practice to
> discuss my client's strategies with other
> people.

On December 10, 1998, Bainer responded to Fasano, stating:

> As for your alleged "strategy," it doesn't
> seem to have served [Flanagan] very well at all.
> From what I can tell, and in my opinion, there
> is no organized "strategy" at <u>all</u>. Which is one
> of the reasons the current difficulty exists.
> It was your obligation to protect [Flanagan]
> from testifying in any fashion that would harm
> him, and arguably the corporation. My
> understanding is that he has testified before
> the federal court as recently as November 1998,
> that no restriction has been placed upon his
> stock. It is my further understanding that
> a copy of his stock, without the restriction I
> personally typed onto it [in August 1998], was
> presented to the Federal Court in November 1998,
> as a copy of his current stock in its current
> form.
>
> <u>You</u> knew a restriction had been placed on that
> stock and purportedly allowed [Flanagan]
> to harm himself by testifying in that fashion.
> You should have protected [Flanagan] from
> himself and his lack of knowledge about the
> legal system, in this regard and did not do
> so.
> . . . .
>
> Further, that you don't see the problem

15

> with such an arrangement, or your representing
> [Flanagan] and [his father], with regard to
> [Flanagan's] pledging of his stock, in
> known violation of the buy/sell agreement, and
> in an obvious attempt to frustrate the creditors,
> is a strong testament to the reason [Flanagan]
> finds himself in the serious difficulty
> he apparently, and unfortunately, does.  Your
> representation of the pledgor and pledgee
> in this situation is strong evidence that
> there does exist an improper effort to
> defraud the creditors. . .

In reply, on December 11, 1998, Fasano sent Bainer a letter

stating in part:

> Since you admitted in your first letter
> you are totally in the "dark" as to any
> procedures held in any of the courts as
> well as any orders issued by any judge,
> it is unfathomable that you could even
> comment on the issue of "strategy."  For
> instance, to stop [Flanagan] from testifying
> back in March of 1998, we pled the Fifth
> Amendment based on outside issues.  It
> was only until Judge Covello on October 22,
> 1998, sua sponte ordered Charlie to appear
> to testify on limited issues.  Therefore, to
> the best of our ability we fully protected
> [Flanagan].  As far as presenting a copy of
> the stock to Federal Court, I do not recall
> even presenting a copy of the stock to the
> Court on the date that [Flanagan] testified.
> All of this leads me to believe that your
> erroneous information is coming from
> Attorney Gaide [i.e., counsel for Cadle]
> . . .
>
> Once again, your unauthorized letter is self
> serving and factually inaccurate. . .

    In a follow-up letter dated December 16, 1998, Bainer told

Fasano,

> With regard to your various threats of suits,
> conflicts, etc., it is unfortunate that you
> practice this way.  The substantive conflicts
> are yours.  You and [Flanagan's] interest is
> now at conflict because you made a materially

> false and misleading representation to the court
> in your November 12, 1998 pleading of
> 'Amended Compliance" about the location and
> control of physical possession of [Flanagan's]
> stock.
>
> . . . .
>
> You are not going to hold Thompson & Peck,
> Inc., hostage by telling me what I can or
> cannot do for my client.  From what I can
> tell, your legal acumen is to fight with
> everyone whom doesn't agree with your view
> of things.  It is your judgment of allowing
> [Flanagan] to move the stock around, instead
> of dealing with the matter straight-up,
> which causes him to be in the current
> predicament in which he finds himself –
> including a federal court judge threatening
> to put him in federal prison.

