UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **THE CADLE COMPANY** and | § | |
| **D.A.N. JOINT VENTURE,** | | |
| **A LIMITED PARTNERSHIP,** | § | |
| | | |
| Plaintiffs, | § | |
| | | |
| vs. | § | **No. 3:01CV531(AVC)** |
| | | |
| **CHARLES A. FLANAGAN; LISA G.** | § | **May 12, 2005** |
| **FLANAGAN; ANGELA CIMINO BURR;** | | |
| **MJCC CORPORATION; MJCC REALTY,** | § | |
| **LIMITED PARTNERSHIP (a/k/a MJCC** | | |
| **REALTY LIMITED PARTNERSHIP);** | § | |
| **SOCRATES T. BABACAS; LEONARD A.** | | |
| **FASANO; FASANO & IPPOLITO** | § | |
| **(n/k/a FASANO, IPPOLITO & LEE,** | | |
| **L.L.C.); TODD R. BAINER; TODD** | § | |
| **R. BAINER, L.L.C.; STANLEY F.** | | |
| **PRYMAS; THOMPSON & PECK, INC.;** | § | |
| and **JOSEPH CAPORALE,** | | |
| | § | |
| Defendants. | | |

**THIRD AMENDED
COMPLAINT AND JURY DEMAND**

Plaintiffs complain of Defendants as follows:

**Summary Of The Suit**

1. Plaintiffs are the owners and holders of over $2,400,000 in judgment and other debt claims against Charles A. Flanagan ("Flanagan"). This suit involves the negligence and a fraudulent conspiracy among Flanagan, his wife, and numerous of Flanagan's friends, relatives and business associates to transfer, hide and otherwise shield the substantial assets of Flanagan from the claims of Plaintiffs.

**Jurisdiction And Venue**

2.    This Court has federal question jurisdiction under 28 U.S.C. §1331 and §1964(a) of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §1961-1968 (1984 and Supp. 1991)) ("RICO") (see Stochastic Decisions, Inc. v. DiDomenico, 995 F.2d 1158 (2d Cir.1993)), and supplemental jurisdiction of the state law claims under 28 U.S.C. §1367.  In the alternative, this Court has diversity jurisdiction under 28 U.S.C. §1332.

3.    Venue is appropriate in this Court because acts and transactions constituting tortious conduct and violations of RICO have occurred in this district.

**Parties**

4.    **Plaintiffs**.

4.1. Plaintiff The Cadle Company ("TCC") is an Ohio corporation with its principal place of business in Newton Falls, Ohio.

4.2. Plaintiff D.A.N. Joint Venture, A Limited Partnership ("DJV") is an Ohio limited partnership with its principal place of business in Newton Falls, Ohio.  At all relevant times, all of the partners of DJV were and are citizens of Ohio.

5.    **Defendants**.  All of the Defendants listed below were active participants in and provided knowing and substantial

assistance for the implementation and successful execution of the fraudulent scheme involved in this suit.

5.1. Defendant Charles A. Flanagan is a citizen of Connecticut who resides in North Haven, Connecticut.

5.2. Defendant Lisa G. Flanagan is a citizen of Connecticut who resides in North Haven, Connecticut.

5.3. Defendant Angela Cimino Burr is a citizen of Connecticut who resides in Branford, Connecticut.

5.4. Defendant MJCC Corporation is a Connecticut corporation with its principal place of business in North Haven, Connecticut.

5.5. Defendant MJCC Realty, Limited Partnership (a/k/a M.J.C.C. Realty Limited Partnership) is a Connecticut limited partnership with its principal place of business in North Haven, Connecticut. At all relevant times, all of the partners of MJCC Realty, Limited Partnership (a/k/a M.J.C.C. Realty Limited Partnership) were and are citizens of Connecticut.

5.6. Defendant Socrates T. Babacus is a citizen of Massachusetts who resides in Springfield, Massachusetts.

5.7. Defendant Leonard A. Fasano is a citizen of Connecticut who resides in New Haven, Connecticut.

5.8. Defendant Fasano & Ippolito (n/k/a Fasano, Ippolito & Lee, L.L.C.) is a Connecticut law firm with its

principal place of business in New Haven, Connecticut.  At all relevant times, Defendant Leonard A. Fasano was acting as an agent of and within the course and scope of his duties as an attorney working for Defendant Fasano & Ippolito, and all of the partners of Fasano & Ippolito and Fasano, Ippolito & Lee, L.L.C. were and are citizens of Connecticut.

5.9. Defendant Todd R. Bainer is a citizen of Connecticut who resides in Branford, Connecticut.

5.10.  Defendant Todd R. Bainer, L.L.C. is a Connecticut law firm with its principal place of business in Branford, Connecticut.  At all relevant times, Defendant Todd R. Bainer acted as an agent of and within the course and scope of his duties as the sole attorney working for Defendant Todd R. Bainer, L.L.C. and its predecessor in interest, the Law Firm of Todd R. Bainer.

5.11.  Defendant Stanley F. Prymas is a citizen of Connecticut who resides in Deep River, Connecticut.

5.12. Defendant Thompson & Peck, Inc. is a Connecticut corporation with its principal place of business in New Haven, Connecticut.  At all relevant times, Defendant Stanley F. Prymas was acting as an agent of and within the course and scope of his duties as an officer for Defendant Thompson & Peck, Inc.

5.13. Defendant Joseph Caporale is a citizen of Connecticut who resides in Branford, Connecticut.

<u>**Facts**</u>

**A.   <u>Flanagan Had Wealth, Power And Influence</u>**

6. The Debtor, Charles A. Flanagan ("Flanagan"), was a very wealthy man.  In 1992 Flanagan submitted financial statements to Connecticut banks representing that he had a net worth of over $4,355,000, with an annual salary of over $300,000. In addition, Flanagan received substantial rental income from numerous apartment buildings and other rental properties that he owned.

7. Flanagan's largest single asset was his 50% ownership interest in Defendant Thompson & Peck, Inc. (the "Insurance Agency"), one of the largest independent insurance agencies in Connecticut.  Flanagan represented that his 50% ownership interest in the Insurance Agency was worth $2,500,000.

8. In addition to wealth, Flanagan had considerable power and influence in the Connecticut legal community.  His father, Judge John C. Flanagan, was a long standing Connecticut Superior Court Judge, and Flanagan was not loath in letting his friends, business associates and adversaries know about the influence he supposedly could assert in Connecticut legal circles.  Indeed, even in a case where the opposing lawyer, William Gallagher, was

the president of the Connecticut Bar Association, Flanagan boasted that he would win the suit because his father supposedly had "put the fix in".

**B.**   **Flanagan Transfers A Number Of His Assets**

9.  Flanagan, however, was not satisfied with just being wealthy; he wanted to be very wealthy.  So he borrowed millions of dollars from Connecticut banks and other banks in the New England area to acquire millions of dollars in apartment buildings and other income producing real estate.

