**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **THE CADLE COMPANY** and **D.A.N. JOINT VENTURE, A LIMITED PARTNERSHIP,** | § | **No. 3:01CV531(AVC)** |
| Plaintiffs, | § | |
| vs. | § | |
| **CHARLES A. FLANAGAN, et al.** | § | **May 17, 2005** |
| Defendants. | § | |

**PLAINTIFFS' MOTION AND BRIEF FOR CLARIFICATION AS TO THE ROLE OF ATTORNEY WILLIAM GALLAGHER AS TRIAL COUNSEL**

The lead attorney for Defendants Stanley F. Prymas ("Prymas") and Thompson & Peck, Inc. ("T&P"), Barbara Cox, Esq., was "uncertain" about whether Attorney William Gallagher was a fact witness and thus disqualified from serving as her co-counsel for the trial, and requested clarification on how Plaintiffs anticipated using Attorney Gallagher as a fact witness at trial. Plaintiffs will call Attorney Gallagher as a fact witness during their case in chief, and, pursuant to D.Conn.L.Civ.R. 83.13(b)(2), believe Attorney Gallagher is disqualified from serving as co-counsel with Attorney Cox for the trial of this case.

1. Attorney William Gallagher was the attorney for Defendant Prymas in connection with the suit between Charles A. Flanagan ("Flanagan") and Prymas, which resulted in the $75,000

settlement agreement payments by T&P to Flanagan. The characterization of the payments under that settlement agreement are part of the "settlement proceeds" scheme involved in this case.

2. While Plaintiffs do <u>not</u> allege that Attorney Gallagher was involved in the conspiracy to hide Flanagan's assets, Attorney Gallagher is a material fact witness who will be called to testify as a witness for the Plaintiffs. Indeed, Plaintiffs have, for quite some time, listed Attorney Gallagher as a witness Plaintiffs intended to call to testify at the trial. In fact, on January 29, 2004 Plaintiffs took the deposition of Attorney Gallagher, which confirmed that Attorney Gallagher is a material fact witness for Plaintiffs in this case.

3. Defendants Prymas and T&P have been represented in this action by Attorney Barbara Cox. Attorney Cox has handled all of the pre-trial matters in this case and has attended all of the depositions on behalf of Defendants Prymas and T&P. Even though Attorney Cox is associated with Attorney Gallagher's law firm, Plaintiffs believe that Attorney Cox's continued representation of Defendants Prymas and T&P is authorized by Local Rule 83.13(c), and Plaintiffs do <u>not</u> seek disqualification of Attorney Cox from continuing to act as trial counsel for Defendants Prymas and T&P.

4.  Although Plaintiffs had listed Attorney Gallagher as a material fact witness and had taken his deposition, in the proposed voir dire submitted by Defendants Prymas and T&P they indicated that Attorney Gallagher would serve as co-counsel during the trial with Attorney Cox.  Accordingly, on May 13, 2005 the undersigned counsel conferred with Attorney Cox to see if she did, in fact, anticipate using Attorney Gallagher as her co-counsel during the trial, and whether she had examined the issue as to whether Attorney Gallagher could serve as trial counsel.  Attorney Cox responded that she was "uncertain" if Attorney Gallagher was disqualified as trial counsel, and that in order to decide that issue she would "have to see how Plaintiffs anticipated calling Attorney Gallagher as a fact witness."  As set forth below, Plaintiffs will call Attorney Gallagher as a witness during Plaintiffs' case in chief, and believe that Attorney Gallagher is prohibited from serving as trial counsel with Attorney Cox pursuant to Local Rule 83.13(b)(2) because Attorney Gallagher's testimony "is or may be prejudicial to the client."

5.  At the trial Plaintiffs will attempt to prove that there was a conspiracy orchestrated by Flanagan to recharacterize the $75,000 settlement agreement payments from 1099 miscellaneous income (subject to this Court's property

execution) to wages (which would be exempt from the property execution). In that connection, an important issue is the intent of Flanagan, Prymas and T&P at the time they entered into the settlement agreement.

