**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| THE CADLE COMPANY, ET AL | : | CIVIL ACTION NO. |
|     Plaintiffs, | : | 3:01CV531(AVC) |
| | : | |
| vs. | : | |
| | : | |
| CHARLES A . FLANAGAN, ET AL | : | |
|     Defendants. | : | MAY 20, 2005 |

**PLAINTIFFS' RESPONSE TO DEFENDANTS STANLEY PRYMAS**
**AND THOMPSON & PECK'S MOTION TO QUASH A TRIAL**
**SUBPOENA SERVED ON WILLIAM F. GALLAGHER**

       1. In over 25 years as a litigator, the undersigned counsel has never before moved to

disqualify opposing counsel or co-counsel as a fact witness. It is unseemly; it is usually done

for strategic purposes; and, when the attorney involved is, in fact, a fact witness, it usually is

not necessary because the lawyer/fact witness realizes the inevitable difficulties and jury

confusion that flow from a fact witness also serving as an advocate, many times trying to justify

his or her conduct which has become part of the evidence in the case. Here, unfortunately, a

Motion to Disqualify Attorney Gallagher as co-counsel is necessary.

       2. There was no strategic maneuvering on the part of Plaintiffs. Indeed, Plaintiffs had

Attorney Gallagher listed on Plaintiffs' Witness List over 36 months ago (Px B¶ 18), and on

January 29, 2004 – almost 16 months ago – Plaintiffs took the deposition of Attorney Gallagher

without any objection by any of the Defendants.

3.  Attorney Gallagher – as counsel for Defendant Stanley F. Prymas  – is at the very

core of Plaintiffs' allegations in connection with the settlement proceeds scheme for both (a)

the initial intent to characterize the $75,000 settlement proceeds as 1099 miscellaneous income

(and thus subject of this Court's property execution); and (b) the attempts by the Defendants to

recharacterize the settlement agreement payments as "wages" after the January 5, 1998 service

of the writ of execution on Thompson & Peck ("T&P").

4.  Charles Flanagan now claims that it was <u>always</u> the intent of the parties to treat the

settlement agreement payments as wages, not 1099 income.  Attorney Gallagher's testimony is

relevant on that issue.  Attorney Gallagher, the attorney for Prymas in connection with the

settlement of the <u>Flanagan v. Prymas</u> suit, believed that the accountants for the parties had

made a determination that the $75,000 settlement agreement payments by T&P to Flanagan

were 1099 miscellaneous income, and not wages.  (Gallgher Dep. (Px A) pp. 14-15)  According

to Attorney Gallagher, it was the <u>desire</u> and the <u>plan</u> of T&P, Prymas and Flanagan to treat the

$75,000 in settlement payments as 1099 miscellaneous income.  (<u>Id</u>. pp. 15-16)  As admitted by

Attorney Gallagher at his deposition:

> Q:     As of the date that the stipulation was dictated into the record for
> the settlement, the proposed settlement of the state court litigation
> [in <u>Flanagan v. Prymas</u>], it was the intention of both Stan Prymas
> and Charlie Flanagan and the intention of Thompson & Peck to
> treat the $75,000 as damage settlement which would be 1099
> miscellaneous income?

2

A:      Yes.

                                    * * *

Q:      And not wages, correct?

A:      That's correct.
                                    * * *

Q:      At the time that those three parties, Charlie Flanagan, Thompson &
        Peck, Stan Prymas, at the time that the settlement agreement was
        tendered to the judge for approval, at that time you understood it
        was the intent of all three of those parties that the $75,000 payments
        would be damage payments, 1099 miscellaneous income, and not
        wages?

A:      Yes.

                                    * * *

Q:      [Would] it be wrong for Stan Prymas and Thompson & Peck to
        acquiesce in changing the characterization [of the settlement
        agreement payments] if it was for the purpose of cheating a
        creditor?

A:      Absolutely.

(Id. pp. 19-20 & 41)  See, also, Px 204 ¶1.

    5.  Moreover, in a letter dated June 18, 1997 from Attorney Gallagher to Prymas (Px 240),

Attorney Gallagher stated:

        We need the letter from the company's accountant that we discussed
        yesterday.  Once Reilley [Flanagan's attorney] examines the letter
        and agrees that it is acceptable, we can then forward the agreement
        to the court with a joint motion to enter judgment in accordance
        with the agreement, and to seal the file in accordance with the
        agreement.

