The Cadle Co. vs Flanagan

1/29/2004                                                             William Gallagher

Page 1

1                UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF CONNECTICUT
2

3

4    ------------------------------)
     THE CADLE COMPANY and          )
5            Plaintiff              ) Civil Action No.
     VS                             ) 3:01CV531(AVC)
6                                   )
     CHARLES A. FLANAGAN; LISA G.   )
7    FLANAGAN; ANGELA CIMINO BURR;  )
     MJCC CORPORATION; MJCC REALTY  )
8    LIMITED PARTNERSHIP (a/k/a MJCC)
     REALTY LIMITED PARTNERSHIP);   )
9    SOCRATES T. BABACAS; LEONARD A.)
     FASANO; FASANO & IPPOLITO & LEE,)
10   (n/k/a FASANO, IPPOLITO & LEE, )
     L.L.C.); TODD R. BAINER; TODD  )
11   R. BAINER, L.L.C.; STANLEY F.  )
     PRYMAS; THOMPSON & PECK, INC.; )
12   and JOSEPH CAPORALE,           )
              Defendant             )
13   ------------------------------)

14

15

16         DEPOSITION OF: WILLIAM GALLAGHER
           DATE: JANUARY 29, 2004
17         HELD AT: FEDERAL BUILDING
           450 MAIN STREET
18         HARTFORD, CONNECTICUT

19

20

21

22

23      Reporter: WENDY J. ALLEN, RPR, CRR, LSR #00221
              BRANDON SMITH REPORTING SERVICE
24                  44 Capitol Avenue
                    Hartford, CT 06106
25                  Tel (860) 549-1850

PLAINTIFF'S EXHIBIT

The Cadle Co. vs Flanagan
1/29/2004
William Gallagher

Page 2

APPEARANCES:

REPRESENTING THE PLAINTIFF:
F. DEAN ARMSTRONG, ESQ.
639 Perth Avenue
Flossmoor, Illinois 60422
Tel: (708) 798-1599
Fax: (708) 798-1597
-and-
EDWARD C. TAIMAN, JR., ESQ.
SABIA & HARTLEY, LLC
190 Trumbull Street
Suite 202
Hartford, Connecticut 06103-2205

REPRESENTING DEFENDANT TODD R. BAINER:

MARY ANNE A. CHARRON, ESQ.
GORDON, MUIR AND FOLEY, LLP
Hartford Square North
Ten Columbus Boulevard
Hartford, Connecticut 06106-5123

REPRESENTING DEFENDANT STANLEY PRYMAS:
BARBARA L. COX, ESQ.
GALLAGHER & CALISTRO
1377 Ella Grasso Boulevard
P.O. Box 1925
New Haven, Connecticut 06509

REPRESENTING DEFENDANT LEONARD A. FASANO:
FASANO & IPPOLITO:
JUNE M. SULLIVAN, ESQ.
HALLORAN & SAGE
One Goodwin Square
225 Asylum Street
Hartford, Connecticut 06103

ALSO IN ATTENDANCE:

DAN CADLE

Page 3

INDEX

WITNESS:                                        PAGE:

William Gallagher
  Direct Examination by Mr. Armstrong      5
  Cross-Examination by Ms. Sullivan        58
  Redirect Examination by Mr. Armstrong    59

EXHIBITS:                                       PAGE:

Exhibit 173, memo dated 4/22/98 to
William Gallagher from Leonard Fasano............ 8
Exhibit 174, letter dated 4/30/98 to
Leonard Fasano from William Gallagher............ 9

(Exhibits retained by Attorney Cox)

Page 4

(Deposition commenced at 10:15 a.m.)

WILLIAM GALLAGHER, Deponent, having first been duly sworn, deposes and states as follows:

DIRECT EXAMINATION BY MR. ARMSTRONG:

Q  Mr. Gallagher, please state your full name for the record.
A  William Gallagher. Middle initial is F.
Q  Mr. Gallagher, can you tell us what you did to prepare for your deposition today?
A  I talked to Barbara at length and reviewed the settlement agreement that we entered into in 1997 and some correspondence subsequent to that date from Attorney Fasano seeking to amend, I think the paragraph number was 12.
Q  Was that done this morning or last night?
A  No, it was done a couple days ago.
Q  Did you review the allegations in the second amended complaint?
A  In this case?
Q  Yes, sir.
A  No.
Q  Have you ever reviewed the allegations in the

Page 5

second amended complaint?
A  I think I did initially. By the way, I broke my glasses, that's why I have my sunglasses, it's the last bifocals I got.
Q  These are from Walgreens, I broke mine, too.
   MS. COX: For the record, I don't think Attorney Gallagher has seen the second amended complaint.
BY MR. ARMSTRONG:
Q  The documents that you reviewed were the settlement agreement, and then you said there's correspondence subsequent to the date of the settlement agreement from Len Fasano seeking to amend paragraph 12 of the settlement agreement?
A  Right. And I think he attached a proposed amendment. I responded by letter. And by the way, I have no recollection of this at all. I know what happened because I looked at the correspondence, but I don't recall it.
Q  Would it be fair to say that your recollection, your testimony today would be based in part upon these documents that you just recently reviewed?
A  In part, yes.
Q  Do you have with you the letter that Len

