UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| THE CADLE COMPANY, ET AL | : | CIVIL ACTION NO. |
|     Plaintiffs, | : | 3:01CV531(AVC) |
| | : | |
| vs. | : | |
| | : | |
| CHARLES A. FLANAGAN, ET AL | : | |
|     Defendants. | : | JUNE 6, 2005 |

## PLAINTIFFS' MOTION TO ADMIT REDACTED LETTERS FOR PURPOSES OF IMPEACHMENT

      1. On the first day of the trial, the Court ruled that the "lawyer-to-lawyer" letters were not admissible for the purposes for showing mail fraud or wire fraud under RICO. After that ruling, the Defendants have carefully crafted their testimony to that of positions which are at odds with the admissions that were made in their lawyer-to-lawyer letters.

      2. On the second day of trail, however, the Court clarified its prior ruling by making it clear that the lawyer-to-lawyer letters – if <u>redacted</u> – might be admissible for the independent purpose of impeachment:

> By the same token, correspondence such as that might be the subject of impeachment of the testimony of the witness, and perhaps what's going to have to happen with respect to these letters is that they're all going to have to be expurgated and perhaps a sentence or two out of them authorized.

(5/24/05 Tr. at p. 62, copy attached as Px A) Indeed, the Defendants did not to preclude Plaintiffs' use of the letters for all purposes – they only claimed that lawyer-to-lawyer letters were not admissible for purpose of proving mail fraud or wire fraud.

3. All of the Defendants have testified that the change in the characterization of the settlement agreement proceeds from 1099 income to wages was done in reliance upon the revised opinion of Flanagan's accountant, Andy D'Agostino.  Further, some of the Defendants have testified that there was no discussion at a February 9, 1998 meeting that, if they changed the characterization of the settlement proceeds at that time, they faced a substantial risk of being sued for a civil conspiracy to defraud Flanagan's creditors.  In a February 25, 1998 letter to Defendant Fasano -- with a copy sent to Defendant Prymas and Flanagan -- Defendant Bainer stated:

> As we discussed at the [February 9, 1998] meeting, no matter what you call the monies, and no matter how correct that new interpretation may or may not be -- now -- the change of positions on what the money is characterized as [as to how it has been treated in the past by the Corporation] in response to the service of the execution is troubling to me.  I believe we need to go very slowly and very carefully, here.  If it is not handled properly, a claim can and likely will be made that there has been some type of civil conspiracy to help Charlie defraud his creditors.  That is a risk that needs to be seriously assessed because such a claim would most assuredly have a damaging affect on the Corporation and it would not be in the Corporation's best interest to permit that possibility to occur.

(Px 72 --R p. 2) Credibility is always an issue, and our Jury is entitled to decide this case based on the truth, not the distorted testimony by Defendants at the trial.

4. The Defendants have also claimed that Defendant Fasano played little, if any, role in the preparation of the restrictive legend on Flanagan's stock.  Indeed, the Defendants now claim

2

that Defendant Fasano did not even know that the Buy -- Sell Agreement had been finalized and that the restrictive legend was going to be placed on Flanagan's stock in August of 1998. The truth, however, is disclosed in the documents:

> <u>Px 195 -- R</u>: In reviewing the Buy and Sell Agreement, there are significant issues which need to be addressed: . . . While we believe a Buy and Sell Agreement is important, I also believe that Al's expertise coupled with your agreement may yield a more complete and sound agreement. I would respectfully request that when Al returns on Tuesday, July 28, 1998, that you and Al discuss this matter and perhaps Al can give a little more input in this document.
>
> <u>Px 18 -- R</u>: <u>You</u> knew a restriction had been placed on that stock and purportedly allowed Charlie to harm himself by testifying in that fashion.
>
> <u>Px 66 -- R</u>: Again, while you might not have known where the stock was at any given time, you knew we were negotiating a buy/sell and knew at some point prior to your representation to the Federal Court that the stock was unavailable, that it had to have been available at some point [when you claimed it wasn't to the Court] because you knew I had typed a restriction on it.
>
> You were aware of this. Charlie is a layperson. He doesn't understand all this legalese. <u>You</u> should never have filed the documents you did about the stock being unavailable when you knew it had to have been available at some point to put the restriction legend on it.

