UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| THE CADLE COMPANY, ET AL | : | CIVIL ACTION NO. |
|     Plaintiffs, | : | 3:01CV531(AVC) |
| | : | |
| vs. | : | |
| | : | |
| CHARLES A . FLANAGAN, ET AL | : | |
|     Defendants. | : | NOVEMBER 7, 2005 |

### PLAINTIFFS' MOTION TO STRIKE DEFENDANTS' MOTION FOR NEW TRIAL AND PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR NEW TRIAL AND/OR MOTION FOR REMITTITUR

**I.    DEFENDANTS' MOTION TO DISMISS SHOULD BE STRICKEN IN ITS ENTIRETY BECAUSE DEFENDANTS FAILED TO MAKE ANY SPECIFIC REFERENCES TO THE TRANSCRIPT.**

Defendants raised numerous alleged errors at trial upon which they based their motion for a new trial. Conspicuously absent from their Motion and Brief, however, was any specific references to the trial transcript. Plaintiffs and this Court, therefore, are left to hunt through thousands of pages of transcripts to find references that Defendants might believe support their claims. Plaintiffs have been highly prejudiced by Defendants' failure to reference the specific portions of the transcripts that they believe support their arguments. While Plaintiffs have attempted to address as many of the allegations as possible in this Memorandum, they have been unable to locate all the references, and therefore, have not been able to address all of the

allegations.  Plaintiffs, therefore, have been unable to fully rebut many of Defendants'

arguments.

Toward this end, Local Rule 7(a)(1) states that:

> Nothing in this Rule shall require the Judge ruling on the motion
> to review portions of the record in response to a motion, where
> the moving papers do not make specific reference to such
> portions of the record.

This Court, therefore, is not required to entertain Defendants' motion because they have failed

to provide even the most rudimentary references to the record.  Furthermore, Defendants'

failure to provide these references is highly prejudicial to Plaintiffs because absent this

information, Plaintiffs have been unable to fully respond in opposition to the Motion.

Toward that end, Plaintiffs request that Defendants' Motion for New Trial and/or

Remittitur be dismissed in its entirety.  In the alternative, Plaintiffs request that this Court order

Defendants to supplement their Motion with specific references and provide Plaintiffs a

reasonable amount of time to respond to the same.

Notwithstanding the foregoing, Plaintiffs respond to Defendants' Motion for New Trial

and/or Remittitur as follows:

## II.    STANDARD OF REVIEW

"A motion for new trial ordinarily should not be granted unless the trial court is

convinced that the jury has reached a seriously erroneous result or that the verdict is a

2

miscarriage of justice." <u>Tesser v. Board of Educ. of City Sch. Dist. of City of New York</u>, 370

F.3d 314, 320 (2d Cir. 2004) (internal quotations omitted). "It is well-settled that Rule 59 is not

a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing

on the merits, or otherwise taking a second bite at the apple." <u>Segua Corp. v. GBJ Corp.</u>, 156

F.3d 136, 144 (2d Cir. 1998) (internal quotations omitted). "A jury's credibility assessments

are entitled to deference, and ... where the resolution of the issues depended on assessment of

the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict

and granting a new trial." <u>United States v. Landau</u>, 155 F.3d 93, 104-05 (2d Cir. 1998). A

judge cannot "substitute his or her assessment of the credibility of witnesses for that of the jury

simply because the judge disagrees with the jury." <u>Id.</u> at 104.

## III.    ARGUMENT AND AUTHORITIES

### A.    The Court's Instruction To The Jury That They Could Discuss The Case During The Course Of This Trial If They Were All Together And If They Did Not Form An Opinion Was Not Reversible Error.

Contrary to Defendants' argument, the Court's instruction to the jury at the start of the

trial that it could discuss the case during the course of the trial under certain circumstances was

not reversible error. First, Defendants waived this objection because they raised it for the first

time after the jury reached an adverse verdict. Second, Defendants have provided this Court

with no case law to support their claim that the instruction in a civil trial was improper; rather,

Defendants rely upon inapplicable criminal law to support their argument. Third, Defendants

3

have not presented even a scintilla of evidence that would suggest they were prejudiced by the

instruction, or in fact that the jurors even discussed the case prior to beginning formal

deliberations. The instruction, therefore, was not reversible error and Defendants are not

entitled to a new trial.

During the first day of trial, the Court gave the jury the following admonishment:

> during the course of a trial, we want you to discuss this case
> among yourselves. We don't expect you to sit here like eight
> pieces of stone and receive all of this information and not
> comment or discuss it among yourselves. A couple of very
> important warning points, however. If you are going to discuss
> the case, be certain that you're all present. Obviously if four of
> you go out to lunch and you go out to a cafeteria and you start
> talking about the case, the others aren't going to have the benefit
> of your discussion and it's just not appropriate. So if you are
> going to discuss it, make sure that all of you are present.
>
>          *  *  *
>
> Second, if you are going to or even if you don't discuss the case,
> don't form an opinion here until all the evidence is in. We don't
> want you to start to deliberate until you've heard all of the
> evidence and the Court's charge at the end of the case. So we
> want you to keep an open mind until you've begun the
> deliberations.

May 23, 2005 Transcript pp. 46-47. Defendants did not object to the instruction at the time it

was given. Rather, they raised it for the first time in a Motion for New Trial after receiving an

adverse jury verdict.

4

### 1.    Defendants waived any objection to the Court's instruction regarding jury discussions by failing to raise it prior to receiving an adverse jury verdict.

Defendants sat by passively when the instruction was given. They waited to hear the jury verdict and when it was adverse, they searched around for alleged errors at the trial and raised their objection to the instruction for the first time in their Motion for New Trial, long after the jury was dismissed. Their failure to object in a timely fashion, however, should be fatal to their claims.

"A principal that strikes very deep is that a new trial will not be granted on grounds not called to the court's attention during the trial unless the error was so fundamental that gross injustice would result." 11 C. Wright & Miller § 2805. As the Second Circuit noted in U.S. v. Thai, 29 F.3d 785, 803 (2d Cir. 1994):

> We are particularly loath to second-guess the actions of the
> district court when the defendant has failed to object at trial, lest
> the defendant be permitted to "wait to hear the verdict before
> contesting the impartiality of the jury and then attack the court's
> refusal to investigate his allegation." United States v. Edwards,
> 696 F.2d 1277, 1282 (11th Cir.) (per curiam), cert. denied, 461
> U.S. 909, 103 S.Ct. 1884, 76 L.Ed.2d 813 (1983).

