2006 MAR 27 P 4: 44

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| THE CADLE COMPANY and **D.A.N. JOINT VENTURE, A LIMITED PARTNERSHIP,** | § | No. 3:01CV531(AVC) |
| | § | |
| Plaintiffs, | § | |
| vs. | § | |
| **CHARLES A. FLANAGAN, et al.,** | § | March 27, 2006 |
| Defendants. | § | |

**PLAINTIFFS' SUPPLEMENTAL RESPONSE TO
DEFENDANTS' JOINT RULE 50 MOTION**

Pursuant to the Court's March 21, 2006 Order, Plaintiffs The Cadle Company ("TCC") and D.A.N. Joint Venture hereby supplement Plaintiffs' Amended Response to Defendants' Joint Motion for Judgment as a Matter of Law.[1]

In §I (pp. 2 - 40), Plaintiffs provide a detailed summary of the evidence, with specific citations to the record, for the facts supporting the jury finding of continuity on Plaintiffs' RICO claims. In §II (pp. 41 - 49), Plaintiffs provide a brief chronology, with specific citations to the record, which summarizes the factual basis to support the jury finding of continuity. Finally, in §III (pp. 49 - 52), Plaintiffs provide a brief explanation of the facts which support the jury finding of continuity. In viewing the evidence in a light most

---

[1] In addition, Plaintiffs direct the Court's attention to Plaintiffs' Supplemental Response to Defendants' Supplemental Motion for Judgment which was filed on January 24, 2006.

**SABIA & HARTLEY, LLC**
ATTORNEYS AT LAW

190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
tel 860.541.2077    fax 860.713.8944    www.sabiahart.com

favorable to the Plaintiffs, and granting Plaintiffs every reasonable inference that the jury might have drawn in Plaintiffs' favor (see DeFalco v. Bernas, 244 F.3d 286, 305 (2d Cir. 2001); Samuels v. Air Transport Local 504, 992 F.2d 12, 16 (2d Cir. 1993); and Metromedia Company v. Fugazy, 983 F.2d 350, 361 (2d Cir. 1992)), there was ample evidence before the jury to support the RICO verdict against the Defendants.

### I.    Summary Of Continuity Facts

#### (A)    Fasano Provided Knowing And Substantial Assistance To Flanagan In Connection With The Settlement Proceeds Scheme

In 1996 Flanagan and Prymas had a dispute over management and control of T&P, which resulted in a suit filed by Flanagan against Prymas and T&P in state court in Connecticut ("Flanagan v. Prymas"). (Px 21 ¶11)  Pursuant to a June 17, 1997 settlement of that suit (Px 21) (the "Settlement Agreement"), Flanagan, Prymas and T&P agreed that (1) there would be an adjustment of the management compensation paid to Flanagan to cover the discrepancies for the additional sums that had been paid to Prymas (id. ¶2); (2) an additional $75,000 in settlement proceeds would be paid to Flanagan over three years payable in 78 equal bi-monthly installments of $961.10 (id. ¶12); and (3) Flanagan would not transfer his T&P stock to any other person or entity. (Id. ¶13)

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street   Suite 202   Hartford, CT 06103-2205
tel 860.541.2077   fax 860.713.8944   www.sabiahart.com

It was the original intent of Prymas, T&P and Flanagan that the ¶12 Settlement Agreement payments would be 1099-miscellaneous income, and not wages. The accountant for T&P, James Rayner, was of the opinion that the ¶12 Settlement Agreement payments to Flanagan were "not W-2 compensation [wages], but a taxable damage settlement to be reported on 1099-MISC." (Px 22; 5/24/05 Tr. p. 131)  Further, at a T&P corporate meeting on September 3, 1997, Flanagan, Prymas and T&P all agreed that the settlement payments to Flanagan under ¶12 were "1099 income not subject to garnishments or withholding." (Px 106 p. 3)

Moreover, the Settlement Agreement payments were classified as 1099 income to Flanagan the first time the liability was put on the T&P corporate books.  (5/31/05 Tr. pp. 30-31)  Further, when T&P started issuing the Settlement Agreement checks in August of 1997, those checks were classified as 1099 payments to Flanagan.  (5/31/05 Tr. p. 28)

One of the reasons why the Defendants wanted the Settlement Agreement payments to Flanagan characterized as 1099 miscellaneous income was to assist Flanagan in his effort to avoid the wage garnishments that had been served on Flanagan and T&P.  (5/24/05 Tr. p. 42)  As Prymas told Bainer, the strategy among Flanagan, Prymas and T&P at that time was to characterize

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
tel 860.541.2077    fax 860.713.8944    www.sabiahart.com

the Settlement Agreement payments as 1099 miscellaneous income
so the proceeds would not be subject to Flanagan's wage
garnishments, and Flanagan would not have to pay a percentage of
the Settlement Agreement payments to the garnishing creditor.
(5/24/05 Tr. p. 42)

On January 5, 1998 a federal court writ of execution --
approved by Judge Covello (Px 68A p. 3) -- was served on Prymas,
as president of T&P, in connection with TCC's March 20, 1997
judgment against Flanagan. At p. 2 of the writ, T&P was
commanded to

> pay to the sheriff the amount of a debt owed
> by you [T&P] to the judgment debtor
> [Flanagan], provided, if the debt owed by
> you [T&P] is not yet payable, payment shall
> be made to the sheriff when the debt becomes
> due if it becomes due within four months
> after the date of issuance of this
> execution.

