### (6) The Transfer Of Flanagan's T&P Stock To Flanagan's Father

Since neither Flanagan nor Fasano could produce the documentation to show the bona fides of the purported Babacus loan and stock pledge, Flanagan needed to pay-off the federal court judgment as his "get-out-of-jail card." Any pledge of Flanagan's stock to his father, however, would be in violation of the T&P buy-sell agreement (Px 57); would be a violation of the March 9, 1998 injunction; would be a violation of the April 13, 1998 Turnover Order; and would constitute an obvious attempt to frustrate Flanagan's creditors. (Px 130 p. 2)

Although Babacus supposedly held Flanagan's T&P stock to secure a purported $120,000 loan from Babacus to Flanagan, on November 19, 1998 Babacus faxed a memo to Fasano (Px 8) authorizing the release of Babacus' bogus first lien position for no consideration. Further, Fasano prepared a pledge and security agreement (Px 59) to show the transfer of Flanagan's T&P stock to Flanagan's father. Fasano's dual representation of Flanagan and his father in connection with the stock pledge was evidence to support a claim that the transfer and pledge of Flanagan's T&P stock to his father was part of an effort to defraud Flanagan's creditors. (Px 130 p. 2)

-31-

>        **(7)   With Desperation Setting In, The Defendants
>               Develop A New Game Plan To Defeat
>               Plaintiffs' Efforts To Execute On Flanagan's
>               T&P Stock**

In December of 1998 Bainer had a concern that at some point

Plaintiffs were going to be able to execute on Flanagan's T&P

stock.  (5/25/05 Tr. pp. 26-27)  Accordingly, on December 15,

1998 Bainer called TCC's collection attorney, Paul Gaide, to try

to convince Gaide that the value of Flanagan's T&P stock was

much less than Gaide thought it might be because of the

restrictive legend that Bainer had placed on the stock in August

of 1998.  (Pxs 135 & 160)

Further, on December 9, 1998 Bainer, at Flanagan's request,

called Fasano to discuss the crisis over the impending execution

by Plaintiffs on Flanagan's T&P stock.  (Px 130)  As noted by

Bainer in his memorandum summarizing his discussion with Fasano:

>        Fasano . . . explain[ed] concern that Gaide
>        will obtain Charlies' TPeck stock.  Told him
>        that I didn't think Gaide creditor's would
>        find the stock attractive with the
>        restriction/legend on it.
>
>        He replied "What if the restriction is
>        invalid?"  He then related that the Federal
>        Court [[Judge] Covello] had issued an order
>        in March 1998 prohibiting Charlie from
>        transferring or diminishing his assets
>        including the stock.  Lenny seemed to think
>        that this affected the viability of the

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street   Suite 202   Hartford, CT 06103-2205
tel 860.541.2077   fax 860.713.8944   www.sabiahart.com

> restriction placed on the stock in the
> summer of 1998.
>
>            * * *
>
> Much concentration on Prymas' need to strike
> some deal with Charlie in order to avoid
> Gaide coming in and getting stock and
> allegedly making Prymas' life miserable.
>
> Lenny wants meeting to discuss finding way
> out of Gaide getting stock.  Seems a bit
> desperate.

(Px 130 pp. 1-3)

Then on December 14, 1998 Bainer received a call from

Fasano who was "irate".  (Px 160)  As summarized in Bainer's

memorandum of his telephone conversation with Fasano:

> [Fasano] had a motion from Gaide [Fasano Ex.
> 502] to re-open the Federal matter before
> [Judge] Covello.  He said he was reading it
> and was at about page four of seven when he
> called me.  Apparently, the concern is that
> Charlie and/or Mr. Fasano represented to the
> Federal Court that Charlie's stock was
> exclusively in the possession of Mr. Backus
> [Babacus] since before March 1998, the date
> of Judge Covello's restraining order on the
> stock.  The problem, I guess, is that Gaide
> now knows this not to be true since I told
> him that I put a restriction legend on the
> stock in August or September of this year.
>
> Why an apparently false representation was
> made to the Federal Court, I don't know.
> But this is the crux of the problem, not my
> discussion with Gaide.  I was trying to
> convince Gaide that the stock isn't worth
> much to him because of the restriction on
> it.

(Px 160)

-33-

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW
190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
tel 860.541.2077    fax 860.713.8944    www.sabiahart.com

Near the end of 1998 Fasano was "playing" by moving Flanagan's T&P stock around. (5/23/05 Tr. p. 136) Further, it was Fasano's judgment of allowing Flanagan to move his stock around that got Flanagan in all of the trouble. (5/23/05 Tr. pp. 138-39)

Accordingly, by December of 1998 "desperation [was] setting in", and it looked like Plaintiffs would be successful in their efforts to execute on Flanagan's T&P stock. (Px 20) As admitted by Flanagan's partner, Prymas:

> Apparently, collection attorney Gaide has made some significant [progress] against Charlie (Charlie paid him over $90,000 a few weeks ago to settle a debt and Gaide has close to $1,000,000 more in judgments against him), and it appears that desperation is setting in. Gaide has his sights on Charlie's stock and it now looks like he will get it.

