UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
THE CADLE COMPANY and D.A.N.   :
JOINT VENTURE, LTD.            :
     Plaintiffs,              :
                              :
                              :
VS.                          :      Civil No. 3:01CV531 (AVC)
                              :
CHARLES A. FLANAGAN,         :
ET AL.,                      :
     Defendants.             :
```

## AMENDED[1] RULING ON THE DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW

This is an action for damages and equitable relief brought pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. The plaintiffs, Cadle Company and D.A.N., Joint Venture, Ltd. ("the plaintiffs") claim that the defendants, Leonard Fasano and the law firm of Fasano, Ippolito & Lee, LLC ("the Fasano defendants"), Todd Bainer, Stanley Prymas, and Thompson & Peck, Inc. ("T&P") (collectively "the defendants") engaged in a pattern of racketeering activity involving bankruptcy fraud, mail fraud and wire fraud in order to prevent the plaintiffs from collecting a debt.

On May 23, 2005, the parties appeared for jury trial and, on June 10, 2005, the jury found that the Fasano defendants had operated and/or managed a RICO enterprise in violation of 18 U.S.C. § 1962(c), and that they had conspired with the debtor,

---

[1] The court sua sponte furnishes this amended ruling in order to correct minor errors appearing in Facts section of its March 31, 2006 ruling.

Charles Flanagan, and co-defendants Bainer, Prymas, and T&P to defeat through fraud the plaintiffs' debt collection efforts in violation of 18 U.S.C. § 1962(d).  The jury thereafter awarded the plaintiffs $500,000 in RICO collection expense damages.

The defendants now move for judgment as a matter of law pursuant to Fed. R. Civ. P. 50 arguing that there is no legally sufficient evidentiary basis for the jury to find for the plaintiffs.

The issues presented are whether: (1) an award of RICO damages is barred as indefinite because Flanagan's bankruptcy action remained pending at the time of trial; (2) the evidence was insufficient to sustain a jury award of $500,000; (3) the plaintiffs failed to prove individual injury; (4) an award of collection expense damages is barred by the failure to prove lost debt damages; (5) the Fasano defendants, as a lawyer and law firm, should not be subjected to RICO liability for policy reasons; (6) the evidence was insufficient to prove RICO enterprise; (7) the evidence was insufficient to prove that the Fasano defendants participated in the operation or management of the enterprise in violation of RICO § 1962(c); (8) the evidence was insufficient to prove that the Fasano defendants knowingly participated in any of the schemes to defraud or used the mails or wires in furtherance thereof; (9) the evidence was insufficient to prove the RICO requirement of continuity with

2

respect to the Fasano defendants; (10) the evidence was
insufficient to prove the RICO requirement of reliance with
respect to the Fasano defendants; (11) the evidence was
insufficient to prove that the defendants, Bainer, Prymas, or T&P
engaged in RICO conspiracy; (12) the evidence was insufficient to
show that the damages awarded were proximately caused by any
crime under RICO; (13) the plaintiffs' actions constituted an
abuse of process entitling the defendants to judgment as a matter
of law; and (14) the evidence was insufficient to show continuity
with respect to the conspiracy claims.

For the reasons hereinafter that follow, the court answers
each issue set forth above in the negative and, accordingly, the
motion is DENIED.

## FACTS

A jury could have reasonably found the following facts.
In 1996, the plaintiffs filed suit against Flanagan in the United
States District Court for the District of Connecticut in
connection with his default on a $75,000 loan.  The Cadle Company
v. Charles Flanagan, Civ. No. 3:96cv2648(AVC) ("Cadle I").
On March 20, 1997, the plaintiffs prevailed in the action and
obtained a judgment against Flanagan in the amount of $90,747.87.
Flangan declined to pay the judgment.  On October 2, 1997, the
plaintiffs obtained a writ of execution against Flanagan but
failed to realize any payment or property.  On January 5, 1998,

3

the plaintiffs served a writ of execution on T&P, an insurance
company that Flanagan jointly owned with co-defendant, Prymas.
The writ sought any property in the possession of T&P that
Flanagan owned.  Thereafter, Flanagan and the defendants
conspired with one another to defeat through the following
schemes the plaintiffs' collection efforts.

A.    The Settlement Proceeds Scheme

        At the time of the January 5, 1998 writ of execution, T&P
was paying Flanagan approximately $1,000 every two weeks as part
of a $75,000 lawsuit settlement with Prymas.  Flanagan and Prymas
had settled the matter on June 17, 1997 and had agreed to treat
the payments as "1099 - miscellaneous income" - after T&P's
accountant, one James Rayner, advised Prymas that

> it is our opinion that this type of payment
> to a stockholder in settlement of a corporate
> disagreement in not W-2 compensation [i.e.,
> wages], but a taxable damage settlement to
> be reported on 1099-MISC.

Thereafter, T&P classified the payments as 1099 miscellaneous
income to Flanagan.[2]

        Upon being notified of the January 5, 1998 writ of
execution, Flanagan became concerned that the bi-monthly
settlement payments might be subject to the property execution,

---

[2]   The defendants wanted to characterize the settlement
agreement payments as 1099 miscellaneous income in order to
assist Flanagan in avoiding wage garnishments that had been
served on him and T&P.

