UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

THE CADLE COMPANY and D.A.N. :
JOINT VENTURE, LTD. :
    Plaintiffs, :
  :
  :
VS. : Civil No. 3:01CV531 (AVC)
  :
CHARLES A. FLANAGAN, :
ET AL., :
    Defendants. :

### AMENDED[1] RULING ON THE DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW

    This is an action for damages and equitable relief brought pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. The plaintiffs, Cadle Company and D.A.N., Joint Venture, Ltd. ("the plaintiffs") claim that the defendants, Leonard Fasano and the law firm of Fasano, Ippolito & Lee, LLC ("the Fasano defendants"), Todd Bainer, Stanley Prymas, and Thompson & Peck, Inc. ("T&P") (collectively "the defendants") engaged in a pattern of racketeering activity involving bankruptcy fraud, mail fraud and wire fraud in order to prevent the plaintiffs from collecting a debt.

    On May 23, 2005, the parties appeared for jury trial and, on June 10, 2005, the jury found that the Fasano defendants had operated and/or managed a RICO enterprise in violation of 18 U.S.C. § 1962(c), and that they had conspired with the debtor,

---

    [1] The court sua sponte furnishes this amended ruling in order to correct minor errors appearing in Facts section of its March 31, 2006 ruling.

Charles Flanagan, and co-defendants Bainer, Prymas, and T&P to defeat through fraud the plaintiffs' debt collection efforts in violation of 18 U.S.C. § 1962(d). The jury thereafter awarded the plaintiffs $500,000 in RICO collection expense damages.

The defendants now move for judgment as a matter of law pursuant to Fed. R. Civ. P. 50 arguing that there is no legally sufficient evidentiary basis for the jury to find for the plaintiffs.

The issues presented are whether: (1) an award of RICO damages is barred as indefinite because Flanagan's bankruptcy action remained pending at the time of trial; (2) the evidence was insufficient to sustain a jury award of $500,000; (3) the plaintiffs failed to prove individual injury; (4) an award of collection expense damages is barred by the failure to prove lost debt damages; (5) the Fasano defendants, as a lawyer and law firm, should not be subjected to RICO liability for policy reasons; (6) the evidence was insufficient to prove RICO enterprise; (7) the evidence was insufficient to prove that the Fasano defendants participated in the operation or management of the enterprise in violation of RICO § 1962(c); (8) the evidence was insufficient to prove that the Fasano defendants knowingly participated in any of the schemes to defraud or used the mails or wires in furtherance thereof; (9) the evidence was insufficient to prove the RICO requirement of continuity with

2

respect to the Fasano defendants; (10) the evidence was insufficient to prove the RICO requirement of reliance with respect to the Fasano defendants; (11) the evidence was insufficient to prove that the defendants, Bainer, Prymas, or T&P engaged in RICO conspiracy; (12) the evidence was insufficient to show that the damages awarded were proximately caused by any crime under RICO; (13) the plaintiffs' actions constituted an abuse of process entitling the defendants to judgment as a matter of law; and (14) the evidence was insufficient to show continuity with respect to the conspiracy claims.

For the reasons hereinafter that follow, the court answers each issue set forth above in the negative and, accordingly, the motion is DENIED.

## **FACTS**

A jury could have reasonably found the following facts. In 1996, the plaintiffs filed suit against Flanagan in the United States District Court for the District of Connecticut in connection with his default on a $75,000 loan. The Cadle Company v. Charles Flanagan, Civ. No. 3:96cv2648(AVC) ("Cadle I"). On March 20, 1997, the plaintiffs prevailed in the action and obtained a judgment against Flanagan in the amount of $90,747.87. Flangan declined to pay the judgment. On October 2, 1997, the plaintiffs obtained a writ of execution against Flanagan but failed to realize any payment or property. On January 5, 1998,

3

the plaintiffs served a writ of execution on T&P, an insurance company that Flanagan jointly owned with co-defendant, Prymas. The writ sought any property in the possession of T&P that Flanagan owned. Thereafter, Flanagan and the defendants conspired with one another to defeat through the following schemes the plaintiffs' collection efforts.

