UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| THE CADLE COMPANY and<br>D.A.N. JOINT VENTURE,<br>A LIMITED PARTNERSHIP, | §<br><br>§ | No. 3:01CV531(AVC) |
| Plaintiffs, | § | |
| vs. | § | |
| CHARLES A. FLANAGAN, et al. | § | APRIL 27, 2007 |
| Defendants. | § | |

**PLAINTIFFS' OBJECTION TO DEFENDANT JOSEPH CAPORALE'S MOTION TO SET ASIDE DEFAULT AND PLAINTIFFS' RESPONSE TO DEFENDANT JOSEPH CAPORALE'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' SECOND AMENDED MOTION FOR FINAL DEFAULT JUDGMENT**

The Plaintiffs, The Cadle Company and D.A.N. Joint Venture, A Limited Partnership (collectively "Plaintiffs"), hereby respond to Defendant Joseph Caporale's ("Caporale") Motion to Set Aside Default ("Motion") and Caporale's Memorandum in Opposition to Plaintiff's Second Amended Motion for Final Default Judgment ("Memorandum") (collectively the "Caporale Pleadings".) For the reasons set forth below, Caporale's requested relief should be denied.

**I.   Caporale Likely Knew of Attorney Skelton's Death In 2002.**

Caporale argues he last spoke to his attorney, Robert Skelton, on September 7, 2001. Attorney Skelton died on August 3, 2002. His Affidavit further claims he has no recollection of having received various pleadings which were certified to his home address. According to the Caporale Pleadings, Caporale had no knowledge of Attorney Robert Skelton's death for over four years until Plaintiff's Second Amended Motion For Final Judgment, dated December 18, 2006, and this Court's Order to Show Cause, dated February 25, 2007, were sent to him.

It strains credulity to believe that Caporale had actively retained counsel to defend himself in a major RICO case in U.S. District Court involving himself and approximately eleven other defendants, and that from September 7, 2001 to the present he never heard another word from his attorney, presumably because he thought the case had been resolved in his favor. It also appears unlikely that Caporale would retain Attorney Skelton (who also represented his wife's second cousin and her husband, former co-defendants Charles and Lisa Flanagan) and then never hear another word from him for over five years without making even the slightest inquiry into the status of his case.

On October 6, 2000, Caporale testified at a Bankruptcy Rule 2004 examination where he admitted that he and his wife

socialized with the Flanagans on a yearly basis and that the wives also spoke to each other on the telephone.  See, Rule 2004 Examination of Joseph Caporale, dated October 6, 2000 at pgs. 5-6, attached hereto as exhibit A (hereinafter "Transcript").  Obviously, Caporale never received any legal bills, correspondence, copies of pleadings, telephone calls or other forms of communication from Attorney Skelton during the last four and one half years after his death.  Plaintiffs do not believe Caporale had a good faith understanding the Court had ruled in his favor and Attorney Skelton simply closed his file without even informing his client(s) of the good news or without sending a bill.  Plaintiffs also do not believe that Caporale testified at the RICO trial under force of subpoena without first making an attempt to call Attorney Skelton.  When he testified at the Rule 2004 examination which took place before this lawsuit was filed, he had his own legal counsel in attendance.  Transcript at pg. 2.  Given the totality of the circumstances, including the Caporales' relationship with the Flanagans, who were also represented by Attorney Skelton and certainly knew of his death, it is more likely than not that Caporale knew full well of Attorney Skelton's death and rather than retain new counsel, he instead chose to ignore the lawsuit in its entirety in hopes of it disappearing.

### II. Caporale Was An Active Participant In Charles Flanagan's Scheme to Defraud His Creditors.

Caporale was a willing participant and assisted Charles Flanagan in hiding his assets from his creditors, thereby preventing Plaintiffs from exercising their lawful judgment claims against Flanagan. Caporale voluntarily took title to three of Charles Flanagan's rental properties at a time when he knew Flanagan had financial problems. Transcript at pgs. 8, 37. Together, they opened a bank account into which rental payments from the properties were deposited. Id. at pg. 23. Lisa Flanagan collected rent checks from a Hamden, CT postal box and Caporale, at Charles Flanagan's behest, signed numerous blank checks so that Charles Flanagan could use the rental monies, presumably for his own personal use. Id. at pgs. 23-30, 36. When asked about his involvement, Caporale was evasive and gave testimony which contradicted itself.

For instance, he testified that in October or November of 1998 he agreed to take title to three of Charles Flanagan's properties because "[he] thought [he] could come in and restructure all of his property and then give it back to him again." Transcript at pg. 7. When asked what he meant by "restructure his property", Caporale testified that he thought he could straighten Charles Flanagan's finances out. Id. Later, when asked what he knew of Charles Flanagan's financial problems

back during that same timeframe, his response was "nothing".
Id. at pg. 9.

> Q.      Did he say he had financial problems or he had problems with those properties?
>
> A.      Problems.
>
> Q.      He didn't say which?
>
> A.      No.

Transcript at pg. 12.

