COPY

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF CONNECTICUT

NEW HAVEN DIVISION


In Proceedings Under Chapter 11


Case Number: 99-30565 (ASD)


- - - - - - - - - - - - - - - - - - - - - - - - - -

IN RE:

      CHARLES ATWOOD FLANAGAN,

              Debtor.

- - - - - - - - - - - - - - - - - - - - - - - - - -


2004 EXAMINATION OF

JOSEPH CAPORALE

October 6, 2000




## The Cunningham Group, Inc.

Total Litigation Management

111 Gillett Street
(Corner Asylum Ave.)
Hartford, CT 06105
860-521-3664

Danbury
203-797-8107

Stamford
203-356-1229

Nationwide 800-842-4486
www.cunninghamreporting.com

J. CAPORALE - 10/06/00

2

```
 1    A p p e a r a n c e s :

 2        For The Cadle Company:

 3            SABIA & HARTLEY, LLC.

 4            190 Trumbull Street

 5            Suite 202

 6            Hartford, Connecticut  06103-2205

 7              By:  EDWARD C. TAIMAN, JR., ESQ.

 8

 9        For the Debtor:

10            NEUBERT, PEPE & MONTEITH, P.C.

11            195 Church Street

12            13th Floor

13            New Haven, Connecticut  06510-2026

14              By:  DOUGLAS S. SKALKA, ESQ.

15

16        For the Witness:

17            JOHN P. COLEMAN, ESQ.

18                1200 Summer Street

19                Suite 201 C

20                Stamford, Connecticut   06905

21

22

23

24

25
```

CUNNINGHAM REPORTING ASSOCIATES

J.  CAPORALE - 10/06/00

3

1            ...The following is the

2    Deposition of JOSEPH CAPORALE of 36 Coachman

3    Drive, Branford, Connecticut 06405, taken in

4    the above-entitled cause, pending in the

5    United States Bankruptcy Court for the

6    District of Connecticut, New Haven Division,

7    pursuant to Notice, Subpoena and the Federal

8    Rules of Civil Procedure, before Jenny C.

9    Ebner, R.P.R., L.S.R., a Notary Public duly

10   commissioned and qualified, at the offices of

11   United States Bankruptcy Court, 157 Church

12   Street, New Haven, Connecticut, on October 6,

13   2000, at 12:20 o'clock p.m., at which time

14   counsel appeared as hereinbefore set forth,

15   and also present was Charles Flanagan...

16

17               STIPULATIONS

18            Formalities as to proof of the

19   authority of the Notary Public and

20   sufficiency of notice are waived.

21            The deposition may be signed

22   before any Notary Public.

23

24

25

CUNNINGHAM REPORTING ASSOCIATES

J. CAPORALE - 10/06/00

4

1    J O S E P H    C A P O R A L E,

2         called as a witness, being first duly

3         sworn by Jenny C. Ebner, R.P.R.,

4         L.S.R., a Notary Public duly

5         commissioned and qualified, was

6         examined and testified on his oath as

7         follows:

8                    (Caporale Deposition Exhibits

9    1 through 15:  Marked for identification.)

10                   EXAMINATION

11   BY MR. TAIMAN:

12         Q.   Good afternoon, Mr. Caporale.

13         A.   Good afternoon.

14         Q.   My name is Ted Taiman, and I

15   represent The Cadle Company.  I am going to

16   be asking you a series of questions.  Have

17   you ever had your deposition taken before? .

18         A.   Once.

19         Q.   I will be asking you a number of

20   questions.  If you don't understand or hear

21   the question, let me know, because if you

22   answer the question it's assumed that you

23   both heard and understood it.

24         A.   Correct.

25         Q.   Make sure when you do respond to a

CUNNINGHAM REPORTING ASSOCIATES

J. CAPORALE - 10/06/00

1    question that you do so audibly so the Court

2    Reporter can take down your response.

3           A.    Okay.

4           Q.    Sir, what is your occupation?

5           A.    Retired.

6           Q.    How long have you been retired?

7           A.    Eight years.

8           Q.    Prior to your retirement, what did

9    you do for a living?

10          A.    Worked for the post office.

11          Q.    How many years?

12          A.    Thirty-one years.

13          Q.    Where would that be located?

14          A.    New Haven.

15          Q.    What is street address of that post

16   office?

17          A.    Fifty Brewery Street.

18          Q.    Now, do you know Charles Flanagan?

19          A.    Yes.

20          Q.    How long have you known him?

21          A.    Quite a few years.

22          Q.    How many years back would you say,

23   ten years, fifteen?

24          A.    I would go back better than

25   fifteen.

CUNNINGHAM REPORTING ASSOCIATES

J. CAPORALE - 10/06/00

6

1    Q.    Under what circumstances did you

2  first meet him?

3    A.    Charlie's wife and my wife, they

4  are second cousins.

5    Q.    I see.  Okay.  How often do you --

6  let me ask the question a different way.

7         Do your wife and his wife continue

8  to socialize?

9    A.    They speak on the phone, yes.

10   Q.    Have you ever gotten together

11 socially with Charles and his family?

12   A.    Yes.

13   Q.    How often do you do that?

14   A.    Maybe twice a year.

15   Q.    Going back over these years, last

16 10 or 15 years, once or twice a year you

17 would get together?

18   A.    Yes.

19   Q.    Now, prior to attending today's

20 deposition, did you have any discussions with

21 Charles Flanagan about this particular

22 deposition?

23   A.    Did I?

24   Q.    Yes.

25   A.    No.

1      Q.    Did there come a time when Charles

2    Flanagan discussed with you your taking title

3    to some of his properties?

4      A.    Yes.

5      Q.    Do you recall when that was?

6      A.    I believe it was October, November

7    of 1998.

8      Q.    What did he say to you?

9      A.    Well, I was interested.  I used to

10   own property before, with my brothers, so,

11   now, I knew Charlie was going through bad

12   times, so I thought I could come in and

13   restructure all of his property, and then

14   give it back to him again.

15     Q.    What do you mean by restructure his

16   property?

17     A.    Straighten everything out.

18     Q.    What was your understanding of what

19   needed to be straightened out?

20     A.    His finances.

21     Q.    His finances?

22     A.    Uh-huh.

23     Q.    That is different from the property

24   itself, is it not, or are we talking about

25   the same thing?

1      A.    Well, he had problems with his

2   property, financially, and I thought maybe I

3   could step in and help him out, and let it go

4   back to him again, and he could start all

5   over.

6      Q.    Why did he have to deed you the

7   property?

8      A.    Well, one time I thought I was

9   going to take it over.  I was going -- I

10   would buy it from him.

11      Q.    What properties have you owned in

12   the past that --

13      A.    I own two stores, two houses.

14      Q.    Were they multifamily units?

15      A.    Yep.

16      Q.    How many families in each,

17   two-family houses?

18      A.    Two-family houses and one was a

19   three.

20      Q.    What towns are these properties

21   located in?

22      A.    New Haven.

23      Q.    Do you still own them?

24      A.    No.

25      Q.    When did you last own one of those

1    properties?

2         A.    Nineteen seventy-eight.  That is

3    when my brothers and I sold everything.

4         Q.    What was the street address?

5         A.    Whalley Avenue, Henry Street, and

6    Water Street.

7         Q.    Now, what do you know of Charles

8    Flanagan's financial problems?  Let's go back

9    and put it in a time frame.  Back in October

10   or November of 1998, when he first discussed

11   with you the possibility of your taking title

12   to some of his real estate, what did you know

13   about his financial problems at that time?

14        A.    Nothing.

15        Q.    Did you know he was in trouble?

16        A.    No.

17        Q.    What exactly did he say to you?

18        A.    Well, he asked me if I would -- if

19   he could quit claim the houses over to me,

20   and going down the road I would buy them from

21   him.  I agreed.

22        Q.    So you are saying he was going

23   to -- you discussed him quit claiming the

24   property to you?

25        A.    Uh-huh.

J. CAPORALE - 10/06/00

10

1    Q.    Down the road you would buy them

2    from him?

3    A.    Eventually, yes.

4    Q.    And how far was down the road, in

5    your mind?  What did that mean to you?

6    A.    I thought maybe a couple years.

7    Q.    Did you ever discuss a price for

8    how much would you pay?

9    A.    No.

10    Q.    What properties did he say he was

11    interested in deeding over to you?

12    A.    Whitney Avenue, George Street and

13    Howell Street.

14    Q.    Let's talk about the Whitney Avenue

15    property.  Do you know what the street

16    address is for the Whitney Avenue property?

17    A.    No, I don't.

18    Q.    What about the George Street

19    property, do you know the street address?

20    A.    Five something.

21    Q.    So you don't know?

22    A.    I really don't know.

23    Q.    Okay.  How about the Howell Street

24    property?