D.    The Bankruptcy Fraud Scheme

On February 17, 1999, Flanagan filed a petition in the
United States Bankruptcy Court for the District of Connecticut
seeking relief under Chapter 11 of the United States Bankruptcy
Code.[1]  Fasano once again served as Flanagan's legal counsel.  In
his Chapter 11 filing, Flanagan stated that he owned no real
estate and that his only asset of significance for purposes of
his bankruptcy estate consisted of a 50% stock ownership
Thompson & Peck, with an estimated fair market value of the stock
at $1,000,000.  Flanagan also listed the debt he allegedly owed
to Babacas, but not the debt he allegedly owed Demetropoulous.
Flanagan also did not disclose that he owned three residential

---

[1] On May 4, 1999, Flanagan commenced a bankruptcy adversary
proceeding against Cadle to recover the transfer, alleging that
the $99,542.87 that was paid to Cadle was a voidable preference,
and thus subject to recoupment under § 547(b) of the Bankruptcy
Code.

properties, i.e., the George Street property, the Howe Street property, and the Whitney Avenue property, and testified at a section 341 meeting pursuant to the United States Bankruptcy Code that he did not own any real estate.  Flanagan also did not list in his bankruptcy schedules the rental income that he received and was continuing to receive from his rental properties.

Just a few months prior to the bankruptcy petition, in December of 1998, Flanagan transferred title to his residential properties his wife's cousin, one Joseph Caporale.  Flanagan then set up a post office box in Hamden, Connecticut for the receipt of monthly rent checks, and opened a joint checking account with Caporale for deposit of the rent checks.  From early 1999 until October 2000, tenets made out monthly rent checks to Caporale and mailed them to the post office box.  Flanagan collected the checks, deposited them into his joint checking account with Caporale and then, by forging Caporale's endorsement on the checks, deposit the checks for his use and benefit.

### STANDARD

Summary judgment is appropriately granted when the evidentiary record shows that there are no genuine issues of material fact and that the moving party is entitled to judgement as a matter of law. Fed. R. Civ. P. 56(c).  In determining whether the record presents genuine issue for trial, the court must view all inference and ambiguities in a light more favorable to the non-moving party.  See Bryant v. Maffacci, 923 F.2d 979,

982 (2d Cir.), <u>cert</u>. <u>denied</u>, 112 S. Ct. 152 (1991).  A plaintiff
raises a genuine issue of material fact if the "jury could
reasonably find for the plaintiff.  "<u>Anderson v. Liberty Lobby,</u>
<u>Inc.</u>, 477 U.S. 242, 252 (1986).  Rule 56 "provides that the mere
existence of some alleged factual dispute between the parties
will not defeat an otherwise properly supported motion for
summary judgement; the requirement is that there be no genuine
issue of material fact."  <u>Liberty Lobby</u>, <u>supra</u>, at 247-48
(emphasis original). The Supreme Court has noted that:

> Rule 56 must be construed with due regard not
> only for the rights of persons asserting claims
> and defenses that are adequately based in fact
> to have those claims and defenses tried to a
> jury, but also for the rights of persons opposing
> such claims and defenses to demonstrate in
> the manner provided by the rule, prior to
> the trial, that the claims and defenses have
> no factual basis.

<u>Celotex v. Catrett</u>, 477 U.S. 317, 327 (1986). "One of the
principal purposes of the summary judgement rule is to isolate
and dispose of factually unsupported claims. . . [and] it should
be interpreted in a way that allows it to accomplish this
purpose." <u>Celotex v. Catrett</u>, 477 U.S. 312, 323-324 (1986).

## **DISCUSSION**

1.   <u>Flanagan, Fasano & Criminal Activity</u>

Fasano first moves for summary judgment with respect to the
RICO cause of action on grounds that Cadle has failed to prove

that either Flanagan or himself were involved in any criminal
act, a material element for establishing a RICO claim.  In
response, Cadle maintains that the record supports a finding that
Flanagan engaged in the RICO predicate acts of wire fraud, mail
fraud, and bankruptcy fraud, and that Fasano provided Flanagan
with knowing and substantial assistance of a degree to implicate
liability under § 1962(d) of RICO.