10.  When the local real estate market took a downturn in 1993, Flanagan took precautionary measures to protect his substantial assets.  At a time when he was burdened with millions of dollars in bank debt, Flanagan transferred the title to an 18-unit apartment building at 17 Howe Street, New Haven, Connecticut (the "Howe St. Property") to Howe Street Associates, which was a d/b/a of Flanagan.  In addition, Flanagan placed a bogus $250,000 mortgage lien on the Howe St. Property in the name of Crocker House Associates, which was another d/b/a of Flanagan.  Further, Flanagan transferred the title to an office building at 2790 Whitney Avenue, Hamden, Connecticut (the "Whitney Ave. Property") to West Meadow Associates, another d/b/a of Flanagan, and transferred the title to an apartment building at 475-81 George Street, New Haven, Connecticut (the

"George St. Property") to Howe Street Associates, the other d/b/a of Flanagan.  The above transfers and the bogus mortgage lien were implemented by Flanagan in an effort to delay, hinder or defraud his creditors and to shield his rental properties from the claims of his creditors.

11.  On April 5, 1995 Prime Bank (a bank that was seeking repayment from Flanagan on a defaulted real estate loan) took the deposition of Flanagan.  At that time Flanagan testified that he no longer owned the Insurance Agency stock, and that he had previously transferred the stock to a "family trust". Flanagan's representation was false.

12.  On July 18, 1994 Flanagan formed Defendant MJCC Corporation ("MJCC Corp."), but put the stock of the corporation in the names of Sharon Rosen and "Angela Cimino".  Sharon Rosen is Flanagan's sister and "Angela Cimino" is in actuality Defendant Angela Cimino Burr ("Burr"), Flanagan's mother-in-law. Flanagan used MJCC Corp. as a vehicle to collect the rental proceeds from his properties in an effort to hide and shield that income from the claims of his creditors.  Despite the fact that Sharon Rosen and Burr were the sole shareholders and sole officers and directors of MJCC Corp., Flanagan dominated and controlled the corporate affairs of MJCC Corp. and otherwise

utilized MJCC Corp. as a vehicle to delay, hinder or defraud his creditors.

13.   Further, although Flanagan arranged for the funds to acquire the house at 230 Millbrook Road, North Haven, Connecticut (the "North Haven House"), on June 23, 1995 the house was placed in the name of "Angela Cimono".   On that same day, "Angela Cimono" deeded the North Haven House to M.J.C.C. Realty Limited Partnership, which is believed to be a d/b/a of Defendant MJCC Realty, Limited Partnership ("MJCC Ltd.").   The general partner of MJCC Ltd. is MJCC Corp. and the limited partners are Sharon Rosen, Flanagan's sister, and Burr, Flanagan's mother-in-law.   Despite the fact that Sharon Rosen and Burr were the sole limited partners of MJCC Ltd., Flanagan dominated and controlled the business affairs of MJCC Ltd. and otherwise utilized MJCC Ltd. as a vehicle to delay, hinder or defraud his creditors.

14.   Shortly after the conveyance to MJCC Ltd., Flanagan and his wife, Defendant Lisa G. Flanagan, moved into the North Haven House.   The transferor, "Angela Cimono", was in actuality Burr, Flanagan's mother-in-law.   Flanagan handled the acquisition of and transfer of title to the North Haven House in this manner in an effort to delay, hinder or defraud his creditors.

**C.   Flanagan Refuses To Repay The Loans Owed To Plaintiffs And Refuses To Produce Documents Pertaining To His Assets**

15.  By 1995 a number of the banks that had loaned money to Flanagan had failed and were taken over by the FDIC.  Flanagan was able to settle many of his real estate bank debts by misrepresenting his true financial condition to the FDIC, and thereafter paying in settlement with the FDIC a substantially discounted sum.  Flanagan, however, refused to honor his word and repay the loan balances that were owed to the banks that are Plaintiffs' predecessors in interest.

16.  In an effort to get Plaintiffs to substantially reduce the loan balances that were owed by Flanagan, on September 7, 1995 Flanagan represented to Plaintiffs that he had met with a "legal aid attorney" and had "completed [his] schedules for bankruptcy".  Flanagan then warned Plaintiffs that if they did not accept a substantially discounted sum, Flanagan would file bankruptcy, and there would be nothing left for Plaintiffs.

17.  On October 19, 1995 Flanagan had his wife, Lisa Flanagan, file for Chapter 7 (no asset) bankruptcy in the United States Bankruptcy Court, District of Connecticut, No. 95-32150.  After filing, Flanagan arranged for Defendant Leonard Fasano ("Fasano") to become Lisa Flanagan's attorney in connection with her bankruptcy proceeding.

18.  In the Lisa Flanagan bankruptcy proceeding, Plaintiff DJV sought the production of documents pertaining to the substantial assets that the Flanagans previously had represented that they owned in prior financial statements.  Neither Flanagan nor Lisa Flanagan, however, produced the requested documents. Indeed, even in the face of an order by Bankruptcy Judge Dabrowski compelling the production of the documents relating to the Flanagans' assets, the subpoenaed documents were not produced.  Accordingly, on October 15, 1997 Lisa Flanagan was denied a discharge in bankruptcy for failure to produce the documents pertaining to the ownership and transfer of the Flanagans' assets.

**D.  Flanagan Takes The Fifth Amendment And Judge Covello Enjoins Flanagan's Transfer Of Assets**

19.  In 1996 Plaintiff TCC filed suit against Flanagan in Cadle v. Flanagan, United States District Court, District of Connecticut, No. 3:96-CV-02648 (AVC) (the "Federal Suit") in connection with Flanagan's default on a $75,000 loan owed to Great Country Bank in Ansonia, Connecticut.  On March 20, 1997 a final judgment was entered by Judge Covello against Flanagan and in favor of TCC in the amount of $93,519.38.

20.  A debtor's examination of Flanagan was scheduled before Judge Covello on March 9, 1998.  On February 25, 1998 Plaintiff TCC served a document subpoena on Flanagan requiring

Flanagan to produce at the debtor's examination documents pertaining to Flanagan's assets, including Flanagan's stock ownership in the Insurance Agency and Flanagan/Prymas Insurance Group, Inc. (the "Insurance Group").

21.   At the March 9, 1998 debtor's examination, however, Flanagan refused to produce any documents pertaining to his assets, and refused to provide any testimony about his assets. Rather, Flanagan's attorney represented to Judge Covello that Flanagan was invoking his Fifth Amendment right against self-incrimination and was refusing to provide any evidence about his assets because Flanagan was under criminal investigation by the I.R.S. and the F.B.I. for income tax matters.   Flanagan contended that any documents or testimony about his assets would tend to incriminate him as to the I.R.S. matters.   The purported Fifth Amendment I.R.S. concerns, however, were simply a ruse concocted by Flanagan and Fasano to avoid or delay providing any information to Plaintiffs about the location and transfer of Flanagan's assets.