6. Attorney Gallagher, the attorney for Prymas in connection with the settlement of the Flanagan v. Prymas suit, believed that the accountants for the parties had made a determination that the $75,000 settlement agreement payments by T&P to Flanagan were 1099 miscellaneous income, and not wages. (Gallgher Dep. (Px A) pp. 14-15) According to Attorney Gallagher, it was the desire and the plan of T&P, Prymas and Flanagan to treat the $75,000 in settlement payments as 1099 miscellaneous income. (Id. pp. 15-16) As admitted by Attorney Gallagher at his deposition:

> Q: As of the date that the stipulation was dictated into the record for the settlement, the proposed settlement of the state court litigation [in Flanagan v. Prymas], it was the intention of both Stan Prymas and Charlie Flanagan and the intention of Thompson & Peck to treat the $75,000 as damage settlement which would be 1099 miscellaneous income?
>
> A: Yes.
>
> * * *
>
> Q: And not wages, correct?
>
> A: That's correct.
>
> * * *

Q: At the time that those three parties, Charlie Flanagan, Thompson & Peck, Stan Prymas, at the time that the settlement agreement was tendered to the judge for approval, at that time you understood it was the intent of all three of those parties that the $75,000 payments would be damage payments, 1099 miscellaneous income, and not wages?

A: Yes.

* * *

Q: [Would] it be wrong for Stan Prymas and Thompson & Peck to acquiesce in changing the characterization [of the settlement agreement payments] if it was for the purpose of cheating a creditor?

A: Absolutely.

(Id. pp. 19-20 & 41) See, also, Px 204 ¶1.

7. According to Attorney Gallagher, it was "pretty obvious" why Flanagan wanted to change his characterization of the settlement agreement payments. (Id. p. 47) As Attorney Gallagher testified at his deposition, Flanagan wanted to change the characterization of the settlement agreement payments:

> to avoid paying his creditors. He had a history of that. I told you, he was the judicial district's biggest deadbeat, in my opinion, had 96, computer printout showed 93 or 96 cases in which he was a defendant.

(Id. p. 47-48) Moreover, Attorney Gallagher testified at his deposition that:

Q: Is there any doubt in your mind [Flanagan] set out to defraud the Cadle Company?

> A: Charlie, no doubt in my mind that Charlie set out not to pay the Cadle Company, one way or the other.
>
> Q: By hook or by crook?
>
> A: That's right.

(Id. pp. 60-61)  Accordingly, Attorney Gallagher is a material fact witness to prove Plaintiffs' claims that Flanagan orchestrated a conspiracy to hide, transfer and otherwise shield his assets from the claims of the Plaintiffs.

   8.   Prymas also contends that he should not be held liable for the failure to comply with the orders issued by the Court in Cadle I because Prymas supposedly was not aware of those orders. Plaintiffs intend to call Attorney Gallagher to the witness stand to refute that claim.  Indeed, in an April 25, 1998 letter by Attorney Gallagher to Defendant Leonard A. Fasano ("Fasano"), Attorney Gallagher stated:

> I interpret your April 22, 1998 letter to attempt to shift some responsibility to Stanley Prymas for Mr. Flanagan's current problem in the federal court. Mr. Prymas is not responsible for the status of that matter, he did not invoke the 5th Amendment, and he did not bring about the request by Judge Covello to look at the Waterbury file [Flanagan v. Prymas] in camera.

(Px 192)  A copy of this letter was sent by Attorney Gallagher to Prymas.  (Id. p. 2)

9. Further, another defense raised by Prymas and T&P in this case is that Prymas and Flanagan did not get along, so that it was not realistic to conclude that Prymas would do anything to help Flanagan avoid his creditors. At Attorney Gallagher's deposition, however, he testified that:

Q: February 25, 1998, you understood at that time Todd Bainer was the corporate counsel for Thompson & Peck?

A: Yes, that's right.

Q: Page 2 [Px 72], "There has been much discussion and willingness on the part of the corporation," that's Thompson & Peck, "to try to assist Charlie in the current predicament in which he finds himself." Do you see that reference?

A: I do, yes.