3

Attorney Gallagher is a material fact witness to refute Flanagan's claim that it was always the intent

of the parties to treat the $75,000 settlement agreement payments as wages.

6. Indeed, the fact that Attorney Gallagher is a material fact witness on the

recharacterization of the settlement proceeds is beyond dispute.  In a letter dated April 19, 1998

from Leonard Fasano to Todd R. Bainer (Px 245), Fasano stated that Flanagan had informed him

(Fasano) that "Attorney Gallagher will be reviewing some of the documentation", apparently

pertaining to issues surrounding the recharacterization of the settlement agreement proceeds.  In

a Memo dated April 13, 1998 from Flanagan to Fasano (Px 246), Flanagan stated that it was "[his]

understanding that Attorney Gallagher will not agree to allow Attorney Gaide to [review the sealed

file in Flanagan v. Prymas] without a fight."  In a Memo dated April 29, 1998 from Prymas to

Flanagan (Px 247) Prymas informed Flanagan that:

> I spoke with Attorney Gallagher yesterday and he told me that he
> did not like some of the wording in the proposed amendment to our
> Settlement Agreement that Attorney Fasano drafted.  He told me
> that he would send a letter to Attorney Fasano with his ideas on how
> it should be changed.

7. In the third recital of the proposed modification of the settlement agreement (Px 247 p.

2 #401176) it is recited that "said [settlement agreement] monies were always to be considered

wages."  Plaintiffs intend to call Attorney Gallagher to the witness stand to show that he would not

agree to the proposed amendment to the settlement agreement because the proposed amendment

4

contained a representation in the third recital which was false. Attorney Gallagher knew from his

personal knowledge that the settlement agreement payments were <u>not</u> intended to be considered

wages.

8.  Further, in the T&P Auxiliary Committee Minutes dated May 1, 1998 (Px 248) it is

stated that:

> Mr. Prymas and Mr. Flanagan discussed the draft of the amendment
> to the Settlement Agreement which was prepared by Attorney
> Fasano (attached).  Mr. Flanagan will ask Attorney Fasano to
> contact Attorney Gallagher to work out some wording changes as
> well as to share this information with T&P's corporate attorney,
> Todd Bainer, for his review and approval.

Moreover, in a Memo from Flanagan to Prymas dated May 6, 1998 "Re Revised Settlement

Agreement", Flanagan states "Please see the attached.  A copy has been sent to Atty. Gallagher and

I believe Atty. Bainer.  The changes you and I spoke about on 5/1/98 have been so noted."

9.  Plaintiffs intend to call Attorney Gallagher to witness stand to prove that he wouldn't

agree with the proposed modifications to the settlement agreement because the representations that

Prymas and Flanagan sought to make therein where not to the truth.

10.  If, as the Defendants now claim, they relied on the advice of Flanagan's accountant to

change the characterization of the settlement agreement proceeds, why did they feel the need – <u>after</u>

<u>the</u> <u>accountant's</u> <u>new</u> <u>opinion</u> <u>was</u> <u>rendered</u> – to seek a modification of the settlement agreement

and obtain a court order approving the modification?  Attorney Gallagher is a material fact witness

on the efforts of the parties to seek a court order in <u>Flanagan v. Prymas</u> so as to justify a change in

characterization.

11.  According to Attorney Gallagher, it was "pretty obvious" why Flanagan wanted to

change his characterization of the settlement agreement payments.  (Px A p. 47)  As Attorney

Gallagher testified at his deposition, Flanagan wanted to change the characterization of the

settlement agreement payments:

> to avoid paying his creditors.  He had a history of that.  I told you,
> he was the judicial district's biggest deadbeat, in my opinion, had
> 96, computer printout showed 93 or 96 cases in which he was a
> defendant.

(<u>Id</u>. p. 47-48)  Moreover, Attorney Gallagher testified at his deposition that:

> Q:    Is there any doubt in your mind [Flanagan] set out to defraud the
>       Cadle Company?
>
> A:    Charlie, no doubt in my mind that Charlie set out not to pay the
>       Cadle Company, one way or the other.
>
> Q:    By hook or by crook?
>
> A:    That's right.

(<u>Id</u>. pp. 60-61)  Accordingly, Attorney Gallagher is a material fact witness to prove Plaintiffs'

claims that Flanagan orchestrated a conspiracy to hide, transfer and otherwise shield his assets from

the claims of the Plaintiffs.