2 (Pages 2 to 5)

Brandon Smith Reporting

Page 14

1  This particular paragraph, paragraph 12, was left silent
2  because we didn't have, and we, but until we had this
3  opinion, Stanley wasn't going to sign the agreement.
4     Q  We're going to get into some correspondence
5  later from Todd Bainer, but was there ever any
6  discussions with Stan Prymas, Todd Bainer, about one of
7  the reasons to treat it as 1099 miscellaneous income was
8  to avoid the wage garnishments that other creditors had
9  placed on Charlie's wages?
10    A  No.
11      MS. CHARRON: If you don't mind, could
12 you do one person at a time instead of multiple?
13      MR. ARMSTRONG: Yes. He said no, though.
14      THE WITNESS: The answer was no. My
15 recollection is that the only concern at this point was
16 not to compromise the Sun Trust loan because they
17 couldn't risk the company calling the loan, and
18 apparently it was a major concern to Stanley.
19 BY MR. ARMSTRONG:
20    Q  Take a look, if you would, sir, at Exhibit
21 172. This is going to be kind of hard to get at, but
22 we'll do our best. Exhibit 172 is a letter dated July
23 2, 1997 to you from David Reilly. Did you receive that
24 letter?
25    A  Yeah, obviously if David Reilly sent it to me

Page 15

1  I got it. I don't recollect exactly what his concern
2  was.
3     Q  The CPAs had the duty to determine whether it
4  was a 1099 or a W-2, they acted. What did you
5  understand that to mean?
6     A  Meaning that they had made a determination, as
7  far as I knew, that it was 1099.
8     Q  They being Thompson & Peck's accountant and
9  Charlie Flanagan's accountant?
10    A  If Charlie got an independent accountant I
11 don't have any recollection. I haven't seen any
12 documents concerning that.
13    Q  Take a look at Exhibit 110, if you would,
14 please. Andy D'Agostino, do you know who he is?
15    A  No, I don't. I can see he's a certified
16 public accountant and this is addressed to Charlie
17 Flanagan. I don't recollect having seen this letter
18 before.
19    Q  When you said you understood they had spoken,
20 being Thompson & Peck's accountant and Charlie
21 Flanagan's accountant, were you aware that Andy
22 D'Agostino was Charlie Flanagan's accountant?
23    A  No, I was not aware. I might have been told
24 that, but as I sit here today I can't remember.
25    Q  Did you understand that the $75,000 in

Page 16

1  settlement proceeds after the settlement agreement was
2  entered into, the payments that were periodic payments
3  to Charlie Flanagan were, in fact, treated by Thompson &
4  Peck, Stan Prymas and Charlie Flanagan as 1099 income?
5     A  I'm not sure how exactly how they -- I believe
6  that's true, but I don't have direct knowledge of that.
7     Q  That was their desire, as far as you
8  understood it?
9     A  As far as I understood, yes.
10    Q  That was their plan, as far as you understood
11 it?
12    A  That's right.
13    Q  And that's what they did, as far as you
14 understood it?
15    A  As far as I know. Up to a point. There was a
16 point at which another controversy arose, but then
17 that's represented in Fasano's letters.
18    Q  Take a look, if you would, please, at Exhibit
19 23.
20    A  This is the Mr. Rayner letter of June 17th,
21 right, that's the letter that we got before Stanley
22 signed the agreement.
23    Q  Then Exhibit 69, have you seen Exhibit 69
24 before? That's a memorandum from Stan Prymas to Todd
25 Bainer dated February 4th, '98.

Page 17

1     A  I have no recollection of this.
2     Q  And then take a look and see if Exhibit 69-A
3  refreshes your recollection as to motion for turnover
4  order?
5     A  I have no recollection of this, either. This
6  is in the Cadle Company versus Flanagan. Did Thompson &
7  Peck have counsel at the time of the certification as to
8  Attorney Fasano and Thompson & Peck?
9       MS. COX: This is the debt collection
10 action, Bill.
11      THE WITNESS: I understand that, yeah.
12 All right. But I understand it, yeah.
13 BY MR. ARMSTRONG:
14    Q  At this time, February 4th, 1998, you
15 represented Stan Prymas?
16    A  Well, in matters that he consulted me about.
17 The active representation of Stanley ended with the
18 conclusion of the litigation in June or July. I think
19 the final proceeding was in July of 1997. That's the
20 Flanagan versus Prymas lawsuit.
21    Q  February 4th, 1998, did you have any
22 conversations about that time frame with Stan Prymas
23 about a property execution or a motion for turnover
24 order that was served on Thompson & Peck?
25    A  If I did, I have no recollection. You'd have