While it is significant that the other Defendants are willing to work together with Defendant Fasano at trial, the Defendants' credibility is at issue, and our Jury is entitled to see the truth.

3

5. The Defendants also claim -- now, at trial -- that the actions taken by Defendant Fasano on behalf of Flanagan to evade Cadle's collection efforts where not being done in a coordinative effort with T&P, and where not taken to further the interest of T&P. The pre-trial documents, overcome and impeach the Defendants' current position:

> <u>Px 131 -- R</u>: There is absolutely, positively no question that Thompson & Peck is better off today by virtue of our acts then they would be if we did not perform said acts. Although I represent Mr. Flanagan, my interest is to preserve his asset i.e. the stock, and to keep my client out of contempt orders.
>
> <u>Px 70 -- R</u>: [Defendant Prymas] also informed me that the settlement agreement specifically anticipated that the payments to Charlie under that agreement would be 1099 income. The reason for this was twofold: 1. Thompson & Peck, Inc. has a covenant with Sun Trust Bank which does not permit that Stanley or Charlie have more than a certain amount of annual wages; 2. Charlie had garnishments attaching his wages and it was decided that the best way to ensure that he received the funds was by characterizing them, appropriately, as non-wages.
>
> Charlie and Stanley have been getting along fairly well of late, which is in Thompson & Peck, Inc.'s best interest. Stanley has reassured me that he is quite willing to do anything legally proper, if that is possible, to see that Charlie and none of his creditors receives the funds at issue.
>
> <u>Px 67 -- R</u>: We made a lot of progress on Friday, last, and your concern is now about a conversation between me and Attorney Gaide which took place prior to that progress we made on Friday. . . . The only important issue is whether or not he will really be able to get Charlie's stock and affect [adversely] the Corporation – from my perspective.

The lack of candor of the Defendants should be exposed, and the Jury is entitled to decide this case based on the truth, not obfuscation of the truth.

      6. The Defendants claim now -- at trial -- that simple mistakes were made by Defendant Fasano in the pleadings that he filed in this Court as to who had possession of and control over Flanagan's stock. In the redacted letters, however, there are numerous admissions by the Defendants that Defendant Fasano's representations to this Court were far from simple mistakes:

> <u>Px 19 -- R</u>: You and Charlie's interest is now at conflict because you made a materially false and misleading representation to the Court in your November 12, 1998, pleading of "Amended Compliance" about the location and control of physical possession of Charlie's stock. . . . It is your judgment of allowing Charlie to move the stock around, instead of dealing with the matter straight-up, which causes him to be in the current predicament in which he finds himself -- including Federal Court Judge threatening to put him in Federal prison.
>
> <u>Px 136 -- R</u>: Finally, Charlie keeps sending me letters over the facsimile, in part, reciting his [alleged] active 50% ownership interest in Thompson & Peck, Inc. Apparently, he doesn't realize that he is creating discoverable documents which exactly contradict the representations he/you have made to the Court.
>
> <u>Px 134 -- R</u>: I strongly urge that you do not write to Judge Covello or Attorney Gaide because that may only spawn fuel to this fire. Judge Covello has ended this case. I do not believe that this case will be reopened but I do believe if your intention was to write to Judge Covello, this may draw attention to this issue which is now for all practical matters dead. I do not want to enhance Attorney Gaide's ability to reopen this case.