Courts from other jurisdictions faced with the issue of pre-deliberation jury discussions have refused to entertain a motion for new trial when the party failed to object during the trial. See e.g. United States v. Broome, 732 F.2d 363 (4th Cir. 1984) (refusing to entertain defendant's belated motion for new trial based on the Court's instruction to the jury that it

5

could discuss the proceedings during the trial because defendant failed to object to the

instruction when given); Meggs v. Fair, 621 F.2d 460 (1st Cir. 1980) (dismissing defendant's

request for new trial because he did not raise any objection to the instruction during the trial).

See also F.R.C.P. 51(c) (party objecting to a jury instruction must object on the record).

Defendants in this case failed to raise any objection to the Court's instruction when it

was made, or at any time during the trial. Defendants should not be allowed to sit back and

wait to hear the verdict before challenging the Court's instructions to the jury. Defendants,

therefore, have waived any such objection and their Motion for New Trial should be dismissed.

### 2. The instruction allowing jury discussions was appropriate but even if not appropriate it was not reversible error because Defendants have shown no prejudice flowing from it.

"[P]rejudice is generally the touchstone of entitlement to a new trial when improper

intra-jury influences are at issue." United States v. Abrams, 137 F.3d 704, 709 (2nd Cir. 1998)

(citing United States v. Resko, 3 F.3d 684, 694 (3d Cir. 1993)). If Defendants cannot

demonstrate prejudice flowing from the instruction, then they are not entitled to a new trial.

Here, Defendants have provided no evidence of prejudice flowing from the instruction.

Moreover, modern jurisprudence suggests that an instruction such that the Court gave is highly

appropriate in a civil trial. Defendants, therefore, are not entitled to a new trial.

"It has never been the law of this circuit that the trial judge must admonish the jurors not

to discuss the case among themselves ...." United States v. Viale, 312 F.2d 595, 602 (2d Cir.

6

1996), see also, Abrams, 137 F.3d at 708. Few federal courts, however, have looked at the issue of a court affirmatively telling a jury that it may discuss the case during the trial. Those federal courts that have addressed this issue have universally addressed it in the context of a criminal case and the defendant's Sixth Amendment right to a fair trial. In contrast, however, this is a civil case and the Sixth Amendment jurisprudence does not apply. Defendants have pointed to no cases, and Plaintiffs have located no cases, finding that a court instruction allowing jurors to discuss the case as a whole during the trial, as long as they do not form any opinions, violated a civil litigant's right to a jury trial and/or his right to due process. Even in the context of a criminal trial, many courts have found that premature jury deliberations were insufficient to warrant a new trial.

The Fourth Circuit in United States v. Lemus, 542 F.2d 222 (4th Cir. 1976) addressed a criminal trial where on two occasions the District Court advised the jury that "discussions among the jury members was 'entirely proper.'" Id. at 223-24. The first such instruction was coupled with a "lengthy admonition to the jury" as to why they should not discuss the evidence and an instruction to refrain from reaching any conclusions until all the evidence was submitted and the jury was charged. Both times, the defendant objected to the instruction. While noting that such an instruction if given "in the abstract" might jeopardize the criminal defendant's right to a fair trial, the court found that any danger to the defendant was minimal because of the district court's further admonishments to the jury. The court, therefore, refused to overturn the

7

conviction. The Fourth Circuit reiterated this position in <u>United States v. Broome</u>, 732 F.2d 363 (4th Cir. 1984). There the District Court instructed the jury on the first day of trial that they could discuss the case among themselves but should not "try to arrive at any judgment or decision about the facts of this case until the case is completely tried ...." <u>Id</u>. at 366. The court refused to entertain defendant's belated motion for a new trial because the defendant had failed to object to the instruction when it was given. The Fourth Circuit noted in a footnote, however, that in <u>Lemus</u>, "this Court held that a trial judge who twice instructed the jurors that it would be proper for them to discuss the case during recess committed only harmless error. Had appellants objected at trial, there would have been no reason to have held differently in this case."

The First Circuit in <u>Meggs v. Fair</u>, 621 F.2d 460 (1st Cir. 1980) reached a similar decision. There the District Court instructed the jury that "its perfectly all right to talk about a witness' testimony" while cautioning them not to come to a conclusion or commit themselves one way or the other until they had heard all the evidence and the instructions. <u>Id.</u> at 463. The defendant did not object to the instruction during the trial. The court dismissed the defendant's appeal on this issue because he failed to raise it at trial. The court noted, however, that "the judge's admonition to the jury members not to commit themselves until 'you hear all the evidence and hear arguments and then my instructions' minimized any danger to the defendant." <u>Id.</u> at 464.

8

Many courts have denied a defendant a new trial even in light of evidence that the jurors engaged in premature deliberations in violation of the court's direction not to discuss the case. For example, the Ninth Circuit addressed the issue in United States v. Klee, 494 F.2d 394 (9th Cir.), cert. denied, 419 U.S. 835, 95 S.Ct. 62, 42 L.Ed.2d 61 (1974). There, despite the District Court's admonishment to the jury not to discuss the case, the court received an affidavit from one of the jurors that the jury had discussed the case during recesses and that nine of the jurors had expressed premature opinions as to the defendant's guilt. The trial court did not conduct any investigation into the allegations of jury misconduct. The Ninth Circuit upheld the District Court's denial of a new trial stating that "[t]he important thing is not that jurors keep silent with each other about the case but that each juror keep an open mind until the case has been submitted to the jury." Id. at 396. The Ninth Circuit found that there was no evidence that the juror discussions had prejudiced the defendant. See also, Davis v. Woodford, 384 F.3d 628, (9th Cir. 2004) (reaffirming that "[w]hat is crucial is not that jurors keep silent with each other about the case but that each juror keep an open mind until the case has been submitted to the jury." (internal quotations omitted)).

Even the Second Circuit has had occasion to deny a motion for new trial in the face of evidence that the jurors had engaged in discussions prior to the close of evidence. In United States v. Carmona, 858 F.2d 66 (2d Cir. 1988), the Second Circuit upheld the District Court's

9

refusal to grant a new trial following the disclosure that some of the jurors had discussed the case during the trial.