(Px 68A)

As of January 1, 1998 the total balance due from T&P to
Flanagan under the Settlement Agreement was $60,416.62.
(5/31/05 Tr. p. 46) At the time the writ of execution was
served, Flanagan, Prymas and T&P all considered the monthly
Settlement Agreement payments to Flanagan to be 1099
miscellaneous income (5/24/05 Tr. pp. 44-45), and thus those
payments were subject to the writ of execution. (5/25/05 Tr. p.
32; 6/6/05 Tr. pp. 49-52)

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
tel 860.541.2077    fax 860.713.8944    www.sabiahart.com

Prymas was unsure how to deal with the property execution, and suggested to Flanagan that they seek the guidance of T&P's attorney, Bainer. (Px 68) With the consent of Flanagan, on January 5, 1998 Prymas forwarded the property execution to Bainer for his legal opinion, which was reviewed by Bainer on January 5, 1998. (Px 65)

On January 5, 1998 Flanagan also forwarded the property execution to his personal attorney, Fasano, expressing his concern that the ¶12 Settlement Agreement payments might be subject to the property execution:

> Please see enclosed which was served to Stanley Prymas this morning. I have not received anything as yet, however I should be served shortly. My concern here is with the money I am currently receiving from [T&P] as a result of the Settlement between Mr. Prymas and I. Is this subject to being taken?

(Px 144) On the next day -- January 6th -- Flanagan asked Fasano whether it would make sense for Fasano to contact T&P's attorney, Bainer, to discuss how to handle the property execution which had been served on T&P. (Px 3)

After service of the writ of execution, Flanagan and Fasano wanted the Settlement Agreement payments recharacterized from 1099 miscellaneous income to wages in an effort to avoid Judge Covello's writ. (5/31/05 Tr. pp. 75, 79 & 85-86) Bainer and Prymas also knew that Flanagan and Fasano wanted to

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW
190 Trumbull Street   Suite 202   Hartford, CT 06103-2205
tel 860.541.2077   fax 860.713.8944   www.sabiahart.com

recharacterize the ¶12 Settlement Agreement payments from 1099 miscellaneous income to wages in an effort to avoid the property execution. (5/31/05 Tr. pp. 85-87, 124-25 & 186) Flanagan, however, was in a predicament: all parties had previously agreed that the ¶12 settlement payments were 1099 miscellaneous income, and T&P had previously treated the prior settlement payments to Flanagan as 1099 miscellaneous income.  (Px 72-R p. 2)

Fasano understood that if the Settlement Agreement payments continued to be characterized as 1099 miscellaneous income, those payments would be subject to Judge Covello's writ of execution.  (6/1/05 Tr. p. 22)  Fasano, however, advised Flanagan that if they recharacterized the Settlement Agreement payments as W-2 wages, those payments would not be subject to Judge Covello's writ.  (6/1/05 Tr. p. 22)

On January 12, 1998 Flanagan and Prymas agreed that T&P would "temporarily hold" the ¶12 Settlement Agreement payments to Flanagan, with the checks issued, but placed in a file at T&P, until the matter was resolved. (Px 140)  Rather than take any affirmative legal action in federal court to stay the writ of execution (5/26/05 Tr. p. 121), on January 20, 1998 Flanagan and Fasano simply filed, on behalf of T&P, a claim exemption form (Px 25) and an Objection to Property Execution (Px 24) which represented to TCC and Judge Covello that "[o]ther than

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
tel 860.541.2077    fax 860.713.8944    www.sabiahart.com

wages, there is no property [belonging to Flanagan] held by [T&P]." (Px 24)

Fasano had previously sent a draft of the Objection and the claim exemption form to Bainer for his review and approval. (Pxs 25A & 25B) Although Bainer and Prymas knew that Flanagan's and Fasano's representations to TCC and Judge Covello were false (Px 69), they took no steps to honor the federal court property execution and have the ¶12 Settlement Agreement proceeds paid over to the sheriff. (5/26/05 Tr. pp. 121-22)

On February 4, 1998 Prymas informed Bainer that any representation to TCC and Judge Covello that T&P does "not have any money assets due to Mr. Flanagan" was a misrepresentation, because "T&P does have an obligation to [Flanagan]." (Px 69) The "money assets" that T&P owed to Flanagan were the $75,000 in Settlement Agreement payments. (5/31/05 Tr. pp. 83-84) Shortly after Prymas' February 4, 1998 memorandum, a meeting was scheduled to discuss strategy on how best to circumvent Judge Covello's writ of execution. (Px 72-R p. 2; Px 65 (2/9/98 entry))

On February 9, 1998 Flanagan and Fasano met with Prymas and Bainer to discuss the federal court property execution and the plan by Fasano and Flanagan to change the characterization of the Settlement Agreement payments to wages. (Px 65 p. 2; Px 72-R

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street     Suite 202     Hartford, CT 06103-2205
tel 860.541.2077     fax 860.713.8944     www.sabiahart.com

p. 2)    Bainer explained to Prymas that Flanagan and Fasano wanted to recharacterize the Settlement Agreement Payments from 1099 miscellaneous income to W-2 wages so that Flanagan could "skirt the writ".    (5/31/05 Tr. pp. 85-87, 124-25, & 186) Bainer then warned the other Defendants and Flanagan that changing the characterization of the Settlement Agreement payments from 1099 miscellaneous income to wages in response to the federal court property execution would leave them all open to a claim that there was a civil conspiracy to help Flanagan defraud his creditors. (5/24/05 Tr. p. 54; Px 72-R p. 2)    Bainer further warned that the conspiracy claim was a risk that they had to seriously consider. (Id.; Px 65 p. 2)