(Px 20) Prymas wanted to set up a meeting to "develop a game plan to deal with this crisis." (Id., emphasis added)

There were two parts to the Defendants' new "game plan" to deal with the "crisis" over Plaintiffs' attempts to execute on Flanagan's T&P stock. First, the Defendants would "sue Gaide to get him out of the litigation". (6/2/05 Tr. pp. 151-53 & 156; 6/3/05 Tr. p. 91) And second, Flanagan would file bankruptcy with a side deal for Prymas to acquire Flanagan's T&P stock out

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
tel 860.541.2077    fax 860.713.8944    www.sabiahart.com

of bankruptcy, and then reconvey that stock back to Flanagan.
(Px 130 pp. 2-3; 5/23/05 Tr. pp. 160-62 & 173)

### (8) In An Effort To Halt Attorney Gaide's Efforts To Execute On Flanagan's T&P Stock, The Defendants Agreed To Prosecute A Baseless Grievance Against Attorney Gaide

Attorney Paul Gaide, as counsel for Plaintiffs, was very
aggressive in his collection efforts on Flanagan's assets.
(6/3/05 Tr. p. 77)  Gaide was extremely steadfast at trying to
collect on behalf of Cadle.  (Id. p. 78)

There were a number of T&P board meetings about trying to
keep Plaintiffs from Flanagan's assets.  (6/3/05 Tr. p. 74)
Flanagan, Prymas and Bainer discussed in several of their
meetings the mechanisms of trying to stop Gaide's collection
efforts on Flanagan's T&P stock (6/3/05 Tr. p. 193), and the
filing of a grievance against Gaide was one of them.  (Id.)
Although it was Bainer's idea about how to get Gaide to back off
of his collection efforts by bringing suit against Gaide (6/2/05
Tr. pp. 151-53), Fasano provided advice and counsel in
connection with the grievances that were filed by Flanagan
against Gaide.  (5/25/05 Tr. p. 166)

After Bainer made the suggestion about suing Gaide to get
him out of the litigation, there was a grievance filed by
Flanagan against Gaide.  (6/2/05 Tr. p. 156)  The attorney for
Flanagan in connection with the grievance was Bainer.  (Id. p.

-35-

157)    Although T&P agreed to pay Bainer's legal fees for prosecuting Flanagan's grievance against Gaide (5/31/05 Tr. pp. 117-118 & 6/2/05 Tr. p. 156), Bainer insisted on indemnification by T&P before he would proceed with representation of Flanagan in the grievance proceeding.   (5/31/05 Tr. p. 118 & 6/2/05 Tr. pp. 157-58)

There was no evidentiary hearing as to probable cause to proceed with Flanagan's grievance against Gaide.   (5/26/05 Tr. p. 102)   The Grievance Committee, however, found probable cause to proceed with Flanagan's grievance "because of the various lies of the people involved."   (5/26/05 Tr. pp. 94-95)   When Gaide finally had the chance for an evidentiary hearing to put on the evidence countering Flanagan's grievance, Gaide was exonerated on all issues.   (5/26/05 Tr. pp. 102-03 & 94)

### (D) Fasano Provided Knowing And Substantial Assistance To Flanagan In Connection With The Bankruptcy Fraud Scheme

The next step in the Defendants' new plan to shield Flanagan's assets from Plaintiffs' execution efforts was to have Flanagan file for bankruptcy shortly after he was set free from Judge Covello's order of contempt.   (Px 130 pp. 2-3)  Because of Fasano's intimate knowledge of the inner workings of the conspiracy to shield Flanagan's assets (Px 130 pp. 2-3), the Defendants agreed that it would be Fasano who would steer

-36-

Flanagan through the rocky waters of bankruptcy.  (Id.; 6/3/05
Tr. p. 92; 6/1/05 Tr. pp. 93-94 & 100)

In December of 1998 Bainer had a discussion with Fasano
about the possibility of Flanagan filing for bankruptcy.
(5/23/05 Tr. p. 160)   During that conversation Fasano told
Bainer that Flanagan wouldn't file bankruptcy unless he had some
side deal with Prymas pertaining to Flanagan's T&P stock.
(5/23/05 Tr. pp. 161-62)   As noted by Bainer in his memorandum
summarizing his December 9, 1998 conversation with Fasano:

> We talked about a bankruptcy for Charlie and
> letting the Bankruptcy trustees deal with
> the stock since Lenny was concerned that
> Gaide might get it.   Lenny's concern was:
> possible licensure/loan-bond default probs.
> re: insurance business; 2: that Charlie
> would have to litigate a number of fraud
> claims against him then and, 3) that Prymas
> would be in a better position in bankruptcy
> to get the stock -- something that
> apparently Charlie doesn't prefer over Gaide
> getting it.
>
> Lenny volunteered that Charlie would be
> willing to go bankrupt and deal with these
> issues, including Stanley getting the stock
> if there was a deal basically reinstating
> Charlie's ownership interest in TPeck post-
> bankruptcy.
>
>                 *  *  *
>
> Much concentration on Prymas' need to strike
> some deal with Charlie in order to avoid
> Gaide coming in and getting stock and
> allegedly making Prymas' life miserable.