and sent a note to his attorney, Fasano, stating:

> Please see enclosed which was served to
> Stanley Prymas this morning.  I have not
> received anything as yet, however I
> should be served shortly.  My concern here
> is with the money I am currently receiving
> from Thompson & Peck Inc., as a result of the
> settlement between Mr. Prymas and I.
> Is this subject to being taken?

Prymas also forwarded the writ to T&P's attorney, co-defendant Todd Bainer.  On January 12, 1998, Flanagan and Prymas agreed that T&P would temporarily hold the payments to Flanagan until the matter was resolved.

On January 20, 1998, Fasano filed a claim exemption form and an objection to property execution with the court in order to block the writ.  In that objection, Fasano falsely represented that "other than wages, there is no property [belonging to Flanagan] held by Thompson & Peck."

On February 4, 1998, Prymas informed Bainer that any representation to the plaintiffs or the court that T&P does "not have any money assets due Mr. Flanagan" was a misrepresentation because "T&P does have an obligation to [Flanagan]."  Thereafter, a meeting was scheduled to discuss strategy on how best to circumvent the court's writ of execution.

On February 9, 1998, Flanagan, Fasano, Prymas, Bainer, T&P and the law firm of Fasano, Ippolito and Lee, conspired and agreed to change the characterization of the settlement proceeds to wages notwithstanding an initial warning by Bainer that

5

changing the characterization would leave them open to a claim that there was a civil conspiracy to help Flanagan defraud his creditors.  No one attempted to stay the writ of execution, and not a single payment of the $75,000 settlement obligation was turned over as required by the writ.[3]

On February 4, 1998, the plaintiffs filed a motion with the court seeking an examination of Flanagan as the judgment debtor. On February 11, 1998, the court granted the motion and scheduled the hearing for March 9, 1998.  On February 25, 1998, the plaintiffs served Flanagan with a subpoena requiring him to produce at the hearing documents pertaining to his assets.

On March 9, 1998, the court held an examination of judgment debtor hearing with Fasano and attorney Robert Skelton appearing on behalf of Flanagan.  During the hearing, Skelton represented to the court that Flanagan was under criminal investigation by the Federal Bureau of Investigation ("FBI") and the Internal Revenue Service ("IRS"), and that Flanagan would invoke his Fifth Amendment right against self-incrimination and, in this regard, would not furnish any documents or testimony pertaining to his assets.  At the close of the hearing, the court issued an injunction prohibiting Flanagan from transferring his assets and

---

[3]  The writ of execution was issued on January 5, 1998 and expired on May 5, 1998.  The parties suspended payment of the settlement proceeds during this period and therefore extended by four months the original term of the payout from March 2000 to June 2000, with payments characterized as W-2 wages.

ordered him to submit to the court for in camera inspection documents pertaining to those assets.

On April 22, 1998, Fasano, on behalf of Flanagan, represented to the court that they had "gathered together thousands of documents to be produced for in camera inspection," and estimated that the documents would be produced to the court within the next week.

On July 29, 1998, Fasano filed a privilege log with the court on behalf of Flanagan in which he represented that Flanagan had asserted his Fifth Amendment privilege and declined to furnish information because the FBI and IRS were investigating Flanagan's financial activities. In response, the court ordered Flanagan to furnish to the court the documents withheld based upon privilege, and thereafter determined that documents had been improperly withheld.

On November 16, 1998, the court held Flanagan in contempt for failure to turn over information relating to his assets[4] and ordered him committed to the Federal Bureau of Prisons until such time as he purged himself of that contempt. After entering a stay of that order to give Flanagan an opportunity to comply, on November 19, 1998, the court vacated the order when Flanagan paid

---

[4] The court also held Flanagan in contempt for failure to provide an accounting as to any disposition of his T&P stock, as summarized in the court's discussion of the "shifting stock scheme," infra.

the judgment in full with interest, in the amount of $ 99,542.87.

At the close of trial, the jury found that Fasano had operated and/or managed a RICO enterprise in connection with the instant scheme, and that he and his law firm had conspired with Bainer, Prymas, T&P, and Flanagan to defeat through fraud the plaintiffs' efforts to collect the settlement proceeds.

B.   The Shifting Stock Scheme

After being served with the property execution, on January 6, 1998, Flanagan sent Fasano a letter stating in relevant part:

> I [] do not want it disclosed where my stock
> is presently kept.  There may be an attempt
> to grab this stock.  If there is a concern here,
> please let me know if I should be doing
> anything different than what is presently
> being done.

As Fasano knew, Flanagan had placed his stock with one Socrates Babacas for safekeeping and over the next several months refused to honor demands for that stock.  Specifically, Flanagan ignored the February 25, 1998 subpoena requiring him to produce at hearing documents pertaining to his assets, including his stock ownership in T&P.  Based on advice from Fasano, Flanagan also ignored an April 13, 1998 turn-over order requiring him to surrender his stock in T&P and an order requiring him to provide a full and complete accounting as to any purported transfer or other disposition of the stock.