A.  The Settlement Proceeds Scheme

At the time of the January 5, 1998 writ of execution, T&P was paying Flanagan approximately $1,000 every two weeks as part of a $75,000 lawsuit settlement with Prymas. Flanagan and Prymas had settled the matter on June 17, 1997 and had agreed to treat the payments as "1099 - miscellaneous income" - after T&P's accountant, one James Rayner, advised Prymas that

> it is our opinion that this type of payment
> to a stockholder in settlement of a corporate
> disagreement in not W-2 compensation [i.e.,
> wages], but a taxable damage settlement to
> be reported on 1099-MISC.

Thereafter, T&P classified the payments as 1099 miscellaneous income to Flanagan.[2]

Upon being notified of the January 5, 1998 writ of execution, Flanagan became concerned that the bi-monthly settlement payments might be subject to the property execution,

---

[2] The defendants wanted to characterize the settlement agreement payments as 1099 miscellaneous income in order to assist Flanagan in avoiding wage garnishments that had been served on him and T&P.

4

and sent a note to his attorney, Fasano, stating:

> Please see enclosed which was served to
> Stanley Prymas this morning. I have not
> received anything as yet, however I
> should be served shortly. My concern here
> is with the money I am currently receiving
> from Thompson & Peck Inc., as a result of the
> settlement between Mr. Prymas and I.
> Is this subject to being taken?

Prymas also forwarded the writ to T&P's attorney, co-defendant Todd Bainer. On January 12, 1998, Flanagan and Prymas agreed that T&P would temporarily hold the payments to Flanagan until the matter was resolved.

On January 20, 1998, Fasano filed a claim exemption form and an objection to property execution with the court in order to block the writ. In that objection, Fasano falsely represented that "other than wages, there is no property [belonging to Flanagan] held by Thompson & Peck."

On February 4, 1998, Prymas informed Bainer that any representation to the plaintiffs or the court that T&P does "not have any money assets due Mr. Flanagan" was a misrepresentation because "T&P does have an obligation to [Flanagan]." Thereafter, a meeting was scheduled to discuss strategy on how best to circumvent the court's writ of execution.

On February 9, 1998, Flanagan, Fasano, Prymas, Bainer, T&P and the law firm of Fasano, Ippolito and Lee, conspired and agreed to change the characterization of the settlement proceeds to wages notwithstanding an initial warning by Bainer that

5

changing the characterization would leave them open to a claim that there was a civil conspiracy to help Flanagan defraud his creditors. No one attempted to stay the writ of execution, and not a single payment of the $75,000 settlement obligation was turned over as required by the writ.[3]

On February 4, 1998, the plaintiffs filed a motion with the court seeking an examination of Flanagan as the judgment debtor. On February 11, 1998, the court granted the motion and scheduled the hearing for March 9, 1998. On February 25, 1998, the plaintiffs served Flanagan with a subpoena requiring him to produce at the hearing documents pertaining to his assets.

On March 9, 1998, the court held an examination of judgment debtor hearing with Fasano and attorney Robert Skelton appearing on behalf of Flanagan. During the hearing, Skelton represented to the court that Flanagan was under criminal investigation by the Federal Bureau of Investigation ("FBI") and the Internal Revenue Service ("IRS"), and that Flanagan would invoke his Fifth Amendment right against self-incrimination and, in this regard, would not furnish any documents or testimony pertaining to his assets. At the close of the hearing, the court issued an injunction prohibiting Flanagan from transferring his assets and

---

[3] The writ of execution was issued on January 5, 1998 and expired on May 5, 1998. The parties suspended payment of the settlement proceeds during this period and therefore extended by four months the original term of the payout from March 2000 to June 2000, with payments characterized as W-2 wages.

ordered him to submit to the court for in camera inspection documents pertaining to those assets.

On April 22, 1998, Fasano, on behalf of Flanagan, represented to the court that they had "gathered together thousands of documents to be produced for in camera inspection," and estimated that the documents would be produced to the court within the next week.