As shown below, Caporale could never satisfactorily explain how taking title to Flanagan's real estate would solve Flanagan's problems if he did not know what the problems were. In fact, his responses were nonsensical. Caporale testified that he knew he was taking title to three of Charles Flanagan's properties, but he had no idea why:

> Q.      Why did you want to take title to the property? Why wouldn't you just help him fix it up without taking title?
>
> A.      I don't know. I really don't know.

Transcript at pgs. 14-15.

Even though he knew he was taking title, Caporale testified he wanted to later buy the properties back from Charles Flanagan. Id. at pgs. 18, 20, 39.

> Q.      If he (Charles Flanagan) was going to quit claim a property to you, why would you have to pay him several years down the road?
>
> A.      Pay who?

-5-

    Q.        Pay Charles Flanagan.

    A.        I thought -- well, I shouldn't say that. I was going -- all right. He was going to quit claim the property over to me. Okay? Then we went in -- I went in and -- I am getting ahead of myself. I thought I would buy it from Charlie later.

Id. at pgs. 19-20.

He stated on two occasions that he wanted to make money from the transfer of properties to him (Id. at pgs. 12, 18), but he also testified that he never expected to receive payment (Id. at pg. 17) and never discussed money or the price he would be paying for the properties.

    Q.        So, you talked -- you talked about you paying him later for this? In other words, did you have a discussion with him?

    A.        Charlie and I?

    Q.        Yes.

    A.        Yes. We never discussed money whatsoever.

Transcript at pg. 20.

Though Caporale testified that he knew nothing of Charles Flanagan's financial problems, he thought he could take title to the three properties and "...we could build it up so it would be sound, and it would be a money maker." Id. at pg. 12. After taking title, he never went to any of the properties and never informed any of the tenants that he was the new owner. Id. at pgs. 54-55.

-6-

Caporale characterized his business relationship with Charles Flanagan as a "good venture" into which the two would be going together, although Caporale acknowledged there was never any discussion of what this venture might be until after it began. Transcript at pgs. 16-17, 44-45.

In spite of the fact that he was going to "straighten" out Charles Flanagan's finances, Caporale decided he want out of the venture, because, as he testified, he received a bill and a phone call from the water company. <u>Id</u>. at pgs. 40-41. When shown rent checks made out to him and endorsed by someone signing his name, Caporale testified that he had no idea who forged his name to the rent checks. <u>Id</u>. at pg. 58.

Caporale's suggestion that he was duped into taking title to the three properties from Charles Flanagan is a fallacy. His actions are not consistent with someone who set out with honest intentions to help another with their financial problems. Caporale was actively involved in helping Charles Flanagan avoid his creditors and he went into this "venture" with Charles Flanagan with open eyes. He agreed to open a bank account. He agreed that rent checks should go to a post office box in Hamden, CT. He suggested that Lisa Flanagan be involved. She took the rent checks and negotiated them for her husband's benefit. Caporale knew full well that Charles Flanagan had financial problems and he knew, or should have known, that by

taking title to Flanagan's real estate and allowing the rent checks to be diverted to a post office box he would be hindering the collection efforts of Charles Flanagan's creditors, including the Plaintiffs.

Caporale's testimony on this subject also puts at issue the question of whether he knew of Attorney Skelton's death in August, 2002.  The Flanagans were also being represented herein by Attorney Robert Skelton.  Because of the personal, family and business relationships between these parties, we may safely assume that Caporale knew of Attorney Skelton's death back in 2002.  His prior testimony is not credible.  He most certainly was not telling the whole story.  Caporale obviously ignored this lawsuit in hopes that the other defendants would prevail in having it dismissed.  He took his chances and lost.  A jury has already ruled that all of the appearing defendants had engaged in a civil conspiracy to hinder and defraud Charles Flanagan's creditors by preventing them from exercising their lawful judgment claims against Charles Flanagan.  Caporale was part of that conspiracy.

Now Caporale is asking the Court to hold a second trial on this issue.  This is highly prejudicial to the Plaintiffs, who should not be forced to relitigate all of their claims at a separate hearing when all of this could have been put before the jury in 2005.

For all of the foregoing reasons, defendant Caporale's Motion To Open Default should be denied, and this Court should enter judgment in Plaintiffs' favor under their Second Amended Motion for Final Default Judgment.

PLAINTIFFS,
The Cadle Company, DAN Joint Venture, A Limited Partnership

By_____
Edward C. Taiman, Jr. Esq.
CT Federal Bar #CT01319
Barry & Taiman, LLC
202 West Center Street
Manchester, CT  06040
(860) 649-4400
Fax (860) 645-7900

**CERTIFICATION OF SERVICE**

I hereby certify that on April 27, 2007, a copy of the foregoing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

By _____
Edward C. Taiman, Jr.
Barry & Taiman, LLC
202 West Center Street, 1st Floor
Manchester, CT 06040
860-649-4400
Federal ID No. CT01319

-10-

```
ECT/he
C\Cadle Company\Flanagan\Flanagan\RICO\Obj to Def Caporale Mot to Set Aside Default 4.18.07.doc
```