25    A.    I believe it's 17.

1      Q.   What town is the George Street

2   property located in?

3      A.   New Haven.

4      Q.   What about the Whitney Avenue

5   property?

6      A.   Hamden.

7      Q.   Howell Street property?

8      A.   New Haven.

9      Q.   When was the last time -- ask this

10  a different manner -- how many times have you

11  been out to the Howell Street property?

12     A.   None.

13     Q.   What about the George Street

14  property, how many times have you been out to

15  the George Street property?

16     A.   None.

17     Q.   Whitney Avenue property?

18     A.   None.

19     Q.   Back in October or November of

20  1998, the two of you discussed your taking

21  title to those properties?

22     A.   Correct.

23     Q.   Were there any other properties you

24  discussed taking title to?

25     A.   No.

J. CAPORALE - 10/06/00

12

1      Q.    Any reason why you have to take

2   title to the property in order to --

3      A.    Pardon me?

4      Q.    Is there any reason why you

5   discussed taking title to the property?  In

6   other words, what did you envision yourself

7   doing with these three properties?

8      A.    Like I said before, I thought we

9   could build it up where it would be sound,

10  and it would be a money maker.

11     Q.    What did he tell you about the

12  properties that you thought you could fix, in

13  other words?

14     A.    Nothing.

15     Q.    How did you know there was a

16  problem?

17     A.    He told me there were problems, but

18  he never said what.

19     Q.    So all you knew was that he had

20  problems.  Did he say he had financial

21  problems or he had problems with those

22  properties?

23     A.    Problems.

24     Q.    He didn't say which?

25     A.    No.

J. CAPORALE - 10/06/00

13

1    Q.    So then how would taking title to,

2    let's say, the Howell Street property solve

3    some of his problems if you didn't know what

4    the problems were?

5    A.    Well, if I remember correctly, he

6    had that property, then it wasn't fully

7    rented.  He had empty rooms there or empty

8    apartments, and they had to be fixed up.  I

9    thought, maybe, I could go in there and fix

10   them up so he could rent them.

11   Q.    So you did know some of the nature

12   of some of the problems; is that what you are

13   testifying to now?

14   A.    I knew at the apartments, yes.

15   Q.    What about the George Street

16   property?

17   A.    I don't know nothing about that

18   property.

19   Q.    Well, did he talk to you about the

20   Howell Street property and some of the

21   problems and not the George Street property?

22   A.    We never got to George Street.

23   Q.    What did you talk about as far as

24   the Howell Street property is concerned?

25   A.    I thought I could go in there and

CUNNINGHAM REPORTING ASSOCIATES

1    fix the them up so they could be rented out,

2    and that would bring money into the apartment

3    house.

4         Q.    How many apartments are in this

5    building?

6         A.    Jesus, I don't know.  I really

7    don't know.

8         Q.    Do you have a rough idea?

9         A.    No, I don't.  I can't give you a

10   number.

11        Q.    What about the George Street

12   property, do you have any idea how many

13   apartments are in that building?

14        A.    I think four.

15        Q.    How do you know there were four if

16   you have never seen the building?

17        A.    Charlie told me he had four

18   apartments there.

19        Q.    What about the Whitney Avenue

20   property?

21        A.    I have no knowledge of that

22   property whatsoever.

23        Q.    Well, why did you want to take

24   title to the property?  Why wouldn't you just

25   help him fix it up without taking title?

1         A.    I don't know.  I really don't know.

2         Q.    Did you ever ask him, "Why do I

3     need to take title to the property"?

4         A.    No.  No, I never asked.

5         Q.    All right.  After your discussion

6     in October or November of 1998, what was the

7     next thing that took place?  When was the

8     next time you talked to him about it, or did

9     you, in fact, take title right away?

10        A.    If I remember correctly, I took

11    title, maybe, right after the first of the

12    year.

13        Q.    First of -- sometime?

14        A.    Ninety-nine.

15        Q.    Sometime in January of 1999?

16        A.    I believe so, yes.  I am not sure.

17.       Q.    Where were you when you discussed

18    with him taking title back in October or

19    November of 1998?  Were you at his house,

20    your house?

21        A.    We had coffee together at Dunkin'

22    Donuts.

23        Q.    What town?

24        A.    Branford.

25        Q.    He drove out to your town?

J. CAPORALE - 10/06/00

16

1          A.    Yes.

2          Q.    He must have, obviously, called you

3     prior to that meeting?

4          A.    Yes.

5          Q.    What did he tell you on the phone?

6          A.    That he wanted to talk to me.

7          Q.    What was your response?

8          A.    "I will meet you."

9          Q.    Did he indicate the nature of the

10    intended meeting?

11         A.    No.

12         Q.    Did he say he had some problems, I

13    need to talk to you about?

14         A.    No.

15         Q.    So you are at the Dunkin' Donuts in

16    Branford, having coffee, and is that when he

17    said to you -- what did he tell you?

18         A.    He asked me if I would like to go

19    into a venture with him, that he would quit

20    claim the properties over to me, and I told

21    him down the road I would try to buy them

22    from him.

23         Q.    In other words, the two of you

24    would go in to the venture together?

25         A.    Yes, I would say so, yes.

CUNNINGHAM REPORTING ASSOCIATES

J. CAPORALE - 10/06/00

17

1    Q.    What was in this for you?  In other

2    words, did you guys -- you must have

3    discussed money?

4        A.    No money was discussed.

5        Q.    What was the arrangement of this

6    venture?

7        A.    There wasn't any until we started.

8        Q.    All right.  What was your -- did

9    you have any assumptions that you were going

10   to be paid something?

11       A.    No.

12       Q.    Why would you do this?

13       A.    Why would I do this?  I was

14   retired.  I had nothing to do.

15       Q.    Did you expect to receive some type

16   of remuneration or payment?

17       A.    No.

18       Q.    So you went into this, never

19   expecting anything?

20       A.    True.

21       Q.    You were going to do all this work

22   for free?

23       A.    My labor, yes.

24       Q.    Did you put any money into this

25   venture?

1      A.    No.

2      Q.    Do you feel you, in fact, went into

3  some type of joint venture with Mr. Flanagan?

4      A.    Joint venture?

5      Q.    You talked about some type of

6  business arrangement that the two of you were

7  going to go into; is that fair to say?

8      A.    No, I wouldn't say a business

9  venture.

10      Q.    What was your understanding of what

11  the two of you were going to be doing?

12      A.    I thought, maybe, one day the

13  property would be sound.  I would buy it; I

14  could make money from it.  That was it, but

15  it didn't happen.

16      Q.    You testified a few moments ago

17  that you really knew nothing about the Howell

18  Street property.  You knew very little about

19  the George Street property, and apparently

20  very little also about the Whitney Avenue

21  property.  So what was your understanding of

22  what you were going to be doing?

23      A.    I knew a couple of the apartments

24  at Howell Street were vacant, and they needed

25  repairs.  I thought I could go in there and

J. CAPORALE - 10/06/00

19

1    repair them so they could be rentable.

2         Q.    What was the next conversation you

3    had with Mr. Flanagan concerning your going

4    into this arrangement with him?

5         A.    Well, he called me, and he says

6    that he was going to get his attorney and

7    quit claim the properties over to me.

8         Q.    Who was his attorney?

9         A.    I think it was Mr. Reynolds.

10        Q.    Now, did you ever meet the

11   attorney?

12        A.    I spoke to him on the phone.

13        Q.    What did he tell you?

14        A.    He told me that Charlie wanted to

15   quit claim the property over to me if it was

16   okay.

17        Q.    Do you understand what "quit claim"

18   means?

19        A.    Yes.  Goes from his name to my

20   name.

21        Q.    If he was going to quit claim a

22   property to you, why would you have to pay

23   him several years down the road?

24        A.    Pay who?

25        Q.    Pay Charles Flanagan.

CUNNINGHAM REPORTING ASSOCIATES

J.  CAPORALE - 10/06/00

20

1        A.    I thought -- well, I shouldn't say

2    that.  I was going -- all right.  He was

3    going to quit claim the property over to me.

4    Okay?  Then we went in -- I went in and -- I

5    am getting ahead of myself.

6             I thought I would buy it from

7    Charlie later.

8        Q.    Pay him later?

9        A.    Yes.

10        Q.    How much were you going to pay him?

11        A.    We never put any value on the

12    property.

13        Q.    But did you have any idea as to how

14    much you were going to pay him?

15        A.    No, I didn't.

16        Q.    So, you talked -- you talked about

17    your paying him later for this?

18             In other words, did you have a

19    discussion with him?

20        A.    Charlie and I?

21        Q.    Yes.

22        A.    Yes.  We never discussed money

23    whatsoever.