The Racketeer Influenced and Corrupt Organizations Act
("RICO"), 18 U.S.C. § 1961(c) authorizes a private cause of
action for any person injured in his business or property by
reason of a violation of section 1962.  Id.  A defendant will be
found to have violated section 1962 if a plaintiff proves: (1)
that the defendant (2) through the commission of two or more acts
(3) constituting a pattern (4) of racketeering activity (5)
directly or indirectly invests in, or participates in (6) an
enterprise (7) the activities of which affect interstate of
foreign commerce.  Mos s v. Morgan Stanley, Inc., 719 F.2d 5, 17
(2d Cir. 1983)(citing 18 U.S.C. §§ 1962(a)- (c).  "Racketeering
activity is defined in RICO to mean 'any act or threat involving'
specified state-law crimes, any 'act' indictable under various
specified federal statutes, and certain federal offenses."  H.J.
Inc. V. Northwestern Bell Tel. Co., 492 U.S. 229, 232, 109 S.Ct.
2893 (1988).  The federal offenses that constitute the basis for
a claim of racketeering activity are set forth in Title 18,

20

section 1961(1) of the United States Code.  The listed offenses
include mail fraud in violation of 18 U.S.C. § 1341, wire fraud
in violation of 18 U.S.C. § 1343, and bankruptcy fraud in
violation of 18 U.S.C. § 152.  See Cadle v. Flanagan, 271 F.
Supp. 2d 279, 385 (D. Conn. 2003) (Bankruptcy fraud under § 152
may constitute the basis for a cause of action under RICO).

A.    Flanagan and Criminal Activity

      i.    Mail Fraud and Wire Fraud

      In order to prove a violation of the mail fraud or wire
fraud statute, 18 U.S.C. § 1341 and § 1343 respectfully, the
plaintiff must prove that the defendant (1) participated in a
scheme to defraud (2) with money or property as the object of the
scheme, and (3) use of the mail or wires in furtherance of the
scheme.  United States v. Dinome, 86 F.3d 277, 283 (2d Cir.
1996).  Further, the plaintiff must "show that the scheme was
devised with the specific intent to defraud. . . that the use of
the mails [or wires] in furtherance of the scheme was reasonably
foreseeable, . . that . . . non-disclosures or affirmative
misrepresentations [were] material, . . [and] that some actual
harm or injury was at least contemplated." United States v.
Rodolitz, 786 F.2d 77, 80 (2d Cir. 1986)(quoting United States v.
Bronston, 658 F.2d 920, 927 (2d Cir. 1981)).

      The court is of the opinion that Flanagan can be charged
with having committed multiple acts of mail and wire fraud.  For

21

example, Flanagan's conduct in defeating the lawful claims of
Cadle by (1) intentionally misrepresenting settlement proceeds as
wages; (2) intentionally hiding his rental properties and his
rental income; and (3) intentionally hiding his stock
certificates – all evidence a specific intent to defraud, with
actual harm to Cadle at least contemplated.  Further, the record
reflects that Flanagan, Fasano, Bainer, and Prymas routinely used
the mail and wires for communicating plans and strategies in
furtherance of the above.

    ii.   <u>Bankruptcy Fraud</u>

   "Section 152 of Title 18 of the United States Code provides
that it is unlawful for any individual. . . to knowingly and
fraudulently transfer or conceal any of his. . . property in
contemplation of a bankruptcy proceeding, or with intent to
defeat the bankruptcy law."  <u>United States v. DePalma</u>, 461 F.
Supp. 778, 798 (S.D.N.Y. 1978).  Where a defendant is alleged to
have fraudulently transferred an asset and subsequently concealed
the same asset by making false statements in a bankruptcy
petition, there are two separate violations of the bankruptcy
fraud statute sufficient to constitute a pattern of racketeering
activity within the meaning of RICO.  <u>See</u> <u>Cadle v. Flanagan</u>, 271
F. Supp. 2d 279, 385 (D. Conn. 2003) (<u>citing</u> <u>Bankers Trust v.
Feldesman</u>, 648 F. Supp. 17 (S.D.N.Y. 1986), <u>on</u> <u>reargument</u>, 676 F.
Supp. 496 (S.D.N.Y. 1987), <u>rev'd sub nom.on other grounds</u>,

22

Bankers Trust v. Rhoades, 859 F.2d 1096 (2d Cir. 1988)).