22.   After hearing the purported excuses for Flanagan's refusal to produce documents or testify about his assets, Judge Covello issued an order (1) prohibiting Flanagan from transferring his assets; and (2) requiring Flanagan to submit to the Court for in camera inspection the documents pertaining to

Flanagan's assets which supposedly were subject to the Fifth
Amendment's privilege against self-incrimination:

> I'm entering an order that Mr. Flanagan,
> from this point forward, transfer nothing of
> a single asset until such time as this is
> unraveled, and that includes the family lawn
> mower, bicycle, whatever.
>
> * * *
>
> And, to the extent that the documents that
> [Plaintiff TCC] seeks are claimed [by
> Flanagan] to be the subject of a Fifth
> Amendment privilege, again, the Court would
> direct that those be submitted to the Court
> for in-camera inspection.

### E.    The Children's Checking Account Scheme

23. In a deliberate and bad faith effort to avoid Judge
Covello's injunction, and a further effort to defraud
Plaintiffs, in March of 1998 Flanagan -- upon the advice of
Fasano -- set up separate checking accounts in the name of
Flanagan's minor children, and then had the rental income from
Flanagan's rental properties deposited into those accounts.
Flanagan would then write checks on his children's checking
accounts to transfer assets (cash) in violation of Judge
Covello's injunction and to further hide his income from the
claims of Plaintiffs.

24. The children's checking account scheme continued from
March of 1998 until at least November of 1998. This scheme was
implemented through the use of the U.S. mails in that monthly

bank statements were mailed to Flanagan (but addressed to his minor children) for each month from March of 1998 until at least November of 1998.

**F.   Judge Covello Orders Flanagan To Turn Over The Insurance Agency Stock And To Account For <u>Any Disposition Or Transfer Of The Stock</u>**

25.  Then on April 13, 1998 Judge Covello entered a turnover order requiring Flanagan and the Insurance Agency to (1) turn over to TCC Flanagan's stock in the Insurance Agency; and (2) provide TCC with a full and complete accounting as to any purported transfer or other disposition of the stock if a claim was asserted that Flanagan had "sold, hypothecated, pledged, gifted or otherwise divested himself or disposed of any interest in the [Insurance Agency]."

26.  On April 22, 1998 Fasano, on behalf of Flanagan, represented to Judge Covello that they had "gathered together thousands of documents to be produced for in-camera inspection", and estimated that the documents would be produced to the Court within the next week.  The relevant subpoenaed documents, however, were never produced to the Court or to Plaintiffs.

27.  On September 23, 1998 Judge Covello again ordered Flanagan to turn over the Insurance Agency stock to Plaintiff TCC.  After two motions to stay the enforcement of the turnover order were overruled by Judge Covello, on October 21, 1998

Flanagan and Fasano submitted to the Court a "Notice of Compliance" (Px 1), representing that Flanagan's stock was in the hands of a purported creditor, "Sharon Demetropolis" (actually, "Demetropoulous"), and that Flanagan did not have possession or control of the stock. On the very next day Flanagan and Fasano submitted an "Amended Notice of Compliance" (Px 2), again representing that Flanagan's stock was in the hands of Ms. Demetropoulous and that Flanagan did not have possession or control of the stock. Flanagan and Fasano also represented that

> [s]aid stock has been held by Sharon Demetropolis [sic] prior to the Court's order for turnover on April 13, 1998, and prior to the Court's order on March 9, 1998 prohibiting [Flanagan] from transferring any of his assets.

28. In an affidavit submitted by Fasano to Judge Covello, Flanagan represented that he had "borrowed money from Sharon Demetropolis [sic] and gave her the stock as security for the money." But Ms. Demetropoulous (who was one of Fasano's clients) knew nothing about Flanagan's stock and did not in fact have possession of Flanagan's stock. Fasano knew, must have known, or should have known that Flanagan's representations to the Court were false. Indeed, in a letter by Flanagan to Fasano dated January 6, 1998 (Px 3), Flanagan instructed Fasano that "I

. . . do not want it disclosed where my Stock is presently kept. There may be an attempt to grab this stock."

### G.  **Plan B: The Bogus Babacas Debt Scheme**

29.   On October 26, 1998 Judge Covello issued a Show Cause Order scheduling a contempt hearing on November 16, 1998 for Flanagan's failure to turn over his stock and failure to provide an accounting as to any disposition of the stock as required by the turnover order.   Now Flanagan and Fasano were caught in a bind.   The purported secured debt of Flanagan to Ms. Demetropoulous was bogus, and Fasano's client did not in fact have possession of Flanagan's stock.   Flanagan and Fasano then came up with Plan B: a friend and business associate of Flanagan by the name of Socrates T. Babacas ("Babacas") would claim to have loaned substantial sums of money to Flanagan and also claim to have possession of the stock as collateral for the bogus loan.

30.   Pursuant to this plan, on November 11, 1998 Flanagan prepared and had Babacas fax from his office in Springfield, Massachusetts to Fasano's office in New Haven, Connecticut a bogus stock pledge agreement (Px 4) and a bogus assignment of rents. (Px 5)   Then on November 12, 1998 Flanagan and Fasano submitted a Second Amended Notice of Compliance (Px 6) now representing that the stock of the Insurance Agency was not

really in the hands of Ms. Demetropoulos as previously represented, but rather was in the possession of Babacas. Flanagan and Fasano also represented that Babacas supposedly had loaned Flanagan "$120,000.00 on or about June 19, 1997, and has held said stock as security for the judgment [sic] since the above date until present . . .." Fasano knew, must have known, or should have known that the Babacas debt/stock collateral representations were false.

31. At the November 16, 1998 contempt hearing Flanagan testified that on two occasions Ms. Demetropoulos had loaned him $10,000 in cash, and "we have an understanding that when the Babacas liability is satisfied, she would take over his position." As far as the alleged Babacas debt and stock pledge, Flanagan testified that Babacas had loaned him (Flanagan) $125,000 on September 16, 1997; that Flanagan had pledged the Insurance Agency stock to Babacas as security for the loan; that Flanagan and Babacas had signed the pledge agreement on September 16, 1997; and that Flanagan gave the Insurance Agency stock to Babacas on September 16, 1997, the same date that Flanagan supposedly signed the pledge agreement. Flanagan further testified that he had paid the $1,600 per month in rent from the Whitney Ave. Property to Babacas in cash from September 20, 1997 until February of 1998. Flanagan's testimony was false.

**H.   Judge Covello Holds Flanagan In Contempt, But Gives Flanagan The Opportunity To Purge The Contempt By Producing The Subpoenaed Documents**

32.   After hearing Flanagan's excuses for not complying with the Court's turnover order, on November 16, 1998 Judge Covello proceeded to hold Flanagan in contempt:

> It has been established here [that Flanagan] had willfully and intentionally not complied with the order as previously entered by the Court, and orders [Flanagan] committed to the Bureau of Prisons until such time as he purges himself of the contempt by complying further with the order.

33.   In an effort to keep Flanagan from going to jail that very day, Fasano represented to Judge Covello that Flanagan and Fasano would immediately produce all relevant documents about the purported Babacas debt and the purported stock transfers.

34.   Based on the representations of Fasano, Judge Covello temporarily stayed the execution of his contempt order:

> We're going to continue the [contempt] matter to a very short date here . . . and we'll see what has been produced here, and what problems exist.  But we're going to keep after this on a day to day basis until it's resolved. . . . The execution of the [contempt] order is stayed, and the matter is continued to [November 24, 1998] at 10:00 a.m.