Q: Are you aware, or were you a participant in any discussions about the willingness of Thompson & Peck to help Charlie out of his predicament?

A: No. As a matter of fact, this is contrary to my understanding.

Q: What did you understand or what do you understand Charlie's predicament to have been as of February 25, 1998?

A: Charlie's predicament was, and I can't remember when he filed bankruptcy, but before he filed his bankruptcy he was probably the New Haven Judicial District's biggest deadbeat. He had enormous number of debts against him. He had been, or was being investigated by the United States Attorney, and I'm not sure whether that was

> for bankruptcy fraud or for income tax evasion.
>
> They also happened to have one of the most successful insurance agencies in the business, and Stanley wanted the business to continue successfully, but my sense is that Stanley personally, and Mike Buckmir, who was involved in the company at this time, would have been involved with <u>helping Charlie</u> only to the extent of it <u>benefiting the business</u> in some way.

(Px A pp. 27-28 (emphasis added))

10. It is also the position of Plaintiffs that if the Defendants had complied with this Court's turnover order, instead of moving Flanagan's stock around and placing a restrictive legend on that stock, Plaintiffs would have been able to execute on that stock towards satisfaction of the approximately $1 million in judgment and promissory note claims that Flanagan owed to Plaintiffs. Attorney Gallagher's testimony will help prove this issue:

> Q: So you understand there was a prior episode where an executing creditor was able to get physical possession of Charlie Flanagan's stock?
>
> A: That's right.
>
> Q: And you understood that Charlie Flanagan paid off the creditor when the stock was subject to be foreclosed upon or sold at a sheriff's sale?
>
> A: That's right.

* * *

Q: So you understand that if the creditor could get hold of Charlie Flanagan's stock, at least in prior episodes, Charlie paid the creditor?

A: That's right.

(Id. p. 23)

11. Finally, Flanagan claims that he did not use the rental property income that he ran through his children's checking accounts for his personal benefit, but rather used that rental property income to renovate his rental properties. According to Attorney Gallagher, however, he "had many conversations about Charlie's behavior as a slumlord." (Id. p. 56)

Q: Slumlord?

A: Yeah. Several of the houses Charlie invested in and went ultimately to demolition were not very far from where my office is located. We had, there's an orthodox community in the neighborhood that at one time was on a campaign to rid the neighborhood of prostitutes and slumlords, and Flanagan owned property on Chapel Street in New Haven on the south side of Chapel Street, which was understood in the definition of the neighborhood, and the rabbi in charge of the neighborhood association at the time became so frustrated that he, to deal with Charlie he just redefined the lines of the neighborhood to exclude the south side of that street, because there were houses there that Charlie owned that were absolute disasters.

    Q: Did it appear to you that Charlie was draining income from the properties, in other words taking the income out but not putting money back in?

* * *

THE WITNESS: Yeah.

(Id. pp. 56-57)

**PRAYER**

Because Attorney Cox was noncommittal about whether Attorney Gallagher was disqualified from serving as her co-counsel for the trial of this case, Plaintiffs request the ruling from this Court that Attorney Gallagher be disqualified from serving as co-counsel with Attorney Cox for the trial of this case pursuant to Rule 83.13(b)(2) because Attorney Gallagher's testimony "is or may be prejudicial to the client."

Respectfully submitted,
ARMSTRONG LAW FIRM

DATED: May 17, 2005.

By__________/s/______
F. Dean Armstrong
Ct. Fed. Bar #CT22417
1324 Dartmouth Road
Flossmoor, IL 60422
(708) 798-1599
Fax (708) 798-1597

Edward C. Taiman, Esq.
SABIA & HARTLEY, LLC
190 Trumbull Street
Suite 202
Hartford, CT 06103-2205
(860) 541-2077
Fax (860) 713-8944

Attorneys for Plaintiffs
The Cadle Company and
D.A.N. Joint Venture,
A Limited Partnership

**Certificate of Service**

I certify that a correct copy of the foregoing instrument was mailed on May 17, 2005 to all defense counsel as shown on the attached Service List.

___________/s/______________
F. Dean Armstrong