6

12. Unfortunately, Attorney Gallagher is also a material fact witness on the efforts of the parties to place a restrictive legend on Flanagan's T&P stock. In an April 7, 1998 Memo from Prymas to Flanagan (Px 243) Prymas stated:

> As I mentioned to you yesterday, I also think it is a good idea to have restrictive wording on our stock. However, the restrictive wording usually states that the stock cannot be transferred or sold in accordance with a dated stockholder's agreement.
>
> Since we do not have a stockholder's agreement yet, we need to develop one. The A.C. is working to develop a stockholder's agreement and have it finalized by the June meeting of the A.C. Todd Bainer is drafting an agreement based on the input from our April 3, 1998 meeting. He will have a draft for the May meeting which Attorney Fasano can review. <u>I will also have Attorney Gallagher review it.</u> Hopefully, we can finalize an agreement and restrict the stock before the end of June.

(Px 243)(emphasis added) Attorney Gallagher cannot be put in the position of arguing the merits of having a restrictive legend placed on Flanagan's T&P stock when Plaintiffs claim that the efforts of Prymas and Flanagan to so restrict Flanagan's T&P stock was part of a scheme to avoid this Court's orders and Plaintiffs' execution efforts.

13. Prymas also contends that he should not be held liable for the failure to comply with the orders issued by the Court in <u>Cadle I</u> because Prymas supposedly was not aware of those orders. Plaintiffs intend to call Attorney Gallagher to the witness stand to refute that claim. Indeed, in an April 25, 1998 letter by Attorney Gallagher to Defendant Leonard A. Fasano ("Fasano"), Attorney Gallagher stated:

7

> I interpret your April 22, 1998 letter to attempt to shift some
> responsibility to Stanley Prymas for Mr. Flanagan's current problem
> in the federal court. Mr. Prymas is not responsible for the status of
> that matter, he did not invoke the 5th Amendment, and he did not
> bring about the request by Judge Covello to look at the Waterbury
> file [Flanagan v. Prymas] in camera.

(Px 192) A copy of this letter was sent by Attorney Gallagher to Prymas. (Id. p. 2) When Attorney

Gallagher states that Prymas was not responsible "for Mr. Flanagan's current problem in the federal

court" and that Prymas was not the one to "invoke the Fifth Amendment, and he did not bring

about the request by Judge Covello to look at the [Flanagan v. Prymas] file in camera", it is

reasonable to infer that Attorney Gallagher – as counsel for Prymas – was informed of this Court's

March 9, 1998 injunction prohibiting Flanagan from transferring his assets, and thus refute the

claims by Prymas, T&P and Bainer that they had no knowledge of this Court's injunction.

14. Further, another defense raised by Prymas and T&P in this case is that Prymas and

Flanagan did not get along, so that it was not realistic to conclude that Prymas would do anything

to help Flanagan avoid his creditors. At Attorney Gallagher's deposition, however, he testified that:

> Q:    February 25, 1998, you understood at that time Todd Bainer was the
>       corporate counsel for Thompson & Peck?
>
> A:    Yes, that's right.
>
> Q:    Page 2 [Px 72], "There has been much discussion and willingness
>       on the part of the corporation," that's Thompson & Peck, "to try to
>       assist Charlie in the current predicament in which he finds himself."
>       Do you see that reference?

A:      I do, yes.

Q:      Are you aware, or were you a participant in any discussions about the willingness of Thompson & Peck to help Charlie out of his predicament?

A:      No.  As a matter of fact, this is contrary to my understanding.

Q:      What did you understand or what do you understand Charlie's predicament to have been as of February 25, 1998?

A:      Charlie's predicament was, and I can't remember when he filed bankruptcy, but before he filed his bankruptcy he was probably the New Haven Judicial District's biggest deadbeat.  He had enormous number of debts against him.  He had been, or was being investigated by the United States Attorney, and I'm not sure whether that was for bankruptcy fraud or for income tax evasion.

They also happened to have one of the most successful insurance agencies in the business, and Stanley wanted the business to continue successfully, but my sense is that Stanley personally, and Mike Buckmir, who was involved in the company at this time, would have been involved with <u>helping</u> <u>Charlie</u> only to the extent of it <u>benefiting</u> <u>the</u> <u>business</u> in some way.