The Cadle Co. vs Flanagan

1/29/2004                                                      William Gallagher

### Page 18

```
 1   to —
 2      Q   This refers to a motion for turnover order,
 3   which is Exhibit 69-A. Stan Prymas says, "I'm concerned
 4   about item number 6 that says, furthermore, Thompson &
 5   Peck can claim to not have any money assets due to Mr.
 6   Flanagan." That's in quotes. Then Mr. Prymas says,
 7   "Who represented this to the Court? As you know it is
 8   inaccurate because T&P does have an obligation to CF."
 9   Do you see that reference?
10      A   Yeah, I do, yeah.
11      Q   Then the next paragraph, sixth line from the
12   bottom, talks about the apparent misrepresentation to
13   the Court that T&P does not have possession of any money
14   or assets due CF, do you see that reference?
15      A   I see it, yeah.
16      Q   Was it your understanding that the way the
17   parties originally treated the settlement agreement, the
18   $75,000 in settlement proceeds, was considered money or
19   assets belonging from Thompson & Peck to Charlie
20   Flanagan?
21      A   Well, I know there was a controversy as to
22   whether it was paid as part of salary or whether it was
23   a settlement, installment payments on a settlement. So
24   far as I knew, there was installment payments on a
25   settlement. Apparently that changed at some point. But
```

### Page 20

```
 1            MS. COX: Objection.
 2   BY MR. ARMSTRONG:
 3      Q   That was the intent when you told the judge
 4   about the terms of the settlement, correct?
 5      A   I don't think we told the judge. We gave the
 6   judge the document, and the discussion on the record had
 7   to do with sealing the file. The judge had to make
 8   specific findings.
 9      Q   At the time that those three parties, Charlie
10   Flanagan, Thompson & Peck, Stan Prymas, at the time that
11   the settlement agreement was tendered to the judge for
12   approval, at that time you understood it was the intent
13   of all three of those parties that the $75,000 payments
14   would be damage payments, 1099 miscellaneous income, and
15   not wages?
16      A   Yes.
17      Q   Now, you said there was confusion and later on
18   you said there was a flip-flop. There wasn't confusion
19   in your mind, as far as you knew Stan Prymas's mind,
20   correct?
21      A   There was confusion in my mind. I happened to
22   disagree with the accountant's letter, but since the
23   accountant had given it — you got to step back a
24   minute. The litigation and the $75,000 had to do with
25   Charlie's claim there was a shortfall in wages, and the
```

### Page 19

```
 1   I think there was a fair amount of confusion about that.
 2      Q   Confusion. The —
 3      A   With respect to the legal status, because I
 4   think Charlie did a flip-flop and wanted, at some point
 5   wanted it as wages. Stanley's main concern, I think
 6   this is reflected in my letter to Fasano, that was
 7   marked this morning, the Sun Trust was advised or
 8   inquired of and never really responded one way or
 9   another, and I think my letter refers to their inaction
10   could be inferred as acquiescence, and therefore if you
11   want to make it wages, you got an accountant's opinion,
12   I don't see the problem.
13      Q   As of the date that the stipulation was
14   dictated into the record for the settlement, the
15   proposed settlement of the state court litigation, it
16   was the intention of both Stan Prymas and Charlie
17   Flanagan and the intention of Thompson & Peck to treat
18   the $75,000 as damage settlement which would be 1099
19   miscellaneous income?
20      A   Yes.
21      Q   And not wages?
22            MS. COX: Objection.
23   BY MR. ARMSTRONG:
24      Q   And not wages, correct?
25      A   That's correct.
```

### Page 21

```
 1   $75,000, in my judgment, represented wages, and it was
 2   couched, as I recall, he had asserted a tort claim and a
 3   wage claim in the lawsuit, and I felt that although it
 4   was wages, ultimately the money would be taxed to
 5   Charlie, and whether it was 1099 or wages at that moment
 6   wasn't an important concern from my point of view, other
 7   than not violating the Sun Trust agreement. That's the
 8   real key here, and that's the reason we got the letter.
 9      Q   Mr. Gallagher, were you part of a conspiracy
10   to defraud Sun Trust?
11      A   Was there a conspiracy to defraud Sun Trust?
12      Q   You tell me.
13      A   I have no idea.
14      Q   Were the settlement wages payment or 1099
15   miscellaneous income?
16      A   I don't know definitively what they were. We
17   had an opinion from an accountant that they were 1099,
18   and that's the way we proceeded.
19      Q   Did you have your fingers crossed?
20      A   No. We felt that with that evidence Sun
21   Trust, the settlement agreement and the Sun, the letter
22   from the accountant was submitted, so far as I
23   understand, to Sun Trust to make a determination as to
24   whether the provisions of the agreement were violated,
25   and if they were violated whether they would call the
```

6 (Pages 18 to 21)