> Px 67 -- R: Despite your protests, you have filed a pleading before the Federal Court stating that Charlie's stock was out of his possession and control since June of 1997. This representation by you before the Federal Court was knowingly both false and misleading. . . . I am extremely troubled by your November 12, 1998 filing before the Federal Court. Despite your protests in your letter, there is just no way to interpret that document, signed by you as an Officer of the Court, stating and implying that Charlie has not had the stock in his possession or control since June of 1997. When that filing was made with the court, you knew that is was substantively untrue.
>
> Px 66 -- R: You are upset, in reality, that there has been an apparent misrepresentation to the Federal Court - - in part by you - - which has been found out. . . . Again, while you might not have known where the stock was at any given time, you knew we were negotiating a buy/sell and knew at some point prior to your representation to the Federal Court that the stock was unavailable, that it had to have been available at some point [when you claimed it wasn't to the Court] because you knew I had typed a restriction on it. . . . You were aware of this. Charlie is a layperson. He doesn't understand all this legalese. You should never have filed the documents you did about the stock being unavailable when you knew it had to have been available at some point to put the restriction legend on it.

These documents should be admitted into evidence to impeach Defendant Bainer's credibility.

  7.  Further, Defendant Bainer testified at trial that he was not trouble by the "side deal" proposed by Defendant Fasano that if Flanagan filed for bankruptcy, there would have to be some arrangement with Defendant Prymas for Flanagan to get his stock back after the

bankruptcy was concluded. The documents, however, revealed Defendant Bainer's lack of credibility:

> <u>Px 18 -- R</u>: In addition, I'm very troubled by your statement to me yesterday on the telephone that Charlie will not be going bankrupt unless he has some side "deal" with Stan Prymas regarding the stock.

8. Finally, Defendants Prymas and Bainer claim that they had no notice of this Court's March 9, 1998 injunction until December of 1998. But in an April 25, 1998 letter by Attorney Gallagher to Defendant Fasano - - <u>with a copy to Defendant Prymas</u> - - Attorney Gallagher stated:

> I interpret your April 22, 1998 letter to attempt to shift some responsibility to Stanley Prymas for Mr. Flanagan's current problem in the federal court. Mr. Prymas is not responsible for the status of that matter, he did not invoke the 5th Amendment, and he did not bring about the request by Judge Covello to look at the Waterbury file in camera.

(Px 155 -- R) Notice to Defendants Prymas and Bainer is a crucial issue, and Plaintiffs are entitled to impeach Defendant Prymas' claim of lack of notice through the use Px 155 -- R.

## **CONCLUSION**

Cases should be decided by the facts and the truth -- not the hiding of the facts; not the obfuscation of the truth. It is simply not fair for the Defendants to get up on the witness stand and feign lack of recollection ("I don't recall") or to obfuscate the truth when they know full

7

well the truth is contained in their own letters.  Our Jury has a right to see the facts, and a right to base their decision based on the truth.

Plaintiffs respectfully request that the Court authorize Plaintiffs to use the redacted letters, not as evidence of mail fraud or wire fraud, but solely for the purpose of impeachment. So as to not delay the trial, Plaintiffs would simply seek leave of court to admit the letters (Pxs 72 -- R; 195 -- R; 18 -- R; 66 - R; 131 -- R; 70 -- R; 67 -- R; 19 -- R; 136 -- R; 134 -- R; &  155 -- R) into evidence, without cross examination of any witnesses as to the contents of those letters.

        Respectfully submitted
        ARMSTRONG LAW FIRM

By:_____
    F. Dean Armstrong, Esq.
    1324 Dartmouth Road
    Flossmoor, IL 60422
    Federal Bar No. ct22417

and

    Edward C. Taiman, Jr.
    Sabia & Hartley, LLC
    190 Trumbull Street, Suite 202
    Hartford, CT 06103
    (860) 541-2077
    Fed. Bar No. ct01319

**Certification of Service**

I certify that a true and correct copy of the foregoing instrument was hand – delivered to all defense counsel on June 6, 2005 as shown on the attached Service List.

                                                                                    _____
                                                                                    F. Dean Armstrong

E:\WPDOCS\CADLE\Flanagan\RICO\Mt.Admit.For.Impeachment.wpd