Defendants' reliance on Winebrenner v. United States, 147 F.2d 322 (8th Cir. 1945), to support their position is misplaced. The Winebrenner Court instructed the jury that they should "not discuss the case before [them] to such an extent that [they] form definite fixed ideas that would prevent [them] from changing after [they] had heard all of the evidence in this case." Id. at 327.[1] Thus, pursuant to this instruction, the Winebrenner jury (or any portion of the jury) was permitted to discuss, deliberate and reach an opinion at any time during the trial as long as they were willing to change it if future evidence persuaded them it was necessary. The Eighth Circuit found that this instruction was highly prejudicial because it permitted the jurors to reach an opinion prior to the end of the case.

The Winebrenner instruction was substantially different than the current instruction. Unlike the jurors in Winebrenner, who were allowed to deliberate and reach an opinion before the end of the trial as long as they did not reach "fixed ideas that would prevent [them] from changing after [they] heard all the evidence in the case", the current jurors were admonished clearly not to deliberate and not to reach any opinions until the close of the evidence. As the dissent in Winebrenner noted: "[n]o normal honest Americans ever worked together in a

---

[1]    Unlike the current case, the defendants in Winebrenner contemporaneously objected to the instruction and requested that the court admonish the jury not to discuss the case among themselves. The court declined to do so.

10

common inquiry for any length of time with their mouths sealed up like automatons or oysters." Id. at 330. Unlike the defendant in Winebrenner, Defendants in this case have not demonstrated any prejudice flowing from the instruction.

Defendants' reliance on United States v. Resko, 3 F.3d 684 (3d Cir. 1993), which court disagreed with the Ninth Circuit's decision in Klee, is similarly misplaced. It was clear from the Third Circuit's ruling that the court placed great emphasis on the fact that it was a criminal trial implicating the protections of the Sixth Amendment. Thus, it has little application to the current civil trial. Furthermore, in that case, the conduct was objected to during the trial and every juror admitted that he/she discussed the case in violation of the court's direction against discussing the case during the trial. Despite this, the District Court failed to engage in any attempt to determine the extent of the discussions and/or to measure the potential prejudice to the defendants. The court ultimately determined that the judge's failure to further investigate the extent of the jurors' discussions violated the defendant's Sixth Amendment rights because there was no way to determine if prejudice had occurred. In the present case, in addition to being a civil trial where the important Sixth Amendment rights are not at stake, Defendants also failed to object to the instruction when it was given (or any other time during the trial). The jurors, therefore were released without the court having the opportunity to question them as to the extent of any discussions. Thus, any lack of ability to determine prejudice is due to Defendants' lack of diligence in raising their objections in a timely manner. There is no

11

evidence that the jurors even discussed the case prior to deliberations or that any prejudice

flowed from those discussions, if they occurred. <u>Resko</u>, therefore, is inapplicable to the current

case.

There is a new trend in the courts recognizing the benefit of allowing civil jurors to

discuss the case during the trial. The American Bar Association recently published its

"Principles for Juries and Jury Trials" in which it suggested that:

> Jurors in civil cases may be instructed that they will be permitted
> to discuss the evidence among themselves in the jury room during
> recesses from trial when all are present, as long as they reserve
> judgment about the outcome of the case until deliberations
> commence.

<u>Principles for Juries and Jury Trials</u>, p. 23 (principle 13(F), American Bar Association (August

2005)). Similarly, some state courts have moved toward allowing civil juries to engage in

discussions during the duration of the trial. For example, Arizona's Court Rules allows for jury

discussions "during recesses from trial when all are present, as long as they reserve judgment

about the outcome of the case until deliberations commence." 16 A.R.S. Rules of Civ. Pro.

39(f). Similarly, North Dakota now allows courts the discretion to "allow the jury to engage in

predeliberation discussion." N.D.R.Ct. 6.11. These discussions may be had only when all

jurors are present and only if the jury reserves judgment about the outcome of the case until

deliberations commence. <u>Id.</u> <u>See also</u> In. St. Jury Rule 20 (requiring that each court instruct the

jury before opening statements that they "are permitted to discuss the evidence among

12

themselves in the jury room during recesses from trial when all are present, as long as they reserve judgment about the outcome of the case until deliberations commence"). Thus, there is a growing trend toward allowing civil juries to discuss the evidence as a group prior to the commencement of deliberations.

Defendants have waived the objection to the instruction by waiting until after they received an adverse jury verdict to raise it for the first time. Furthermore, in the context of a civil trial, the Court's instruction was entirely appropriate. Finally, Defendants have failed to demonstrate any prejudice flowing from the Court's instruction. Defendants, therefore, are not entitled to a new trial.[2]

## B.    Plaintiffs Produced Ample Evidence Of $500,000 Debt Collection Damages To Support The Jury Award And Therefore Are Not Entitled To Remittitur.

Dan Cadle testified that Plaintiffs expended approximately $500,000 in attempting to recoup lost debt damages caused by Defendants' RICO violations. The jury found such testimony to be credible and awarded these damages. Defendant have produced no evidence to refute this determination. Defendants' argument that Mr. Cadle failed to define "collection damages" and/or itemize those damages does not support Defendants' request for a new trial and/or remittitur.

---

[2]    Defendants' reliance on Connecticut state case law to support their request for a new trial is similarly unavailing. State law is inapplicable to a trial in federal court on a federal issue.

13

> The right of trial by jury is of ancient origin, characterized by
> Blackstone as 'the glory of the English law' and 'the most
> transcendent privilege which any subject can enjoy.' (Bk. 3, p.
> 379). ... Maintenance of the jury as a fact-finding body is of such
> importance and occupies so firm a place in our history and
> jurisprudence that any seeming curtailment of the right to a jury
> trial should be scrutinized with the utmost care.

Dimick v. Schiedt, 293 U.S. 474, 485-86, 55 S. Ct. 296, 300-01, 79 L.Ed. 603 (1935). "It is

well settled that calculation of damages is the province of the jury." Trademark Research Corp.

v. Maxwell Online, Inc., 995 F.2d 326, 337 (2d Cir. 1993) (quoting Ismail v. Cohen, 899 F.2d

183, 186 (2d Cir. 1990)). The jury found that the Plaintiffs suffered, and therefore were entitled

to, $500,000 in debt collection damages.

The jury was entitled to accept Mr. Cadle's testimony regarding the amount of damages

suffered.