Fasano and Flanagan, as well as Bainer, Prymas and T&P, all agreed to accept that risk.    (Px 142) Although no affirmative steps were taken in federal court to stay the writ of execution (5/25/05 Tr. p. 121), not a single payment of the $75,000 settlement obligation was turned over to the sheriff, with the ¶12 settlement funds simply recharacterized as wages, and then paid directly to Flanagan. (Pxs 142, 143 & 145)

Judge Covello's writ of execution was not honored by the Defendants.    (5/25/05 Tr. pp. 117-18)    Because the Settlement Agreement payments to Flanagan were originally classified as 1099 miscellaneous income and had been treated as such prior to

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
tel 860.541.2077    fax 860.713.8944    www.sabiahart.com

service of the writ, the Settlement Agreement payments after January 5, 1998 should have been paid over to the sheriff, but were not. (5/25/05 Tr. p. 118)    If Judge Covello's writ of execution had been complied with, Attorney Paul Gaide, on behalf of the Plaintiffs, would have sought a turnover order for the balance of the money due to Flanagan under the Settlement Agreement. (5/25/05 Tr. p. 118)    No such action was taken, however, because of the misrepresentations by the Defendants. (Id.)

Further, on March 9, 1998 Judge Covello issued an injunction which provided that:

> I am entering an order that Mr. Flanagan,
> from this point forward, transfer nothing of
> a single asset until such time as this is
> unraveled, and that includes the family lawn
> mower, bicycle, whatever.

(Fasano Ex. 502 p. 2; Px 62 p. 1 ¶13)    Judge Covello's injunction was likewise not honored by the Defendants. (5/25/05 Tr. pp. 119-20)    The Settlement Agreement proceeds should have been paid over to TCC, but were not, and the injunction prevented the payment of those Settlement Agreement payments to anybody else or any change in the characterization of the Settlement Agreement payments. (Id.)

The federal court property execution was issued on January 5, 1998 and expired on May 5, 1998. (Px 68A; 5/31/05 Tr. pp. 104

-9-

& 108-09; Pxs 157 & 142)  The period during which the Settlement Agreement payments were suspended was the same four month period. (Pxs 142, 143 & 145)  Prymas told the T&P bookkeeper, Andrea Steele, to process the checks for those four months, but to hold on to them and not distribute them to Flanagan. (5/31/05 Tr. pp. 49-52, 54-56 & 61-62; Pxs 142, 143 & 145)  The eight checks that were issued reflected money that was due by T&P to Flanagan under ¶12 of the Settlement Agreement, and at the time that those eight checks were issued, the payments were considered 1099 income. (Id.)

To avoid the federal court property execution, the eight issued-but-not-cashed settlement checks were moved to the end of the Settlement Agreement payout (after the writ of execution had expired), and then recharacterized as wages.  (5/31/05 Tr. pp. 49-52, 54-56 & 61-62; Pxs 142, 143 & 145)  Prymas explained that the eight issued but not cashed checks were to be moved and not paid to Flanagan until after June of 2000 because of Flanagan's legal problems.  (5/31/05 Tr. pp. 61-62)

Having successfully conspired to defeat the January 5, 1998 federal court property execution, the next few TCC collection efforts were much easier to circumvent.  On November 12, 1998 Prymas and T&P were served with TCC's federal court Post Judgment Remedies ("PJR")  Interrogatories, which inquired

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
tel 860.541.2077    fax 860.713.8944    www.sabiahart.com

whether T&P held any non-exempt property (such as Settlement Agreement payments) that belonged to Flanagan. (Pxs 116 & 117)

Although Prymas knew that the ¶12 Settlement Agreement payments had been recharacterized from 1099 income to wages to "skirt the writ" (5/30/05 Tr. pp. 85-87, 124-25 & 186), he sought comfort from co-conspirator Bainer on how to respond to the federal court PJR Interrogatories. (Px 116)  Bainer affirmed the earlier conspiracy by concurring with Prymas that Flanagan was only paid wages by T&P (Px 118), and thus it was appropriate to respond to TCC that T&P was not in possession of any non-exempt property that belonged to Flanagan. (Px 119)  On November 30, 1998 Flanagan agreed to the continuation of the recharacterization plan. (Id.)

Despite the fact that both Prymas and Bainer knew that T&P owed the settlement proceeds to Flanagan pursuant to the earlier Settlement Agreement, Bainer advised Prymas to respond that no money was due by T&P to Flanagan. (Pxs 118 & 119)  Thus, in addition to the federal court writ of execution, another asset discovery "storm" had been weathered by implementation of the Defendants' settlement proceeds scheme.  (Px 122)

Both the IRS form 1099 for the miscellaneous income payments to Flanagan and the IRS W-2 wage form for Flanagan were mailed by T&P to the IRS.  (5/31/05 Tr. pp. 31 & 66)  The W-2

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
tel 860.541.2077    fax 860.713.8944    www.sabiahart.com

forms <u>mailed</u> by T&P to the IRS would have been for 1998, 1999 and 2000, which was the entire period of time for the payout by T&P to Flanagan under the Settlement Agreement. (5/31/05 Tr. p. 66)  For the entire period of time -- 1998, 1999 and 2000 -- there would have been W-2 forms mailed by T&P to the IRS which reflected the recharacterized Settlement Agreement payments to Flanagan. (5/31/05 Tr. p. 66)

### (B)    Fasano    Provided    Knowing    And    Substantial Assistance    To    Flanagan    In    Connection    With The Checking Account Scheme