-37-

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
tel 860.541.2077    fax 860.713.8944    www.sabiahart.com

> Lenny wants meeting to discuss finding way
> out of Gaide getting stock.    Seems a bit
> desperate.

(Px 130 pp. 2-3)    The fraud claims that Fasano was concerned
about if Flanagan filed for bankruptcy pertained to the earlier
misrepresentations that Fasano had made about the possession and
control of the stock being in the hands of Sharon Demetropoulous
and Socrates Babacus.    (6/1/05 Tr. pp. 80 & 82-83)

Fasano then had Flanagan file for bankruptcy in February of
1999.    (6/3/05 Tr. p. 92)    And, according to the new game plan,
Prymas    acquired    Flanagan's    T&P    stock    out    of    bankruptcy.
(5/23/05 Tr. p. 159)

Further,    on    the    eve    of    bankruptcy    Flanagan    transferred
three of his rental properties -- the George Street apartments;
the Howe Street apartments; and the Whitney Avenue property --
to a relative, Joe Caporale (5/23/05 Tr. pp. 86 & 88-89), for no
consideration.    (6/3/05 Tr. pp. 6, 11 & 13)[3]

As of December 4, 1998 when Flanagan quitclaimed his rental
properties to Caporale for no consideration, the Howe Street
apartments had $38,000 per year in rental income (6/3/05 Tr. pp.

---

[3]    Compare First Capital Asset Management, Inc. v. Satinwood, Inc., 385
F.3d 159, 179 (2d Cir. 2004), where the RICO plaintiff failed to allege
facts that yielded a strong inference that, some two years before
bankruptcy, the debtor transferred his interest in his assets in
contemplation of bankruptcy as required by 18 U.S.C. §152(7).    "In contrast,
a debtor who has deliberately transferred assets a year and a day prior to
filing a petition has clearly engaged in a thinly-veiled attempt to avoid
the preference rule. . . . Similarly, a debtor who has followed a course of
conduct that inevitably leads to bankruptcy is fairly presumed to have
perpetrated a fraudulent scheme."    First Capital, 385 F.3d at 179.

SABIA & HARTLEY, LLC    |    190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
ATTORNEYS AT LAW    |    tel 860.541.2077    fax 860.713.8944    www.sabiahart.com

20-22); the George Street apartments had $19,000 per year in rental income (6/3/05 Tr. pp. 20-22); and the Whitney Avenue building had a nursery school tenant that was paying rent. (6/3/05 Tr. pp. 11-12)  The total rental income that Flanagan received for his rental properties in 1998 was approximately $130,000.  (6/1/05 Tr. p. 218)  Moreover, even after the $94,200 that Flanagan took out of the George Street apartments in October of 1998 (Px 178; 6/3/05 Tr. pp. 18-19), there was still $60,000 in equity left in that property at the time of the transfer to Caporale.  (6/3/05 Tr. p. 20)

Caporale held title to Flanagan's three rental properties in name only.  Caporale never looked at any of the properties (5/23/05 Tr. p. 90); never collected any rent for any of the properties (5/23/05 Tr. pp. 94-95); never contacted any of the tenants (id.); and never wrote the tenants telling them that he was the new owner of the properties.  (Id.)  Moreover, Caporale had no idea where any of the tenants were to send their rent checks, and had no idea where the rental proceeds were going. (5/23/05 Tr. p. 94)  Caporale did know, however, that none of the rental proceeds went to him.  (5/23/05 Tr. pp. 94-95)

After Flanagan deeded his rental properties to Caporale, Flanagan opened up a P.O. Box for the tenants to mail their rent checks to Caporale at that address.   (6/3/05 Tr. p. 24)

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street   Suite 202   Hartford, CT 06103-2205
tel 860.541.2077   fax 860.713.8944   www.sabiahart.com

Flanagan expected the tenants to mail their rent checks to that P.O. Box, and that's what they did.  (Id.)