Flanagan, Prymas and Bainer discussed the plaintiffs' execution efforts at several meetings in the spring of 1998.

8

Fasano stated to Bainer that if the plaintiffs were successful in getting Flanagan's stock, the plaintiffs would make things difficult for Prymas. To protect the stock, the defendants agreed to execute a shareholder agreement and place a restrictive legend on Flanagan's stock.

Despite an injunction forbidding Flanagan from transferring his assets and an order requiring Flanagan to turn over his stock, in July of 1998, Fasano, Flanagan, Prymas, and Bainer proceeded with their plan to execute a shareholder agreement and place a restrictive legend on Flanagan' stock, with Fasano suggesting to Bainer that Fasano's law partner, Al Ippolito, review the proposed shareholder agreement.

In August 1998, Flanagan entered into a Shareholder Agreement [buy-sell agreement] with Prymas. The agreement provided that, among other things, they would not sell, assign, pledge, mortgage, transfer or in any way encumber their stock. On August 21, 1998, Flanagan, Prymas and Bainer met at T&P's office in New Haven. There, Flanagan – in violation of the court's turnover order – gave his stock to Bainer. Bainer, who was also subject to the court's turn over order as T&P's and attorney, thereafter typed a restrictive legend on the stock certificates in order to limit their transferability, and, in violation of the turn over order, returned the certificates to Flanagan. Fasano once again advised Flanagan that he need not

turn over his stock.

On September 23, 1998, the court once again ordered Flanagan to turn over his stock. After the court denied two motions to stay the enforcement of that order, on October 21, 1998, Fasano filed a "Notice of Compliance" with the court in which he falsely represented that Flanagan's stock was in the hands of a purported creditor, one Sharon Demetropolis, and that Flanagan did not have possession or control of the stock. On October 22, 1998, Fasano filed an amended notice, falsely representing that Flanagan gave the stock to Demetropolis prior to the court's turnover order, and prior to the court's order of March 9, 1998 that prohibited Flanagan from transferring his assets. In an affidavit submitted by Fasano, Flanagan falsely represented that he had "borrowed money from Sharon Demetropolous [sic] and gave her the stock as security for the money." Ms. Demetropoulis, however, knew nothing of the stock, and did not have possession of it. Fasano knew that Flanagan's statement was false.

On October 26, 1998, the court ordered Flanagan to show cause why he should not be found in contempt for failure to turn over his stock and failure to provide an accounting as to any disposition of the stock, and set the matter down for hearing on November 16, 1998. On October 27, 1998, Fasano falsely represented to the court that "Mr. Flanagan did not make any transfers after Judge Covello's [March 9, 1998] order freezing

10

the assets of Mr. Flanagan."

On November 12, 1998, Fasano filed a Second Amended Notice of Compliance.  With this notice, Fasano falsely represented to the court that as of June 19, 1997, the stock of T&P was actually in the hands of one Socrates Babacus as collateral for a $120,000 loan from Babacus.  The notice also falsely recited that Flanagan had agreed to secure with the stock two loans of $10,000 that Demetropolis had made to him.

On November 16, 1998, the court held the contempt hearing. Fasano falsely represented to the court that, pursuant to the court's order of March 9, 1998, Flanagan had not transferred any assets.[5]  Disagreeing with Fasano, the court found Flanagan in contempt for transferring assets in violation of an injunction and for failure to provide an accounting as to any disposition of the stock.  After entering a stay of that order to give Flanagan an opportunity to comply, on November 19, 1998, the court vacated the order when Flanagan paid the judgment in full with interest, in the amount of $99,542.87.  On November 20, 1998, Fasano filed a motion to vacate the court's order prohibiting Flanagan from transferring his assets and, on December 3, 1998, the court

---

[5]  During this period the jury could have also found that with Fasano's knowledge and advice, Flanagan, on March 11, 1998 and on August 28, 1998, withdrew approximately $4,500 from two checking accounts set up in his children's names and, on October 12, 1998, loaned Babacas $500, all in violation of the injunction prohibiting property transfers.

entered an order granting that relief.

On December 9, 1998, Bainer telephoned Fasano at the request of Flanagan.  Bainer's notes regarding that conversation indicate that the call was made out of concern that the plaintiffs would obtain Flanagan's stock.  Bainer told Fasano that he "didn't think [the plaintiffs] would find the stock attractive with restriction/legend on it."  According to Bainer, Fasano then responded "what if the restriction is invalid" as Judge Covello "had issued an order in March 1998 prohibiting [Flanagan] from transferring or diminishing his assets including the stock" and this may "affect[] the validity of the restriction placed on the stock in the summer of 1998."  The notes also indicate that Bainer and Fasano discussed bankruptcy for Flanagan, with Fasano concerned about a bankruptcy filing because, among other things, "[Flanagan] would have to litigate a number of fraud claims against him then."