On July 29, 1998, Fasano filed a privilege log with the court on behalf of Flanagan in which he represented that Flanagan had asserted his Fifth Amendment privilege and declined to furnish information because the FBI and IRS were investigating Flanagan's financial activities. In response, the court ordered Flanagan to furnish to the court the documents withheld based upon privilege, and thereafter determined that documents had been improperly withheld.

On November 16, 1998, the court held Flanagan in contempt for failure to turn over information relating to his assets[4] and ordered him committed to the Federal Bureau of Prisons until such time as he purged himself of that contempt. After entering a stay of that order to give Flanagan an opportunity to comply, on November 19, 1998, the court vacated the order when Flanagan paid

---

[4] The court also held Flanagan in contempt for failure to provide an accounting as to any disposition of his T&P stock, as summarized in the court's discussion of the "shifting stock scheme," infra.

7

the judgment in full with interest, in the amount of $ 99,542.87.

At the close of trial, the jury found that Fasano had operated and/or managed a RICO enterprise in connection with the instant scheme, and that he and his law firm had conspired with Bainer, Prymas, T&P, and Flanagan to defeat through fraud the plaintiffs' efforts to collect the settlement proceeds.

B.  The Shifting Stock Scheme

After being served with the property execution, on January 6, 1998, Flanagan sent Fasano a letter stating in relevant part:

> I [] do not want it disclosed where my stock
> is presently kept.  There may be an attempt
> to grab this stock.  If there is a concern here,
> please let me know if I should be doing
> anything different than what is presently
> being done.

As Fasano knew, Flanagan had placed his stock with one Socrates Babacas for safekeeping and over the next several months refused to honor demands for that stock.  Specifically, Flanagan ignored the February 25, 1998 subpoena requiring him to produce at hearing documents pertaining to his assets, including his stock ownership in T&P.  Based on advice from Fasano, Flanagan also ignored an April 13, 1998 turn-over order requiring him to surrender his stock in T&P and an order requiring him to provide a full and complete accounting as to any purported transfer or other disposition of the stock.

Flanagan, Prymas and Bainer discussed the plaintiffs' execution efforts at several meetings in the spring of 1998.

8

Fasano stated to Bainer that if the plaintiffs were successful in getting Flanagan's stock, the plaintiffs would make things difficult for Prymas. To protect the stock, the defendants agreed to execute a shareholder agreement and place a restrictive legend on Flanagan's stock.

Despite an injunction forbidding Flanagan from transferring his assets and an order requiring Flanagan to turn over his stock, in July of 1998, Fasano, Flanagan, Prymas, and Bainer proceeded with their plan to execute a shareholder agreement and place a restrictive legend on Flanagan' stock, with Fasano suggesting to Bainer that Fasano's law partner, Al Ippolito, review the proposed shareholder agreement.

In August 1998, Flanagan entered into a Shareholder Agreement [buy-sell agreement] with Prymas. The agreement provided that, among other things, they would not sell, assign, pledge, mortgage, transfer or in any way encumber their stock. On August 21, 1998, Flanagan, Prymas and Bainer met at T&P's office in New Haven. There, Flanagan - in violation of the court's turnover order - gave his stock to Bainer. Bainer, who was also subject to the court's turn over order as T&P's and attorney, thereafter typed a restrictive legend on the stock certificates in order to limit their transferability, and, in violation of the turn over order, returned the certificates to Flanagan. Fasano once again advised Flanagan that he need not

9

turn over his stock.

On September 23, 1998, the court once again ordered Flanagan to turn over his stock. After the court denied two motions to stay the enforcement of that order, on October 21, 1998, Fasano filed a "Notice of Compliance" with the court in which he falsely represented that Flanagan's stock was in the hands of a purported creditor, one Sharon Demetropolis, and that Flanagan did not have possession or control of the stock. On October 22, 1998, Fasano filed an amended notice, falsely representing that Flanagan gave the stock to Demetropolis prior to the court's turnover order, and prior to the court's order of March 9, 1998 that prohibited Flanagan from transferring his assets. In an affidavit submitted by Fasano, Flanagan falsely represented that he had "borrowed money from Sharon Demetropolous [sic] and gave her the stock as security for the money." Ms. Demetropoulis, however, knew nothing of the stock, and did not have possession of it. Fasano knew that Flanagan's statement was false.