24        Q.    What gave you the idea you would be

25    paying him for these properties at a later

J. CAPORALE - 10/06/00

21

1   time?

2         A.    Because it's only right to do that.

3         Q.    Well, you understand the

4   significance of taking title to real estate,

5   do you not?

6         A.    Yes.

7         Q.    Do you own your home where you live

8   now?

9         A.    I do.  I don't, but the bank owns

10  it.

11        Q.    I understand.  You were willing to

12  take title to these properties without ever

13  seeing them?

14        A.    Yes.

15        Q.    Are you aware that there can be

16  criminal repercussions for owning property if

17  certain services are not provided to the

18  tenants, if you don't provide heat, for

19  instance?

20        A.    Of course, yes.

21        Q.    You were willing to take title to

22  these properties without looking at them?

23        A.    Yes.

24        Q.    Without even knowing what kind of

25  condition they were in?

J. CAPORALE - 10/06/00

22

1  A. Correct.

2  Q. Did you discuss this with anybody

3 else?

4  A. No.

5  Q. Your wife?

6  A. Of course.

7  Q. Anybody else?

8  A. No.

9  Q. Did you ever discuss this with Lisa

10 Flanagan?

11  A. No.

12  Q. So just you and Charlie, and you

13 had some discussions with your wife?

14  A. That is all.

15  Q. All right.  So you had your

16 conversation at the Dunkin' Donuts in

17 Branford back in October or November of 1998?

18  A. Correct.

19  Q. When was the next time you spoke to

20 him or saw him, whatever the case may be?

21  A. I guess it was after January of

22 '99.

23  Q. You didn't see him over the

24 holidays?

25  A. No, I didn't.  No, not that year.

CUNNINGHAM REPORTING ASSOCIATES

J. CAPORALE - 10/06/00

23

1      Q.   So did you see him in January of

2   1999?

3      A.   Yes.

4      Q.   All right.  Where did you see him?

5      A.   Dunkin' Donuts.

6      Q.   Same Dunkin' Donuts?

7      A.   Yes.

8      Q.   What was discussed at that time?

9      A.   He thought that we should open up a

10   checking account together in a bank, so all

11   the rents would go into that checking

12   account.

13      Q.   Was this his suggestion?

14      A.   Yes.

15      Q.   What was your response?

16      A.   I went along with him.

17      Q.   Was it presumed at that time you

18   were going to get involved in the business,

19   this arrangement?

20      A.   Well, I told Charlie that I would

21   open up the checking account, but Lisa would

22   manage everything.

23      Q.   Lisa who?

24      A.   Flanagan.

25      Q.   She would manage the property?

1        A.    She would manage it.

2        Q.    What was the response to that?

3        A.    He said it was okay.

4        Q.    Which property were you referring

5    to, or were you referring to all three?

6        A.    All three.

7        Q.    Was that agreeable to him?

8        A.    Yes.

9        Q.    So it was your suggestion that Lisa

10   Flanagan began to manage these properties?

11       A.    Yes.

12       Q.    Why did you suggest Lisa Flanagan?

13       A.    I thought it would only be right.

14       Q.    Well, he owns the properties, and

15   he wants to deed them to you.  Why would it

16   be right that Lisa manage them?

17       A.·   That was my idea.  Let her manage

18   it.

19       Q.    What is your idea of "manage"?

20   When someone says "manage the property,"

21   what is your knowledge of that?

22       A.    Paying all of the bills.

23       Q.    Pay the bills?

24       A.    Right.

25       Q.    Writing the checks?

J. CAPORALE - 10/06/00

25

1     A.    Writing out the checks.  Correct.

2     Q.    What about collecting rent?

3     A.    Same thing.

4     Q.    Were you aware of whether or not

5  some of these properties might be in tough

6  neighborhoods?

7     A.    No.

8     Q.    Did you have any discussions with

9  Charles Flanagan about the type of

10 neighborhood the properties were in?

11    A.    No.  I knew what neighborhoods they

12 were in.

13    Q.    What is your understanding of

14 George Street?

15    A.    Safe.

16    Q.    What about Howell Street?

17    A.    Safe.

18    Q.    What is your understanding of how

19 one goes about collecting rent from these

20 properties?

21    A.    Say that again.

22    Q.    What is your understanding about

23 how one goes about to collect rent from these

24 properties?  Is it just simply a matter of

25 sitting back and waiting for the checks to

1    come in mail, or is there something else that

2    has to be done?

3         A.    You have to call them up or you

4    have to go over to the house and knock on the

5    door if they are behind.

6         Q.    You thought that was something that

7    might be appropriate for Lisa Flanagan to do?

8         A.    During the day, yes.

9         Q.    Why wouldn't you do this?

10        A.    Because I live in Branford.

11        Q.    You talked about fixing the

12   properties up?

13        A.    Yes.

14        Q.    You wouldn't fix them up from

15   Branford?

16        A.    I would be in New Haven then.

17        Q.    Why wouldn't you collect the rent

18   and fix them up at the same time?

19        A.    If I was in New Haven, I would, but

20   I never had to.

21        Q.    Why didn't you have to?

22        A.    Because I believe all of their

23   rents were being sent to a post office box.

24        Q.    What post office box is that?

25        A.    Charlie Flanagan, he set up the

1    post office box.

2        Q.    What town was that in?

3        A.    I think Hamden.  I am not sure.  I

4    am not sure on that.

5        Q.    Did you ever go to the post office?

6        A.    Did I ever go?

7        Q.    Yes.

8        A.    No.

9        Q.    Was this a new box that he talked

10   about setting up for the purpose of

11   collecting rent, or was this something that

12   had been in existence?

13       A.    I think this box was in existence.

14       Q.    You have to make sure I finish the

15   question before you answer.

16       A.    I am sorry.  Okay.

17       Q.    That is okay.  So you are having a

18   second meeting at Branford Dunkin' Donuts in

19   January of 1999?

20       A.    Uh-huh.

21       Q.    You brought up the idea that Lisa

22   Flanagan should manage these properties?

23       A.    Correct.

24       Q.    Then he was going to deed to you

25   the properties?

1          A.    Yes.

2          Q.    This is something you wanted to

3     have done?

4          A.    Did I want it done?

5          Q.    Did you want title to these

6     properties?

7          A.    I thought it would be good.

8          Q.    Was it your idea to take title?

9          A.    He asked me if I would, yes.

10         Q.    So you said yes?

11         A.    (Nodding in the affirmative.)

12         Q.    All right.  What else was discussed

13    at this meeting?

14         A.    That we would have a checking

15    account.

16         Q.    And where would this checking

17    account be? ·

18         A.    What do you mean, where would it

19    be?

20         Q.    What bank?  What town?

21         A.    I believe it was First Union, in

22    Branford.

23         Q.    Did you open up this checking

24    account?

25         A.    We both did.

1      Q.    You both did.  The two of you went

2    to First Union branch in Branford?

3      A.    Correct.

4      Q.    What street is that on?

5      A.    Main Street.

6      Q.    What discussions, if any, did you

7    have with Charles Flanagan concerning whose

8    name this bank account would be opened under?

9      A.    It was opened under both names.

10      Q.    That is your understanding?

11      A.    It was.

12      Q.    I am asking.

13      A.    Yes.

14      Q.    Okay.  What was the purpose of this

15    bank account?

16      A.    All the monies would go into the

17    account from the apartments.

18      Q.    Did you discuss with him changing

19    the location of the post office box to

20    something more convenient to you?

21      A.    No.

22      Q.    Why would you open up a bank

23    account that would, at least, be in your name

24    and his name in Branford, when his wife,

25    Lisa, is going to be paying the bills, and

J. CAPORALE - 10/06/00

30

1   she doesn't live in Branford?

2        A.    I believe the rents went to the

3   post office box in Hamden, and they live out

4   in Hamden, and Lisa went to the post office

5   box and picked up all those rent checks.

6        Q.    Okay.  Did she deposit those

7   checks?

8        A.    She did.

9        Q.    Did she deposit them in a local

10  branch of the First Union?

11       A.    I believe so.

12       Q.    Who received the monthly statements

13  from the bank account?

14       A.    They went to the post office box.

15       Q.    What was the name at the post

16  office box?  Was it under your name?

17       A.    No.

18       Q.    Under his name?

19       A.    Yes.

20       Q.    Do you know if it was under his

21  name or his wife's name?

22       A.    I have no idea.

23       Q.    Did you open up this bank account

24  the same day you met with Mr. Flanagan,

25  January of 1999?  We talked about the fact

J. CAPORALE - 10/06/00

31

1    you were at Branford Dunkin' Donuts.