On February 17, 1999, Flanagan filed for relief under
Chapter 11 of the United States Bankruptcy Code.  Flanagan did
not disclose in that petition that he owned three residential
properties or the rental income he received from tenants of those
properties.  Just a few months prior to his bankruptcy filing, in
December of 1998, Flanagan transferred title to his residential
properties to his wife's cousin, one Joseph Caporale, and then
used Caporale's name to collect the rental income for himself
during the pendency of the bankruptcy petition.  The foregoing
constitutes evidence that Flanagan fraudulently transferred
assets and subsequently concealed the same assets by making false
statements in a bankruptcy petition.  Accordingly, there is
predicate conduct of bankruptcy fraud sufficient to constitute
the basis for a cause of action under RICO.

B.   Fasano and Conspiracy

Section 1962(d) of RICO imposes liability for any individual
who conspires to violate the substantive provisions of section
1962.  See id.  The requirements for a RICO conspiracy charge
under section 1962(d) are less demanding.  Baisch v. Gallina, 346
F.3d 366, 376 (2d Cir. 2003).  A conspirator must simply "adopt
the goal of furthering or facilitating the criminal endeavor,"
id. at 377, that is, in the civil context, the plaintiff must
simply show that "the defendant 'knew about and agreed to
facilitate the scheme.'"  Id.  Accordingly, the RICO conspiracy

23

charge "is proven if the defendant 'embraced the objective of the alleged conspiracy,' and agreed to commit two predicate acts in furtherance thereof." Madanes v. Madanes, 981 F. Supp. 241, 258 (S.D.N.Y. 1997).  An attorney, however, may not become subject to liability under RICO for simply furnishing legal advice. Biofeedtrac v. Kolinor Enterprises, 832 F. Supp. 585, 591 (E.D.N.Y. 1993).

Viewing all inferences and ambiguities in the light most favorable to Cadle, the court concludes that the evidence is sufficient to raise a genuine issue of material fact that Fasano embraced the objectives of the alleged conspiracy and agreed to commit at least two predicate acts in furtherance thereof.  In particular, there is evidence that Fasano assisted Flanagan with the settlement proceeds scheme and the shifting stock scheme -- schemes that not only were intended to defraud Cadle from collecting on its lawful claims, but schemes that, through their execution, demonstrate a disregard for the rule of law and the authority of this court.  In particular, there is evidence that Fasano may have: (1) instructed Flanagan to disregard a court order requiring the disclosure and turn-over of Flanagan's assets; (2) assisted Flanagan in setting up checking accounts in his minor childrens' names in order to hide rental income – though the court had placed a freeze on Flanagan's assets; (3) conspired with Flanagan, Bainer, and Prymas to wrongfully change the characterization of payments that Flanagan was receiving from Thompson & Peck from settlement proceeds to wages– all in an

24

effort to undermine a court order and property execution; (4) disregarded a turn-over order of the court and conspired with Flanagan, Prymas, and Bainer to place a restrictive legend on Flanagan's stock certificates; (5) knowingly filed fictitious notices of compliance in response to an order of the court requiring the turn over of Flanagan's stock; and (6) despite knowledge to the contrary, represented to the court that Flanagan did not make any asset transfers after the court's March 9, 1998 order freezing Flanagan's assets. Such conduct far exceeds the rendering of legal advice and suggests participation in fraudulent conduct. See e.g., Madanes v. Madanes, 981 F. Supp. 241, 259 (S.D.N.Y. 1997).[2]