**I.   Plan C: Pay Off The Federal Judgment And Pledge The Stock To Flanagan's Father**

35.   But now Flanagan, Fasano and Babacas had painted themselves into a corner.  Since there was a bogus loan from

Babacas and a bogus stock pledge, either they would have to engage in wholesale fabrication of checks, receipts and numerous other documents, or they would have to pay off the full amount of the judgment, and thereby obviate the need to comply with Judge Covello's outstanding orders.  So Flanagan and Fasano came up with Plan C: "borrow" money from Flanagan's father, and represent to the Court that Flanagan had pledged the stock to Judge Flanagan as security for the loan.  (Px 7)

36.  On November 19, 1998 Flanagan tendered $99, 542.87 into the registry of the district court as the payoff for the judgment against him in the Federal Suit.  Fasano then prepared a pledge and security agreement between Flanagan and his father whereby the effective date of the stock pledge was the date that Judge Covello vacated the injunction order prohibiting Flanagan from transferring his assets.  In an effort to give Plan C an aura of legitimacy, Flanagan and Fasano had Babacas sign, for no consideration and with no apparent benefit to Babacas, a purported "release" (Px 8) authorizing the release of the Insurance Agency stock to Flanagan's father and the subordination of Babacas' purported lien position.

37.  On November 20, 1998 Flanagan and Fasano filed a motion to vacate the court's order prohibiting Flanagan from transferring his assets, and on December 3, 1998 Judge Covello

entered an order lifting the injunction. Accordingly, the purported pledge agreement from Flanagan to his father did not become effective until December 3, 1998.

### J. Flanagan Loans Money To Babacas, But Claims The Loans Were Really Repayment Of The Bogus Babacus Debt

38.  The purported Babacas loan of $125,000 to Flanagan was a sham.  Flanagan did not want to turn the Insurance Agency stock over to Plaintiffs, and Judge Covello refused to allow Flanagan to get away with not producing all of the documents pertaining to the purported loan and the purported stock pledge to Babacas.  Flanagan and Fasano were left with no alternative but to pay off the judgment, and then place the stock in the hands of Flanagan's father as collateral for the loan.

39.  On October 27, 1998 Fasano represented to the Court that "Mr. Flanagan did not make any transfers after Judge Covello's [March 9, 1998] order freezing the assets of Mr. Flanagan."  Then again on November 16, 1998 Fasano represented to Judge Covello that "from the day that order has been received [March 9, 1998], Mr. Flanagan has not transferred any assets."  Fasano knew, must have known, or should have known that his representations were false.

40.  Although Flanagan represented to Judge Covello (a) that he had not transferred any assets after March 9, 1998; and (b) that Babacas had loaned Flanagan $125,000:

    (a)  On May 24, 1998, while the federal court injunction was in effect, Flanagan <u>loaned</u> $500 to Babacas.  (Px 9)

    (b)  On June 19, 1998, while the federal court injunction was in effect, Flanagan <u>loaned</u> $1,000 to Babacas.  Indeed, the $1,000 check was marked "<u>loan</u> - 2 week pay off."  (Px 10) Further, in his June 19, 1998 transmittal letter to Babacas (Px 11), Flanagan wrote: "Enclosed is the amount I can <u>loan</u> you. . . . I hope you can repay this <u>loan</u> amount as you told me - w/in 2 wks as I have bills I will have to pay with the money I have <u>loaned</u> to you."

    (c)  On August 24, 1998, while the federal court injunction was in effect, Flanagan <u>loaned</u> $500 to Babacas.  (Px 12)

    (d)  On October 21, 1998, while the federal court injunction was in effect, Flanagan <u>loaned</u> $500 to Babacas.  (Px 13)  In a transmittal letter to Babacas (Px 14), Flanagan wrote: "Enclosed is $500 check for the <u>loan</u> we spoke about.  Per our discussion this <u>loan</u> will be paid back w/in 2 wks."

41.  In addition, on March 25, 1999 Flanagan loaned an additional $300 to Babacas, the very same person that supposedly loaned $125,000 in cash to Flanagan.  In his March 25, 1999 transmittal letter to Babacas, Flanagan wrote: "Enclosed please find the $300 <u>loan</u> amount we spoke about today. . . . I am running real low on funds."  (Px 15)

42.  On that same date Flanagan wrote another letter to Babacas stating:

> I have sent via express mail today the $300. You will have it delivered to you by noon tomorrow.
>
> I really hope this matter goes this next week.  I do not have the ability to <u>loan</u> any more money.  As it is I am taking my daughters savings and I do not like doing this.

(Px 16)  Then on the next day (March 26th) Flanagan faxed yet another letter to Babacas (Px 17) again confirming the loan by Flanagan to Babacas, and not any repayment of a loan: "The $300 <u>loan</u> will arrive by noon today. . . . I also must tell you that I do not have the ability to <u>loan</u> any more money."

**K.    The Shifting Stock Scheme**

43.  While Flanagan owned 50% of the Insurance Agency, the other 50% owner was Defendant Stanley F. Prymas ("Prymas").  In 1997 and continuing to the present, the attorney for the Insurance Agency was Defendant Todd R. Bainer ("Bainer").

44.  On October 2, 1997 a writ of execution was issued against Flanagan in the Federal Suit.  Then on January 5, 1998, at a time when Bainer represented the Insurance Agency, a property execution in the Federal Suit was served on the Insurance Agency by service on its president, Prymas.

45. Prymas knew of and was concerned about Flanagan's creditors, and was primarily concerned about the collection efforts of Plaintiffs TCC and DJV. During the summer of 1998 Flanagan and Prymas had some discussions about the security of Flanagan's stock in the Insurance Agency and how to prevent the stock from falling into the hands of Flanagan's creditors. Prymas was in favor of Flanagan's desire to keep the stock out of the hands of Plaintiffs.

46. So during the summer of 1998 Flanagan, Prymas and the Insurance Agency attorney, Bainer, came up with a plan to shield Flanagan's Insurance Agency stock from Plaintiffs: (1) Flanagan and Prymas would enter into a shareholder agreement restricting the ability of either shareholder to transfer or otherwise encumber their Insurance Agency stock; and (2) a restrictive legend would be placed on the stock purporting to limit the transferability of the stock. It was Bainer's idea to have a restrictive legend placed on the Insurance Agency stock.

47. Bainer then prepared a "Shareholders' [Buy-Sell] Agreement" whereby both Prymas and Flanagan would agree that they would not "sell, assign, pledge, mortgage, transfer or in any way encumber" their stock in the Insurance Agency. On August 21, 1998 Flanagan, Prymas and Bainer met at the Insurance

Agency's office in New Haven to carry out the terms of their plan.

48. After signing the Shareholder Agreement, Flanagan handed his Insurance Agency stock to Bainer, who then typed the restrictive legend on Flanagan's stock certificate. Bainer then returned the stock certificate to Flanagan, who had actual physical possession of the stock during the time that Judge Covello's order was still in effect for Flanagan to turn over the stock to Plaintiff TCC. Flanagan, however, willfully disobeyed Judge Covello's order.