(Px A pp. 27-28 (emphasis added))

15.  It is also the position of Plaintiffs that if the Defendants had complied with this Court's turnover order, instead of moving Flanagan's stock around and placing a restrictive legend on that stock, Plaintiffs would have been able to execute on that stock towards satisfaction of the approximately $1 million in judgment and promissory note claims that Flanagan owed to Plaintiffs. Attorney Gallagher's testimony will help prove this issue:

Q:    So you understand there was a prior episode where an executing creditor was able to get physical possession of Charlie Flanagan's stock?

A:    That's right.

Q:    And you understood that Charlie Flanagan paid off the creditor when the stock was subject to be foreclosed upon or sold at a sheriff's sale?

A:    That's right.

* * *

Q:    So you understand that if the creditor could get hold of Charlie Flanagan's stock, at least in prior episodes, Charlie paid the creditor?

A:    That's right.

(Id. p. 23)

16.    Finally, Flanagan claims that he did not use the rental property income that he ran through his children's checking accounts for his personal benefit, but rather used that rental property income to renovate his rental properties.  Attorney Gallagher knows from his personal knowledge – from his own observations – that Flanagan's representations are false.  According to Attorney Gallagher, he "had many conversations about Charlie's behavior as a slumlord."  (Id. p. 56)

Q:    Slumlord?

A:    Yeah.  Several of the houses Charlie invested in and went ultimately to demolition were not very far from where my office is located.

> We had, there's an orthodox community in the neighborhood that at one time was on a campaign to rid the neighborhood of prostitutes and slumlords, and Flanagan owned property on Chapel Street in New Haven on the south side of Chapel Street, which was understood in the definition of the neighborhood, and the rabbi in charge of the neighborhood association at the time became so frustrated that he, to deal with Charlie he just redefined the lines of the neighborhood to exclude the south side of that street, because there were houses there that Charlie owned that were absolute disasters.

> Q:    Did it appear to you that Charlie was draining income from the properties, in other words taking the income out but not putting money back in?

                                    * * *

THE WITNESS:    Yeah.

(Id. pp. 56-57)

17. The disqualification standard set forth by the 8th Circuit in Shelton v. American Motors Corporation, 805 F.2d 1323 (8th Cir. 1997) have not been adopted by the Second Circuit. See In Re: Subpoena issued to Dennis Friedman, 350 F.3d 65, 71-72 (2d Cir. 2003). Indeed, the Second Circuit has required the disqualification of attorneys as fact witnesses in situations similar to that present in this case. See Lamborn v. Dittmer, 873 F. 2d 522, 530 – 32 (2d Cir. 1989). See, also, Fulfree v. Manchester, 945 F. Supp. 768 (S.D.N.Y. 1986); MacArthur v. Bank of New York, 524 F. Supp. 1205 (S.D.N.Y. 1981). Moreover, the Second Circuit has ruled that "in the disqualification situation, any doubt is to be resolved in favor of disqualification." Hull v. Celanese

Corporation, 513 F.2d 568, 571 (2d Cir. 1975). Here the evidence is clear that Attorney Gallagher

is a fact witness who will be called to the witness stand by Plaintiffs and, pursuant to Local Rule

83.13(b)(2), should be disqualified because Attorney Gallagher's testimony is or may be prejudicial

to the client.

## PRAYER

Pursuant to Local Rule 83.13(b)(2), Plaintiffs respectfully request the court overrule the

motion by Prymas and T&P to quash the trial subpoena served on Attorney Gallagher, and that the

court rule that Attorney Gallagher is disqualified from serving as co-counsel with Attorney Cox

for the trial of this case pursuant to Rule 83.13(b)(2) because Attorney Gallagher's testimony is or

may be prejudice to the client.

Respectfully submitted
ARMSTRONG LAW FIRM

By:_____

F. Dean Armstrong, Esq.
1324 Dartmouth Road
Flossmoor, IL 60422
Federal Bar No. ct22417

and

Edward C. Taiman, Jr.
Sabia & Hartley, LLC
190 Trumbull Street, Suite 202
Hartford, CT 06103
(860) 541-2077
Fed. Bar No. ct01319

12

## **Certification of Service**

I certify that a correct copy of the foregoing instrument was sent by via facsimile and U.S. mailed on May 20, 2005 to all defense counsel as shown on the attached Service List.

_____
F. Dean Armstrong

E:\WPDOCS\CADLE\Flanagan\RICO\RespMtQuashGallagher.wpd

13