Page 22

1  loan, and they took no action as far as I know.
2      Q  They took no action. Did they take no action
3  as far as you understood based on representations to Sun
4  Trust by Stan Prymas and Thompson & Peck that the
5  $75,000 was not wages but was in fact 1099 miscellaneous
6  income?
7          MS. COX: Objection.
8          THE WITNESS: I don't know because I —
9  this was done by Stanley, you'd have to ask him.
10 BY MR. ARMSTRONG:
11     Q  This Exhibit 69 talks about, "As you know it
12 is inaccurate because Thompson & Peck does have
13 possession of money or assets due to Charlie Flanagan."
14 As of February 4, 1998, did you share that belief, that
15 Thompson & Peck —
16     A  February 4, '98. There was a period of
17 time — well, first, Stanley I think had the notion that
18 the settlement payments, the structured settlement
19 payments might have been an asset, and secondly, there
20 was a long period of time when Charlie's stock was in
21 the possession of the Thompson & Peck safe because it
22 had been seized by a sheriff, and as a matter of fact,
23 it was redeemed by Charlie on the day of the auction,
24 and I don't remember if that event occurred before or
25 after this controversy. It was Attorney Pat Young who

Page 23

1  represented a creditor of Charlie who seized the stock
2  and set it out for, a sheriff set it out for auction,
3  and as I understand it, the indebtedness to Young's
4  client was paid the day before or the day of the
5  auction.
6      Q  So you understand there was a prior episode
7  where an executing creditor was able to get physical
8  possession of Charlie Flanagan's stock?
9      A  That's right.
10     Q  And you understood that Charlie Flanagan paid
11 off the creditor when the stock was subject to be
12 foreclosed upon or sold at a sheriff's sale?
13     A  That's right.
14     Q  The very day of the sale?
15     A  Or very close to the day of the sale. I
16 recall it being the day of the sale, but it might have
17 been the day before.
18     Q  So you understand that if the creditor could
19 get hold of Charlie Flanagan's stock, at least in prior
20 episodes, Charlie paid the creditor?
21     A  That's right.
22     Q  Take a look, if you could, at Exhibit 70.
23 That's a letter to Leonard Fasano from Todd Bainer dated
24 February 4th, 1998. Have you seen that document before?
25     A  Very recently.

Page 24

1      Q  When did you see that one, sir?
2      A  I think it was called to my attention, it
3  would be a while ago. I saw it recently within the last
4  six months, and I saw it also when I believe this letter
5  was given to Attorney Gaide, this series of
6  correspondence, by Attorney Steve Wright, and I think I
7  saw it at that time.
8      Q  Let me ask you, did you understand that
9  somebody took some documents out of the safe or out of a
10 closet at Thompson & Peck that purportedly belonged to
11 Charlie Flanagan, gave them to Steve Wright, who then
12 gave them to Paul Gaide?
13     A  No, I have no knowledge of that. I know Steve
14 Wright had some documents that he gave to Paul Gaide,
15 but as to the source of Steve's, how Steve came in
16 possession of those documents I have no idea.
17     Q  PX 70, "Mr. Prymas," the third paragraph,
18 "informed me that the settlement agreement specifically
19 anticipated that the payments to Charlie under that
20 agreement would be 1099 income." Do you see that
21 reference?
22     A  Whereabouts are you referring?
23     Q  Second paragraph, talks about discussion with
24 Stan Prymas. "He," Stan Prymas, "also informed me the
25 settlement agreement specifically anticipated that the

Page 25

1  payments to Charlie under that agreement would be 1099
2  income." Are you following me there?
3      A  Yes.
4      Q  That's consistent with your understanding,
5  correct?
6      A  Yes.
7      Q  Then it says, "The reason for this was
8  twofold." Are you following me, sir?
9      A  Yes.
10     Q  You've told us about number one, "Thompson &
11 Peck has a covenant with Sun Trust which does not permit
12 that Stanley or Charlie have more than a current amount
13 of annual wages," do you see that?
14     A  Yes, a certain amount, right.
15     Q  Now, the second part, talk to Stan Prymas,
16 okay? Reason number two for considering a 1099
17 miscellaneous income, number 2, "Charlie had
18 garnishments attaching his wages and it was decided that
19 the best way to insure that he," Charlie, "received the
20 funds was by characterizing them appropriately as
21 non-wages." Do you see that reference?
22     A  That may have been — yes, I do see the
23 reference, yeah.
24     Q  Does that refresh your recollection as to
25 discussions with Charlie Flanagan and Mr. Prymas about

7 (Pages 22 to 25)

The Cadle Co. vs Flanagan

1/29/2004                                              William Gallagher

Page 26

1  what we're going to do, fellows, is we're going to treat
2  this damage settlement as miscellaneous income so it's
3  not subject to the wage garnishments, does that refresh
4  your recollection at all?
5     A   Not at all. My discussions, by the way, were
6  not with Charlie Flanagan. He had grieved me. As a
7  matter of fact, I think in connection with this case.
8  My discussions were with David Reilly, who is Charles
9  Flanagan's lawyer at the time, and the only issue that I
10 had with David Reilly was the Sun Trust issue, because
11 that's the only one articulated to me by Stanley. This
12 may have been Charlie's motivation, but it wasn't, as
13 far as I knew, it wasn't mine, and it wasn't Reilly's,
14 and it wasn't Stanley's.
15    Q   Did Stan ever tell you that one of the
16 reasons, one of the reasons why we're doing this is
17 because of concerns over wage garnishments, he never
18 said anything like that to you?
19    A   He might have told me that that was Charlie's
20 concern. I don't think Stanley was concerned about that
21 one way or the other.
22    Q   And then please take a look, sir, if you
23 would, at Exhibit 72, February 25, 1998 letter from Todd
24 Bainer to Leonard Fasano. Have you seen that document
25 before?