At trial, Mr. Cadle testified as follows:

Q.    ... collection expense damages, what are those?

A.    That is checks that I have to write to attorneys and sheriffs and court costs in
order to try to get the assets.

June 2, 2005 Transcript p. 18, lines 16-20. He further testified:

Q.    Mr. Cadle, have you included in your collection expense damages the attorney's
fees for prosecuting this suit or is that a separate category?

A.    That is a separate category.

14

SABIA & HARTLEY, LLC          190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
ATTORNEYS AT LAW              tel 860.541.2077    fax 860.713.8944    www.sabiahart.com

Q.    So the figure you're about to give to folks on the jury doesn't include the
      attorney's fees for prosecuting this?

A.    Correct.

                        *       *       *

Q.    Was there any interest on this collection expense damage, sir?

A.    No.

Q.    Okay.  Now, what are the collection expense damages, sir?

A.    We spent $494,000 on chasing the assets.

                        *       *       *

Q.    Was there any amount above that?

A.    Yes.

Q.    Can you explain to the jury why you deducted ...

                        *       *       *

A.    We didn't include some of our attorney fees that we would normally spend to
      collect on a judgment.  You know if you're going to sue someone you're going
      to pay an attorney fee.  That's not part of this 494,000.

                        *       *       *

Q.    Did you spend the money but not include it in the calculation?

A.    Yes.

Q.    What other major category would that be?

15

A.      On the Paul Gaide grievance, I paid those attorney fees to defend his grievance. I did not include those in this calculation. There was a contempt order. I did not include those attorney fees in this matter either, in addition to the normal collection expense.

Id. at 22:20 - 25:3.

Q.      The collection expense damages, that was rounding up or rounding down?

A.      Rounding down.

Id. at 26:12-15.

In the Court's charge, the Jury was instructed that:

> Now, in this RICO case the plaintiffs' damages are limited to one, lost debt damages. ... [A]nd, two, money expended pursuing the fraudulently concealed monies. Now a RICO injury does not exist where such a loss is speculative or the amount and nature of the alleged loss is not provable.

June 8, 2005 Transcript p. 115. And then in the Verdict Form, the Jury was instructed that:

> For collection expense damages, the plaintiffs must show by a preponderance of the evidence the amount of legal fees and other expenses that they incurred in their unsuccessful attempts to collect on Flanagan's assets which were proximately caused by the Defendant(s)' alleged RICO violations.

Furthermore, Paul Gaide, the attorney for Plaintiffs in connection with their efforts to collect on the five underlying obligations owed by Flanagan, testified that as a result of the Defendants' failure to comply with this Court's writ of execution, injunction and turnover

16

order, there were increased legal fees incurred by Plaintiffs, with attorney Gaide's increased

legal fees estimated at $10,000 - $15,000. May 25, 2005 Transcript 128:1 - 129:6.

Thus, there was ample evidence that Plaintiffs sustained approximately $500,000 in

collection damages and that they were careful to delete from their calculation of damages those

damages not allowed under RICO such as normal debt collection, attorney fees for defending a

grievance against Plaintiffs' attorneys, defending a contempt claim and most importantly, the

costs of the current suit. In fact, Mr. Cadle testified that his out-of-pocket expenses in this one

case so far are about $1.5 million. June 2, 2005 Transcript 74:21-22. The fact that Paul Gaide

testified that his fees were $10,000 - $15,000 is not dispositive of the issue as there was no

evidence that Paul Gaide's fees were the only collection damages suffered by Plaintiffs as a

result of Defendants' RICO violations.

In short, the evidence was sufficient to support the jury's award of $500,000 in

collection damages. This Court, therefore, should not disturb the jury's findings. Defendants

are not entitled to a new trial and/or remittitur based on the alleged lack of evidence.[3]

---

[3]     At most, Defendants would be entitled to remittitur of $6,000 because Dan Cadle
        testified that Plaintiffs' damages were $494,000, when "rounding down" and the
        jury awarded $500,000. The $494,000 of damages about which Dan Cadle
        testified, however, did not include prejudgment interest. Even the lowest amount
        of allowable interest would have increased that amount to well over $500,000.

17

**C.    Under RICO The Jury's Award For Collection Expense Damages Is Subject To Mandatory Trebling.**

In is unclear how Defendants can state that Cadle[4], which was forced to spend approximately $500,000 chasing Flanagan's fraudulently hidden assets, has not suffered any loss to its business or property.  As discussed in Section IIB supra, there was ample evidence at trial that Cadle spent approximately $500,000 in attempting to collect those debts.  There was ample evidence that this amount did not include the attorney's fees for the current trial.  June 2, 2005 Transcript 22:20-23:2.  The jury was never instructed that it could award attorney fees for this case, and there was no evidence presented to the jury as to the attorney fees in this case.[5] This Court, therefore, should reject Defendants' argument that the jury was confused regarding collection damages and included in its award the costs of the current suit.[6]  Defendants have

---

[4]    The Cadle Company and D.A.N. Joint Venture shall be referred to collectively as "Cadle."

[5]    To the extent Defendants are claiming that the instruction given regarding collection damages was inappropriate, Defendants waived any objection by failing to timely raise it.  (See discussion § IV(A)(1) and F.R.C.P. 51(c) regarding the requirement to raise any objections to jury instructions prior to the time the jury is charged).

[6]    It is unclear how the jury's question as to whether their answers to the interrogatories must be unanimous in any way supports Defendants' contention that the jury was confused as to how to calculate RICO damages.

18

pointed to no testimony that would suggest Cadle included the costs of the current case in its estimation of damages.[7] This basis for a new trial, therefore, should be denied.

### D. Defendants Have Failed To Meet Their Burden Of Demonstrating That Attorney Armstrong's Allegedly Improper Conduct Was Prejudicial And/Or Unfairly Influenced The Jury.

Defendants argue that Plaintiffs' counsel engaged in improper and prejudicial trial tactics during the examination of witnesses and closing argument. Defendants' position is without merit. Even if the Court were to find that some of Attorney Armstrong's behavior was improper, Defendants have failed to provide any proof that the conduct unfairly influenced the jury. Defendants also waived any objection to Attorney Armstrong's closing argument as they failed to timely raise any objection to it.