On March 20, 1997 TCC obtained a judgment against Flanagan in the amount of $90,747.87 (Pxs 68A & 196 p. 2 ¶1) for Flanagan's failure to repay a loan. (5/27/05 Tr. pp. 21-22)  In addition, Flanagan owed close to $1,000,000 for other unpaid financial obligations owed to Plaintiffs. (Fasano Ex. 502 p. 4 ¶(c); Px 20)

In 1997 Flanagan owned three rental properties -- the Howe Street apartments; the George Street apartments; and the Whitney Avenue property (6/2/05 Tr. pp. 200-01; 6/3/05 Tr. p. 5) -- which generated a substantial amount of rental income for the

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
tel 860.541.2077    fax 860.713.8944    www.sabiahart.com

benefit of Flanagan.[2]   These rental properties, however, were
not held in Flanagan's name.   Rather, in an effort to avoid
Flanagan's creditors, Flanagan placed record title to these
income producing properties in the names of controlled entities,
which were not readily traceable to Flanagan.   (6/2/05 Tr. pp.
201-02; Pxs 75, 76 & 77)

In 1997, Flanagan, at Fasano's direction, set up checking
accounts in the names of Matthew Flanagan and Jeremy Flanagan,
who were two of Flanagan's minor children.   (5/26/05 Tr. pp. 45
& 113; 6/2/05 Tr. p. 240)   In addition, Flanagan had a checking
account in the name of MJCC Corp. (6/2/05 Tr. pp. 195-97), which
was set up by Fasano's law firm (6/1/05 Tr. p. 7), and which was
used by Flanagan as a property management account for several
rental properties that he owned.   (6/2/05 Tr. p. 197)

In 1997 and 1998 Flanagan ran his rental property income
through these nominee checking accounts, at Fasano's direction,
in an effort to avoid the execution efforts by TCC and
Flanagan's other creditors.   (5/26/05 Tr. pp. 45 & 113; 6/2/05
Tr. pp. 195-97, 200 & 240; 6/3/05 Tr. pp. 32 & 35-36)   Moreover,
in 1997 Flanagan deposited sums of money in Fasano's law firm's
trust account. (6/1/05 Tr. pp. 12, 16 & 20)   Flanagan would then
have Fasano draw funds out of that trust account so Flanagan

---

[2]     In 1998, Flanagan's rental properties generated approximately $130,000
in rental income for Flanagan's benefit.   (6/1/05 Tr. p. 218)

-13-

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street   Suite 202   Hartford, CT 06103-2205
tel 860.541.2077   fax 860.713.8944   www.sabiahart.com

could pay certain bills.  (Id.)  Accordingly, Fasano knew that
Flanagan was running his rental property income through these
nominee checking accounts in an effort to defeat the judgment
claims of TCC and Flanagan's other creditors.  (Id.; 5/26/05 Tr.
pp. 45 & 113; 6/2/05 Tr. pp. 195-200 & 240; 6/3/05 Tr. pp. 32 &
35-36; Pxs 254, 255 & 256; 6/1/05 Tr. p. 11; 6/3/05 Tr. pp. 110,
131 & 133)

On March 9, 1998 TCC attempted to conduct a judgment debtor
examination of Flanagan in an effort to locate any assets of
Flanagan that were subject to execution.  (6/2/05 Tr. p. 170; Px
196 p. 3 ¶6)  At that time, however, Flanagan took the Fifth
Amendment and refused to testify about the location of any of
his assets.  (Id.; Px 62 p. 2 ¶2)  As a result, on March 9, 1998
Judge Covello issued an injunction "freezing all of Mr.
Flanagan's assets."  (Px 62 p. 1 & p. 2 ¶3; 6/2/05 Tr. p. 170;
Px 196 p. 3 ¶6)

Judge Covello left little doubt about the scope of the
injunction he was issuing:

> I'm entering an order that Mr. Flanagan,
> from this point forward, transfer nothing of
> a single asset until such time as this is
> unraveled, and that includes the family lawn
> mower, bicycle, whatever.

(Fasano Ex. 502 p. 2)  A mere two days after that injunction,
however, Flanagan wrote a check for cash on his MJCC account,

-14-

which was endorsed by Flanagan.    (Px 79; 6/3/05 Tr. pp. 40-41)
Similar checks were written by Flanagan on nominee checking
accounts whereby Flanagan transferred cash in violation of Judge
Covello's March 9, 1998 injunction.    (Pxs 13 & 100; 6/3/05 Tr.
pp. 40, 42-44 & 111-12; 5/25/05 Tr. p. 120-122)

The amount of money that Flanagan ran through these nominee
checking accounts in violation of Judge Covello's injunction was
staggering.    There was in excess of $125,000 run through one of
Flanagan's minor children's account, and well over $300,000 that
Flanagan ran through the MJCC account, from and after the March
9, 1998 injunction until the date that Flanagan filed for
bankruptcy.    (5/25/05 Tr. pp. 120-122)    And it was Fasano who
had advised Flanagan to run his rental property income through
these nominee checking accounts, all in violation of Judge
Covello's injunction.    (6/3/05 Tr. pp. 43-44)

Equally as disturbing, Fasano represented to Judge Covello
and TCC on October 29, 1998, and then on November 16, 1998, that
Flanagan had not, in fact, transferred any assets after the
March 9, 1998 injunction.    (Px 62 p. 1 ¶13; 6/1/05 Tr. p. 65)
Fasano intended for Judge Covello and TCC to rely on Fasano's
knowingly false assurances.    (6/1/05 Tr. p. 66)

Finally, in connection with the March 9, 1998 injunction,
Judge Covello ordered Flanagan to prepare an income and expense