The rent checks were sent through the United States mail to Flanagan's P.O. Box.  (6/3/05 Tr. p. 31)  Even after the filing of bankruptcy by Flanagan in February of 1999, those rent checks continued to be sent to that same P.O. Box.  (6/3/05 Tr. p. 32)

There were numerous rent checks that were payable by the tenants to Caporale.  (6/3/05 Tr. pp. 25-26)  On a number of these checks, Flanagan signed the back of the checks.  (6/3/05 Tr. p. 26)  Caporale never saw those rent checks, and never signed or endorsed the back of any rent checks that were made payable to Caporale.  (5/23/05 Tr. p. 93)  Moreover, Caporale never authorized anyone to sign his name to the back of any of the rent checks, and the endorsements on those checks were not the signature of Caporale.  (5/23/05 Tr. p. 99)

Some eight months after Flanagan filed for bankruptcy, Flanagan had Caporale quitclaim the properties back to Flanagan in October or 1999.  (6/3/05 Tr. pp. 30-31)

Fasano was the attorney for Flanagan in connection with Flanagan's bankruptcy filing and the preparation of Flanagan's bankruptcy schedules.  (6/3/05 Tr. p. 92; 5/31/05 Tr. p. 11; 6/1/05 Tr. pp. 93-94 & 100)  Although Flanagan had received a substantial amount of rental income from his three rental

-40-

Finally, Fasano did not make any disclosure in Flanagan's bankruptcy filings about the $94,200 income that Flanagan received in October of 1998 for the placement of a mortgage on the George Street apartments.  (Px 210 p. 1 #2)  Fasano never disclosed that in October or 1998 Flanagan transferred a security interest in the George Street property for a payment of $94,200 to Flanagan.  (Px 210 p. 3 #10)

## II.  Chronology Of Continuity Facts

| Date | Event | Reference |
|------|-------|-----------|
| 3/20/97 | TCC obtains judgment against Flanagan for $90,747.87. | Pxs 68A & 196 p. 2 |
| 1997 | Flanagan does not put his rental property in checking accounts in his own name because he was concerned about his creditors. | 6/3/05 Tr. pp. 35-36 |
| 1997 | Flanagan, at Fasano's direction, runs his rental property income through nominee checking accounts. | 5/26/05 Tr. pp. 45 & 113 |
| 1997 | Flanagan deposits money in Fasano's trust account, uses Fasano's account to pay certain bills. | 6/3/05 Tr. p. 131; 6/1/05 Tr. pp. 12, 15 & 20 |
| 6/17/97 | Settlement Agreement between Flanagan and Prymas - $75,000 Settlement Agreement payments due by T&P to Flanagan over three years; Flanagan represents that he will not transfer his stock. | Px 21 p. 5 ¶12 & p. 6 ¶13 |
| 6/19/97 | Flanagan deposits his T&P stock with Babacus. | Pxs 6 & 3 |

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
tel 860.541.2077    fax 860.713.8944    www.sabiahart.com

| | | |
|---|---|---|
| 7/17/97 | Flanagan signs affidavit representing that he owns his T&P stock unencumbered from any source and that he will continue to own his T&P stock and not transfer the stock to any other person or entity. | Px 61 |
| 9/18/97 | Flanagan **mails** MJCC check to Fasano. | Px 255; 6/3/05 Tr. p. 110 |
| 10/13/97 | Flanagan **mails** MJCC check to Fasano. | Px 254; 6/3/05 Tr. p. 110 |
| 12/12/97 | Flanagan **mails** MJCC check to Fasano. | Px 256; 6/3/05 Tr. p. 110 |
| 1/5/98 | Writ of execution served on T&P | Px 68A; Px 144 |
| 1/6/98 | Fasano and Flanagan want Settlement Agreement payments recharacterized as W-2 wages. | Px 3; 5/31/05 Tr. p. 79 |
| 1/6/98 | Flanagan does not want Fasano to disclose the location of his T&P stock. | Px 3; 6/2/05 Tr. p. 161; 6/3/05 Tr. p. 67 |
| 1/12/98 | Flanagan, Prymas and T&P agree to issue Settlement Agreement checks, but keep in file until they decide what to do. | Px 140 |
| 1/20/98 | Fasano objection to Property Execution **mailed** to Gaide; misrepresentation that T&P holds no assets of Flanagan other than wages. | Px 24 p. 2; 5/26/05 Tr. pp. 41-43 |
| Jan. 1998 | Writ of execution not complied with; Settlement Agreement payments not handed over the sheriff. | 5/25/05 Tr. pp. 117-18 |
| 2/9/98 | Meeting among Fasano, Flanagan, | 5/24/05 Tr. p. 54; |