At the close of trial, the jury found that Fasano and his law firm had operated and/or managed a RICO enterprise in connection with the instant scheme, and that they had conspired with Bainer, Prymas, T&P, and Flanagan to defeat through fraud the plaintiffs' efforts to obtain Flanagan's stock.

C.  The Checking Account Scheme

Flanagan owned three rental properties, i.e., the George Street property, the Howe Street property, and the Whitney Avenue

12

property.  Flanagan placed the title to these properties in the
names of two entities that he owned and controlled, i.e., Howe
Street Associates and West Meadow Associates.  On March 9, 1998,
the court issued an injunction freezing all of Flanagan's assets.
Shortly thereafter, Fasano advised Flanagan to set up checking
accounts in the names of his minor children for purposes of
collecting rental income on his rental properties and hiding
those funds from his creditors.  During the period that the
injunction was in effect, on advice from Fasano, Flanagan used
these accounts to hide and to transfer approximately $43,000.

    In October of 1998, while the injunction was still in effect,
Flanagan borrowed $94,200 against the George St. Property and
placed a $94,200 mortgage on that property.

    At the close of trial, the jury found that Fasano and his law
firm, Fasano, Ippolito & Lee, LLC, had operated and/or managed a
RICO enterprise in connection with the instant scheme, and that
they had conspired with Flanagan to defeat through fraud the
plaintiffs' efforts to collect Flanagan's rental income.

D.  The Bankruptcy Fraud Scheme

    On February 17, 1999, Flanagan filed a petition in the United
States Bankruptcy Court for the District of Connecticut seeking
relief under Chapter 11 of the United States Bankruptcy Code.
Fasano once again served as Flanagan's legal counsel in
connection with that filing.  In his Chapter 11 submission,

13

Flanagan stated that he owned no real estate and that his only
asset of significance for purposes of his bankruptcy estate
consisted of a 50% stock ownership in T&P, with an estimated fair
market value of the stock at $1,000,000. Flanagan did not
disclose that he owned three residential properties[6], the rental
income that he received and was continuing to receive from his
rental properties, or the $75,000 in settlement proceeds he was
receiving from T&P. Flanagan did, however, list the plaintiffs
as non-secured creditors of a loan in the amount of 1,200,000.[7]

At the close of trial, the jury found that Fasano and his law
firm had operated and/or managed a RICO enterprise in connection
with the instant scheme, and that they had conspired with
Flanagan to defeat through bankruptcy fraud the plaintiffs'
rights as creditors.

## STANDARD

Rule 50 enables the district court to enter judgment as a

---

[6] Although the evidence demonstrated that six weeks before
the bankruptcy filing, Flanagan transferred title to these
properties to Joseph Caporale, the jury could have reasonably
found that the transfers were a sham. Coporale testified that he
had nothing to do with the properties and Flanagan continued to
collect all rental income via a P.O. Box set up in Corporale's
name and by forging Caporale's signature.

[7] Further, after the bankruptcy filing, Flanagan commenced
a bankruptcy adversary proceeding against the plaintiffs to
recover the $99,542.87 judgment in Cadle I, claiming that it was
a voidable preference and subject to recoupment under § 547(b) of
the Bankruptcy Code.

14

matter of law against a party on an issue only if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue" and "permits the district to do so after a jury verdict, provided a pre-verdict motion is properly renewed." Nadel v. Isaksson, 321 F.3d 266, 272 (2d Cir. 2003).  "In ruling on a motion for judgment as a matter of law, the court 'must view the evidence in a light most favorable to the non-movant and grant that party every reasonable inference that the jury might have drawn in its favor.'" Samuels v. Air Transport Local 504, 992 F.2d 12, 16 (2d Cir. 1993).  " A court must give deference to all credibility determinations and reasonable inferences of the jury, and may not weigh the credibility of witnesses or otherwise consider the weight of the evidence.  Thus, judgment as a matter of law should be granted only if: (1) there is such complete absence of evidence supporting the verdict that the jury's findings could only have been the result of a sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it]." Caruolo v. John Crane, Inc., 226 F.3d 46, 51 (2d Cir. 2000).

## **DISCUSSION**

1. <u>RICO Standing</u>

The defendants first argue that they are entitled to judgment

15

as a matter of law because, at the time of trial, Flanagan's bankruptcy proceeding was still pending and therefore, the RICO claims were not yet ripe.  In response, the plaintiffs maintain that to the contrary, their claims for RICO collection expense damages were ripe regardless of the status of the bankruptcy proceeding.  The court agrees with the plaintiffs.

The law is clear that where a judgment creditor pursues a debtor in bankruptcy court for fraudulently conveying assets during that proceeding, RICO damages may be unrecoverable as speculative in the district court until the bankruptcy proceeding has terminated.  Bankers Trust Co. v. Rhoades, 859 F.2d 1096, 1106 (2d Cir. 1988).  The law is equally clear, however, that a claim for legal fees incurred as a proximate cause of a RICO violation constitutes a claim for RICO damages that does not fail for indefiniteness.  Stochastic Decisions, Inc. v DiDomenico, 995 F.2d 1158, 1166-67 (2d Cir. 1993) (incurring legal fees was RICO injury where predicate acts included illegal actions impeding the plaintiff's collection efforts on outstanding judgment).  Consequently, although Flanagan's bankruptcy case may still have been pending at the time of trial in this matter, the plaintiffs were nevertheless entitled to pursue RICO claims for damages incurred in collecting outstanding debts where the defendants had frustrated collection through fraud.