On October 26, 1998, the court ordered Flanagan to show cause why he should not be found in contempt for failure to turn over his stock and failure to provide an accounting as to any disposition of the stock, and set the matter down for hearing on November 16, 1998. On October 27, 1998, Fasano falsely represented to the court that "Mr. Flanagan did not make any transfers after Judge Covello's [March 9, 1998] order freezing

the assets of Mr. Flanagan."

On November 12, 1998, Fasano filed a Second Amended Notice of Compliance. With this notice, Fasano falsely represented to the court that as of June 19, 1997, the stock of T&P was actually in the hands of one Socrates Babacus as collateral for a $120,000 loan from Babacus. The notice also falsely recited that Flanagan had agreed to secure with the stock two loans of $10,000 that Demetropolis had made to him.

On November 16, 1998, the court held the contempt hearing. Fasano falsely represented to the court that, pursuant to the court's order of March 9, 1998, Flanagan had not transferred any assets.[5] Disagreeing with Fasano, the court found Flanagan in contempt for transferring assets in violation of an injunction and for failure to provide an accounting as to any disposition of the stock. After entering a stay of that order to give Flanagan an opportunity to comply, on November 19, 1998, the court vacated the order when Flanagan paid the judgment in full with interest, in the amount of $99,542.87. On November 20, 1998, Fasano filed a motion to vacate the court's order prohibiting Flanagan from transferring his assets and, on December 3, 1998, the court

---

[5] During this period the jury could have also found that with Fasano's knowledge and advice, Flanagan, on March 11, 1998 and on August 28, 1998, withdrew approximately $4,500 from two checking accounts set up in his children's names and, on October 12, 1998, loaned Babacas $500, all in violation of the injunction prohibiting property transfers.

11

entered an order granting that relief.

On December 9, 1998, Bainer telephoned Fasano at the request of Flanagan. Bainer's notes regarding that conversation indicate that the call was made out of concern that the plaintiffs would obtain Flanagan's stock. Bainer told Fasano that he "didn't think [the plaintiffs] would find the stock attractive with restriction/legend on it." According to Bainer, Fasano then responded "what if the restriction is invalid" as Judge Covello "had issued an order in March 1998 prohibiting [Flanagan] from transferring or diminishing his assets including the stock" and this may "affect[] the validity of the restriction placed on the stock in the summer of 1998." The notes also indicate that Bainer and Fasano discussed bankruptcy for Flanagan, with Fasano concerned about a bankruptcy filing because, among other things, "[Flanagan] would have to litigate a number of fraud claims against him then."

At the close of trial, the jury found that Fasano and his law firm had operated and/or managed a RICO enterprise in connection with the instant scheme, and that they had conspired with Bainer, Prymas, T&P, and Flanagan to defeat through fraud the plaintiffs' efforts to obtain Flanagan's stock.

C. The Checking Account Scheme

Flanagan owned three rental properties, i.e., the George Street property, the Howe Street property, and the Whitney Avenue

12

property. Flanagan placed the title to these properties in the names of two entities that he owned and controlled, i.e., Howe Street Associates and West Meadow Associates. On March 9, 1998, the court issued an injunction freezing all of Flanagan's assets. Shortly thereafter, Fasano advised Flanagan to set up checking accounts in the names of his minor children for purposes of collecting rental income on his rental properties and hiding those funds from his creditors. During the period that the injunction was in effect, on advice from Fasano, Flanagan used these accounts to hide and to transfer approximately $43,000.

In October of 1998, while the injunction was still in effect, Flanagan borrowed $94,200 against the George St. Property and placed a $94,200 mortgage on that property.

At the close of trial, the jury found that Fasano and his law firm, Fasano, Ippolito & Lee, LLC, had operated and/or managed a RICO enterprise in connection with the instant scheme, and that they had conspired with Flanagan to defeat through fraud the plaintiffs' efforts to collect Flanagan's rental income.