2         A.    Not that day.  A couple days later.

3         Q.    What else was discussed at the

4    second meeting in Branford at the Dunkin'

5    Donuts?

6              Obviously, you came to an agreement

7    that you were going to go into this

8    arrangement with him concerning these

9    properties.

10        A.    Yes.

11        Q.    Was there ever anything put in

12   writing?

13        A.    Writing?

14        Q.    Yes.

15        A.    No.

16        Q.    Was it discussed that you were

17   going -- again, that you were going to take

18   title to these properties?

19        A.    Quit claim.

20        Q.    Was it discussed when this quit

21   claim was going to take place?

22        A.    No.

23        Q.    So as of January 1999, he had not

24   quit claimed the properties to you?

25        A.    You know, I don't know if it was

1   '99 -- maybe it was January '99. I don't

2   remember.

3        Q.   This is the year 2000; we are

4   talking about last year.

5        A.   I think it was last year, yes, '99.

6   January, '99, I believe it was. I am not

7   sure.

8        Q.   Okay. What else was discussed in

9   the second meeting at the Dunkin' Donuts in

10  Branford?

11       A.   Nothing.

12       Q.   You must have discussed getting

13  back together again to meet at the bank?

14       A.   We would a couple days later, yes.

15       Q.   Did he call you up to tell you to

16  meet him?

17       A.   No. I think we made the

18  appointment that day, a certain day we would

19  be at the bank.

20       Q.   All right. In fact, the two of you

21  meet at the bank?

22       A.   We did.

23       Q.   All right. Now, who filled out an

24  application form?

25       A.   We both did.

J. CAPORALE - 10/06/00

33

1    Q.   Together?

2    A.   Yes.

3    Q.   You signed the application form?

4    A.   I did.

5    Q.   Did he also sign it?

6    A.   He did.

7    Q.   Was the bank account in both of

8    your names?

9    A.   Yes.

10   Q.   Did you ever receive any other

11   documents from the bank concerning this bank

12   account?

13   A.   Yes.  I got an ATM card.

14   Q.   Do you still have that card?

15   A.   No.  I ripped it up.

16   Q.   So after you opened this account,

17   is it safe to say you never received any

18   documents whatsoever?

19   A.   None.

20   Q.   Did you ever withdraw any monies

21   from this account?

22   A.   None.

23   Q.   Did you ever put any money into

24   this account?

25   A.   None.

J. CAPORALE - 10/06/00

34

1        Q.    Did the bank require that there be

2    some type of deposit when it was initially

3    opened up, generally?

4        A.    I think we put in $25.

5        Q.    Was it your money or his?

6        A.    Charlie's money.

7        Q.    This was a checking account?

8        A.    Yes.

9        Q.    Do you know if there were any other

10    names on this checking account?

11        A.    Not to my knowledge.

12        Q.    Did the two of you have signatory

13    powers on this account, or was anyone else

14    included?

15        A.    Just the two of us.

16        Q.    Was Lisa Flanagan included?

17        A.    No.

18        Q.    How is she going to manage the

19    property by writing checks and paying bills

20    if she didn't have signatory powers on this

21    account?

22        A.    What happened then, Charlie took

23    his name off the bank account, and mine was

24    the only one.

25        Q.    How did he take his name off?

J. CAPORALE - 10/06/00

35

1        A.    I think he called the bank and had

2     it removed.  So, now, when he had to pay

3     bills, we used to meet, and I used to sign

4     blank checks for him, and then they used to

5     pay all of the bills.

6        Q,    Are you sure the bank would simply

7     remove his name from the account?

8        A.    I don't know how it happened,

9     Mr. Taiman.

10       Q.    My understanding is you have to

11    close the account down and reopen a second

12    account under one name.

13       A.    I don't believe that happened.

14       Q.    Is it possible that you were the

15    only one on that account from the very start?

16       A.    No, because we signed together.

17       Q.    Did you ever see any checks that

18    were printed on this account?  You must have

19    if --

20       A.    I signed them.

21       Q.    What was the name of the account?

22       A.    I never took notice.  I never took

23    notice.  Believe me, I never looked up on top

24    to see whose name was on it.  I just singed

25    wherever you sign your name.

J. CAPORALE - 10/06/00

36

1          Q.    How often did you get together to
2     sign checks?
3          A.    Maybe every couple weeks.
4          Q.    Once a month?
5          A.    Every two or three weeks, yes.  We
6     would have a meeting, and Charlie would tell
7     me what was going on, and if we had some
8     bills, he says, "Sign some blank checks and
9     we will pay them."
10         Q.    Well, after you opened the bank
11    account in Branford at the First Union Bank,
12    what was the next thing you did in connection
13    with this whole arrangement concerning the
14    properties?  Did you meet with him, meet with
15    his attorney?  What happened?
16         A.    Charlie and I we used to meet, and
17    he used to fill me in what was going on.
18         Q.    When you say "fill me in," what
19    would he tell you?
20         A.    He would tell me I would have to
21    sign some checks for him.
22         Q.    Blank checks?
23         A.    Blank checks, to pay utility bills,
24    taxes, mortgage.  So I would sign them, and
25    they would pay them.

J. CAPORALE - 10/06/00

37

1      Q.    What about taking title to the

2    properties, did you ever do that, take a quit

3    claim deed?

4      A.    I thought I did.

5      Q.    When did that take place?

6      A.    I thought it was January of '99.

7      Q.    In other words, where were you when

8    this supposedly took place?

9      A.    Where was I?

10      Q.    In other words, didn't he hand you

11    a deed at some point, or did he not?

12      A.    I think he did.  I am not sure.  I

13    really don't know.

14      Q.    Well, did he give you a deed at the

15    bank?

16      A.    Deed at the bank?  No.  Wait a

17    minute.  What bank?

18      Q.    The First Union Bank, when you met

19    to open up the account.

20      A.    No.

21      Q.    Did you ever meet at any other

22    banks?

23      A.    None.

24      Q.    Did you ever meet at any place

25    other than Dunkin' Donuts to discuss

J. CAPORALE - 10/06/00

38

1    business?

2        A.    Only Dunkin' Donuts.

3        Q.    Did you ever meet in his attorney's

4    office?

5        A.    No.

6        Q.    Did you ever meet Attorney

7    Reynolds?

8        A.    No.

9        Q.    Other than talking to Attorney

10   Reynolds the one time we discussed prior, did

11   you talk to him again, Attorney Reynolds

12   again?

13       A.    I might have.  I don't remember.

14       Q.    What is your understanding as far

15   as -- about when you took title to these

16   properties?

17       A.    What do you mean?

18       Q.    Well, at some point you must have

19   realized that you owned these properties?

20       A.    True.

21       Q.    When did that realization take

22   place?

23       A.    I thought it was January 1999 or

24   February 1999.  I don't know.

25       Q.    Did Charles Flanagan ever tell you

J. CAPORALE - 10/06/00

. 39

1    that he had a number of creditors pursuing

2    him?

3        A.    No.

4        Q.    No?

5        A.    No.

6        Q.    Why were you taking title?

7        A.    Why was I taking title?

8        Q.    Yes.    What was that trying to

9    accomplish?

10       A.    Well, I thought maybe some day I

11   would own them.

12       Q.    If you take title, you do own them.

13       A.    I mean really owned them.    That is

14   like -- no, I thought some day I would own

15   them.    I would pay Charlie for them.    It

16   didn't work out.

17       Q.    Why did you have to take title to

18   help him out?    Why couldn't you help him out

19   by fixing up the apartments without taking

20   title?

21       A.    I don't know.

22       Q.    You must have -- there must have

23   been a reason.    People don't take title to

24   real estate lightly.

25             Let me just remind you -- I know

J. CAPORALE - 10/06/00

40

1    your counsel -- I am not going to get into

2    what your counsel may have told you, but you

3    know you are under oath?

4         A.   Yes.

5         Q.   You know you are going to testify

6    in the United States Bankruptcy Court at a

7    subsequent time under penalties of perjury.

8    I am going to ask you again:  Why did you

9    take title to the property?

10        A.   I thought I would help Charlie out.

11        Q.   How is taking title helping him?

12        A.   Well, I thought if I could take the

13   title, fix up the apartments so they could be

14   rentable, he'd have an extra income coming

15   in.  It didn't happen.

16             I was getting harassed by

17   creditors.  I called up Charlie, and I said,

18   "I want out."  That is when he took my name

19   off the property again.

20        Q.   When did you call him up and tell

21   him you wanted out?

22        A.   Maybe three months down the road.

23        Q.   So April -- January, February,

24   March, April or May 1999?

25        A.   About April or May, somewhere

J. CAPORALE - 10/06/00

41

1      around there.

2           Q.    And what creditors were harassing

3      you?

4           A.    Water company.

5           Q.    Did they send you a bill?

6           A.    Most certainly did.

7           Q.    What was the bill for?  How much,

8      do you recall?