2. Operation and Management - RICO § 1962(c)

Fasano next moves for summary judgment arguing that, because

---

[2] Fasano also maintains that because Cadle offers no proof that he gained an interest or control over Flanagan's financial empire, he is entitled to judgment as a matter of law on the complaint to the extent it alleges a violation of RICO section 1962(b). In response, Cadle argues that there is no requirement that it prove "interest or control" because the action alleges RICO conspiracy in violation of section 1962(d) – a section which simply requires proof that Fasano furnished knowing and substantial assistance to Flanagan in the implementation of his schemes. Section 1962(b) prohibits a person from acquiring or controlling an enterprise through a pattern of racketeering activity. Biofeedtrac v. Kolinor Optical Enterprises, 832 F. Supp. 585 (E.D.N.Y. 1993). Because Cadle does not dispute that the record lacks evidence that Fasano had the requisite interest and control to substantiate a violation of section 1962(b), Fasano is entitled to judgment as a matter of law in this respect.

he simply furnished legal advice and services to Flanagan, the record lacks evidence that he participated in the operation or management of the enterprise sufficient to constitute a violation of RICO section 1962(c).  In response, Cadle maintains that there are disputed issues of act as to whether or not Fasano participated in the operation or management of Flanagan's enterprise.

RICO section 1962(c) makes it unlawful for any person to "participate, directly or indirectly, in the conduct of [a RICO] enterprise's affairs through a pattern of racketeering activity." Id.  "One must participate in the operation or management of the enterprise itself in order to be subject to § 1962 (c) liability."  Reves v. Ernst & Young, 507 U.S. 170, 185 113 S.Ct. 1163 (1993).  This test is satisfied by "knowingly implementing decisions, as well as by making them."  United States v. Allen, 155 F.3d 35, 42 (2d Cir. 1998).  Further,

> it is no great leap to find that one who
> assists in the fraud also conducts or
> participates in the conduct of the affairs
> of the enterprise.

First Capital Asset Management v. Satinwood, Inc., 358 F.3d 159, 178 (2d Cir. 2004).  The issue of whether a RICO defendant operated or managed the affairs of an enterprise is essentially a question of fact.  United States v. Allen, 155 F.3d 35, 42-43 (2d Cir. 1998).

A genuine issue of material fact exists as to whether

26

Fasano's conduct rises to the level of operation or management. As the court has previously concluded, the record suggest that Fasano actively assisted Flanagan with the settlement proceeds scheme and the shifting stock scheme, among others – conduct which the court cannot say, as a matter of law, fails to rise to operation or management sufficient to constitute a violation of RICO section 1962 (c).

3.    RICO Damages

Fasano next argues that he is entitled to judgment as a matter of law because Flanagan paid the judgment in full in connection with Cadle I, and hence, in Fasano's view, Cadle can recover no damages as matter of law.  In response, Cadle maintains that although Flanagan paid the judgment in full in Cadle I, it did not receive reimbursement for its attorneys fees incurred in that collection.  Further, Cadle maintains that it still holds over $ 1 million dollars in judgment and other debt claims against Flanagan, and has been unable to recover on these claims because of the schemes articulated herein.

Without determining the relevance of the $ 1 million dollars in debt Cadle claims to hold, the court concludes that RICO damages are nevertheless properly alleged.  "Legal fees may constitute RICO damages when they are proximately caused by a RICO violation." Stochastic Decisions, Inc. v DiDomenico, 995 F.2d 1158, 1166-67 (2d Cir. 1993) (incurring legal fees was RICO injury where predicate acts included preventing plaintiff's collection efforts on outstanding judgment); see also Bankers

27

<u>Trust Co. V. Rhoades</u>, 859 F.2d 1096, 1005 (2d Cir. 1988) (plaintiff suffered RICO injury by paying attorneys' fees defending frivolous lawsuits started by defendant and designed to forestall collection on an outstanding bankruptcy claim).

Because legal fees incurred in fighting a debtor's attempt to frustrate collection can constitute the basis for a RICO injury, and the record reflects that, indeed, Cadle expended money in fighting the defendant's efforts to frustrate collection through fraud, the cause of action does not fail for want of RICO injury.

## CONCLUSION

For the foregoing reasons, the motion for summary judgment (document no. 187) is denied.

It is so ordered this 2nd day of May, 2005 at Hartford, Connecticut.

        ___/s/ AVC_____
        Alfred V. Covello
        United States District Judge