49. Bainer received the Insurance Agency stock from Flanagan, typed the restrictive legend on Flanagan's stock certificate, and returned the stock certificate to Flanagan at a time when Bainer knew of the property execution that had been served on the Insurance Agency, and knew, must have known, or should have known of the federal court turnover order and the injunction restricting Flanagan's ability to transfer or alienate his property. The primary purpose of signing the Shareholder Agreement and placing the restrictive legend on the stock was to delay, hinder or defraud Plaintiffs in their efforts to execute on Flanagan's stock.

50. Flanagan claims that he then drove to Bradley Airport and delivered his Insurance Agency stock to Babacas, who

supposedly was waiting for Flanagan at the airport. According to Flanagan, Babacas then went back to Springfield, Massachusetts with Flanagan's stock. Although the federal court injunction and turnover orders were still in effect at the time that Flanagan purportedly transferred his Insurance Agency stock to Babacas, Flanagan claims that he did not comply with Judge Covello's orders and did not turn the stock over to Plaintiffs based on the advice of Fasano.

51. Then, when Flanagan faced the prospect of jail time for contempt, Flanagan met with Prymas and discussed Flanagan's plan to pay off the Federal Suit judgment and pledge his Insurance Agency stock to his father. Despite the restrictions in the prior Shareholder Agreement limiting Flanagan's ability to pledge his Insurance Agency stock, Prymas (according to Flanagan) consented to the November 19, 1998 pledge of Flanagan's stock to his father.

### L.    Bainer Vies For Control Of The Efforts To Protect Flanagan's Assets

52. On December 9, 1998 Bainer and Fasano had a telephone conversation to discuss Plaintiffs' efforts to execute on Flanagan's Insurance Agency stock and Fasano's concern that Plaintiffs would obtain Flanagan's stock. Fasano said that he was concerned that the restrictive legend that Bainer had placed on Flanagan's stock might be invalid because it was placed on

Flanagan's stock in violation of Judge Covello's injunction against Flanagan transferring or diminishing his assets. Fasano also informed Bainer that Flanagan would not be going bankrupt unless Flanagan had some sort of "side deal" with Prymas regarding the Insurance Agency stock.

53. Bainer, however, was not overly impressed with Fasano's handling of the Flanagan stock crisis, and was more than willing to let Flanagan and Prymas know that he could do a much better job in fending off the execution efforts of Plaintiffs. In a December 10, 1998 letter to Fasano, Bainer wrote:

> As for your alleged "strategy", it doesn't seem to have served Charlie very well at all. From what I can tell, and in my opinion, there is no organized "strategy" at all. Which is one of the reasons the current serious difficulties exist. It was your obligation to protect Charlie from testifying in any fashion that would harm him, and arguably the Corporation. My understanding is that he has testified before the Federal Court as recently as November 1998, that no restriction has been placed upon his stock. It is my further understanding that a copy of his stock, without the restriction I personally typed onto it [in August 1998], was presented to the Federal Court in November 1998, as a copy of his current stock in its current form.
>
> You knew a restriction had been placed on that stock and purportedly allowed Charlie to harm himself by testifying in that fashion. You should have protected Charlie,

from himself and his lack of knowledge about
the legal system, in this regard and did not
do so.

(Px 18)

54.   In that same letter, Bainer told Fasano:

Further, that you don't see the problem with
such an arrangement, or your representing
Charlie and Judge Flanagan, with regard to
Charlie's pledging of his stock, in known
violation of the buy/sell agreement, and <u>in
an obvious attempt to frustrate the
creditors</u>, is a strong testament to the
reason Charlie finds himself in the serious
difficulty he apparently, and unfortunately,
does.   Your representation of the pledgor
and pledgee in this situation is <u>strong
evidence</u> that there does exist an <u>improper
effort to defraud the creditors</u>.   Even the
most inexperienced of counsels in this type
of matter, usually knows enough to make sure
each player has separate counsel in such a
factual scenario.   Your rationalization that
you're saving Judge Flanagan from expending
monies is just that - a rationalization.
There are any number of lawyers in the area
which would be honored to protect his
interests, if he has any, without charge to
him.

(Px 18, emphasis added)

55.   In a follow up letter to Fasano, Bainer stated:

With regard to your various threats of
suits, conflicts, etc., it is unfortunate
that you practice this way.   The substantive
conflicts are yours.   You and Charlie's
interest is now at conflict because <u>you made
a materially false and misleading
representation to the Court</u> in your November
12, 1998, pleading of "Amended Compliance"
<u>about the location and control of physical
possession of Charlie's stock</u>.

-26-

* * *

> You are not going to hold Thompson & Peck,
> Inc. hostage by telling me what I can or can
> not do for my Client.  From what I can tell,
> your legal acumen is to fight with everyone
> whom doesn't agree with your view of things.
> It is your judgment of <u>allowing</u> <u>Charlie</u> <u>to</u>
> <u>move</u> <u>the</u> <u>stock</u> <u>around</u>, instead of dealing
> with the matter straight-up, which causes
> him to be in the current predicament in
> which he finds himself -- including a
> Federal Court Judge threatening to put him
> in Federal prison.

(Px 19, emphasis added)

56.  Prymas was also concerned about the ability of Fasano
to handle the Insurance Agency stock crisis.  As noted by
Prymas, Plaintiffs' collection attorney, Paul Gaide, Esq., had
made significant progress toward executing on Flanagan's
Insurance Agency stock, "and it appears that desperation is
setting in.  Gaide has his sights on Charlie's stock and it
looks like he will get it."  (Px 20)

57.  A board of directors meeting of the Insurance Agency
was held on December 11, 1998 where Bainer made his pitch to
take over the efforts to thwart Plaintiffs' ability to execute
on Flanagan's Insurance Agency stock.  At that meeting Flanagan,
Prymas and Bainer agreed that they would work together in an
effort to defeat the judgment claims of Plaintiffs.

**M.    The Settlement Proceeds Scheme**

58.    In 1996 Flanagan and Prymas had a dispute over control of the Insurance Agency, which resulted in a suit filed by Flanagan against Prymas in state court in Connecticut.  In mid-June of 1997 Flanagan and Prymas settled that suit.  Pursuant to a June 17, 1998 Settlement Agreement (Px 21), Flanagan, Prymas and the Insurance Agency agreed that (1) there would be an adjustment of the management compensation paid to Flanagan to cover the discrepancies for the additional sums that had been paid to Prymus (id. ¶2); (2) an additional $75,000 in settlement proceeds would be paid to Flanagan over three years payable in 78 equal bi-monthly installments of $961.10 (id. ¶12); and (3) Flanagan would not transfer his Insurance Agency stock to any other person or entity.  (Id. ¶13)  It was fully recognized by Flanagan, Fasano, Prymas and Bainer that the settlement proceeds due to Flanagan were not exempt wages.  As noted by the Insurance Agency's accountant, the payments to Flanagan under the Settlement Agreement were not wages, but "a taxable damage settlement to be reported on 1099-MISC." (Px 22)  Indeed, in early December of 1997 Flanagan told Bainer that he (Flanagan) was going to have a "family trust" set up to receive the settlement proceeds in an effort to shield the settlement proceeds from the claims of Flanagan's creditors.