Page 27

1     A   Yes, I have.
2     Q   Was that in connection with your preparation
3  for the deposition, correct?
4     A   No, not in preparation for this deposition. I
5  had seen these some time ago.
6     Q   Exhibit 72?
7     A   Yeah. And then the one before that, the
8  correspondence between Fasano and Bainer. At the time
9  that this was given to Gaide, Paul Gaide, by Steve
10 Wright, copies made their way to me, and I honestly
11 can't remember if they were sent to me by Steve or by
12 Stanley or someone else. And that's the first time I
13 saw this, and then subsequent to that I think in a
14 lawsuit that Paul Gaide brought against me and others
15 these came up, but in connection with this deposition I
16 haven't reviewed them.
17    Q   February 25, 1998, you understood at that time
18 Todd Bainer was the corporate counsel for Thompson &
19 Peck?
20    A   Yes, that's right.
21    Q   Page 2, "There has been much discussion and
22 willingness on the part of the corporation," that's
23 Thompson & Peck, "to try to assist Charlie in the
24 current predicament in which he finds himself." Do you
25 see that reference?

Page 7

1     A   I do, yes.
2     Q   Are you aware, or were you a participant in
3  any discussions about the willingness of Thompson & Peck
4  to help Charlie out of his predicament?
5     A   No. As a matter of fact, this is contrary to
6  my understanding.
7     Q   What did you understand or what do you
8  understand Charlie's predicament to have been as of
9  February 25, 1998?
10    A   Charlie's predicament was, and I can't
11 remember when he filed bankruptcy, but before he filed
12 his bankruptcy he was probably the New Haven Judicial
13 District's biggest deadbeat. He had enormous number of
14 debts against him. He had been, or was being
15 investigated by the United States Attorney, and I'm not
16 sure whether that was for bankruptcy fraud or for income
17 tax evasion.
18        They also happened to have one of the most
19 successful insurance agencies in the business, and
20 Stanley wanted the business to continue successfully,
21 but my sense is that Stanley personally, and Mike
22 Buckmir, who was involved in the company at this time,
23 would have been involved with helping Charlie only to
24 the extent of it benefiting the business in some way.
25    Q   So it was your understanding that Stan Prymas

Page 29

1  and Thompson & Peck would help Charlie, but only to the
2  extent it would also help Thompson & Peck?
3         MS. COX:  Objection.
4         THE WITNESS:  Well, I suppose that's what
5  I just said, but.
6  BY MR. ARMSTRONG:
7     Q   Yeah, isn't it?
8     A   You're correct in characterizing it that way,
9  but I don't think -- and you'd really have to ask
10 Stanley Prymas and Mike Buckmir those questions because
11 I didn't have that impression. The sooner that Stanley
12 could get rid of Charlie, from his point of view, the
13 better, and I don't think that Stanley Prymas had any
14 personal desire to help Charlie Flanagan out of these
15 problems or to utilize the business to do so. I
16 recognize that Attorney Bainer has said something
17 different here, but it's not consistent with my
18 understanding. There had been long years, literally
19 years of difficulty with Charlie Flanagan, in many, many
20 respects, pretty much with everybody who came into
21 contact with him, including Stanley, and Stanley was
22 interested in surviving in the business.
23    Q   How long have you known Todd Bainer?
24    A   Probably, the years creep up on you, but he, I
25 met Todd when the firm of Garcia, Cooney & Bender

8 (Pages 26 to 29)

Brandon Smith Reporting

59c25ffd-d5ab-4507-b77a-66f7089fcb3a

Page 38

1  MS. COX: You mean just now?
2  MR. ARMSTRONG: Yes, just a few minutes
3  ago.
4  THE WITNESS: There's no reference here
5  to Cadle Company.
6  MR. ARMSTRONG: Creditor.
7  THE WITNESS: Yeah, there is reference to
8  creditors.
9  BY MR. ARMSTRONG:
10  Q  Did you understand that settlement proceeds
11  were recharacterized in response to efforts by a
12  creditor to seize the remaining portion of the $75,000
13  settlement proceeds?
14  MS. COX: Objection.
15  THE WITNESS: I don't think he could --
16  the settlement, as I understand it, the proceeds were
17  being paid, based on paragraph 12 of the agreement,
18  biweekly, or bimonthly in an amount, $900, or whatever
19  the figure shows, so that if there was a seizure they
20  would have been able to get the payments that were due
21  at that time, I suppose. I don't know.
22  BY MR. ARMSTRONG:
23  Q  Did you understand that the characterization
24  was changed from 1099 miscellaneous income to wages
25  because of concern over the property execution that had