#### 1. Defendants failed to timely raise their objections to Plaintiffs' closing argument and therefore have waived their objections

Defendants failed to timely object to Plaintiffs' attorney's closing argument. Instead, they waited almost two days, until the day after the jury was charged, to first raise a complaint about the closing. Having failed to timely raise their objections, Defendants have waived any rights to complain about Plaintiffs' closing argument.

---

[7]    In fact Dan Cadle's testimony made it clear that he did not include the costs of the current case in his calculation of damages. See § IIB *supra*.

19

"A principle that strikes very deep is that a new trial will not be granted on grounds not called to the court's attention during the trial unless the error was so fundamental that gross injustice would result." 11 C. Wright & A. Miller, § 2805 p. 39 (1973 ed.). Fed. R. Civ. Pro. 61 further states that no error "is ground for granting a new trial or for setting aside a verdict ... unless refusal to take such action appears to the court inconsistent with substantial justice." The rule further admonishes the court to "disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." Id. The Second Circuit has stated that "[t]he purpose of requiring a timely objection is to identify the disputed issue and give the trial judge a chance to correct errors which might otherwise necessitate a new trial." Robinson v. Shapiro, 646 F.2d 734, 742 (2d Cir. 1981). "Absent objection, an error may be pursued on appeal only if it is 'plain error' that may result in a miscarriage of justice, or in 'obvious instances of ... misapplied law." Metromedia Co. v. Fugazy, 983 F.2d 350, 363 (2d Cir. 1992) (quoting City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 256, 101 S. Ct. 2748, 2754, 69 L.Ed.2d 616 (1981)).

In Greenway v. Buffalo Hilton Hotel, 951 F.Supp. 1039, 1053 (W.D.N.Y. 1997) the court noted:

> that Defendant did not object to Plaintiff's closing argument at
> the time of trial. At oral argument on these post-trial motions,
> Defendant's counsel conceded that he did not object during the
> summation as he did not wish to bring further attention to
> Plaintiff's counsel's allegedly inflammatory remarks. However,

20

> neither did defense counsel object after the jury left the
> courtroom which would have enabled the court to further instruct
> the jury about the issue.

(emphasis supplied).   The court, therefore, agreed with the plaintiff that the defendant had

waived any objection to the closing argument.  Any improper statements should be brought to

the attention of the court so that the court has an opportunity to timely correct any prejudice that

might result from such remarks.  See e.g., Doe v. Johnson, 52 F.3d 1448, 1465 (7th Cir. 1995).

In fact, the Fifth Circuit found that "it is reversible error to *grant* a plaintiff's motion for a new

trial based on admittedly improper statements during defendant's summation when the plaintiff

failed to object either during the argument or at a sidebar conference immediately thereafter."

Datskow v. Teledyne Continental Motors Aircraft Product, 826 F.Supp. 677, 687 (W.D.N.Y.

1993) (emphasis in original) (citing Nissho-Iwai Co., Ltd. v. Occidental Crude Sales, Inc., 848

F.2d 613, 619-20 (5th Cir. 1988)).

The Datkow court insightfully noted that:

> I instructed the jury both in the preliminary instructions at the
> start of the case, and again in the jury charge, that counsel's
> remarks are not evidence, and that the jury was not to be swayed
> by bias, prejudice, or sympathy, but to decide the issue solely on
> the basis of the evidence before them and the law as give to them
> by the court.  Jurors are presumed to obey the court's instructions
> in this regard as in any other.

Id. at 687 (emphasis supplied).

21

Defendants first raised objections to Attorney Armstrong's closing argument two days

after Plaintiff delivered its closing argument and one day after the jury was charged. (June 9,

2005 Transcript 4:16-5:25). Defendants have pointed to nothing that would suggest this

objection was timely. Like the Plaintiffs in Nissho -Iwai, Defendants had plenty of opportunity

to raise the issue prior to the court charging the jury, but failed to do so. Defendants, therefore,

have waived any objections to Plaintiffs' closing argument.

### 2.    Defendants have failed to show that Plaintiffs' counsel's conduct unfairly influenced the jury's verdict

"Not every improper or poorly supported remark made in summation irreparably taints

the proceedings; only if counsel's conduct created undue prejudice or passion which played

upon the sympathy of the jury, should a new trial be granted." Marcic v. Reinauer

Transportation Companies, 397 F.2d 120, 127 (2d Cir. 2005) (quoting Matthews v. CTI

Container Transport Int'l. Inc., 871 F.2d 270, 278 (2d Cir. 1989)). "It is not enough, however,

that the [attorney's] remarks were improper; rather ... constitutional error occurs when the

[attorney's] remarks were so prejudicial that they rendered the trial in question fundamentally

unfair." Floyd v. Meachum, 907 F.2d 347, 355 (2d Cir. 1990). "Only where an unpreserved

error [is] so serious and flagrant that it goes to the very integrity of the trial will a new civil trial

be warranted." Pescatore v. PanAm World Airways. Inc., 97 F.3d 1, 17-18 (2d Cir. 1988).

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
tel 860.541.2077    fax 860.713.8944    www.sabiahart.com

Defendants have failed to demonstrate conduct by Attorney Armstrong that was so prejudicial as to render the trial "fundamentally unfair." In fact, the jury's ultimate verdict, wherein they absolved some defendants of liability under § 1962(c), found that not all Defendants participated in every scheme and failed to award Plaintiffs any lost debt damages, shows that they deliberated and reached a well-reasoned verdict without being swayed by any of the alleged misconduct. Furthermore, as to much of the alleged conduct, the Court gave the jury curative instructions. June 8, 2005 Transcript 98:3-9; June 9, 2005 Transcript 11:6-12.

Defendants' reliance on Floyd v. Meachum, 907 F.2d 347, 354 (2d Cir 1990) and Koufakis v. Carvel, 425 F.2d 892 (2d Cir. 1970) to suggest they are entitled to a new trial is misplaced. Furthermore, Defendants attempt to mislead this Court by referencing only discrete portions of selected case law. Defendants cite the Floyd case for the notion that the court in that case ordered a new trial because the "prosecutor impermissibly asked [the] jury to pass on her personal integrity and personally vouched for a witness's credibility". Motion for New Trial pp. 9-10. A review of that case, however shows that this merely was one of many impermissible actions that the prosecutor took in that case. The court very clearly stated that its decision was not based on one instance of prosecutorial misconduct. In fact, in that case, the court noted that it was "one of those rare cases where the improper comments in a prosecutor's summation were so numerous, and, in combination, so prejudicial that a new trial is required." Id. at 348. (emphasis supplied) The court further stated that:

23

> [W]e emphasize that our holding today is based on the cumulative effect of the three alleged categories of improper remarks. We also emphasize that, unlike many appeals raising claims of prosecutorial misconduct, this case does not involve one, or a few isolated, brief episodes; rather, it involves repeated and escalating prosecutorial misconduct from initial to closing summation.