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
tel 860.541.2077    fax 860.713.8944    www.sabiahart.com

statement (a "production budget") (Px 90) which was supposed to list all of Flanagan's monthly income and usual and customary living expenses.  (5/25/05 Tr. pp. 49-51 & 54-55; 6/1/05 Tr. pp. 85-89)   Although Fasano received Flanagan's income tax return (which reflected approximately $130,000 in rental income paid to Flanagan (6/1/05 Tr. p. 218)), and Fasano knew that Flanagan received income from his rental properties (6/1/05 Tr. p. 100), Fasano did not list in Flanagan's Production Budget the substantial amount of rental income that Flanagan was receiving from his rental properties.   (Px 90; 6/1/05 Tr. p. 89; 6/2/05 Tr. p. 238)

**(C)  Fasano Provided Knowing And Substantial Assistance To Flanagan In Connection With The Shifting Stock Scheme**

After service of the property execution on January 5, 1998 (Px 68A), Flanagan wrote to his personal attorney, Fasano, on January 6th, seeking advice on how to shield Flanagan's T&P stock from TCC's execution efforts:

> I wanted to make you aware that S. Prymas faxed to Atty. Bainer who represents T&P Inc. a copy of the Execution from Gaide that I faxed to you on Tues. . . .
>
>          * * *
>
> Does it make sense for you to contact Atty. Bainer on my behalf and find out now what the issues are with T&P Inc. over this.  Why would Gaide have S. Prymas served over my matter?  I also do not want it disclosed

-16-

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
tel 860.541.2077    fax 860.713.8944    www.sabiahart.com

> where my Stock is presently kept.    There
> may be an attempt to grab this stock.    If
> there is a concern here, please let me know
> if I should be doing anything different than
> what is presently being done.

(Px 3 (emphasis added))

Flanagan's memo to Fasano (Px 3) referred to Plaintiffs' efforts to execute on Flanagan's T&P stock.  (6/2/05 Tr. p. 161) As far as the reference to "doing anything different than what is presently being done" (Px 3), this referred to what Flanagan and Fasano were doing with Flanagan's T&P stock.  (6/3/05 Tr. pp. 67-68)

In addition to the property execution which was served on January 5, 1998, on February 2, 1998 TCC filed a motion for turnover of Flanagan's assets (Px 69A), which was received by T&P and Bainer on February 4, 1998.  (Pxs 69 & 69A)  TCC was attempting to gather information on any interest which Flanagan may have had in T&P by filing a Petition for Examination of Judgment Debtor, which examination was ordered by the Court for March 9, 1998.  (Px 196 p. 3 ¶6)

Flanagan and Fasano, however, had developed a strategy to stop Flanagan from testifying about the location of his T&P stock by pleading the Fifth Amendment privilege against self-incrimination "based upon outside issues" (i.e., an IRS investigation).  (6/1/05 Tr. pp. 42-3; 6/2/05 Tr. pp. 173-75 &

-17-

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
tel 860.541.2077    fax 860.713.8944    www.sabiahart.com

193; Px 188 pp. 3-4; & 5/25/05 Tr. p. 68.)  Accordingly, at the
March 9, 1998 Examination of Judgment Debtor, Flanagan asserted
the Fifth Amendment and refused to testify about the location of
his T&P stock.  (6/2/05 Tr. p. 170; Px 196 p. 3 ¶6)  But as
reluctantly admitted by Flanagan at trial, the location of his
T&P stock had nothing to do with the IRS investigation.  (6/2/05
Tr. pp. 194-95)

Based on Flanagan's refusal to testify about the location
of any of his assets (Px 196 p. 3 ¶6), on March 9, 1998 Judge
Covello    issued    an    injunction    prohibiting    Flanagan    from
transferring any of his assets.  (Fasano Ex. 502 p. 2; Px 62 p.
2 ¶¶2-3)

On March 12, 1998 TCC filed a second motion for turnover
order (Fasano Ex. 502 p. 2; Px 196), which was granted by Judge
Covello on April 13, 1998.  (Px 127; Fasano Ex. 502 p. 2)  As a
result thereof, Flanagan and T&P were ordered to:

> immediately    turn    over    all    evidence    of
> Charles A. Flanagan's ownership . . . in
> [T&P],    including    any    and    all    stock
> certificates    in    his/its    possession,    under
> his/its control and/or available to him/it
> in which [Flanagan] had an interest as of
> the date the Property Execution [Px 69A] in
> this matter was served [January 5, 1998] . .
> ..

(Fasano Ex. 502 p. 2; Pxs 127 & 196)  Further, Flanagan and T&P
were ordered to:

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
tel 860.541.2077    fax 860.713.8944    www.sabiahart.com

> provide to [TCC] a full and complete
> accounting as to any disposition of such
> evidence if a claim is asserted . . . that
> Charles A. Flanagan sold, hypothecated,
> pledged, gifted or otherwise divested
> himself or disposed of any interest in the
> referenced entit(ies).