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street   Suite 202   Hartford, CT 06103-2205
tel 860.541.2077   fax 860.713.8944   www.sabiahart.com

|  | Bainer and Prymas; discussion of conspiracy to defraud creditors because of change of positions in response to writ of execution; agree to recharacterize Settlement Agreement payments as W-2 wages. | Px 72-R; 6/3/05 Tr. p. 75; Px 65 |
|---|---|---|
| 2/12/98 | TCC files first motion for turnover order as to any property of Flanagan held by T&P. | Px 69A |
| 2/25/98 | Conspiracy letter **mailed** by Bainer to Fasano. | Px 72-R |
| 3/9/98 | Judgment debtor examination of Flanagan. | Px 196 p. 3 ¶6 |
| 3/9/98 | Fasano developed the strategy of having Flanagan assert the Fifth Amendment based on "outside issues" to avoid testifying about the location of Flanagan's T&P stock; the location of Flanagan's T&P stock had nothing to do with the IRS investigation. | 6/1/05 Tr. pp. 42-43; 6/2/05 Tr. pp. 170 & 194-95 |
| 3/9/98 | Judge Covello issues injunction freezing all of Flanagan's assets. | Fasano Ex. 502 p. 2; Px 62 p. 1 & p. 2 ¶¶2 & 3 |
| 3/11/98 | Fasano advises Flanagan that Flanagan could write checks out of Flanagan's nominee checking accounts in spite of the injunction. | 6/3/05 Tr. pp. 43-44 |
| 3/11/98 | Flanagan writes check to "cash" on MJCC account (which contains Flanagan's rental property income), endorsed by Flanagan. | Px 79; 6/3/05 Tr. pp. 40-41 & 111-12 |
| 3/12/98 | TCC files motion for turnover order seeking turn over of Flanagan's T&P stock, accounting | Px 196 |

-44-

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
tel 860.541.2077    fax 860.713.8944    www.sabiahart.com

|  | as to any disposition of the stock. |  |
|---|---|---|
| 3/17/98 | Fasano provides false accounting to the Court; Production Budget does not disclose Flanagan's rental property income, **mailed** to Gaide. | Px 90 p. 2; 5/23/05 Tr. pp. 49-51 & 54-55; 6/1/05 Tr. pp. 85-89 & 218 |
| 4/13/98 | Court grants TCC's second motion for turnover order as to Flanagan's T&P stock, accounting as to any disposition. | Pxs 127 & 196 |
| April 1998 | Fasano and Flanagan discuss the idea of placing a restrictive legend on Flanagan's T&P stock to restrict transfer of the stock. | 6/1/05 Tr. pp. 96-97; 6/2/05 Tr. pp. 216-17; 6/3/05 Tr. p. 155 |
| 5/8/98 | Flanagan's motion for reconsideration; misrepresentation about getting together relevant documents, **mailed** to Gaide. | Px 186 p. 4; 5/25/05 Tr. p. 57 |
| 5/8/98 | From January 5, 1998 until May 5, 1998, T&P cut the Settlement Agreement payment checks to Flanagan, but were held by T&P and put in a file. | 5/31/05 Tr. pp. 49-50 |
| 5/8/98 | Writ of execution expires; agreement to reclassify Settlement Agreement payments, going forward, as W-2 wages; January through May, 1998 payments to be moved to the end of the payout in June of 2000. | Pxs 142, 143, 145 & 157; 5/31/05 Tr. pp. 11 & 54-56 |
| 5/8/98 | Discussion with Bainer about placing a restrictive legend on Flanagan's T&P stock to restrict transfer. | 6/2/05 Tr. pp. 212-13 |
| 5/8/98 | Letter by Bainer to Flanagan | Px 128 |

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
tel 860.541.2077    fax 860.713.8944    www.sabiahart.com

|  | about plan to place to place restrictive legend on T&P stock. | |
|---|---|---|
| 7/28/98 | Memo by Flanagan to Bainer about restrictive legend, review by Fasano's firm, and Flanagan's delivery of stock to Bainer. | Px 56 |
| 7/29/98 | Fasano files privilege log **mailed** to Gaide re assertion of Fifth Amendment pertaining to Flanagan's T&P stock. | Px 188 p. 3 ¶9; 5/25/05 Tr. p. 68; 6/12/05 Tr. pp. 173-75 & 193 |
| Aug. 1998 | Bainer comes up with the idea of suing Gaide to get him to back off his collection efforts. | 6/2/05 Tr. pp. 151-53 |
| 8/21/98 | Meeting at T&P's office in New Haven to place the restrictive legend on Flanagan's T&P stock; Bainer had possession of stock; Fasano says Flanagan does not have to comply with turnover order. | 6/2/05 Tr. pp. 224, 226 & 228; 5/23/05 Tr. pp. 157 & 168 |
| 8/28/98 | Fasano advises Flanagan that Flanagan could write checks on Flanagan's nominee checking accounts in spite of injunction. | 6/3/05 Tr. pp. 43-44 |
| 8/28/98 | Flanagan writes $3,000 check to "cash" on Jeremy Flanagan account (which contains Flanagan's rental property income), endorsed by Flanagan. | Px 100; 6/3/05 Tr. pp. 111-12 |
| 10/5/98 | In spite of injunction, Flanagan obtained a mortgage on the George Street apartments and takes $94,200 out of the property. | Px 178; 6/2/05 Tr. pp. 235 & 237; 6/3/05 Tr. pp. 16 & 18-19 |
| 10/12/98 | In spite of injunction, Flanagan loans an additional $500 to Babacus through a check written on the Matthew Flanagan account. | Px 13 |