2.  Sufficiency of the Evidence - $500,000 Damages

16

The defendants next argue that the jury's award of $500,000 in RICO collection expense damages was not supported by the evidence because the sum included collection costs that are not recoverable under Stochastic Decisions, Inc. v. DiDomenico, 995 F.2d 1158, 1166-67 (2d Cir. 1993), that is, attorneys' fees in obtaining judgments, bankruptcy attorneys' fees, and attorneys fees incurred in pressing the first Cadle v. Flanagan case, i.e., Cadle I.  In response, the plaintiffs maintain that the defendants are simply wrong.  The court agrees with the plaintiffs.

As set forth in Stochastic Decisions, Inc., attorneys' fees incurred by a judgment creditor in collecting a debt are not recoverable as RICO damages.  Id. at 1166.  Where, however, the debtor engages in illegality in impeding collection, the costs of collection may constitute RICO damages.  Id.

The plaintiffs did not precisely identify the measure of costs they incurred in defeating the defendants' fraudulent efforts to frustrate collection.  They did, however, offer a reasonable estimate of more than $500,000 in costs and were careful to identify them as separate from generic collection costs.  Specifically, the plaintiffs' representative, Dan Cadle, explained that he spent $494,000 chasing assets and that this figure did not include fees for prosecuting the present action or interest.  Cadle also noted that it,

17

> didn't include some of our attorney
> fees that we normally spend to collect
> on a judgment.  You know if you are going to
> sue someone you're going to pay an attorney
> fee.  That's not part of this [$]494,000.

(emphasis added).  Further, Paul Gaide, one of the attorneys for

the plaintiffs, testified that as a result of the defendants'

failure to comply with the court's writ of execution, injunction

and turnover order, there were increased legal fees of $10,000,

bringing the total to $ 504,000.  No evidence was offered

generally of fees incurred in obtaining judgments, fees incurred

in connection with Flanagan's bankruptcy, or fees incurred in

connection with Cadle I.

    When the court delivered the jury charge, the court

specifically instructed the jury that:

> in this RICO case the plaintiffs' damages are
> limited to one, lost debt damages. . . [a]nd,
> two, money expended pursuing the fraudulently
> concealed monies.
>                 . . . .
>
> For collection expenses damages, the
> plaintiffs must show by a preponderance of
> the evidence the amount of legal fees and
> other expenses that they incurred in their
> unsuccessful attempts to collect on Flanagan's
> assets which were proximately caused by the
> defendant(s)' alleged RICO violations.

(emphasis added).  Drawing all reasonable inferences in the

plaintiffs favor, the jury could have reasonably found that the

plaintiffs suffered $500,000 in collection expense damages-

damages incurred in pursuing fraudulently concealed debts and

excluding "normal" collection expenses.

3. <u>Sufficiency of the Evidence - Individual Injury</u>

The defendants next argue that they are entitled to judgment as a matter of law because the plaintiffs failed to prove individual injury, that is, the extent to which damages should have been apportioned to each plaintiff. In response, the plaintiffs maintain that no apportionment was required. The court agrees with the plaintiffs.

As a general rule, the failure to apportion damages among several plaintiffs does not constitute the basis for reversal of a judgment unless the defendant can show prejudice caused by the failure. <u>Central Vermont Railway Co. v. White</u>, 238 U.S. 507, 514 (1915). Prejudice in this regard would arise if the failure to apportion would allow either plaintiff to recover more than once. <u>Jefferson & N.M. Ry. Co. v. Woods</u>, 64 S.W. 830, 831 (Tex. Civ. App. 1901).

In this case the plaintiffs offered competent evidence that they suffered damages in the amount of $500,000. The failure to separate out damages is not reversible because satisfaction of this judgment would bar either plaintiff from pursuing a second recovery.[8]

---

[8] Further, because the defendants failed to object to the court's charge and verdict form which did not require a breakdown as to the damages sought by each individual plaintiff, they have waived any claim of error. <u>DeFalco v. Bernas</u>, 244 F.3d 286, 315 n. 19 (2d Cir. 2001).

4.  <u>RICO Damages</u>

   The defendants next argue that because the jury found that
the plaintiffs were not entitled to lost debt damages, there can
be no RICO damages as a matter of law.  The plaintiffs respond
that regardless of their failure to prove lost debt damages,
their collection expenses constitute RICO damages as a matter of
law.  The court agrees with the plaintiffs.