D. The Bankruptcy Fraud Scheme

On February 17, 1999, Flanagan filed a petition in the United States Bankruptcy Court for the District of Connecticut seeking relief under Chapter 11 of the United States Bankruptcy Code. Fasano once again served as Flanagan's legal counsel in connection with that filing. In his Chapter 11 submission,

Flanagan stated that he owned no real estate and that his only asset of significance for purposes of his bankruptcy estate consisted of a 50% stock ownership in T&P, with an estimated fair market value of the stock at $1,000,000. Flanagan did not disclose that he owned three residential properties[6], the rental income that he received and was continuing to receive from his rental properties, or the $75,000 in settlement proceeds he was receiving from T&P. Flanagan did, however, list the plaintiffs as non-secured creditors of a loan in the amount of 1,200,000.[7]

At the close of trial, the jury found that Fasano and his law firm had operated and/or managed a RICO enterprise in connection with the instant scheme, and that they had conspired with Flanagan to defeat through bankruptcy fraud the plaintiffs' rights as creditors.

## **STANDARD**

Rule 50 enables the district court to enter judgment as a

---

[6] Although the evidence demonstrated that six weeks before the bankruptcy filing, Flanagan transferred title to these properties to Joseph Caporale, the jury could have reasonably found that the transfers were a sham. Coporale testified that he had nothing to do with the properties and Flanagan continued to collect all rental income via a P.O. Box set up in Corporale's name and by forging Caporale's signature.

[7] Further, after the bankruptcy filing, Flanagan commenced a bankruptcy adversary proceeding against the plaintiffs to recover the $99,542.87 judgment in Cadle I, claiming that it was a voidable preference and subject to recoupment under § 547(b) of the Bankruptcy Code.

14

matter of law against a party on an issue only if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue" and "permits the district to do so after a jury verdict, provided a pre-verdict motion is properly renewed." Nadel v. Isaksson, 321 F.3d 266, 272 (2d Cir. 2003). "In ruling on a motion for judgment as a matter of law, the court 'must view the evidence in a light most favorable to the non-movant and grant that party every reasonable inference that the jury might have drawn in its favor.'" Samuels v. Air Transport Local 504, 992 F.2d 12, 16 (2d Cir. 1993). " A court must give deference to all credibility determinations and reasonable inferences of the jury, and may not weigh the credibility of witnesses or otherwise consider the weight of the evidence. Thus, judgment as a matter of law should be granted only if: (1) there is such complete absence of evidence supporting the verdict that the jury's findings could only have been the result of a sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it]." Caruolo v. John Crane, Inc., 226 F.3d 46, 51 (2d Cir. 2000).

### DISCUSSION

1. RICO Standing

The defendants first argue that they are entitled to judgment

15

as a matter of law because, at the time of trial, Flanagan's bankruptcy proceeding was still pending and therefore, the RICO claims were not yet ripe. In response, the plaintiffs maintain that to the contrary, their claims for RICO collection expense damages were ripe regardless of the status of the bankruptcy proceeding. The court agrees with the plaintiffs.

The law is clear that where a judgment creditor pursues a debtor in bankruptcy court for fraudulently conveying assets during that proceeding, RICO damages may be unrecoverable as speculative in the district court until the bankruptcy proceeding has terminated. Bankers Trust Co. v. Rhoades, 859 F.2d 1096, 1106 (2d Cir. 1988). The law is equally clear, however, that a claim for legal fees incurred as a proximate cause of a RICO violation constitutes a claim for RICO damages that does not fail for indefiniteness. Stochastic Decisions, Inc. v DiDomenico, 995 F.2d 1158, 1166-67 (2d Cir. 1993) (incurring legal fees was RICO injury where predicate acts included illegal actions impeding the plaintiff's collection efforts on outstanding judgment). Consequently, although Flanagan's bankruptcy case may still have been pending at the time of trial in this matter, the plaintiffs were nevertheless entitled to pursue RICO claims for damages incurred in collecting outstanding debts where the defendants had frustrated collection through fraud.

2. Sufficiency of the Evidence - $500,000 Damages

16