9           A.    I don't know.  Maybe 1,100, $1,200.

10          Q.    When you received this bill, what

11     was your reaction?

12          A.    I called up Charlie.

13          Q.    Right away?

14          A.    Of course.  I says, "Charlie,

15     didn't you pay this bill?"  I says, "They are

16     calling me up at the house."

17          Q.    They called you up at your house?

18          A.    Yes.

19          Q.    For what property was this, do you

20     recall?

21          A.    I am not sure.  I think it was

22     Howell Street.

23          Q.    After you believed you took title

24     to the property in January of 1999, why

25     didn't you go out to the property to start

CUNNINGHAM REPORTING ASSOCIATES

J. CAPORALE - 10/06/00

42

1   working on fixing them up?

2        A.    Because I went in the hospital for

3   an aneurysm operation.

4        Q.    When did that operation take place?

5        A.    I think it was February '98.

6        Q.    Nineteen ninety-eight or 1999?

7        A.    Ninety-nine.  I am sorry.

8        Q.    February 1999?

9        A.    Yes.

10        Q.    Which hospital did you go into?

11        A.    Saint Raphael's.

12        Q.    You have to excuse my lack of

13   medical knowledge.  Would that be a brain

14   aneurysm?

15        A.    Aorta.

16        Q.    How long were you in the hospital

17   for?

18        A.    A week.

19        Q.    Were you advised by your doctors

20   not to -- what did they advise you?

21        A.    I couldn't do anything.

22        Q.    When in February did this take

23   place, beginning or end or middle?  Do you

24   recall what?

25        A.    What?  The operation?

J. CAPORALE - 10/06/00

43

1      Q.    Yes.

2      A.    I think it was around the 13th or

3   12th.

4      Q.    Now, after you took title to the

5   properties, and prior to your aneurysm, why

6   didn't you go out to look at them?  You had a

7   bank account opened up, took title.

8      A.    I believe 1998 --

9      Q.    Nineteen ninety-nine we are talking

10   about.

11      A.    Okay.  Nineteen ninety-nine.  I

12   don't know.  I don't know if it was the

13   weather involved or what, I don't.

14      Q.    We had a very mild winter last

15   winter.

16      A.    I think I went on vacation.  Was it

17   last year?  I really don't remember.  I

18   really don't remember.

19      Q.    Did you go to Florida in the

20   wintertime or other southern location?

21      A.    No.  I go to Florida, yes.

22      Q.    Do you go to Florida every year?

23      A.    Every other.

24      Q.    Did you -- you sat with Charles

25   Flanagan on several occasions?

J. CAPORALE - 10/06/00

44

1       A.    Uh-huh.

2       Q.    You talked about taking title to

3    the properties?

4       A.    Uh-huh.

5       Q.    In fact, you took title to the

6    properties and opened up a bank account

7    together?

8       A.    Uh-huh.

9       Q.    Did you feel that in -- in a

10    certain sense that you were in a partnership

11    with him on these properties?

12       A.    Would I say that?  No.  I really

13    wouldn't.

14       Q.    Did you feel you were in business

15    together?

16       A.    No.

17       Q.    You were on your own; is that how

18    felt?

19       A.    I just thought I was helping him.

20    That is all.

21       Q.    You knew you were working together

22    on this whole situation?

23       A.    Yes, yes, yes.

24       Q.    I think you used the term "venture"

25    of some sort?

J. CAPORALE - 10/06/00

45

1       A.    I thought it was going to be a good

2   venture, yes.

3       Q.    Now, during the time that you had

4   your name on the title to these properties,

5   did you ever speak to Lisa Flanagan about --

6       A.    No, never did.

7       Q.    Let me finish the question -- about

8   the collection of rents?

9       A.    No, never.

10      Q.    Did you ever talk to her about

11  anything?

12      A.    I talked to her, but nothing about

13  this.

14      Q.    You, at one point, thought it would

15  be a good idea to have her manage the

16  properties?

17      A.    Uh-huh.

18      Q.    Is that true?

19      A.    I told Charlie, I said, "Have Lisa

20  manage it."

21      Q.    What was his response?

22      A.    He said it was okay.  I don't know

23  if he told her that I suggested it.  I don't

24  know.

25      Q.    You mean you never spoke to her at

J. CAPORALE - 10/06/00

46

1    all about it?

2         A.    To Lisa?

3         Q.    Yes.

4         A.    Never.

5         Q.    But you know that she picked up the

6    checks and deposited them in the bank

7    account.  Correct?

8         A.    To my knowledge, yes.

9         Q.    Is that something that would have

10   been communicated to you by Charles Flanagan?

11        A.    He told me Lisa was going to the

12   post office box, yes.

13        Q.    Did you ever say to Charles, "Hey,

14   what is in this for me"?

15        A.    Never.

16        Q.    Sir, if I may ask, how old are you?

17        A.    Sixty-eight.

18        Q.    Now, you are here today pursuant to

19   a Subpoena Duces Tecum that was served upon

20   you, and actually it requested that you

21   attend a deposition which was going to take

22   place at an earlier date and time.

23             I have marked as Exhibit 1 a copy

24   of the Subpoena which originally requested

25   that you attend the deposition up in

J. CAPORALE - 10/06/00

47

1     Hartford.

2         A.   Correct.

3         Q.   As a convenience to all parties

4     involved, we are down here in New Haven

5     today.  I am going to see if you recognize

6     that as being a copy of the Subpoena that was

7     served upon you.  I see, in your file, a

8     Subpoena right on top.

9         A.   This is it.

10        Q.   In your envelope.  Actually this

11    right here (indicating).

12        A.   Okay.  Yes.

13        Q.   Okay.  It is like a copy?

14        A.   Same.

15        Q.   This Subpoena requested that you

16    produce with you copies of all documents in

17    your actual or constructive possession

18    relating to Charles Flanagan, as well as

19    475-81 George Street, New Haven, Connecticut;

20    2790 Whitney Avenue, Hamden, Connecticut; and

21    17 Howell Street, New Haven, Connecticut, and

22    it goes on to say, "this includes but is not

23    limited to all correspondence, memos, rent

24    rolls, bills, receipts, checks, deeds and

25    bank statements," and also requests that you

J. CAPORALE - 10/06/00

48

1    produce your 1998 and 1999 federal tax

2    returns.

3            Do you have any documents that are

4    responsive to this Subpoena?

5        A.    No.

6            MR. COLEMAN:    The documents we

7    turned over at the beginning of the hearing

8    were the documents we have.

9            MR. TAIMAN:    Okay.    Very

10    well.    For the record, we have -- if we could

11    have the Reporter mark this.    For the record

12    we have a quit claim deed, appears to be a

13    quit claim deed, and it appears to deed

14    property identified as Schedule A as attached

15    to it, and it appears to be the 475-41 George

16    Street property, deeded back to Charles

17    Flanagan, and it's dated September 11, 2000.

18            MR. TAIMAN:    Could you mark

19    that, please?

20            (Caporale Deposition Exhibit

21    14:    Marked for identification.)

22    BY MR. TAIMAN:

23        Q.    All right.    The copy of the quit

24    claim deed has been marked as Exhibit 14.

25            Sir, as I said a moment ago, this

J. CAPORALE - 10/06/00

49

1  deed is dated September 11, 2000.  Now, I

2  thought you mentioned that you had asked that

3  the properties be deeded back to Charles

4  Flanagan back in May of 1999.

5       A.    Correct.

6       Q.    Okay.  Why was this document -- why

7  did you deed this property back in September

8  of this year, of the year 2000, which is all

9  of a few weeks ago?

10      A.    Correct.  Because I think the first

11  one didn't take.

12      Q.    The first one -- when you say the

13  "first one," was there a prior deed you

14  prepared?

15      A.    Yes.

16      Q.    Who actually prepared this deed?

17  Did you retain counsel to prepare that, or

18  did you do it yourself?

19      A.    No.  I didn't do it.

20      Q.    Who prepared that deed?

21            MR. SKALKA:  Maybe I can help

22  you out on this one.  For the record, Douglas

23  Skalka on behalf of Mr. Flanagan.  The George

24  Street property, in my review of the records,

25  did not reflect the transfer -- original

CUNNINGHAM REPORTING ASSOCIATES

J. CAPORALE - 10/06/00

1    transfer from Mr. Flanagan to

2    Mr. Caporale, but I believe there was a deed

3    signed by Mr. Flanagan conveying the property

4    to Mr. Caporale sometime in, I believe in

5    1998 or could have been 1999, at some point.

6    It's not on the land records.

7                    As a protective measure,

8    because no one seemed to know where that

9    original deed is, my office prepared that

10   quit claim deed so that title would

11   clearly -- if somehow the property was

12   recorded, if the missing deed is recorded,

13   there would be a deed back to Mr. Flanagan.