59.  On January 5, 1998 a property execution was served on the Insurance Agency and Prymas in connection with the final judgment in the Federal Suit.  The settlement proceeds, as non-exempt funds owed by the Insurance Agency to Flanagan, should have been disclosed and turned over to Plaintiff TCC in connection with the property execution.  (Px 23)  Flanagan, however, with the cooperation of Fasano, Prymas and Bainer, agreed to recharacterize the settlement payments as "wages" in an effort to shield those settlement proceeds from Plaintiffs and to delay, hinder or defraud Plaintiffs in their efforts to execute on Flanagan's assets.

60.  Accordingly, on January 20, 1998 Fasano, on behalf of Flanagan, submitted to the federal court an objection to property execution claiming that "other than wages, there is no property held by Thompson & Peck."  (Px 24)  Further, on that same date Flanagan signed, on behalf of the Insurance Agency, a claim exemption form representing that "there is no property held by Thompson & Peck, Inc. with the exception of wages."  (Px 25)  Fasano's and Flanagan's representations were knowingly false.

61. In connection with a $128,217 judgment that had been entered in favor of People's Bank against Flanagan (and subsequently assigned to TCC), on December 18, 1998 TCC served

Post Judgment Remedies Interrogatories on Prymas and the Insurance Agency. Prymas forwarded the PJR Interrogatories to Bainer with the request that Bainer review the documents "and let us know how to respond." (Px 26)

62. Despite the fact that both Prymas and Bainer knew that the Insurance Agency owed the settlement proceeds to Flanagan pursuant to the earlier Settlement Agreement, Bainer advised Prymas to respond that no money was due by the Insurance Agency to Flanagan. Pursuant to the plan worked out among Flanagan, Fasano, Prymas and Bainer, on January 19, 1999 Prymas mailed to Plaintiffs' counsel responses to the PJR Interrogatories which falsely represented that Prymas knew of no funds that were owed to Flanagan.

63. Further, in an effort to prevent Plaintiffs from further inquiry about the settlement funds owed by the Insurance Agency to Flanagan, on December 15, 1998, December 31, 1998, and February 19, 1999, Bainer threatened Plaintiffs' attorneys with grievance filings should they persist in doing what Bainer knew they had a perfect right to do. Bainer's letters threatening quasi-criminal action against Plaintiffs' attorneys (Pxs 27, 28 & 29) were mailed to Plaintiffs' attorneys on or about the dates indicated on the letters.

### N.  The Caporale Property Transfer Scheme

64.  In September of 1998 the George St. Property (which was owned by Flanagan but placed in the name of his d/b/a, Howe Street Associates) had a fair market value of $157,000.  On September 18, 1998 -- while the federal court injunction and turnover order were still in effect -- Flanagan borrowed $94,200 against the George St. Property and placed a $94,200 mortgage on the property.  In violation of Judge Covello's injunction and turnover orders, Flanagan not only placed a mortgage on one of his rental properties, but also dissipated or hid every penny of the $94,200 in mortgage proceeds.

65.  In a further attempt to delay, hinder or defraud Plaintiffs in their efforts to collect on their judgments against Flanagan, in November of 1998 Flanagan and his wife, Lisa Flanagan, devised a scheme to transfer title to Flanagan's remaining rental properties, but still receive the benefit of the rental income from those properties.  Pursuant to this plan, Flanagan would transfer title to his rental properties (the George St. Property; the Howe St. Property; and the Whitney Ave. Property) to a relative; Flanagan would then have the rental proceeds placed in a bank account in the name of the relative; and then Flanagan's wife would retrieve the rent checks from the P.O. box and sign the relative's name to the checks so that the

Flanagans could cash the checks and maintain full use and benefit of the rental proceeds.

66.  In November of 1998 Flanagan met with Defendant Joseph Caporale ("Caporale") to discuss Flanagan's property transfer scheme.  Caporale's wife is the cousin of Flanagan's wife.  At this meeting Flanagan said that he wanted to put some of his properties into Caporale's name if he (Caporale) was willing to go along with it.  Caporale agreed.

67.  Although Caporale never saw any of the rental properties, on December 4, 1998 Flanagan had his controlled business entities execute deeds to convey the George St. Property, the Howe Property and the Whitney Ave. Property to Caporale.  Flanagan and Caporale then set up a United States Post Office box in Hamden, Connecticut (near Flanagan's office) for the receipt of the monthly rent checks, and opened up a joint checking account at First Union Bank in Branford, Connecticut for the deposit of the rent checks.

68.  From early 1999 until approximately October of 2000, the monthly rent checks from Flanagan's rental properties were made out, at Flanagan's direction, to Caporale and mailed by the various tenants on the various properties to the P.O. box in Hamden, Connecticut.  For one tenant alone, the monthly rent checks made out to Caporale were $1,100 per month.

69.  Although these monthly rent checks were made out to Caporale and mailed to the Caporale P.O. box, Caporale never went to the P.O. box; never saw a rent check; never endorsed a rent check for deposit; never saw a monthly bank statement; and never saw or received a penny from the rents.  Rather, either Flanagan or Lisa Flanagan would forge Caporale's name on the back of each rent check, and then cash or deposit the funds for Flanagan's own use and benefit.

### O.  **Flanagan Commits Bankruptcy Fraud**

70.  Although Flanagan had transferred, hidden or shielded his assets from the claims of Plaintiffs, Flanagan still wanted to recoup the $99,542.87 that he was forced to pay to TCC to avoid going to jail for contempt.  So on February 17, 1999 Flanagan, with Fasano as his attorney, filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Connecticut in New Haven.  Thereafter Flanagan filed a bankruptcy adversary proceeding against TCC (Flanagan v. Cadle, Adversary No. 99-3053) alleging that the $99,542.87 that was paid to TCC was a voidable preference, and thus subject to recoupment by Flanagan through §547(b) of the Bankruptcy Code.

71.  In his bankruptcy schedules, Flanagan and Fasano listed the false debt owed to Babacas, but did not list the alleged debt owed to Ms. Demetropoulous.  Further, Flanagan did

not list in his bankruptcy schedules the ownership interests that he had in the three rental properties, and falsely testified at the §341 Meeting of Creditors that he did not own any real estate.

72.  Equally as disturbing, Flanagan did not list in his bankruptcy schedules the substantial rental income that he had received and was continuing to receive from the George St. Property, the Howe St. Property and the Whitney Ave. Property. Then, however, on January 25, 2000 Flanagan was arrested by the New Haven police for failing to provide heat and water for the tenants at the Howe St. Property.  (Px 30)  This prompted an investigation by Plaintiffs which eventually unearthed Flanagan's ownership interest in the three rental properties that Flanagan had not disclosed in connection with his bankruptcy filing.