Page 39

1  been served on Thompson & Peck?
2  MS. COX: Objection.
3  THE WITNESS: No, I didn't know that. As
4  I understood it, a letter surfaced from yet another
5  accountant advising Thompson & Peck that it could get
6  into trouble with the IRS if it failed to treat this
7  money as W-2 income, and so it was, the change was made.
8  BY MR. ARMSTRONG:
9  Q  So it's your position -- excuse me, Mr.
10  Gallagher, you take an oath to tell the truth and the
11  whole truth, you understand that?
12  A  That's right.
13  Q  Is there any part of your understanding that
14  the settlement proceeds were recharacterized in response
15  to efforts by a creditor to attach that income as 1099
16  miscellaneous income?
17  A  Not to my knowledge.
18  MS. COX: Objection.
19  THE WITNESS: Not to my knowledge.
20  Because I was not a party to and didn't know about
21  proceedings against Charlie Flanagan by the Cadle
22  Company, didn't represent anybody in connection with
23  that proceeding, and the first time I saw these
24  documents is long after the fact. At the time my
25  understanding was that there was a CPA's letter

Page 40

1  somewhere that surfaced at the behest of Charles
2  Flanagan that said that you're going to get in trouble,
3  you could risk getting in trouble with the IRS if it's
4  not reported as W-2 income, and they did so. Now, what
5  Charlie's motivation might have been or what the
6  knowledge of the individuals at the time might have been
7  I don't know.
8  BY MR. ARMSTRONG:
9  Q  Does it now appear to you that somebody didn't
10  tell you the full and complete story?
11  MS. COX: Objection.
12  THE WITNESS: No, it doesn't appear that
13  at all, because I had no role in the proceedings at the
14  time.
15  BY MR. ARMSTRONG:
16  Q  Whether you had a role in the proceedings or
17  not, you understood that the income was being
18  recharacterized because Charlie's accountant had said it
19  should be wages, not 1099 income?
20  A  That's right.
21  Q  That's the full extent of your understanding
22  as to why it was changed?
23  A  That's right.
24  Q  Now, we just read a letter from Todd Bainer,
25  there appears to have been another reason why it was

Page 41

1  changed.
2  A  It appears that Bainer is concerned about
3  these other readings and what the inference could be by
4  others as a result of changing it, but as to whether
5  that was the motivation is highly questionable, and I
6  frankly doubt that Thompson & Peck or Charlie or Stanley
7  Prymas would acquiesce in a desire to Charlie Flanagan
8  to change this in the absence of a letter that indicated
9  that they would have problems with the IRS if they
10  didn't do it.
11  Q  That it be wrong for Stan Prymas and Thompson
12  & Peck to acquiesce in changing the characterization if
13  it was for the purpose of cheating a creditor?
14  A  Absolutely.
15  MS. COX: Objection.
16  MR. ARMSTRONG: Thank you, Mr. Gallagher.
17  Take a break, and then maybe that's it.
18  THE WITNESS: Fine.
19  (Off record)
20  BY MR. ARMSTRONG:
21  Q  Mr. Gallagher, were you aware of any efforts
22  by Thompson & Peck, Stan Prymas, or Charlie Flanagan to
23  place a restrictive legend on the Thompson & Peck stock?
24  A  I recall some discussions about that, but
25  without looking at documents I have no independent

Page 46

1  A  Well, I'm speculating, unfortunately, but the
2  letter, as I recall it, indicated that Thompson & Peck
3  would risk some problem with the IRS if it did not
4  characterize this as wages, and my notion from the
5  outset was that this was to make up a shortfall in
6  wages, and if that was the case, my sense was, and is,
7  and I think I told, must have told Stanley, to go along
8  with it.
9  Q  Wait a minute, this is the same accountant
10  that originally said it was okay to treat it --
11  A  No, that's a different accountant.
12  Q  It wasn't Andy D'Agostino?
13  A  No. It was a different. There's an
14  accountant's letter, and I'm sorry to tell you I don't
15  have it, I don't know if it's part of your exhibits
16  here, but there's a letter sometime in '98, isn't it,
17  1998, or in late 1997 that raises that.
18  Q  Let me see a copy of that letter, please.
19  A  I don't have it. I don't even know if we
20  brought it. I did see such a letter.
21  Q  So you understood that Andy D'Agostino when he
22  showed that you letter, he agreed to treat it as 1099
23  miscellaneous income?
24  A  That's right.
25  Q  You're saying that there was a subsequent

Page 47

1  letter from --
2  A  That's right.
3  Q  -- a different accountant?
4  A  I honestly can't tell you if it was, either
5  one of the same accountants or a different accountant.
6  My impression is that it was yet a third accountant, it
7  was a different accountant.
8  Q  From a different firm?
9  A  I don't know, I don't know.
10  Q  In no part of your thinking process went to
11  the effect that they're doing this because creditors are
12  pursuing the settlement payments by virtue of the
13  property execution or turnover order?
14  A  Not as far as Stanley and Thompson & Peck is
15  concerned.
16  Q  What about in terms of Charlie?
17  A  Well --
18     MS. COX: Objection.
19     THE WITNESS: I don't know what Charlie's
20  motivation was. I think it's pretty obvious what his
21  motivation was.
22  BY MR. ARMSTRONG:
23  Q  What was his motivation?
24  A  He wanted to avoid paying his creditors. He
25  had a history of that. I told you, he was the judicial