Id. at 353.  Finally, the court stated:

> In sum, we conclude that the cumulative effect of the prosecutor's remarks, which included both inflammatory comments and erroneous statements of law, and which implicated Floyd's specific constitutional right to remain silent, diverted the jury from the charges on which Floyd was being tried, and from the fundamental principles by which a jury must discharge its duty. ... While each instance of prosecutorial misconduct, standing alone, might not justify reversal, the effect of all of them requires it.

Id. at 356-57.  Unlike the minor alleged transgressions committed by Attorney Armstrong, the prosecutor in Floyd made repeated references to Floyd's failure to testify at trial, in essence urging the jury to draw negative inferences from his exercising his constitutional rights under the Fifth Amendment.  Second, the prosecutor repeatedly vouched for the credibility of one of the witnesses and asked the jury to decide whether the prosecutor herself was ethical.  Finally, the prosecutor referred to Floyd, who had not testified, as a "liar literally dozens of times throughout her opening and closing summations."  Id. at 354.  The court found that this misconduct was so severe and pervasive that it warranted granting the defendant's writ of habeas corpus.

24

Similarly, the Defendants cite the <u>Koufakis</u> case for the proposition that a new trial was granted in that case because of "improper personal references and reference to matters outside the record." <u>Motion for New Trial</u> p. 10. In <u>Koufakis</u>, the attorney made repeated "references to the Mafia in a way to liken Thomas Carvel to a head man in that organization" and "repeatedly suggested that Carvel coerced the 'little guys' in his organization by invoking the same kind of fear employed by the Mafia to keep its soldiers in line." He made at least six references to the Mafia in his closing argument. <u>Id</u>. at 901. He established a theme throughout the litigation of pitting a poor but virtuous man against "a powerful and unscrupulous man with untold wealth." <u>Id</u>. at 902. He remarked at least five times in summation how Thomas Carvel did not testify and referred to the vigorous cross examination he would have undergone if he had testified. <u>Id</u>. He brought to the jury's attention other litigation that was not part of the record. <u>Id</u>. at 903. He consistently misused the findings of the Federal Trade Commission trial examiner. <u>Id</u>. Finally, his summation was replete with improper references to himself and the opposing counsel. <u>Id</u>. at 904. Based on all of the above, not just an improper personal reference and/or a reference to matters outside the record, the court found that it was "clear that [plaintiff's counsel] so persistently and continuously abused the freedom afforded counsel that his presentation – particularly in summation – was based on an appeal to passion and prejudice not warranted by the proof." <u>Id</u>. (internal citations and quotations omitted).

25

The egregious conduct of the attorneys in <u>Floyd</u> and <u>Koufakis</u> stand in stark contrast to the alleged "misconduct" of Attorney Armstrong.

### a.    <u>Vouching</u>

Defendants urge this Court to grant them a new trial because Attorney Armstrong allegedly vouched for the credibility of Dan Cadle and Paul Gaide and the importance of the case. Defendants have waived this objection by failing to timely raise it. (<u>See</u> discussion § II(D)(1) for failure to timely object). Furthermore, Defendants have not pointed to any civil cases in which a party has been granted a new trial based on vouching. In fact, it is unclear whether the improper vouching rule only applies to prosecutors in criminal cases or whether it applies to attorneys in civil cases as well. As noted by the District Court of Oregon, in an unpublished opinion:

> Logically, the improper vouching rule would only apply in criminal cases in which the government is a party. The theory behind this rule is to ensure that criminal defendants receive a constitutionally fair trial. Because jurors will presumably believe the government if it states that a witness or some party is truthful, courts forbid prosecutors from vouching for the credibility of any witness during trial. However, in a civil case in which the government is not a party, the concern that jurors will be swayed by one attorney's comments on the evidence or a witness's credibility does not exist.
>
> Furthermore, the improper vouching rule does not derive from any statute or the common law. Instead, it was established by the courts when deciding whether a criminal defendant has received a constitutionally fair trial.

26

Schmitz v. City of Wilsonville, 1999 WL 778586 (D. Or. Sept. 17, 1999).[8] The court,

therefore, refused to grant a new trial in a civil case based on allegedly improper vouching.

Defendants have provided no legal authority to support the granting of a new trial in a civil case

because of an attorney improperly vouched for the credibility of a witness or the importance of

the case.

It is undisputed that Attorney Armstrong told the jury during his closing that this case

was important to him and his Dad and stated that he did not doubt Dan Cadle's sincerity.

Attorney Armstrong also referred to Dan Cadle and Paul Gaide as "friends" on at least one

occasion.[9] Attorney Armstrong's innocent colloquialism, however, is not the type of reversible

error anticipated by the Second Circuit. The jury sat through eleven days of trial, and observed

the attorneys and parties during this entire time. Defendants' suggestion that a few quick

comments by Attorney Armstrong would be sufficient to unfairly prejudice them and render the

trial fundamentally unfair is unpersuasive. Furthermore, any possible prejudice was cured by

the Court's repeated instructions to the jury that questions and comments by counsel were not

evidence and could not be considered by them in reaching a verdict. May 23, 2005 Transcript

---

[8]    A copy of this decision is attached as exhibit 1.

[9]    The references to Dan Cadle and Paul Gaide as friends of Attorney Armstrong
were fully supported by unopposed testimony in the record. See June 2, 2005
Transcript 3:25-4:1 (Attorney Armstrong and Dan Cadle have been friends "for a
long time"); May 25, 2005 Transcript, 129:14-17 (Attorney Arstrong and Paul
Gaide are friends).