(Id.) TCC's Second Motion for Turnover Order (Px 196) was served on T&P. (Px 196 p. 7; 5/25/05 Tr. p. 48)

Fasano asked Bainer not to acquiesce in TCC's efforts to execute on Flanagan's assets. (6/1/05 Tr. pp. 28-29) In response to Plaintiffs' execution efforts on Flanagan's assets, Flanagan, Fasano, Prymas and Bainer had worked out a "plan A" whereby they would all work together with the "goal" to "weather this storm" on Plaintiffs' attempts to execute on Flanagan's T&P stock. (Px 122) In acting in concert to avoid Plaintiffs' execution efforts, the Defendants and Flanagan agreed to be on the "same page". (Pxs 130 p. 1 & 135 pp. 1-2) Part of the "overall plan" was to place a restrictive legend on Flanagan's T&P stock which would make that stock less attractive to Plaintiffs. (Px 128)

The second motion for turnover order (Px 196) was served upon T&P because the relief TCC was seeking was, in part, directed against T&P. (5/25/05 Tr. p. 48) As far as TCC seeking an accounting as to any alleged disposition of

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
tel 860.541.2077    fax 860.713.8944    www.sabiahart.com

Flanagan's T&P stock, TCC's counsel for those collection efforts, Paul Gaide, wanted to know

> who had [Flanagan's T&P stock], how they got it, what consideration they had given for it, who was in possession of it.  Once we had that information, we could then execute on the stock, sell it at a judicial sale, and if the person who was in possession of the stock held a duly perfected security interest in the stock, they would be paid first out of the sale proceeds, and [TCC] would be paid subsequent to that up to the amount of its judgment.

(5/25/05 Tr. p. 74)

Both Bainer and Prymas were informed of both Judge Covello's March 9, 1998 Injunction and Judge Covello's April 13, 1998 Turnover Order. (5/25/05 Tr. pp. 123, 124 & 149; 5/26/05 Tr. pp. 58-59; 6/2/05 Tr. pp. 150-51 & 205-06)  Even with the federal court writ of execution (Px 68A); the injunction freezing Flanagan's assets (Fasano Ex. 502 p. 2; Px 62 p. 1 & p. 2 ¶3); and the Turnover Order for Flanagan's T&P stock (Pxs 127 & 196), Fasano, Bainer, Prymas and T&P were still willing to do all that they could to avoid TCC's collection efforts, and thereby prevent TCC from seizing Flanagan's T&P stock. (Pxs 72-R & 128)

**(1)    The Scheme To Place A Restrictive Legend On Flanagan's T&P Stock**

One of the avenues discussed by Flanagan and the Defendants in mid-1998 was the execution of a buy-sell agreement and

-20-

placement of a restrictive legend on Flanagan's T&P stock, which would make Flanagan's T&P stock less attractive to his creditors. (Pxs 128; 135 p. 1; 6/2/05 Tr. pp. 148-49, 214 & 220-21)  As summarized by Bainer:

> As we have discussed previously, part of the overall plan would be to place restrictive language on [Flanagan's T&P] stock certificates . . . .  This restrictive covenant, which must be placed on the face of the original stock certificates, would likely make [T&P] stock less attractive to creditors of [Flanagan].

(Px 128 (emphasis added))

The issue of Plaintiffs' execution efforts was discussed on numerous occasions at T&P's board (auxiliary committee) meetings. (6/2/05 Tr. pp. 212-13 & 217)  Bainer specifically instructed Prymas and Flanagan to not make any reference in the board meeting minutes to the discussions among Flanagan, Prymas and Bainer about the strategies of the Defendants in resisting Plaintiffs' execution efforts. (6/2/05 Tr. p. 207)

Further, Flanagan had a discussion with Fasano in April of 1998 about the propriety of placing a restrictive legend on Flanagan's T&P stock. (6/3/05 Tr. p. 155)  At that time Flanagan asked Fasano if it was the right thing to do to put a restrictive legend on Flanagan's T&P stock. (6/1/05 Tr. p. 96)  Fasano advised Flanagan to go ahead and place the restrictive

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street   Suite 202   Hartford, CT 06103-2205
tel 860.541.2077   fax 860.713.8944   www.sabiahart.com

legend on Flanagan's T&P stock.    (6/1/05 Tr. pp. 59-61 & 96-97;

6/2/05 Tr. pp. 216-17)

Despite Judge Covello's injunction against the transfer of

Flanagan's assets and the turnover order requiring the turn over

of Flanagan's T&P stock, the Defendants proceeded with their

plan to place a restrictive legend on Flanagan's stock. (Px 56)

On July 27, 1998 Flanagan informed Bainer that:

> I received your fax regarding the delivery
> of the T&P Stock Certificates from Stanley
> and I.  I left you a message yesterday that
> I can deliver the T&P Inc. stock that
> pertains to me, have the restrictive wording
> put on my stock and take my stock back with
> me.    Before this is done, it is my
> understanding that you were going to review
> with Atty. Ippolito [Fasano's law partner]
> on Tues. 7-28-98 the Buy Sell Agreement for
> Atty. Ippolito's input.    Shouldn't this
> discussion and a draft of your and his
> discussion take place, have this draft
> discussed, modified if need be, voted on by
> Stanley and I and than finish with the Stock
> restrictions.
>
> Please advise.

(Px 56 (emphasis added))  Accordingly, Fasano knew that Flanagan

had  possession  or  control  of  his  T&P  stock,  and  that  a

restrictive legend was to be placed on Flanagan's stock.    (Px

56; 6/1/05 Tr. pp. 59-61 & 96-97; 6/2/05 Tr. pp. 216-17)

On August 21, 1998 Flanagan, Prymas and Bainer met at T&P's

office in New Haven to carry out the terms of their plan. (Px

56; 5/23/05 Tr. pp. 157-58 & 168; 6/2/05 Tr. p. 224) At this

-22-

meeting, Flanagan handed his T&P stock certificate to Bainer, who then typed the restrictive legend on the stock and returned it to Flanagan. (Id.)