-46-

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street   Suite 202   Hartford, CT 06103-2205
tel 860.541.2077   fax 860.713.8944   www.sabiahart.com

| | | |
|---|---|---|
| 10/21/98 | Fasano **mails** Notice of Compliance to Gaide, representing that Demetropoulous has possession of Flanagan's T&P stock and that Flanagan does not have control of the stock. | Px 1; 5/25/05 Tr. pp. 72-73; 6/1/05 Tr. p. 45 |
| 10/22/98 | Fasano **mails** Amended Notice of Compliance to Gaide, again representing that Demetropoulous has possession of Flanagan's T&P stock and that Flanagan does not have control of the stock. | Px 2; 5/25/05 Tr. pp. 76 & 83; 6/1/05 Tr. p. 49 |
| 10/26/98 | Show Cause Order setting contempt hearing for 11/16/98. | Px 190 |
| 0/29/98 | Fasano **mails** response and Flanagan's false affidavit to Gaide; Fasano represents that Demetropoulous has possession and control of stock and that Flanagan had not transferred any assets after 3/9/98 injunction. | Pxs 62 & 58; 6/3/05 Tr. pp. 50-51 & 54-55 |
| 11/11/98 | Babacus **faxes from Massachusetts** a bogus stock pledge agreement. | Px 4 |
| 11/12/98 | Prymas faxes memo to Bainer about service of PJR interrogatories; requests assistance re settlement proceeds scheme. | Px 116 |
| 11/12/98 | Fasano **mails** second amended notice of compliance to Gaide, now representing that Babacus has possession of the stock and that Flanagan does not have control of the stock. | Px 6; 6/1/05 Tr. pp. 57-59 |

-47-

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
tel 860.541.2077    fax 860.713.8944    www.sabiahart.com



| 11/16/98 | Contempt hearing; Fasano assurances that Flanagan had not transferred any assets after 3/9/98 injunction; Fasano hands Judge Covello a copy of Flanagan's stock certificate, but it does not contain the restrictive legend that Bainer placed on the stock on 8/21/98; Flanagan held in contempt, but contempt stayed to allow Fasano and Flanagan the opportunity to provide further documentation re Babacus loan, stock pledge. | 6/1/05 Tr. pp. 65-66 & 94-95; Fasano Ex. 502 p. 6 |
|---|---|---|
| 11/19/98 | Fasano represents both Flanagan and his father re new stock pledge to Flanagan's father; part of an effort to defraud Flanagan's creditors; Flanagan places a **call to Babacus in Massachusetts** re delivery of stock to Flanagan's father; **Babacus faxes from Massachusetts to Fasano** a subordination of stock pledge for no consideration. | Px 130 p. 2; 6/3/05 Tr. p. 150; Px 8 |
| 11/19/98 | Bainer **mails** to Prymas a letter re settlement proceeds scheme. | Px 130 p. 2; 6/3/05 Tr. p. 150; Px 8 |
| 11/24/98 | Prymas memo to Flanagan re settlement proceeds scheme. | Px 118 |

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
tel 860.541.2077    fax 860.713.8944    www.sabiahart.com

| | | |
|---|---|---|
| 11/30/98 | Discussion among Flanagan, Prymas and Bainer at T&P board meetings re strategies to defeat TCC's collection efforts. | Px 119 |
| Dec. 1998 | In contemplation of bankruptcy, transfer of Flanagan's rental properties to Caporale for no consideration; rent checks made out to Caporale to be **mailed** to P.O. Box set up by Flanagan. | 6/2/05 Tr. p. 144 |
| 12/4/98 | Discussion between Fasano and Bainer about **bankruptcy fraud**; side deal to have Prymas acquire stock, reconvey to Flanagan; concern about fraud claims against Fasano because of prior misrepresentations as to stock pledges to Demetropoulous and Babacus. | Px 130; 5/23/05 Tr. pp. 86-89; 6/3/05 Tr. pp. 6,11,13, 21-24 & 105 |
| 12/9/98 | Memo from Prymas re Gaide execution on Flanagan's stock, desperation setting in, need for new game plan. | Px 130; 5/23/05 Tr. pp. 160-62 & 173; 6/1/05 Tr. pp. 80 & 82-83 |
| 12/10/98 | Letter **mailed** by Bainer to Flanagan re need to work together to avoid TCC's execution efforts. | Px 20 |
| 12/15/98 | Memo from Flanagan and Prymas **mailed** to Bainer re resisting TCC's execution efforts. | Px 135 |
| 12/30/98 | For each month, two recharacterized Settlement Agreement payments made by T&P to Flanagan. | Px 124 |
| 6-12'98 | From the date of the injunction (3/9/98) until Flanagan filed for | Px 227 |