   "Legal fees may constitute RICO damages when they are
proximately caused by a RICO violation."  <u>Stochastic Decisions,</u>
<u>Inc. v DiDomenico</u>, 995 F.2d 1158, 1166-67 (2d Cir. 1993)
(incurring legal fees was RICO injury where predicate acts
included preventing plaintiff's collection efforts on outstanding
judgment); <u>see also</u> <u>Bankers Trust Co. v. Rhoades</u>, 859 F.2d 1096,
1005 (2d Cir. 1988) (plaintiff suffered RICO injury by paying
attorneys' fees for defending frivolous lawsuits started by
defendant and designed to forestall collection on an outstanding
bankruptcy claim).

   Because legal fees incurred in fighting a debtor's attempt to
frustrate collection can constitute the basis for a RICO injury,
and the record reflects that, indeed, the plaintiffs expended
some $500,000 in fighting the defendant's efforts to frustrate
collection through fraud, the defendants are not entitled to
judgment as a matter of law.

20

5.  <u>Attorney Liability and Fasano</u>

The Fasano defendants next argue that they are entitled to judgment as a matter of law because holding them liable under RICO § 1962(c) for the acts of a client would have a dangerous ripple effect for the legal profession at large.

Although the court agrees that holding an attorney liable for the wrongful acts of a client would be manifestly unjust and, at the very least, have disastrous effects for the legal profession – this concern was never an issue in this case.  The lawyers here were called to answer for their own conduct – conduct that included wrongfully advising a client that he was free to disregard a federal injunction and turnover order, and knowingly filing false documents with the court in an attempt to frustrate collection.  In the court's view, this conduct far exceeded the rendering of legal advice and constituted participation in fraudulent conduct in violation of RICO.  <u>See</u> <u>Handeen v. LeMaire</u>, 112 F.3d 1339, 1349 (8th Cir. 1997) ("An attorney's license is not an invitation to engage in racketeering, and a lawyer no less than anyone else is bound by generally applicable legislative enactments [including RICO].").

6.  <u>RICO Enterprise and RICO § 1962(c)</u>

The defendants next argue that the plaintiffs failed to prove two of the elements necessary to establish a RICO enterprise, that is, (A) that an enterprise existed, and (B), that the

21

enterprise was separate and distinct from the racketeering
activity.  For the following reasons, the court does not agree.

A. <u>RICO Enterprise</u>

The defendants argue that evidence was insufficient to
establish the court's definition of a RICO enterprise because,
while "the plaintiffs proved that Leonard Fasano and Charles
Flanagan were associated together as attorney and client, []
there [was] no evidence that they functioned as a 'common unit'
or that they were 'engaged in a course of conduct to defraud the
plaintiffs.'" Specifically, they argue that "the only testimony
of this effect was that of Flanagan and Fasano, both of whom
denied that Fasano knew of Flanagan's actions, or that Fasano was
involved in Flanagan's schemes. . . [and] the jury was not
entitled to make a contrary conclusion."  The court does not
agree.

A trial, the court instructed the jury that a RICO enterprise
is defined as "an association of individuals . . . associated
together and functioning as a common unit for the common purpose
of engaging in a course of conduct to defraud the plaintiffs."

Despite their denials, there was evidence from which the jury
could find that Fasano and Flanagan worked together as a common
unit for the common purpose of engaging in a course of conduct to
defraud the plaintiffs.  Specifically, correspondence admitted
into evidence disclosed that on January 5, 1998, Flanagan reached

out to Fasano for help in hiding from a writ of execution funds
that he was receiving pursuant to a settlement agreement with
Prymas.  Thereafter, Fasano filed documents with the court in
which he falsely characterized the proceeds as wages exempt from
the execution when in fact the proceeds were 1099 income subject
to execution.  Further, Flanagan recalled at trial that during a
deposition, he testified that Fasano advised him that he need not
surrender his stock in T&P, notwithstanding a turn-over order
requiring him to do so, and that he consulted with Fasano before
he transferred rental property income in violation of an
injunction prohibiting such transfers.  The facts at trial
therefore supported a finding that Fasano and Flanagan worked
together as a common unit to defraud the plaintiffs.

  B. Enterprise Separate and Distinct from
     Racketeering Activity

    The defendants also argue that the plaintiffs failed to prove
a material element of their RICO claim, that is, that the
enterprise existed separate and apart from the racketeering
activity in which its members engaged.  In the defendants' view,
the plaintiffs only offered evidence of predicate racketeering
acts, acts which are insufficient to prove the existence of an
enterprise.  The court cannot agree.

    In order to prove the existence of a RICO enterprise, a
plaintiff must show "an entity separate and apart from the
pattern of activity in which it engages." United States v.

23

Riccobene, 709 F.2d 214, 223-24 (3d Cir. 1983). "The function of overseeing and coordinating the commission of several different predicate offenses and other activities on an on-going basis is adequate to satisfy the separate existence requirement." Id. The "proof used to establish the 'pattern of racketeering activity' element 'may in particular cases coalesce' with the proof offered to establish the 'enterprise' element of RICO." United States v. Mazzei, 700 F.2d 85, 89 (2d Cir. 1983).