14   BY MR. TAIMAN:

15        Q.   Okay.  Did you sign this at the law

16   office of Neubert, Pepe and Monteith?

17        A.   No.

18        Q.   Where did you sign this deed?

19        A.   Charlie Flanagan's office.

20        Q.   Did he call you up to ask you to

21   come down and sign this document?

22        A.   Yes.

23        Q.   What did he tell you?

24        A.   He said he had the quit claim deed

25   to be signed.

J. CAPORALE - 10/06/00

51

1       Q.    What was your response to that?

2       A.    I says I thought we already did it.

3       Q.    His response?

4       A.    He says the first one got lost

5   somehow so they had to make out another one.

6       Q.    Now, did you just sign one deed at

7   that time, or was there more than one deed

8   being signed?

9       A.    On this day?

10      Q.    On that day?

11      A.    One.

12            MR. SKALKA:  For the record, I

13  will add that deed is being held by my

14  office.  It has not been recorded.

15            MR. TAIMAN:  The original?

16            MR. SKALKA:  The original.

17  BY MR. TAIMAN:

18      Q.    Do you recall deeding back the

19  other properties, or actually all three

20  properties to Mr. Flanagan?

21      A.    Yes.

22      Q.    When did that place?

23      A.    Last year.

24      Q.    Last year?

25      A.    Uh-huh.

J. CAPORALE - 10/06/00

52

1    Q.    Was it in -- do you recall, was it

2    in May?  I think you mentioned earlier, was

3    it May 1999 or thereabouts?

4    A.    I think it was May or June.  I told

5    Charlie I want out.  I want out of

6    everything, and I believe it was.  I am not

7    sure.

8    Q.    Did he ask you why?

9    A.    Because I didn't want to get

10   harassed.  I told him, I says, "I am getting

11   harassed by these creditors, and I don't want

12   it.  I want out."

13   Q.    What was the next thing that took

14   place?

15   A.    I quit claimed everything over to

16   him again.

17   Q.    Okay.  Who prepared the quit claim

18   deeds?

19   A.    I think Charlie's attorney.

20   Q.    Mr. Reynolds?

21   A.    I believe so.

22   Q.    What do you base that knowledge on?

23   A.    I assume he did, because he did the

24   first ones.

25   Q.    In other words, where did you meet

J. CAPORALE - 10/06/00

53

1    to -- do you recall meeting somewhere to sign

2    the quit claim deeds?

3         A.    Yes.    I went to Charlie's office

4    again.

5         Q.    You went to his office?

6         A.    Yes.

7         Q.    You did not retain copies of these

8    other deeds?

9         A.    I had them, but I think my dog got

10   a hold of them and chewed everything up.

11        Q.    Are you serious?

12        A.    Positive.    He loves to chew paper.

13        Q.    Did you ever receive any income

14   from any of the buildings?

15        A.    None, none whatsoever.

16        Q.    Now, I am holding copies of your

17   1998 and 1999 tax returns, federal and

18   state.    And to the best of your knowledge,

19   did you claim any income on these tax returns

20   relating to any of those three properties?

21        A.    Did I claim any income?

22        Q.    Any income?

23        A.    I never received a penny, so why

24   should I claim?

25        Q.    I am just asking.

J. CAPORALE - 10/06/00

54

1    A.    Okay.

2    Q.    Okay.  I will let you take those

3 back.  That is why I asked that question.  So

4 you can keep your original returns.

5    A.    That is okay.

6    Q.    Now, the checks that came in, the

7 rental checks that came in on these

8 properties, were any -- did you ever see any

9 of these rental checks?

10    A.    Never.

11    Q.    Let's talk about the Howell Street

12 property.

13    A.    Okay.

14    Q.    I don't know, as I sit here, how

15 many apartments are in that building.

16 Apparently you don't either.  Was -- after

17 you took title to this property, to the

18 Howell Street property, did you send any

19 notice to any of the tenants that you were

20 now the owner of the property?

21    A.    No.

22    Q.    Did you ever speak to anyone to

23 inform them you were now the owner of the

24 property?

25    A.    No.

CUNNINGHAM REPORTING ASSOCIATES

1          Q.    We already discussed the fact that

2     you never have been to the property?

3          A.    No.

4          Q.    What about the George Street

5     property, did you ever send notice to any of

6     the tenants that you were now the owner of

7     the property?

8          A.    No.

9          Q.    Do you know if Charles Flanagan

10    ever sent notice?

11         A.    Not to my knowledge.

12         Q.    The Howell Street property that we

13    were just talking about, do you know if

14    Charles Flanagan sent notice to any of the

15    tenants that you were the owner?

16         A.    Not to my knowledge.

17         Q.    Do you know if any notice was given

18    to any tenant?

19         A.    Not to my knowledge.

20         Q.    Not to your knowledge as to the

21    Howell Street and George Street properties?

22         A.    Correct.

23         Q.    So, as far as you knew, the tenants

24    were still paying rent to Charles Flanagan?

25         A.    Yes.

J. CAPORALE - 10/06/00

56

1      Q.    They were sending to it a P.O. Box

2  in Hamden?

3      A.    I believe it was, yes.

4      Q.    What about the Whitney Avenue

5  property, which, by the way, is 2790 Whitney

6  Avenue in Hamden, did you ever give notice to

7  any of the tenants that you were now the

8  owner of the property?

9      A.    No.

10     Q.    Do you know if any notice was given

11 to any of the tenants?

12     A.    Not to my knowledge.

13     Q.    Do you recall ever signing any

14 checks from the Whitney Avenue property, rent

15 checks that came in?

16     A.    That came in?

17     Q.    Yes.

18     A.    None.

19     Q.    I am going to show you what is

20 marked -- sir, I am going to actually ask if

21 I could see your tax return again for one

22 moment.  This tax return does not have your

23 signature on it that I can see.  Appears to

24 have Albert Glassman's name at the bottom.

25 Apparently he prepared these?

J. CAPORALE - 10/06/00

57

1          A.   He does.

2          Q.   Okay.  I am going to hand them back

3     to you.

4          A.   Okay.

5          Q.   I am looking at your quit claim

6     deed.  In fact, is that your signature, sir?

7          A.   Yes.

8          Q.   All right.  Sir, I am going to show

9     you what has been marked as Exhibit Number 4,

10    and there's a check and also a signature

11    right here (indicating).  I ask if you

12    recognize that signature?  Is that your

13    signature?

14         A.   No.

15         Q.   All right.  I am going to ask you

16    to look at this check, made out to Joseph

17    Caporale.  Have you ever seen that check

18    before?

19         A.   First time.

20         Q.   All right.  Just for the record,

21    this check is from the Mount Carmel Nursery

22    School.  Have you ever heard of the Mount

23    Carmel Nursery School?

24         A.   No.

25         Q.   This check is dated August 10,

1    1999, and in the amount of $1,100.  And the

2    Mount Carmel Nursery School has a address of

3    3790 Whitney Avenue, Hamden -- actually says

4    Mount Carmel, Connecticut.  I imagine that is

5    a part of  Hamden.

6         A.    That is part of Hamden.

7         Q.    Are you aware they are writing rent

8    checks out to you each month in the amount of

9    $1,100?

10        A.    No.

11        Q.    Do you have any idea who would have

12   signed your name to this check?

13        A.    No.

14        Q.    You have no idea?

15        A.    No.

16        Q.    Let's think who it might be.  Is it

17   possible it was Lisa Flanagan or Charles

18   Flanagan?

19        A.    Could have been.

20        Q.    I am going to show you what has

21   been marked as Exhibit Number 5, and each of

22   these exhibits have two stickers on them.

23   One says Caporale 5, and the other says

24   Creditor 5.

25             This is another check from the

J.  CAPORALE - 10/06/00

59

1    Mount Carmel Nursery School, dated

2    September 10, 1999, made out to Joseph

3    Caporale, and it's in the amount of $1,100.

4    I am going to ask if you would first tell me

5    if you can read that signature on that check

6    that purports to be on the back of that

7    check?  Can you read the name?

8         A.    No.

9         Q.    Is it possible that says Joseph

10   Caporale?

11        A.    It could.  I don't know.

12        Q.    Is that your signature?

13        A.    No.

14              MR. COLEMAN:  Would you like

15   me to address that later or give an

16   explanation?

17              MR. TAIMAN:  We can do it

18   later.