   **P.   The Defendants Are Jointly And Severally
        Liable For The Conduct Of Flanagan And
        The Other Co-Conspirators**

73.  The Defendants made or knowingly participated in the fraudulent transfers referred to above with actual intent to hinder, delay or defraud Plaintiffs in their efforts to enforce the judgments and other debt claims that they hold against Flanagan.  The Defendants were and are part of a conspiracy to wrongfully and fraudulently transfer, hide and otherwise shield

the assets of Flanagan from the judgment and other debt claims of Plaintiffs.  The acts of each Defendant as described herein played an integral role in the execution of the fraudulent scheme, and at all relevant times all Defendants acted with awareness that their role was part of an overall improper activity.

74.  All of the Defendants are jointly and severally liable for the full amount of damages caused to Plaintiffs because they each engaged in the affirmative conduct described herein in furtherance of the goals of the conspiracy.  Upon joining the conspiracy, each Defendant became liable for the prior conduct of Flanagan and the earlier conspirators, and remains liable for the subsequent conduct of the other conspirators until such time as there is a clear and unequivocal renouncement of any further participation in the conspiracy.  To date, none of the co-conspirators named as Defendants herein have renounced their further participation in the fraudulent conspiracy.  As far as Plaintiffs' claims against Flanagan, Plaintiffs only seek damages from Flanagan for his post-petition wrongful conduct, and not for any pre-petition conduct on Flanagan's part, and hereby expressly limit their damage claims against Flanagan for the damages caused by Flanagan's wrongful conduct which occurred

from and after the time he filed for bankruptcy on February 17, 1999.

75.   In connection with the fraudulent transfers described herein, the Defendants used the United States mails and interstate telephone lines as an integral part of the conspiracies to wrongfully and fraudulently transfer, hide and otherwise shield Flanagan's assets from the judgment and other debt claims of Plaintiffs.

**Q.   Plaintiffs Have Standing As Assignees Of The Judgment And Other Debt Claims Against Flanagan**

76.   Plaintiffs TCC and DJV, as assignees, are the owners and holders of the judgments and other debt claims against Flanagan, with the full power and right to enforce any claims pertaining thereto against the Defendants as named herein.

77.   All conditions precedent to recovery by Plaintiffs have been performed or have occurred.

78.   Plaintiffs reallege all preceding and succeeding paragraphs as the basis for each of the following Counts.

**Count One**
**(RICO)**

79.   The course of conduct described above constitutes violations by Defendants of §§1962(b), (c) and (d) of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§1961 _et_ _seq._) ("RICO").   The Defendants engaged in a pattern

of wrongful conduct involving bankruptcy fraud, mail fraud and wire fraud to acquire an interest in and to maintain control over the affairs of Flanagan's financial empire. Further, the Defendants combined together to engage in a pattern of wrongful conduct involving bankruptcy fraud, mail fraud and wire fraud to fraudulently transfer and otherwise maintain custodianship over Flanagan's assets. See <u>Handeen v. Lemaire</u>, 112 F.3d 1339 (8th Cir. 1997); <u>Stochastic Decisions, Inc. v. DiDomenico</u>, 995 F.2d 1158 (2d Cir. 1993); <u>Gutierrez v. Givens</u>, 989 F.Supp. 1033 (S.D.Cal. 1997); <u>Gutierrez v. Givens</u>, 1 F.Supp.2d (S.D.Cal. 1998); and <u>Cadle Co. v. Schultz</u>, 779 F.Supp. 392 (N.D.Tex. 1991).

     80.    **Predicate Acts**.

     80.1.    **Bankruptcy Fraud**. The conduct of the Defendants described herein constitutes bankruptcy fraud in violation of 18 U.S.C. §152, 18 U.S.C. §157 and 11 U.S.C. §548 in that the Defendants provided knowing and substantial assistance to Flanagan in connection with the fraudulent transfer of Flanagan's assets as set forth above; Flanagan's assertion of the bogus Babacus debt; and the filing of fraudulent bankruptcy schedules and statements of financial affairs.

80.2.  **Mail Fraud.**  The conduct of the Defendants described herein constitutes mail fraud in violation of 18 U.S.C. §1341 in that:

    (a)  the Defendants participated in a scheme or artifice to defraud or attempt to defraud Plaintiffs;

    (b)  the Defendants, or someone associated with the scheme, used the mails or caused the mails to be used, by placing or causing to be placed in an authorized depository for mail a letter intended to be sent or delivered by the United States Postal Service; and

    (c)  the use of the mails was for the purpose of executing the scheme.

In that regard, the United States mails were used in connection with:

    (1)  the implementation and execution of transfers of title to the Howe St. Property; the George St. Property; and the Whitney Ave. Property in 1995, and the placement of the bogus $250,000 mortgage lien on the Howe St. Property;

    (2)  the formation of MJCC Corp. and MJCC Ltd.;

    (3)  the acquisition of the North Haven House in the name of "Angelo Cimono" and transfer of that property to MJCC Ltd. in June of 1995;

    (4)  the children's checking account scheme;

    (5)  the bogus Babacas debt scheme;

    (6)  the pay-off of the federal judgment and the pledge of Flanagan's Insurance Agency stock to Flanagan's father;

(7)   the loaning of funds by Flanagan to Babacas;

(8)   the settlement proceeds scheme; and

(9)   the Caporale property transfer scheme, including the mailing of the monthly rent checks from Flanagan's tenants to the P.O. box in Hamden, Connecticut.

80.3.  **Wire Fraud.**  The conduct of the Defendants described herein constitutes wire fraud in violation of 18 U.S.C. §1343 in that:

(a)   the Defendants devised a scheme or artifice to defraud or attempt to defraud Plaintiffs;

(b)   the Defendants transmitted communications by means of a telephone or fax machine connected to interstate wires for the purpose of executing such scheme or artifice; and

(c)   the Defendants used a telephone or a fax machine connected to interstate wires willfully and with the specific intent to carry out some essential step in attempting to carry out the scheme or artifice to defraud or attempt to defraud Plaintiffs.

In that regard, the interstate telephone wires were used in connection with:

(1)   the bogus Babacas debt scheme;

(2)   the pay off of the federal judgment and the pledge of Flanagan's Insurance Agency stock to Flanagan's father; and

(3)   the loaning of funds by Flanagan to Babacas.

81.  **Pattern Of Racketeering Activity.**   As described herein, the Defendants engaged in numerous acts of racketeering activity within ten years of each other.  The predicate acts and other wrongful conduct of the Defendants described herein were related in the sense that they involved the same or similar purposes, results, participants, victims and methods of commission, and did not involve isolated or sporadic events. Further, there was continuity of conduct in that the predicate acts and other wrongful activities of the Defendants described herein extended over a considerable period of time and involved conduct with the threat of continuing wrongful activities.

82.  **Enterprise.**

82.1. Pursuant to 18 U.S.C. §1962(b), the Defendants have engaged in the pattern of racketeering activity described herein to acquire an interest in or maintain control of Flanagan's financial empire, an "enterprise" affecting interstate commerce within the meaning of 18 U.S.C. §1961(4).