Page 48

1  district's biggest deadbeat, in my opinion, had 96,
2  computer printout showed 93 or 96 cases in which he was
3  a defendant.
4  Q  So in the 1997/1998 time frame, you viewed
5  Charlie Flanagan as being the biggest deadbeat in the
6  New Haven Judicial District?
7     MS. COX: Objection.
8     THE WITNESS: I did. Matter of fact, I
9  wouldn't give the company my insurance business until
10  Charlie was out of there.
11  BY MR. ARMSTRONG:
12  Q  You testified in the grievance trial against
13  Paul Gaide?
14  A  I didn't testify against him, I testified in
15  that proceeding.
16  Q  Who paid the attorneys fees? Did you charge
17  attorneys fees for that matter?
18  A  No.
19  Q  Did Stan Prymas talk to you about Thompson &
20  Peck paying Todd Bainer's attorney's fees to prosecute
21  the grievance?
22     MS. COX: Objection, that's privileged.
23     THE WITNESS: Should I answer, or no?
24     MS. COX: It's privileged.
25  BY MR. ARMSTRONG:

Page 49

1  Q  Did you have any meetings with Todd Bainer to
2  go over your testimony for the grievance?
3  A  No.
4  Q  Telephone conversations?
5  A  Not with Todd Bainer.
6  Q  Pardon?
7  A  Not with Todd.
8  Q  With Stan Prymas?
9  A  No.
10  Q  With who?
11  A  I had a conversation with Cooney, Brad Cooney.
12  Q  To go over your testimony?
13  A  Well, to review it, yes.
14  Q  What do you mean to review it?
15  A  Well, I had made statements before Judge
16  Elaine Gordon, I think it was Judge Gordon, in
17  connection with a motion for a production of documents,
18  and there was a transcript of that oral argument, it was
19  a short calendar argument, and I think that was the
20  extent of it. The issue was the extent of the
21  authorization I gave to Paul to talk to Stanley, whether
22  there were any restrictions on it.
23  Q  Did you have any discussions with Todd Bainer
24  about filing any additional grievances against Paul
25  Gaide?

Page 54

1  MS. COX: Objection.
2  THE WITNESS: You're asking for my
3  opinion on his volunteer to do some pro bono work for
4  another lawyer?
5  BY MR. ARMSTRONG:
6  Q  Sure. How does that strike you?
7  A  Well, I think I would have to know a little
8  bit more about the details of the claimed misconduct
9  against Pepe & Hazard's client, because as I indicated
10 before, Bainer sometimes gets emotional and overreacts,
11 but whether this is overreaction or the conduct is
12 inappropriate, there's just not enough evidence to make
13 that evaluation.
14 Q  Just what you've read so far, just you and me
15 talking, okay? How does that strike you?
16 MS. COX: Objection.
17 THE WITNESS: It strikes me that Todd
18 Bainer was very upset with Attorney Gaide, and that he
19 had seen what he perceived as similar misconduct against
20 Pepe & Hazard's client, and was volunteering to assist
21 them, and I have no idea whether they took him up on it
22 or whether they did anything.
23 BY MR. ARMSTRONG:
24 Q  It doesn't offend you at all in the slightest?
25 A  No. I think that lawyers are, as a matter of

Page 55

1  fact, I think the rules of professional conduct require
2  lawyers to report misconduct.
3  Q  Have you had any discussions with Robert
4  Skelton?
5  A  This is the late Robert Skelton?
6  Q  Right.
7  A  I did, yes.
8  Q  About any matters in this case?
9  A  Not in this case. I met Skelton for the first
10 time in the bankruptcy court and had a lengthy
11 conversation with him in connection with a bankruptcy
12 proceeding, and I honestly can't tell you, it was
13 shortly before his death, and I can't remember, and then
14 we had a discussion in connection with the Gaide RICO
15 action when it was first initiated, just general
16 recollection, I remember talking to him. I frankly
17 couldn't tell you exactly what we talked about.
18 Q  How would you characterize Robert Skelton's
19 reputation among the Connecticut Bar?
20 A  I didn't know Skelton, and I didn't know what
21 his reputation was when I met him or talked to him. I
22 have heard rumors subsequent, but at the time I was
23 impressed, he seemed to be a very knowledgeable and
24 capable young man.
25 Q  You hadn't heard that Bob Skelton had a

Page 56

1  reputation for playing fast and loose with the rules?
2  A  No, I did not hear that.
3  Q  You said you heard rumors afterwards, what are
4  those rumors?
5  A  After his death I heard a rumor, and I have no
6  idea whether it's factual or not, that he was, he drank
7  excessively, drank alcohol to excess.
8  Q  Have you had any discussions with any other
9  attorneys or any other people about Charlie Flanagan and
10 Charlie Flanagan being the biggest deadbeat in the New
11 Haven Judicial District?
12 A  Well, I've had many conversations about
13 Charlie's behavior as a slumlord.
14 Q  Slumlord?
15 A  Yeah. Several of the houses Charlie invested
16 in and went ultimately to demolition were not very far
17 from where my office is located. We had, there's an
18 orthodox community in the neighborhood that at one time
19 was on a campaign to rid the neighborhood of prostitutes
20 and slumlords, and Flanagan owned property on Chapel
21 Street in New Haven on the south side of Chapel Street,
22 which was understood in the definition of the
23 neighborhood, and the rabbi in charge of the
24 neighborhood association at the time became so
25 frustrated that he, to deal with Charlie he just