27

（空白）

41:1-2; June 8, 2005 Transcript 98:309; June 9, 2005 Transcript 11:6-12. Finally, because this

is a civil trial, comments such as those made by Attorney Armstrong are not sufficiently

prejudicial that they should entitle Defendants to a new trial.[10]

---

[10]     Any "vouching" allegedly engaged in by Attorney Armstrong pales in comparison
to the vouching performed by defense counsel. Attorney Gallagher blatantly
vouched for his client's integrity when he stated: "I could stand up and tell you
I'm proud to represent one of the oldest insurance agencies in New Haven and
Stanley Prymas, who is in the insurance business and runs a business based on
trust and it's obvious what a RICO verdict would do to him. I'm not going to do
that because it's inappropriate." June 8, 2005 Transcript 31:18-32:4; 53:1-13.

Attorney Hill stated his personal opinion that this litigation is "nothing short of
frivolous" and that the only reason he did not bring a claim for vexatious litigation
was that his "client wouldn't let [him]." June 7, 2005 Transcript 120:19-22. He
further stated (with no support in the record) that: "Why wouldn't he let me? He
wants to be done with this thing. He wants to get on with his life, his career in
politics, his career as a lawyer, and to his family. He said: Be done with this. If
we bring a claim for frivolous, vexatious lawsuit, if the jury finds in our behalf,
Cadle is going to appeal that decision, I've got to deal with these guys for the next
two or three years. He wants to be done with this thing. I commend him for it."
Id. at 120:22-121:5.

Furthermore, Attorney Hill stated to the jury that: "The reason I'm particularly
animated in this case, I represent a decent human being." June 7, 2005 Transcript
117:9-11. He went on to improperly appeal to the biases and prejudices of the
jury by telling them how an adverse finding in this trial would affect "Fasano's
family, how his kids are treated in school by their friends." Id. at 117:16-17. .

Attorney Clooney referenced his clients as "good people." June 8, 2005
Transcript 57:19.

Defendants, therefore, have unclean hands and should not be
allowed to argue about Plaintiffs' attorney's alleged "vouching"
when they clearly have engaged in impermissible vouching and

28

### b.    Reference to witnesses who did not testify

Attorney Armstrong's comment regarding the failure of the Defendants to call the

accountant, Andrew D'Agostino, to testify did not create prejudicial error such that a new trial

was warranted.  Any prejudice was cured by the instruction that the Court gave to the jury

following the comment.

As the Court noted during discussions with counsel, "Attorney Armstrong wasn't the

only person who challenged the whereabouts of missing people or things." June 9, 2005

Transcript 7:4-6.  Toward that end, the Court gave the jury the following curative instruction:

> ... I believe you have been repeatedly told that the arguments of
> counsel are not evidence ...
>
> And I would certainly not relay [sic] this at one attorney's feet or
> foot, but there were in closing arguments several comments about
> where was either so-and-so or where was this document, or where
> was that document, and so forth.  Here in Connecticut we have
> the protocol that if you're going to be asked to draw an adverse
> inference on the absence of somebody or something, the person
> arguing that point has to first get permission of the Court to do
> that.  I just simply say nobody asked me to – for permission to do
> that.

Defendants have failed to demonstrate any prejudice from the statement.  Furthermore, any

prejudice was cured by the Court's further instructions on the issue.  Such conduct, therefore, is

not grounds for a new trial.

---

attempting to improperly appeal to the biases and prejudices of the
jury.

29

### c.    Reference to Thompson and Peck as a "multi-million dollar company"

Out of eleven days of trial, Defendants are apparently concerned that they were materially prejudiced by one reference by Attorney Armstrong to Thompson and Peck as a "multimillion dollar corporation during his closing argument."[11] It is unreasonable to suggest that one three-word reference out of thousands of pages of transcript could materially prejudice the Defendants and unfairly influence the jury." Furthermore, any possible prejudice was overcome by the Court's instructions to the jury that (1) "[c]onsideration of the size of these entities or their financial position have no place in this trial", June 8, 2005 Transcript 99:16-17; and (2) "in this case you should not and may not consider the value of Charles Flanagan's stock in Thompson and Peck in the damages calculation simply because there's a special way of proving that and there was no competent evidence here as to that value." Id. at 115:24-116:3. Finally, Defendants failed to raise a timely objection to the statement.[12]

Furthermore, Plaintiffs' one reference pales in comparison to the Defendants' repeated attempts to improperly bring before the jury Cadle's wealth. The transcripts are replete with

---

[11]    Furthermore, the reference is supported by evidence that was introduced during the trial. May 25, 2005 Transcript 138:3-9.

[12]    Defendants waited two days, until after the jury had been charged, to raise an objection.

30

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
tel 860.541.2077    fax 860.713.8944    www.sabiahart.com

Defendants' references to Cadle's net worth and suggestions that the jury should not award

anything to Cadle because it did not need the money.  For example;

1.  Cadle is "[u]sing a nuclear bomb to get what they want, which is money" June 8, 2005 7:24-25;

2.  "[Cadle has] already made more than he paid on these notes.  And that's without even taking into consideration how much he made on the rest of the notes in the same pool."  Id. at 61:10-13;

3.  Cadle has "made an awful lot of money."  Id. at 54:1-2;

4.  Cadle is "going to make an awful lot of money."  Id. at 61:3.

In questioning Dan Cadle, defense attorneys referenced the income of his company: June 7,

2005 Transcript 15:15-25; the amount he spent on attorneys fees' last year: June 7, 2005

Transcript 15:15-18, June 8, 2005 Transcript 92:18-19; and suggested that because he was rich

he did not need the money from this trial.  June 2, 2005 Transcript 63: 17-19 ("Let me ask you,

are you saying you need this money, sir?").  Defense counsel went so far as to attempt to elicit

from Dan Cadle his "net worth."  Id. at 63:20.  To suggest that a one-time reference to

Thompson and Peck being a multimillion dollar company is prejudicial to Defendants is the

height of hypocrisy and should not be the basis for granting a new trial.

31

### 4.    The "Lawyer Letters"

As Defendants have failed to provide any citations to the record in support of their

allegations regarding the "lawyer letters", Plaintiffs cannot adequately respond to this allegation.

Defendants, however, have failed to demonstrate that any such conduct prejudiced them or

unduly influenced the jury.[13]  Contrary to Defendants' assertions, any prejudice was cured by the

Court's explanation to the jury regarding the fact that these letters cannot form the basis of a

RICO claim and, therefore, are not admissible.  May 23, 2005 Transcript 198:9-15.[14]

---

[13]    As per Local Civil Rule 7(a)(1) the Court is not required to review parts of the
record in response to a motion, when the moving papers do not make specific
reference to such portions of the record."  This Court, therefore, should disregard
this alleged error in its entirety as Defendants have not made even the most
rudimentary attempt to make specific references to the record.