Although Judge Covello had issued an injunction prohibiting Flanagan's transfer of assets, and had issued a turnover order requiring Flanagan and T&P to turn over Flanagan's T&P stock, Flanagan, Bainer and Prymas refused to obey Judge Covello's orders and turn over the stock. Bainer, as T&P's agent, was also subject to the turnover order and should have turned Flanagan's T&P stock over to TCC. (Px 133; 5/25/05 Tr. p. 123) Flanagan, however, did not feel as though he was obligated to honor Judge Covello's orders because Fasano had told him he did not have to turn over his T&P stock. (6/2/05 Tr. pp. 226-28)

The placement of the restrictive legend on Flanagan's T&P stock caused the stock to no longer be freely transferable. (5/25/05 Tr. p. 120) Moreover, the handing of the stock from Flanagan to Bainer; from Bainer back to Flanagan; and then from Flanagan back to Babacus, was all in violation of Judge Covello's injunction and turnover order. (5/25/05 Tr. pp. 120 & 122-23)

### (2)  The Sharon Demetropoulous Scheme

On September 23, 1998 Judge Covello again ordered Flanagan to turn over the T&P stock and the documentation showing any

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street   Suite 202   Hartford, CT 06103-2205
tel. 860.541.2077   fax 860.713.8944   www.sabiahart.com

transfer of that stock.  (Px 187)  After two motions to stay the
enforcement of the turnover order were overruled by Judge
Covello, on October 21, 1998 Fasano submitted to the Court and
TCC a "Notice of Compliance" (Px 1), representing that
Flanagan's stock was in the hands of "Sharon Demetropolous"
(actually, "Demetropoulous"), and that Flanagan did not have
possession or control of the stock.  (Id.; 6/1/05 Tr. p. 47)
After Attorney Gaide received a copy of the Notice of
Compliance, he contacted Fasano and asked Fasano to comply with
the balance of Judge Covello's turnover order and provide the
paper trail as to the disposition of Flanagan's T&P stock.
(5/25/05 Tr. p. 75)

On the next day Flanagan and Fasano submitted an "Amended
Notice of Compliance" (Px 2), again representing that Flanagan's
stock was in the hands of Ms. Demetropoulous and that Flanagan
did not have possession or control of the stock.  Flanagan and
Fasano also represented that

> [s]aid stock has been held by Sharon
> Demetropolous [sic] prior to the Court's
> Order for Turnover on April 13, 1998, and
> prior to the Court's Order on March 9, 1998
> prohibiting [Flanagan] from transferring any
> of his assets.

(Id.; 6/1/05 Tr. p. 49)  Further, Fasano represented to Judge
Covello, and by mail to Attorney Gaide, that Flanagan did not

-24-

SABIA & HARTLEY, LLC      190 Trumbull Street   Suite 202   Hartford, CT 06103-2205
ATTORNEYS AT LAW          tel 860.541.2077   fax 860.713.8944   www.sabiahart.com

have <u>control</u> over the T&P stock, so if Flanagan asked, he couldn't get his stock back.  (6/1/05 Tr. pp. 48-49)

Fasano intended for Judge Covello and TCC to rely on its prior representations that Ms. Demetropoulous held Flanagan's T&P stock.  (6/1/05 Tr. pp. 57-58)  The representations by Fasano, however, were false.  (5/26/05 Tr. p. 119)

Flanagan never told Fasano that Sharon Demetropoulous held Flanagan's T&P stock (6/3/05 Tr. pp. 54-55), and Fasano never asked Flanagan if Ms. Demetropoulous held Flanagan's T&P stock.  (6/3/05 Tr. p. 66; 5/23/05 Tr. p. 64)  Moreover, although Sharon Demetropoulous was Fasano's client (6/1/05 Tr. p. 45), Fasano never called Ms. Demetropoulous to ask whether she did, in fact, hold Flanagan's T&P stock.  (6/1/05 Tr. p. 48)  Indeed, it was Sharon Demetropoulous who called Fasano and told him that she never had Flanagan's stock.  (6/1/05 Tr. p. 48)  Ms. Demetropoulous never had possession or control of Flanagan's T&P stock (5/23/05 Tr. pp. 61-62), and she never had a discussion with Fasano about being in possession of Flanagan's T&P stock.  (5/23/05 Tr. p. 66)

In an affidavit submitted by Fasano to Judge Covello and TCC, Fasano represented that Flanagan had "borrowed money from Sharon Demetropolous [sic] and gave her the stock as security for the money."  (Px 58)  This false affidavit, however, was

-25-

prepared and submitted by Fasano, and Flanagan signed the affidavit without reading the first page. (6/3/05 Tr. pp. 50-51 & 54)

Flanagan never told Fasano that Sharon Demetropoulous had possession of his T&P stock. (6/3/05 Tr. p. 55) Indeed, upon receipt of Fasano's Notice of Compliance (Px 1) representing to the Court and TCC that Sharon Demetropoulous held Flanagan's T&P stock, Attorney Gaide contacted Ms. Demetropoulous. (6/3/05 Tr. p. 141) When Ms. Demetropoulous then asked Flanagan "what's going on, I don't have your stock", Flanagan's response was "I know you don't". (6/3/05 Tr. pp. 141-42) Indeed, in an affidavit dated July 7, 1997, Flanagan had previously warranted and represented that he owned his T&P stock unencumbered, and that he would not transfer his T&P stock to any other person or entity. (Px 61 ¶4) Fasano knew that any representations to Judge Covello and TCC that Sharon Demetropoulous held Flanagan's stock were false. (Px 3)

### (3) **The Bogus Babacus Debt Scheme**

On October 26, 1998 Judge Covello issued, _sua sponte_, a Show Cause Order scheduling a contempt hearing on November 16, 1998 for Flanagan's failure to turn over his stock and failure to provide an accounting as to any disposition of the stock as required by the turnover order. (Px 190) Now Flanagan and

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
tel 860.541.2077    fax 860.713.8944    www.sabiahart.com

Fasano were in a bind. The purported secured debt to Ms. Demetropoulous was bogus, and Fasano's client (Ms. Demetropoulous) did not in fact have possession of Flanagan's stock. Flanagan and Fasano then came up with an alternate plan: a friend and business associate of Flanagan by the name of Socrates T. Babacus ("Babacus") would claim to have loaned substantial sums of money to Flanagan and also claim to have possession of the stock as collateral for the bogus loan.