-49-

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street   Suite 202   Hartford, CT 06103-2205
tel 860.541.2077   fax 860.713.8944   www.sabiahart.com

|  | | |
|---|---|---|
|  | bankruptcy, Flanagan ran an excess of $125,000 through one of his son's accounts, and well over $300,000 through the MJCC account. | |
| Feb. 1999 Feb. 1999 | Shortly after quitclaiming rental properties to Caporale, Fasano places Flanagan in bankruptcy; **bankruptcy fraud**. | 5/25/05 Tr. pp. 120-22 6/3/05 Tr. p. 92 |
|  | **Bankruptcy fraud**; no reference in bankruptcy schedules to (1) rental property income; (2) checking accounts in names of MJCC, Matthew Flanagan and Jeremy Flanagan. | |
| 3/19/99 | Rental payments payable to Caporale **mailed** to Flanagan's P.O. Box. | Pxs 209 & 210; 5/31/05 Tr. p. 11; 6/3/05 Tr. pp. 92-93 |
| Mar. 1999 | For each month, two recharacterized Settlement Agreement payments made by T&P to Flanagan. | 6/3/05 Tr. pp. 28 & 31-32 |
| Jan. – Dec. 1999 | Two Settlement Agreement payments made to Flanagan that were due as 1099 income in the first quarter of 1998 but recharacterized as W-2 wages. | Px 227 |
| July 2000 | Two Settlement Agreement payments made to Flanagan that were due as 1099 income in the first quarter of 1998 but recharacterized as W-2 wages. | 5/31/05 Tr. pp. 54-56; Px 227 |
| August 2000 | Two Settlement Agreement payments made to Flanagan that were due as 1099 income in the first quarter of 1998 but recharacterized as W-2 wages. | 5/31/05 Tr. pp. 54-56; Px 227 |
| Sept. | Two Settlement Agreement payments | 5/31/05 Tr. pp. 54- |

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
tel 860.541.2077    fax 860.713.8944    www.sabiahart.com

| | | |
|---|---|---|
| 2000 | made to Flanagan that were due as 1099 income in the first quarter of 1998 but recharacterized as W-2 wages. | 56; Px 227 |
| Oct. 2000 | Two Settlement Agreement payments made to Flanagan that were due as 1099 income in the first quarter of 1998 but recharacterized as W-2 wages. | 5/31/05 Tr. pp. 54-56; Px 227 |
| Jan.-Dec. 2000 | For each month, two recharacterized Settlement Agreement payments made by T&P to Flanagan. | Px 227 |
| End of 2000 | W-W forms mailed by T&P to the IRS which reflected the recharacterization Settlement Agreement payments to Flanagan. | 5/31/05 Tr. p. 66 |

### III. The Evidence Was Sufficient To Support The Jury Finding Of Continuity

As far as closed-ended continuity, the Defendants contend that Plaintiffs only proved wrongful acts that had occurred over a 13-month period from January of 1998 until February of 1999. (Ds' Mem. p. 25)    At trial, the Fasano Defendants took the position that Plaintiffs could only look back to June or December of 1997 for the earliest predicate acts.    (6/6/05 Tr. pp. 81-82)    Evan assuming a January, 1998 start date, Plaintiffs still proved interrelated wrongful acts over a period of time exceeding two years, and thus the jury was justified in finding closed-ended continuity.

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
tel 860.541.2077    fax 860.713.8944    www.sabiahart.com

Here the jury specifically found that the Fasano Defendants conspired with Flanagan in connection with (a) the settlement proceeds scheme; (b) the checking account scheme; (c) the shifting stock scheme; and (d) the bankruptcy fraud scheme. (Px B p. 2 #2)    When viewing the evidence in the light most favorable to the Plaintiffs and granting Plaintiffs every reasonable inference that the jury might have found in Plaintiffs' favor, and considering the evidence as to all four interrelated schemes to defraud Plaintiffs, the evidence shows (a) wrongful conduct beginning in 1997 with the running of Flanagan's rental property income through Flanagan's nominee checking accounts; and (b) wrongful conduct continuing through 2000 with W-2 forms mailed by T&P to the IRS which reflected the recharacterized Settlement Agreement payments to Flanagan. (5/31/05 Tr. pp. 51-52, 54-56 & 66)

Upon the advice and recommendations of Fasano and Bainer, on February 9, 1998 Flanagan and Prymas agreed that, going forward, the money that was owed to Flanagan under the Settlement Agreement was to be recharacterized as wages.    (Px 157 pp. 1-2)  At the time that the eight checks were issued from January of 1998 through May of 1998, those checks reflected money that was due as 1099 miscellaneous income under the Settlement Agreement.  (5/31/05 Tr. pp. 51-52)    Further, those