The evidence presented at trial demonstrated not only that the defendants engaged in multiple predicate acts to defraud the plaintiffs of their lawful claims, but that they did so in a coordinated fashion constituting a function above and beyond that necessary to carry out any single one of the racketeering activities proven at trial. Accordingly, the evidence did support a RICO enterprise.

7. Operation and Management - RICO § 1962(c)

The Fasano defendants next argue that they are entitled to judgment as a matter of law with respect to the finding that they violated RICO section 1962(c) because the plaintiffs failed to offer any evidence that Fasano participated in the operation or management of the enterprise. In response, the plaintiffs maintain that the evidence was sufficient for such a finding. The court agrees with the plaintiffs.

RICO section 1962(c) makes it unlawful for any person to

24

"participate, directly or indirectly, in the conduct of [a RICO] enterprise's affairs through a pattern of racketeering activity." Id. "One must participate in the operation or management of the enterprise itself in order to be subject to § 1962(c) liability." Reves v. Ernst & Young, 507 U.S. 170, 185 113 S.Ct. 1163 (1993). This test may be satisfied by "knowingly implementing decisions, as well as by making them." United States v. Allen, 155 F.3d 35, 42 (2d Cir. 1998).

With respect to the various schemes at issue during trial, the jury could have found that, on January 5, 1998, Flanagan reached out to Fasano for help in hiding from a writ of execution funds that he was receiving pursuant to a settlement agreement, and that it was Fasano who advised him to characterize the proceeds as wages exempt from execution knowing all the while that the proceeds were 1099 income subject to execution. A jury could have also found that on January 20, 1998, and in furtherance of this scheme, Fasano knowingly filed a false claim exemption form and an objection to property execution on behalf of T&P which falsely represented to the court that "other than wages, there is no property [belonging to Flanagan] held by Thompson & Peck."

With respect to the shifting stock scheme, the jury could have found that Fasano advised Flanagan that he need not surrender his T&P stock even though the court had issued a turn-

over order requiring him to do so, and that in furtherance of
what had become a plan -- on October 21, 1998, October 22, 1998,
and November 12, 1998 -- Fasano knowingly filed false compliance
statements with the court in which Fasano represented that
Flanagan had complied with the court's turnover order.

In the court's view, the filing of false claim exemptions and
compliance statements is conduct reaching beyond the furnishing
of advice, and constitutes decision making for the enterprise or,
at the very least, the knowing implementation of decisions
designed to defraud the plaintiffs.  Consequently, the evidence
at trial did support a finding that Fasano participated in the
operation or management of the enterprise in violation of RICO §
1962(c).

8.  Racketeering Activity -Predicate Acts

The Fasano defendants next argue that the plaintiffs failed
to prove that Fasano knowingly participated in any of the schemes
to defraud, that he used the mails or transmission facilities to
further those schemes, or that he knowingly concealed assets from
the bankruptcy court.

The law governing RICO liability among co-defendants for
racketeering activity has been painstakingly set forth in the
court's May 2, 2005 summary judgment ruling and the court's
charge to the jury.  Ignoring that standard, the defendants make
the sweeping assertion that the evidence simply did not support a

26

finding that Fasano knowingly participated in the several schemes or predicate acts.  The argument is simply without merit.

9.  Racketeering Activity and Continuity

The defendants next argue that they are entitled to judgment as a matter of law because, in their view, the plaintiffs failed to prove the RICO requirement that the pattern of racketeering activity have continuity.  The court cannot agree.

In order to prove a RICO claim, a plaintiff must show, among other things, that the defendants engaged in a pattern of racketeering activity.  Cadle v. Flanagan, 271 F. Supp.2d 379, 387 (D. Conn. 2003).  "At least two acts of racketeering activity must occur within ten years of each other to constitute a pattern."  Id. at 388 (citing 18 U.S.C. § 1961(5)).  The Supreme Court has construed the pattern element as additionally requiring a showing that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity. H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239, 109 S.Ct. 2893 (1989).  Acts are related if they "have the same or similar purpose, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."  Id. at 240.

"The continuity necessary to prove a pattern can be either 'close-ended continuity' or 'open ended continuity.'"  Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 242 (2d Cir.

1999).  "Close-ended continuity is demonstrated by predicate acts that 'amount to continued criminal activity' by a particular defendant."  <u>Id.</u>  "To satisfy closed-ended continuity, the plaintiff must prove 'a series of related predicates extending over a substantial period of time.'"  <u>Id.</u>  "The Second Circuit "has never held a period of less that two years to constitute a 'substantial period of time.'"  <u>Id.</u>

The evidence at trial supported a finding of interrelated fraudulent acts occurring over two years and hence, close-ended continuity.  Specifically, the jury could have reasonably found that the schemes began in January 1998 with the settlement proceeds scheme, wherein the defendants wrongfully agreed to characterize settlement proceeds as wages in order to defeat the plaintiffs' collection efforts.  This mischaracterization continued for over two years, was accompanied by the shifting stock scheme and the checking account scheme, and became a predicate for the bankruptcy fraud scheme when Fasano failed to disclose this income in Flanagan's bankruptcy filing as an asset for purposes of Flanagan's bankruptcy estate.  Since Flanagan continued to receive these hidden funds through June of 2000, a jury could have reasonably found a series of related predicates extending over a period of more than two years.[9]

---

[9]  Because the jury could have reasonably found close ended continuity, the court does not address the issue of whether the evidence also supported a finding of open ended continuity.