19              MR. COLEMAN:  Very good.

20   BY MR. TAIMAN:

21        Q.    These checks appear to have been

22   deposited into a Fleet Bank account, because

23   it does say "Fleet."  Are you sure you opened

24   up the account at First Union, or was it a

25   Fleet Bank?

CUNNINGHAM REPORTING ASSOCIATES

1        A.    First Union.

2        Q.    First Union.  Would you recognize

3   Charles Flanagan's signature if you saw it?

4        A.    No, not really.

5        Q.    Let me show you what has been

6   marked as Exhibit 6.  Again, it's a check,

7   $1,100, made out to Joseph Caporale for Mount

8   Carmel Nursery School, dated October 9,

9   1999.  I am going to ask if you recognize any

10  of the signatures on the back of that check?

11       A.    None.

12       Q.    Have you ever seen this check

13  before?

14       A.    No, I haven't.

15       Q.    Let me show you what has been

16  marked as Creditor's Exhibit 7, also Caporale

17  Exhibit 7, and again Mount Carmel Nursery

18  School check in the amount of $1,100 made out

19  to Joseph Caporale.  Apparently they

20  misspelled your name.  On each of these

21  checks they use an "E" at the end.  Is it an

22  "I" at the end?

23       A.    E.

24       Q.    So it's spelled correctly.  And the

25  signature was not copied very well, but do

1    you recognize any portion of that signature?

2        A.    No.

3        Q.    Doesn't reflect the lower half of

4    your signature?

5        A.    No, it doesn't.

6        Q.    Show you Exhibit 8, again Mount

7    Carmel Nursery School check in the amount of

8    $1,100, dated December 12, 1999.  This check

9    is made out to Joseph Caporale in care of

10   Charles Flanagan.

11            Do you recognize that signature on

12   the back of that check?

13       A.    No.

14       Q.    Does it look like the signature of

15   Charles Flanagan?

16       A.    I don't know.

17       Q.    You don't know.  This is Exhibit

18   Number 9, another check in the amount of

19   $1,100 from Mount Carmel Nursery School.

20   This is dated February 12, 2000, a check made

21   out to Joseph Caporale in care of Charles

22   Flanagan.

23            Do you recognize any handwriting on

24   the back of that check?

25       A.    No.

J. CAPORALE - 10/06/00

62

1          Q.    Have you seen any of these checks

2     that I have shown you?

3          A.    Never.

4          Q.    If you recognize any of them,

5     please tell me.  This is Exhibit 10, another

6     Mount Carmel Nursery School check in the

7     amount of $1,100, dated May 10, 1999, another

8     check made out to Joseph Caporale care of

9     Charles Flanagan.

10              Do you recognize the signature on

11    the back of that check?

12         A.    No.

13         Q.    All right.  Exhibit 11, Mount

14    Carmel Nursery School check in the amount of

15    $640, not made out to you.  So -- I will not

16    ask you about it.

17              But since it's in my hands, it's

18    made out to Frank Esposito.  Do you recognize

19    any signature on the back of that check?

20         A.    No.

21         Q.    And just for the record, so it's

22    clear, the checks are made out to Joseph

23    Caporale.  With the exception of the last

24    check, these are made out to Joseph Caporale,

25    and in the memo portion it says, "Joseph

J. CAPORALE - 10/06/00

63

1    Caporale, care of Charles Flanagan," and has

2    a P.O. Box 5699 in Hamden, Connecticut 06518.

3              Is that the P.O. Box we spoke of

4    earlier?

5         A.    I believe it is.  I don't know.  I

6    don't have a post office box number.

7         Q.    Okay.  The check I am reading from

8    right now is from Exhibit 12, P.O. Box,

9    dated March 12, 2000, in the amount of $640.

10   I am going to ask you if you recognize any

11   signature on the back of this?

12        A.    No.

13        Q.    Looking at Exhibits 11 and 12, and

14   it appears that the check made out on Exhibit

15   11, the check is made out to Frank Esposito

16   in the amount of $640, who we understand to

17   be a person who did some snowblowing at the

18   Mount Carmel Nursery School, appears to have

19   the signature on the back of it, Charles

20   Flanagan, and the check is made out to Joseph

21   Caporale, which is Exhibit 12, for $640, are

22   both dated March 12, 2000, appear to have the

23   signature, if I am reading this correctly --

24   looks like it says "Esposito" on the back.

25              I think they mixed up the banks of

CUNNINGHAM REPORTING ASSOCIATES

J. CAPORALE - 10/06/00
64

1   those two checks, so we are all on the same

2   wavelength.  All right.

3           I am showing you Exhibit 3, another

4   check for $1,100 from the Mount Carmel

5   Nursery School, dated March 25, 1999, made

6   out to Joseph Caporale.  Now just the

7   handwriting on the back says "Deposit Only."

8   Do you recognize that handwriting?

9       A.   No.

10      Q.   Is that your handwriting?

11      A.   No.

12      Q.   Never seen that check before?

13      A.   No.

14      Q.   Exhibit 15, $1,100 check made out

15  to Joseph Caporale from the Mount Carmel

16  Nursery School, dated November 11, 1999.  Do

17  you recognize any signature on the back of

18  that check?

19      A.   No.

20      Q.   Exhibit 3, $1,100 check from the

21  Mount Carmel Nursery School, dated July 23,

22  1999, made out to Joseph Caporale.  Sir, do

23  you recognize the signature on the back of

24  that check?

25      A.   No.

J. CAPORALE - 10/06/00

65

1        Q.    Finally Exhibit 2, Mount Carmel

2    Nursery School check in the amount of $1,100,

3    dated June 11, 1999, made out to Joseph

4    Caporale.  Sir, do you recognize any of this?

5        A.    No.

6        Q.    You don't recognize the handwriting

7    or anything?

8        A.    No, I don't.

9        Q.    You have never seen any of these

10   checks before?

11       A.    No.

12       Q.    Do you have any idea how your --

13   why your name was on these checks?

14       A.    I have no idea.

15       Q.    Do you have any idea as to why it

16   appears that your name was signed to the back

17   of these checks?

18       A.    I have no idea.

19       Q.    Have you ever spoken to Charles

20   Flanagan about the Mount Carmel Nursery

21   School?

22       A.    No.

23       Q.    All right.  You told him in May or

24   June of 1999 that you no longer wanted to

25   have your name on the properties?

CUNNINGHAM REPORTING ASSOCIATES

J. CAPORALE - 10/06/00

66

1          A.    Correct.

2          Q.    Then when did you meet him?  I

3    apologize if I ask asked you this earlier.

4    When did you meet him to execute the quit

5    claim deeds back to him?

6          A.    I believe it was May or June.

7          Q.    So it would have been somewhat

8    contemporaneous with the phone call?

9          A.    Yes.

10          Q.    Did you ever have any more meetings

11    at Dunkin' Donuts in Branford?

12          A.    I am sure we did.  I am sure we

13    did.

14          Q.    What did you discuss?

15          A.    Again, I told him, "Charlie, I want

16    out.  Take my name off everything."

17          Q.    Well, after you quit claimed the

18    deeds -- excuse me -- after you executed the

19    quit claim deeds --

20          A.    Okay.

21          Q.    -- did you have any more meetings

22    in Branford at the Dunkin' Donuts?

23          A.    I am trying to think.  Maybe once.

24    Maybe once.

25          Q.    Do you recall when that was?  Was

1    it in the summer?

2         A.    Yes, it could have been, yes.

3         Q.    What did you discuss?

4         A.    He just told me that my name was

5    taken off everything.

6         Q.    That was it?

7         A.    Yes.   Then we discussed sports.

8         Q.    Was this at the Dunkin' Donuts?

9         A.    Yes.

10        Q.    Did you ever meet with him at

11   Dunkin' Donuts in Branford where someone else

12   in addition to Charles Flanagan showed up?

13        A.    No, no, just the two of us.

14        Q.    Did you ever discuss any of your

15   business affairs -- when I say "business

16   affairs," I am talking about the three

17   properties -- with anyone other than Charles

18   Flanagan?

19        A.    No, no.

20        Q.    So after he told you that your name

21   was off the properties -- in other words,

22   you sat at the Branford Dunkin' Donuts in May

23   or June of 1999, and you told him you wanted

24   to be off the properties?

25        A.    I told him on the phone first.

J. CAPORALE - 10/06/00

68

1      Q.    Told him on the phone first?

2      A.    Yes.

3      Q.    Then you met at Dunkin' Donuts?

4      A.    Yes.

5      Q.    Was the next meeting, was it --

6   what?  Was there a meeting to actually sign

7   the deeds?  Do you recall signing them?

8      A.    I went to his office for that.  I

9   signed them at his office.

10     Q.    All right.  What month would that

11  have been?

12     A.    I don't know.  I don't know if that

13  was May, June or what, I really don't

14  remember.

15     Q.    What was the next -- after you

16  signed the deeds, did you take them to record

17  them, or did you have anything to do with

18  those deeds after that?