82.2. Further, pursuant to 18 U.S.C. §1962(c), Flanagan, the Defendants and other persons not named as Defendants herein have participated in an associational enterprise-in-fact affecting interstate commerce.  The associational enterprise was devoted to the wrongful and fraudulent transfer and continuing custodianship of Flanagan's

assets, and was formed for the purpose of carrying out the activities alleged in this Complaint. The enterprise has an on-going organization and functions as a continuing unit. The purpose of the enterprise is to accomplish the fraudulent transfer and continuing custodianship of Flanagan's assets to shield those assets from the claims of Plaintiffs. Flanagan, the Defendants and other persons not named as Defendants herein have conducted the affairs of this enterprise through the pattern of racketeering activity described herein.

82.3. Further, the Defendants participated in varying capacities in the fraudulent scheme to transfer Flanagan's assets for the purpose of defeating the claims of Plaintiffs. The Defendants willfully associated themselves with the scheme to defraud Plaintiffs and willfully participated in such scheme. As set forth above, Flanagan committed numerous fraudulent and wrongful acts which constitute mail fraud, wire fraud and bankruptcy fraud. The Defendants named herein knew about and agreed to facilitate Flanagan's wrongful and fraudulent scheme, and provided knowing and substantial assistance toward the accomplishment of Flanagan's wrongful and fraudulent goal. In addition, the Defendants aided or abetted the mail fraud, wire fraud and bankruptcy fraud described herein. Accordingly,

pursuant to 18 U.S.C. §1962(d) and 18 U.S.C. §2, the Defendants are liable as principals and co-conspirators.

83. **Injury.** Although the fraudulent conspiracy described herein was directed primarily at Plaintiffs, the victims of the Defendants' fraudulent scheme are Plaintiffs as well as the other judgment creditors of Flanagan, including Fleet Bank in New Haven, Connecticut; Heritage Bank & Trust in Holyoke, Massachusetts; First Federal Savings and Loan Association of Rochester in Rochester, New York; and Milford Savings Bank in Milford, Connecticut. Plaintiffs have been injured in their business or property by reason of a violation of 18 U.S.C. §1962. Pursuant to 18 U.S.C. §1964(c), Plaintiffs are entitled to recover from the Defendants treble their actual damages, costs of suit, and reasonable attorneys' fees.

### Count Two
### (Tortious Interference)

84. The course of conduct described above constitutes tortious interference by Defendants with Plaintiffs' right to enforce, and realize the benefits from, their judgments against Flanagan. See Cadle Co. v. Schultz, 779 F.Supp. 392 (N.D.Tex. 1991).

<u>**Count Three**</u>
**(Negligence And Negligence Per Se)**

85.  On January 5, 1998 the Court issued a property execution requiring Flanagan and T&P to allow the execution on assets of Flanagan that were held by T&P.

86.  On March 9, 1998 the Court issued an injunction prohibiting Flanagan from transferring his assets.

87.  On April 13, 1998 the Court issued a turnover order requiring Flanagan and T&P to turn over to Plaintiffs Flanagan's T&P stock and to provide an accounting as to any alleged disposition of Flanagan's T&P stock.

88.  The Defendants, including, in particular, Defendants Fasano and Bainer, owed a duty to the Court and to the Plaintiffs to honor these orders, and Plaintiffs were the direct and intended beneficiaries of the above court orders.

89.  The Defendants breached their duties to the Court and to the Plaintiffs in the manner set forth above, proximately causing direct, consequential and proximate damages to Plaintiffs in the amount of approximately $1.7 million for lost debt damages, and approximately $500,000 for collection expense damages.

<u>**Damages**</u>

90.  Plaintiffs have suffered direct, proximate and consequential damages as a result of the acts described above in

an amount not less than $2,400,000, which includes the amount that Plaintiffs would have been able to collect under Plaintiffs' judgment and other debt claims against Flanagan, as well as the attorneys' fees incurred by Plaintiffs in connection with their unsuccessful efforts to execute on the assets of Flanagan. The damage claims against Flanagan, however, are limited to the damages caused by Flanagan's wrongful conduct which occurred from and after Flanagan's bankruptcy filing on February 17, 1999. Plaintiffs only seek damages from Flanagan for his post-petition wrongful conduct, and not for any pre-petition conduct on Flanagan's part, and hereby expressly limit their damage claims against Flanagan to the damages caused by Flanagan's wrongful conduct which occurred from and after the time he filed for bankruptcy on February 17, 1999. Further, in the event Plaintiffs obtain a final judgment against Flanagan herein, Plaintiffs will not proceed against any assets of Flanagan without first obtaining permission from the bankruptcy court so long as Flanagan's bankruptcy case remains open at the bankruptcy court level.

91. In addition, because the wrongful acts of the Defendants as described herein were willful and malicious, Plaintiffs are entitled to an assessment of punitive damages

against the Defendants in an amount not less than three times Plaintiffs' actual damages.

## Attorneys' Fees

92. As a result of the acts described above, Plaintiffs have employed the undersigned attorneys to prosecute this cause. Plaintiffs are entitled to recover reasonable attorneys' fees from Defendants for trial of this cause, plus additional reasonable attorneys' fees for any further trials, hearings or appeals.

## PRAYER

Plaintiffs TCC and DJV request:

(1) that the Defendants be cited to appear and answer;

(2) that Plaintiffs have judgment against the Defendants, jointly and severally, for an amount not less than the sum of (a) Plaintiffs' actual damages in an amount not less than $2,400,000; (b) statutory treble damages under 18 U.S.C. §1964(c); (c) punitive damages in an amount not less than three times Plaintiffs' actual damages; (d) pre- and post-judgment interest at the highest lawful rate; and (e) reasonable attorneys' fees; however, no joint and several liability is sought as to Flanagan, but rather as to Flanagan Plaintiffs only seek damages from Flanagan for his post-petition wrongful conduct, not for any pre-petition conduct on Flanagan's part,

and hereby expressly limit their damage claims against Flanagan for the damages caused by Flanagan's wrongful conduct which occurred from and after the time he filed for bankruptcy on February 17, 1999; and

(3)   that the Court grant Plaintiffs court costs and such further relief to which they may be entitled.

### JURY DEMAND

Plaintiffs request a trial by jury.

Respectfully submitted,
LAW OFFICES OF
F. DEAN ARMSTRONG, P.C.

DATED: May 12, 2005.          By_____

F. Dean Armstrong
Ct. Fed. Bar #CT22417
1324 Dartmouth Road
Flossmoor, IL  60422
(708) 798-1599
Fax (708) 798-1599

Edward C. Taiman, Jr., Esq.
SABIA & HARTLEY, LLC
190 Trumbull Street
Suite 202
Hartford, CT 06103-2205
(860) 541-2077
Fax (860) 713-8944

Attorneys for Plaintiffs
The Cadle Company and
D.A.N. Joint Venture,
A Limited Partnership

**<u>CERTIFICATE OF SERVICE</u>**

I certify that the foregoing instrument was hand delivered on May 12, 2005 to all defense counsel of record as shown on the attached Service List.

_____
F. Dean Armstrong