Page 57

1  redefined the lines of the neighborhood to exclude the
2  south side of that street, because there were houses
3  there that Charlie owned that were absolute disasters.
4  Q  Did it appear to you that Charlie was draining
5  income from the properties, in other words, taking the
6  income out but not putting money back in?
7  MS. COX: Objection.
8  THE WITNESS: Yeah.
9  BY MR. ARMSTRONG:
10 Q  Isn't that the definition of a slumlord, in
11 part?
12 A  In part, yeah. And it can take on many forms,
13 but yeah, that was our impression.
14 Q  When you say the term deadbeat, what does
15 deadbeat mean?
16 A  A person who doesn't pay his bills.
17 MR. ARMSTRONG: Pass the witness.
18 THE WITNESS: Can I go?
19 MS. CHARRON: I don't have any questions.
20 BY MR. ARMSTRONG:
21 Q  Oh, I'm sorry, Exhibit 174, paragraph 2,
22 "There are a couple of problems. The money was not
23 always to be considered wages." It says, "Charlie
24 Flanagan considered it wages, Stanley Prymas does not."
25 So your understanding was Stan Prymas did not consider

The Cadle Co. vs Flanagan

1/29/2004  William Gallagher

Page 58

1  the settlement money wages at any time?
2      MS. COX: Objection.
3      THE WITNESS: I don't know about that. I
4  said before that there was a controversy about this as
5  to whether it was or was not wages, and I think that
6  that's what I'm alluding to here, that Stanley initially
7  did not, and at a later time acquiesced because there
8  was a letter that said he'd get into trouble with the
9  IRS, or the company would.
10 BY MR. ARMSTRONG:
11   Q  In your letter do you make any reference to
12 the IRS matter and the letter from the other accountant?
13   A  No, no reference to it at all.
14     MR. ARMSTRONG: Okay, pass the witness.
15     MS. CHARRON: No questions.
16
17     CROSS-EXAMINATION BY MS. SULLIVAN:
18
19   Q  I just have one question. My name is June
20 Sullivan, and I represent Attorney Fasano.
21   A  Yes.
22   Q  To your knowledge, did Attorney Fasano have
23 any involvement in a conspiracy to defraud the Cadle
24 Company?
25     MR. ARMSTRONG: Object to the form.

Page 59

1      THE WITNESS: Absolutely not.
2      MS. SULLIVAN: Thank you, that's all I
3  have.
4
5      REDIRECT EXAMINATION BY MR. ARMSTRONG:
6
7   Q  Mr. Gallagher, what is a conspiracy to defraud
8  the Cadle Company?
9   A  An agreement entered into with others to
10 frustrate collection efforts of legitimate debts of the
11 Cadle Company.
12   Q  An agreement. Is there a signed, sealed,
13 written articles of conspiracy, or is it something done
14 under cover of darkness?
15     MS. COX: Objection.
16     THE WITNESS: It can be oral.
17 BY MR. ARMSTRONG:
18   Q  Cover of darkness?
19     MS. COX: Objection.
20     THE WITNESS: That's how you characterize
21 it.
22 BY MR. ARMSTRONG:
23   Q  How do you characterize it?
24   A  It could be oral.
25   Q  You've prosecuted cases before where there's

Page 60

1  been conspiracy allegations?
2   A  I think we might have, yes.
3   Q  In those cases have you ever had a signed,
4  sealed, notarized articles of conspiracy?
5   A  As a matter of fact we did, in one case.
6   Q  In the majority of cases hasn't it been bits
7  and pieces of circumstantial evidence when you put in
8  the proper context show that there was a scheme or
9  design to cheat somebody?
10  A  Yeah, but I find the proposition of these
11 people combining to defraud the Cadle Company as
12 absolutely preposterous.
13  Q  Why?
14  A  Because they had, nobody had a motivation.
15 Charlie Flanagan was a problem, and Charlie owed a lot
16 of money, and they didn't know how to deal with it, and
17 they were dealing with the problem at hand for whatever
18 the issue might have been, but to articulate or
19 predicate a conspiracy to defraud a specific creditor, I
20 think it's absurd.
21  Q  How about a group of creditors?
22  A  I think that's absurd, too.
23  Q  Is there any doubt in your mind Charlie set
24 out to defraud the Cadle Company?
25  A  Charlie, no doubt in my mind that Charlie set

Page 61

1  out not to pay the Cadle Company, one way or the other.
2   Q  By hook or by crook?
3   A  That's right.
4      MR. ARMSTRONG: No further questions.
5  (Deposition concluded at 11:40 a.m.)

16 (Pages 58 to 61)