[14]    Contrary to Defendants' assertions, the Court did not refer to "lawyer letters"
during the explanation.  Rather, the Court explained:

> What this is all about is there's a body of law that
> says that correspondence between attorneys with
> respect to their matters cannot serve as the basis for
> a RICO claim because of the fact that the law wants
> to respect and encourage the matter of
> communications between attorneys in the hopes of
> things get resolved and so forth.  That's what the
> basis of the ruling is here.

May 23, 2005 Transcript 198:9-15.  Rather than "add[ing] to the suspicion"
allegedly created by these letters, this was sufficient to instruct the jury that the
letters could not form the basis of any claim under RICO.

32

### 5.    Linking of Bainer To Crocker House

The evidence showed that Bainer represented Flanagan in connection with Crocker House. The evidence further showed that Flanagan was indicted for criminal activity in conjunction with Crocker House. Attorney Armstrong's comments regarding these facts during closing were not improper. Furthermore, Defendants failed to timely object to this statement and, therefore, have waived this objection.

### 6.    Miscellaneous Objections

Defendants have failed to point out to this Court which compound questions allegedly imbedded with misrepresentations they feel should entitle them to a new trial. As Plaintiffs are unaware of to which questions Defendants refer, they cannot adequately respond to those allegations.[15] Similarly, it is beyond belief to suggest that Defendants were materially prejudiced by Attorney Armstrong's prefacing some of his objections by a comment about his dislike of objections. The jurors, having sat through eleven days of trial, clearly were able to draw their own conclusions as to which attorneys did and did not like to object. As Defendants have pointed toward no specific objections that they feel were materially prejudicial, Plaintiffs are unable to address them at this time.

---

[15]    See, Local Civil Rule 7(a)(1) as discussed in footnote 13 supra.

33

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW                    190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
tel 860.541.2077    fax 860.713.8944    www.sabiahart.com

**D.      There Is No Basis For Granting A New Trial Because The Jury Heard Evidence
Relative To An Alternative Theory Of Liability.**

There is no basis for Defendants' request for a new trial based on this Court's allowance

of Plaintiffs' Motion to Amend their Complaint to include negligence shortly before the trial.

The merits of that decision have been briefed and decided previously and Defendants' attempt to

revisit that issue in a Motion for New Trial is inappropriate.[16] Assuming that the Court's

decision to allow Plaintiffs to amend the Complaint was proper (a decision Plaintiffs obviously

support), there is simply nothing to suggest that a jury should not hear evidence regarding both

claims at the same time. Defendants have pointed to no case law or statute to support their

suggestion that it was reversible error to allow the jury to hear evidence on the alternative theory

of liability.[17] Amazingly, after arguing vociferously against the inclusion of the negligence

claims, Defendants appear to be suggesting that the Court's ultimate decision to dismiss that

claim sua sponte was prejudicial to them. Again, however, Defendants provide this Court with

no legal support for this argument. Rather, it is the norm for plaintiffs with alternative theories

of liability to present all theories in one trial and have the jury (and/or the court) be the ultimate

---

[16]      "It is well settled that Rule 59 is not a vehicle for relitigating old issues . . ."
Segua Corp., 156 F.3d at 144.

[17]      If Defendants were concerned about both claims being heard at the same time, the
proper approach would have been to request that the trial be bifurcated. This
request was never made.

34

arbitrator of those claims. The fact that the different claims may include different elements does

not result in reversible error and Defendants have provided no support to the contrary.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that Defendants' Motion For

New Trial and/or Motion For Remittitur be dismissed.

> **PLAINTIFFS, THE CADLE COMPANY AND**
> **D.A.N. JOINT VENTURE, L.P.**
>
> By:_____
> Edward C. Taiman, Jr.
> Sabia & Hartley, LLC
> 190 Trumbull Street, Suite 202
> Hartford, CT 06103
> (860) 541-2077
> Fed. Bar No. ct01319
>
> and
>
> F. Dean Armstrong, Esq.
> 1324 Dartmouth Road
> Flossmoor, IL 60422
> Federal Bar No. ct22417

35

## CERTIFICATION OF SERVICE

  I hereby certify that a true and correct copy of the foregoing instrument was mailed, postage prepaid, U.S. regular mail to all defense counsel on November 7, 2005 as shown on the attached Service List.

           Edward C. Taiman, Jr.

### SERVICE LIST

William F Gallagher, Esq.
Barbara L. Cox, Esq.
Gallagher & Calistro
1377 Ella Grasso Boulevard
P.O. Box 1925
New Haven, CT 06509
(counsel for Stanley Prymas and Thompson
& Peck, Inc.)

Douglas S. Skalka, Esq.
James A. Lenes, Esq.
Neubert, Pepe & Monteith, P.C.
195 Church Street, 13th floor
New Haven, CT 06510
(counsel for Charles A. Flanagan)

David G. Hill, Esq.
June Sullivan, Esq.
Halloran & Sage LLP
One Goodwin Square
225 Asylum Street
Hartford, CT 06443
(counsel for Leonard A. Fasano and
Fasano & Ippolito, LLC)

Roger J. Frechette, Esq.
Frechette & Frechette, Esq.
12 Trumbull Street
New Haven, CT 06511
(counsel for Leonard A. Fasano)

Mary Anne A. Charron, Esq.
Gerald R. Swirsky, Esq.
R. Bradley Wolfe, Esq.
Gordon, Muir and Foley, LLP
Hartford Square North
Ten Columbus Boulevard
Hartford, CT 06106-5123
(counsel for Todd Bainer)

Bradley K. Cooney, Esq.
Bradley K. Cooney, P.C.
69 Island Avenue
Madison, CT 06443
(counsel for Thompson & Peck, Inc.)

Todd R. Bainer
71 Cedar Street
P.O. Box 1092
Branford, CT 06405

Richard Roberts, Esq.
Karen T. Gerber, Esq.
Amber J. Branciforte, Esq.
Nuzzo & Roberts LLC
One Town Center
P.O. Box 747
Cheshire, CT 06410-0747

E:\WPDOCS\CADLE\Flanagan\RICO\Mot Judgment as a Matter of Law\mol1.newtrial11.7.05.wpd

37