Pursuant to this plan, on November 11, 1998 Flanagan prepared and had Babacus fax from his office in Springfield, Massachusetts to Fasano's office in New Haven, Connecticut a bogus stock pledge agreement. (Px 4)  Then on November 12, 1998 Flanagan and Fasano submitted a Second Amended Notice of Compliance (Px 6) now representing that the stock of T&P was not really in the hands of Ms. Demetropoulous, but rather was in the possession of Babacus.

Flanagan and Fasano also represented that Babacus supposedly had loaned Flanagan "$120,000.00 on or about June 19, 1997, and has held said stock as security for the judgment [sic] since the above date [June 19, 1997] until present . . . ." (Id.)  Although Fasano intended for Judge Covello and TCC to rely on the representations that he made as to the purported secured debt owed to Babacus (6/1/05 Tr. p. 58), Fasano knew

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
tel 860.541.2077    fax 860.713.8944    www.sabiahart.com

that the Babacus debt/stock collateral representations were false. (Px 3; 6/1/05 Tr. pp. 140-42)

Indeed, Fasano knew that Flanagan had signed a Settlement Agreement on June 17, 1997 (Px 21) which, in ¶13, contained a commitment by Flanagan to not transfer his stock to any other person or entity. Moreover, Fasano knew that on July 7, 1997 Flanagan had signed a sworn certificate representing that he owned his T&P stock "unencumbered from any source", and that he "will not transfer the stock to any other person or entity." (Px 61 ¶4)

### (4) Flanagan Loans Money To Babacus, But Claims The Loans Were Really Repayment Of The Bogus Babacus Debt

On October 27, 1998 Fasano represented to the Court that "Mr. Flanagan did not make any transfers after Judge Covello's [March 9, 1998] order freezing the assets of Mr. Flanagan." (Px 62 p. 1 ¶13)  Then again on November 16, 1998 Fasano "assure[d]" the Court that "from the day that order has been received [March 9, 1998], Mr. Flanagan has not transferred any assets." (6/1/05 Tr. p. 65)  Fasano's representations were false.

Although Fasano and Flanagan had represented to Judge Covello and TCC that Flanagan had not transferred any assets after March 9, 1998, and that Babacus had loaned Flanagan $120,000, on October 21, 1998 -- while the federal court

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
tel 860.541.2077    fax 860.713.8944    www.sabiahart.com

injunction was still in effect -- Flanagan <u>loaned</u> $500 to Babacus. (Px 13) Babacus supposedly held the T&P stock as collateral for a purported $120,000 loan, but when Flanagan asked for the return of the stock, Babacus released the purported collateral (the T&P stock) to Flanagan, <u>for no consideration</u>, so Flanagan could then pledge the stock to his father. (Px 8)

Indeed, the representations by Fasano to Judge Covello and Plaintiffs about the whereabouts and availability of Flanagan's T&P stock were materially false. (5/23/05 Tr. pp. 140-42; Pxs 160 & 130) As admitted by T&P's attorney, Fasano made materially false and misleading statements to Judge Covello and the Plaintiffs as to the location and control of Flanagan's T&P stock. (<u>Id</u>.) Further, it was Fasano who was allowing Flanagan to shift his stock all around in defiance of Judge Covello's orders, and in derogation of Plaintiffs' rights to obtain execution upon that stock in satisfaction of their judgments against Flanagan. (5/23/05 Tr. pp. 136 & 138-39; Pxs 160 & 130)

### (5) Judge Covello Holds Flanagan In Contempt, But Gives Flanagan The Opportunity To Purge The Contempt By Producing The Subpoenaed Documents

At the November 16, 1998 show cause hearing, Fasano presented a purported copy of Flanagan's T&P stock certificate to Judge Covello, representing that the copy was a true and

-29-

correct copy of Flanagan's then current stock certificate. (6/1/05 Tr. pp. 94-95) The copy provided to Judge Covello, however, was knowingly misleading because it did not contain the restrictive legend which Bainer had placed on Flanagan's stock certificate back on August 21, 1998. (6/1/05 Tr. pp. 94-95)

After hearing Flanagan's excuses for not complying with the Court's turnover order, on November 16, 1998 Judge Covello proceeded to hold Flanagan in contempt. (Fasano Ex. 502 p. 6) In an effort to keep Flanagan from going to jail that very day, Fasano represented to Judge Covello that Flanagan would immediately produce all relevant documents about the alleged Babacus debt and the alleged stock transfers. (Fasano Ex. 502 p. 6) Based on Fasano's representations, Judge Covello temporarily stayed the execution of his contempt order so as to provide Flanagan with an opportunity to produce the represented support documentation. (Id.)

For Flanagan to stay out of jail, Flanagan and Fasano were supposed to produce to Judge Covello the documents which would show the bona fides of the purported $120,000 loan by Babacus to Flanagan, and the documents which would show the bona fides of the purported stock pledge by Flanagan to Babacus. (Fasano Ex. 502 p. 6) The represented support documentation, however, was never produced. (6/1/05 Tr. pp. 68-72)

-30-

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
tel 860.541.2077    fax 860.713.8944    www.sabiahart.com