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
tel: 860.541.2077    fax 860.713.8944    www.sabiahart.com

eight checks reflected financial obligations that were due from T&P to Flanagan at the time that the checks were issued. (5/31/05 Tr. p. 54)  Those eight checks were moved to the end of the payout period after June of 2000.  (5/31/05 Tr. pp. 54-55) But, according to the Defendants' scheme, when those recharacterized and moved Settlement Agreement payments were paid to Flanagan after June of 2000, they became W-2 wages. (5/31/05 Tr. p. 56)

The mailings by T&P to the IRS of the recharacterized W-2 payments for the period of time from 1998 to the end of 2000 constituted mail fraud in connection with the execution of the settlement proceeds scheme.  See Carpenter v. United States, 484 U.S. 19, 27 (1987); Schmuck v. United States, 489 U.S. 705, 710-12 & 715 (1989).[5]  In addition, here Flanagan's bankruptcy filing was not the end of the scheme; rather, it was simply a further step in the Defendants' plan.  (Px 130 pp. 2-3) Accordingly, there was sufficient evidence to support the jury finding of closed-ended continuity, and the Defendants' Motion for Judgment as a Matter of Law should be denied.

---

[5]    See, also, Baisch v. Gallina, 346 F.3d 366, 374 (2d Cir. 2003); Cadle Co. v. Schultz, 779 F.Supp. 392, 400 n. 50 (N.D. Tex. 1991); United States v. Finney, 714 F.2d 420, 423 (5th Cir.1983); United States v. Green, 494 F.2d 820, 823-24 (5th Cir.1974); Sun Savings & Loan Association v. Dierdorff, 825 F.2d 187, 196 (9th Cir.1987).

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
tel 860.541.2077    fax 860.713.8944    www.sabiahart.com

As far as open-ended continuity, the nature of the Defendants' enterprise in this case involved inherently unlawful activities, and the predicate acts committed by Flanagan and his co-conspirator Defendants were a regular way of conducting or participating in the conduct of the RICO enterprise -- the association-in-fact enterprise dedicated to the purpose of hiding, shielding and continuing the custodianship over Flanagan's assets. See DeFalco, 244 F.3d at 323; H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 250 (1989).[6]

There was ample evidence to support the jury finding of a threat of continued wrongful activities. See Px 142 ("our agreement going forward . . ."); Px 157 (both Flanagan and Prymas agreed that "going forward . . ."); 5/31/05 Tr. pp. 51-52, 54-56, 61-62 & 66; Px 227 (recharacterized settlement agreement payments to be continued to at least 6/1/00); Px 20 (the need to develop a "game plan" to deal with the "crisis" pertaining to Plaintiffs' efforts to execute on Flanagan's T&P stock) & Px 130 pp. 2-3 (after bankruptcy, Flanagan would reacquire his T&P stock form Prymas).[7]  Accordingly, the Defendants' Joint Motion for Judgment as a Matter of Law should be denied.

---

[6]    See, also, Akin v. Q-L Investments, Inc., 959 F.2d 521, 533 (5th Cir.1992); Ticor Title Ins. Co. v. Florida, 937 F.2d 447, 450-51 (9th Cir. 1991); Ikuno v. Yip, 912 F.2d 306, 309-19 (9th Cir. 1990).

[7]    See, also, Pxs 3, 143, 145 & 227; 6/3/05 Tr. pp. 24 & 31-32.

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW
190 Trumbull Street   Suite 202   Hartford, CT 06103-2205
tel 860.541.2077   fax 860.713.8944   www.sabiahart.com

## Conclusion

Based on the foregoing, and for the reasons set forth in Plaintiffs' Amended Response to Defendants' Joint Motion for Judgment as a Matter of Law filed herein on November 9, 2005 and for the reasons set forth in Plaintiffs' Supplemental Response to Defendants' Supplemental Motion for Judgment filed herein on January 24, 2006, Plaintiffs respectfully request that the Court deny Defendants' Joint Motion for Judgment as a Matter of Law, and that the Court then enter judgment for Plaintiffs on the Jury Verdict and Supplemental Jury Verdict.

Respectfully submitted,

ARMSTRONG LAW FIRM

DATED: March 27, 2006.

By F. Dean Armstrong (ECT)

F. Dean Armstrong
Ct. Fed. Bar #CT22417
1324 Dartmouth Road
Flossmoor, IL 60422
(708) 798-1599
Fax (708) 798-1597

Edward C. Taiman, Esq.
SABIA & HARTLEY, LLC
190 Trumbull Street
Suite 202
Hartford, CT 06103-2205
(860) 541-2077
Fax (860) 713-8944

Attorneys for Plaintiffs
The Cadle Company and
D.A.N. Joint Venture,
A Limited Partnership

-55-

## Certificate of Service

I certify that a correct copy of the foregoing instrument was faxed and mailed on March 27, 2006 to all defense counsel as shown on the attached Service List.

F. Dean Armstrong

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
tel 860.541.2077    fax 860.713.8944    www.sabiahart.com