10. Reliance

The Fasano defendants next argue that they are entitled to judgment as a matter of law because, in their view, the plaintiffs failed to prove reliance.  The court cannot agree.

"[I]n order to prevail on a civil RICO claim, the plaintiff must show that the defendant's violation was the proximate cause of the plaintiff's injury."  Bank of China v. NBM, LLC, 359 F.3d 171, 176 (2d Cir. 2004).  "It is well established in this Circuit that where mail [or wire] fraud is the predicate act for a civil RICO claim, the proximate cause element [] requires the plaintiff to show 'reasonable reliance.'"  Id.  The Second Circuit has "accepted the principle that a RICO claim based on mail [or wire] fraud may be proven where the misrepresentations were relied upon by a third person, rather than the plaintiff."  Ideal Steel Supply Corp. v. Anza, 373 F.3d 251, 262 (2d Cir. 2004).  Consistent with this standard, the court charged the jury that:

> The plaintiffs under RICO must [] prove
> reliance.  That is, reasonable reliance on
> any of the defendants' alleged fraudulent
> acts.  The plaintiffs need not be the party
> that relied on the fraudulent acts, however.
> In this regard if the plaintiffs established
> that the defendants' misrepresentations to
> a third-party harmed the plaintiffs, the
> plaintiffs need only show that the third
> party reasonably relied on the
> misrepresentations.

In this case, a jury could have reasonably found that the defendants misrepresented to the plaintiffs and the court: (a)

29

that T&P did not hold any property belonging to Flanagan at the time the plaintiffs served the property execution; (b) that Flanagan did not have possession of his stock in T&P at the time the court issued the turn over order; (c) that Flanagan did not transfer his assets in violation of the court's injunction; and (d) that for purposes of Flanagan's bankruptcy filing, Flanagan did not own real estate or receive rental income or settlement proceeds.  Further, the jury could have reasonably found that the plaintiffs relied upon these misrepresentations when, as a result of them, they were forced to pursue costly collection alternatives.

11.  Liability under 18 U.S.C. § 1962(d) - RICO Conspiracy

     The defendants, Bainer, Prymas, and T&P next argue that they are entitled to judgment as a matter of law on the jury finding of RICO conspiracy because, in their view, they cannot be held liable for conspiracy when the jury found that they did not violate a substantive provision of RICO.  In response, the plaintiffs maintain that the jury properly found the defendants liable for conspiracy because the law does not require that the defendants themselves violate a substantive provision of RICO, rather all that is required is what the jury found here, that is, that they served as co-conspirators with Fasano – a defendant whom the jury found to have violated one of RICO's substantive provisions, i.e., 18 U.S.C. § 1962(c).  The court agrees with the

30

plaintiffs.

Although a RICO conspiracy claim under "[s]ection 1962(d)
fails as a matter of law if the substantive claims based on
[section 1962 (a) -(c)] are defective" First Capital Asset Mgtm
v. Brickellbush, 219 F. Supp.2d 576, 588 (S.D.N.Y. 2002), a
plaintiff who claims that one conspirator has violated a
substantive provision may "sue co-conspirators who might not
themselves have violated one of the substantive provisions of §
1962." Beck v. Prupis, 529 U.S. 494, 506-507 (2000); see also
Contawe v. Crescent Heights of America, Inc., No. Civ. A.04-2304,
2004 WL 2244538, *1 (E.D.Pa. Oct. 1, 2004) ("A defendant need not
himself be charged with a substantive RICO violation to face
§ 1962(d) liability, as long as the plaintiff has adequately pled
substantive claims against the defendant's co-conspirators.")
(citing Salinas v. United States, 522 U.S. 52, 65-66 (1997)).

Because the jury found Fasano liable for violating 18 U.S.C.
§ 1962(c)- a substantive provision of RICO - the jury's finding
that Bainer, T&P, and Prymas acted a co-conspirators under 18
U.S.C. § 1962(d) is not erroneous as a matter of law.

12. Other Arguments

The defendants, Bainer, Prymas, and T&P have also argued: (a)
that the evidence was insufficient to show that the damages
awarded were proximately caused by any crime under RICO; (b) that
the defendants are entitled to judgment as a matter of law

31

because the plaintiffs engaged in abuse of process; and (c) the evidence was insufficient to show continuity with respect to the conspiracy allegations.

The court has reviewed these arguments and concludes that they are without merit.

**CONCLUSION**

For the foregoing reasons, the clerk is ordered to docket this ruling as ruling amending the court's March 31, 2006 ruling denying the defendants' motion for judgment as a matter of law (document no. 644). With this amendment, the defendants' motion remains DENIED.

It is so ordered this 8th day of May, 2006 at Hartford, Connecticut.

_____
Alfred V. Covello
United States District Judge