19     A.    I brought them home, and my dog got

20  a hold of them.

21     Q.    You mean your copies?

22     A.    Yes.

23     Q.    The original ones you signed?

24     A.    Where did they go?

25     Q.    Yes.

CUNNINGHAM REPORTING ASSOCIATES

1        A.    I don't know.

2        Q.    Safe to say you left them at his

3    office, the originals?

4        A.    I believe so.

5        Q.    When he deeded the properties to

6    you, gave you -- did you ever see the deeds

7    or did you -- were you just told that, in

8    fact, you were now the owner?

9        A.    I never saw them.

10        Q.    After you signed the deeds putting

11    title back in Charles Flanagan's name --   let

12    me ask you this:  Am I correct in assuming

13    that you deeded them back to Charles

14    Flanagan?

15        A.    Yes.

16        Q.    What was the next time you

17    discussed any of this with him?

18        A.    When?  I don't remember.  I don't

19    remember.

20        Q.    Do you recall what you discussed

21    with him?

22        A.    He just told me that everything was

23    out of my name.  I was out of it.  That was

24    it.

25        Q.    Any further discussions after that?

J. CAPORALE - 10/06/00

1        A.    About the properties?

2        Q.    Yes.

3        A.    No.

4        Q.    Nothing further until recently when

5    you were told there was a problem with the

6    deed.  Is that fair to say?  When you signed

7    the new deeds, quit claim deeds?

8        A.    Yes.

9        Q.    Did any of the tenants at these

10   properties ever attempt to get a hold of you?

11       A.    No.

12       Q.    Were you ever made aware that

13   Charles Flanagan had filed for bankruptcy?

14       A.    No, I didn't know it.

15       Q.    When did you first learn that?

16       A.    When I received this (indicating),

17   the first one.

18       Q.    The first Subpoena?

19       A.    Yes.  Where is it?  This

20   (indicating).

21       Q.    Just for the record, in the

22   Subpoena Duces Tecum, dated September 5,

23   2000, requesting your appearance in court on

24   September 12, 2000.

25             Sir, are aware this hearing was

CUNNINGHAM REPORTING ASSOCIATES

1  continued until October 16?

2      A.  Yes.

3      Q.  You are aware this Subpoena is

4  still in force and effect?

5      A.  Yes.

6      Q.  After you received the Subpoena,

7  did you call Charles Flanagan?

8      A.  I did.

9      Q.  What did you say to him?

10     A.  I told him that I was served with a

11 Subpoena today, and I says, "It's about you

12 filing bankruptcy."

13     Q.  What was his response?

14     A.  He didn't answer.  He didn't go

15 into it.  I didn't ask anymore, because it's

16 not my business.

17     Q.  Between the time that you received

18 that Subpoena, the September 5 Subpoena,

19 where you first learned that he had filed for

20 bankruptcy, and today, what conversations did

21 you have with Charles Flanagan?

22     A.  None.

23     Q.  Did you have any conversations with

24 Lisa Flanagan?

25     A.  None.

J. CAPORALE - 10/06/00

72

1        Q.    Did you have any meetings with

2    them?

3        A.    With Charlie?

4        Q.    Yes.

5        A.    No.

6        Q.    All right.  I know you all walked

7    in together.  Is it by coincidence, chance

8    you came in here today together, or did you

9    meet at his counsel's office first?

10        A.    At the counsel's office.

11        Q.    Okay.  You're pointing to Attorney

12    Skalka's office?

13        A.    That's right.

14        Q.    Okay.  What time did you meet at

15    his office?

16        A.    I never looked at my watch.

17        Q.    Well, this was starting at 12:00

18    o'clock?

19        A.    Must have been 11:30.

20        Q.    What was discussed -- I am not

21    asking for any conversations with your

22    counsel, but what was discussed at his

23    office?

24        A.    What was discussed?

25        Q.    Yes.

J. CAPORALE - 10/06/00

73

1       A.   What do you mean by "what was

2   discussed"?  I met John.  I met the attorney.

3       Q.   Yes.  Did you talk about the fact

4   this deposition was going to be taking place?

5       A.   He told me I was going to go

6   through a deposition, yes.

7       Q.   When you say "he," who is "he"?

8       A.   Attorney.

9       Q.   Attorney Skalka?

10      A.   Yes.

11      Q.   Anything else?

12      A.   No.

13              MR. SKALKA:  For the record,

14  I told him you were a nice guy.

15              MR. TAIMAN:  Thank you.

16              Now, a moment ago when we were

17  going through the various checks, I believe,

18  Attorney Coleman --

19              MR. COLEMAN:  Yes, sir.

20              MR. TAIMAN:  -- you are

21  Mr. Caporale's counsel.  Was there something

22  you wanted to say about these checks?

23              MR. COLEMAN:  Yes.

24                  EXAMINATION

25  BY MR. COLEMAN:


CUNNINGHAM REPORTING ASSOCIATES

J. CAPORALE - 10/06/00

74

1        Q.    Isn't it possible that these checks

2   could have been sent to the P.O. Box without

3   your knowledge?

4        A.    Yes, that is exactly what

5   happened.

6        Q.    They could have been deposited in

7   the account by the people managing the

8   apartment?

9        A.    Exactly.

10       Q.    That is why you didn't recognize

11  the checks?

12       A.    Correct.

13               MR. COLEMAN:    Thank you.

14                    EXAMINATION

15  BY MR. TAIMAN:

16       Q.    Is it possible when you signed all

17  those pieces of paper, when you and Charlie

18  got together and he asked you to sign a

19  number of blank checks, is it possible you

20  signed the back of those checks?

21       A.    No, no.

22       Q.    Other than these properties that

23  we have discussed today, the three pieces of

24  real estate, have you ever engaged in any

25  other business relationships with Charles

J. CAPORALE - 10/06/00
75

1  Flanagan?

2      A.    None.

3              MR. TAIMAN:  I have no other

4  questions.

5              MR. SKALKA:  I have no

6  questions.

7              MR. TAIMAN:  Thank you, sir.

8  We are all set.

9              MR. COLEMAN:  I would like to

10  read.

11              (Whereupon, the witness was

12  excused at 2:00 o'clock p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

CUNNINGHAM REPORTING ASSOCIATES

J. CAPORALE - 10/06/00

76

1

2

3

4             _____

5             Joseph Caporale

6

7             Subscribed and sworn to before

8 me on this ____ day of _____, 2000.

9

10             _____

11             Notary Public

12

13 My commission expires:

14

15

16

17

18

19

20

21

22

23

24

25

CUNNINGHAM REPORTING ASSOCIATES

J. CAPORALE - 10/06/00

77

1                      CERTIFICATE

2    STATE OF CONNECTICUT    )

3                           )   SS.

4    COUNTY OF HARTFORD      )

5

6         I, Jenny C. Ebner, R.P.R., L.S.R., a

7    Notary Public duly commissioned and

8    qualified, do hereby certify that pursuant to

9    Notice, Subpoena and the Federal Rules of

10   Civil Procedure, there appeared before me on

11   The 6th day of October, 2000, at 12:20

12   o'clock p.m., at the offices of United States

13   Bankruptcy Court, 157 Church Street, New

14   Haven, Connecticut, the following named

15   person, to wit:  JOSEPH CAPORALE, who was by

16   me duly sworn to testify to the truth and

17   nothing but the truth of his knowledge

18   touching and concerning the matters in

19   controversy in this cause; that he was

20   thereupon carefully examined upon his oath

21   and his testimony reduced to writing under my

22   direction by computer-aided transcription;

23   that the deposition is a true record of the

24   testimony given by the witness; that the

25   deposition may be signed before any Notary

1  Public.

2       I further certify that I am neither

3  attorney or counsel for, nor related to or

4  employed by any of the parties to the action

5  in which this deposition is taken, and

6  further, that I am not a relative or employee

7  of any attorney or counsel employed by the

8  parties hereunto or financially interested in

9  the action.

10      In witness whereof, I have hereunto set

11  my hand and affixed my notarial seal this

12  ____ day of _____, 2000.

13

14

15              _____

16              Jenny C. Ebner, R.P.R., L.S.R.

17              Notary Public

18

19

20  My commission expires:

21  August 31, 2005

22

23

24

25

J. CAPORALE - 10/06/00

79

1                    I N D E X

2            EXAMINATION OF JOSEPH CAPORALE

3    EXAMINATION                      PAGES

4    By Mr. Taiman                    4, 74

5    By Mr. Coleman                     73

6

7                 CAPORALE EXHIBITS

8                (For Identification)

9             EXHIBIT              PAGE

10           1 through 15           4

11               14                48

12

13   (Reporter's Note:  All exhibits were retained

14   by counsel.)

15

16

17

18

19

20

21

22

23

24

25